```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
 2                       Civil No. 07-05325(JLL)

 3
          - - - - - - - - - - - - - - - -X
 4        JUDY LARSON, BARRY HALL,
          and TESSIE ROBB,             :        TRANSCRIPT OF
 5        individually and on behalf of  :       PROCEEDINGS
          others similarly situated,   :
 6                                     :
                  Plaintiffs,          :        October 21, 2009
 7                                     :
                    -vs-               :
 8                                     :
          SPRINT NEXTEL CORPORATION    :
 9        and SPRINT SPECTRUM, LP d/b/a  :
          SPRINT NEXTEL, and NEXTEL    :
10        FINANCE COMPANY,             :
                                       :
11                Defendants.          :        Newark, New Jersey
                                       :
12        - - - - - - - - - - - - - - -X

13

14

15

16        B E F O R E:

17              THE HONORABLE JOSE L. LINARES,
                UNITED STATES DISTRICT COURT JUDGE
18

19

20
              Pursuant to Section 753 Title 28 United States Code, the
21        following transcript is certified to be an accurate record
          as taken stenographically in the above-entitled proceedings.
22
          s/Phyllis T. Lewis, CSR, CRR
23        - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                        PHYLLIS T. LEWIS, C.S.R., C.R.R.
24        Official Court Reporter - United States District Court
                  P.O. Box 25588, Newark, New Jersey  07101
25                        (732) 735-4522
```

```
 1      A P P E A R A N C E S:

 2              CARELLA, BYRNE, BAIN, GILFILLAN,
                CECCHI, STEWART & OLSTEIN, PC
 3              5 Becker Farm Road
                Roseland, New Jersey 07068
 4              BY:  JAMES E. CECCHI, ESQ.
                     LINDSEY H. TAYLOR, ESQ.
 5                   -and-
                SEEGER WEISS, LLP
 6              550 Broad Street
                Newark, New Jersey 07102
 7              BY:  STEVEN WEISS, ESQ.
                     -and-
 8              FREED & WEISS, LLC
                111 West Washington Street (Suite 1331)
 9              Chicago, Illinois 60602
                BY:  JEFFREY A. LEON, ESQ.
10                   PAUL WEISS, ESQ.,
                Attorneys for Plaintiffs.
11
                KELLEY, DRYE & WARREN, LLP
12              200 Kimball Drive
                Parsippany, New Jersey 07054
13              BY:  JOSEPH A. BOYLE, ESQ.
                     LAURI MAZZUCHETTI, ESQ.,
14                   -and-
                QUINN EMANUEL
15              BY:  DOMINIC SUPRENANT, ESQ.
                865 S. Figueroa Street (10th Floor)
16              Los Angeles, California 90017
                Attorneys for Defendants,
17              Sprint Nextel Corporation,
                Sprint Spectrum, LP, and
18              Nextel Finance Company.

19

20

21

22

23

24

25
```

```
 1        A P P E A R A N C E S  (CONTINUED):

 2
                 LAW OFFICES OF ANTHONY L. COVIELLO, LLC.
 3               307 Montgomery Street
                 Bloomfield, New Jersey 07003
 4               BY:  ANTHONY L. COVIELLO, ESQ.
                    -and-
 5               BOCK & HATCH, LLC
                 134 N. La Salle Street (Suite 1000)
 6               Chicago, Illinois 60602
                 BY:  RICHARD J. DOHERTY, ESQ.
 7                  -and-
                 LAKIN, CHAPMAN, LLC
 8               300 Evans Avenue
                 PO Box 229
 9               Wood River, Illinois 62095
                 BY:  ROBERT J. EVOLA, ESQ.
10               Attorneys for Objector, Jessica Hall.

11               PINILIS HALPERN, LLP
                 160 Morris Street
12               Morristown, New Jersey 07960
                 BY:  WILLIAM J. PINILIS, ESQ.
13                  -and-
                 SCOTT A. BURSOR, ESQ.
14               369 Lexington Avenue (10th Floor)
                 New York, New York 10017
15                  -and-
                 BRAMSON, PLUTZIK,
16               MAHLER & BIRKHAEUSER, ESQS.
                 2125 Oak GroveRoad (Suite 120)
17               Walnut Creek, California 94598
                 BY:  ALAN PLUTZIK, ESQ.,
18               Attorneys for Objectors,
                 Lina Galleguillos, Michael Moore and
19               Antranick Harrentsian.
                 (Also for fees in connection with the Ayaad versus
20               Sprint, Robertson versus Nextel, Molfetas and Lee
                 actions)
21
                 LITE, DE PALMA, GREENBERG & RIVAS, LLC
22               Two Gateway Center (12th Floor)
                 Newark, New Jersey 07102
23               BY:  JOSEPH DE PALMA, ESQ.
                 (For fee application)
24

25
```

```
 1      A P P E A R A N C E S:  (Continued)

 2              WEINSTEIN LAW FIRM
                518 East Tyler Street
 3              Athens, Texas 75751
                BY:  JEFF WEINSTEIN, ESQ.
 4              Attorneys for Objectors,
                Sandra and Kenneth Griffin
 5
                DRINKER, BIDDLE & REATH
 6              One Logan Square
                18th and Cherry Streets
 7              Philadelphia, Pa. 19103
                BY: WILLIAM M. CONNOLLY, ESQ.
 8              Attorneys for AT&T Mobility, LLC

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE CLERK:  All rise.
 2                    THE COURT:  Good morning.
 3                    Please be seated.
 4                    All right.  This is in the matter of Larson, et al.
 5          Versus Sprint Nextel, et al.
 6                    Counsel, your appearances for the record, please.
 7                    MR. CECCHI:  James Cecchi, Carella, Byrne, and
 8          Lindsey Taylor for the class.
 9                    With me today, your Honor, is Stephen Weiss from
10          Seeger Weiss --
11                    MR. WEISS:  Good morning, your Honor.
12                    MR. CECCHI:  -- and Jeff Leon and Paul Weiss from
13          Freed & Weiss.
14                    MR. LEON:  Good morning, your Honor.
15                    MR. PAUL WEISS:  Good morning, your Honor.
16                    MR. BOYLE:  Good morning, your Honor.
17                    Joe Boyle with Lauri Mazzuchetti from Kelley, Drye
18          & Warren on behalf of Sprint.
19                    With us today is Dominic Suprenant from the Quinn
20          Emanuel firm in Los Angeles, also counsel to Sprint.
21                    MR. SUPRENANT:  Good morning.
22                    THE COURT:  Good morning.
23                    MR. EVOLA:  Robert Evola, Lakin Chapman on behalf
24          of the Hall objectors.
25                    THE COURT:  I'm sorry.  What was your name, sir?
```

```
 1                    MR. EVOLA:  Robert Evola.

 2                    THE COURT:  And who do you represent?

 3                    MR. EVOLA:  The Jessica Hall objectors.

 4                    THE COURT:  Okay.

 5                    MR. DOHERTY:  Richard Doherty, Bock & Hatch, also

 6          on behalf of the Hall objectors.

 7                    MR. PINILIS:  Good morning, your Honor.

 8                    Billy Pinilis for the Galleguillos objectors, along

 9          with Scott Bursor and Alan Plutzik.

10                    MR. PLUTZIK:  Good morning, your Honor.

11                    Alan Plutzik, I am also appearing today on behalf

12          of the counsel who are applying for fees in connection with

13          the Ayaad versus Sprint, Robertson versus Nextel, Molfetas

14          and Lee actions.

15                    MR. COVIELLO:  Anthony Coviello, local counsel for

16          objector, Jessica Hall.

17                    MR. WEINSTEIN:  Your Honor, Jeff Weinstein on

18          behalf of Sandra and Kenneth Griffin, objectors.

19                    MR. DE PALMA:  Good morning, your Honor.

20                    Joseph DePalma, on behalf of Lite, DePalma,

21          Greenberg & Rivas in connection with the fee application.

22                    MR. CONNOLLY:  Good morning, your Honor.

23                    William Connolly, counsel for defendant, AT&T.

24                    THE COURT:  Now, just so you understand, when you

25          get up to speak, remind me who it is that you represent
```

1    again.  I think I have it, but just remind me of that.

2              As I see it, Mr. Weinstein, you are the only new

3    objector that is here.  We received other objections, but

4    the only one that is here represented by counsel is you, so

5    I intend to take you first when we get to the objectors.

6              MR. WEINSTEIN:  Thank you, your Honor.

7              THE COURT:  All right.

8              For the other objectors and the attorneys who are

9    here, I will tell you the following:

10             I have the transcripts from the last hearing.  In

11   fact, I have them with me.

12             I have your arguments that were made in connection

13   with today's hearing, some of which are identical to what

14   was made before.  It is not my intent or desire to rehash

15   everything that already has been said.  You protected the

16   record.  I have your arguments.  I will incorporate it into

17   my final opinion in this matter.

18             I do not intend this to be another four-day

19   hearing.  It is not necessary.  We have already talked about

20   it, and the Court is well aware of everybody's positions

21   with regard to everything.

22             To the extent you have something new to say,

23   certainly with regard to the notice, I guess, we can have a

24   conversation about that.  But to the extent that you have

25   objections to the reasonableness or the attorneys' fees or

1    whatever else it may be, that has already been argued, and

2    we don't need to argue that again.  I think that is for

3    everybody's benefit.

4         By way of background, this is a class action

5    involving a claim by plaintiff that the early termination

6    fees that have been referred to throughout the history of

7    this case as the ETFs charged by Sprint violate, among other

8    things, the Federal Communications Act and the State

9    Consumer Protection Laws.

10        The plaintiff, Judy Larson, is a citizen of

11   Washington, whose subscriber agreement with Sprint contained

12   an ETF provision and who apparently was charged an ETF.

13        This matter was filed in this court and then

14   underwent several days of mediation with Retired Federal

15   Judge Nicholas H. Politan, and that culminated into a

16   proposed settlement agreement on December 8th, 2008.

17   I preliminarily certified the class.

18        Thereafter, I entered a preliminary approval order.

19   At that time I set forth a schedule addressing the final

20   approval process, and the time line culminated in a four-day

21   hearing before this Court that started on March 12th, 2009

22   and ended on March 17th, 2009.  During these four days the

23   Court addressed numerous objections and heard testimony from

24   at least two expert witnesses that I recall.

25        I thereafter ruled that the publication component

1    of the initial notice plan complied with Rule 23(c)(2), but

2    that the individual notice component of the initial notice

3    plan did not.  A proposed amended notice plan was then

4    submitted on May 21st, 2009, which I approved on June 2nd,

5    2009.

6          Presently before the Court is the scheduled hearing

7    in the parties' joint application for final approval of the

8    class settlement.

9          That pretty much sets forth the background of what

10    has transpired here.  Obviously, I will set it forth in more

11    detail in my ultimate opinion in this case.

12          So having said that, Mr. Cecchi, I guess we will

13    hear from you first, and then we will hear from Sprint, and

14    then we will hear from Mr. Weinstein.

15          Is it Weinstein or Weinstein?

16          MR. WEINSTEIN:  It's Weinstein, your Honor.

17          Thank you, Judge.

18          MR. CECCHI:  Thank you, Judge.

19          Since we last appeared before your Honor, there has

20    only been a limited number of items which I would like to

21    address to your Honor, which I would consider to be new and

22    not previously covered in the extensive and thorough

23    examination and inquiry that we had the last time.

24          The first is that your Honor issued a thorough,

25    thoughtful, detailed, extensive opinion concerning the

1    notice and publication component.

2         We then, Sprint, and the class counsel, submitted

3    an amended notice plan after there was an extensive interim

4    motion practice, which your Honor is aware of, motion for

5    reconsideration, opposition, motion by the Bursor group to

6    basically vacate all of your Honor's previous orders and

7    writ of mandamus to the Third Circuit, which was denied.

8         Following that litigation, we submitted an amended

9    notice plan on notice to everybody.  Your Honor considered

10   the amended notice plan and issued an order, which Sprint

11   and class counsel diligently and faithfully carried out.

12   The amended notice went out to the class.  The amended bill

13   insert went out to the class, a direct mail piece went out

14   to the Robertson class and the other individuals identified

15   by Sprint, so that has changed.  We carried out your Honor's

16   order diligently and faithfully.

17        The other piece that has changed since the last

18   time is your Honor has considered and granted final approval

19   to a factually legally identical case in the case of

20   T Mobile.  That was a case where the Bursor and Plutzik

21   group did not object to the consideration paid by the

22   defendant, did not object at all, but sought attorneys' fees

23   in that case.

24        Your Honor issued a thorough and detailed and

25   thoughtful opinion in that case, which granted final

1      approval and also set the framework for an analysis, we

2      believe appropriately, for the consideration of attorneys'

3      fees, so that, too, has changed.

4           And all of those factors, those two points, simply

5      buttress all of the arguments, which we made before, which I

6      will not repeat, as your Honor directed us not to do, and I

7      don't think it is necessary, because we're all familiar with

8      it.  We have all seen this before.  We have all read the

9      script, and we know the objections that were raised before,

10      which your Honor overruled.

11           So when we get back down to the basics here, we

12      have a robust and appropriate settlement of this case.  We

13      think it is fair.  It compares to the other cases which your

14      Honor is aware of, the Verizon case and the T Mobile case,

15      and it compares favorably given what we consider to be the

16      defense verdict in Ayyad, which in our judgment diminished

17      the value of these cases.  And they will take a different

18      position, and your Honor knows those arguments.  The point

19      being that it's fair, it's reasonable, it's adequate under

20      any benchmark, all of which your Honor knows about, and

21      therefore, this settlement, as T Mobile and as Verizon

22      should receive your Honor's blessing and final approval.

23           The final point I would make, Judge, is that we've

24      got objectors before your Honor, all of whom seek legal

25      fees.  Different concepts and different analyses should be

1          applied in our judgment to those objectors.

2                    There are objectors who made objections the last

3     time who are no longer before your Honor seeking to dissolve

4     the common fund.  I point to Mr. Strange, Strange &

5     Carpenter, made an objection, and they have withdrawn that

6     objection.

7                    The common fund doctrine, as your Honor knows, we

8     cited it to your Honor, says that lawyers who preserve or

9     create a common fund for the benefit of others in equity

10    should be entitled to recover from that same common fund.

11                   The converse is also true, your Honor, that lawyers

12    who seek to destroy and dissolve the common fund cannot in

13    good conscience and under the law and factually with a

14    straight face come to your Honor and say, "Judge, it is the

15    worst settlement ever.  It's a charade.  It's a joke,

16    dissolve the common fund, let's go on with our litigation,

17    but still pay us for causing all of the consternation we

18    have done, so dissolve the fund and give us our fees."

19                   Of course, in the T Mobile case, where your Honor

20    applied Cendant in a detailed and thoughtful way, T Mobile

21    framework, the very same lawyers who object here, who seek

22    to dissolve the fund seek to be paid and were paid in that

23    case, but nevertheless appealed, but we think the impediment

24    is the --

25                   THE COURT:  Well, what if the lawyer's argument and

```
 1    efforts lead to, for example, as may have happened in this
 2    case, to the Court considering part of the process and
 3    saying, hey, you know this wasn't right, you have to
 4    contribute something at that point --
 5              MR. CECCHI:  I think that that's --
 6              THE COURT:  -- that is not destroying the fund, but
 7    it's trying to add to the fund --
 8              MR. CECCHI:  -- I think your Honor is on to the
 9    second tier of the objector analysis, which is you start
10    with the proposition that ordinarily an objector is not
11    entitled to fees.
12              However, if the lawyer raises an objection that
13    substantially benefits the class, your Honor has discretion
14    to give them a fee.
15              We don't quarrel with that.  We also don't quarrel
16    with the notion, Judge, here that what occurred in terms of
17    the bill insert and the direct mail piece to Robertson is a
18    benefit.  We set that forth in our brief.
19              The question is:  How do you quantify that benefit.
20              They agree with us that it is exceedingly difficult
21    to quantify, indeed impossible.  I think it is on page 11 of
22    Mr. Bursor's brief.  I think it is impossible to actually
23    quantify it.
24              So if your Honor got over the intellectual hurdle,
25    and I think it is a conceptional and intellectual hurdle
```

    1        that is indeed hard to breach or hard to get over, that you

    2        can simultaneously seek to destroy the fund, but recover

    3        from it, because I think that is the principal impediment to

    4        the Bursor group, and I just want to put a footnote on that,

    5        Judge, that there are other lawyers --

    6            THE COURT:  Excuse me a second.

    7            Go ahead.

    8            MR. CECCHI:  -- I think the footnote on the common

    9        fund impediment would be there are other lawyers who will

   10        address your Honor, who stand slightly different than Mr.

   11        Bursor.  Mr. Plutzik, of course, right?  That will be, and I

   12        will let him speak for himself, that will be Mr. DePalma.  I

   13        think he will be differently situated than them because he

   14        is no longer sitting over here objecting where he was

   15        before.

   16            He is sitting back there, so I think the common

   17        fund doctrine prevents you from getting to the substantial

   18        benefit doctrine.

   19            But if your Honor did, in all candor, I think there

   20        is a benefit that inured to the class by virtue of the bill

   21        notice and the mailing.  There absolutely is.  So the

   22        question then would become if we get to that analysis, which

   23        again you know my argument was why the common fund prevents

   24        you, what is it worth.

   25            They didn't give you any coherent analysis as to

1    how you can quantify or value that benefit.

2          We gave you a number of different methodologies

3    that we think fairly capture the value, and there are a

4    number of precedents in this area that are particularly

5    interesting,

6          The Home Stores case we sent to your Honor, where

7    the enhanced notice that went out to the class in a massive

8    securities case out on the West Coast was much more

9    important than what happened.

10         In Home Stores the court concluded that but for the

11   enhanced notice or new notice, the class wouldn't have been

12   able to claim at all.  There wouldn't have been any claims

13   because the notice wouldn't have gotten to the class until

14   after the claim period ended.  In that case the court

15   awarded the objector $8900.

16         What that illustrates is that there is a broad

17   range of discretion available to your Honor, and we have

18   given you the range.

19         One theory or one approach that I think would be

20   entirely appropriate is to look at what they objected to and

21   what they achieved.  They threw a lot of stuff at the wall,

22   most of which your Honor rejected.

23         By my calculations, ten percent of their objections

24   were sustained and 90 percent were not, so they have a

25   lodestar on the objections of $750,000.  Ten percent of that

```
 1        would be an approximation of the value of the benefit that
 2        your Honor sustained.  They can't get credit for all of the
 3        objections that they raised the last time, which your Honor
 4        rejected in the opinion.  That obviously didn't benefit the
 5        class.
 6              So the other analysis, which is in my brief, is
 7        based upon the value by doing a calculation from the claims
 8        that came in since the notice, but the footnote there, and
 9        they admit this, is we just don't know exactly what number
10        of those claims is attributable to what they did and the
11        original notice, because the claim period was open.  Claims
12        were coming in anyway, and the claims would have come in for
13        another 60 days irrespective of what happened, so we don't
14        know where it ultimately would have ended up.
15              But if you give them credit for 25 percent of all
16        of the claims that came in, you get to a fee of about
17        $250,000.  So if you got the Home Store range on the low
18        end, and you have the high end, which we have given you, we
19        all agree, your Honor has discretion, and you are in the
20        best position to judge.  You saw it.  You know what
21        happened.  You are in the best position to apply your
22        Honor's discretion and say this what I think is fair.
23              Of course, again, I note, I have my common benefit
24        argument, which says these guys because they want to destroy
25        the fund in the first instance are not preserving or
```

```
 1        creating anything, so they can't then with the same face

 2        come to your Honor and say, well, destroy that anyway.

 3               As to the value of the -- I call it the T Mobile

 4        framework, because that is also another issue before your

 5        Honor today, what is the value of the pre-appointment work

 6        that the Bursor group, the Plutzik group performed.

 7               The big picture point that I want to make, and I

 8        know your Honor is aware of it, we did not settle their

 9        case.  This is not exactly T Mobile.  In T Mobile, of

10        course, they had a case in California, which was released as

11        part of the T Mobile case, and we presented your Honor with

12        an analysis which was about 16 percent of the national

13        class.

14               Here, and it amazes me to this day, we did not

15        settle their case.  We intentionally carved their case out

16        of our settlement, so they are free to litigate Ayyad

17        forever, and I hope they win.  I hope they recover for that

18        class as much as they can, and I hope they get paid as much

19        as they can, but that big picture has to be filtered into

20        your Honor's analysis as to what is appropriate here.

21               We did not settle their big case.  We intentionally

22        left it to them, but yet, they come before your Honor and

23        they throw all of the infectum that they do at us throughout

24        this proceeding even though we left them their case

25               So what are the other cases worth?
```

```
 1              I gave your Honor our judgment as to whether those
 2    cases under the T Mobile framework benefited the class.
 3              Our judgment is they did not.  Molfetas, that is
 4    the case in Florida that was dormant, nothing of moment
 5    occurred in that case.  The Lee case was filed after our
 6    appointment in this case.  It was solely filed as a
 7    procedural tactic.
 8              The only thing that ever happened was some dispute
 9    over Mr. Bursor's pro hac vice status, and then it was
10    stayed because your Honor preliminarily approved this
11    settlement.  Nothing of value occurred in Lee.
12              Ayyad, I think a fair application of the T Mobile
13    framework says you don't get paid for Ayyad.  Mr. Plutzik,
14    Mr. Bursor can get paid for Ayyad in California.
15              They can't come here and say, "I want to be paid
16    for Ayyad."
17              It is not part of this case.  It's not released.
18    Cendant and T Mobile prevent them from being paid in Ayyad.
19    If anything, Ayyad diminished the settlement value of this
20    case.  It's clear, Mr. Suprenant and Mr. Boyle will speak to
21    that, but Ayyad is in California.  Let them be paid there.
22              Can they be paid?
23              Is there a benefit that accrued to the class for
24    the consequence of the work they performed in the subscriber
25    portion of their case in California?
```

1           Now, remember, Ayyad was split into two cases, the

2      payer case, i.e., the people who came out of pocket and paid

3      ETFs and the subscribers who did not, who were current

4      Sprint subscribers.

5           There is a quantum, Judge, that we would submit can

6      be -- you could make a logical argument that there is a

7      benefit that accrued to this case because we swallowed up

8      the California subscribers, right?

9           Our brief tries to come up with the framework there

10     as well, and what we believe is appropriate is, you know,

11     let's look at how the subscribers are treated here, let's

12     look at how Mr. Bursor was treated in Verizon, where he

13     didn't get a dollar recovery, and they get dollar recovery

14     here, and we did an analysis based upon the number of

15     subscribers in California that they had a representation of.

16          So we posited that formula and we also said you

17     could make a logical argument that they worked on that case,

18     it is released, and under T Mobile they should be paid.

19          It is hard for me to say that given everything else

20     that they say to try to destroy our settlement, but

21     nonetheless, T Mobile applied fairly I think would justify a

22     quantum that we outlined for the subscriber portion.

