**NOT FOR PUBLICATION**                                                    **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUDY LARSON, et al., individually and on behalf of all others similarly situated, | Civil Action No.: 07-5325 (JLL) |
| Plaintiffs, | |
| v. | |
| SPRINT NEXTEL CORPORATION, et al., | **OPINION** |
| Defendants. | |

**LINARES**, District Judge.

This Court granted preliminary approval to the proposed settlement of this class action lawsuit on December 8, 2008 ("Preliminary Approval Order"), and set forth a timeline pursuant to which Class Counsel and Sprint Nextel Corporation ("Sprint") (collectively, the "Settling Parties") could move for final approval of the "Settlement Agreement." (Docket Entry No. 92). Pursuant to that schedule, the Court conducted an initial fairness hearing from March 12, 2009 through March 17, 2009. Following the initial fairness hearing, the Court ruled that the individual notice component of the initial Notice Plan did not comply with Federal Rule of Civil Procedure 23(c)(2). Thereafter, an Amended Notice Plan was approved by the Court and a second fairness hearing was conducted on Wednesday, October 21, 2009. Now, having considered the briefs and declarations filed by the parties, including the objectors, and the arguments raised at the aforesaid fairness hearing, the Court sets forth its findings below.

-1-

## I.      Background

This class action involves a claim by Plaintiffs that the early-termination fees ("ETFs")
charged by Sprint violate, inter alia, the Federal Communications Act and state consumer protection
laws.[1]  (Second Am. Compl. ¶ 4, Docket Entry No. 90).  ETFs constitute a fee of between $150 and
$200 charged to customers for cancellation of their wireless service "at any time after a trial period
but before the end of the 'service plan' term, regardless of the reason(s) for cancellation."  (Id., ¶ 3).
Plaintiff Judy Larson is a citizen of Washington whose subscriber agreement with Sprint contained
an ETF provision and who was ultimately charged an ETF.  (Id., ¶ 7).  Plaintiff Barry Hall is a citizen
of California whose subscriber agreement with Sprint contained an ETF provision and who was
ultimately charged an ETF. (Id., ¶ 8).  Plaintiff Joe Milliron is a citizen of California whose
subscriber agreement with Sprint contained an ETF provision and who was ultimately charged an
ETF. (Id., ¶ 9).  Plaintiff Tessie Robb is a citizen of Florida whose subscriber agreement with Sprint
contained an ETF provision and who was ultimately charged an ETF.  (Id., ¶ 10).  Plaintiff Willie
Davis is a citizen of Alabama whose subscriber agreement with Sprint contained an ETF provision
and who was ultimately charged an ETF, but did not pay the ETF. (Id., ¶ 11).

After undergoing five months of mediation with the Honorable Nicholas H. Politan (ret.), the
parties agreed to settle the matter for $17.5 million ($14 million in cash and $3.5 million in
activation fee waivers, bonus minutes and credit forgiveness) pursuant to the terms of a settlement
agreement ("Settlement Agreement").  In the event that the claims to be paid out of the cash portion

---

[1] The Court retains jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d).  This is a
class action involving more than 100 members where at least one class member resides in a state
different from the defendants and where the aggregate amount in controversy exceeds $5,000,000.

of the Settlement Fund exceed the available amount in the fund, all cash benefits would be reduced in pro rata proportion.  At the close of the claim period, any cash left in the Settlement Fund would be converted into a cy pres award and would be distributed by Sprint in the form of pre-paid calling cards to the United States military for use by members of the armed forces and their families.[2]  In addition to such monetary relief, the Settlement Agreement would also serve to enjoin Sprint from entering into new fixed-term subscriber agreements containing flat-rate ETFs for a period of two-years.

On December 8, 2008, this Court preliminary certified a Rule 23(b)(3) class defined as follows:

> All persons in the United States who are or were parties to a personal fixed-term subscriber agreement for a Sprint Nextel Wireless Service Account for personal or mixed business/personal use, whether on the Sprint CDMA network or Nextel iDen network, or both, **excluding accounts** for which the responsible party for the Wireless Service Account is a business, corporation or a governmental entity, entered into between July 1, 1999 and December 31, 2008 and whose claims relate in any way to an Early Termination Fee or use of an Early Termination Fee in a fixed-term subscriber agreement, and/or use or propriety of a fixed-term subscriber agreement whether the term was for the initial fixed-term subscriber agreement or subsequent extensions or renewals to the fixed-term subscriber agreement for whatever reason and/or who were charged by or paid an Early

---

[2] See Joint Stipulation Regarding the Cy Pres Terms of Settlement Agreement, Docket Entry No. 367 ("The parties agree, subject to the Court's discretion and approval, that if any money remains in the Common Fund after the expiration of the Claim Period, that money would be used to: (a) to purchase prepaid long distance calling cards to be donated to a charitable organization or for a charitable purpose (since the Settlement Agreement was first signed, the parties have agreed that these prepaid calling cards would be donated to the U.S. Military for use by members of the armed forces and their families); or (b) in any other appropriate manner the Court directs.  It is not the intent of the parties that this cy pres provision would work as a reverter or result in any portion of the Common Fund being returned to Sprint."); see also Tr. (Oct. 21, 2009) at 22:13-15 ("The idea was cy pres under Your Honor's discretion, and our stipulation, which Your Honor has noted, says it unequivocally, it's not a reverter.").

Termination Fee to Sprint Nextel, excluding only the <u>Ayyad</u> Class Claims[3] and Persons whose right to sue Sprint Nextel as a Settlement Class Member is otherwise barred by a prior settlement agreement and/or prior final adjudication on the merits.  The Settlement Class includes Persons who were subject to an ETF, whether or not they paid any portion of the ETF either to Sprint Nextel or to any outside collection agency or at all, and includes persons who are prosecuting excluded claims to the extent such persons have claims other than those expressly excluded.

(Docket Entry No. 92 ("Preliminary Approval Order") at 3-4) (emphasis in original).

Following the initial fairness hearing which was held from March 12, 2009 through March 17, 2009, the Court ruled that the publication component of the initial Notice Plan complied with Rule 23(c)(2) but that the individual notice component of the initial Notice Plan did not.  (Docket Entry Nos. 321, 339). A proposed Amended Notice Plan was submitted on May 21, 2009 and approved by the Court on June 2, 2009. (Docket Entry No. 344).

Now, having considered the arguments and briefs in support of and in opposition to the preliminarily-approved settlement,[4] and having conducted the fairness hearing required by Fed. R.

---

[3] The matter of <u>Ayyad et al. v. Sprint Spectrum, et al.</u>, Case No. RG03-121510, proceeding in the Superior Court of the State of California, Alameda County, was originally part of the coordinated proceedings pending in the <u>Cellphone Termination Fee Cases</u> (California Judicial Council Coordinated Proceedings No. 4332).  The Ayyad Class Claims, as defined in the Settlement Agreement, were severed from all other claims alleged in the <u>Cellphone Termination Fee Cases</u>. Such claims have been carved out of the <u>Larson</u> Settlement Agreement. (Settlement Agreement at 5, Docket Entry No. 84-1).

[4] The Court declines to consider any submissions, including supplemental declarations, filed by objectors after October 7, 2009.  This Court's June 2, 2009 Order made clear that <u>all</u> objections to the settlement were due to the Court by October 7, 2009.  Class Counsel and Sprint were permitted to file their material in support of final approval of the settlement by October 14, 2009.  The Court's June 2, 2009 Order did not provide for the filing of reply briefs or other submissions in response to arguments made by Class Counsel and/or Sprint. Thus, the Court declines to consider: (1) the Declaration of Robert W. Schmeider III submitted by Objector Jessica Hall (Docket Entry No. 398), (2) the Declaration of Brad Lakin submitted by Objector Jessica Hall (Docket Entry No. 401), (3) the Declaration of Colin Weir submitted by the Galleguillos Objectors (Docket Entry

Civ. P. 23(e)(2), the Court issues this Opinion to address the issues of: (1) Class certification; (2) reasonableness of the settlement; (3) reasonableness of the requested attorney fee award; and (4) allocation of the attorney fee award.

## II.      Class Certification

Prior to addressing the specifics of the settlement, the Court analyzes the class certification factors promulgated by Fed. R. Civ. P. 23.  Rule 23 has been held to permit classes certified only for settlement.  In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 777-78 (3d Cir. 1995).  In order to be certified, the class must meet all of the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a)(1-4).  It must also meet the additional requirements of Rule 23(b)(3): superiority and predominance.  Fed. R. Civ. P. 23(b)(3).

### A.      Rule 23(a) Factors

#### 1.      Numerosity

Fed. R. Civ. P. 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  "The Third Circuit has generally held that the numerosity requirement is met if the proposed class exceeds 100 members."  Welch v. Bd. of Dirs. of Wildwood Golf Club, 146

---

402), and (4) the Supplemental Declaration of Scott Bursor submitted by the Galleguillos Objectors (Docket Entry No. 400).  The Court recognizes its initial willingness, at the October 21, 2009 hearing, to consider or reject the Weir Declaration (Docket Entry No. 402), in whole or in part. Having considered the circumstances surrounding the filing of the Weir Declaration, along with the motion to strike said declaration (Docket Entry No. 411) subsequently filed by counsel for Sprint, the Court agrees with Sprint that said declaration is untimely and procedurally inappropriate.  The Court will, however, consider those materials submitted after October 7, 2009 which relate to applications for attorneys' fees.

F.R.D. 131, 135 (W.D. Pa. 1993).  The Class includes millions of class members, dispersed nationwide.  Thus, it is so numerous that joinder of all members is impracticable.

### 2. Commonality

All members of the Class seek to declare Sprint's flat-rate ETF an unenforceable penalty. "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).  Here, the requirement is easily satisfied, as all Class members share a common question of law and seek relief on the same nucleus of operative facts.

### 3. Typicality

The typicality inquiry "assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interest will be fairly represented."  Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 149-50 (3d Cir. 2008) (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996)).  Its purpose is to ensure that the interests of the class representatives do not diverge from those of the class as a whole.  Baby Neal, 43 F.3d at 57.  Here, the claims of the named Plaintiffs are typical of the Class claims because, like the Class, Larson and the other named Plaintiffs, allege that Sprint charged them a flat-rate ETF, which operates as an unenforceable penalty.  Stated differently, the named Plaintiffs' claim is based on the same legal theory and course of conduct as that of the absent members of the Class.  Thus, the named Plaintiffs' incentives line up with those of absent class members.  This factor is accordingly satisfied.

### 4. Adequacy

In order to certify a class, a court must also find that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "There are two factors: (1)

the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." In re Prudential Ins. Co. Sales Practice Litig., 962 F. Supp. 450, 519 (D.N.J. 1997).

No objection has been lodged specifically as to the qualifications and capabilities of Class Counsel, and the Court is aware of Class Counsel's expertise in handling complex civil litigation.[5] In fact, many of the firms handling this matter on behalf of the Class have appeared before this Court on other class action-related litigation, and the Court is satisfied that they are well-equipped to handle a case of this size and complexity.

With respect to the Class representatives, the Court finds that Plaintiffs' interests are not antagonistic to those of other members of the Class. Lina Galleguillos, Michael Moore and Antranick Harrentsian (collectively, "Galleguillos Objectors") argue that Plaintiffs are inadequate representatives inasmuch as there are no named Plaintiffs who are current subscribers to Sprint's illegal ETFs; as a result, Plaintiffs did not negotiate or otherwise attempt to enjoin Sprint from enforcing its flat-rate ETFs in the future.[6] As a preliminary matter, Class members who had

---

[5] The Court notes that the Galleguillos Objectors argue, generally, that Class counsel are inadequate for the same reasons that the Class representatives are inadequate, as well as for failing to make sufficient efforts to provide adequate notice (both initially, and again upon re-notice). Such objection is not only unsubstantiated, but is also meritless. The fact that the Court took issue with certain aspects of the initial notice plan has no bearing on the qualifications or capabilities of Class Counsel. In any event, the Court subsequently approved the Amended Notice Plan submitted by Class Counsel and Sprint, and now finds that Class Counsel and Sprint fully complied with the stringent requirements set forth by Rules 23(c)(2)(B) and 23(e).

[6] To the extent the Galleguillos Objectors challenge the adequacy of the settlement on this basis, the Court rejects such challenge. The fact that Sprint is permitted to continue to collect flat-rate ETFs is a provision which was part and parcel of heavy negotiation and compromise, and was ultimately agreed upon by Class Counsel and Sprint in the context of this particular case. The fact that T-Mobile agreed, in the context of a separate litigation, to pro-rate its ETFs going forward has no bearing on the particular circumstances of this case or the reasonableness of its settlement. The

California Subscriber Class Claims, that is, claims asserted in California state court by Sprint customers who did not allege that they had been charged and/or paid an ETF, but instead alleged simply that they were subject to an ETF in their subscriber agreement,[7] do receive a benefit under the terms of the Settlement if they are charged or are otherwise harmed by the flat-rate ETF.  For instance, if they are charged an ETF, they would fall into Category I or Category II Class members (depending on whether or not they paid the ETF), and would be entitled to the relief provided for under such categories.  (Settlement Agreement, Art. II, Docket Entry No. 84-1).  If they are otherwise harmed because of the existence of the flat-rate ETF, such Class members would fall into Category IV Class members and would be entitled to the relief afforded therein.  (Id.).  By contrast, the type of injunctive relief referred to by the Galleguillos Objectors – which would allow them to terminate without paying an ETF – could potentially expose such Class members to a counterclaim for damages from Sprint.  See, e.g., Garrett v. Coast & Southern Fed. Sav. & Loan Assn., 9 Cal.3d 731, 741 (1973) ("We do not hold herein that merely because the late charge provision is void and thus cannot be used in determining the lender's damages, the borrower escapes unscathed. He remains liable for the actual damages resulting from his default.").

Moreover, no defenses unique to the class representatives have been raised, and the class representatives do not have divergent interests from the Class as a whole.  Thus, the Court finds that the named Plaintiffs are capable of fairly and adequately protecting the interests of the Class in

Galleguillos Objectors mere disagreement with this particular provision is equally irrelevant to reasonableness of the overall settlement.

[7] California Subscriber Class Claims, part of the Cellphone Termination Fee Cases, JCCP 4332 (Calif. Superior Ct., Alameda Cty, CA), are identified as "Related Claims" in Article I of the Settlement Agreement. Thus, the Settlement Agreement will settle and release the California Subscriber Class Claims.

connection with the proposed settlement.

**B.     Rule 23(b)(3) Factors**

Pursuant to Fed. R. Civ. P. 23(b)(3), a Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   In examining predominance, the purpose of the inquiry is to determine whether class-wide issues outweigh individual issues.   Here, the Court finds that common questions of law and fact predominate over questions affecting only individual members of the Settlement Class. Each Class member signed a contract with Sprint that contained a flat-rate ETF provision.   Each Class member maintains that Sprint's flat-rate ETF is an unenforceable penalty.   Nothing in the record exists to indicate that individual issues would predominate at trial.

Additionally, given that the value of an individual claim is no more than a few hundred dollars, maintaining individual actions in this case would be prohibitively expensive.   A class action is, therefore, the superior method of fairly adjudicating the controversy.   Thus, the Settlement Class satisfies  the  predominance  and  superiority  requirements  of  Rule  23(b)(3).    Having  met  the requirements Rules 23(a) and 23(b)(3), the Settlement Class is granted final certification.

**III.     Notice**

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class."   In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 306 (3d Cir. 1998).

Under Federal Rule of Civil Procedure 23(c), notice must be disseminated by "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c); see also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175-76 (1974) (finding that Rule 23(c) includes an "unambiguous requirement" that "individual notice must be provided to those class members who are identified through reasonable effort").