23          Beyond that, Judge, I don't have anything further.

24          THE COURT:  Well, one thing.

25          Mr. Griffin's objections raise some new things.  Do

```
1    you want to address them now, or do you want to address them

2    after Mr. Weinstein sets forth his objection?

3              MR. CECCHI:  I think I would prefer to address them

4    after Mr. Weinstein, if that would be acceptable to the

5    Court.  I just want to look at my notes on Griffin.  If it

6    would --

7              THE COURT:  He takes issue with the definition of a

8    class, for example, which is new, and takes issue with

9    reasonableness also, but that is kind of interrelated with

10   the definition of the class, I think.

11             MR. CECCHI:  Right.

12             I think he's -- on the definition of the class, the

13   Griffin objector is confusing nouns and verbs.  He talks

14   about how a class can't be ascertainable if you are defining

15   it by reference to people's subjective mind sets, and that's

16   not what our class definition is directed to.

17             What it says is:  If your claim, not if you claim,

18   if your claim, i.e., what you have actually claimed in your

19   pleading is related to an ETF, that is part of the class, so

20   it is the difference between nouns and verbs as opposed to

21   subjective intent, which is clearly not what we were

22   capturing, and I don't think the class definition does.

23             Griffin I think also, and I didn't mention this,

24   and we had some colloquy the last time about it, he objects

25   to the quote, unquote, unreasonable of the cypres provision,
```

```
 1        which your Honor noted in your opinion.

 2                There is a very fundamental point that I wish to

 3        make --

 4                THE COURT:  I guess the cypres, too, has been

 5        amended somewhat since our last hearing --

 6                MR. CECCHI:  I would, hum --

 7                THE COURT:  -- I think, if I remember correctly, I

 8        did a lot of reading in this case, but I know there was a

 9        new proposal with regard to cypres, which basically said

10        either, you know, give them three minutes to a charitable

11        organization like the military or whatever it was, or to be

12        determined as the Court deems appropriate, except that it is

13        not meant to be a reversion to defendant --

14                MR. CECCHI:  Right.

15                The comment that I would make in reference then,

16        Judge, is as follows, and I think the first point I make is

17        important.

18                There was never ever an objection filed prior to

19        the hearing by Mr. Bursor or anybody else to that provision

20        of the settlement agreement.

21                THE COURT:  Except the Court still had discretion

22        to take you to task on that, and I did.  I had a little

23        problem with it and I said so.

24                MR. CECCHI:  Right.

25                The point from our perspective was when it was
```

```
1        raised on the third day, we said to your Honor, our intent

2        was never to have a reverter.  Sprint said that the intent

3        was, we believed, that it was a cypres provision and that an

4        appropriate exercise or fulfillment of the cypres would be

5        for guys overseas in the military.

6                Now, we have been criticized for that, and the

7        point I want to make about it is, we didn't intend a single

8        dollar would ever go back to Sprint ever.  I said that then

9        unprepared because that was always my understanding and

10       Sprint's understanding.  It wasn't supposed to be cash going

11       back to them.  If we didn't articulate it clearly in the

12       settlement agreement, I think your Honor appropriately

13       pointed it out.  The idea was cypres under your Honor's

14       discretion, and our stipulation which your Honor has noted

15       says it unequivocally, it's not a reverter.

16               Judge, we discussed it in the mediation.  There is

17       not a reverter.  It's not a reverter.

18               The change I think would be what would be that, if

19       the military is not a good exercise of our discretion here,

20       both sides are happy to have whatever cypres remedy your

21       Honor thinks is appropriate, whatever charitable

22       organization is appropriate.  We are happy to use those

23       dollars in consultation with everybody in that manner.

24               What I think that says to the Court and what I

25       repeatedly tried to say to the objectors is:  It is not a
```

1    reverter.  We didn't agree to a reverter, and never would

2    have agreed to a reverter, and Mr. Griffin goes after or

3    attacks that provision as well.

4            I hope our stipulation is clear.  We did wish to

5    address your Honor's comment in your opinion, which

6    obviously appropriately addressed the issue that was raised,

7    but we think at this point it is a bogeyman, as we described

8    in our brief.  It doesn't exist.

9            THE COURT:  All right.

10           MR. CECCHI:  Thank you, Judge.

11           THE COURT:  I will hear from Sprint's counsel.

12           Mr. Boyle?

13           MR. BOYLE:  Good morning.

14           Joe Boyle from the law firm of Kelley, Drye &

15   Warren on behalf of the Sprint defendants.

16           Your Honor, I am going to have some brief remarks

17   and confine myself to the notice issue.

18           Mr. Suprenant is going to address the

19   reasonableness of the settlement.

20           Your Honor, I think what is important here, and it

21   dovetails a little bit with Mr. Cecchi's remarks about the

22   Bursor group seeking to claim funds because they enhanced

23   the notice and then presumably enhanced the take rate as a

24   result, so I think with that framework in mind, it is

25   important to look at the events as they unfolded.

1           Your Honor ordered that we supply an amended notice

2    plan.  Class counsel and Sprint did that.  We filed it on

3    ECF.  It was served on Mr. Bursor, and it was served on the

4    Hall objectors, and it was served on Mr. Strange.

5           At that point in time Mr. Hilsee was in tow.

6    Everybody was on board.  They could have taken a look at it.

7    They could have said, hey, you know, this still doesn't get

8    it done, and here are the reasons why.

9           If your Honor had gotten those considerations

10   before your Honor, I don't think they have any merit, but at

11   least your Honor would have considered them prior to the

12   time of approving the amended notice plan.

13          We think the law of the case likely bars them from

14   raising it now, but to the extent the Court has a fiduciary

15   obligation to require notice, we understand --

16          THE COURT:  If you think about it, though, even

17   though we had a prior fairness hearing, I am just thinking

18   procedurally, and I thought about that, but procedurally it

19   is really a brand new fairness hearing, right, to which

20   there was a new notice issued.  So therefore, to the

21   extent -- well, what makes Mr. Bursor and their group

22   different is that they were aware of what happened with the

23   last notice, they were aware of the changes I intended to

24   make, and they had an opportunity to challenge it at that

25   point, and they didn't, but I don't know if that

1    procedurally necessarily forecloses them from making some

2    arguments about it today.

3          MR. BOYLE:  I understand that, your Honor, although

4    I do think it goes to the credibility of those arguments.

5          THE COURT:  Right.  It may go to weight as opposed

6    to admissibility.

7          MR. BOYLE:  The only point I wanted to make, your

8    Honor.

9          And with respect to publication notice, your Honor,

10    obviously your Honor considered at the initial fairness

11    hearing an extensive presentation of evidence and argument

12    on that point, and after reconsideration determined

13    publication notice was Rule 23 compliant, so we are not

14    going to argue that again, and I don't think that there is

15    any reason to entertain argument on it again.

16          Other than Mr. Hilsee's affidavit, the second

17    affidavit that has been submitted here, I don't think there

18    has been much dedication to that issue, and we obviously

19    rest on our submissions that were accepted by the Court

20    and the previous testimony of Mr. Vasquez and the arguments

21    against it, that were rejected by the Court, so that really

22    leaves us to mail notice.

23          Again, the focus of the mail notice with respect to

24    the issue of reasonable efforts to identify individual class

25    members was really the Rice declaration and to a lesser

```
1          extent Mr. Dupon's certification.

2                  As we sit here today, your Honor, nothing in the

3          Rice declaration has been rebutted by any competent

4          evidence.  Not a single word he said has been rebutted.

5          Nobody has taken him on, on the underlying facts of what he

6          said about the effort that it would take.  There is no

7          expert who went in and looked at Sprint's data environment

8          and said, he is wrong, you could do X.

9                  You don't have that, your Honor, so Mr. Rice's

10         declaration stands before you as completely unrebutted.  And

11         I believe as a factual matter, your Honor has the record

12         that your Honor needs to confirm what your Honor found when

13         you found the amended notice plan to be appropriate.

14                 What the Rice declaration and the Dupon submission

15         confirmed, your Honor, is the difficulty that would be

16         encountered in attempting to create a partial class list or

17         a class list, and we submitted that.  Your Honor looked at

18         it.  Your Honor determined that is correct.  We don't need

19         to pour over those records to try to find it.

20                 Really the only contention that is not just a

21         previous statement or an argument unsupported by the

22         evidence about the facts of Mr. Rice's declaration is Mr.

23         Bursor's contention that we needed to give your Honor a

24         numeric statement of what the anticipated results of each of

25         those endeavors would be, but there is no case law that says
```

1           that.  There is case law that does have anticipated results,
2           and there's case law that doesn't.  For example, Carlo
3           doesn't have any anticipated results.
4                   But your Honor noticed in your opinion and the
5           Nissan court has noted that it is a pragmatic test, and
6           there is no formula.
7                   So the notion there has to be some, you know, a
8           numeric statement of anticipated results does not find
9           support in the law.  Obviously your Honor knew at the time
10          based upon the four days of preliminary approval hearing and
11          from all of the submissions in this case, that the class was
12          numbered in the millions, and that if Sprint was going to
13          undertake these efforts, lists containing millions of people
14          would likely be found.
15                  Sprint could not give you an idea of what that
16          number would be, nor can Mr. Bursor, which, your Honor, I
17          would note, we moved to strike Mr. Bursor's supplemental
18          declaration and Mr. Weir's declaration as late and also
19          unhelpful to the Court.
20                  But what was interesting in Mr. Bursor's
21          declaration is that he waived around the number 9.2 million
22          with great vehemence in his brief, and then apparently when
23          he hired an expert to actually look at it, he knocked that
24          number more than in half, down to 4.1 million just like
25          that.  What that shows you is they don't have any idea what

1          they are talking about, and it's pure guess work.

2                  What they did was they searched the collectibility

3          analysis done by an algorithm from our general ledger.  It

4          doesn't -- it's not an analysis of class members, so it is

5          not going to give you a notion of how many class members

6          might have been identified if this endeavor was undertaken,

7          but nobody doubts that number would be large.  Your Honor

8          knew that the number would be large when you considered the

9          submissions.

10                 So the only real argument that they have, the

11         anticipated results argument, it's bogus.  It's not

12         supported, and it doesn't have to be numeric, and your Honor

13         had before you when you considered it, the notion that the

14         endeavor would produce a large list.

15                 So we think that, you know, the rest of the Bursor

16         objections on this, for example, the challenges to Mr.

17         Rice's credibility, one is, you know, it wasn't done in

18         conformance with the rules of evidence.  The case law makes

19         it clear that rules of evidence don't apply strictly in a

20         fairness hearing, and Mr. Bursor hasn't cited a case that

21         says they do.

22                 Then he says, well, Sprint is able to identify

23         customers, you know, to bill them the ETF or to settle the

24         debt, but he still disregards the fundamental premise, which

25         I think your Honor noted in March, what was clearly part of

```
 1        Mr. Rice's declaration is we -- certainly we can charge the

 2        ETF, but we don't sort customers that way.  We don't keep

 3        track of them by ETF charges, so every one of the examples

 4        that Mr. Bursor gives is just a restatement of the same

 5        problem, the same problem that we came to you originally,

 6        the same problem identified by Mr. Rice, and nothing Mr.

 7        Bursor has done through his legal arguments and his lack of

 8        expert testimony and lack of factual foundation changes any

 9        of that.

10              Again, I close on this notion, your Honor, the Rice

11        declaration stands unrebutted.  Today it is unrebutted.  As

12        a result, you are in exactly the same position factually as

13        you were the day you approved the amended notice plan, and

14        there is simply no reason to change that decision.

15              Thank you, your Honor.

16              THE COURT:  Thank you.

17              MR. SUPRENANT:  Good morning.

18              THE COURT:  I see you had your exhibits delivered.

19              MR. SUPRENANT:  I did, your Honor.  I'm sorry for

20        the delay.

21              Dominic Suprenant, Quinn Emmanuel for Sprint.

22              Your Honor will recall that in March I addressed

23        the issue of the adequacy and fairness of the settlement,

24        and I responded to the objections.

25              THE COURT:  Yes, you did.
```

```
 1                And to the extent that you did, I know today is a
 2      fairness hearing, so you have to make obviously a record as
 3      to the fairness today again, but you don't have to be as
 4      comprehensive as you were last time because a lot of the
 5      arguments apply to what we did back in March, true?
 6                MR. SUPRENANT:  Absolutely, your Honor.  That was
 7      the next thing I was going to say.
 8                THE COURT:  Okay,
 9                It is my intent to finish this hearing today, so
10      take that into consideration, and go ahead and tell me
11      whatever you have to say.
12                MR. SUPRENANT:  It is my hope that we will finish.
13      I hope, I fervently hope we will finish today.
14                What I was going to say, your Honor, is that in our
15      brief, we argued the Girsh factors, and I don't want to
16      repeat that argument.
17                One of the primary drivers of that argument, your
18      Honor, was that the result in the Ayyad versus Sprint ETF
19      case powerfully confirmed the fairness and the adequacy of
20      the settlement.
21                And Mr. Bursor claims at page 31 of his objections,
22      that he actually was awarded - that's the verb he used -
23      over $299 million, and potential recovery here he said is
24      1.2 billion, and therefore, it is woefully inadequate.
25                Your Honor, I will be guided by your Honor because
```

1        I was going to address three points.  I was going to address

2        that point and show it is a fabrication.  Plaintiff's loss

3        in Ayyad, they have been litigating for six years.  It is an

4        endless hole that the class would never see --

5              THE COURT:  Didn't we go through this last time

6        extensively?

7                  They think they want you to think they lost --

8              MR. SUPRENANT:  Your Honor, I was going to address

9        that.  I was going address the Hall objection, and I was

10       going to address the Griffin objection.

11           What I was going to inquire of the Court is I

12       understand your Honor's desire for efficiency, and I

13       actually thought it would be better --

14             THE COURT:  I am not trying to curtail any new

15       arguments, but to the extent it is the same thing, and we

16       are going to argue about whether they were successful or not

17       successful in Ayyad, and what that contributed towards the

18       settlement and all of that, I have it, and that is old.

19       Right?  That is nothing new.

20             Nothing has changed since the last time we were

21       here, has it?

22             MR. SUPRENANT:  Well, there has been some

23       additional clarification from Judge Smith.

24             THE COURT:  To that extent, I think people should

25       now talk to me about that and how that changes anything, if

1    it does or not.

2         MR. SUPRENANT:  Your Honor, just to cut it short,

3    what I was going to propose to your Honor is rather than

4    talk any more now, I think it might be more efficient to

5    have the objectors speak to the extent your Honor allows

6    them to, and then I will know what in your Honor's view I

7    will need to respond to.

8         THE COURT:  What I am going to do is I will let

9    them talk about anything new that happened in Ayyad, and to

10   the extent that that affects or should affect my reasoning

11   in this case, I think in fairness to them that should be

12   brought out.

13        To the extent that they are going to rehash

14   everything that we already talked about regarding Ayyad the

15   last time, I am not going to hear about it.

16        So we can do it your way, and we can wait to see

17   what they say about that, but if you know there is something

18   new, and you want to address it now, you can, too.

19        MR. SUPRENANT:  Well, your Honor, one thing is, and

20   I think my presentation is a little longer than 15 minutes,

21   but I think that --

22        THE COURT:  Then I don't want to prolong it.  Go

23   ahead.

24        (Laughter)

25        You're are on the clock.  It's ten of eleven.

```
 1                    MR. SUPRENANT:  There is a spectrum, your Honor,
 2          where it gets completely old and completely new.
 3                    What I was planning to address is somewhat in the
 4          middle, and I think what I would respectfully request of
 5          your Honor, I'll just stop now, and I'll see what your Honor
 6          allows them to say, and then I'll respond to that.  I think
 7          that would be most efficient.
 8                    THE COURT:  Fine.  Go ahead.
 9                    MR. SUPRENANT:  Thank you, your Honor.
10                    THE COURT:  All right.
11                    We will hear from Mr. Weinstein or Mr. Weinstein,
12          I'm sorry.
13                    MR. WEINSTEIN:  We are all related, Judge.
14                    (Laughter)
15                    May it please the Court --
16                    THE COURT:  Good morning.
17                    MR. WEINSTEIN:  -- good morning, your Honor.
18                    Jeff Weinstein from Athens, Texas.
19                    I appreciate your allowing me to speak on behalf of
20          Kenneth and Sandra Griffin of Fruitville, Texas.
21                    They are category one class members who were
22          charged for and paid an ETF charge.  Your Honor, I'm only
23          going to discuss two of our objections today, but I can tell
24          from how the Court has responded, that you certainly will
25          entertain all of our written objections, and we appreciate
```

1          that.

2                    THE COURT:  I will.

3                    MR. WEINSTEIN:  The first objection is the class is

4          not adequately defined, and before I explain why, I would

5          like to point out to the Court that it is unclear what

6          definition the parties are proposing.

7                    The settlement agreement contains two different

8          definitions, your Honor, one at page 19 in the definitions

9          section, and one at pages 54 to 56 regarding their agreement

10         to amend the complaint's class definition.

11                   Note in any additional parentheticals in the second

12         class definition, now, the notice did not contain the

13         parenthetical definition, but oddly class counsel's brief

14         filed just last week.  Document 382, page 9, uses the

15         parenthetical definition, not the definition in the notice,

16         so we don't even know what definition class counsel are

17         proposing today.

18                   But most importantly, your Honor, the definition

19         violates the Third Circuit decision of -- I'm going to botch

20         it up, I apologize -- Chiang vs. Veneman, C-h-i-a-n-g versus

21         V-e-n-e-m-a-n, and that is at 385 F.3d 256, 272 (3d Circuit)

22         (2004).

23                   THE COURT:  The issue with the word "claim"?

24                   MR. WEINSTEIN:  The issue with the word "claim."

25         That's exactly right, your Honor.

```
 1                    THE COURT:  Doesn't that relate to what a person
 2       claims in their --
 3                    MR. WEINSTEIN:  Your Honor --
 4                    THE COURT:  -- subjective issue in that case,
 5       right, as opposed to what the claim is, as opposed to, you
 6       know, the claim that is being submitted, which is more of an
 7       objective thing?
 8                    MR. WEINSTEIN:  -- your Honor, in this case the
 9       definition relates to the person, open quote, whose claims
10       relate in any way to an early termination fee, period, close
11       quote.
12                    That is the exact provision that the Third Circuit
13       said is not allowed in the class definition, the exact
14       verbiage.
15                    The second objection I wanted to discuss is the
16       cypres component.  There are two parts to our objection.
17                    First, there should not even be a cypres provision
18       because any unclaimed money should be paid to class members
19       who do make claims.
20                    Second, if there is a cypres, it should be in the
21       full amount of the unclaimed money.
22                    The settlement provides that Sprint can donate
23       calling cards in the amount of the unclaimed funds, but
24       those credits cost Sprint less than the face value.
25       Obviously cost Sprint less if the calling card has a dollar,
```

```
1          it costs them less than a dollar.

2                 The amount of credit should be increased, so that

3          Sprint's out-of-pocket expense for that donation is equal to

4          the amount of the unclaimed funds.

5                 And, again, your Honor, thank you very much for

6          allowing me to be heard today.

7                 THE COURT:  I am actually typing what you are

8          saying.

9                 Just hang on a second.

10                I am a little confused about the cypres argument.

11         You just said that the people who make claims should be

12         allowed to get that fund.

13                MR. WEINSTEIN:  Yes.  Let me just --

14                THE COURT:  I thought cypres was to the extent that

15         there no claims were made, and there was money left over,

16         that money would then go by way of the settlement --

17                MR. WEINSTEIN:  -- what I am saying, your Honor, is

18         obviously there are people who are going to make claims.

19         Instead of having cypres, the money should just be

20         proportionately paid --

21                THE COURT:  Proportionately paid to those who do

22         make the claim --

23                MR. WEINSTEIN:  Absolutely.

24                The second point was about the value of the calling

25         card.
```

```
1                    THE COURT:  That I understand.
2                    Okay.   Thank you.
3                    MR. WEINSTEIN:   Thank you very much, your Honor.
4                    THE COURT:   Thank you for coming all the way from
5          Texas.
6                    MR. WEINSTEIN:   Thank you.
7                    MR. CECCHI:   Judge, can I briefly address the last
8          point that Mr. Weinstein made as to the calling card issue,
9          just very briefly?
10                    THE COURT:   Yes.   Why don't you do that, and then I
11         will hear from -- you were going to address the Griffin
12         objections, you said before.
13                    MR. SUPRENANT:   Yes, your Honor.
14                    THE COURT:   Now, I will hear from Mr. Cecchi and
15         then at least we can get Mr. Weinstein back on the plane, if
16         he wants to leave.
17                    MR. CECCHI:   I think Mr. Weinstein's --
18                    THE COURT:   Weinstein.
19                    MR. CECCHI:   -- Weinstein's last point was that if
20         there is a delta between the dollars that went back to
21         Sprint and the cost Sprint incurred in purchasing those
22         cards, our position would be if at the end of the day we get
23         to point where the Court and parties are comfortable with
24         the military calling card proposal we made, it has always
25         been my understanding, and we would be happy to -- we said
```

```
 1          it before in the third day of hearing, it is dollar for
 2          dollar.
 3                  So if Sprint got a dollar back, and it was your
 4          Honor's decision to use the calling card, then they can use
 5          the whole dollar, so it's the dollar that they get back
 6          would be used to purchase whatever that resulted in calling
 7          cards for the military.
 8                  That is what I said before, the last time we were
 9          here, and we certainly agree with that now.
10                  The footnote again being that --
11                  THE COURT:  What do you say about his proposal,
12          that the money that's left over should be distributed
13          proportionately to all members of the class?
14                  (Mr. Cecchi indicating)
15                  What kind of a legal argument is that?
16                  (Laughter.)
17                  I never heard that one before.
18                  MR. CECCHI:  I don't know if we can put that on the
19          transcript, but I think that is something that we would talk
20          to your Honor about when we got there, that that would be,
21          you know -- if as opposed to a cypres remedy, you know, we
22          would have to think about it.
23                  THE COURT:  It is certainly something I could think
24          about.
25                  MR. BOYLE:  Your Honor, if I could just make a
```

```
 1      point on that --
 2              THE COURT:  I thought you would have an issue.
 3              (Laughter)
 4              MR. BOYLE:  First of all, if you read the language
 5      in the cypres agreement in the settlement, there is no
 6      language that says Sprint makes a profit on this.  Sprint
 7      doesn't even have a calling card business.  They would have
 8      to buy them, so, you know --
 9              THE COURT:  So why do you care then --
10              MR. BOYLE:  We don't care --
11              THE COURT:  -- whether it goes into a calling card
12      or it gets distributed proportionately to the members of the
13      class?
14              MR. BOYLE:  -- we don't care.  That's the point.
15      This is becoming some kind of a huge issue that doesn't
16      exist --
17              THE COURT:  It is not a huge issue.
18              MR. BOYLE:  -- but with respect to redistributing
19      to the class members, I think one of the things that's
20      important to remember is at the time we negotiated the
21      settlement agreement, at least it was my presumption, there
22      wasn't going to be a lot whole lot of money left over.  So
23      to go back and spend all of that money, you know, to
24      redistribute the money might eat up whatever was left over,
25      so that's why we negotiated and came up with the cypres
```

 1          because we thought it was the right thing to do.

 2                  That's all.

 3                  MR. CECCHI:  Thinking about it, Judge, the problem

 4          potentially with that suggestion in just thinking about it,

 5          and Mr. Weinstein raised it, it could result in a situation

 6          where a class member received more than his actual damages,

 7          but it would have to be something that we would have to

 8          analyze and look at, right?

 9                  That would be my concept.

10                  THE COURT:  All right.

11                  I don't consider this a main issue, but it is an

12          issue to deal with.

13                  I assume, too, Mr. Boyle, that to the extent that

14          there is some administrative expenses associated with that,

15          maybe, you know, from whatever the funds are that are left

16          over, we can figure that out.

17                  MR. BOYLE:  Absolutely, your Honor.

18                  That is why we said in the stipulation that

19          obviously the Court has the final say on it in any event.