Additionally, in this case, where a settlement class has been provisionally certified and a proposed settlement preliminarily approved, proper notice must meet the requirements of Federal Rules of Civil Procedure 23(c)(2)(B) and 23(e).  See Larson v. Sprint Nextel Corp., No. 07-5325, 2009 WL 1228443, at *2 (D.N.J. April 30, 2009) (Linares, J.).  Rule 23(c)(2)(B)-compliant notice must inform class members of: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the class member's right to retain an attorney; (5) the class member's right to exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on class members under Rule 23(c)(3). Id.; Fed. R. Civ. P. 23(c)(2)(B)(I)-(vii).  Rule 23(e) notice must contain a summary of the litigation sufficient "to apprise parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections."  In re Prudential Ins. Co. of Am. Sales Practices Litig., 177 F.R.D. 216, 231 (D.N.J. 1997).

On December 18, 2008, this Court approved a notice program containing the following components: (1) publication notice in major national and regional publications, (2) a bill insert, (3) a "PR Newswire Release," (4) Google AdWords campaign, and (5) a website.  Of these five components, the bill insert represented the individual notice to Sprint's current subscribers while the

-10-

other four pieces comprised the notice publication plan intended to reach a large portion of class members.

Objections related to notice were filed by two groups of objectors: (a) the Galleguillos Objectors, and (b) Jessica Hall.   Objector Jessica Hall argues that class notice continues to be deficient inasmuch as the cost of such notice should not take away from the class relief.  However, such objection actually relates to the reasonableness of the settlement itself, not to any alleged deficiency with respect to the notice plan. Thus, this aspect of the Hall Objection will be addressed by the Court in connection with its assessment of the reasonableness of the settlement.

**A.     Publication Notice**

Following the initial fairness hearing, the Court assessed and approved the notice publication plan in its April 30, 2009 Opinion, as amended by Order dated May 21, 2009.[8]  The implementation and design of the publication notice plan fell upon Gilardi & Co., LLC ("Gilardi"), a nationally-recognized specialist in the construction and dissemination of media-based notice programs in class action cases.  According to Plaintiffs' expert, Alan Vasquez, Gilardi began by defining the target audience as "all U.S. Adult Mobile Phones Subscribers."  (Vasquez Decl. ¶ 6).  That left a total audience size of 168,557,000 individuals.  (Id.)  In order to reach as many of those individuals as possible, Gilardi designed a three-prong publication notice plan that included: (1) publication notice in various magazines and newspers, (2) a PR Newswire Release, and (3) a Google AdWords

_____

[8] Accordingly, the Court hereby incorporates the reasons set forth in its April 30, 2009 Opinion, as amended by Order dated May 21, 2009.  Having already found the publication notice Rule 23-complaint, the Court will not repeat each and every aspect of its decision regarding same herein.

campaign.[9]

In ultimately finding the publication notice Rule 23-compliant, the Court addressed several substantive objections, including objections by the Galleguillos Objectors.[10]  The real dispute over publication notice concerned two elements: (1) the effective overall reach of the campaign, and (2) the content of the notice.

### 1.    Reach

As to reach, after carefully considering the issue of whether the initial plan met or exceeded acceptable reach statistics, the Court noted, in its April 30, 2009 Opinion, its satisfaction that the publication notice plan was calculated to reach a significant amount of the Class.  Although the parties differed over the concept of "reach" and whether the present plan met or exceeded acceptable reach statistics, the Court ultimately found that the important statistic for analysis purposes is net reach and both Todd Hilsee, the expert witness put forth by the Galleguillos Objectors and Alan Vasquez, Plaintiffs' expert, agreed that the publication plan had a net reach of anywhere from 49-53 percent.  See Tr. (March 12, 2009) at 16-20; 153-154.  The Court acknowledged that the parties differ about where along that spectrum this plan falls, but for purposes of analyzing the effectiveness

---

[9] As previously explained, Gilardi also set up a website containing all relevant information for prospective class members.  The website, while important, cannot be considered part of the notice publication plan given that it does not actively place itself in view of class members.  Rather, class members had to know the website address or be provided the website link to access it.  Because of its static nature, it is not considered a piece of the publication notice campaign.

[10] To the extent the Galleguillos Objectors have requested additional discovery in connection their Notice-related objections, such requests are denied as untimely.  Such requests were admittedly made on October 7, 2009, yet, the October 21, 2009 fairness hearing was scheduled by the Court on June 2, 2009.  Moreover, the Galleguillos Objectors failed to bring this matter to the Court's attention until October 16, 2009 – less than a week before the scheduled fairness hearing. See Docket Entry No. 395. The Galleguillos Objectors' efforts in this regard were not only untimely, but also unrealistic under the circumstances.

of a notice plan, the Court found that it was sufficient to peg the program at 49 to 53 percent.

Ultimately, after having thoroughly evaluated the publication plan and the objections of the Galleguillos Objectors, the Court noted its satisfaction that such plan was calculated to reach a significant amount of the class.  In particular, the Court noted that the regional newspapers were chosen to represent areas with large concentrations of Sprint subscribers.  (Vasquez Decl., ¶ 8).  The Court likewise noted that the plan incorporated multiple notices in issues of large national publications, including USA Today, Parade Magazine, Vista Magazine, and the New York Times. Finally, the Court explained that no case stands for the proposition that a publication notice reach of 49-53 percent is disallowed, especially when coupled with a strong individual notice program. Given the large size of this class and the discretion afforded this Court, the Court found the publication notice plan to have been sufficient.

### 2. Content

As to the content of the publication notices, the Court found that the sample provided to the Court (as "Exhibit A" to the Vasquez Declaration), contained all of the information required by Rule 23(c)(2).  In particular, the Court found that such notice provided a description of the case and settlement class, along with the steps necessary to submit a claim, opt-out and/or object.  Finally, the Court found that it informed the potential class member that future claims are barred unless the individual excludes him or herself from the settlement.

### 3. Conclusions Regarding Publication Notice

Many, if not all, of the arguments now raised by the Galleguillos Objectors regarding the publication notice were previously presented to, considered and rejected by the Court.  These arguments include: (1) the weak and/or ineffective nature of the publication, (2) defects in the design

and content of the notice, (3) the notice provided false information concerning the status of the

<u>Robertson v. Nextel Commc'ns, Inc.</u> matter,[11] (4) the notice provided false information concerning

findings of illegality by a California state court,[12] (5) the notice provided false information

concerning the alleged reversion of cash to Sprint,[13] (6) notice was not written in plain language, and

---

[11] <u>Robertson v. Nextel Commc'ns, Inc.</u> was originally part of the <u>Cellphone Termination Fee Cases</u>, JCCP 4332, proceeding in Alameda County, California.  Unlike the claims asserted in <u>Ayyad</u>, claims asserted in the matter of in <u>Robertson</u> were specifically <u>included</u> in the Larson Settlement. (Settlement Agreement at 5, Docket Entry No. 84-1).

The Galleguillos Objectors argue that the publication notice, which refers to the Settlement Agreement, incorrectly represents that summary judgment had been granted in the matter of <u>Robertson</u> in Nextel's favor when in fact the order granting summary judgment had been reversed on reconsideration.  The Court noted such objection in its April 30, 2009 Opinion and directed that, "to the extent the parenthetical following the <u>Robertson</u> citation in the Settlement Agreement is incorrect, the parties should correct it." The Galleguillos Objectors now argue that the publication notice remains deficient because such parenthetical, contained in the Settlement Agreement, was never corrected.  It is Defendant's position that no such correction was necessary because the information concerning the <u>Robertson</u> case was accurate on the date on which the Settlement Agreement was entered into and that they were under no obligation to amend the Settlement Agreement to reflect a status change that occurred thereafter. The Court is equally unaware of such an obligation, and the Galleguillos Objectors cite to no legal authority in support of same.

[12] The Galleguillos Objectors continue to take issue with the portion of the Long Form Notice which states "[t]his notice does not imply that there have been or would be any findings of violation of the law by Sprint Nextel or that recovery could be had in any amount if the Action were not settled." <u>See</u> Docket Entry No. 84-6.  They maintain that such statement is inaccurate inasmuch as there <u>has</u> been a finding of illegality by a California court.  When read in the proper context, however, it is clear that this statement was intended to reflect the legal posture of <u>this</u> action. Therefore, there is nothing inaccurate about this statement.

[13] The Galleguillos Objectors maintain that the Long Form notice was inadequate inasmuch as it failed to provide notice to the Class that monies left in the Common Fund would revert to Sprint. In support of this argument, the Galleguillos Objectors cite to page 23 of the Settlement Agreement which states that "[i]n the event there remains cash left in the fund after all claim periods have expired, the remaining cash will be returned to Sprint Nextel and Sprint Nextel shall issue prepaid calling Personal Identification Numbers valued in the amount of the remaining cash to a charitable organization . . ." The fact that such monies would initially be "returned to Sprint Nextel," does not signify that such monies would revert to Sprint; rather, the Settlement Agreement makes clear that such cash "shall" then be used by Sprint Nextel to issue prepaid calling cards to a

(7) the extremely low response rate confirms inadequacy of notice.[14]  Such arguments were raised

in prior briefing before the Court and/or at the initial fairness hearing.  In finding the publication

notice to be Rule 23-compliant, despite such alleged problems, the Court noted – and reiterates once

again – that notices can never be perfectly drafted.  There is a fine line between writing them in

"plain" language and incorporating all of the relevant information. Class Counsel and Sprint have,

in this case, succeeded in striking the right balance. Accordingly, for these reasons as well as those

set forth by the Court in its April 30, 2009 Opinion, as amended by Order dated May 21, 2009, the

Court is satisfied that the publication component of the initial Notice Plan proposed and executed

by Sprint and Class Counsel complies with Rule 23.

### B.   Individual Notice

In its April 30, 2009 Opinion, this Court found the individual notice component of the Notice

Plan to have been deficient.  As a result, the Court ordered Sprint and Class Counsel to re-notice the

Class in accordance with the following directions:

> Within 21 days, they shall present that notice plan to the Court.  It

---

charitable organization. Thus, the Settlement Agreement does not – and never has – provided for a
reversion of money to Sprint. This point has been confirmed both during the October 21, 2009
hearing, as well as in the parties' joint stipulation regarding the cy pres provision.  See Joint
Stipulation Regarding the Cy Pres Terms of Settlement Agreement, Docket Entry No. 367 ("It is not
the intent of the parties that this cy pres provision would work as a reverter or result in any portion
of the Common Fund being returned to Sprint."); see also Tr. (Oct. 21, 2009) at 22:13-15 ("The idea
was cy pres under Your Honor's discretion, and our stipulation, which Your Honor has noted, says
it unequivocally, it's not a reverter.").

[14] In previously finding the publication notice component of the Notice Plan compliant with
Rule 23, the Court explained and now reiterates that  "response rate is not by itself a factor to
determining the strength or weakness of a notice campaign."  In any event, since the Amended
Notice Plan was implemented, there have been an additional 44,808 claims representing 66,913 lines
of service submitted, thereby demonstrating the overall effectiveness of the Amended Notice Plan.
(Carmin Decl., ¶ 9).

> should include at least the following: (1) a new form of individual notice that contains the 23(c)(2) elements; (2) a plan to supply that individual notice to members of the <u>Robertson</u> class; (3) a plan to supply that notice to all current Sprint subscribers; (4) an indication from Sprint as to what subclasses of subscribers are reasonably identifiable and a corresponding plan to provide individual notice to those subscribers . . . .

In response to this Court's directives, Sprint and Class Counsel devised an Amended Notice Plan. Such plan was submitted to the Court for approval on May 21, 2009.  <u>See</u> Docket Entry No. 340. **No opposition to the Amended Notice Plan was submitted to the Court for consideration**.  On June 2, 2009, this Court approved the Amended Notice Plan and directed Sprint and Class Counsel to re-issue the individual notice component accordingly.  The Galleguillos Objectors now maintain that the individual notice component of the Amended Notice Plan remains deficient both as to its reach and content.

### 1.     Reach

After considering the original objections as to individual notice filed by the Galleguillos Objectors, the Court found the individual notice component of the original Notice Plan to have been deficient and directed Sprint and Class Counsel to provide Rule 23-compliant individual notice to: (a) identified members of the <u>Robertson</u> class, and (b) those subclasses capable of reasonable identification.

In response to this Court's April 30, 2009 Opinion, Sprint and Class Counsel submitted a proposed Amended Notice Plan providing for the mailing of individual postcard notices by direct mail to (a) the 194,461 members of the <u>Roberston</u> class for whom Sprint has contact information, (b) the 34,760 subscribers identified through the records of Sprint's Executive and Regulatory Services Department, (c) the 17,093 customers identified through Sprint's Quality Assurance

Program, (d) the 848 subscribers identified through Sprint email addresses, (e) the 38,000 subscribers identified through data sampling conducted with the Smith v. Sprint Spectrum, L.P. (JAMS Case No. 1220034325) arbitration, and (f) the 413 customers identified by the Minnesota Attorney General in connection with a separate lawsuit brought in Minnesota.  In addition, Sprint also filed the Declaration of its Vice President of Customer Billing Services, Scott Rice, to address what subclasses of the settlement class members are reasonably identifiable and the efforts that would be necessary to search Sprint's billing systems for additional subclasses of settlement class members.

The Galleguillos Objectors now argue that the individual notice component of the Amended Notice Plan remains deficient as to its reach because: (1) Sprint failed to provide individual notice to 9.2 million identifiable class members, and (2) Mr. Rice's declaration setting forth the estimates of the time and expense required to identify different subsets of class members from Sprint's databases is inadmissible.

### (i).    Failure to Provide Notice to 9.2 Million Identifiable Class Members

The Galleguillos Objectors argue that Sprint has failed to comply with Fed. R. Civ. P. 23(c)(2)(B) inasmuch as Sprint has failed to query its own billing records to identify class members who were charged and/or paid early termination fees.  According to the Galleguillos Objectors, 9.2 million of such class members can be identified from Sprint's own billing records with "modest efforts;" thus, in failing to provide individual notice to the 9.2 million identifiable class members, Sprint has failed to meet the "reasonable effort" standard.  Sprint maintains that this figure is flawed inasmuch as it contains national data for ETFs charged not only to relevant individual accounts but

also to millions of non-settlement class members.  For instance, Sprint points out that the 9.2 million

figure includes data for the Ayyad class members who are specifically excluded from the Settlement

Class.

The Galleguillos Objectors now concede that the 9.2 million figure is, at the very least, based

on outdated data and therefore unreliable.  See Docket Entry No. 395 at 2.[15]  In any event, the crux

of the Galleguillos Objection to the reach aspect of the individual component of the notice plan is

that Sprint could have identified millions of additional class members through Sprint's own billing

records.  Even if such speculation were correct, the Court has already examined the Rice Declaration

and found that the time, cost and effort necessary to do so – as certified by Sprint's Vice-President

of Customer Billing Services – would be unreasonable in light of all the circumstances.[16]  Nothing

presented to the Court has given the Court reason to revisit this finding.[17]

_____

[15]  As previously explained by the Court, the Galleguillos Objectors made no effort to obtain additional data and/or discovery from Sprint or Class Counsel until two weeks before the October 21, 2009 fairness hearing, which was scheduled by the Court back on June 2, 2009.  Moreover, such outstanding matters were first brought to the Court's attention on October 16, 2009 –  less than a week before the scheduled fairness hearing.  As a result, their belated efforts to obtain such data were denied by the Court as untimely.

[16]  In doing so, the Court noted that Rule 23 contains a pragmatic "reasonableness" element in terms of identifying individual class members.  See April 30, 2009 Op. at 9.