20                  THE COURT:  All right.

21                  MR. SUPRENANT:  Thank you, your Honor, again.

22                  Griffin objects to the reasonableness of the

23          settlement, and as your Honor pointed out, it really

24          piggybacks on the claim that the class --

25                  THE COURT:  Defined --

```
1                    MR. SUPRENANT:  -- and so since it is not
2        ascertainable, you can't figure out if it is reasonable, and
3        that is just wrong.  He makes two arguments.
4                    One argument is --
5                    THE COURT:  Excuse me a second.
6                    (Court and Clerk confer)
7                    Go ahead.
8                    MR. SUPRENANT:  -- one argument he makes is that
9        the definition of a class is too long, and he doesn't
10       analyze it.  He doesn't point out any ambiguity.  He just
11       has a word count.  And we in our reasonableness brief, we
12       cite, I think at Note 19, that our data indicates almost 90
13       percent of the class can understand and read the notice and
14       understand and read the class definition, so we think that
15       the word count doesn't go anywhere.
16                   Then the second point he makes, which your Honor
17       already has, is that the Chaing case uses "claim" as a verb
18       to mean subjective intent and says you can't ascertain
19       subjective intent.
20                   "Claim," as we use it, means a claim that you put
21       forth in a complaint, which is obviously ascertainable.
22                   So I think those are the answers both to whether
23       the class notice is sufficient, and they respond to the --
24       to the reasonableness objections, and that's all I have on
25       that, your Honor.
```

```
1                    THE COURT:  Thank you.

2                    All right.

3                    Now, do we have any lawyers here that are objectors

4        now that have a time issue that they want to get back to

5        wherever they came from and want to speak first?

6                    Is there anybody that needs to be accommodated?

7                    If not, then I will just take them in order.

8                    Who wants to go first?

9                    MR. BURSOR:  Your Honor, I do.

10                   THE COURT:  Mr. Bursor.

11                   MR. BURSOR:  Yes.

12                   May I?

13                   THE COURT:  You may.

14                   MR. BURSOR:  Thank you, your Honor.

15                   THE COURT:  Mr. Bursor, I am not inclined to make

16       life difficult for you.  I just want to narrow you to new

17       arguments and new things, to the extent that something new

18       has happened in Ayyad.

19                   Look, you are a zealous representative of your

20       position, and I have all of your briefs.  I have the

21       transcripts and what you said the last time here, and I even

22       had my law clerk do a chart juxtaposing some of the

23       arguments to what was said before in the transcript, and a

24       lot of it is identical, so I don't want to go through that

25       again.  I am also trying to streamline the hearing, so I
```

 1    would ask as a courtesy to the Court that you abide by that

 2    now when you make your presentation.  Okay?

 3              MR. BURSOR:  Thank you, your Honor.

 4              I will do my best.

 5              I also would like to finish this in a day because I

 6    have another obligation tomorrow, so I will try.

 7              I want to start out by moving to strike the

 8    declaration of Scott Rice under Federal Rule of Evidence

 9    601.  He's not a common witness.

10              602, he lacks personal knowledge.

11              Rule 701 sets forth opinion testimony by a lay

12    witness.

13              Rule 702 sets forth expert testimony by a lay

14    witness without qualification, lacking sufficient facts and

15    data, and not the product of reliable principles and methods

16    applied by the witness.

17              802 is hearsay.

18              We put these objections in our papers, your Honor,

19    and the response that we got was -- we got two responses

20    from Sprint.

21              They didn't say he does have personal knowledge.

22    They didn't even say that he actually talked to somebody who

23    had personal knowledge.

24              Your Honor, at pages five to seven of our brief, we

25    have a three-page block quote of his deposition testimony,

```
 1    where he said:  I didn't talk to anybody at Amdocks.  I
 2    don't know when the meeting was at Amdocks.  I don't know
 3    who from our company talked to Amdocks, other than Nancy
 4    Roberts, maybe there were some other people.  He didn't
 5    know, and he literally has zero personal knowledge for the
 6    matters set forth in his declaration, so we make that motion
 7    to strike.
 8              I don't know how the Court will rule on that.  I
 9    think it would be helpful going forward, you know, if we
10    knew that because the arguments might branch in different
11    directions.
12              But Sprint's response to that was two things:
13              One, they said that we are estopped because we
14    didn't raise the objections earlier when they submitted the
15    Rice declaration with the amended notice plan, which was in
16    late May, and then 12 days later, your Honor approved the
17    amended notice plan.  There was no motion to approve it.
18    There was no --
19              THE COURT:  Well, you were on notice, though.
20              MR. BURSOR:  Pardon me?
21              THE COURT:  You knew about it.
22              MR. BURSOR:  I knew they submitted it, and we were
23    looking at it.
24              It is difficult to -- it is an expert intensive
25    type thing, so we knew you had it.  We knew your Honor had
```

1          it.

2                    THE COURT:  And you knew what it was.

3                    MR. BURSOR:  I knew what it was.  I read it.

4                    THE COURT:  Okay.

5                    MR. BURSOR:  Okay.  And I didn't know if your Honor

6          was going to issue a briefing schedule to say if anybody has

7          a response to this, file it.

8                    I didn't see a notice of motion that said, please

9          take notice that this is the day your brief is due, so that

10         I could --

11                   THE COURT:  Mr. Bursor, in the history of this

12         case, that has never stopped you.

13                   I could tell you that as of last night I got a

14         declaration from Weir or whoever it was, and I got it

15         yesterday, and that wasn't contemplated in my October 7th

16         order either, so that has never stopped you from submitting

17         papers to this Court.

18                   In fact, there has been a plethora of objections

19         and briefing done without me even requesting it, so I don't

20         know that that would have stopped you from doing it.

21                   MR. BURSOR:  Well, there was 12 days, 12 days to

22         respond to an expert, essentially an expert report, although

23         the guy is not an expert.  Mr. Rice doesn't have any

24         personal knowledge.

25                   So to say that we are estopped because between the

1    12 days they filed it and this Court approved it, we didn't

2    file something in 12 days, I think is a stretch.

3         So if that is going to be the grounds for

4    overruling our objections, you know, I don't think that's

5    fair.

6         THE COURT:  What do you say is the second part?

7    You said to respond in two ways.  One, that you were

8    estopped, and what is the second thing?

9         MR. BURSOR:  The second thing I said was, and Mr.

10   Boyle repeated it today, the Federal Rules of Evidence don't

11   apply.  That is the second argument.  We don't have to

12   comply with the Federal Rules of Evidence.

13        They said Mr. Bursor has cited no case that says

14   the Federal Rules of Evidence don't apply.

15        But, your Honor, Federal Rule of Evidence 101 -- I

16   wanted to grab a copy, so I get it correct.

17        Federal Rule of Evidence 101, quote:  These rules

18   govern proceedings in the courts of the United States and

19   before the United States Bankruptcy Judges and United States

20   Magistrate Judges, to the extent and with the exceptions

21   stated in Rule 1101, and then Rule 1101 has a very long list

22   of exceptions.

23        But there is no exception for Rule 23, a fairness

24   hearing.  There is no exception that even remotely applies

25   to the situation, so I think it is crystal clear that the

```
 1        Federal Rules of Evidence do apply here, and I think if that
 2        was clear to your Honor on March 12th when your Honor
 3        applied the Federal Rules of Evidence to strike the
 4        testimony of Mr. Vasquez, the expert witness, that class
 5        counsel presented on March 12th, and your Honor struck it,
 6        the Federal Rules of Evidence were the basis for that, so
 7        the Federal Rules of Evidence do apply.
 8             Mr. Rice's declaration is undisputed that it does
 9        not comply with the Federal Rules of Evidence.  It is not
10        even close.  It is fourth-hand hearsay at best.  It should
11        be stricken.
12             There is an additional reason to strike it.  The
13        additional reason to strike Mr. Rice's declaration is that
14        we have been denied the opportunity to cross-examine him on
15        any of the matters set forth in his declaration, and it is
16        not because we didn't take his deposition.
17             We sent a lawyer to Kansas City in February to
18        depose Mr. Rice.  It was Mr. Fischer.  He went there at my
19        direction.  And I know your Honor recalls you got a phone
20        call during that deposition because there were about 25
21        instructions not to answer during the one-hour deposition.
22        But the testimony that Mr. Rice gave that day, and that is
23        quoted at length in our objections at pages five to seven is
24        I don't know anything about this.  I didn't talk to anybody
25        who knows anything about this.  I didn't attend a meeting
```

```
 1      about this.   I don't know what year the meeting occurred
 2      about this.
 3              That is the deposition that we got.
 4              So Mr. Boyle comes to court today, and he says, you
 5      know, with grandiosity, the Rice declaration stands before
 6      you unrebutted.
 7              What opportunity did we have to rebut it?
 8              There was 12 days between when it was submitted and
 9      when it was approved.
10              When we sent our guy out there to take his
11      deposition, he said, I don't know anything.
12              How do we -- what rebuttal can we possibly give?
13              Mr. Boyle also says, there is no expert that has
14      gone in to look at Sprint's data bases and put in an expert
15      report saying there is a problem there.
16              Well, that is true, because that's what we want to
17      do, and we have not been given the ability to do that.  And
18      when we filed our objection, we said we would like to talk
19      to the people at Amdocks.  We don't want to hear what
20      Amdocks told to Ms. Roberts, who told it to Mr. Boyle and
21      wrote it on a piece of paper that was then signed by Mr.
22      Rice who then came to the deposition and said I don't know
23      anything about it.
24              We would like to get real facts, because we think
25      the Court deserves to have the facts on this critical issue.
```

1       Obviously it's the most hotly disputed issue in connection

2       with this settlement, and the Court doesn't have any

3       competent evidence on it from these folks.

4               Now, I don't know if your Honor is going to rule on

5       the objection or not because I could fork my argument and

6       streamline the argument, if the Rice declaration were

7       stricken, I think I would have a much shorter argument.

8               So now we get to the issue of, okay, let's say

9       Rice's declaration is not stricken, and the Court accepts

10      his estimates.  What do those estimates show?

11              And we put in our brief that it looks to us based

12      on the figure Sprint reported that there were about 9.2

13      million accounts that were charged ETFs that would be

14      identified during the time period Mr. Rice described.

15              And it turns out Sprint came back and said, well,

16      there might be a lot of business and Government accounts in

17      there, and if they have a valid criticism of us, that we

18      take note of it, and so we did.

19              So I asked Mr. Weir to check with the data base we

20      had to see what proportion was Government and business

21      accounts, and we reduced our numbers accordingly, and we

22      revised our Table II that was in our objection, we revised

23      that and submitted a revised version with my second

24      supplemental declaration.

25              So what does that show?

```
 1                   It shows that just going back to April of 2007,
 2        which Mr. Rice said would cost a hundred-thousand dollars to
 3        do, they would identify somewhere in the neighborhood of 4.2
 4        million class members.
 5                   Now, Sprint says, well, maybe there is some
 6        problems with how Bursor calculated this number, okay,
 7        but it is undisputed -- they don't dispute that there would
 8        have been millions of class members identified through this
 9        effort,
10                   At page 16 of their brief, Docket Entry 390, they
11        say, quote:  A list containing millions of settlement class
12        members would result from the efforts set forth in the Rice
13        declaration.
14                   Not that it could result or might result, but that
15        it would result.
16                   THE COURT:  Isn't that at the end of the day a
17        pragmatic analysis of what it would take to do that?
18                   MR. BURSOR:  Yes.
19                   THE COURT:  Okay.
20                   MR. BURSOR:  Now, what kind of a pragmatic analysis
21        is that?
22                   Is it just free form, we do whatever we want, or is
23        there some legal precedent that guides us?
24                   I would submit there is a legal precedent that
25        guides us, and that is the Nissan case, which your Honor
```

1          cited in the order from April that sustained our objections.

2                    And what Nissan says, 552 F.2d at 1099, quote:

3                    In every case reasonableness is a function of

4          anticipated results, costs, and amount involved, close

5          quote.

6                    Nissan didn't say in this case that is how you do

7          it, or in some cases or in most cases.  In every case it is

8          a function of anticipated results, and what it would cost.

9                    And Nissan also goes on to say that a search may

10         have been omitted -- quote:  A search may be omitted only if

11         its cost will exceed the anticipated benefits.

12                   Now, we have some data that tells us what are the

13         costs and what are the benefits.

14                   When your Honor issued an opinion on May 2nd

15         approving the amended notice -- excuse me a moment, your

16         Honor -- it was the June 2nd order.

17                   So the June 2nd order is the one that approved the

18         amended notice plans, Docket No. 344, and at page two is the

19         entire discussion of this issue.

20                   THE COURT:  Okay.

21                   MR. BURSOR:  Quote:  Additionally, the Court is

22         satisfied upon examining the declaration of Scott Rice,

23         Sprint's Vice President of Customer Billing Services, that

24         it would be unreasonable to require Sprint to engage in

25         further efforts to individually identify additional class

1     members.  The time, cost and effort associated with pouring

2     through and analyzing the various Sprint data bases are not

3     reasonable, and the Court finds that individual notice as

4     outlined above is sufficient to satisfy Rule 23, Thus, the

5     new individual notice plan is approved in full.

6          Now, I can't remember the list of adjectives that

7     Mr. Cecchi used about how thorough and thoughtful the

8     analysis of this issue was, but what I have before me is one

9     paragraph from this order.  That was the entire analysis of

10    this issue, and what is missing from the analysis is any

11    discussion of the anticipated results, which Nissan says

12    have to be considered in every case.

13         In order to make a reasonable analysis, there has

14    to be a weighing of the costs and benefits.  That is how one

15    would do a pragmatic reasonable analysis.

16         Now, what are the costs?

17         I submit that the costs are trivial, and Mr. Weir

18    has submitted a declaration, and he is in the courtroom

19    today, and if necessary, we can call him to the stand,

20    although I hope to abbreviate the proceedings here.  In our

21    view this could have been done in 15 minutes at a trivial

22    cost.

23         What is in the record, unless it is stricken, is

24    Mr. Rice's declaration saying it would cost a

25    hundred-thousand dollars.

1          If it would cost a hundred-thousand dollars to

2     identify millions of class members, and there is no dispute

3     that this is a computerized search, there is no dispute that

4     this is some kind of a crap shoot, maybe we will identify

5     the class members, maybe we won't.  That is not an issue.

6     We will identify the class members.  That's admitted.

7          There is no contention that the list is stale or

8     that there is any problem with it.  Nobody has to manually

9     pour over punch cards or anything like that.  This is

10    pushing a button on a computer.  If it costs a

11    hundred-thousand dollars to do that, as Mr. Rice, you know,

12    says, based on what somebody, who told somebody, who told

13    somebody, who told him, if it costs that much, that is still

14    pennies per class member.  Even if that only identified a

15    little over 4 million class members, which was the revised

16    figure that we provided the Court, that is about 2.4 cents

17    per class member.

18         What are the criteria by which that was determined

19    to be an unreasonably large effort?

20         There is nothing in the June 2nd order from this

21    Court that says that -- that identifies what the criteria

22    were, that discusses the anticipated results at all.  And

23    so, your Honor, that is why, you know, we contend that even

24    if the Court accepts the Rice declaration and does not

25    strike it, the Court still has to go back and revisit this

1      reasonableness analysis because it was not done in

2      connection with the June 2nd order.

3            The reason it was not done is because the parties

4      did not provide the Court with the information that they had

5      an obligation to provide to the Court and that Nissan said

6      should be considered in every case.  So now we got, you

7      know, based on what Mr. Rice says, we know we can identify

8      class members for about two cents per class member.

9            We looked at the language at the last hearing about

10     how a large class requires a large effort and it makes a

11     larger effort reasonable, et cetera.

12           So we went back and we looked at the Oppenheimer

13     case from the Supreme Court, 437 U.S. 340.  That was a case,

14     your Honor, where the Court found that it would cost $16,580

15     in 1973 to identify 121,000 class members.  It is 13.7 cents

16     per class member in 1973 without adjusting for inflation.

17           If you adjust it for inflation, it is about 67

18     cents per class member.  It's about 27 times more than what

19     it would cost here, and the Supreme Court said that is

20     reasonable, and that must be done.  And yet here when it

21     cost only two cents per class member, the contention is we

22     shouldn't do it at all.

23           Your Honor, I also reference the Court to the Third

24     Circuit's decision in the Orthopedic Bone case, 246 F.3d at

25     page 327, footnote 11.

```
 1                  The Orthopedic Bone case was one where a class
 2      member came in late and tried to file a claim late, so it
 3      wasn't a fairness hearing.  The class members shows up
 4      that --
 5                  THE COURT:  Was that case quoted in your briefs?
 6                  MR. BURSOR:  Yes.
 7                  THE COURT:  I don't remember it, but go ahead.
 8                  It's footnote 11 that you are referring to?
 9                  MR. BURSOR:  Yeah.  Page 327, footnote 11, and I
10      can tell your Honor --
11                  THE COURT:  That's okay.  You can tell me.  I will
12      look it up anyway.
13                  MR. BURSOR:  So a class member shows up late.  He
14      is tardy, and the parties say, Judge, disallow the claim
15      because he is late, he got notice, and he didn't come in on
16      time.
17                  The notice was a notice by publication only, so the
18      Third Circuit said it is not really fair to penalize this
19      class member because he didn't see a small advertisement
20      that was on page 50 of a magazine he doesn't receive.
21      That is not a very good notice, so we are not going to
22      penalize him for being late, and we will allow his claim.
23                  Then they added a footnote, and the footnote says,
24      and I'm paraphrasing, your Honor, but the footnote says:  If
25      this is a recurring issue that comes up in the District
```

```
1        Court, so we would be remiss if we did not express our
2        concern and provide some guidance on what better practices
3        are.
4               So now we have the Third Circuit saying, we are
5        concerned about these publication notices, and we want to
6        let the District Courts know what we think.  Here are some
7        better practices.
8               Then they quote from the class members' brief,
9        where he said they could have done this, and they could have
10       done that.  They could have asked hospitals and doctors to
11       identify patients that got orthopedic bones -- screws in the
12       bones.
13              They could have sent out a general "Dear Doctor"
14       letter, saying if you know any patients that got these
15       orthopedic screws in their bones, please provide them to us,
16       we want to give them individual notice.
17              They could have placed ads in orthopedic trade
18       publications seeking people to identify these class members.
19              Then at the end of the footnote, the Third Circuit
20       says:  Some combination of these would have constituted a
21       reasonable effort to identify class members.
22              So this is an indication.  It is a guidance.  It is
23       not a holding.  It is guidance from the Third Circuit on
24       what they think is reasonable.
25              We can also look at Carlo, your Honor, where
```

```
1     efforts like those were made, where the parties didn't have
2     a data base the way Sprint has.  So the parties had to send
3     out "Dear Doctor" letters or run advertisements, saying if
4     you know people that might be class members, tell us, so we
5     can send them an individual notice.
6              That was done in Carlo, and the Third Circuit said,
7     it should have been done in Orthopedic Bone.
8              Yet, here, where they already have the names, and
9     they could get them with the push of a button, they didn't
10    send out the notices.
11             Now, Mr. Boyle said that Carlo, Carlo is one of the
12    cases where these ads were run to try to find class members
13    and give them individual notice.
14             I am sure the Court understands this, but I am
15    talking not about an ad with the notice.  I am talking about
16    an ad designed to identify the people, so that they could be
17    sent an individual notice.
18             So Mr. Boyle says, there was no data provided to
19    the Court in Carlo on what the anticipated results of that
20    effort would be, how many class members would be identified,
21    and that is correct.
22             But how could they know, you know, how could they
23    know the anticipated results of an effort like that because
24    that is kind of attenuated, placing an ad and saying if you
25    know people, let us know.
```

 1              So he is correct.  There were no results there, but
 2       the more important point, your Honor, is that in Carlo the
 3       effort was made.  They did it.
 4              And so when we go back to Nissan, and we say a
 5       search may be omitted only if its costs will exceed the
 6       anticipated benefits, they didn't omit the search in Carlo.
 7       They did the search, and so they didn't have to present data
 8       on the anticipated benefits of the search because they were
 9       not omitting it.  They were doing it.
10              Your Honor, on the individual notice point, the
11       last thing I would like to say on that issue, and I will go
12       on to the other notice issues more briefly, is that we now
13       have some data to see what the effect was of actually giving
14       individual notice in this case because the first notice that
15       went out here that we objected to, and our objection was
16       sustained, had no individual notice whatsoever, and we asked
17       for discovery of the updated claims data, and we didn't get
18       it.  But what we did get was some declarations from Mr.
19       Kareem that were submitted by class counsel providing a
20       little bit of the updated data.
21              Your Honor, I just wanted to go get a chart that I
22       prepared from those data.
23              THE COURT:  What you did get was what, Mr. Kareem?
24              MR. BURSOR:  Pardon me?
25              THE COURT:  You said you asked for updated data,

```
 1          but what you did get was what?
 2                  MR. BURSOR:  Class counsel submitted a declaration
 3          from a fellow at Gelardi named Mr. Kareem -- what was his
 4          first name?
 5                  MR. CECCHI:  It's Karen Carmen.  It was a women.
 6                  MR. BURSOR:  Oh, Karen Carmen.  I'm sorry.
 7                  Okay.  Ms. Carmen.  I never met Ms. Carmen, so I
 8          was going by the name, your Honor.
 9                  THE COURT:  All right.
10                  MR. BURSOR:  So we wanted reports like the reports
11          we put in last time.
12                  We didn't get that.
13                  We got Ms. Carmen's declaration, and Ms. Carmen
14          reported the number and amount of claims that came in during
15          the first notice period, and the number and amount of claims
16          that came in after the amended notice was done as a result
17          of our initial objection, and I would like to present the
18          Court with a summary of that, if I may.
19                  THE COURT:  Go ahead.
20                  (Documents handed to the Court)
21          Do you have an extra copy for my law clerk?
22                  MR. BURSOR:  Yes.
23                  THE COURT:  I'll mark this as Bursor 1.
24                  (Exhibit Bursor 1 marked.)
25                  MR. BURSOR:  Your Honor, there is some information
```

```
 1      on here about fees.  I will not focus on that now.  I will

 2      talk about that later.  I am only talking about the notice

 3      right now.

 4              The initial notice that went out with no individual

 5      notice at all and with just the publication, according to

 6      Ms. Carmen's declaration, paragraph 2, Docket Entry 404-2,

 7      that resulted in 12,100 in claim forms being filed, and

 8      19,105 lines, and the cash value of those claims was

 9      $810,800, and if we hadn't come in here and objected, that

10      would have been the end of it.

11              There would have been no further notice, and there

12      would have been a very, very small trickle of a few more

13      claims while the claim period remained open.

14              The reason I say a very, very small trickle is

15      because with no notice, you get no claims.

16              Now, according to the declaration of Ms. Carmen,

17      that is at Docket Entry 384-4, since the second notice was

18      issued as a result of our objection, there have been 44,808

19      additional claims filed on an additional 66,913 lines, and

20      the cash value of those claims is almost two and a half

21      million dollars.

22              Now, what does this tell us?

23              Well, what it tells me is that the first notice was

24      really bad because it was with a second notice that had no

25      additional publication, and that was still defective for
```

1      many reasons that we outlined in our papers.

2              Make no mistake, the second notice was still a bad

3      notice.  It did not meet Rule 23's requirements.  But even

4      as bad as the second notice was, it produced 3.7 times the

5      number of claims.  That is how much more effective

6      individual notice can be, and the individual notice only

7      went out to about 200-some-thousand former customers.

8      248,000 roughly was the number I saw from the papers, and of

9      course, you had the new bill insert that went out to the

10     current customers, about 15 million of those.