[17]  The Court has considered the January 4, 2010 letter submitted to the Court by Scott Bursor, as well as the responses submitted by Class Counsel and counsel for Sprint.  Mr. Bursor urges the Court to consider the recent decision in West v. Carfax, Inc., 2009 WL 5064143 (Ohio Ct. App. Dec. 24, 2009), where the Ohio Court of Appeals reversed a trial court's approval of a settlement where individual notice had not been provided to class members whose names and addresses were obtainable from information on the defendant's database.  As a preliminary matter, the Court notes that the Ohio court's decision in Carfax is not binding on this Court.  In any event, the Court has considered the Carfax decision and finds that it supports this Court's April 30, 2009 and June 2, 2009 decisions regarding individual notice.   In particular, both courts utilized the same reasonable efforts standard in assessing what efforts should be required of the defendants in order to satisfy Rule 23.  The fact that the court in Carfax determined, based upon a unique set of facts, that Carfax could

-18-

### (ii).   Rice Declaration

In connection with the proposed Amended Notice Plan, Sprint submitted a declaration by Mr. Rice describing Sprint's billing databases and providing estimates of time and expense required to query and identify various subsets of class members.  In approving the Amended Notice Plan, the Court relied upon the Rice Declaration in determining the reasonableness of requiring Sprint to engage in further efforts to individually identify additional class members.

The Galleguillos Objectors now argue that Sprint withheld important data regarding the anticipated benefits of such efforts when it submitted the proposed Amended Notice Plan, and that such data was necessary in order to properly evaluate the reasonableness of said efforts.  In addition, the Galleguillos Objectors urge the Court to strike Mr. Rice's Declaration on the following grounds: (a) the Rice Declaration is based on double and triple hearsay, and (b) the Rice Declaration is inadmissible under Federal Rules of Evidence 601, 602, 701, 702 and 802.  In response, Sprint argues that the declaration of Mr. Rice did, in fact, address anticipated results.  In any event, Sprint maintains that the Court was provided with all of the information that it required to determine whether it would be reasonable to require Sprint to engage in the efforts set forth in the Rice Declaration, and that the Court properly exercised its discretion when it concluded that the efforts necessary to do so were not reasonable.

The Rice Declaration was submitted to the Court on May 21, 2009.  See Docket Entry No. 341.  The Galleguillos Objectors took no action with respect to this declaration until October 7,

---

have converted an already existing list of vehicle identification numbers into a list of class members through the efforts of a co-defendant, which was "in the business of providing names and addresses of vehicle owners in class action suits," and in failing to do so, failed to meet the reasonable effort standing, has no bearing on what constitutes reasonable effort by Sprint in the Larson matter.

2009.  See Docket Entry No. 370.  To the extent the Galleguillos Objectors took issue with any aspect of the Rice Declaration, such issues should have been brought to the Court's attention at or around the time that such declaration was submitted for the Court's consideration.[18]  This holds particularly true in a nationwide class action of this magnitude, and given (a) the particular circumstances giving rise to the re-notice, including the Galleguillos Objectors appearance at the first fairness hearing and their objections to the original notice plan, (b) that such declaration was filed on the public docket and in conjunction with a proposed Amended Notice Plan as directed by the Court, and (c) that counsel for the Galleguillos Objectors had notice of the declaration and read it when filed.[19]  Thus, all of the grounds for the objection to the Rice Declaration were known to the Galleguillos Objectors when the Declaration was filed.  Having failed to raise such issues regarding the admissibility of the Rice Declaration at a time when the Court could have taken said issues into consideration prior to the Court's approval (and execution) of the Amended Notice Plan, the Galleguillos Objectors have waived their right to challenge the Rice Declaration on such a basis.

See, e.g., Gov't of Virgin Islands v. Archibald, 987 F.2d 180, 184 (3d Cir. 1993) ("The appropriate

---

[18] During the second fairness hearing, Mr. Bursor, arguing on behalf of the Galleguillos Objectors, took the position that the Galleguillos Objectors did not respond to the Rice Declaration at the time in which it was filed because no formal motion seeking approval of the Amended Notice Plan was pending before the Court. See Tr. (Oct. 21, 2009) at 44:17-20.  According to Mr. Bursor, "I knew they submitted it, and we were looking at it. . . . I didn't know if your Honor was going to issue a briefing schedule to say if anybody has a response to this, file it. I didn't see a notice of motion that said, please take notice that this is the day your brief is due. . . ." Id. at 44:22-45:9.  The Court finds such a rationale to be entirely unconvincing.  As the Court explained during the hearing, "Mr. Bursor, in the history of this case, that has never stopped you. [Even] as of last night, I got a declaration from Weir . . . [and] that wasn't contemplated in my October 7th Order either, so that has never stopped you from submitting papers to this Court.  In fact, there has been a plethora of objections and briefing done without me even requesting it, so I don't know that that would have stopped you from doing it." Id. at 45:11-20.

[19] See Tr. (Oct. 21, 2009) at 44:19-45:3.

time to raise an objection is as soon as the party knows or reasonably should know of the grounds for objection."); Presidential Life Ins. Co. v. Milken, 946 F. Supp. 267, 278-279 (S.D.N.Y. 1996) ("A party to a settlement may be estopped from objecting thereto once another party to the settlement has relied, to its detriment, on the first party's failure to object to the settlement terms.").

### 2.     Content

Of the five components of the original notice plan, the bill insert represented the sole component of individual notice to Sprint's current subscribers.  This Court ruled, in its April 30, 2009 Opinion, that the content of the initial bill insert failed to comply with the dictates of Rule 23(c)(2).  The Amended Notice Plan submitted by Sprint and Class Counsel proposed the following changes to the content of the individual component of the notice plan: (1) insertion of a new two-sided bill insert into current Sprint customer's bills for a one-month billing cycle, (2) insertion of a brief bill message in the "Sprint News and Notices" box of the bill directing customers to look at the bill insert, and (3) the mailing of individual postcards by direct mail to the various subclasses of Class members identified by Sprint in the proposed Amended Notice Plan.  Sprint and Class Counsel also attached, as Exhibits A and B to the proposed Amended Notice Plan, the proposed form and content of the bill insert and postcard notice.

The Court has previously analyzed both the bill insert and the postcard, and found that both contain all of the information required by Rule 23(c)(2)(B)(I)-(vii) and comply fully with Rule 23(e). See June 2 Order at 2, Docket Entry No. 344.[20]  None of the objections raised by the Galleguillos Objectors (or any other objectors) give the Court reason to revisit this issue.

---

[20] The Court hereby incorporates the reasons set forth in its June 2, 2009 Order.

### 3.    Conclusions Regarding Individual Notice

Current Sprint customers received the following individual notice: (1) a two-sided bill insert in their monthly bill for a one-month billing cycle, and (2) a brief bill message in the "Sprint News and Notices" box of their bill directing them to look at the bill insert.  In addition, individual postcard notice was sent by direct mail to the following subclasses of Class members: (a) the 194,461 members of the Roberston class for whom Sprint has contact information, (b) the 34,760 subscribers identified through the records of Sprint's Executive and Regulatory Services Department, (c) the 17,093 customers identified through Sprint's Quality Assurance Program, (d) the 848 subscribers identified through Sprint email addresses, (e) the 38,000 subscribers identified through data sampling conducted with the Smith v. Sprint Spectrum, L.P. (JAMS Case No. 1220034325) arbitration, (f) the 413 customers identified by the Minnesota Attorney General in connection with a separate lawsuit brought in Minnesota.  For the reasons discussed above, as well as those reasons set forth by the Court in its June 2, 2009 Order approving the Amended Notice Plan, the Court concludes that both the bill insert and the postcard contain all of the information required by Rule 23(c)(2)(B)(I)-(vii) and comply fully with Rule 23(e).  In addition, the Court is satisfied that it would be unreasonable to require Sprint to engage in further efforts to identify class members beyond those set forth above.

### C.    Conclusions Regarding Notice Plan

After the initial notice period, 12,501 claim forms for 19,105 lines of service were submitted. Since implementation of the Amended Notice Plan, an additional 44,808 claims forms for 66,913 lines of service have been submitted. (Carmin Decl., ¶ 9).  The Court finds that the parties have now

fully complied with the stringent requirements set forth by Rules 23(c)(2)(B) and 23(e).[21]   The

notice plan was robust, thorough, and included all of the essential elements necessary to properly

apprise absent Class members of their rights.  Additionally, on December 12, 2009, Sprint properly

gave notice of the pending class settlement to the Attorney General of the United States and the

attorneys general of all fifty states, as required by 28 U.S.C. § 1715.  (Burke Decl., Docket Entry No.

287).


## IV.   Final Settlement Approval

Under Rule 23, a court may only approve a class settlement after it has held a hearing and

determined that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The

Third Circuit has enumerated nine factors to be utilized in this determination:

> (1) the complexity, expense and likely duration of the litigation; (2)
> the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks of
> establishing liability; (5) the risks of establishing damages; (6) the
> risks of maintaining the class action through the trial; (7) the ability
> of the defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible
> recovery; (9) the range of reasonableness of the settlement fund to a
> possible recovery in light of all the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975).  Additionally, a presumption of fairness exists

where a settlement has been negotiated at arm's length, discovery was sufficient, the settlement

proponents are experienced in similar matters, and there are few objectors.  See In re Warfarin

Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004).  Moreover, "the participation of an independent

---

[21] For a more detailed discussion of the notice requirements associated with Rule 23(c)(2)(B) and 23(e), see Larson v. Sprint Nextel Corp., 2009 WL 1228443.

mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties." Bert v. AK Steel Corp., No. 1:02-CV-467, 2008 WL 4693747 (S.D. Ohio Oct. 23, 2008). The presumption of fairness attaches in this case because: (a) the Settling Parties negotiated the settlement before the Honorable Nicholas H. Politan (ret.), (b) pre-settlement discovery in related cases, as well as disclosures made during mediation, supplied counsel with an understanding of the factual and legal issues involved, (c)  the attorneys litigating this matter are experienced in similar litigation, and (d) relatively few class members have objected. See generally Varacallo v. Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 235 (D.N.J. Feb. 15, 2005) (Linares,  J.).

Finally, settlement of litigation is generally favored by courts, especially in the class action setting.  "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." In re General Motors, 55 F.3d 768, 784 (3d Cir. 1995); see also In re Warfarin, 391 F.3d at 535 (noting the "overriding public interest in settling class action litigation").  At the same time, the district court functions "as a fiduciary who must serve as a guardian of the rights of absent class members" by ensuring that the proposed settlement is fair, reasonable, and adequate.  In re General Motors, 55 F.3d at 785.

Turning, therefore, to each of the Girsh factors, the Court finds as follows:

## A.     Complexity, Expense and Likely Duration of the Litigation

The expense and likely duration of litigation are factors to be considered in evaluating the reasonableness of a proposed class action settlement.  In this case, the litigation has the potential to drag on for years.  The issues involved are legally and factually complex.  Continued litigation of this matter would require numerous depositions, extensive inquiry into Sprint's cost accounting

methods and assumptions and expert witness testimony related thereto.  That the parties were able to reach a settlement very early in the litigation weighs in favor of approval, as it saves the time associated with discovery, motions, and eventually trial.  Importantly, of course, it also provides the Class with immediate, definite relief.  This factor therefore weighs in favor of approval.

**B.      Reaction of the Class to the Settlement**

This second <u>Girsh</u> factor gauges whether members of the class generally support or object to the settlement.  In order to properly evaluate it, "the number and vociferousness of the objectors" must be examined.  <u>In re General Motors</u>, 55 F.3d at 812.  Generally, "silence constitutes tacit consent to the agreement."  <u>Id.</u> (quotation omitted).

Here, out of an estimated 40 million Class members, only 575[22] individuals opted out of the Class.  <u>See</u> Docket Entry No. 377.  Moreover, the Court has received only fourteen (14) objections related to the fairness of the proposed settlement.  Thus, this settlement has strong class support.  The Court has considered each of the fourteen (14) objections and, based on the reasons that follow, finds that none are meritorious.

**1.      Galleguillos Objectors[23]**

The Galleguillos Objectors, represented by Scott Bursor, argue that the value of the proposed settlement is inadequate, particularly (1) in comparison to the <u>Ayyad</u> award, and (2) given the cash reversion to Sprint.

---

[22] The Court notes that three (3) out of the fourteen (14) objections filed appear to be requests to opt-out.  It is unclear whether such requests were taken into account by Sprint and Class Counsel in reaching this figure.  In any event, such discrepancy – to the extent it even exists – would be very minimal and is, therefore, immaterial to the Court's analysis.

[23] The Galleguillos Objectors have also raised objections as to notice, the adequacy of the class representatives and the adequacy of class counsel.  Such objections are addressed separately.

As previously addressed, there is no cash reversion to Sprint.  The Settlement Agreement provides that  "[i]n the event there remains cash left in the fund after all claim periods have expired, the remaining cash will be returned to Sprint Nextel and Sprint Nextel shall issue prepaid calling Personal Identification Numbers valued in the amount of the remaining cash to a charitable organization . . ."  (Settlement Agreement at 23, Docket Entry No. 84-1).  The fact that monies remaining in the Common Fund would initially be "returned to Sprint Nextel," does not signify that such monies would revert to Sprint; rather, the Settlement Agreement makes clear that such cash "shall" then be used by Sprint Nextel to issue prepaid calling cards to a charitable organization. Thus, the Settlement Agreement does not provide for a reversion of money to Sprint. This point has been confirmed by Class Counsel and counsel for Sprint both during the October 21, 2009 hearing, as well as in the parties' joint stipulation regarding the cy pres provision.  See Joint Stipulation Regarding the Cy Pres Terms of Settlement Agreement, Docket Entry No. 367 ("It is not the intent of the parties that this cy pres provision would work as a reverter or result in any portion of the Common Fund being returned to Sprint."); see also Tr. (Oct. 21, 2009) at 22:13-15 ("We didn't intend [that] a single dollar would ever go back to Sprint, ever. . . .  The idea was cy pres under Your Honor's discretion, and our stipulation, which Your Honor has noted, says it unequivocally, it's not a reverter."). Thus, this argument is rejected without further discussion.

As to the adequacy of the proposed settlement amount, according to the Galleguillos Objectors, using Ayyad as a benchmark, here, the award should be more like $1.2 billion, including $296 million in cash, as opposed to only $14 million in total since the settlement class is four times the size of that in Ayyad.  The Court finds that the Gallguillos Objectors' reliance on the Ayyad award is misplaced.  Although the jury in Ayyad found Sprint liable to the class of California

-26-

consumers in the amount of $73,775,975.00, the jury also found that the class of California consumers had breached their contracts with Sprint and that Sprint's actual damages from such breach was over $225 million. See Docket Entry No. 235, Ex. H. Thus, Sprint's award of damages actually exceeded the class's recovery in that case.[24]

By contrast, the settlement amount here –$14 million in cash and $3.5 million in non-cash relief for an estimated 40 million member class – provides immediate and substantial relief to Class members, and is proportional to similar nationwide ETF settlements. See, e.g., White v. Cellco Partnership d/b/a Verizon Wireless, RG04-137699 (Calif. Superior Ct., Alameda Cty, CA) (October 21, 2008) (approving settlement in the amount of $21 million for an estimated 92 million member class).[25]

### 2.    Objector Jessica Hall

Objector Jessica Hall, represented by Bradley Lakin, Robert Evola and Phillip Bock, objects to the proposed settlement on the basis that: (a) the settlement is the alleged product of a reverse auction, and (b) the cost of notice should not take away from the class relief.[26]

A "reverse auction" is generally "the practice whereby the defendant in a series of class

---

[24] Moreover, a new trial on damages in the Ayyad case is forthcoming, and, in the interim, "[t]he order granting a new trial on Sprint's cross-claim damages vacated the [underlying] judgment in its entirety for all purposes except for review on appeal." See Docket Entry No. 388, Ex. A at 5:9-10.

[25] See Docket Entry No. 86-4 at 3, 23.