11             So with the additional individual notice, as bad as

12     it still was, we got almost four times the number of claims.

13             What that shows is that if you actually identify

14     people, you make a reasonable effort to identify them, and

15     you actually send them a notice that says something, not

16     like that bill insert that we spent two days on at the last

17     hearing, but an actual notice that has some information in

18     it, all of a sudden, now you got 66,000 new claims.  And so

19     these class members, if they get notice, they will file

20     claims.

21             And if the efforts described in the Rice

22     declaration, which are conceded by everybody, that they

23     would identify millions more of class members, if those

24     efforts were undertaken, you would have hundreds of

25     thousands of more claims.

1          There's no doubt about it.  I don't think anybody
2     would dispute that or could dispute that.
3          So, your Honor, we think that is further evidence
4     of the inadequacy of the notice.
5          Now, there are some other notice issues that we
6     raised previously, some of which there is new information
7     on.  I will try to go through those as efficiently as
8     possible.
9          In the prior hearing, your Honor, we criticized the
10    reach of the publication plan and the publication and what
11    they called the mail notice plan combined.
12         Since then we submitted a new declaration for Mr.
13    Hilsee, who recalculated the reach based on the amended
14    notice plan, found that the calculated reach is only 66
15    percent, and with respect to the former customers, those who
16    are due the lion's share of the settlement funds, as your
17    Honor found in the order from April, the former customers
18    who paid or were charged ETFs, the reach was less.  It was
19    approximately 50 percent, and it remains at that level after
20    the amended notice plan.  That is in Mr. Hilsee's affidavit.
21         Your Honor, if I could -- we didn't know -- I was
22    told by Mr. Boyle that there would be some objection or
23    motion to strike the second affidavit, and so I asked Mr.
24    Hilsee to come from Philadelphia today, who said he would be
25    present to testify in case that was necessary to address

1       some objection.

2               I learned this morning that there will be no

3       objection or motion to strike, and so if that is the case,

4       then we will not need to put Mr. Hilsee on the stand.

5               MR. BOYLE:  Your Honor, I object.

6               Mr. Bursor sent an email on Saturday that asked us

7       to provide him with the grounds for any motion to strike,

8       otherwise, Mr. Hilsee would not be here.

9               We did not provide him with those grounds.  He

10      brought Mr. Hilsee here on his own.  The idea that I caused

11      this man to come from Philadelphia needlessly is just an

12      inaccurate statement.

13              I have the email, if your Honor would like to see

14      it.

15              THE COURT:  You can send Mr. Hilsee home.

16              MR. BURSOR:  Okay.

17              Mr. Hilsee, thank you.

18              Your Honor, just to take care of the business while

19      we are on it, I also brought Mr. Weir, who is prepared to

20      testify today to the ease with which Sprint's data bases can

21      be sorted.

22              There has been an objection.  Mr. Boyle articulated

23      an objection to Mr. Weir's testimony.

24              And so that I would have the opportunity to examine

25      Mr. Weir to cure any perceived defect, he is here, and so if

1          the Court --

2                   THE COURT:  I have your declaration from Mr. Weir.

3          I don't need to hear testimony on it.  I will consider it,

4          and I will accept or reject whatever parts I feel are

5          necessary.

6                   MR. BURSOR:  Okay.

7                   So then we can dispense with that thankfully, your

8          Honor, and that was my hope, so I appreciate that.

9                   Other new material concerning the contents of the

10         notice, Mr. Hilsee reviewed the amended notice plan, and the

11         new notice that was included there, and details the ways in

12         which it, too, departs from the FJC models in the best

13         projects described in the FJC model, so that is new

14         evidence, and that is in the record in Mr. Hilsee's

15         declaration.

16                  The class definition, your Honor, we raised the

17         same objection as the Griffin objectors did.  I don't want

18         to belabor that, but we said essentially the same thing,

19         which is the Third Circuit in the Chaing case said you can't

20         define a class by reference to, quote, claims.

21                  Class counsel came back and they said, well, this

22         "claims" is different because this "claims" is objective.

23         It is not based on somebody's subjective state of mind.

24                  The way class counsel expressed it in their brief,

25         it was at page 20 of their brief on the notice.

1            They said, quote:  Whether someone is in the class

2    does not depend on their subjective state of mind, but upon

3    the objective content of the subject matter of the claim

4    they have asserted.

5            So if we are to take class counsel's spin on this

6    claim language, whether you are a member of a class or not

7    depends on whether you've asserted the right kind of a

8    claim.

9            Well, what if you have not asserted any claim,

10   which is 99.9 percent of the people covered in this -- that

11   they believe are covered in this class.

12           If you are sitting at home, and you get this

13   notice, actually you'd see it on page 50 of the newspaper or

14   whatever, and you say, gee, I have an assertive claim, then

15   I am not in the class, according to Mr. Cecchi's brief.

16           So the subjective objective twist on this doesn't

17   cure the Chaing problem or, you know, if they want to

18   redefine the class to include only those people who have

19   asserted such claims through some objective means, meaning

20   they filed a piece of paper with some court or filed a claim

21   somewhere else, or maybe it's just the claims that were

22   filed with Gilardi for this settlement, I don't know.  I

23   don't know what it means, and I was litigating this case for

24   six years.  I don't think Mr. Boyle or Mr. Cecchi knows what

25   it means.

```
1              With all due respect, I don't think this Court has

2        any idea what this means, because I don't think it has any

3        meaning.  It is a prohibited way to define a class under the

4        Third Circuit's law.

5              Another new point on the content of the notice,

6        your Honor, is that your Honor made an order on our last

7        objection about the false information concerning the

8        Robertson class.  What your Honor's order said is fix it,

9        and it was in a footnote.

10             I am going to paraphrase it, your Honor, because I

11       am sure the Court remembers what it said, and you could find

12       it in the footnote of the ruling.

13             The Court said:  The Galleguillos objectors say

14       that there is false information about the status of the

15       Robertson class, because the information that was put on the

16       settlement website says that summary judgment was granted

17       against the Robertson class and in favor of Nextel.

18             At the time that information was put on the

19       website, that ruling had been reversed.  Summary judgment

20       had been denied.  The exact opposite ruling had been

21       entered.

22             So we came in in March, and we said, your Honor,

23       look at this.

24             Your Honor said fix it.

25             Well, they didn't fix it.  They left the false
```

```
 1        information on the website.  It's there today -- well, I

 2        didn't check it today, but I checked it the day we filed the

 3        objection, and it was still there.

 4             Why couldn't they fix that?

 5             Well, when they say they faithfully and carefully

 6        applied your Honor's order, they didn't get that part.

 7             We also made the argument, your Honor, that the

 8        notice provided false information on the Ayyad class.  I

 9        think you heard that last time, but your Honor's order

10        didn't address that.  Well, the order --

11             THE COURT:  Didn't address what?

12             MR. BURSOR:  The argument that -- the parties put

13        into this notice a statement that said there is no -- this

14        notice does not mean to suggest that there has been any

15        finding of any wrongdoing by Sprint in this case.

16             Now, of course, there has been a finding of

17        wrongdoing by Sprint in the case that I tried, where we

18        pre-claimed on every single claim we asserted in our

19        complaint, and we were awarded a hundred percent of damages

20        that we sought and a hundred percent of the injunctive

21        relief, although there is some dispute about whether we won.

22             But to say in the notice, we are not trying to

23        suggest that there has been a finding of any wrongdoing,

24        when there had been a finding that Sprint had violated the

25        law with this ETF.  In the words of Mr. Hilsee, I think he
```

```
1         described it as essentially a lie, and it is.

2                 There has been a finding of wrongdoing, so why they

3         would put that into the notice is difficult to understand.

4                 Your Honor, the notice is also defective because it

5         provides false information about the reversion.  This is in

6         our brief.

7                 They say the money is going to be distributed to

8         class members, and it turns out no, the money is going to go

9         back to Sprint -- a portion of the money is going to go back

10        to Sprint.

11                Now, you have seen some --

12                THE COURT:  Where do you get that from?

13                MR. BURSOR:  I get from that page 23 of the

14        settlement agreement that says if there is any cash in the

15        fund, it will go back to Sprint.

16                I also get it from Mr. Suprenant's statement at the

17        prior final approval hearing on day three, where he said, as

18        I understand it:  If there is money left in the fund, it is

19        going to come back to us.

20                So I get it from the language of the agreement and

21        from the words of Mr. Suprenant.

22                I can provide the citations to those, if you'd

23        like.

24                MR. CECCHI:  We would like him to because he didn't

25        add the rest of the sentence, of course, and everything else
```

```
1            that was said about it.

2                   THE COURT:  Well, Mr. Cecchi, please.

3                   Counsel, I will look it up.

4                   Go ahead.

5                   What else?

6                   MR. BURSOR:  Okay.

7                   So when I was here in March, I said look at page

8            23.  It says the money goes back to Sprint.

9                   Mr. Suprenant stands up and says, yeah, we get the

10           money back.

11                  Now, that is a real problem for the class because

12           they don't get the money, but it is also a real problem for

13           Mr. Cecchi and his group because if there was a

14           6-million-plus-dollar reversion, in the agreement they

15           settled, that they signed, it creates a lot of problems for

16           him because it makes them look inadequate, makes it look

17           like they made a mistake, makes it look like maybe they

18           committed malpractice or made some kind of a gross error,

19           where the $6 million was going to go back to Sprint, and it

20           make it look bad because they never told you about it.  I

21           did.

22                  So what are they doing to do?

23                  If they just come in, and they say, okay, we did

24           this, it has been brought to our attention, we didn't

25           realize it, or we made a mistake, we are going to fix it.
```

1          If they did that, well, then they are just

2     supporting a fee application by my group in the event the

3     settlement is approved for recovering that $6 million that

4     they thought they had, but they didn't get, so they can't do

5     that.  They can't admit they made a mistake because it will

6     cost them a lot of money on fees.

7          So what do they do?

8          Well, your Honor told them what to do in the order

9     from April.  I am paraphrasing again, but your Honor heard

10    what I said at the April -- at the March hearing and put a

11    discussion at the end of the prior order from April that

12    said:  I don't have jurisdiction to address the

13    reasonableness of the settlement, but I have a concern about

14    this one provision, this reversion.  And because I have this

15    concern, if the parties are going to come back again with

16    this provision in the agreement, they should be prepared to

17    explain the merits of that to the Court.

18         That is essentially what your Honor said.

19         So what did we get?

20         They come back, and class counsel filed a brief in

21    oppo -- I believe it was the brief in opposition to our fee

22    application, where they say, there has been no change to the

23    settlement agreement.  Bursor's objection to the reversion

24    did not result in a change in the settlement agreement.  The

25    cypres provision remains in the settlement agreement

```
1        unchanged, and that is true.

2                 So what did they do?

3                 They -- about 12 hours before we were -- our

4        objection was due, late in the evening on October 6th, what

5        did they do?

6                 Well, ECF comes across my desk, and I see a

7        stipulation regarding cypres.  It says -- it's a two-page

8        stipulation, and I am paraphrasing again, your Honor.  It is

9        in the record.  You can see the exact language, but what it

10       says is:  There was never any reversion.  It was never

11       intended to be any money going back to Sprint, and this is

12       consistent with what we said at the hearing.

13                Never mind Mr. Suprenant saying, yeah, the money is

14       coming back to us.

15                So that never happened.

16                This thing on page 23 of the settlement agreement

17       isn't there, and here is what we are going to do about it.

18       If the Judge doesn't like it, we will change it.  But what

19       we are going to do as of right now with the Judge's approval

20       is we're going to buy calling cards for the military, just

21       like we always said we were going to do.

22                So when your Honor came in today, and I was

23       interested in the Court's comments from the bench, where

24       your Honor said to Mr. Cecchi, I believe, that has been

25       changed, and Mr. Cecchi kind of stuttered and hummed and
```

```
 1    shifted on his feet, because he can't say it was changed
 2    because then I am going to make a fee application on that
 3    change, and I've done that, and because it's going to make
 4    him look bad.
 5            So what he is going to try to say is it never
 6    happened.  There is no reversion.  There never was.
 7            Now, the even more interesting thing that I heard
 8    today is Mr. Boyle saying we are not even in the calling
 9    card business, we don't sell calling cards.
10            Maybe they were going to buy the calling cards from
11    Mr. Connolly's client, AT&T,
12            Who are they going to buy these calling cards from,
13    because they don't sell them?
14            That's what he said.
15            I think to figure that one out, your Honor, we
16    would have to go back to the settlement agreement at page 23
17    and look at what it says.
18            If we go back to the settlement agreement at page
19    23, we are going to see that it says:  Any cash remaining in
20    the fund -- let me get it -- I don't want to paraphrase this
21    one.  I want to get it exactly right, your Honor.
22            Here is the quote from page 23, quote -- this is
23    Docket Entry 84-2, the settlement agreement:
24            "In the event there remains cash left in the fund
25    after all claim periods have expired, the remaining cash
```

1          will be returned to Sprint Nextel."

2                  Now, Mr. Cecchi says that was never the intent, not

3          going to happen, a figment of my imagination.

4                  So getting back to the language:  "The remaining

5          cash will be returned to Sprint Nextel, and Sprint Nextel

6          shall issue prepaid calling personal identification numbers

7          valued in the amount of the remaining cash to a charitable

8          organization that holds a 501(c)(3) designation or other

9          organization or institution to be agreed on by the parties,

10         or failing agreement ordered by Judge Linares."

11                 Okay.  So now we can assess the credibility of what

12         was said in court today, because now we know that where they

13         will get these calling cards is from Sprint Nextel, the

14         company that Mr. Boyle just said isn't in the business of

15         providing calling cards, and Mr. Connolly finds out a lot,

16         they're not going to buy them from AT&T.

17                 And why are they buying calling cards at all?

18                 That hasn't been explained.  So what your Honor

19         said is, if you want to do this, come in and defend the

20         merits and explain to the Court why this should be done, so

21         they come back.

22                 Did we see a declaration from Mr. Cecchi about how

23         great these calling cards are?

24                 Did we get any detail about the calling cards?

25                 Is there a declaration from Judge Politan about how

```
 1      hard fought this mediation was, and arms-length, and it was

 2      a hard negotiation over these calling cards?

 3              Your Honor, we didn't get any of that.

 4              THE COURT:  They don't say just calling cards.

 5      They say calling cards or anything else that I deem

 6      appropriate, right?

 7              MR. BURSOR:  Wrong.

 8              THE COURT:  What do you mean "wrong"?

 9              Counsel, reread the sentence all the way to the

10      end.  It says that.

11              MR. BURSOR:  "In the event there remains cash left

12      in the fund after all claim periods have expired, the

13      remaining cash will be returned to Sprint Nextel" --

14              THE COURT:  Continue.

15              MR. BURSOR:  -- " and Sprint Nextel shall issue

16      prepaid calling personal identification numbers valued in

17      the amount of the remaining cash to a charitable

18      organization that holds a 501(c)(3) designation or other

19      organization or institution to be agreed on by the parties,

20      or failing agreement ordered by Judge Linares."

21              THE COURT:  Exactly.

22              MR. BURSOR:  So Judge Linares gets to pick the

23      organization that will receive the calling cards.

24              Judge Linares does not get to say, I don't want

25      calling cards, I'd rather have cash.
```

```
 1                 THE COURT:  And when I took them to issue on that,
 2      they said, "or whatever the Court may."
 3                 In fact, today I asked them whether or not they
 4      would just give the money to the class members in some kind
 5      of a proportional way, and they don't seem to disagree with
 6      that either.
 7                 MR. BURSOR:  Well, Mr. Cecchi disagreed with that
 8      because he thought that would overcompensate some class
 9      members.  They might get more than their claim, more than
10      they're out of pocket.  That's what I remember Mr. Cecchi
11      saying.
12                 THE COURT:  He said he didn't want to create that
13      issue --
14                 MR. BURSOR:  Yes, and interestingly, he represents
15      those people.  He is supposed to be here trying to maximize
16      their recovery.
17                 In reality, it's not going to result in anybody
18      being overcompensated because --
19                 THE COURT:  All right.  Can we wrap it up?  You
20      have been talking now for almost an hour already --
21                 MR. BURSOR:  Okay.  So --
22                 THE COURT:  -- I understand your arguments on the
23      cypres and the reversion, what you claim is the reversion.
24                 MR. BURSOR:  I claim it is a reversion, right.
25                 THE COURT:  Right.
```

1             MR. BURSOR:  Your Honor, just for the record, it

2    was at page 87, lines 4 to 9 of the March 16th hearing

3    transcript, where Mr. Suprenant said, quote:

4             If there is any money left, it comes back to us,

5    and we match it dollar for dollar, dollar for dollar, with

6    essentially calling cards that are donated to things like

7    the USO.

8             I am really confused by Mr. Boyle's statement, that

9    they are not calling cards from Sprint, and that they're

10   coming from somebody else, because Sprin's not in the

11   business --

12            THE COURT:  What were the lines that you gave me?

13            MR. BURSOR:  It's page 87, lines 4 through 9 of the

14   March 16th, 2009 hearing transcript, Docket No. 305 --

15            THE COURT:  I have that.  Okay.

16            MR. BURSOR:  So that's --

17            THE COURT:  Thank you.

18            MR. BURSOR:  -- I am not going to argue the fee,

19   unless your Honor wants me to argue the fee now.

20            THE COURT:  No.  Well, how long is that argument

21   going to take?

22            MR. BURSOR:  A lot shorter.

23            THE COURT:  Why don't you argue it now, so we can

24   finish with you, have counsel address all of your

25   objections, and then we can move on.

1          MR. BURSOR:  I'll be very brief on the fee, but

2     just one last point on the notice.

3          Mr. Hilsee has now done an analysis of plain

4     language, the plain language that -- your Honor, the reading

5     test analysis that he presented at the prior hearing, he has

6     now re-run on the revised notice that went out as a result

7     of the amended notice plan, and his findings on that are new

8     and are presented in his affidavit that was submitted to the

9     Court.  He finds that it does not pass muster.

10         THE COURT:  All right.

11         MR. BURSOR:  Now -- I mean, there are two other

12    broad topics, the reasonableness of the settlement and the

13    fee issues.

14         On the reasonableness of the settlement, I will be

15    brief because I don't think the Court is going to get there.

16         THE COURT:  The reasonableness of the settlement

17    was addressed the last time.

18         MR. BURSOR:  Yes, it was, so I am not going to

19    repeat old stuff on the reasonableness of the settlement.

20    But the new information that I would present to the Court on

21    the reasonableness of the settlement again relates to this

22    reversion.

23         The proposal that is before the Court now has a

24    stipulation.  They tried to amend the settlement agreement

25    with the stipulation that they filed the day before

1 objections were due.  What that says is we still want to buy

2 calling cards for the military.  Class counsel have agreed

3 to that, with Sprint.  They want your Honor to approve that.

4   We object to that.  We object to it being at page

5 23 of the settlement agreement.  We object to your Honor

6 approving that stipulation.  We object to any calling cards

7 being bought for anybody, and there just hasn't been a

8 showing as to what the value of these cards are or why it

9 makes sense from the perspective of the class to purchase

10 them from Sprint or whoever it is that Mr. Boyle is going to

11 tell us they were going to be purchased from.

12   Now, the -- excuse me for a moment, your Honor.  I

13 lost my train of thought.

14   The other objection that we made broadly to the

15 fairness of the settlement is to both the amount and the

16 lack of injunctive relief.

17   And with respect to the amount, we have new updated

18 claim statistics that show that now instead of getting

19 800,000 to the class -- I mean, that was the value of the

20 settlement when first proposed to the Court when we

21 objected.  The class members, the result they were going to

22 get was $800,000 in cash based on the claims they filed.

23   Now, based on the new claims data that we provided,

24 the class is going to get about $3.3 million because there

25 was another two and a half million that came in as a result

```
 1            of our objection.
 2                    So when judged against the recovery that we got in
 3            Ayyad, even this $3.3 million recovery now, in Ayyad we were
 4            awarded, yes, we were awarded $73 million in cash, and an
 5            additional $225 million in basically debt relief, injunctive
 6            relief against charges on behalf of a class that is less
 7            than -- much, much less than one-fifth the size of this
 8            class, so even with the --
 9                    THE COURT:  What is the status of your collection
10            of the $73 million award?
11                    MR. BURSOR:  Well, I think your Honor is aware we
12            have not collected anything yet because it is on appeal.
13            You know, Sprint has a right to appeal, just like we have
14            appellate rights here.
15                    THE COURT:  That $225 million in debt, is that also
16            on appeal?
17                    MR. BURSOR:  Yes.  That's also on appeal.  Yes,
18            your Honor.
19                    So I mean, if your Honor is interested in who won
20            or lost that case --
21                    THE COURT:  We have been through that.  I don't
22            want to hear it.  I am going to consider it, but I don't
23            want to hear it today.
24                    MR. BURSOR:  Yeah.  You know, fair enough, your
25            Honor.
```

80

1           In any event, to get 3.3 million, it's a very small

2      class --

3           THE COURT:  Wait.  The reason I asked you the

4      question before about the status of the collection, I wasn't

5      being funny about that.  I just didn't know if things had

6      changed since yesterday.  There could have been an agreement

7      made, or there could have been an appeal that was dismissed

8      that I didn't know anything about.  I didn't want to be --

9           MR. BURSOR:  Okay.  Fair enough.

10          I apologize for the way I responded to that issue,

11     your Honor.  But it's on appeal, and it will be on appeal

12     for a while.

13          The second sort of broad objection to the fairness

14     of the settlement relates to the subscriber class issue,

15     which is the settlement does not require Sprint to change

16     its practices in any way.

17          THE COURT:  Vis-a-vis the subscriber class.

18          MR. BURSOR:  Right.

19          So in our case, for example, and I don't want to

20     rehash the entire chronology of the All Writs Act, you know,

21     practice here, but in our case -- our case got sort of

22     bifurcated where the subscriber class got separated from the

23     payer class, even though they're all on the same complaint,

24     the same docket, and the payer class was tried first with

25     the understanding that the result of the payer class case

1          would bind the subscriber class.

2                   So we then win the payer class case, or at least

3          win in the sense that we proved the illegality of the fee,

4          which means that Sprint should then be enjoined from

5          charging the fee.

6                   In January of 2009, we in fact got a tentative

7          ruling on a temporary restraining order enjoining Spring

8          from charging the fee, the value of which, just for the

9          California class, was millions of dollars every month,

10         if that TRO had gone into effect.

11                  So -- and actually I am overstating that a little

12         bit, your Honor, because the TRO was not going to enjoin

13         collection per se.  It was enjoining certain

14         collection-related activities that we believe would have

15         basically prevented collection.

16                  They were not allowed to report, make adverse

17         credit reports, and they were not allowed to assign the

18         debt, so as a practical matter it would have stopped

19         collection of millions of dollars just from the California

20         subscriber class every month.  That was the context in which

21         the parties came to you to get the All Writs Act injunction.