[26] To the extent Hall attempts to raise the alleged conflict of interest involving Paul M. Weiss in objection to the settlement, this Court has previously addressed and rejected this very argument in denying Hall's motion to disqualify Freed & Weiss, Paul Weiss and Richard Burke. See Larson v. Sprint Nextel, No. 07-5325, 2009 WL 2836489 (D.N.J. Aug. 27, 2009).

actions picks the most ineffectual class lawyers to negotiate a settlement within the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." In re Community Bank of Northern Virginia, 418 F.3d 277, 308 (3d Cir. 2005) (quoting Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 282-83 (7th Cir. 2002)).  Generally, the danger underlying a reverse auction is the potential for collusiveness. See id.  Aside from the mere overlap of time between when counsel for Jessica Hall and Class Counsel were apparently negotiating with Sprint, the Court has been presented with no evidence of collusiveness.  By contrast, Judge Politan, who oversaw five months of intense settlement negotiations, specifically dismissed the idea that the Settlement was the product of a reverse auction or collusion. See Politan Declaration Decl., Docket Entry No. 231-2, ¶¶ 15-18 ("During the five months that I oversaw the mediation of this case, I never once observed anything that would suggest any collusion between any persons or parties.  Indeed I am hard pressed to understand this suggestion as this mediation was extremely difficult to conduct and was certainly as hard fought as any I have conducted.").  In light of these circumstances, the Court finds Hall's contentions regarding collusion to be baseless.

Objector Hall also claims that the cost of re-notice should not take away from the Common Fund. In particular, Objector Hall argues that any additional costs incurred as a result of the re-notice should be borne by Class Counsel and/or Sprint, not members of the Class.  Although Hall's objection is well taken, the Settlement Agreement always contemplated that "all costs" of providing notice would be reimbursed from the Common Fund. See Settlement Agreement at 46, Docket Entry No. 84-1. In addition, the Amended Notice Plan, which was submitted to the Court on May 21, 2009 and approved by the Court on June 2, 2009, specifically provided that Sprint and Class Counsel would seek reimbursement from the Common Fund for the re-notice costs. See Proposed Amended

Notice Plan at 3, 5, 7; Docket Entry No. 340.  Despite having received notice, through counsel, of the proposed Amended Notice Plan, Objector Hall did not bring this issue to the Court's attention before the Amended Notice Plan was implemented, nor did Objector Hall seek reconsideration of this Court's June 2, 2009 decision approving the Amended Notice Plan.  In light of the foregoing, the Court rejects such an objection at this juncture.

### 3.  Objector Dean Short

Objector Dean Short argues that the release contained in the Settlement Agreement is overly broad.  In particular, Objector Short argues that the Settlement Agreement purports to release claims that do not arise out of the "identical factual predicate" as those originally alleged in the complaint.  However, "a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint." In re Corrugated Container Antitrust Litig., 643 F.2d 195, 221 (5th Cir. 1981) (internal citations omitted); see, e.g., In re Prudential Ins. Co. of Am. Sales Practice Litig., 261 F.3d 355, 366 (3d Cir. 2001) ("It is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action. This is true even though the precluded claim was not presented, and could not have been presented, in the class action itself.").  This objection is, thus, rejected.

### 4.  Objectors Kenneth and Sandra Griffin

Kenneth and Sandra Griffin assert the following objections.  First, they argue that the term "Class" was not adequately defined, and, instead, its definition is an "incomprehensible run-on sentence."  Second, Objectors Kenneth and Sandra Griffin argue that the class definition is inadequate because it makes whether a person is included in the Class turn on the class member's

subjective state of mind.  Third, they take issue with the cy pres provision of the Settlement Agreement and maintain that any unclaimed monies remaining should be paid to claimants, not to third parties.  Fourth, they claim that the release provision is overly broad.[27]

The Court has already ruled upon the objection regarding the alleged overly broad nature of the release provision in assessing Dean Short's objection.  This objection is, therefore, rejected without further discussion.  As to the alleged inadequacy of the "Class" definition, this Court disagrees.  The specific language challenged by the Griffin Objectors is as follows: "All persons in the United States who are or were parties to a personal fixed-term subscriber agreement for a Sprint Nextel Wireless Service Account for personal or mixed business/personal use . . .  and whose claims relate in any way to an Early Termination Fee or use of an Early Termination Fee in a fixed-term subscriber agreement . . ."   The Court finds that the definition at issue is a reasonable one which does not depend on the reader's subjective state of mind.  Rather, whether someone is deemed to be a member of the "Class" depends upon the objective nature of the claim they have or could have asserted.  Lastly, as to the cy pres provision, such provisions are a feature common to many class action settlements.  The mere fact that the Settlement contains a cy pres feature does not render the settlement itself unreasonable.[28]  Such objections are, therefore, rejected by the Court.

_____

[27] Objectors Kenneth and Sandra Griffin also object to what they characterize as "excessive attorneys fees." In this regard, they attempt to incorporate by reference the objection of John J. Pentz. To the extent Mr. Pentz originally submitted an objection to the settlement, he has chosen not to renew this objection; thus, no such objection is currently before the Court.

[28] To the extent the Court had any concerns with the particular terms of the cy pres provision, such concerns have been addressed by Class Counsel and Sprint, both at the October 21, 2009 fairness hearing, as well in their October 6, 2009 joint stipulation regarding the cy pres provision. See Docket Entry No. 367.  In light of such developments, and based on the reasons more fully explained herein, the Court finds the particular terms of the cy pres provision to be fair and reasonable.

### 5.    Objectors Anita Levine and Tom Montague III

As a preliminary matter, the Court notes that the objection filed by Anita Levine and Tom Montague III on October 8, 2009 is untimely and, therefore, need not be considered by the Court. Regardless, based on the reasons that follow, the Court finds such objection to lack merit.

These objectors take issue with various aspects of the settlement. For instance, they argue that non-cash benefits to the Class are illusory inasmuch as such benefits (such as bonus minutes, calling cards related to the cy pres provision, etc.) are provided at little or no cost to Sprint. In addition, they argue that the period of the injunction (preventing Sprint from implementing new flat-rate ETFs) should be extended from two years to five years. Finally, they take issue with the fact that class members who do not file a formal objection and appear at the fairness hearing cannot appeal the Settlement under its terms.

Such distinct provisions were the result of an arms-length negotiation between Class Counsel and Sprint. Such negotiations resulted in a compromise. If this case is not settled, for instance, Sprint would be under no obligation to cease its practices of charging flat-rate ETFs. Thus, the fact that Anita Levine and Tom Montague III would prefer to extend the two year injunction to five years or make it easier for other class members to appeal the Settlement has no bearing on whether the terms of the Settlement Agreement itself are fair and reasonable. This objection is, therefore, overruled.

### 6.    Objector Michael Wein

Michael Wein objects to the settlement as insufficient based on its failure to account for additional charges associated with collection of taxes by Sprint that were, according to Mr. Wein, not permitted by law. Sprint represents that the tax charge referred to by Mr. Wein is part and parcel

of Sprint's ETF, that is, Sprint is required to charge this additional tax when charging ETFs.  In any event, no claim regarding the alleged unlawfulness of such tax charge has ever been raised in this matter. Any such claim is, therefore, not properly before the Court.

### 7.    State of Minnesota

As a preliminary matter, the Court notes that the State of Minnesota is neither a member of the Class nor a party to this litigation.  Nevertheless, it has submitted an objection to the settlement by way of an amicus curiae brief.  In the interest of fairness to the Class, and for purposes of completeness, the Court has considered its objection.

By way of background, in September 2007, the State of Minnesota commenced a law enforcement action on behalf of Minnesota consumers in Minnesota state court alleging that Sprint Nextel violated Minnesota's Consumer Fraud Act by engaging in fraudulent and/or deceptive means to enter Minnesota consumers into wireless contracts and/or to extend their contracts without first making proper disclosures.   Although such law enforcement action does not challenge the lawfulness of ETFs, the State of Minnesota notes that the Second Amended Complaint contains the allegation that "customers are not always informed of or consent to the extended contract term in such a way that ensures that customers are fully informed of all material terms and provide proper consent to any such contract extension." (Second Am. Compl., Docket Entry No. 90, ¶ 30).

In objecting to the Settlement, the State of Minnesota takes issue with the amendment of the operative complaint, prior to settlement, to include the foregoing provision, and, accordingly asks the Court to: (a) make an explicit finding that the release provision does not affect the ability of the State of Minnesota to seek restitution and other relief for violations of consumer protection laws by Sprint Nextel in Minnesota, (b) modify the release provision to the extent any provisions contained

therein purport to affect the State of Minnesota's ability to seek such relief, and (c) in the alternative, to reject the proposed settlement in whole or in part as unfair.

The Court has considered the foregoing objection and notes the following.  First, the State of Minnesota cites to no legal authority allowing the Court to unilaterally re-write the terms of the Settlement Agreement, nor is the Court aware of any such authority.  The Court's role in reviewing a proposed settlement is not to revise the terms of the agreement reached by the parties, but instead, to assess the fairness of such terms as they apply to the class as a whole.  Thus, the Court will not modify the terms of the release provision, nor will the Court reject the proposed settlement in lieu of such modification.

In addition, to the extent the State of Minnesota encourages the Court to declare that the release provision contained in the <u>Larson</u> Settlement Agreement does not affect its right to pursue its law enforcement action (and corresponding restitution claims) in Minnesota state court, such matters are not presently before this Court and, therefore, will not be addressed at this juncture.

### 8.    General Objections Regarding Fairness

Pamela Orbison and Joel Rothman, both of whom are existing Sprint customers, object generally to the fairness of the settlement.  In particular, they argue that the Settlement Agreement, as currently drafted, is unfair inasmuch as it fails to provide for a pro-rated ETF in their existing contracts with Sprint.  The Court has considered such objections and, once again, reiterates that a settlement is, by its very nature, a compromise that naturally involves mutual concessions.  Orbison and Rothman do not dispute that the settlement would provide them with some relief should they choose to terminate their existing contracts with Sprint.  That they would prefer to receive a pro-rated ETF has no bearing on the fairness and reasonableness of the settlement as it relates to the

nationwide class as a whole.  Such objections are, therefore, overruled.

### 9.   Remaining Objections

The following class members have also filed objections: Daniel Jakeway, Danielle Koenig, Priscilla Maestas, Latrell Barfield and Helen Wade.  The foregoing objectors have not raised any substantive objection as to the fairness or reasonableness of the settlement itself.  Rather, Objectors Maestas, Wade and Koenig simply seek to be excluded from the Class.  Such objections shall be construed as requests to opt-out.  Objectors Jakeway and Barfield take issue with the entire premise of the lawsuit.  Such objections are rejected without further discussion, as they have no bearing on the fairness and/or reasonableness of the <u>Larson</u> settlement.

### C.   Stage of the Proceedings and Discovery Completed

Although this action was settled at a relatively early stage, the parties engaged in five months of intense and hard fought mediation.  Said mediation and settlement negotiations were not conducted in a vacuum.  Sprint provided Class Counsel with access to substantial information – including documents, deposition testimony and discovery responses – from other pending ETF cases which enabled Class Counsel to assess the strengths and weaknesses of the class claims and damage theories, as well as the strengths and weaknesses of Sprint's counterclaims.   In addition, Sprint produced to Class Counsel economic information which allowed Class Counsel to thoroughly evaluate the economics of a nationwide settlement.  Thus, although this case was settled prior to formal discovery within it, it was not settled without the benefit of the type of information such discovery would have yielded.  It is clear that the parties had sufficient information to assess the settlement value of the case and examine the strengths and weaknesses of their relative positions.

Additionally, Class Counsel has extensive experience litigating ETF cases, having filed

similar actions against T-Mobile, Verizon, and AT&T.  Thus, even though the action settled at a relatively early stage, the Court finds that counsel on both sides of the table are experienced and able litigators, and that the parties have sufficiently apprised themselves of the relevant facts and law to make a knowledgeable decision as to settlement.  This factor weighs in favor of approval.

### D.      Risk of Establishing Liability

The risks of proceeding to trial in any case are always considerable.  See In re Prudential, 962 F. Supp. at 539.  This case is no different.  Class Counsel has outlined several risks to establishing liability and damages, including: (i) even if Plaintiffs succeed in establishing that Sprint's flat-rate ETF is an enforceable policy, any recovery to which the Class may be entitled might be offset by Sprint's counterclaim for actual damages, and (ii) Sprint's actual damages could very well exceed the amounts recoverable by the Class.   In that scenario, the Class recovery would be zero.  Given such risks, and noting the inherent difficulty associated with litigating and proving this case at trial, the Court agrees that this Girsh factor weighs in favor of approval.

### E.      Risks of Establishing Damages

This factor is intertwined with the previous one, and weighs in favor of approval.

### F.      Risks of Maintaining the Class Action Through Trial

Plaintiffs run the risk that the Court would not find this action suitable for certification.  Even if class certification were granted, Plaintiffs face the added challenge of maintaining class certification through trial.

Here, an additional risk arises because of Sprint's corporate structure.  In its motion to dismiss for lack of personal jurisdiction, Sprint took the position that the Court lacked personal jurisdiction over Sprint Nextel Corp. and that any contacts between its subsidiaries and the State of

New Jersey cannot be imputed to Sprint.  This motion was administratively terminated once the parties reached a proposed settlement, and was, therefore, never ruled upon.  Nevertheless, should this matter proceed, Plaintiffs run the risk that the Court would agree with Sprint and assert its jurisdiction only over certain of Sprint's operating subsidiaries.  Taken in concert, the settlement reached clearly resolves such issues in Plaintiffs' favor.

> **G.      Ability of Defendant to Withstand A Greater Judgment**

Sprint is a multi-billion dollar company that has given no indication of an inability to pay a greater judgment.  Thus, this factor weighs against settlement.

> **H.      The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of all the Attendant Risks of Litigation**

Combining the final two <u>Girsh</u> factors, the analysis here compares the reasonableness of the settlement against the risks of litigation and the best possible Class recovery.  Class Counsel suggests that a jury would be tasked with properly ascertaining Sprint's actual damages in the event that the ETF is found to be an unenforceable penalty.  As indicated earlier, a jury could very well find a net recovery in favor of the Class, but it also could find that Sprint's damages exceed those of the Class, thereby leaving the Class with no recovery at all.   Ultimately, it is difficult to predict the best possible recovery for this Class.  That being said, it is clear that $17.5 million is a reasonable recovery in light of the risks already highlighted.

Having evaluated the proposed settlement against the nine <u>Girsh</u> factors and against the dictates of Rules 23(b)(3), 23(c), and 23(e), the Court finds that it warrants approval.  The minuscule number of objectors combined with the size of the class recovery, the robust notice program, and the real risks associated with taking this matter to trial all indicate that the settlement ought to be

approved.  The Court therefore grants the motion for final approval of the settlement reached in this matter.

## V.      Attorneys' Fees and Expenses

Next, Class Counsel also moves for an award of attorneys' fees in the amount of 33% of the Class benefit plus reimbursement of expenses in the amount of $256,115.91.  Thirty-three percent of the $17.5 million settlement ($14 million in cash and $3.5 million in non-cash) is equal to $5,775,000.  Objections to Class Counsel's application for fees have been filed by: (1) Objector Jessica Hall, and (2) the Galleguillos Objectors.

In addition, the following groups of attorneys have filed motions for their own share of the expected multi-million dollar fee: (1) the "Bursor Group" on behalf of the Galleguillos Objectors,[29] (2) Lite DePalma,[30] also on behalf of the Galleguillos Objectors, and (3) the "Plutzik Group."[31]

---

[29] The Bursor Group are counsel to the Galleguillos Objectors.  The lawyers comprising the Bursor Group are: (1) Law Offices of Scott Bursor, (2) Bramson, Plutzik, Mahler & Birkhaeuser, LLP, and (3) Faruqi & Faruqi, LLP.  The Court refers to the foregoing group of law firms as the "Bursor Group" for ease of reference only.

[30] Lite DePalma, Greenberg & Rivas ("Lite DePalma") are former liaison counsel for the Galleguillos Objectors. Lite DePalma withdrew as counsel for the Galleguillos Objectors after the Court issued its April 30, 2009 decision denying, without prejudice, final approval of the settlement.