22                  In class counsel's brief at page 17, in their

23         response to objections, they say the following, quote:

24                  Class counsel convinced Sprint to settle by

25         pointing to the ability of a Federal Court to enjoin

```
 1          parallel state court actions through the All Writs Act.

 2                  That is how class counsel got the settlement.

 3          They went to these guys, and they said, we can enjoin Mr.

 4          Bursor's case.  That is how they settled it.  That's what

 5          they say in their brief, so that had a lot of immediate

 6          value to Sprint because once that TRO got entered in our

 7          case, the spigot would have been turned off.

 8                  If you look at Appendix A to our recent objection

 9          brief, your Honor, that is the one where it has the

10          cancellation fees collectibility analysis, and the numbers

11          are rather large.  60, 70, $80 million each month.

12                  That is what we were threatening.  And when I say

13          "threatening," it was a sure thing by the time January came

14          around, we were going to turn off not the whole spigot

15          because our case only covered California, but California is

16          about a fifth of the nation.

17                  We were going to turn off a fifth of that spigot.

18          That is about 15 -- that is about 12 to 14 -- 12 to $15

19          million every month.  That was an immediate risk, and to say

20          risk is to overstate the uncertainty, it was going to stop.

21                  They knew that was coming for a long time because --

22          and this is all in the All Writs Act brief, your Honor, but

23          the process of getting from verdict to TRO in California was

24          long and drawn out, but it was clear where it was going.

25                  So Mr. Cecchi comes along and convinces them that
```

```
1      he could put a stop to that, if they settle here, and they

2      do that for, you know, a very small amount of money, less

3      than, you know, we would have saved the class -- the

4      subscriber class members in California even in a single

5      month, when you talk about the whole fund.  And when you

6      talk about what's actually being paid out to class members,

7      the class members would have gotten $800,000 under the deal.

8      That's about two days of ETFs in our case.

9              So that's a very small amount, and they didn't get

10     injunctive relief that we had basically already got.

11             And, your Honor, the reason that is important is

12     because that just had tremendous value, and they just gave

13     it away for nothing.

14             Your Honor, I know if you look at -- I know this

15     Court now has a broader experience with these ETF cases

16     because your Honor has the T Mobile case, and your Honor has

17     the AT&T case.  If you look at the settlements that are

18     before your Honor in those cases, and again, I am not

19     endorsing those settlements.  We got issues with the AT&T

20     case that we will address later, but not today.

21             But none of the other carriers attempted to do --

22     even attempted to do what Sprint is attempting to do here

23     because in the T Mobile case, T Mobile agreed under that

24     settlement to prorate the ETF going forward.  There's an

25     injunction in the T Mobile settlement, and that has a lot of
```

```
1      value.  And in the AT&T case, AT&T agreed to essentially the
2      same type of injunctive relief.
3              And although I will likely be objecting in the AT&T
4      case to other things, I will be the first to concede that
5      that injunctive relief has a lot of value, and this is the
6      only case that has even been attempted.  In the Verizon
7      case, we got that relief as well.
8              This is the only one of the four carriers where
9      they are coming in and saying, we are going to keep on doing
10     it.  This is the only one of the four carriers by the way
11     where there has already been a finding that this fee is
12     illegal.  So that is both unfair, unreasonable, and it
13     creates a lot of questions for this settlement.
14             Now, your Honor, I will leave it at that on the
15     fairness of the settlement.  If your Honor wants to hear
16     from me on fees, I'll do that.
17             THE COURT:  Why don't you do that now, so that way
18     when we take our shortened lunch break for my staff, we will
19     have finished all of your arguments by then.
20             MR. BURSOR:  Your Honor, may I just have a moment
21     to get my other book?
22             (Counsel confer)
23             Your Honor, I am addressing only the fee
24     application for the work done in connection with the
25     Galleguillos' objection.
```

1          There is a distinct fee application that Mr.

2    Plutzik is going to present based on the prior work from the

3    subscriber class case in California and Molfetas and Lee and

4    Robertson, so I will just limit myself to the objection on

5    the fee.

6          Now, I think the lesson we learned from your

7    Honor's ruling on the T Mobile case and the key quote that I

8    took away from that case was that this Court in applying

9    Cendant and the Third Circuit law gives great weight to the

10   result that's actually achieved as opposed to the number of

11   hours worked.

12          In connection with the Galleguillos' objections, we

13   achieved quite a bit.  We challenged the notice that was

14   found inadequate.  Our objections to the notice were

15   sustained in several respects, and I think even Mr. Cecchi

16   acknowledged that our entitlement to a fee is really not in

17   dispute, although he said we should -- well, he said we

18   shouldn't get any fee because we are still objecting,

19   because we're still trying to either make this settlement to

20   go away to get a better deal --

21          THE COURT:  I understand.  He is saying you are

22   attacking the funds, and because of that -- forget about

23   what he said.  I understand that --

24          MR. BURSOR:  That is not the law.

25          So we did accomplish something because your Honor

 1    sustained our objections, and that does have a quantifiable

 2    effect in a few different ways.

 3         One way that we put in our brief was that --

 4    actually the only methodology that we found in a Third

 5    Circuit case was from the Prudential case, and we explain

 6    that in our brief at page ten -- beginning at page ten.  We

 7    call it the Prudential calculation.

 8         What the Third Circuit did in Prudential was it

 9    calculated the benefit of the objection as a proportion of

10    the total fund and awarded that proportion of the total fee

11    award.

12         THE COURT:  Right.

13         MR. BURSOR:  So when we apply that just to what we

14    accomplished on the reversion, and I think it would be a

15    fair point to say that I am getting ahead of myself because

16    maybe we have not accomplished anything on reversion,

17    because maybe the reversion is going to be approved -- I

18    mean, I can't imagine the Court is going to approve it, but

19    you know, let's assume for sake of my argument that the

20    money is not going to go back to Sprint as a result of our

21    objection.

22         If that is the case, we are entitled to a fee on

23    that because the class gives that money, not Sprint, as a

24    result of our effort.

25         Now, the amount of reversion based on the claims

```
 1    data that we had at the prior hearing was approximately $6.3
 2    million.  Now, that amount has gone down a bit because
 3    Sprint had to spend more than on notice to the class, which
 4    is a benefit to the class.
 5            They spent an additional -- about $800,000
 6    providing additional notice, and there has now been an
 7    additional two and a half million dollars in claims.  So if
 8    one were to try to calculate the amount of the reversion
 9    today -- I've actually done that.  If I may, your Honor, I
10    have prepared a single sheet --
11            THE COURT:  Were you able to break down the number
12    of claims that were attributable to the new notice versus
13    just claims that would just come in anyway?
14            MR. BURSOR:  Well, that's --
15            THE COURT:  It is hard to do, right?
16            MR. BURSOR:  -- it's hard to do.
17            You have to know how many claims would come in
18    anyway.  I think that could be done.  That is why when we
19    filed our fee application, we asked for discovery.
20            Gilardi issues a weekly report showing how many
21    claims came in in a week -- well, it shows the cumulative
22    amount.  And by looking at the prior week's claims, you can
23    see how many came in in that week.
24            Now, as of the time of the last hearing, there had
25    been approximately $690,000 worth of claims filed.  That is
```

1    on an exhibit that we provided to the Court, and it is also

2    attached again to our objection.  I think it's attached as

3    Appendix C to our objection.  It's one of the appendices

4    to our objection.  It is the one with the handwritten

5    calculation on it.

6              THE COURT:  I understand.

7              MR. BURSOR:  So when we came in in March, there had

8    been, give or take, about $680,000 in claims, and the new

9    notice was issued in August, as I understand it, based on

10   the limited materials that were put in by the parties.  It

11   was mailed notice that went out during the August billing

12   cycle.

13             So we have -- we know there was six-eighty as of

14   March.

15             When we get Ms. Carmen's declaration, she said that

16   before the second notice period began, there had been

17   810,000, so there was another $130,000 worth of claims that

18   came in between March of '09 and August of '09.

19             And, your Honor, I would rather have more precise

20   figures, because I would like to have the weekly reports,

21   like the ones we put in the record, and that is why we asked

22   for that, but this is the best we can do with the snippets

23   of information we've been given.

24             So what that shows is that the claims have trailed

25   off to a trickle, and there wasn't going to be any more

```
 1          notice, and without any more notice, the trickle isn't going
 2          to get bigger.
 3                    So, you know, can we say that there wouldn't have
 4          been any?
 5                    No.
 6                    Can we make a reasonable projection how many there
 7          would have been with the Gilardi weekly reports?
 8                    Yes, we could, if we had them.  The Court could do
 9          it, if the Court orders the production.
10                    These documents already exist.  I mean, they work
11          for me -- I mean, they did in our Verizon case, and we got
12          weekly reports.  These fellows are getting weekly reports.
13          The only one here who doesn't have it is me and the Court.
14                    So it had trickled off to very little, and then all
15          of a sudden, between August and now, which goes out in the
16          August billing cycle, so it is between one and two months,
17          there is two and a half million dollars in claims.
18                    So to say, well, that really wasn't because of the
19          second notice, therefore, it is not attributable to our
20          objection, I mean, I suppose you could say that, but it
21          wouldn't be true.  It wouldn't be defensible.
22                    I think it is clear that these $2.4 million in
23          claims came in because there was another notice.
24                    Maybe there would have been 20, 30, $40,000 more in
25          claims, but for -- maybe even without it, but maybe there
```

90

1    wouldn't have been any.  Wouldn't have been two and a half

2    million, so this is my -- my -- it is shown on the sheet

3    that I gave you.

4            So the Prudential calculation based on the

5    reversion is in our brief setting a value of the reversion

6    at 6.3 million, you know, assuming it doesn't get approved,

7    which I don't think it is going to.

8            We got the money for the class, not them, so we

9    should get the proportionate amount.

10           But this chart that I made today has an alternate

11   Prudential type of calculation, because when I got the T

12   Mobile order from your Honor, and again, I don't agree with

13   it, but it is not for me to agree or disagree, you're the --

14   the order is the order, so I have to live with it or appeal.

15   What that order says is what matters is the result.

16           What did you do for the class?

17           And so I went back and looked at these claims data

18   and said, let's look at where the rubber meets the road.

19   Let's look at where the dollar bills are hitting the class

20   members' wallets, because that is what any of us have done

21   for the class.  They either got money or they didn't.

22           If they got money as a result of what we did, we

23   should be compensated.

24           So as a result of what these folks did, class

25   members are getting $810,000.

```
 1              As a result of what we did, the class members are
 2     getting an additional two and a half million dollars.
 3              Our efforts have produced three times the bottom
 4     line result as their efforts.  Therefore, we should get
 5     three times the fee that these folks get because we did
 6     three times as much for the class.
 7              Now, let me be clear.  I don't want any fee because
 8     this Court does not have jurisdiction because the notice is
 9     defective, and even if the notice wasn't defective, this
10     settlement should not be approved because it is the worst
11     deal for class members I've ever seen in my life.
12              But in the event the settlement is approved, we
13     should be compensated for what we did, and they should be
14     compensated for what they did, and even if we get every
15     penny of the fee, and Mr. DePalma said this at the first
16     hearing, and I agree with it wholeheartedly, even if we were
17     awarded every penny of the fee, we are going to appeal any
18     approval of the settlement because we are not interested in
19     obtaining a fee here.  We're interested in representing
20     class members and doing what's best for them.
21              But if the settlement is approved over our
22     objection, we are entitled to that compensation.
23              Now, in Mr. Cecchi's objection to our fee
24     application, he has a couple of other theories.
25              One theory he's got is that the Court should count
```

1      the pages in our brief and make some kind of a fraction

2      based on the number of those pages that were related to

3      objections that he characterizes as being sustained as

4      opposed to overruled.

5             I don't think there is any legal support for that

6      approach, but if there is, I would like when Mr. Plutzik

7      argues the fee application from the other one, I'd like that

8      one to be calculated based on the number of the pages in the

9      briefs, too, because they don't have very many, and we have

10     a lot of them.

11            But I don't think the Third Circuit would approve

12     an analysis that says, pay me ten percent of my lodestar

13     because ten percent of the pages in the briefing I filed

14     were related to the notice.  I don't think that would fly.

15            The other thing that he does is he put in, in his

16     supplemental declaration from Ms. Carmen, that calculates

17     the fraction of the new claims that came in -- my chart has

18     the two and half million claims that came in since our

19     notice went out.

20            What he does is say, okay, Ms. Carmen, please tell

21     us how many of those came in from California.

22            So I assume he wants to try some kind of maneuver

23     where we get 16 cents on the dollar, because California is

24     16 percent of the country, which is what was done to us in T

25     Mobile case.

1          Why would that be wrong?

2          Well, other than the T Mobile opinion, there is no

3     legal support for that.

4          But in this case, this objection is not -- this was

5     not work that was done on behalf of the California class or

6     benefited the California class.

7          The objection we made was an objection to benefit

8     the entire class, and that did benefit the entire class in

9     all 50 states because the notice that was issued as a result

10    of our objection didn't just go to California people.  There

11    were 15 million individual notices that were mailed to the

12    people who previously got that bill insert that the Court

13    found lacking, so there is no basis to cut the benefit that

14    we achieved to say just look at California.  We benefited

15    the whole class.

16         So, you know, the Court has some discretion, but

17    the discretion has to be exercised based on facts found in

18    the record based on the evidence, and that California split

19    wouldn't work.

20         Your Honor, I almost got it up there, but I got off

21    on a side track.  The recalculation of the disbursements

22    from the fund and the amount of the reversion, if I may hand

23    it up.

24              THE COURT:  Sure.

25              We will mark that version 2.

1          (Document handed to the Court)

2          MR. BURSOR:  If I can just walk through this

3     quickly, just like a minute and a half, we start with the

4     common fund of $14 million.

5          The parties spent $528,000 on the first

6     publication.

7          They estimated in the Rice declaration -- in the

8     amended notice plan, that the bill insert would cost

9     $750,000.

10         The postcards to the Robertson class would be

11    another $73,895.

12         The postcards to the partial list that they

13    assembled would cost $34,623.

14         When you deduct those notice costs from the common

15    fund, you are down to $12,613,482, which is the remainder in

16    the fund after the notice costs to date.

17         The Gilardi administration, I am estimating is

18    going to cost about $1 million.

19         I believe they said that they have been invoiced

20    for about $250,000 so far, but they haven't done any of the

21    claims processing yet.  Based on the bills we got in the

22    Verizon case, I think that is conservative.

23         So the remainder after notice and administration is

24    going to be a little over $11.6 million.

25         Class counsel is asking for slightly more than $6

```
 1      million in fees and expenses, leaving about $5.6 million for
 2      the class after the fees are taken off.  And we now got
 3      class claims of about -- class cash claims of about 3.3,
 4      which leaves 2.3 million to revert to Sprint under the
 5      calling card scheme that they want your Honor to approve.
 6             So if nothing else, you know, when calculating --
 7      you know, I don't know how the Court will rule on this
 8      reversion.  We think it should be eliminated in its
 9      entirety, but if it's not eliminated in its entirety, at
10      least as a result of our efforts, it's gone from 6.3 million
11      down to 2.3 million, so $4 million less reverting to Sprint.
12             If you do approve the reversion, I hope that they
13      get a really great deal on the calling cards.
14             Your Honor, lastly, I do want to say that I don't
15      think -- this is the objections to the notice that we made
16      here cannot be cured with a do-over, and the reason is, a
17      second do-over.  And the reason is because once you identify
18      the millions of people who are reasonably identifiable at a
19      relatively low cost, the additional notice cost to provide
20      notice to those people will deplete the fund to such an
21      extent, that there won't be any cash left to pay claims or
22      to revert to Sprint.
23             So, you know, to the extent the Court is weighing
24      in its mind, gee, if I sustain this objection, can we redo
25      this again the way we tried to redo it last time, I think
```

1        the answer to that is no.

2                And, your Honor, unless you have any questions for

3        me, I will leave it at that.

4                THE COURT:  I have no questions.

5                Thank you.

6                MR. BURSOR:  Thank you, your Honor.

7                THE COURT:  We are going to take a break now and

8        then when we come back, I will hear from you and Mr. Cecchi

9        or whoever will address the Court.

10               Again, I caution you also not to rehash old

11       arguments, be succinct and specific as to the arguments

12       raised by Mr. Bursor, and then we will go from there.

13               You wanted to say something?

14               MR. PLUTZIK:  Yes, your Honor.

15               Before we break, just to question about the order

16       in which the Court wants to take matters up.  I am going to

17       be speaking about the two matters, the fee --

18               THE COURT:  Just for the record, you have to state

19       your name.

20               MR. PLUTZIK:  Yes, sorry.

21               Alan Plutzik.

22               I am going to be speaking about two matters.

23       Number one is the fee application that has been submitted

24       with regard to efforts related to the Ayyad, Robertson and

25       other cases, and secondly, the objection to the fee

```
1        application of class counsel.
2               So I wanted to put that in front of your Honor to
3        see whether your Honor wants to hear from me before Mr.
4        Cecchi and Mr. Boyle respond or not.  I mean, I am happy to
5        do it either way.
6               THE COURT:  Okay.
7               I guess it does make sense to hear from you, so
8        they can address both yours and Mr. Bursor's objections in
9        one sitting, and we don't have to keep going back and forth.
10              MR. PLUTZIK:  That is fine, your Honor.
11              Thank you.
12              THE COURT:  Okay.
13              Is there anybody else that is going to be speaking
14       with regard to the fee?
15              MR. EVOLA:  Your Honor, Robert Evola for the Hall
16       objectors.
17              THE COURT:  Okay.
18              Now, to the extent that you are not going to be
19       repeating any of the arguments that have been made, then you
20       can also speak.
21              Mr. DePalma?
22              MR. DE PALMA:  I thought you had mentioned was
23       there anybody else that would speak with regard to the fee.
24              THE COURT:  Yes, I did.
25              MR. DE PALMA:  I stood up, so that when it was my
```

```
1     turn, if it is, I will be very brief, your Honor.  I think

2     most of what I have is in the papers, and so I do intend to

3     speak.

4               THE COURT:  All right.

5               So it is just you and Mr. Plutzik.  I will probably

6     take all of the fee arguments then upfront, so that way you

7     can address them after the break, all of you, one after the

8     other.

9               MR. EVOLA:  I am not addressing the fee.

10              THE COURT:  You are not?

11              MR. EVOLA:  No.  I misunderstood, your Honor.

12              THE COURT:  Okay.

13              Anybody else going to be addressing the fee, other

14    than Mr. DePalma then?

15              All right.  Then we will hear from Mr. Plutzik and

16    then hear from you after lunch, and then we will have

17    counsel deal with it, and that only leaves the last of the

18    objections, which hopefully will be brief because they are

19    going to be limited to new things.

20              All right.  We will take a 45-minute break.  It is

21    quarter after twelve for the record, and we will be back at

22    one o'clock.

23              Thank you.

24              (Lunch recess taken)

25
```

```
1                (Afternoon session)

2                THE CLERK:  All rise.

3                THE COURT:  All right.

4                You may be seated.

5                Mr. Plutzik?

6                MR. PLUTZIK:  Thank you, your Honor.

7                I am Alan Plutzik, and I am going to address two

8      fee related issues.

9                The first is the application for an award of

10     attorney fees and expenses on behalf of the law firms

11     related to the Ayyad, Robertson, Molfetas and Lee cases.  I

12     am not going to burden the record with a list, but we filed

13     a fee application, and it is all of the firms that filed

14     that application, including my own and Mr. Bursor and many

15     others.

16               We are the lawyers who litigated the California

17     cases and have litigated them.

18               Second:  I am going to address the Galleguillos, et

19     al. Objection to the fee request of class counsel and the

20     Larson generally.

21               First, with regard to the fee application related

22     to the Ayyad case and other cases like that, I understand

23     and take to heart the Court's admonition that it doesn't

24     want to hear a bunch of repetition.  I am going to focus on

25     new things to the extent that I can.
```

1          The first item that I want to call to the Court's

2     attention is a new Third Circuit case that addresses

3     attorney's fees, and the name of that case, like many others

4     is In Re:  Diet Drugs.  It is one of that Diet Drugs series

5     of decisions, and it is found at 2009 U.S. App. Lexis 22194.

6     It was decided on October 8th, 2009.

7          I want to simply mention a couple of principles

8     recognized by the Third Circuit in that new Diet Drugs case.

9     One is found at star 70, where the court says that in

10    discussing a question of allocation of fees between and

11    among counsel, it says and I quote:  "Basic concerns for

12    fairness and due process always circumscribe judicial

13    discretion."

14         I will show in my remarks today that the concern

15    for fairness and due process militates in favor of a

16    substantial fee award to the counsel who were engaged in the

17    litigation in California for the last six and a half years.

18         The second issue addressed in Diet Drugs that I

19    want to call to the Court's attention is at star 56 and

20    following.  The Court says that the common benefit doctrine

21    applies to the allocation of fees, and the Court applies it.

22    In circumstances under which the work of one counsel in a

23    particular case was held to confer a benefit on other

24    counsel in another case, and the award reflected the

25    conferral of that benefit, and I will show your Honor today

1      in my remarks that the common benefit doctrine as applied to

2      this case would militate in favor of substantial and fair

3      fees for those counsel who have been performing litigation

4      in California for all of these years since 2003.

5              And the third point that the Diet Drugs court

6      addresses is simply that the trial court would abuse its

7      discretion, if it had failed to apply the proper procedures,

8      and this is the key point, or if it were to base an award on

9      findings of fact that are clearly erroneous.

10              So the third point I want to show, your Honor, that

11     relates to Diet Drugs is I want to make sure that the record

12     is clear, so that your Honor is not under a misconception

13     that could mislead the Court into making a finding that it

14     is not supported in reality, and the reason that is

15     necessary is because there have been representations made in

16     counsel's briefs that are not correct and give the Court a

17     false impression, so I will get to all of those in my

18     remarks today.

19              A second item that is new since last time, as the

20     other counsel have pointed out, is the Court's ruling in the

21     Milliron case, and that is the case against T Mobile, and in

22     that case the Court allocated fees as between California

23     counsel in the California case and class counsel and their

24     allies here and awarded California counsel, at least in my

25     group, a multiplier, negative multiplier of 0.180 on our

```
 1    lodestar while giving members of Mr. Weiss' and Mr. Cecchi's
 2    group a multiplier of nearly two on their lodestar.
 3          The Court did that based on certain conclusions
 4    that the Court drew from the record in that case, and I want
 5    to urge the Court not to make a similar order here, and I
 6    want to go through a couple of the conclusions that the
 7    Court reached in that case and point out to the Court why it
 8    is that they are not valid in this case.
 9          The Court found that the benefit conferred by
10    counsel -- the Court found in Milliron that the benefit
11    conferred by counsel in the California T Mobile litigation
12    was essentially limited to California residents, and there
13    wasn't a benefit that could be compensated that was
14    conferred on residents of other states.
15          I am not here to reargue that case, but in this
16    case, there is no support in the record -- there would be no
17    support in the record for such a conclusion here.  In fact,
18    there is every support in the record for the contrary
19    preposition in this case.
20          And I think the very first point, the very first
21    thing that proves beyond a shadow of a doubt that there was
22    very, very substantial influence and benefit coming from the
23    California litigation to this case is the passage from the
24    brief cited by Mr. Bursor in his remarks, and that is at
25    page 17 around the middle of the page of class counsel's
```

```
 1    memorandum of law in support -- in opposition to the
 2    objections to the settlement, where class counsel says that
 3    they convinced Sprint to settle, quote, class counsel
 4    convinced Sprint to settle by pointing to the ability of a
 5    Federal Court to enjoin parallel state court actions through
 6    the All Writs Act, close quote.
 7            Mr. Bursor explained why it is that it was so
 8    important to Sprint to be able to enjoin parallel state
 9    court proceedings under the All Writs Act, so I am not going
10    to belabor it, but they were facing an injunction that would
11    cost them tens or even hundreds of millions of dollars in
12    that case, so it would not be appropriate nor would the
13    record support it if this Court were to conclude that there
14    was no benefit to this case from the work done in
15    California.
16            Secondly:  In Diet Drug, the principal benefit
17    conferred by the counsel in case number one, if you will, on
18    the counsel in case number two, there are more cases
19    involved there, but to make it simple, was discovery.  The
20    discovery conducted by the counsel in that case led to the
21    settlement and led the defendant to want to settle, and the
22    Court compensated the counsel who did that work.
23            Now, in this case, we have a record of what class
24    counsel looked at in connection with arriving at this
25    settlement.  It is all of the work that we did.  They are in
```

104

1      court today asking to be compensated for reviewing the

2      transcripts of depositions that we took, documents that we

3      obtained by the sweat of our brow by making motions to

4      compel and by culling through them and by picking the best

5      ones.  That is very time consuming work and very expensive

6      work, simply paying for copies, traveling to depositions,

7      paying court reporters, all of this stuff, we did that.