[31] The Plutzik Group consists of groups of lawyers representing various plaintiffs in the following ETF cases: (1) Ayyad, (2) Robertson, (3) Molfetas v. Sprint Spectrum L.P., et al., and (4) Lee v. Sprint Nextel Corp., et al.  Such lawyers include: (1) Bramson, Plutzik, Mahler & Birkhaeuser, LLP,  (2) Law Offices of Scott Bursor, (3) Franklin & Franklin, (4) Faruqi & Faruqi, LLP, (5) Gilman and Pastor, LLP, (6) Law Offices of Anthony A. Ferrigno, (7) Reich Radcliffe & Kuttler, LLP, (8) Law Offices of Carl Hilliard, (9) Mager & Goldstein, (10) Law Offices of Joshua P. Davis, and (11) Cuneo Gilbert & LaDuca, LLP. The Court refers to the foregoing group of law firms as the "Plutzik Group" for ease of reference only.

A.        **Application of <u>Gunter</u> Factors**

The awarding of fees is within the district court's discretion. <u>See</u> <u>In re Cendant Corp.</u> <u>PRIDES Litig.</u>, 243 F.3d 722, 727 (3d Cir. 2001).  However, the court must clearly articulate the reasons supporting its conclusion.  <u>See</u> <u>In re Diet Drugs</u>, 582 F.3d 524, 538 (3d Cir. 2009); <u>In re Rite</u> <u>Aid Corp. Sec. Litig.</u>, 396 F.3d 294, 301 (3d Cir. 2005).  "In a class action settlement, the court must thoroughly analyze an application for attorneys' fees, even where the parties have consented to the fee award."    <u>Varacallo</u>, 226 F.R.D. at 248.    Generally, a court will use either the percentage-of-recovery method or the lodestar method to determine the fee award.  <u>In re GM</u>, 55 F.3d at 821.  The lodestar method is considered most appropriate in statutory fee-shifting cases, and has the advantage of resembling a tradition fee calculation, whereas the percentage-of-recovery method is viewed as best approximating a contingent fee award in a common fund recovery.  <u>See</u> <u>Cendant PRIDES</u>, 243 F.3d at 732; <u>see</u> <u>generally</u> <u>In re Diet Drugs</u>, 582 F.3d at 540.  The Third Circuit has approved the use of the percentage-of-recovery method for determining attorneys' fees in common fund cases, such as this one. <u>See, e.g.</u>, <u>In re Rite Aid</u>, 396 F.3d at 300.

The standard for evaluating fee awards is reasonableness.  <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).  In common fund cases of the type presented here, where attorneys' fees and the Class recovery come from the same source and the fees are based on a percentage of the Class settlement, the Third Circuit has set forth a multi-factor analysis to help analyze whether or not the percentage award is reasonable.  <u>See</u> <u>Gunter v. Ridgewood Energy Corp.</u>, 223 F.3d 190, 195 n. 1 (3d Cir. 2000).  These factors include:

> (1) the size of the fund created and the number of persons benefited;
> (2) the presence or absence of substantial objections by members of
> the class to the settlement terms and/or fees requested by counsel; (3)

> the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Id.; see also In re AT&T Corp., 455 F.3d 160, 165 (3d Cir. 2006).  These factors are not intended to be exhaustive.  Among other factors that a Court may consider are:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any "innovative" terms of settlement.

AT&T, 455 F.3d at 165-166 (citing In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions, 148 F.3d 283, 338-340 (3d Cir. 1998)).  The above-referenced factors should not be applied in a formulaic way; rather, the district court should "engage in robust assessments of the fee award reasonableness factors recognizing an especially acute need for judicial scrutiny of fee arrangements in class action settlements."  AT&T, 455 F.3d at 166 (citations and quotations omitted); see also Gunter, 223 F.3d at 195 n.1 (finding that "factors listed need not be applied in a formulaic way" and "in certain cases, one factor may outweigh the rest").  Finally, the Third Circuit requires that a district court cross-check the percentage-of-recovery calculation against the lodestar method to ensure that the percentage-of-recovery method has yielded a reasonable number.  See AT&T, 455 F.3d at 164.

Thus, the Court first evaluates the propriety of the requested fee award through application of the Gunter factors, and then addresses the motions regarding allocation of fees.  Importantly, the Girsh factors discussed earlier are similar to and overlap with several of the Gunter factors.  Thus,

the Court incorporates by reference the reasons already articulated for approval of the settlement, and now makes specific findings with respect to each of the <u>Gunter</u> factors.

### 1.        Size of Fund Created and Number of Persons Benefitted

The first <u>Gunter</u> factor analyzes the size of the fund created and the number of persons benefitted.  <u>Gunter</u>, 223 F.3d at 195. n.1.  Generally speaking, there is an inverse relationship between an increase in the size of the settlement fund and the percentage fee award.  <u>In re Prudential</u>, 148 F.3d at 339.  This case, however, involves only a cash fund of $14 million and non-cash benefits valued at $3.5 million.  Although this is a significant amount given the claims asserted and the risks of establishing liability, the net recovery is not so large as to implicate the "inverse relationship" called for by a "very large" settlement.  <u>See In re Ikon Office Solutions, Inc. Sec. Litig.</u>, 194 F.R.D. 166, 195 (E.D. Pa. 2000) (finding that $100 million is the informal marker constituting a "very large" settlement).

The size of the fund here is large and the size of the Class measures in the millions.  As of October 14, 2009, 57,309 claims had been filed.  (Carmin Decl., ¶ 10, Docket Entry No. 384-3).  Thus, the settlement has afforded benefits to a large amount of people.  Additionally, alongside these monetary benefits, Sprint is enjoined from entering into new fixed-term subscriber agreements containing flat-rate ETFs for a period of two-years.  Considering the large number of persons benefitted and the significant size of the common fund created, this factor weighs in favor of the $5,775,000 request for fees.

### 2.        Class Member Objections

Next, a Court must examine "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." <u>Gunter</u>, 223 F.3d at 195 n.1.

Only three objectors have lodged objections to the amount of attorneys' fees requested, and none of those objections state a substantive ground to warrant denying the request.[32]   The Court notes that two additional objections to Class Counsel's fee application have been lodged by the Hall and Galleguillos Objectors.

Objector Hall takes issue with, among other things, the fact that although the Settlement Agreement provides that Class Counsel may seek "an award of attorneys' fees <u>and</u> expenses in an amount not to exceed 33% of the Total Class Benefit,"[33] Class Counsel now asks for a fee award in the amount of 33% of the Total Class Benefit ($5,775,000) <u>plus</u> reimbursement of $256,115.91 in expenses.  The Court has considered Hall's argument in this regard and agrees that the terms of the Settlement Agreement speak for themselves. Therefore, to the extent the Court approves Class Counsel's request for attorneys' fees in the amount of $5,775,000, such an award will be decreased by any expenses to which the Court ultimately determines Class Counsel (or other counsel) may be entitled.

The remaining objections raised by Hall and the Galleguillos Objectors do not strike at the reasonableness of the fee award itself; rather, these objectors – who have simultaneously filed their own motion for attorneys' fees – take issue with the manner in which such fees should be allocated among the various groups of counsel based upon the alleged significance of their respective

---

[32]  These objectors include: (1) Kenneth and Sandra Griffin, (2) Anita Levine and Tom Montague III, and (3) Michael Wein.

[33]  <u>See</u> Settlement Agreement at 46, Docket Entry No. 84-1 (emphasis added). "Total Class Benefit" is defined as $17,500,000. <u>See</u> <u>id.</u> at 22.

contributions to the Class.[34]  Such matters are more appropriately considered in the context of their respective fee applications.

Thus, the Court finds that this factor weighs in favor of approving the requested fee award. Nevertheless, the Court agrees with the Hall Objector that any expenses awarded by the Court should be deducted from the fee award, to the extent the entire requested amount ($5,775,000) is granted.

### 3.    Skill and Efficiency of the Attorneys Involved

The Court considers the skill and efficiency of Plaintiff's counsel, "as measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel."  Nichols v. SmithKline Beecham Corp., No. 00-6222, 2005 WL 950616, at *22 (E.D. Pa. April 22, 2005) (quotation omitted).  The Court has already found, in its analysis of the Girsh factors, that Class Counsel are experienced and skilled in prosecuting ETF cases specifically and class actions generally.  The recovery achieved here came about quickly and swiftly, and although Class Counsel faced few legal difficulties in this particular case (due to the early settlement), the fact remains that a settlement of this magnitude only occurred because both sides properly recognized the legal and factual risks of going to trial.  Finally, Sprint  was represented by highly-skilled attorneys from two very prominent law firms, both of whom have experience litigating these types of cases.  In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of opposing counsel is also important in evaluating

---

[34] See, e.g., Docket Entry No. 402, Objection filed by Galleguillos Objectors at 2 ("Larson's counsel's fee is remarkable, considering that their work did not produce any benefit for the class. Larson counsel simply piggybacked on the work done by California counsel in Ayyad and Robertson.").

the quality of plaintiffs' counsel's work.") Accordingly, this factor weighs in favor of approving the requested fee award.

### 4.    Complexity, Difficulty, and Duration of the Litigation

With respect to duration, the Court has already noted that this particular matter settled early. No substantive motions were entertained by the Court, and the matter proceeded rather quickly from an initial complaint filed on November 5, 2007, to preliminary settlement approval on December 8, 2008, to a final approval fairness hearing on October 21, 2009. Thus, the litigation was not long or drawn out. The Court, however, is aware that ETF litigation against Sprint has been ongoing for several years now - in state and federal court - and that the settlement in this case cannot be evaluated simply by looking at the sparse docket referenced above. As indicated with respect to the third factor, this matter reached settlement because both sides clearly appreciated the difficulties with taking the case to trial.

Next, regarding difficulty and complexity, the legal issues presented were by no means easy to navigate. The Court has already discussed at length the potential hurdles that would have cropped up had Class Counsel elected to pursue this matter to trial. Even though this particular litigation was not lengthy, the Court finds that the duration of all of the ETF cases pending against Sprint (in state and federal courts) along with the complexity of the legal issues involved weighs in favor of awarding the requested amount of fees.

### 5.    Risk of Nonpayment

Class Counsel submits that it undertook this litigation on a contingent fee basis, with the risk that it might yield little or no recovery and leave them uncompensated for their efforts. Certainly, the risk associated with taking a case on contingency is a real and important factor to consider.

> Counsel's contingent fee risk is an important factor in determining
> the fee award. Success is never guaranteed and counsel faced serious
> risks since both trial and judicial review are unpredictable.  Counsel
> advanced all of the costs of litigation, a not insubstantial amount, and
> bore the additional risk of unsuccessful prosecution.

In re Prudential-Bache Energy Income P'ships Litig., No. 888, 1994 WL 202394, at *6 (E.D. La.

May 18, 1994).  Indeed, "[t]he contingent fee agreement further substantiates the propriety of the

attorneys' fee award."  In re Genta Sec. Litig., No. 04-2123, 2008 WL 2229843, at *10 (D.N.J. May

28, 2008); see also In re Pet Food Prods. Liab. Litig., No. 07-2867, 2008 WL 4937632, at *22

(D.N.J. Nov. 18, 2008) ("Courts have consistently recognized that the risk of receiving little or no

recovery is a major factor in considering an award of attorneys' fees.").   The risk of nonpayment

here, as with most contingency work, was high.  Given the legal defenses available to Sprint –

including its position on certain jurisdictional issues, as well as its potential counterclaim for actual

damages – along with the oft-noted hurdles associated with certifying a class and proving liability,

this factor is solidly in favor of approval.

### 6.    Amount of Time Devoted to Case by Plaintiffs' Counsel

Next, the sixth Gunter factor is the "amount of time devoted to the case by plaintiffs'

counsel."  Gunter, 223 F.3d at 195 n.1.  Class Counsel submits a summary of fees and expenses

totaling 8,680.11 hours, equaling $4,964,137.63 in lodestar and $256,115.91 in expenses.  (Docket

Entry No. 383-1 (Decl. of James E. Cecchi ("Cecchi Decl."), Ex. A).[35]  The attorneys comprising this

---

[35] The lodestar is calculated by multiplying an attorney's reasonable rate, as measured by the
prevailing market rates in the community multiplied by the reasonable hours expended.  See
Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 180 (3d Cir. 2001).  In this case, attorneys from ten
separate law firms from different regions of the country comprise Class Counsel's fee application.
The Court has not conducted its own inquiry into the market rates in each of those communities but
is satisfied based upon the declarations received that the various rates charged are reasonable.

hourly bill break down as follows:

| FIRM NAME | HOURS | LODESTAR ($) | EXPENSES ($) |
|---|---|---|---|
| Carella, Byrne | 1538.5 | 997989.5 | 38053.33 |
| Freed & Weiss | 1599 | 906540.17 | 40014.17 |
| Seeger Weiss | 832.15 | 513744.5 | 10810.65 |
| Carey & Danis | 1011.25 | 341005 | 10746.74 |
| Lief, Cabraser | 330 | 146309 | 10892.43 |
| Foley Bezek | 209.85 | 94362.75 | 2221.22 |
| Richard Burke | 423.6 | 165290 | 0 |
| Aria Ozzello | 237 | 88663 | 1062.83 |
| Strange & Carpenter | 2391.56 | 1142817.25 | 80640.27 |
| Jacqueline Mottek (Positive Legal Group) | 107 | 567416.46 | 61674.27 |

(Id.).

The Court notes the concerns raised by the Hall Objectors with respect to the Freed & Weiss lodestar, and in particular, its inclusion of hours spent in litigating the Hall matter. The Declaration submitted by Paul M. Weiss confirms that the fee petition submitted by Freed & Weiss includes work done in Larson, as well as Hall v. Sprint Spectrum, L.P., No. 04-L-113 (Third Judicial Circuit, Madison County, Illinois). The Hall matter is listed as a Related Claim in the Settlement Agreement. As a result, the settlement in this matter will settle and release all claims in the Hall matter. Thus, as a preliminary matter, the hours spent by Freed & Weiss on that case are properly included in Class

---

Additionally, the Court notes that all parties have appropriately broken down their lodestar by rates charged depending on the particular position of the attorney or paralegal involved.

Counsel's fee application.  Moreover, it is clear, based upon the Weiss Declaration, that the <u>Hall</u> docket was not an inactive one.  For instance, the Weiss Declaration confirms the firm's heavy involvement in pre-complaint investigation (Weiss, ¶ 9), as well the significant amount of time spent in defending its heavily contested motion for class certification (through five rounds of appeals) (<u>Id.</u>, ¶ 10).  The Weiss Declaration goes on to divide the number of hours spent on both <u>Larson</u> and <u>Hall</u> into specific categories of work.  Such categories include: pleadings briefs, pre-trial motions, investigation, fact research, discovery, class certification, settlement, court appearance, etc.  Having considered the contents of the Weiss Declaration, the Court is satisfied that the requested lodestar of $906,540.17 is sufficiently supported.

The Court does, however, note its concern with several of Class Counsel's claimed hours, lodestar, and expenses.  First, the law firm of Carey & Danis, LLC appears to have logged 1011.25 hours, equating to a lodestar of $341,005.00.  The Declaration of Michael J. Flannery submitted in support of this figure provides the Court with no basis on which to assess this substantial lodestar. For instance, the Flannery Declaration indicates that the firm of Carey & Danis participated as co-counsel for plaintiffs through its representation of Intervenor Michael Bechtold. (Flannery Decl., ¶ 1). The Flannery Declaration goes on to state the Carey & Danis firm provided the following services: "pre-filing investigation and case assessment; researching and drafting initial and amended complaints; drafting and researching of briefs and motions; conducting discovery, including the drafting of discovery requests and negotiations with defense counsel regarding discovery responses and document production . . . ." (Flannery Decl., ¶ 3).  However, there was no formal discovery in this matter.  Moreover, although the initial complaint in this matter was filed in November 2007, Michael Bechtold's motion to intervene was not filed until February 2009.  By that point, the

operative complaint in this matter had already been filed.[36]  It is, therefore, unclear, the extent to

which the Carey & Danis law firm actually participated in the research and drafting of the initial and

amended complaints.  In addition, the Flannery Declaration fails to specify what types of briefs

and/or motions were drafted in connection with the instant matter.  This is particularly significant

given the particular timeline of this case, specifically as it relates to Intervenor Michael Bechtold,

and the minimal amount of formal motion practice.  Finally, the Court notes that the Summary Time

Report, attached as Exhibit A to the Flannery Declaration, merely states the attorney's name, their

rate and the number of hours they billed. It fails to specify even general categories of work to which

the hours are attributable.  Given its lack of any factual detail, whatsoever, the Flannery Declaration

is of little value to the Court in evaluating this Gunter factor.