8           They are asking to be compensated for it, and your

9      Honor, if the Court is considering compensating them for

10     reading deposition transcripts, we submit respectfully the

11     Court should be compensating the counsel who took those

12     depositions.  And on this record, for example, I think Mr.

13     Bursor has a declaration in, in which he says he was

14     involved in 22 depositions in this litigation.

15          I have a declaration, your Honor, in which I

16     informed the Court that Mr. Fischer of my office and I were

17     involved in something like 20 depositions in this case.

18     Those are the depositions whose transcripts they read.

19          Okay.  I also want to mention other respects in

20     which work in California had a very direct effect on this

21     case.  The FCC proceeding, which we have informed the Court

22     has now been withdrawn by its proponents, that would have

23     had a devastating effect on litigation involving early

24     termination fees nationwide, not just in California, had the

25     FCC come out with a ruling, which it may very well have

     1          done, had we not opposed it.

     2                    We spent a lot of money and a lot of time at the

     3          FCC defeating that, and it was not easy.  I think the record

     4          reflects that a number of us went back there many times.

     5                    I think Mr. Bursor's declaration says he was there

     6          seven times.

     7                    I was there for a public hearing in front of the

     8          Chairman of the Commission and the other Commission members

     9          speaking for consumers, and that was a very, very severe

    10          threat.  I don't think that can be ignored.

    11                    These counsel didn't involve themselves in that,

    12          other than I believe a $20,000 contribution made by one of

    13          them in connection with that, but we never saw them working

    14          on it.

    15                    We had to engage two firms, the Cuneo firm and the

    16          Hilliard firm, to go back there and fight with us to defeat

    17          that, and that is a clear and tangible benefit to the class

    18          that we conferred.

    19                    We proved that these classes can be certified, and

    20          we did that in response to determine opposition with regard

    21          to the Nextel class.  For example, there was a very

    22          strong -- it was heavily, heavily litigated.  We prevailed

    23          and we got a class certified.

    24                    With regard to the Sprint subscriber class, that

    25          class -- that certification of that class was denied by our

```
 1        trial court, so we took it up, and we appealed, and we were
 2        able to obtain a reversal of that ruling, which proved that
 3        a class of current subscribers can be certified in this
 4        case.  That is important, important to this case, important
 5        to the results.
 6             The Court also said in its Milliron opinion that
 7        the position of counsel, California counsel if adopted by
 8        the Court, could have the effect of recognizing that when
 9        counsel in one state file a case that they put a stake in
10        the ground and thereafter they are the ones that own that
11        and counsel in other states can't come along later and file
12        suits and settle them and get compensated.
13             Respectfully, your Honor, the Court should not draw
14        such a conclusion in this case.  We are not claiming, not in
15        this case, and we weren't in Milliron, that we have a stake
16        in the ground, and that nobody can come along later and
17        litigate it in another state.
18             Our point is this:  Anybody who wants to can file a
19        case in another state.  Just if they want to settle our
20        case, if they want to settle our case, we are entitled to be
21        fairly compensated for work we did in our case.
22             Mr. Cecchi said in his remarks we didn't settle
23        their case.  He said we didn't settle the California case,
24        what are these people doing here, we carved out their case,
25        we didn't settle it.
```

```
1              Your Honor, that is an incorrect statement.
2              THE COURT:  Why?  It has been carved out, right?
3              MR. PLUTZIK:  The IF peer class has been carved
4    out.
5              What about Nextel?
6              We filed suit against Nextel in a case, which is
7    known now as Robertson versus Nextel.  That is a payer
8    class.  There was no current subscriber class because Nextel
9    got swallowed up by Sprint, but that was a payer class.  It
10   was an important case, and they seemed to have trouble
11   drafting a notice, which makes it clear, but apparently they
12   intended in their settlement to attempt to settle out the
13   Robertson versus Nextel case.
14             Why are they here telling your Honor that they
15   didn't settle our case?
16             They settled that case.
17             The Sprint subscriber class case, as I told the
18   Court, we spent a lot of time and effort and money on that
19   portion of the Ayyad case, the subscriber class.  We had to
20   take it up.  We handled an appeal, and we won the appeal to
21   get that class certified, and they are settling that case.
22   They settled it out from under us.
23             If they want to settle our case, leaving aside
24   whether the settlement should be approved or not, and I
25   associate myself with Mr. Bursor's remarks and his position
```

1          that it should not, but if there is to be a settlement that

2          settles our case, it is fair and just that we be compensated

3          for work we did in our case.

4               Had they not settled the Robertson case and the

5          Sprint subscriber class case, we would have continued to

6          litigate them.  We believe we would have prevailed in them,

7          and we would have been able to seek an award of fees in the

8          California State Court under either a common fund theory or

9          under a fee shifting theory under California law, and that

10         would be appropriate, and they should not be able to come in

11         and settle out those cases and then say that we should not

12         be fairly compensated.

13              The third item that is new is a supplemental

14         declaration that I submitted to the Court, and I wanted the

15         Court to know -- I assume the Court is familiar with it -- I

16         wanted the Court to know the effect on a small firm of this

17         kind of thing happening, the effect of an order such as was

18         entered in the Milliron case.

19              We are a six-lawyer firm.  This early termination

20         fee litigation including the Sprint and Nextel portions of

21         it has been extraordinarily taxing to my firm as a matter of

22         time, as a matter of effort, as a matter of lodestar, as a

23         matter of expenses, as a matter of preclusion of other

24         employment, which I mentioned specifically in my

25         declaration.

```
 1                   As I said in my declaration, it is not a
 2          sustainable business plan to be spending six and a half
 3          years working our fingers to the bone on litigation only to
 4          see our case settled out from under us and be compensated at
 5          18 cents on the dollar.  That is not sustainable.  And the
 6          case law says, your Honor, that the Court needs to be taking
 7          into consideration the encouragement of counsel who put
 8          themselves out to bring important cases benefiting the
 9          public.
10                   This litigation is precisely that type of case, and
11          a message -- I am sure the Court didn't intend it -- but the
12          message we received from an order that gives us 18 cents on
13          the dollar of our lodestar is to the contrary.  It is a
14          message of discouragement.  In fact, it is such a result
15          that would have -- if adopted in this case -- would have an
16          economically ruinous effect on the counsel who devoted so
17          much time and so much money to that litigation, and it would
18          have a discouraging effect on counsel, including my firm,
19          who might be contemplating bringing cases of this sort in
20          the future.
21                   We can't be bringing cases of that sort if at the
22          end of the day, the compensation is so much closer to zero
23          than it is to a full recognition of the time and effort and
24          work and accomplishment in those cases.
25                   Of course, we work on a contingency fee basis like
```

```
1    all class action lawyers do.  So when we take a case, we are
2    committed to it, and we have to be.  But if at the end it is
3    going to turn out with compensation that falls so far short,
4    we really have to think twice for self-preservation.
5            Now, I know the Court has a lot -- a lot more to
6    think about when it is awarding fees than the effect of its
7    award on my firm or the firms in our group.  Mr. Bursor who
8    is a solo practitioner, Mr. Franklin who is a solo
9    practitioner, Mr. Farino who is a solo, and others who have
10   small firms, but I submit, your Honor, that that is one of
11   the considerations that this Court must consider in making
12   its fee application -- in making its fee award.
13           THE COURT:  The size of the firm?
14           MR. PLUTZIK:  No, your Honor, not the size of the
15   firm.
16           THE COURT:  Look, I recognize that you have a small
17   firm, that they are solo practitioners, but where is there
18   in the law that that is a component that I should take into
19   consideration in determining what reasonable compensation
20   is?
21           MR. PLUTZIK:  I am not claiming that is a
22   consideration.  I do not --
23           THE COURT:  Well, you did spend a lot of time
24   saying to me how it is potentially ruinous to your firm and
25   the amount of work you put in and all of that.
```

```
 1              At the end of the day, the analysis has to do with
 2    what is fair compensation in light of what you did do --
 3              MR. PLUTZIK:  Exactly.
 4              THE COURT:  -- not precisely the firm, or whether
 5    or not it is a solo or not a solo or what effect it will
 6    have on the firm.  As sympathetic as I am, and I am
 7    sympathetic because I came from a small firm myself, that is
 8    not part of the analysis that I have to do.
 9              MR. PLUTZIK:  That is not what I am saying, your
10    Honor.  I failed to communicate effectively, so let me
11    clarify.
12              The size of the firm has nothing to do with it.
13    What has to do with it is precisely what your Honor said,
14    and that's the fairness and adequacy to these firms.
15              THE COURT:  You mean in light of the work --
16              MR. PLUTZIK:  In light of the work --
17              THE COURT:  -- not in light of their size or
18    whether they are solo or a six-man firm or whatever.  That
19    is sort of an argument that appeals to my sympathy as
20    opposed to the law.
21              The law has to do with what is it that you brought
22    to the table, what is it that you did, right?
23              MR. PLUTZIK:  Yes, your Honor, exactly.  And that
24    is why I fear that I still have not clarified my point.
25              I am not claiming that the size of the firm has
```

```
 1      anything to do with your Honor's decision about fees.  If I
 2      gave that impression, it is because I didn't communicate
 3      effectively.
 4              THE COURT:  What does it have to do with, the fact
 5      that you have a six-man firm, or Mr. Bursor is a solo, what
 6      part does that play in the analysis?
 7              You brought it up for a reason.  What is the
 8      reason?
 9              MR. PLUTZIK:  The Court has to -- the Court should
10      consider, we submit, exactly what your Honor said, the
11      fairness and adequacy to all of the firms involved in making
12      its allocation of fees.
13              So if a lot of effort was expended, and it was, if
14      a lot of expense was expended, and it was, and if a lot of
15      accomplishment was achieved, and it was, that is what the
16      Court should look at, that the firms, whether they were
17      firms with one member or 20 members or a hundred or 500
18      members, it is the same analysis.  It is just that to
19      award -- to give an award, which does not provide adequate
20      compensation, is a hardship on all of the firms of whatever
21      size that have devoted themselves to this effort, and this
22      is what I want -- this is a question I want to leave with
23      the Court.
24              Our cases were filed in 2003, and they have been
25      there for six years.
```

```
 1                 Counsel's cases here, this case was filed in late
 2       '07, four and a half years after our cases.  Milliron was
 3       filed in August of '08, more than five years after our
 4       cases.
 5                 What were we supposed to do in the meantime?
 6                 We had to litigate.  We had to fight.  We had to
 7       represent our classes zealously, and that is what we did.
 8       We had no alternatives.  We couldn't wait around for
 9       somebody to come along later.  We were obligated to do the
10       work.  To do otherwise would have been a breach of our
11       ethical duties.
12                 The Court should compensate us for the work that we
13       did during that time.  Your Honor held in Milliron correctly
14       that it is for the Court to decide on fair compensation for
15       counsel who performed work before class counsel were
16       appointed, and in making that determination, your Honor, we
17       submit that the Court needs to take into account the
18       fairness and adequacy to us, not merely overall, but to us.
19       And in doing the allocation, your Honor, you are allocating
20       between fees and -- between firms.  And in the Diet Drugs
21       case, as I pointed out, the Court said that that allocation
22       process involves questions of fairness and due process.
23                 Therefore, the Court we submit needs to take a look
24       at whether it is compensating the time of counsel in those
25       cases at such a small negative multiplier, like .18, which
```

1       is what we got in Milliron.

2               The Court has to take that into consideration, and

3       we submit that if the Court were to issue an order like the

4       Milliron order here, that would not be taking into

5       consideration the fairness to those firms.

6               Now, I mentioned earlier that I was going to try to

7       clarify the record on a number of points made by class

8       counsel in their papers to make sure that the Court has an

9       accurate record on which to decide things.  There are two or

10      three of these points.

11              First of all, counsel says in their papers that our

12      fee application includes time from the Ayyad payer class in

13      our numbers.

14              It does not, and I don't know where they got the

15      argument that it does.

16              I would refer your Honor to, for example, the

17      Bursor declaration of March 3rd at paragraph 48, in which he

18      says such time is excluded.

19              My declaration of the same date, at paragraph 17,

20      which says the Sprint time is subscriber class time, not

21      payer class time.

22              Mr. Farino's declaration at paragraph 5, Mr.

23      Franklin's declaration at paragraphs three and four, et

24      cetera, and I could go down all of them.  The statement that

25      we included time from the case that has been carved out is

 1        wrong.  It is just incorrect.

 2              Secondly:  There is a chart in class counsel's

 3        papers that purports to show -- it is at page 19 of their

 4        brief -- it purports to show our time divided up by case.

 5        It is all wrong.  I don't know where they got any of those

 6        numbers.

 7              They claim, for example, that my firm claimed

 8        $532,000 plus $33,000 from the Ayyad payer class, and that

 9        we claimed zero from the Nextel class.

10              That is completely wrong.

11              If you look at my declaration from March 3rd, the

12        $532,000 Nextel time.

13              Similarly, with regard to Mr. Bursor, they claim

14        that he has $413,000 of payer class time.  That was

15        subscriber class time, if you look at his declaration.

16              I could go through all of the errors on the chart,

17        but my point is the Court should make its own review of the

18        declarations.  And when you do, your Honor, you will see

19        that we are seeking compensation for time in the Sprint

20        subscriber class case, the Robertson case, and Molfetas and

21        Lee, not the Ayyad payer class.

22              The second point counsel make in their papers is

23        that the Ayyad trial was a loss for the plaintiffs or that

24        it is debatable somehow whether it was.  I hear the Court

25        saying it's heard enough about that, and I am not going

 1        to -- I am not going to belabor it, other than the fact that
 2        we got an order declaring their ETF illegal, and I don't
 3        know how that could be a loss.
 4              The third point in their papers is that the Sprint
 5        subscriber class claims that we brought are worthless
 6        because either Mr. Bursor or I said so at the final approval
 7        hearing in Verizon.  I don't know how much your Honor wants
 8        to hear about that.  But, there was no statement made at any
 9        final approval hearing that our Sprint subscriber class
10        claims or any subscriber class claims are worthless.
11              I think Mr. Bursor just got done telling your Honor
12        that we are on the brink of obtaining an injunction worth
13        tens of millions of dollars against the collection of
14        flat -- or collection activities or flat ETFs.  That doesn't
15        sound worthless to me.
16              In the Verizon case we also didn't say it was
17        worthless.  However, in the Verizon case, there was nobody
18        left at the time that the settlement became effective who
19        was a current subscriber and still had a flat ETF because
20        Verizon had prorated two years earlier.  So in that case, it
21        was a vanishing class.  Here it is not.
22              Sprint very, very recently adopted prorated ETFs,
23        and there are still a lot of people among its current
24        subscribers who have flat ones, and there is no injunction
25        in the settlement.

 1              Okay.   In their papers they say that the Sprint

 2      subscriber class claim in California was really that the

 3      flat ETFs tethered existing subscribers to their contracts.

 4      Our claim in the Sprint subscriber class case in California

 5      was that we wanted an injunction because the fees were

 6      illegal.  That was our plan, and we were on the brink of

 7      obtaining such an injunction.

 8              Okay.  Finally, there is -- the Court asked me in

 9      Milliron and it referred to it in its order, how much money

10      are you asking for.

11              I will give your Honor the answer that I gave the

12      court in Milliron.  We are asking to be compensated fairly,

13      and this is how I think the Court should think about fair

14      compensation, and this -- this -- this also gets to the

15      objection to class counsel's fee as well.  The Court needs

16      to satisfy itself that the time and the work being claimed

17      by class counsel is what they claim it is.

18              It is not credible that 8600 hours for $4 million

19      in lodestar were incurred in a case that was filed in which

20      nothing happened other than a settlement.  No private client

21      would pay $4 million for that.  No private client would

22      accept that there are 8600 hours in connection with that.

23      We urge the Court to scrutinize those claims or appoint a

24      special master to do so.

25              Your Honor observed in the Milliron case that the

```
 1        lodestar claimed by one of those counsel was excessive and
 2        not credible, and the claim in that case on behalf of Freed
 3        & Weiss was for a lodestar of $711,000.  There are firms on
 4        that side of the table, a number of them, that claim a
 5        lodestar much higher than that.  The Court should take a
 6        look in the interests of fairness.
 7               Then the Court should take a look respectfully at
 8        the work that we did and the accomplishments that we
 9        achieved, and the Court should weigh the quantity of the
10        work, the quality of the work, the quantity -- the quality
11        of the achievement of all counsel together and make a fair
12        fee award, and that is what we are urging, your Honor.
13               If the Court has any questions, I will be happy to
14        respond.
15               THE COURT:  I have no questions.
16               MR. PLUTZIK:  Thank you.
17               THE COURT:  Mr. DePalma?
18               MR. DE PALMA:  Good afternoon, your Honor.
19               Joseph DePalma of Lite, De Palma, Greenberg & Rivas
20        appearing for my firm.
21               Your Honor, we are I think the only law firm
22        involved today that is in a different position than they
23        were in at the last hearing.
24               We are no longer involved in the case.  As your
25        Honor knows, we withdrew from the case.  We don't have a
```

```
 1        client, and therefore, we take no position today with
 2        respect to the adequacy or the fairness of the settlement.
 3        I don't think we can, and I certainly know that the Court
 4        wouldn't want to hear my opinion without a client, but we do
 5        seek a fee for the work that we performed while we were
 6        involved in the case.
 7             We are seeking nothing for any work we did, and
 8        there wasn't any after our withdrawal.  Like all persons who
 9        have submitted fee applications, I am assuming a premise,
10        and the premise I am assuming is that your Honor is going to
11        approve this new revised settlement as being fair,
12        reasonable and adequate.
13             Assuming that happens, then, your Honor, our
14        papers, my declaration, our brief, and our motion I think
15        establish that we conferred a substantial benefit to the
16        class.
17             I have the benefit of going last, so that I could
18        really rely on much of what was already said.  I will not
19        belabor the point regarding the notice, but my view is that
20        I could think of nothing more substantial than providing the
21        class with their new process rights that they are entitled
22        to.  These constitutional rights are I think paramount to
23        all matters.
24             If the Court does approve the new settlement on a
25        new notice plan that it finds to be Rule 23 compliant and
```

1    compliant with the Constitution, it is my firm along with

2    the efforts of my former colleagues who conferred that

3    benefit on the class.

4         Now, there are a number of ways for the Court to

5    determine how to award a fee if in its discretion it decides

6    to do so.  The way we chose in our papers is a little bit

7    different.  It is not to say it is better or worse than any

8    other way, but we looked at the due process rights as being

9    difficult to quantify.

10        There are ways we could do it.  Mr. Bursor did a

11   very good job of putting numbers on it, but what we felt is

12   that a better approach, at least for our firm, was to look

13   at our lodestar, and we submitted my declaration that sets

14   forth what the lodestar is, and then seek a multiplier based

15   on that given that we took the case on a contingent basis,

16   there was risk involved.

17        And in seeking a multiplier of 1.5, we tried to

18   come well within the range of the Cendant safe harbor

19   provision, which entitles counsel to seek upwards of a

20   multiplier in three or four in some case.

21        So we think our fee request is, in our view,

22   modest, given the work that we did and given the substantial

23   benefits that we gave to the class assuming that this

24   settlement is approved.

25        If the new notice is deemed compliant, I think

1   paragraph 13 of my declaration mentions that that means that

2   286,000 additional individual notices were mailed and about

3   1428 Rule 23 compliant notices were given that were not

4   given earlier.

5           So, your Honor, I think that again listening to the

6   instructions you gave to other counsel, not repeating

7   anything either from the last hearing or what is in the

8   papers, I think our papers are very detailed.

9           We mentioned in the papers that if indeed there is

10  going to be scrutiny, we are certainly willing and have

11  offered to submit our time records for in-camera review, so

12  the Court could determine, if it needs to, anything further

13  beyond my declaration.

14          That's it, your Honor.  I rest on my papers, unless

15  the Court has any questions.

16          THE COURT:  No questions,

17          MR. DE PALMA:  Thank you.

18          THE COURT:  All right.

19          Who is going to go first?

20          MR. BOYLE:  I will, your Honor.

21          Thank you, your Honor.

22          I just wanted to respond to Mr. Bursor's arguments

23  with respect to notice.

24          First of all, with respect to the motion to strike,

25  I don't want to belabor the point, but Mr. Bursor had from

```
 1    May 21 to June 2nd to raise the issue with the Court and
 2    seek discovery.  He didn't do so.  That was 12 days -- he
 3    had from May 21 to October 7th to seek discovery, so he
 4    could amend his objection.  That was 138 days.  Mr. Bursor
 5    didn't do that either.  He waited until the 149th day and
 6    the last day to make a motion to strike.
 7              So the motion is clearly untimely, but more
 8    importantly, it is legally deficient, your Honor, and
 9    because the motion was made, I want to cite the Court to UAW
10    vs. General Motors Corp. 235 FRD 383, wherein the Court
11    rejected Mr. Bursor's argument about subdivision (d) of
12    Federal Rule of Evidence 1101 stating that the list is not
13    an exhaustive list, and specifically holding in the context
14    of a fairness hearing, that hearsay objections and
15    objections, expert qualifications based on the Federal Rules
16    of Evidence are not appropriate.  It is a fairness hearing,
17    not a trial, despite Mr. Bursor's efforts to turn this into
18    a massive ongoing litigation.  This is an attempt to settle
19    the case.  The motion is improper, and it should be denied.
20              Mr. Bursor also doesn't do the Court any favors
21    when he misinterprets the time line of events with respect
22    to the discovery that was conducted.
23              He referred significantly to the Rice deposition,
24    which your Honor will recall when you were asked to recall
25    the telephone conversation that we had with your Honor from
```

1    the deposition.  That deposition was taken before the first

2    fairness hearing and was directed towards the efforts to

3    identify the settlement class as a whole.  And the

4    deposition questions that were asked and that were not

5    answered were efforts directed towards sub-classes, which at

6    that point in time of the Court had not ordered to occur.

7         The Court did order subsequently that such efforts

8    to identify smaller groups of individuals should occur.  Mr.

9    Rice undertook the investigation of what that would take,

10   put it in his declaration, which he says is based on

11   personal knowledge, and obviously conversations with Amdocks

12   instead of the vendor on that issue.

13        Mr. Bursor had 149 days to inspect that declaration

14   and determine whether or not a second deposition was

15   required.  He determined it was not.  It goes directly to

16   the credibility of the arguments he makes here today.

17        Now, with respect to the Rice declaration in and of

18   itself, Mr. Bursor would give you the impression that it is

19   a very simple issue here, do you expend the money set forth

20   in the Rice declaration or do you not.

21        But the Rice declaration addresses much more than

22   simply the out-of-pocket expenses associated with

23   undertaking these specific endeavors.