Second, the following law firms each claim significant lodestars for work done in the matter

of Greene v. Sprint Spectrum, L.P., Case No. CV07-7129-SVW (United States District Court for the

District of Central California): (1) Lieff, Cabraser, Heimann & Bernstein, (2) Foley, Bezek, Behle

& Curtis, and (3) Arias Ozzello & Gignac.  The Greene matter is listed as a Related Claim in the

Settlement Agreement and is therefore released by way of the instant settlement.  The Sobol

Declaration, submitted on behalf of Lieff, Cabraser, Heimann & Berstein, asserts a lodestar of

$146,309.00, but details only one specific contribution to the Greene matter, namely, "successfully

drafting and arguing an opposition brief to defendant's motion to dismiss based on preemption

claims, which led to defendant's motion being denied." (Sobol Decl., ¶ 9). No other details specific

to the Greene matter – and, in particular, the work that was done by counsel in that matter – are

provided in the Sobol Declaration; rather, the balance of the declaration goes on to address the firm's

---

[36] The Second Amended Complaint was filed in December 2008. See Docket Entry No. 90.

history, the implications of the <u>Greene</u> matter on the firm as a whole, <u>other</u> successful class action litigations by the firm, and the firm's litigation objectives, in general.[37]  Similarly, the Curtis and Gignac Declarations, submitted on behalf of Foley, Bezek, Behle & Curtis and Arias Ozzello & Gignac, respectively, assert lodestars of $94,362.75 and $88,663; however, neither declaration details <u>any</u> specific contributions to the <u>Greene</u> matter, whatsoever.   To the contrary, both contain general background information related to the history of the firms and their litigation-related accomplishments.  Such factors are irrelevant to the Court's assessment of the total number of hours spent by plaintiffs' counsel on the instant matter.  Finally, the Court notes that none of the foregoing law firms – (1) Lieff, Cabraser, Heimann & Bernstein, (2) Foley, Bezek, Behle & Curtis, and/or (3) Arias Ozzello & Gignac – have divided their number of hours into specific categories of work.  Thus, the Court has no reasonable basis on which to evaluate this <u>Gunter</u> factor with respect to work done by said law firms.

The Court also notes its concern with the $165,290 lodestar submitted by Richard Burke for work done on the <u>Larson</u> matter.  The Burke Declaration fails to specify any particular contributions to the <u>Larson</u> matter; rather, it contains generalized language – such as "conducting discovery" and "responding to discovery" – with absolutely no context in which the Court can even assess its plausibility.  This is particularly significant in a case such as this one where no formal discovery was conducted prior to settlement.  Moreover, the Burke Declaration purports to attach a detailed summary of the time spent by the various partners, attorneys and professional support staff which comprise the $165,290 lodestar.  However, no such summary was attached to the Burke Declaration.

---

[37] <u>See, e.g.</u>, Sobol Decl., ¶ 7 ("LCHB has taken on litigation to protect consumers from strong-handed, consumer-unfriendly business practices of large telecommunications companies.").

Lastly, the Court notes its concern with the Mottek Declaration submitted on behalf of the Positive Legal Group.  Ms. Mottek was previously associated with the firm of Coughlin Stoia Geller Rudman & Robbins, LLP.  The Mottek Declaration details time spent by Jacqueline Mottek on behalf of both Coughlin Stoia and the Positive Legal Group.  It is unclear, however, whether Mottek seeks compensation for hours worked while at both firms, or whether she simply seeks compensation for time spent while at the Positive Legal Group.  For instance, in the summary of Class Counsels' and Supporting Counsels' Time submitted by James Cecchi, Mottek is listed as seeking a lodestar of $567,416.46 comprised of 107 hours spent while at the Positive Legal Group (presumably since March 2009).[38]  See Docket Entry No. 383-4.  A cross-reference with the Mottek Declaration confirms, however, that the lodestar figure listed by Class Counsel – $567,416.46 – necessarily includes work performed while at Coughlin Stoia and is certainly comprised of well over 107 hours. See Docket Entry No. 383-17.  Moreover, to the extent that the 107 hours is simply additional time spent by Mottek since the initial fairness hearing, Mottek offers no explanation – whatsoever – of what type of work was performed since March 2009 by the Positive Legal Group on behalf of the Larson Class.  In light of such questions, the Court cannot reasonably consider Mottek's hours or lodestar in assessing the sixth Gunter factor.

This Court has evaluated the time summaries provided by the various attorneys identified above, and has considered the objections raised by Hall and Galleguillos Objectors.  The Court has also noted its own concerns with at least several declarations submitted by Class Counsel.

---

[38] Compare March 3, 2009 Mottek Decl., ¶¶ 8-9 (Docket Entry No. 247-11) with October 14, 2009 Mottek Decl., ¶¶ 6-8 (Docket Entry No. 383-17).

Nevertheless, the Court is satisfied that this factor supports a fee award in the amount requested. [39]
Thus, the Court finds this factor to weigh in support of awarding fees.

### 7. Awards in Similar Cases

With respect to this final factor, the court must (1) compare the award requested with other awards in comparable settlements; and (2) ensure that the award is consistent with what the attorney would have received had the fee been negotiated on the open market. See, e.g., McGee v. Continental Tire North Am., Inc., No. 06-6234, 2009 WL 539893, at *15 (D.N.J. March 4, 2009). As to the first inquiry, "most fees appear to fall in the range of nineteen to forty-five percent." In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000). The Court is aware that 33% is a standard figure for recovery in a consumer class action of the contingent-fee variety. See, e.g., Martin v. Foster Wheeler Energy Corp., No. 06-878, 2008 WL 906472, at *5 (M.D. Pa. March 31, 2008) (noting that for a settlement of $1.64 million "district courts have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses…"); In re Corel Corp. Sec. Litig., 293 F. Supp. 2d 484, 495-98 (E.D. Pa. 2003) (awarding one-third of $7 million settlement fund). In this case, where the settlement fund is substantially larger than both $1.64 million and $7 million, the 33% number is certainly justified.

The requested fee of 33% is also consistent with a privately negotiated contingent fee in the marketplace. "Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation." In re Remeron Direct Purchaser Antitrust Litig., No. 03-085, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005); see also In re Orthopedic Bone Screws

---

[39] In doing so, the Court notes the relatively small impact of the lodestars submitted by the law firms which provided incomplete declarations on Class Counsel's total lodestar.

Prods. Liab. Litig., 2000 WL 1622741, at *7 (E.D. Pa. Oct. 23, 2000) (noting that "plaintiffs' counsel

in private contingency fee cases regularly negotiate agreements providing for thirty to forty percent

of any recovery."). Thus, the requested fee award is strongly supported by both subparts to this final

Gunter factor.

### 8.    Conclusion

Application of the Gunter factors confirms the reasonableness of Class Counsel's requested

33% fee award. All seven of the Gunter factors, to varying degrees, militate in favor of approving

this fee. The lack of any notable objections along with the complexity of the case, the substantial

settlement, the contingency risk associated with nonpayment, and the fact that several courts in

similar matters have awarded fees in this amount all indicate that approval of a 33% fee is warranted.

### B.    Lodestar Cross-Check

In common-fund cases, district courts are also advised to cross-check the percentage fee

award against the lodestar method of awarding fees so as to ensure that the percentage is not

unreasonable. Gunter, 223 F.3d at 199. "The lodestar cross-check, while useful, should not

displace a district court's primary reliance on the percentage-of-recovery method." AT&T, 455 F.3d

at 164. The lodestar multiplier is calculated by dividing the attorneys' fees that Class Counsel seeks

by Class Counsel's associated lodestar. See, e.g., Cullen v. Whitman Med. Corp., 197 F.R.D. 136

n.6 (E.D. Pa. 2000).

As indicated above, the total time claimed by Class Counsel is 8,680.11 hours, for a lodestar

of $4,964,137.63. (Cecchi Decl., Docket Entry No. 383-4). Using that figure, the lodestar multiplier

would be 1.16. However, as noted above, the Court takes issue with the declarations submitted by

the following law firms, and, therefore, for purposes of the lodestar cross-check, deducts their

corresponding lodestars from Class Counsel's final figure: (1) Lief, Cabraser, Heiman and Bernstein ($146,309.00), (2) Foley, Bezak, Boble and Curtis, LLP ($94,362.75), (3) Arias, Ozzello & Cignac LLP ($88,663.00), (4) Carey & Danis, LLC ($341,005.00), (5) Richard Burke LLC ($165,290.00), and (6) Jacqueline Mottek ($567,416.46). Deducting the foregoing lodestars yields a lodestar for Class Counsel of $3,561,091.42 and a multiplier of 1.62. The Third Circuit has noted that "[m]ultiples ranging from one to four are frequently awarded in common fund cases where the lodestar method is applied." In re Prudential, 148 F.3d at 341. In fact, in Cendant PRIDES, the Third Circuit approved a lodestar multiplier of 2.99 in a case it described as "relatively simple in terms of proof" in which "discovery was virtually nonexistent." Cendant PRIDES, 243 F.3d at 735-36; see also AT&T, 455 F.3d at 173 (discussing the reasonableness of the Cendant PRIDES multiplier). Thus, a multiplier of 1.62 is well within the range of reasonableness.

Because the Court is also awarding fees to the Bursor Group and Lite DePalma for their work on behalf of the Galleguillos Objectors, and to the Plutzik Group for its work in pursuing the California Subscriber Class Claims, as set forth in Sections V(C)(2)-(3), the Court should also consider their hours in the lodestar multiplier calculation. Adding in the Bursor Group's lodestar of $579,046.75, Lite DePalma's lodestar of $168,757.50, and the Plutzik Group's estimated lodestar of $3.5 million[40] would result in a multiplier of .74. Thus, in theory, this attorney fee award does not cover the entire lodestar. A multiplier of less than one is quite reasonable for the purpose of a lodestar cross-check.

Finally, the Court reiterates that "this is only a cross-check and a not a full lodestar analysis."

---

[40] The Court has utilized the estimate submitted by Class Counsel. See Docket Entry No. 404 at pg. 1.

In re Linerboard Antitrust Litig., No. MDL 1261, 2004 WL 1221350, at *15 (E.D. Pa. June 2, 2004).

To delve deeply into the thousands of hours claimed by the many attorneys involved in this matter would undermine the Court's reliance on the percentage-of-recovery method. Thus, while this Court has raised questions as to some of the hours claimed within Class Counsel's fee petition, the fact of the matter is that the hours claimed by all parties to this ETF litigation against Sprint more than satisfy the lodestar cross-check for percentage-of-recovery purposes. As a result, regardless of the reliability of some of the hours submitted, the cross-check fully supports a fee award in the amount of $5,775,000. Accordingly, the Court finds that the lodestar cross-check confirms the reasonableness of this fee.

###### C.     Allocation of $5,775,000 Fee

Awarding the $5,775,000 does not end the matter. While objections to the reasonableness of the settlement and to the reasonableness of the total fee award have been relatively tepid, the manner in which the fee award is to be allocated is hotly contested. Specifically, Class Counsel, the Bursor Group, Lite DePalma and the Plutzik Group vociferously disagree on how the $5,775,000 fee should be allocated.

###### 1.     Background

Motions for attorneys' fees have been filed by the following groups of attorneys: (1) Class Counsel, (2) the Bursor Group,[41] (3) Lite DePalma,[42] and (4) the Plutzik Group.[43] The Bursor Group

---

[41] The Bursor Group is comprised of: (1) Law Offices of Scott Bursor, (2) Faruqi & Faruqi, and (3) Bramson, Plutzik, Mahler & Birkhaeuser, LLP.

[42] Lite DePalma, Greenberg & Rivas ("Lite DePalma") are former liaison counsel for the Galleguillos Objectors. Lite DePalma withdrew as counsel for the Galleguillos Objectors after the

and Lite DePalma seek fees based on their work as counsel for the Galleguillos Objectors, and, in particular, raising various objections to the settlement which, they maintain, ultimately benefitted the Class.  The Plutzik Group seeks fees for work done in the matters of <u>Ayyad</u>, <u>Robertson</u>, <u>Molfetas</u> and <u>Lee</u>, prior to the appointment of Class Counsel in the instant matter.  The Plutzik Group has taken the position that their accomplishments in the foregoing matters served as the true "catalyst" for the <u>Larson</u> settlement and that, as a result, they should be compensated accordingly.  Class Counsel has opposed the motions for fees filed by the Bursor Group, Lite DePalma and the Plutzik Group.

### 2.    Fees Based on Galleguillos Objections

The Bursor Group maintains that the proposed settlement is not fair, reasonable or adequate. Nevertheless, to the extent the settlement is approved, the Bursor Group seeks compensation for fees and expenses it incurred in representing the Galleguillos Objectors.  In particular, the Bursor Group relies on the work they performed in connection with two categories of objections to the instant settlement raised by the Galleguillos Objectors.  Such categories include: (1) objection regarding reversion to Sprint, and (2) objections regarding notice to the Class.  Lite DePalma, former liaison counsel for the Galleguillos Objectors, seeks its own fees for pursuing the same objections on behalf of the same group of objectors.  As previously explained, Lite DePalma withdrew as counsel for the

Court issued its April 30, 2009 decision denying, without prejudice, final approval of the settlement.

[43] The Plutzik Group consists of groups of lawyers representing various plaintiffs in the following ETF cases: (1) <u>Ayyad</u>, (2) <u>Robertson</u>, (3) <u>Molfetas v. Sprint Spectrum L.P., et al.</u>, and (4) <u>Lee v. Sprint Nextel Corp., et al.</u>  Such lawyers include: (1) Bramson, Plutzik, Mahler & Birkhaeuser, LLP,  (2) Law Offices of Scott Bursor, (3) Franklin & Franklin, (4) Faruqi & Faruqi, LLP, (5) Gilman and Pastor, LLP, (6) Law Offices of Anthony A. Ferrigno, (7) Reich Radcliffe & Kuttler, LLP, (8) Law Offices of Carl Hilliard, (9) Mager & Goldstein, (10) Law Offices of Joshua P. Davis, and (11) Cuneo Gilbert & LaDuca, LLP.

Galleguillos Objectors after the Court issued its April 30, 2009 decision.

### (i).      Objection Regarding Reversion

The Bursor Group maintains that fees are warranted based on their role in objecting to the provision of the settlement agreement which provided for a reversion of cash to Sprint.  In particular, the Bursor Group relies upon the following language contained in the Settlement Agreement:

> In the event there remains cash left in the fund after all claim periods have expired, the remaining cash will be returned to Sprint Nextel and Sprint Nextel shall issue prepaid calling Personal Identification Numbers valued in the amount of the remaining cash, to a charitable organization that holds a 501(c)(3) designation or other organization or institution to be agreed on by the parties (or failing agreement ordered by Judge Linares).

(Settlement Agreement at 23, Docket Entry No. 84-1).  According to the Bursor Group, such language would have resulted in a reversion of more than $6.3 million in cash to Sprint but for their objection thereto.  See Docket Entry No. 385-1 at 9.

As a preliminary matter, no such objection was raised by the Galleguillos Objectors in their objection papers.  See Docket Entry No. 186.  Even if the Court were to construe the concerns raised by the Galleguillos Objectors at the initial fairness hearing as constituting a formal objection to such language, the Court made no findings  with respect to said provision in its April 30, 2009 Opinion, nor did the Court – at any point in this litigation – interpret the Settlement Agreement as actually containing any type of reversion to Sprint.  Moreover, the terms of the cy pres provision have not substantively changed since the matter was presented to the Court for preliminary approval.  In fact, it is apparent that the Settlement Agreement never contained a reversion of cash to Sprint nor does it currently contain a reversion of cash to Sprint. Thus, the suggestion by counsel for the Galleguillos

Objectors that their objection somehow changed the terms of the settlement so as to provide a direct benefit to the Class in the amount of $6.3 million is without merit.