24        In paragraph 22 -- I'm sorry -- in paragraph 21,

25   Mr. Rice indicates that all of this stuff is going to have

1      to be done real time in connection with an ongoing business

2      that handles emergencies all of the time and has to make

3      contingencies for emergent events like hurricanes and wild

4      fires, and there are massive updates to that system.

5            During the process of these updates, these data

6      queries that we would be making to attempt to identify

7      individual class members can be corrupted and destroyed, and

8      there is no way to predict for your Honor when that will

9      happen, when it might happen, and what effect it would have.

10            So your Honor gets a time line, but it is

11      specifically said to be subject to these potential

12      contingencies, and obviously, if we had a contingency, let's

13      say we said it would take two months, and then all of a

14      sudden in the middle of the second month, the data was

15      destroyed.

16            Your Honor had already set a time line.  Notice is

17      going out on this date, the fairness hearing is on this

18      date, and we had to come back up, your Honor, hold on, hold

19      on, we got to start over again.

20            This I think was the essence of the Court's ruling

21      when it said it is not reasonable to force Sprint to pour

22      through all of its data, to basically stop its operations or

23      work around the clock to try to get this list, and the Court

24      found that the Rice declaration and the efforts set forth in

25      there made it clear that that effort would not be

1     reasonable.

2            There is no magic formula.  No matter what Mr.

3     Bursor says, it is a pragmatic case-by-case analysis.  Your

4     Honor had before you the Rice declaration, and I think took

5     a pragmatic view of what was in it.

6            Indeed, Sprint says to your Honor, we don't think

7     some of these efforts are reasonable, but we will undertake

8     whatever the Court orders.

9            I think the Court looked at it and said, this

10    really is not really workable because we have all of these

11    possible delays in addition to the cost and expense that is

12    a known factor.  So I think your Honor absolutely came to

13    the right conclusion, and again, we were willing to do it,

14    but we didn't think it was appropriate to put our entire

15    business on hold to search for these lists, and I think your

16    Honor concluded the same thing.

17           So, you know, I would again stress that the Rice

18    declaration as a whole totally supports your Honor's

19    conclusion, and again, it has not been rebutted.

20           With respect to Mr. Weir's declaration and then Mr.

21    Rice -- or Mr. Bursor's other legal argument in his

22    supplemental declaration, your Honor, it is important to

23    know what we are comparing now.

24           Mr. Weir queried a portion of his data base that

25    was created specifically for the Ayyad litigation.  It was

1      created with significant time and expense, very similar to

2      that which Mr. Rice described in his declaration, and

3      indeed, Mr. Dupon provided your Honor with an affidavit

4      talking about how much money and time it took to create that

5      data base.

6              Mr. Weir only queried a part of it and came up with

7      certain people that he thought he had identified as

8      individually liable customers.

9              Well, he only queried a part of it.  It wasn't a

10     Sprint data base in situ.  It was one that was specially

11     created for the litigation, and then Mr. Bursor takes that

12     percentage and says, I can look at your collectibility

13     analysis, and I can tell you despite the fact that I told

14     this Court it was 9.1, now I can tell you with certainty

15     it's 4.1.

16             Well, neither of those are certain and neither of

17     those declarations are proper.  Your Honor, I have, because

18     we got that, I believe it was yesterday or Monday evening, I

19     think it was Monday evening, we got these again belated

20     submissions by Bursor.  We had to get Mr. Dupon on the line

21     and he was in flight, so he did provide a supplemental

22     declaration, which I would like to hand up to the Court for

23     your consideration when you are examining and determining

24     what weight, if any, to give to Mr. Weir's declaration and

25     whether or not to give any weight to Mr. Bursor's legal

```
 1       argument declaration, if I may.

 2              THE COURT:  Have you shown this to counsel?

 3              MR. BOYLE:  I will now, your Honor.  I brought it

 4       to court this morning.

 5              THE COURT:  What is this going to add?

 6              MR. BOYLE:  Well, it is going to give you an

 7       opportunity to understand the context of what Mr. Weir is

 8       saying that he searched because the impression --

 9              THE COURT:  But that is in your letter to me

10       responding and asking to strike Mr. Weir's last minute

11       declaration.  In your letter, you put it in context, that it

12       is data that was generated in the context of that

13       litigation, et cetera.  All of the arguments that you are

14       making now are in your letter, so is it going to take --

15              MR. BOYLE:  No, it's not.  It would just be the

16       factual background for the fact that it was the Ayyad data

17       base, not a Sprint in situ data base.  That is all.  If the

18       Court doesn't find it helpful --

19              THE COURT:  I will let you hand it up.  I may or

20       may not consider it at the end of the day, but we at least

21       we will mark it, and we'll have it, just like I have the

22       Weir declaration, and there is a motion to strike the whole

23       Rice declaration for that matter, and I will take that all

24       under advisement and figure it out, and I'm going to try to

25       put everything together in context.
```

```
 1                    Make sure counsel gets a copy.

 2                    MR. BOYLE:  May I approach, your Honor?

 3                    THE COURT:  You may.

 4                    Make sure my law clerk has a copy, too.

 5                    Lis, mark that as Boyle 1 with today's date.

 6                    (Exhibit Boyle 1 marked.)

 7                    (Document handed to the Court.)

 8                    MR. BOYLE:  Your Honor, with respect to the

 9      Robertson issue, if your Honor will recall, that direction

10      from the Court --

11                    THE COURT:  It says to the extent that that was

12      erroneous or you got it corrected --

13                    MR. BOYLE:  Right, number one, December 3rd when we

14      signed the settlement agreement, it was not erroneous.

15      There was a reconsideration motion pending.

16                    Second, your Honor gave that direction in paragraph

17      16 of your original -- footnote 16 of your original opinion

18      when you were contemplating a complete renotice of the

19      class.

20                    On reargument, that complete renotice was taken off

21      the table, so we would have had a situation, where some of

22      the folks that got publication notice would not have had

23      reason to go back to the website and view the settlement

24      agreement.

25                    So, again, the information was correct at the time
```

```
 1        it was there, and there was not a complete renotice, and I

 2        think Mr. Bursor's opposition to the motion for reargument

 3        notes that, you know, this was one issue that your Honor

 4        directed, and you need to consider if you are not going to

 5        make it a complete renotice, so again, that was the logic --

 6             THE COURT:  Why would that be something that you

 7        don't consider on a partial notice on renotice --

 8             MR. BOYLE:    Well, because, you know, I could see

 9        somebody coming back and going, oh, anybody who got

10        publication notice only got, you know, the website and

11        looked at the settlement agreement and saw the unchanged

12        version and now you changed it.  So, you know, you can look

13        at it either way, but, again, December 3rd, the big

14        settlement agreement was signed.  That information was

15        accurate.

16             Again, your Honor, that information was there to

17        describe who is in the Ayyad payer class.  It was not a

18        notice directed to the Robertson class.  It was part of a

19        definition to say, okay, because Ayyad has in it Ayyad

20        payer, Ayyad subscriber, Roberson, so it said Ayyad payer is

21        this group in this case except for these folks, and it was

22        only meant as a description of the case and its procedural

23        status on that date.

24             So, again, it was accurate on the date it was

25        given, and considering that we didn't change the rest or any
```

```
 1        other portions of the settlement agreement, and we already

 2        had a part of the notice out there, it didn't seem like we

 3        should change that because, again, it was accurate on the

 4        day the settlement agreement was signed, so that was the

 5        logic that was employed there.

 6               With respect to this idea that the notice is meant

 7        to mislead the class by saying Sprint never was found to

 8        have any -- done anything illegal with respect to an ETF,

 9        that's a ridiculous argument, your Honor.

10               The notice itself says:  This notice is not

11        intended to imply that Sprint has done anything unlawful in

12        this case, so it is both limited to the notice, which

13        obviously didn't make any finding of unlawfulness, and there

14        was no finding of unlawfulness in this case.

15               You get into this whole chase your tail thing on

16        this because, as I understand it, as a result of Mr.

17        Bursor's appeal of the order in the Ayyad payer case, that

18        order allegedly finding illegalities was vacated.

19               So you know what?

20               You're going to send out another notice about that.

21        The notice did its job.  It was supposed to tell people what

22        the case was about and give them notice of how to object or

23        claim, and it certainly met that standard, your Honor.

24               Finally, with respect to the Carlo case, Mr. Bursor

25        contends that there were no numbers on reasonable efforts
```

1    because they undertook the efforts, but what Mr. Bursor

2    fails to point out is that the Court also said certain other

3    efforts suggested by the objectors would be unduly time

4    consuming and expensive, not necessarily fruitful, and it

5    did not analyze any anticipated result from those unduly

6    time consuming, expensive and not necessarily fruitful

7    efforts, so the idea that you have to put out numbers there

8    is just again a misstatement of the law.

9              Thank you, your Honor.

10             MR. CECCHI:  Judge, very briefly.

11             Picking up on Mr. Plutzik's last point, which was

12   critical of the lodestar submitted by class counsel, Mr.

13   Plutzik makes the point and says, well, it's about $4

14   million in lodestar, and the Larson case was filed whenever

15   it was filed, and, you know, you have to carefully

16   scrutinize that.

17             We respectfully suggest, Judge, that that is more

18   of the sleight of hand that's been employed by the

19   Bursor/Plutzik objectors throughout this proceeding.  It's a

20   sleight of hand because he knows full well that the $4

21   million in lodestar is not just my time or it's not just

22   Seeger Weiss' time, it's not just Freed & Weiss' time.  It

23   is the time of all of the other lawyers around the country

24   who had ETF cases who have joined with us in support of this

25   settlement.

```
 1                It is the time of all of the lawyers who support
 2       this settlement, had cases, which were released to this
 3       case, who didn't object to the diligent review of this
 4       settlement and came to the conclusion, as your Honor knows
 5       from the last hearing, that this was fair and reasonable and
 6       part of the class.  It includes the time of Lieffar
 7       Cabraser, a national law firm, highly respected.  It
 8       includes the time of Mr. Beazek who spoke the last time.  It
 9       includes the time of Carey & Danis, all firms who had cases
10       for many years.  It also includes the time of Mr. Strange
11       who had a case for many, many years.
12                What ever anybody wants to say about some of the
13       theories in that case, he had a certified arbitration, 48
14       states, where notice went out, and it includes his time, his
15       million dollars in lodestar, and it includes Mr. Weiss'
16       time, who Mr. Plutzik well knows was litigating these ETF
17       cases just as long as Mr. Plutzik has, so to suggest with a
18       sleight of hand that that $4 million is somehow unreasonable
19       because it only includes the Larson time is just that, it's
20       a sleight of hand.
21                I also want to mention our fee, which they also
22       know.  When we walk out of here, Judge, and your Honor
23       exercises your discretion and awards an appropriate and fair
24       fee to everyone, guess what, we have to work for another two
25       years without getting compensated, by getting compensated
```

```
 1        for whatever you give us now, because we are going to be
 2        dealing with this case on appeal, and that is what I signed
 3        up for, and I am not complaining.  I'm just pointing it out.
 4        We will be dealing with their appeal for years.  We will be
 5        dealing with the claim process for years, so our fee, to
 6        suggest that somehow that lodestar is not appropriate in a
 7        cross-check context section is simply a sleight of hand.
 8             Mr. Plutzik asked your Honor a hypothetical
 9        question, and I won't go into all of the details about the
10        Ayyad case.  Well, how they could consider it a loss, the
11        Ayyad case, when we declared the ETF illegal?
12             You don't have to listen to me, because the answer
13        is so plain.  The jury also found in favor of Sprint that
14        Sprint's damages swamped the ETFs. It's very apparent, but
15        you don't have to trust me.
16             What you can rely upon is the judgment of their
17        co-counsel, Ms. Mottek, who in a recent hearing when Mr.
18        Bursor attempted to up-end the Executive Committee's
19        structure of that state court case in California said as
20        follows:
21             And the last thing I want to say, your Honor, is
22        the reason we oppose Mr. Bursor trying the case - referring
23        to the AT&T case - is because we lost in Sprint.
24             You don't have to rely upon me.  You can rely upon
25        their co-counsel, who honestly and fairly assessed what
```

```
1        happened in Ayyad in California.  It is appended to Mr.

2        Taylor's declaration, which we've submitted, and it's on

3        page 17 of the transcript.  It's Ms. Mottek's assessment of

4        what happened, their co-counsel.

5                Also, just going back to the lodestar, that $4

6        million in lodestar includes Ms. Mottek's time, their

7        co-counsel, who, as she did in T Mobile, looked at this

8        settlement and said it's fair, an unsupporting class

9        counsel.  Again, sleight of hand.

10               You know, I heard Mr. Plutzik making an impassioned

11       plea, and the point that I would wish to make about that is:

12       This is a contingency business.  This is a very risky

13       business that we are all in, the lawyers who speak to your

14       Honor today.

15               You know, the lawyers on this side of the table

16       know something about risk and know something about

17       contingency, because we were the same lawyers who were

18       appointed by the United States Federal Court in this

19       district to represent a national class in Verizon, which

20       they settled in California when they had a California case,

21       they settled our case and they gave us nothing.  They got a

22       seven and a half million dollar fee, and they gave us

23       nothing.

24               THE COURT:  Mr. Cecchi, that is an old argument

25       now.
```

1          MR. CECCHI:  Thank you.

2          The benefit conferred, I think again going to the T

3     Mobile framework, they have a business model.  They filed

4     state court cases for state court classes.

5          We had a national case.  Again, it is not my fault

6     that they had a state court case.  Molfetas, they lost.

7     Robertson was a judgment against them.  If anything, that

8     didn't confer a benefit.  It diminished the settlement value

9     of our national cases.  It was not my decision to focus my

10    efforts in California.

11         I had a national case.  They never had a national

12    case.  They still don't have a national claim for a Sprint

13    national ETF claim, except for the belated filing of that

14    Lee case, which I already spoke to.

15         Finally, the chart Mr. Bursor handed up, the, quote

16    unquote, reverter.

17         You know, even if you take his argument about what

18    the words in the settlement agreement mean and the words in

19    our stipulation mean, and what I would say to your Honor is

20    when we are assessing what it means, I just go back to what

21    I said when the argument was sprung without notice to me.

22    The third day of the hearing back in March, I said it was

23    not a reverter, never intended to be a reverter, when I

24    didn't have notice that it was going to be an issue.  I told

25    your Honor what we thought and that your Honor had

```
 1      discretion.  If your Honor didn't like the military, you
 2      could do whatever you want.  That's what I told you when I
 3      didn't have notice of his argument.
 4              I submit that that statement in conjunction with
 5      our stipulation and all of the words in the alleged reverter
 6      speaks clearly to what it was intended to be, cypres.
 7              But even if you take his chart, where he claims
 8      that the reverter is going to be $2 million to Sprint, it
 9      doesn't make any sense when you compare it to the words,
10      because Sprint or a reverter is when the money goes back to
11      you, the class doesn't take it, the money goes back to you,
12      and you keep it.
13              Even under his theory, they were never keeping the
14      money.  They had to go out dollar for dollar, as he said the
15      last time, and buy calling cards, and that's not a reverter,
16      and pox on me if I thought that it was a good idea to send
17      calling cards to the military.
18              I have nothing further, Judge.
19              MR. SUPRENANT:  Thank you, your Honor.
20              Dominic Suprenant.
21              I am principally going to address as succinctly as
22      I can the reasonableness and the objections.  I know your
23      Honor wants us to be succinct.  I am going to respond to
24      direct quotes made by Mr. Bursor.
25              After that, your Honor, and it should take no more
```

```
 1      than ten to 12 minutes, I would like to address -- Sprint

 2      has no position on fees, but I would like to address factual

 3      statements made by Mr. Plutzik, so the Court has, in my

 4      view, a correct understanding of what happened.

 5              Your Honor said quote:  Be succinct and address

 6      matters raised by Mr. Bursor.

 7              That is what I will do.

 8              Mr. Bursor said, quote, that he never seen, quote,

 9      a worse result for a class.  It was the worst result for a

10      class I've seen.

11              He said in Ayyad, we were, quote, awarded 100

12      percent of our damages.

13              Quote:  Awarded 100 percent of injunctive relief.

14              Quote:  We were awarded 73 million in cash,

15      and 225 million in debt relief.

16              Quote -- what he also said -- he said in his brief

17      that he had been awarded 299 million at page 41, and he said

18      what matters is dollars in the class members' pockets.

19              Your Honor, I saw your Honor taking some notes in

20      response to some things Mr. Bursor was saying, and I think

21      it is very important that I correct the misstatements that

22      he made.  I have some demonstratives I am going to show, two

23      copies, your Honor.

24              THE COURT:  Did you give counsel a copy?

25              MR. SUPRENANT:  Yes, your Honor.
```

PHYLLIS T. LEWIS, CSR, CRR, OFFICIAL COURT REPORTER

```
 1              When Mister --

 2              THE COURT:  Wait, wait, one second.

 3              (Court and Clerk confer)

 4              Go ahead.

 5              MR. SUPRENANT:  Your Honor, this was just a board I

 6    put up when Mr. Cecchi was speaking.  It is Ms. Mottek, a

 7    member of the Executive Committee, telling Judge Smith, who

 8    Mr. Bursor tried to --

 9              THE COURT:  Wait.  Is that part of this?

10              MR. SUPRENANT:  Yes, your Honor.

11              THE COURT:  Is that in here?

12              MR. SUPRENANT:  Yes.

13              THE COURT:  It says, "Conclusion," Exhibit 1, is

14    that what it is?

15              MR. SUPRENANT:  Your Honor, let me --

16              THE COURT:  Oh, I found it.

17              MR. SUPRENANT:  Thank you, your Honor.

18              I am sorry.  They were a little bit out of

19    sequence.

20              THE COURT:  It starts with, "And the last thing" --

21              MR. SUPRENANT:  "And the last thing I want to say,

22    your Honor is the reason we oppose Mr. Bursor trying the

23    case is because we lost in Sprint."

24              That is a member of Executive Committee.  That's

25    Ms. Mottek.  That's not me.
```

1            I want to look at the Court's statement of decision

2       in light of Mr. Bursor telling your Honor he was awarded

3       more than $299 million, telling your Honor that he got 73

4       million in cash and 225 million in debt relief.

5            This is the statement of decision.  It is the

6       conclusion at the end of 26 pages, and it says:

7            "The Court will enter judgment" -- this is Exhibit

8       1, your Honor to Document 235.

9            "The Court will enter judgment in favor of

10      plaintiffs on their claims, and in favor of Sprint on its

11      cross-claim.  After the setoff of monetary relief neither

12      the class nor Sprint is entitled to any monetary recovery."

13            Judge Bonnie Sebraw:  "The class is not entitled to

14      any monetary recovery."

15            Not 299 million, not 73 million.

16            Well, let's try to rehabilitate Mr. Bursor's

17      credibility.  Maybe he was meaning to talk hyperbolically

18      that he got $299 million in debt relief.

19            No, that is also false.

20            This is the relief that the Court gave.

21            "The Court orders that for those class member

22      accounts still in the possession of Sprint that Sprint must

23      reverse the charges for any charged but unpaid flat ETFs and

24      is enjoined from attempting to collect the unpaid flat

25      ETFs."

```
 1              As Mr. Bursor knows from the evidence and testimony
 2      at the Ayyad trial, that debt up to ten years old that we
 3      still own is minuscule.  It is minuscule.  It's either been
 4      written off or sold years ago a penny on the dollar to debt
 5      collectors, so it is not a monetary recovery.  It is a
 6      minuscule reversal of the debt.
 7              That is Judge Bonnie Sebraw's conclusion, so Mr.
 8      Bursor misrepresented what happened.
 9              THE COURT:  Are both aspects of that on appeal?
10              MR. SUPRENANT:  I am going to get to that, your
11      Honor.
12              THE COURT:  That's a yes or no answer.
13              Are both of those aspects on appeal?
14              MR. SUPRENANT:  Yes, but with some clarification
15      that I will get to.
16              Okay.  So let's now -- that was the thing I was
17      going to say is your Honor -- your Honor was obviously
18      interested in where are things now, what is the current
19      status.
20              And what happened, and this is very important, your
21      Honor, on the topic of injunctive relief, the jury verdict
22      was something that the court in California could not get
23      around.  She could not award any money to the class in light
24      of the verdict, so in her statement of decision, this
25      decision, your Honor, Exhibit 1, Document 235, at footnote
```

1    7, she invited the plaintiffs to bring a motion for a new

2    trial on damages, and they did, and she granted it.

3         And as I told your Honor before, the result of her

4    granting that was to vacate the judgment for all purposes,

5    and I got tired, and Sprint got tired of Mr. Bursor

6    misrepresenting the status of that judgment on his website,

7    of misrepresenting it to your Honor, and of misrepresenting

8    it to Judge Smith.

9         So after the initial fairness hearing we had, we

10   brought a motion to get essentially Judge Smith, the current

11   judge, who I think your Honor spoke with by phone, to

12   clarify the statute.

13        This is Exhibit A to Document 388.

14        "The 12/24" "judgment is not divisible into a

15   judgment on the Court's decision on the complaint against

16   Sprint and a separate judgment on the jury's verdict on

17   Sprint's cross-complaint against the plaintiff class.  This

18   is the law as a matter of general jurisprudence."

19        She then goes on, and this is the March 23rd order,

20   your Honor.

21        "This is particularly appropriate," in other words,

22   vacating the entire judgment, "is particularly appropriate

23   on the facts of this case where the Court's decision on the

24   validity of Sprint's ETF created an intertwined cross-claim

25   for breach of contract.

1               "The order granting a new trial on Sprint's

2       cross-claim damages vacated the judgment in its entirety for

3       all purposes except for review on appeal.

4               "Given that as a matter of law," the, quote, "'one

5       final judgment,'" end quote, "has been vacated for all

6       purposes except for review on appeal, the Court cannot give

7       effect to any part of that judgment."

8               Half of what Mr. Bursor and Mr. Plutzik told you is

9       inaccurate.  They have no verdict.  There is no finding of

10      illegality --

11              THE COURT:  All right.

12              Counsel, I have given you some leeway rearguing old

13      stuff.

14              MR. SUPRENANT:  It was in direct response --

15              THE COURT:  He made one statement, and I said we

16      are not going to get into who won or lost, and that is what

17      this is about all over again.

18              I already have that information.  That is why I was

19      only concerned about whether or not there had been a change

20      in the appeal.

21              When I asked Mr. Bursor that question, I was being

22      serious, I thought perhaps I missed something, that there

23      had been a change in the appeal.  That is only the reason I

24      asked.  All of this stuff is not new.

25              MR. SUPRENANT:  This is new, your Honor.

1            This order is after the initial final fairness

2      hearing, and I do think it is important to go to -- we now

3      have a clarifying order from Judge Smith on where the

4      parties stand, and that was the purpose.

5            THE COURT:  Okay,

6            MR. SUPRENANT:  Moving on to the issues of it's

7      been found illegal and the injunctive relief, as I said, I

8      think this order is relevant and touches on that topic on

9      the findings of illegality, and what we were told, your

10     Honor, and it is important, and this is new, this is a new

11     argument, your Honor.

12           We were told -- your Honor was told by Mr. Bursor

13     that the injunctive relief in California was certain.  It

14     was going to happen.  He was talking about a tentative order

15     that was issued at the very end of 2008, early 2009.  And

16     there was a tentative decision, and that tentative decision

17     by Judge Smith that Mr. Bursor is referring to -- Judge

18     Smith was a new judge to the case.  Judge Bonnie Sebraw had

19     retired, and her tentative decision, what she said

20     essentially is, Well, I think Judge Bonnie Sebraw found it

21     illegal, and I think I am going to follow that in a

22     tentative order, and so, you know, I may order some

23     injunctive relief.