In its April 30th decision, the Court did raise, <u>sua</u> <u>sponte</u>, a general concern regarding the logistics underlying said provision; however, since this Court's April 30th decision, Sprint and Class Counsel entered into a joint stipulation which has clarified, to the Court's satisfaction, some of the terms of the cy pres provision.  <u>See</u> Docket Entry No. 367.  Among such clarifications was the identity of the charitable organization to which such prepaid calling cards would be donated, namely the United States Military for use by members of the armed forces and their families. <u>See</u> <u>id.</u>  In addition, the parties confirmed that "[i]t is not the intent of the parties that this cy pres provision would work as a reverter or result in any portion of the Common Fund being returned to Sprint." <u>Id.</u> In light of such clarifications, the Court is now satisfied with the fairness of such terms.  To the extent the Bursor Group and/or Lite DePalma seek attorneys' fees in excess of $2.5 million based on this objection, such applications are denied.

### (ii).    Objections Regarding Notice

The Bursor Group and Lite DePalma also seeks attorneys' fees based on their respective roles in objecting to the initial notice plan on behalf of the Galleguillos Objectors.  By way of background, the Court notes that prior to the original fairness hearing, the Galleguillos Objectors objected to the settlement on the basis that the original notice program failed to supply individual notice to those class members who could have been identified with reasonable effort.  This argument was based on two assertions – first, that Sprint had at its disposal a partial list of class members in a related litigation to whom it should have sent individual notice; and second, that Sprint never provided the Court with an estimate of the expense and cost associated with compiling a partial rather than a

complete list of individual class members. Additionally, the Galleguillos Objectors took issue with the contents of the bill insert.[44]

In originally denying final approval of the <u>Larson</u> settlement, this Court agreed with the Galleguillos Objectors that the original notice program was deficient inasmuch as: (a) it failed to provide notice to identified <u>Robertson</u> class members, (b) it failed to notice subclasses of class members capable of reasonable identification, and (c) the content of the initial bill insert failed to comply with the dictates of Rule 23(c)(2).[45] In light of the foregoing, the Court denied final approval of the <u>Larson</u> settlement and directed Sprint and Class Counsel to devise an amended individual notice program in compliance with Rule 23(c)(2). A proposed Amended Notice Plan was subsequently submitted and approved by the Court. The Bursor Group and Lite DePalma now seek attorneys' fees for their respective roles as counsel in presenting the foregoing objections to the original notice plan.

The common fund doctrine provides that "a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." <u>In re Cendant Corp. Sec. Litig.</u>, 404 F.3d 173, 187 (3d Cir. 2005). It logically follows that objectors to class action settlements are generally not entitled to recover their attorney's fees. <u>See</u> <u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 273 F. Supp. 2d 563, 565 (D.N.J. 2003). However, objectors are entitled to compensation for attorneys' fees and expenses only "if the settlement was improved as

---

[44] The Court notes that the Galleguillos Objectors raised other notice-related objections prior to the original fairness hearing which were rejected by the Court and are, therefore, excluded from the Court's present discussion.

[45] <u>See</u> April 30, 2009 Opinion, <u>Larson v. Sprint Nextel Corp.</u>, 2009 WL 1228443, at *5-12.

a result of their efforts." <u>Id.</u>  In this regard, the Third Circuit has explained that:

> [C]ounsel's proof must be specific: it must show what its efforts were, how they created a benefit, and why that benefit would not have been created absent its efforts. If both lead counsel and the fee-requesting non-lead counsel performed work in parallel, non-lead counsel will not be able to carry this third factor merely by demonstrating that its work was in some subjective way better. Only if it can demonstrate that its work alone was responsible for some demonstrably improved probability of victory, or some identifiable portion of the class's recovery, can non-lead counsel claim a right to fees from the common fund.

<u>In re Cendant Corp. Sec. Litig.</u>, 404 F.3d at 200.

After the initial notice period, 12,501 claim forms for 19,105 lines of service were submitted. (Carmin Decl., ¶ 9). Since implementation of the Amended Notice Plan, an additional 44,808 claims forms for 66,913 lines of service have been submitted. (Carmin Decl., ¶ 9). There is no dispute that the Galleguillos Objectors' efforts in bringing about re-notice to the Class contributed to the increase in the number of class members who received individual notice of the settlement, or that such an increase in awareness conferred a substantial benefit on the Class as a whole. Thus, the only real dispute is the manner in which such benefit should be quantified for purposes of compensating counsel for the Galleguillos Objectors.

Curiously, although the Bursor Group dedicates pages and pages of briefing to the manner in which its reversion-based objection benefitted the Class and how such benefit should be quantified, no such detailed discussion or proposal is included with respect to its notice-related objections. Instead, the Bursor Group merely states: "it is difficult to calculate the cash value of that improvement." (Docket Entry No. 385-1 at 11). Lite DePalma likewise provides no basis for quantifying this benefit. Class Counsel, on the other hand, has presented several alternatives for

quantifying the benefit conferred on the Class by the Galleguillos Objectors' notice-related objections. Based on the reasons that follow, the Court is satisfied that the second proposal set forth by Class Counsel (identified as "Alternative 2") presents a fair and reasonable allocation of fees based upon the benefit conferred by the three foregoing notice-related objections.

Essentially, Class Counsel urges the Court to award fees to the Bursor Group and Lite DePalma for their notice-related objections based upon a percentage of the increase in claims attributable to the Amended Notice Plan. Class Counsel represents that as of June 2009, approximately $810,800 in cash claims had been submitted. <u>See</u> Carmin Supplemental Decl., ¶ 2, Docket Entry No. 404-1. The claim period was to remain open through January 1, 2011. Class Counsel further represents that, as of October 19, 2009, the total claims submitted rose to $3,282,015. <u>See</u> Class Counsel Br. at 16, Docket Entry No. 404; Carmin Decl., ¶ 10, Docket Entry No. 384-3.[46] Class Counsel proposes that 25% of the increase in claims be attributed to the Amended Notice Plan. The Court agrees that this percentage is reasonable under the circumstances. Utilizing this framework, if 25% of the increase of $2,471,215 ($3,282,015 minus $810,800) is attributed to the Amended Notice Plan, the benefit to the class is $617,803.75. Thus, 4.4% of the Settlement Fund ($617,803.75 divided by $14,000,000) can be attributed to the Amended Notice Plan. Applying this figure of 4.4% to the total amount of attorneys' fees being requested ($5,775,000)

---

[46] The Court notes that there is some discrepancy as to this figure. Although Class Counsel represents that, as of October 19, 2009, the total claims have risen to $3,282,015.00 (Docket Entry No. 404 at 16), Class Counsel offers no particular citation for this proposition. The Declaration submitted by Karin Carmin on October 14, 2009, Docket Entry No. 384-3, indicates that, as of that date, the dollar value of the Claim Forms requesting a cash benefit was $3,262,440.00. Because the figure stated by Class Counsel in its brief is more generous than the dollar amount listed in the Carmin Declaration, the Court will utilize such figure in determining the percentage of the increase in claims attributable to the Amended Notice Plan.

results in $254,100.

Having found that the notice-related objections raised by the Bursor Group and Lite DePalma on behalf of the Galleguillos Objectors conferred a substantial benefit on the class, the Court will grant such counsel an award of attorneys' fees in the total amount of $254,100 to be drawn from the Settlement Fund. The Bursor Group and Lite DePalma have collectively billed a total of 1426.95 hours in pursuing their objections to the settlement.[47]  Such hours are broken down as follows: (1) 154.9 hours by Bramson, Plutzik, Mahler & Birkhaeuser, LLP,[48] (2) 555.3 hours by Law Offices of Scott Bursor,[49] (3) 357.75 hours by Faruqi & Faruqi,[50] and (4) 359 hours by Lite DePalma .[51]  Thus, the percentage of $254,100 allocable to each party is: (1) 10.9% ($27,696.90) to Bramson, Plutzik, Mahler & Birkaueser, (2) 38.9% ($98,844.90) to Law Offices of Scott Bursor, (3) 25.1% ($63,779.10) to Faruqi & Faruqui, and (4) 25.1% ($63,779.10) to Lite DePalma.

### 3.    Fees Based on Work Done in <u>Ayyad</u>, <u>Robertson</u>, <u>Molfetas</u> and <u>Lee</u>

The Plutzik Group seeks attorneys' fees based upon their efforts in litigating the following

---

[47]  The Court recognizes that such figure includes time spent on objections which were rejected by the Court.  To be clear, all of the firms seeking fees for their work as counsel to the Galleguillos Objectors have provided the Court with a single figure which appears to include all time spent on <u>all</u> objections pursued by the Galleguillos Objectors, many of which were unsuccessful. Although counsel should not be compensated for its time spent on objections which were rejected by the Court – and thus, conferred no substantial benefit on the Class – given the uniformity with which each law firm has presented its total amount of hours to the Court, the Court will nevertheless utilize such figures in determining the manner in which the $254,100 fee award should be allocated amongst the firms representing the Galleguillos Objectors.

[48]  <u>See</u> Plutzik Decl., ¶ 4, Docket Entry No. 385-2.

[49]  <u>See</u> Bursor Decl., ¶ 4, Docket Entry No. 385-4.

[50]  <u>See</u> Faruqui Decl., ¶ 3, Docket Entry No. 385-3.

[51]  <u>See</u> DePalma Decl., ¶ 3, Docket Entry No. 381-1.

ETF cases: (1) <u>Ayyad</u>, (2) <u>Robertson</u>, (3) <u>Molfetas v. Sprint Spectrum L.P., et al.</u>, and (4) <u>Lee v. Sprint Nextel Corp., et al.</u>  The Plutzik Group is comprised of the following law firms: (1) Bramson, Plutzik, Mahler & Birkhaeuser, LLP,  (2) Law Offices of Scott Bursor, (3) Franklin & Franklin, (4) Faruqi & Faruqi, LLP, (5) Gilman and Pastor, LLP, (6) Law Offices of Anthony A. Ferrigno, (7) Reich Radcliffe & Kuttler, LLP, (8) Law Offices of Carl Hilliard, (9) Mager & Goldstein, (10) Law Offices of Joshua P. Davis, and (11) Cuneo Gilbert & LaDuca, LLP.  Each of the foregoing law firms has submitted their respective lodestars, totaling over $3.5 million.

The Plutzik Group bases its request for such fees on the overarching theory that the <u>Larson</u> settlement, if approved, was produced primarily by the efforts of the lawyers and law firms that litigated <u>Ayyad</u>, <u>Roberston</u>, <u>Molfetas</u> and <u>Lee</u> in California and Florida state courts.  <u>See</u> Docket Entry No. 247-1 at 1.  As a preliminary matter, the Court must assess whether members of the Plutzik Group – who are non-lead counsel in this action – are even entitled to fees in light of the framework set forth by the Third Circuit in <u>In re Cendant Corp. Sec. Litig.</u>, 404 F.3d 173 (3d Cir. 2005), as recently applied by this Court in <u>Milliron v. T-Mobile USA, Inc.</u>, No. 08-4149, 2009 WL 3345762 (D.N.J. Sept. 10, 2009).

Generally, appointed Class Counsel is tasked with the responsibility of allocating the aggregate fee award to the various non-lead counsel who played a role in producing the settlement. The "submission of a combined fee application with actual allocation to be made by lead counsel has generally been adopted by the courts." <u>In re Linerboard</u>, 2004 WL 1221350, at *17.  "From the standpoint of judicial economy, leaving allocation to such counsel makes sense because it relieves the Court of the 'difficult task of assessing counsel's relative contributions.' " <u>Id.</u> at *18(quoting <u>In re Prudential</u>, 148 F.3d at 329 n.96.)

However, most of the fees sought by the Plutzik Group are for work performed prior to the appointment of Class Counsel.  According to the Third Circuit, "the court's involvement in the fee decision will be at its height when the fee request is for work performed before the appointment of the lead plaintiff."  In re Cendant Corp. Sec. Litig., 404 F.3d at 195.  Expanding upon this idea, the Cendant Court discussed the types of work that would be compensable prior to appointment of a lead plaintiff.

> Only those attorneys who confer an independent benefit upon the class will merit compensation.  To summarize, responsibility for determining fees for the work of non-lead counsel performed before the appointment of the lead plaintiff will rest, in the first instance, with the district court, though that court may ask the lead plaintiff for guidance in evaluating claims for fees.  Only work that actually confers a benefit on the class will be compensable; in the ordinary case, simply filing a complaint that is substantially identical to other complaints will not by itself warrant compensation.

Id. at 197.  The Advisory Committee Notes to the 2003 Amendments to Rule 23(h) support the Cendant court's conclusions, stating as follows:

> [Rule 23(h)] provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, not only the award to class counsel.  In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel.  Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

Fed. R. Civ. P. 23(h), Advisory Committee Notes to the 2003 Amendments.

### (i).    Lee, Molfetas and Roberston

As a preliminary matter, the Court notes that Lee, Molfetas and Robertson are all listed as

Related Claims and are, therefore, settled and released by way of the Settlement Agreement.  See Docket Entry No. 84-1 at 17-18.  Thus, in determining whether to award the fees requested, the Court will focus its assessment on whether efforts by members of the Plutzik Group in litigating the foregoing matters conferred an independent benefit on the Larson Class.  See In re Cendant Corp. Sec. Litig., 404 F.3d at 197.

Lee v. Sprint Nextel Corp., Docket No. 08-4959 (N.D. Cal.), was filed in October 2008, two months after Class Counsel was appointed Interim Class Counsel in the Larson matter.  See Docket Entry No. 64.  The Lee matter was stayed several months later (in January 2009) pending resolution of the Larson matter. See Suprenant Decl., ¶ 9, Docket Entry No. 260.  Between October 2008 and January 2009, nothing of substance occurred in the Lee matter.  See id.  Members of the Plutzik Group do not expressly dispute this, nor have they pointed to a single aspect of the Lee matter which – in any way – provided a specific benefit to the Larson settlement.  To the contrary, Scott Bursor admits that the Lee matter was filed simply as a vehicle to extend the anticipated Ayyad trial victory on a nationwide basis. (Bursor Decl., ¶ 61, Docket Entry No. 247-2).  Although the Plutzik Group maintains that they expended a significant amount of time and effort – presumably over the course of three months – in formulating the strategy for the Lee matter and drafting a motion for a preliminary injunction (which was admittedly never filed given the preliminary approval of the Larson settlement),[52] they failed to demonstrate how such efforts ultimately benefitted the Larson Class.   Thus, to the extent they seek attorneys's fees on the basis that the Larson settlement was produced primarily by the efforts of the lawyers who litigated the Lee matter, such request is denied.

The Plutzik Group also seeks fees for the alleged benefits conferred on the Larson settlement

---

[52] See Bursor Decl., ¶ 62.

through their litigation of the Molfetas v. Sprint matter in Florida state court. The memorandum of law submitted by the Plutzik Group fails to explain – with any level of specificity – how its efforts in litigating the Molfetas matter directly benefitted or contributed to the Larson settlement. Although it appears that some discovery was taken and a motion for class certification was filed and briefed in 2008, no decision was rendered and the matter has been inactive ever since. (Suprenant Decl., ¶10; Ex. A to Sprenant Decl., Docket Entry No. 260; Bursor Decl., ¶¶ 54-58). Without a more specific showing of how their work on the Molfetas matter actually conferred a benefit on the Larson Class, the Court has no reasonable basis on which it can award the fees requested. See In re Cendant Corp. Sec. Litig., 404 F.3d at 197 (noting that "[o]nly work that actually confers a benefit on the class will be compensable").

Robertson v. Nextel, like Ayyad, was also part of the Cell Phone Termination Fee Cases, JCCP 4332, which commenced in California state court in 2003. (Suprenant Decl., ¶ 12). Roberston and Ayyad were, for the most part, litigated in tandem. (Bursor Decl., ¶ 45). See Suprenant Decl., ¶ 12 ("It is important to note that relatively little work was done on Robertson that was separate and apart and in addition to work done on the Payor Class claims in Ayyad.").