24           What happened then, your Honor, I believe it was

25     January 27th, it was the grant of a new trial, okay, and

1          that is again the relevance of this.  Judge Smith in the

2          tentative order at the end of December, early January, said

3          in light of Judge Sebraw's order, I will follow it.

4                  But then what happened is that the foundation was

5          taken away with the grant of the new trial on damages, and

6          the order was vacated, so I think it is highly uncertain

7          that they would get any injunctive relief in California.

8          That was a big part of the presentation.  It is new, your

9          Honor, and it is inaccurate.

10                 Now, they said we didn't get any injunctive relief

11         in this case.

12                 What about the poor subscribers who still have a

13         flat rate ETF --

14                 THE COURT:  What would be the value of that

15         injunctive relief, though?  He used a rather formidable

16         number there.

17                 MR. SUPRENANT:  Well, it would have been the value

18         of not assessing ETFs in California on a going forward

19         basis, and I don't have a precise number for that, your

20         Honor.  I do not believe that order would have been granted.

21         That is how I would respond to your Honor's question.

22                 Going to the inadequacy of the settlement because

23         it doesn't have any injunctive relief, and the injunctive

24         relief was certain in California, as I just explained, I

25         think it is highly uncertain and speculative at best.

```
 1              But the class here does get relief, your Honor.
 2    Current class members do get relief if they swear under
 3    penalty of perjury that they attempted to terminate, and the
 4    only reason they didn't is because Sprint said if you
 5    terminate, we will charge you an ETF.
 6              They will get relief.  They will get $35 for 360
 7    minutes, so I think that that is certain relief, not the
 8    speculative relief that Mr. Plutzik and Mr. Bursor referred
 9    to.
10              Now, I do have to respond, your Honor, if I could
11    do so briefly.  Mr. Bursor must have said a dozen times that
12    I said Sprint would get the money back from the cypres.
13              Your Honor pointed out, and Mr. Cecchi pointed out,
14    he wasn't reading the whole sentence, and the whole
15    sentence, which Mr. Cecchi then read and Mr. Bursor read, I
16    don't think there's any way to read it in any way other than
17    perfectly consistent with what Mr. Cecchi's closing comments
18    were.  We were not going to end up with a nickel in our
19    pocket, and the full quote makes that absolutely clear.
20              Mr. Bursor said, what does claim mean.  Claim is
21    highly uncertain for the poor class member who hasn't made a
22    claim.  They don't know.
23              Your Honor, that is all a sleight of hand as well.
24              What the claim plainly means is claims that are
25    alleged in the complaints that are being settled.  It is a
```

146

1    different situation, fundamentally different than in the

2    Chaing case.

3         Your Honor, I do want to make one point.  I don't

4    want to get cross-eyes on your Honor on a jury verdict, and

5    I'm not going to argue what it means, but I do think there

6    is a new point that I would like to make that goes to the

7    Girsh factor of the risk, and I wish I had made this point

8    last time.

9         But there has been one jury verdict in the ETF

10   case, your Honor, one jury verdict.  And if this case

11   continues, all of the cases tried to a jury, I think the

12   most important precedent for your Honor in trying to adjudge

13   the Girsh factors what might happen is what a 12-member jury

14   did after a three-week trial.

15        What they did was they said the class breached

16   their contract.  Sprint recovered 73 million and change, and

17   their actual damages caused by the class' breach was 225

18   million.

19        When you add the damages to what we recovered, had

20   already previously recovered, it exactly matches the ETF

21   charge, so I think this is a very telling and perhaps the

22   most probative piece of date on what kinds of risk the

23   plaintiff's claims face, if this case continued.

24        THE COURT:  By the way, just for the record, your

25   new demonstratives, I marked them Suprenant 1 with today's

```
 1    date 10/21/09.

 2                  (Exhibit Suprenant 1 marked)

 3                  MR. SUPRENANT:  Thank you, your Honor.

 4                  Now, I am now done responding to the objections and

 5    to Mr. Bursor, and I tried to be as succinct as I could.

 6                  I do have a number of points that I would like with

 7    your Honor's permission to make very quickly with respect to

 8    the points Mr. Plutzik made on the fee application.

 9                  Sprint doesn't take a position on how your Honor

10    should award those fees, but there are things that I think

11    are relevant to your Honor's exercise of that discretion.

12                  MR. BURSOR:  I object to that.  I don't think he

13    has standing to address the issues, particularly since

14    Sprint is not taking a position, why do we have to listen to

15    him talk about fees?

16                  THE COURT:  Good point.

17                  MR. SUPRENANT:  Your Honor, do they want to mislead

18    your Honor?  Is that what they are saying, they want to

19    mislead your Honor?

20                  Your Honor, one of the first things I want to

21    say -- the first thing I want to say goes to the value to

22    the class because of their outrageous settlement demand.  I

23    am the only person in this courtroom that knows that.  They

24    worked -- they did the work.

25                  THE COURT:  To that extent he has standing at least
```

```
1          to educate the Court at least on what happened with regard
2          to the attempts that were made by your side to settle it.
3                  But now this sounds like old material, because I
4          know you spent an awful lot of time last time going back and
5          forth and telling me how the settlement was, and what the
6          demand was, and then what happened, and it fell apart, and
7          all of that is on the record.  I have all of the
8          transcripts.
9                  MR. SUPRENANT:  It will take 30 seconds.
10                 THE COURT:  30 seconds.
11                 Go ahead.
12                 MR. SUPRENANT:  In the Spring of 2008, I got a $214
13         million demand from Mr. Plutzik for a national settlement.
14                 One week into the trial, I got a $99 million demand
15         from Mr. Plutzik for a national settlement.
16                 The day before the jury came back on June 12th, Mr.
17         Plutzik told me -- Mr. Bursor told me he didn't have
18         approval from the Executive Committee, but if we agreed to
19         somewhere in the $30 million range, he thought he could
20         settle it.  I think that those provide relevant data for
21         your Honor's exercise of discretion.
22                 If your Honor is uncertain about my standing to
23         correct the record, I follow your Honor's guidance.
24                 THE COURT:  Go ahead.
25                 MR. SUPRENANT:  If your Honor has no questions, I
```

1           am done.

2                    THE COURT:  I have no questions.

3                    MR. BURSOR:  Your Honor, Mr. Boyle cited a case --

4                    THE REPORTER:  I can't hear you over here.

5                    THE COURT:    Mr. Boyle cited a case, 235 Fed. 3rd,

6           383, is that what you think he was talking about?

7                    MR. BURSOR:  Yeah.

8                    THE COURT:  He cited that case.

9                    MR. BURSOR:  I heard that for the first time just

10          now, so I was hoping the Court would give me a few minutes

11          to address that.

12                   That case, UAW vs. General Motors Corp., I just had

13          a quick opportunity to review it now.

14                   Mr. Boyle cited it for the proposition that the

15          Federal Rules of Evidence do not apply at a fairness

16          hearing.

17                   THE COURT:  Right.

18                   MR. BURSOR:  It does not, so it appears that the

19          objection that was made in the UAW case was an objector came

20          in and said the Court cannot receive evidence by declaration

21          or affidavit because those are hearsay, and the Court must

22          take live testimony and must not consider declarations or

23          affidavits.  And furthermore, before the Court can hear

24          expert testimony, we have to have disclosures of the --

25          expert disclosures provided for under Rule 26, so an

1      objector comes in and says you can't even look at

2      declarations.

3                Obviously, that is not what we are asserting.

4                THE COURT:  Well, it sounds like some of what you

5      are asserting.  You asserted it was hearsay.  You asserted

6      that he was not an expert, giving lay opinion, that

7      therefore, it doesn't mean it meets the requirements of

8      expert testimony.

9                Look, I am going to read the case, and I am going

10     to make a determination ultimately as to what I think it

11     holds.

12               MR. BURSOR:  Well, two points about that, your

13     Honor.

14               We don't say that you can't consider Mr. Rice's

15     declaration because it is a declaration.

16               For example, on summary judgment or motions,

17     testimony is often taken by declaration rather than live.

18     That is not the problem with Mr. Rice's declaration.

19               The problem with Mr. Rice's declaration is there

20     are several layers of hearsay.  There are other evidentiary

21     objections to the content of Mr. Rice's declaration.

22     Nowhere does he say that he personally made these

23     investigations.  Nowhere does he say that he communicated

24     with anybody in Amdocks.

25               THE COURT:  Okay.

1          MR. BURSOR:  So that's one point.

2          The second point about UAW, your Honor, is that it

3     is a single case from the Eastern District of Michigan that

4     when we shepherdized, we find it has never been followed

5     ever, no other court.  So to the extent it says anything, it

6     is an outlier, and it doesn't say that you can have a

7     declaration by somebody who lacks personal knowledge and

8     consider that at a fairness hearing.

9          The last point, your Honor, I mean, if you are

10    interested in the jury verdict, if could I just make clear

11    very quickly, this jury verdict right here --

12         THE COURT:  The verdict sheet?

13         MR. BURSOR:  Yeah -- yes.

14         THE COURT:  You learned, though.  That is good you

15    remembered.

16         (Laughter)

17         MR. BURSOR:  I caught myself fast.

18         This answer to Question 3 that supposedly swamped

19    our damages, this is what Judge Sebraw vacated.

20         The rest of the verdict is intact, and the finding

21    of illegality is intact.

22         What happened with Question 3, your Honor, is that

23    this is the exact dollar amount of the ETFs that were

24    charged, but not paid, and Judge Bonnie Sebraw gave some

25    erroneous jury instructions that led the jury to conclude

```
1        that the class had breached their contract by not paying

2        these unpaid charges.  They did not find that this was

3        Sprint's damages, and that is why this got set aside.

4              So this was not a finding of Sprint's damages, that

5        is what Judge Bonnie Sebraw -- and I mean to her very

6        credit, she recognized that she made an error that it

7        affected the jury verdict, so that's gone.

8              That remains, the finding of the illegality

9        remains, and the award of the $225 million definitely

10       remains, so we got $299 million.

11             They are taking it up on appeal.  I don't know how

12       it is going to turn out, but to come in and say this verdict

13       says we swamped them, that's not right.

14             Thank you, your Honor.

15             MR. SUPRENANT:  Your Honor, I won't respond to

16       that, but I urge your Honor to read the statement during the

17       trial because the basis on which it was granted is not

18       anything related to what Mr. Bursor just said in his attempt

19       to mislead the Court.

20             On January 29th, 2009 grant of a new trial, it's in

21       the record, and the basis that Judge Bonnie Sebraw gave was

22       that the jury inadvertently, they must have concluded, there

23       is not a jury instruction mentioned, certainly not

24       negatively mentioned, and I don't think mentioned at all in

25       the order, she said the jury must have decided it was lawful
```

```
 1        and ignored my five separate instructions that I, the Court,

 2        will decide.

 3              That is not the basis for the granting of a new

 4        trial, your Honor.

 5              MR. BURSOR:  If I can just respond.

 6              THE COURT:  All right.  No more from you two.

 7              (Laughter)

 8              MR. DOHERTY:  Your Honor, if I may, Richard Doherty

 9        on behalf of Jessica Hall.  That argument about --

10              THE COURT:  Yes.  You can speak.

11              You can come up here, or you can stay there.

12              Your argument must be short because everyone else

13        has said --

14              MR. DOHERTY:  No one has ever called me short.

15              THE COURT:  -- no, your argument I was speaking

16        about because --

17              (Laughter)

18              MR. DOHERTY:  Mr. Cecchi stated, in talking about

19        lodestar, that at the time class counsel, including all of

20        these other firms, including Freed & Weiss, who he stated

21        worked on this case as long as Mr. Bursor has, my assumption

22        is he is referring to Hall versus Sprint, our case, which

23        Freed & Weiss, which was filed way back in '04, and Freed &

24        Weiss were the court appointed co-lead counsel on the case,

25        and we already made our arguments about the impropriety that
```

154

```
 1    we had about Freed & Weiss being here, so I'm not going to
 2    get into that.
 3              But Mr. Cecchi, when he said it includes all Fried
 4    & Weiss' time way back when, whether the lodestar in this
 5    case includes time that was spent on our case, Hall versus
 6    Sprint, I would just like some clarification on that.
 7              MR. CECCHI:  Yes.
 8              THE COURT:  The answer is yes.
 9              MR. CECCHI:  Yes.
10              The case was part of the release and the time for
11    Mr. Weiss spent in that case, including working on the class
12    certification, briefing, et cetera, was included, yes.
13              MR. DOHERTY:  We believe it's improper, your Honor,
14    and Mr. Weiss is no longer representing Ms. Hall, and Hall
15    is in fact an objector.
16              THE COURT:  Just wait one second, please.
17              Do you want to add anything else, Mr. Doherty?
18              MR. DOHERTY:  No, your Honor, I do not.
19              THE COURT:  Okay.
20              MR. EVOLA:  Your Honor, I'm Robert Evola.
21              THE COURT:  Mr. Evola will deal with the rest.
22    Okay.
23              Are you the last lawyer that we have left to speak?
24    I believe you are.
25              Okay.  We will hear from you.  You can come to the
```

```
 1          podium or speak from there, your choice.
 2                   Again, this should be on new matters.  I am giving
 3          you the same admonition I have given to everybody else.
 4                   MR. EVOLA:  Good afternoon, your Honor.
 5                   THE COURT:  Just give me one second.  I want to
 6          read some stuff here.
 7                   Can I just address Mr. DePalma for a minute?
 8                   Mr. DePalma, you no longer have a client in this
 9          case, right?
10                   I am trying to refresh my recollection as to
11          exactly what happened with you --
12                   MR. DE PALMA:  Your Honor --
13                   THE COURT:  -- I had my notes when you argued, but
14          now --
15                   MR. DE PALMA:  -- I originally came into the case
16          representing the objectors, Galleguillos, et al.  I was one
17          of several counsel for Galleguillos --
18                   THE COURT:  That is right, okay.
19                   MR. DE PALMA:  -- and while I was counsel for
20          Galleguillos, as your Honor recalls, we did work up to the
21          four-day hearing and throughout the four-day hearing.
22                   Subsequent to that hearing, I withdraw and was
23          replaced with Mr. Pinilis who is in my stead.
24                   I seek a fee --
25                   THE COURT:  For the work you did.
```

```
1                    MR. DE PALMA:  -- for the work I did before I
2        withdrew.
3                    THE COURT:  All right.  I just wanted to make sure
4        my notes were in order, and they were.  Okay.
5                    MR. EVOLA:  Your Honor, Robert Evola for the Hall
6        objectors.
7                    I am going to do my best, and I am absolutely going
8        to follow your directions in addressing new matters and not
9        old matters.
10                   I would like to address some new events and some
11       additional information that is in the record since our last
12       hearing.
13                   THE COURT:  Okay.
14                   MR. EVOLA:  The first information, it goes to the
15       idea -- it goes to one of Sprint's responses, the argument
16       about reverse auction, and that is, that Sprint's argument
17       that this settlement is actually better than the Hall
18       settlement or the Hall demand, and therefore, there was no
19       reverse auction.
20                   And there has been a lot of discussion, I know
21       there was the last time, about the debtor class, the
22       forgiveness of debt, and that is particularly important to
23       us to explain this, because back on March 16th, you asked a
24       direct question to Mr. Suprenant, which was:
25                   Do you agree or disagree that the demand with
```

```
1        regard to that category was 14 and a half actual dollars and
2        wiped the debt off?
3              He corrected that it was actually 13 and a half,
4        and regarding the debt, and he said that was not a topic
5        that was discussed.
6              Since then Sprint has filed declarations and Brad
7        Lakin on behalf of us had filed declarations, but even
8        Sprint's declaration of attorney/client on the case says --
9        reveals that in fact the debt relief was a subject that was
10       discussed,
11             On page 15 of Sprint's brief in response to -- in
12       response to our objection, I quote:
13             At the end of the process, and it is their emphasis
14       on the end of the process, meaning their negotiations with
15       Sprint, all that was left of the request for full debt
16       relief was on behalf of class members who were charged an
17       ETF and can prove it, a dollar for dollar credit.
18             I submit, a dollar for dollar credit is
19       significant.  It's pretty good relief, and for those who
20       could provide no proof except for declaring penalty of
21       perjury a $25 credit.
22             So, indeed, there is absolutely no doubt that debt
23       relief was a significant part of the demand that the Hall
24       class was seeking from Sprint, and that is even according to
25       the attorney/client's declaration, which submitted by
```

     1      Sprint.

     2             In that declaration he uses the term all in, and I

     3      would add that Brad Lakin's declaration, he categorically

     4      denies that there was ever an all in demand for 13 and a

     5      half million that did not include debt relief.

     6             In fact, again, attorney/client's declaration and

     7      Sprint's brief that I just read from shows that at the end

     8      in their emphasis on the term, end of our negotiations, our

     9      demand still included either a dollar for dollar credit for

    10      part of that class or $25 for part of that class.

    11             To emphasize that a suggestion that the settlement

    12      here is better for the class than the demand that was sought

    13      in Hall, we submitted the transcript of a hearing in Madison

    14      County, where Richard Burke, an attorney for Freed & Weiss,

    15      discussed this case in the Hall settlement, and he said, and

    16      I will quote it because I don't want to get it wrong, they

    17      claim there was a hijacking of the Hall case, but what they

    18      didn't tell was that they had an exclusive agreement with

    19      Sprint from January of 2008 to July of 2008 when we

    20      negotiated with them, and with Sprint we have in the record,

    21      and what Sprint said is that they were greedy and

    22      belligerent, and they wouldn't negotiate in good faith, so

    23      they cancelled the exclusion.

    24             Now, we hadn't discussed attorney fees -- hadn't

    25      negotiated attorney's fees in the Hall case at that point,

1   so when they say that the Hall objectors and that class was

2   greedy, they are talking about our demands for more on

3   behalf of the class.

4           So to the extent that Sprint tells you that their

5   settlement is better than the Hall class and the Hall

6   objectors were demanding from Sprint, your Honor should find

7   that that is not true.

8           My second and my last point has to do with the

9   effect of the revised notice on the reasonableness of the

10  amount.  I don't want to repeat any of the arguments that we

11  made with regard to the adequacy, other than to say at this

12  point, that the amount available to the class has been

13  reduced by approximately $800,000, and there is no new

14  relief available to the class despite that reduction in the

15  amount that's available to them.

16          I am not saying that the class didn't receive a

17  benefit of adequate -- of better notice, I mean, they needed

18  that.  But the fund that they were to draw their benefit

19  from has been reduced, and there's been no new compensation

20  added for the class members.

21          Those are my remarks.

22          THE COURT:  Does anyone want to respond to --

23          MR. SUPRENANT:  Your Honor --

24          THE COURT:  Mr. Suprenant?

25          MR. SUPRENANT:  -- I am Dominic Suprenant.  I will

1           be very brief, your Honor.

2                    Mr. Lakin claims and Mr. Cohen -- what happened

3           last time just to place it in context, without any briefing,

4           Mr. Cohen went on for about 45 minutes and for the first

5           time said we demand full debt relief of $2.3 billion.

6                    I had some hurried telephone calls with Mr. Klein

7           in Chicago representing -- my co-counsel in Hall versus

8           Sprint, and tried to get my hand around this brand new

9           claim, and your Honor asked me the question that they quote,

10          and I answered it correctly.

11                   And just to place it very quickly in context, we

12          had some discussions with Mr. Lakin in January and February

13          of 2008 prior to our trial in May and June 2008 in the Ayyad

14          case, so we were talking to Mr. Lakin, and we broke off.  We

15          were way, way far apart, and we told him, okay, we are going

16          out, and we will try the Sprint case.

17                   Then after that was over, we restarted

18          negotiations.  And at the beginning of the restart of the

19          negotiations, Mr. Lakin sent us an almost completely blank

20          term sheet.  It is attached as Exhibit 1 to Document 368,

21          and the one thing that this virtually blank term sheet said

22          was waiver of charges not collected, and it was on the basis

23          of that July 2nd mostly blank term sheet that Mr. Cohen made

24          the argument last time, new to us, we heard it for the first

25          time in the courtroom, that their demand was $2.3 billion.

 1          About that, I would like to say two things.

 2               One, your Honor, it is irrelevant, the theory of

 3     reverse auction based on a claim.

 4               Let's assume Mr. Lakin had held firm and he said,

 5     Sprint, we are not going to settle with you unless you give

 6     $2.3 billion in debt relief.  That is irrelevant.  If they

 7     ask for some very large number, and we said no, we are not

 8     interested.  That is just irrelevant.  If they make a note

 9     unreasonable settlement demand.

10               But as Mr. Klein, who was talking with Mr. Lakin

11     declares in Exhibit 6, in Document 389, he said I was

12     disappointed when I got that mostly blank term sheet, that

13     as the discussions progressed, Lakin significantly retracted

14     any claim for full debt relief, and where we were at the end

15     of the day is if you long distance -- if the debt was sold,

16     you would get long distance cards, and you would get cash if

17     you couldn't prove you had an ETF charge suit, but you

18     declared it, you would get cash.

19               So the notion that there was a $2.3 billion debt

20     relief on the table when the negotiations broke off is not

21     true.  It is not relevant.

22               And, in fact, the proposed settlement actually does

23     give debt forgiveness.  If you can provide you were charged

24     an ETF, you would get $25 if you swore to it, if you

25     couldn't prove it, and $90 if you could prove it.

```
 1              If we had sold the debt or didn't have proof -- no,
 2    let me restate that, your Honor.
 3              If you terminated early in the contract, you would
 4    get $25 debt forgiveness.  If you had proof, if you
 5    terminated late, you would get 90.
 6              If the debt had been sold or you couldn't prove it,
 7    you would get a waiver of activation fee.
 8              So the settlement that is before your Honor
 9    compares quite favorably to where the Hall plaintiffs were
10    at the end of the negotiations when they broke off and --
11    and we said, okay, we don't think we can reach a deal with
12    you, and we stopped negotiating with them, so the reverse
13    auction argument is relevant, and it's also they have their
14    facts wrong.
15              Thank you, your Honor.
16              THE COURT:  Okay.
17              Counsel, that I think completes the hearing.  I
18    will certainly take into account all of the arguments that
19    have been made.  I know this is a hotly disputed matter.  I
20    have poured through the transcripts of the last hearing and
21    I intend to do the same again in conjunction with what we
22    heard here today.
23              Yes?
24              MR. CECCHI:  I didn't mean to stand so quickly,
25    Judge.
```

```
 1              THE COURT:  You thought you were leaving, or you
 2    were going to say something to the Court?
 3              (Laughter)
 4              MR. CECCHI:  I was just going to say before we wrap
 5    up, obviously if your Honor has any further questions of
 6    myself, Mr. Weiss, or the other Mr. Weiss about any aspect,
 7    we are here to answer them.
 8              THE COURT:  What I will do is after I have a chance
 9    to go through this by myself and with my law clerk, if there
10    are any additional areas of inquiry, I may set something
11    down and ask people to supplement the record.
12              I don't want you supplementing it on your own.  I
13    may not need anything else.  I don't want to start this
14    whole thing with the faxes and emails starting again.
15              I think I have enough.  If I need anything else, I
16    will notify counsel, and then you can supply it obviously on
17    notice to everybody else.
18              That will be all.
19              Thank you.
20              MR. CECCHI:  Thank you, your Honor.
21              MR. BOYLE:  Thank you, your Honor.
22              MR. SUPRENANT:  Thank you, your Honor.
23              THE COURT:  Have a nice trip, those of you who are
24    traveling back home.
25              (Court adjourned.)
```