Motions for class certification, summary judgment and reconsideration of summary judgment were briefed, filed and contentiously litigated during the prosecution of the Roberston matter. Most relevant, however, for purposes of the instant fee application is the following timeline of events. In November 2007, summary judgment was granted in favor of Nextel. (Bursor Decl., ¶ 14). In granting summary judgment in favor of Nextel, Judge Bonnie Sabraw found that Nextel's ETFs charged to the class understated Nextel's damages by $79.1 million. (Suprenant Decl., ¶33). Then, on December 5, 2008, summary judgment in favor of Nextel was reversed by Judge Sabraw on

reconsideration.  (Bursor Decl., ¶ 39).  This was done so as to  conform the decision in <u>Robertson</u> with her December 2008 Statement of Decision in <u>Ayyad v. Sprint</u>.  (Suprenant Decl., ¶ 35).

The Court has carefully considered the submissions made by the Plutzik Group in support of their request for fees associated with the <u>Robertson</u> matter.  There is no question that members of the Plutzik Group engaged in a significant amount of work in litigating the <u>Robertson</u> matter through summary judgment or that their efforts ultimately resulted in an achievement for the <u>Roberston</u> class.  (Bursor Decl., ¶ 8, Docket Entry No. 247-2).  Nevertheless, the Court notes that at the time the proposed <u>Larson</u> settlement was reached – December 3, 2008 – the original summary judgment ruling in <u>Robertson</u> remained in place.  Thus, for purposes of assessing the instant fee application, <u>Roberston</u> represented a substantial victory for <u>Sprint</u> – not for members of the <u>Roberston</u> or <u>Larson</u> class.  Such a victory – which surely impacted Sprint's own assessment of risk in this matter – likely served as more of an impediment to, rather than a catalyst for, the <u>Larson</u> Settlement.  To the extent the Plutzik Group seeks attorneys' fees based upon their work in litigating the <u>Robertson</u> matter, such request must, therefore, be denied.  <u>See</u> <u>In re Cendant Corp. Sec. Litig.</u>, 404 F.3d at 197 ("Only those attorneys who confer an independent benefit upon the class will merit compensation.").

### (ii).    <u>Ayyad</u> and the California Subscriber Class Claims

By way of background, <u>Ayyad et al. v. Sprint Spectrum, et al.</u>, Case No. RG03-121510, proceeding in the Superior Court of the State of California, Alameda County, originally contained claims asserted by a payer class (comprised of individuals who were assessed and paid an ETF) and a class of subscribers (comprised of individuals who were subject to but never paid an ETF). (Plutzik Decl., ¶ 12, Docket Entry No. 247-6).  Such claims were eventually separated into two

separate actions in June 2006: (1) <u>Ayyad v. Sprint</u>, and (2) the California Subscriber Action.[53]  (<u>Id.</u>).

The <u>Ayyad</u> case proceeded to trial and remains on appeal in California.

The Settlement Agreement in this matter refers to such claims as: (1) Ayyad Class Claims,

and (2) California Subscriber Class Claims.  <u>Ayyad</u> Class Claims are specifically excluded from the

Larson settlement, whereas California Subscriber Class Claims are specifically included in the

Larson settlement.

Law firms comprising the Plutzik Group seek fees from the Common Fund based on the

theory that the <u>Larson</u> settlement, if approved, was produced primarily by the efforts of the lawyers

and law firms that litigated <u>Ayyad</u> in California state court.  Although some members of the Plutzik

Group have attempted to differentiate between hours spent in litigating <u>Ayyad</u> (payer claims) and

those spent on the California Subscriber Class Claims,[54] other members of the Plutzik Group have

taken the position that both sets of claims were part of the same case until June 2006 and, therefore,

work performed by California counsel prior to June 2006 was performed for the benefit of <u>both</u>

classes and cannot be differentiated.[55]

As a general matter, the Court agrees that the Third Circuit's decision in <u>Cendant</u> authorizes

an award of fees for work performed prior to the appointment of Class Counsel that conferred an

independent benefit on the Class.  However, as recently explained by this Court, the effectiveness

of counsel is measured by <u>results</u> – not by the number of depositions taken, pleadings filed, or

---

[53] The California Subscriber Action was originally part of the <u>Cellphone Termination Fee Cases</u>, JCCP 4332, proceeding in the Superior Court of the State of California, Alameda County.

[54] <u>See</u> Bursor Decl., ¶ 74, Docket Entry No. 247-2 (noting number of hours spent on <u>Ayyad</u> which excluded work done solely on the Payer Class case).

[55] <u>See</u> Plutzik Decl., ¶ 12, Docket Entry No. 247-6.

motions briefed.  See Milliron, 2009 WL 3345762, at * 21 ("At the end of the day, results matter. Class Counsel, having settled this case for a value that even the Bursor and Plutzik Groups concede is reasonable, is entitled to reap the benefits.").  The Plutzik Group maintains that the Larson settlement was reached so that Sprint could avoid imminent liability in Ayyad.  Class Counsel, on the other hand, maintains that Ayyad was a major victory for Sprint and, if anything, severely eroded the settlement value of the Larson matter.

Although the parties clearly dispute the significance of Ayyad, one thing is clear: the claims asserted in Ayyad have been carved out of the Larson Settlement Agreement.  See Settlement Agreement at 5, Docket Entry No. 84-1.  Thus, the work performed by the Plutzik Group in litigating the Ayyad matter, even if deemed successful, has benefitted a class of plaintiffs who are not part of the Larson settlement.  Having vigorously prosecuted the Ayyad matter in California state court, the Plutzik Group may be compensated for that work within the confines of that litigation.  The fact that discovery taken in Ayyad may have been utilized by Class Counsel in this action, for settlement purposes or otherwise, does not – alone – entitle the Plutzik Group to an award of attorneys' fees from the Larson Settlement Fund.  Ayyad has been specifically carved out of the instant settlement and may proceed long after the Larson matter is concluded.  Because Ayyad has not been settled or released by way of the proposed Settlement Agreement, Ayyad cannot form the basis of an award of fees to the Plutzik Group in this case based on the theory presented.  Members of the Plutzik Group are free to pursue such fees in California state court.

By contrast, the California Subscriber Class Claims – brought on behalf of individuals who were assessed but never paid an ETF – were severed from Ayyad and are being released by way of the Larson settlement.  It is undisputed that the value of such claims was always speculative, at best,

given the difficulty of proving damages on behalf of a class of subscribers who were – in Mr. Bursor's own words – not "out of pocket a dime." <u>See</u> Tr. of Verizon Final Approval Hearing (Oct. 21, 2008) at 16:16-20, Docket Entry No. 86-3.  Notwithstanding the real challenges that members of the Plutzik Group would have faced in proving damages in the California Subscriber Action, unlike the claims asserted in <u>Robertson</u>, the California Subscriber Class Claims remained alive and viable at the time the proposed <u>Larson</u> settlement was reached.  Moreover, unlike the claims asserted in <u>Ayyad</u>, the California Subscriber Class Claims will be released by way of the instant Settlement. It is clear to the Court that the <u>Larson</u> Class was directly benefitted by the fact that the California Subscriber Class Claims were alive and feasible at the time the <u>Larson</u> settlement was consummated. This is evidenced by the fact that the Settlement Agreement specifically provides an economic benefit to current Sprint subscribers who were never charged or paid an ETF. <u>See</u> Settlement Agreement at 33, Docket Entry No. 84-1.

Class Counsel represents that, as of October 19, 2009, a total of 9,256 claims, worth $326,960, were made on behalf of California subscribers.  Class Counsel further represents that such claims comprise 9.8% of the total dollar value of claims submitted as of October 19, 2009 ($3,282,015).  <u>See</u> Docket Entry No. 404 at 26.  Such figures have gone unchallenged.  Class Counsel urges the Court to award the Plutzik Group with 4.9% (half of 9.8%) of the $5,775,000 fee award for their work in pursuing the California Subscriber Class Claims given (a) the speculative value of such claims, and (b) the significant efforts by Class Counsel to substantiate the value of such claims within the context of the <u>Larson</u> matter.  Notwithstanding Class Counsel's recommendation, given the undeniable overlap – at least initially – between work performed on behalf of the <u>Ayyad</u> (payer class) and work done on behalf of the California subscriber class, the Court will instead award

members of the Plutzik Group with 9.8% of the $5,775,000 fee award for their pre-appointment work on behalf of the California subscribers – $565,950.  The Court finds this figure to be fair, reasonable and consistent with the approach utilized by this Court in Milliron v. T-Mobile USA, Inc., 2009 WL 3345762, at *22.

Although Class Counsel estimates that members of the Plutzik Group seek attorneys' fees and expenses in excess of $800,000 for their pre-appointment work on behalf of the California Subscriber Class, members of the Plutzik Group have not all differentiated their time (or expenses) among the different cases.  Thus, the Court is not in a position to determine the manner in which the $565,950 award should be allocated among the various firms who worked on the California Subscriber Action.  Thus, all counsel comprising the Plutzik Group and seeking fees based upon their work on the California Subscriber Action are hereby directed to submit supplemental declarations to Class Counsel clearly listing the number of hours and lodestar specifically associated with their work on behalf of the California Subscriber Action on or before **Wednesday, February 3, 2010.**  Class Counsel shall then determine the most reasonable method of allocating the $565,950 fee award among the various firms comprising the Plutzik Group and advise the Court accordingly.

### 4.    Conclusion Regarding Allocation of Fees

Based on the reasons set forth above, the Court finds that the efforts by the Bursor Group, Lite DePalma and the Plutzik Group have each provided a direct benefit to the Larson Class and, as a result, they should be compensated accordingly.  Having granted Class Counsel's request for a fee award in the amount of $5,775,000, the Court will allocate $254,100 to the Bursor Group and Lite DePalma, jointly, for their respective efforts in pursuing the successful notice-related objections to the settlement raised by the Galleguillos Objectors.  The Court will also award those firms

-69-

comprising the Plutzik Group with an award of $565,950 for their efforts in litigating the California

Subscriber Class Claims.  The balance of the fee award will be allocated to Class Counsel.

### D.    Expenses

#### 1.    Class Counsel

Class Counsel requests $256,115.91 in out-of-pocket litigation expenses.  Expenses are

recovered if they are adequately documented and reasonable in nature.  In re Safety Components, Inc.

Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001) ("Counsel for a class action is entitled to

reimbursement of expenses that were adequately documented and reasonably and appropriately

incurred in the prosecution of the class action.") (citing Abrams v. Lightolier, Inc., 50 F.3d 1204,

1225 (3d Cir. 1995)).  Courts have generally approved expenses arising from photocopying, use of

the telephone and fax, postage, witness fees, and hiring of consultants.  Abrams, 50 F.3d at 1225;

Cullen, 197 F.R.D. at 151.

Having found the declarations submitted by the following law firms to be incomplete or

facially untenable, the Court is unable to assess whether the expenses asserted therein were

reasonable and necessary to the prosecution of the case:  (1) Carey & Danis ($10,746.74), (2) Lief,

Cabraser ($10,892.43), (3) Foley Bezek ($2,221.22),[56] (4) Aria Ozzello ($1,062.83), and (5)

Jacqueline Mottek ($61,674.27).[57]  The requests for expenses submitted by the foregoing firms are

---

[56] Even aside from the incomplete nature of the Curtis Declaration, the Court notes a
discrepancy between the lodestar and expenses listed by Class Counsel (on behalf of Foley Bezek
Behle & Curtis, LLP) and the amounts listed in the Curtis Declaration.  Compare Ex. A to Cecchi
Decl., Docket Entry No. 383-4 (listing Foley Bezek Behle & Curtis, LLP lodestar as $94,362.75 and
expenses as $2221.22) with Curtis Decl., ¶¶ 7, 12, Docket Entry No. 383-13 (listing Foley Bezek
Behle & Curtis, LLP lodestar as $80,676.50 and expenses as $554.22).

[57] Regardless of the overarching questions raised by the Mottek Declaration, the Court notes
that it fails to adequately document the nature of the expenses it seeks.  For instance, Ms. Mottek

hereby denied without prejudice.  Such firms may submit supplemental declarations to the Court on or before **Wednesday, February 3, 2010** setting forth the specific types and/or categories of out-of-pocket costs comprising the total expenses requested, as well as a short summary explaining the basis on which such expenses were reasonably necessary to the prosecution of the Larson matter. The rest of Class Counsel's expenses, in the amount of $169,518.42, are approved.

## 2.     Counsel for Galleguillos Objectors

The Bursor Group and Lite DePalma also request payment of out-of-pocket litigation expenses incurred during the prosecution of the Galleguillos objections.  Objectors to a class action settlement may be entitled to compensation for attorneys' fees and expenses if the settlement was improved as a result of their efforts.  See, e.g., White v. Auerbach, 500 F.2d 822, 828 (2d Cir. 1974).

As previously explained, the figures submitted by counsel include expenses associated with all objections filed by the Galleguillos Objections, many of which were unsuccessful and, thus, conferred no substantial benefit to the Class.  Counsel for the Galleguillos Objectors have made no effort to assist the Court in estimating the portion of its expenses associated with its successful notice-related objections.  Class Counsel, on the other hand, has proposed that out of the numerous objections raised by the Galleguillos Objectors, only two – constituting approximately 10% – were actually sustained.  See Docket Entry No. 404 at 14.  The Court finds such an estimate to be reasonable.  Thus, the Court will approve 10% of the expenses requested by each firm representing the Galleguillos Objectors for their out-of-pocket expenses associated with the limited notice-related objections which were sustained by the Court.  Accordingly, expenses shall be reimbursed to as

------

does not attach a chart or otherwise attempt to summarize for the Court the specific types of out-of-pocket costs comprising the $61,674.27 in expenses she seeks.

follows: (1) $3,805.57 to Bramson, Plutzik, Mahler & Birkaueser, (2) $575.68 to Law Offices of Scott Bursor, (3) $3,348.40 to Faruqi & Faruqui, and (4) $860.90 to Lite DePalma.

### 3.      Counsel for <u>Ayyad</u>, <u>Robertson</u>, <u>Molfetas</u> and <u>Lee</u> Matters

Members of the Plutzik Group seek reimbursement of out-of-pocket litigation expenses associated with their work on the <u>Ayyad</u>, <u>Roberston</u>, <u>Molfetas</u> and <u>Lee</u> matters.  The Court has found that members of the Plutzik Group are entitled to fees <u>solely</u> for their work on the California Subscriber Action.  Having also found that members of the Plutzik Group have not all sufficiently differentiated their time among the various California (and Florida) actions for purposes of allocating the award of attorneys' fees, the Court is likewise unable to assess their request for reimbursement of out-of-pocket expenses as currently submitted.  As such, the request by members of the Plutzik Group for reimbursement of expenses is hereby denied without prejudice.  Members of the Plutzik Group may submit supplemental declarations to the Court by **Wednesday, February 10, 2010** setting forth the specific types and/or categories of expenses associated with their work done solely on behalf of the California Subscriber Action.

## VI.     Conclusion

For the reasons set forth above, the Court finds that the Settlement in this matter is fair, reasonable, and adequate and provides a significant recovery to the Class.  Additionally, the request for attorneys' fees in the amount of $5,775,000 is approved,[58] as is the request for payment of certain expenses.  Finally, the Court awards a portion of the $5,775,000 to the Bursor Group and Lite

---

[58] Such fee award shall be subject to reduction by any out-of-pocket litigation expenses which are (or may be) granted by the Court.

DePalma for their role in pursuing the successful notice-related objections raised by the Galleguillos

Objectors, and to the Plutzik Group for work performed in prosecuting the California Subscriber

Class Claims.  An appropriate Order accompanies this Opinion.


/s/ Jose L. Linares
Jose L. Linares
UNITED STATES DISTRICT JUDGE