# EXHIBIT B

1

1          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW JERSEY
2            Civil No. 07-05325(JLL)


3      - - - - - - - - - - - - - - -X
4      JUDY LARSON, BARRY HALL, JOE      :
       MILLIRON and TESSIE ROBB,         :      TRANSCRIPT OF
5      individually and on behalf of     :        PROCEEDINGS
       others similarly situated,        :
6                                        :
              Plaintiffs,                :
7                                        :
              -vs-                       :
8                                        :
       AT&T MOBILITY, LLC f/k/a          :      January 15, 2009
9      CINGULAR WIRELESS, LLC and        :
       SPRINT NEXTEL CORPORATION         :
10     and SPRINT SPECTRUM, LP d/b/a     :
       SPRINT NEXTEL, and NEXTEL         :
11     FINANCE COMPANY,                  :
                                         :
12            Defendants.                :      Newark, New Jersey
                                         :
13     - - - - - - - - - - - - - - -X

14

15

16     B E F O R E:

17            THE HONORABLE JOSE L. LINARES,
           UNITED STATES DISTRICT COURT JUDGE
18

19

20
          Pursuant to Section 753 Title 28 United States Code, the
21     following transcript is certified to be an accurate record
       as taken stenographically in the above entitled proceedings.
22

23     - - - - - - - - - - _Phyllis a. Lewis CSR CRR_ - - -
              PHYLLIS T. LEWIS, C.S.R., C.R.R.
24     Official Court Reporter - United States District Court
           P.O. Box 25588, Newark, New Jersey  07101
25                  (732) 735-4522

**2**

```
1   A P P E A R A N C E S:
2
3        CARELLA, BYRNE, BAIN, GILFILLAN,
         CECCHI, STEWART & OLSTEIN, PC
4        5 Becker Farm Road
         Roseland, New Jersey 07068
5        BY: JAMES E. CECCHI, ESQ.,
              -and-
6        SEEGER WEISS, LLP
         550 Broad Street
7        Newark, New Jersey 07102
         BY: STEVEN WEISS, Esq.
8            Attorneys for Plaintiffs.
9        DRINKER, BIDDLE & REATH, LLP
         500 Campus Drive
10       Florham Park, New Jersey 07932
         By: MATTHEW J. FEDOR, ESQ.,
11       Attorney for Defendant,
         AT&T Mobility, LLC.
12       KELLEY, DRYE & WARREN, LLP
         200 Kimball Drive
13       Parsippany, New Jersey 07054
         BY: JOSEPH A. BOYLE, ESQ.,
14         LAURI MAZZUCHETTI, ESQ.,
              -and-
15       QUINN EMANUEL
         BY: DOMINIC SUPRENANT, ESQ.
16         865 S. Figueroa Street (10th Floor)
         Los Angeles, California 90017
17       Attorneys for Defendants,
         Sprint Nextel Corporation,
18       Sprint Spectrum, LP, and
         Nextel Finance Company.
19
20
21
22
23
24
25
```

**3**

```
2   A P P E A R A N C E S (CONTINUED):
    LITE, DE PALMA, GREENBERG & RIVAS, LLC
3   Two Gateway Center (12th Floor)
    Newark, New Jersey 07102
4   BY: JOSEPH DE PALMA, ESQ.
       JENNIFER SARNELLI, ESQ.
5         -and-
    SCOTT A. BURSOR, ESQ.
6   369 Lexington Avenue (10th Floor)
    New York, New York 10017
7         -and-
    BRAMSON, PLUTZIK,
8   MAHLER & BIRKHAEUSER, ESQS.
    2125 Oak GroveRoad (Suite 120)
9   Walnut Creek, California 94598
    BY: ALAN PLUTZIK, ESQ.,
10  Attorneys for Ayyad, et al.

11       STRANGE & CARPENTER, ESQS.
    12100 Wilshire Boulevard
12  Los Angeles, California 90025
    BY: BRIAN STRANGE, ESQ.,
13  Attorneys for the Smith plaintiffs.
14
15
16
17
18
19
22
23
24
25
```

**4**

```
1        THE CLERK: All rise.
2        THE COURT: All right. You may be seated.
3        This is in the matter of Judy Larson, et al. Versus
4   AT& Mobility, et al., Civil Action No. 07-05325.
5        Counsel, your appearances for the record, please.
6        MR. CECCHI: James Cecchi.
7        THE COURT: Also, when you give me your
8   appearances, let me know whether or not you will be arguing.
9   I assume there will be some arguing. There are a lot of
10  lawyers here, and everybody wants to put their appearance on
11  the record, so I just wanted to know who is going to be
12  arguing.
13       MR. CECCHI: Good morning or good afternoon, your
14  Honor, James Cecchi on behalf of the plaintiffs.
15       THE COURT: It is morning. You may think you are
16  in California, but you are not. Well, that wouldn't work
17  either, it would be the other way around.
18       (Laughter)
19       MR. WEISS: Steven Weiss from Seeger Weiss on
20  behalf of the Larson class.
21       I am not certain I will be arguing, but I may
22  depending on how things go.
23       THE COURT: You will see how Mr. Cecchi does, and
24  then clean it up?
25       MR. WEISS: Yes, clean it up.
```

**5**

```
1        (Laughter)
2        MR. BOYLE: Your Honor, Joseph Boyle from the law
3   firm of Kelly, Drye & Warren on behalf of the Sprint
4   defendants. I will be arguing a portion of the argument.
5        With me here today is Mr. Dominic Suprenant from
6   Quinn Emanuel, whose pro hac vice application is pending
7   before the Court, and he will have some argument on behalf
8   of the Sprint defendants, your Honor.
9        THE COURT: What is his name?
10       MR. BOYLE: Dominic Suprenant.
11       THE COURT: Do I have that?
12       THE CLERK: Yes, you do.
13       MR. SUPRENANT: Thank you, your Honor.
14       THE COURT: Now, with regard to that, I know you
15  have a pro hac vice application pending. I think it is
16  before Judge Salas. I will let you argue here today,
17  notwithstanding your application is pending for purposes of
18  this motion, okay?
19       MR. SUPRENANT: Thank you. Your Honor. I
20  appreciate it.
21       MS. MAZZUCHETTI: Lauri Mazzuchetti from Kelley,
22  Drye & Warren on behalf of the Sprint defendants, your
23  Honor. I will not be arguing, your Honor.
24       THE COURT: All right.
25       Is Mr. Suprenant going to be arguing a specific
```

6

1    part of this motion?

2            Are you going to be arguing the Smith case, or are

3    you going to be arguing the subscriber class or --

4            MR. BOYLE:  I think, your Honor, I will present

5    general arguments with respect to the All Writs Act

6    application pending settlement of this nature.

7            Mr. Suprenant will address the procedural issues

8    and the legal claims in the Smith and the subscriber cases.

9            MR. FEDOR:  Good morning, your Honor.

10           Matthew Fedor from Drinker, Biddle & Reath on

11   behalf of AT&T Mobility.

12           I do not anticipate arguing this morning.

13           THE COURT:  Okay.

14           MR. STRANGE:  Good morning, your Honor.

15           Brian Strange from Strange & Carpenter on behalf of

16   the California Smith class.

17           THE COURT:  All right.

18           MR. DE PALMA:  Good morning, your Honor.

19           Joseph DePalma and Jennifer Sarnelli from Lite,

20   DePalma, Greenberg & Rivas for the Ayyad plaintiffs.

21           With me, your Honor, to my immediate left is Scott

22   Bursor of The Law Office of Scott Bursor.  Scott Bursor will

23   be arguing.

24           Next to Mr. Bursor is Alan Plutzik of Bramson,

25   Plutzik, Mahler & Birkhaeuser from California, and I don't

7

1    believe he will being arguing.

2            MR. PLUTZIK:  Good morning, your Honor.

3            I don't expect to be arguing.

4            MR. DE PALMA:  The pro hac vice application is

5    pending.

6            THE COURT:  You're in the same position as Mr.

7    Suprenant, right?

8            Suprenant, is that how you pronounce it?

9            MR. SUPRENANT:  Yes, your Honor.

10           THE COURT:  So obviously, the same ruling will

11   apply to him, notwithstanding the fact that the pro hac

12   hasn't been signed yet.

13           Is that what you told me?

14           MR. DE PALMA:  That is correct.  They are pending

15   before Judge Salas.

16           THE COURT:  You will be allowed to argue for the

17   purposes of this motion.

18           MR. PLUTZIK:  Thank you, your Honor.

19           THE COURT:  I want to make some preliminary

20   statements with regard to this matter, so we have a record

21   in the event somebody needs it.

22           All right.  With regard to the Larson case, that

23   case was filed before this Court back on November 5th, 2007.

24   There was some motion practice with regard to jurisdictional

25   issues back in February of 2008 of last year.

8

1            Subsequently, at least part of the case, the one

2    dealing with AT&T, continued to discovery, and there was

3    some motion practice with regard to arbitration issues on

4    that as well, but the Sprint part went on to mediation.

5            In December of last year, December 3rd

6    specifically, the parties came to me and filed for

7    preliminary approval of a settlement.  They had reached a

8    potential deal.

9            On December 4th, I heard them with regard to that

10   issue, and I issued on December 8th a preliminary approval,

11   and on December 18th I approved the form of notice with

12   regard to the potential settlement of the case.

13           Then on December 23rd, literally as I was leaving

14   the courthouse that day, I received a letter from counsel in

15   the Smith arbitration requesting mass opt-out or requesting

16   the Court to consider Sprint providing individual names or

17   addresses of class members.  I don't recall the exact nature

18   of the letter, but I do have it as part of the sequence of

19   events that transpired here.

20           On December 31st, eventually an order to show cause

21   was issued in this case regarding the opt-out issues and

22   regarding a motion by the Larson parties to stay the Smith

23   arbitration.

24           Subsequently to that, on January 7th, another order

25   to show cause was issued as to why this Court should not

9

1    stay the California case, or at least the subscriber class

2    of the California case, that in some of the papers here has

3    been referred to as the Ayyad class, but we will talk about

4    that as to whether or not they are one and the same.

5            Now, with regard to the California subscriber

6    class, as I understand that, that action started as a

7    consolidated case where the plaintiff in that action

8    challenged the early termination fees, which we will call

9    ETF here, under I guess California law.

10           On June 1st of 2006, the judge, who then I think it

11   was Ronald Sabraw, as opposed to a woman judge --

12           MR. BURSOR:  Bonnie Sabraw.

13           THE COURT:  -- they are related, I assume.

14           MR. BURSOR:  They're related by marriage.

15           THE COURT:  Okay.

16           But in any event, on June 1st of 2006, Ronald

17   Sabraw certified a class of consumers that had cancelled the

18   Sprint accounts after July 23rd, 1999, and that were charged

19   a fee in connection with that cancellation.  I will call

20   that for the purposes of this motion the payer class.  That

21   class sought relief in the form of a return of money that

22   they had paid to the Sprint defendant.

23           There was another class involving that consolidated

24   action or another class action certification being sought by

25   the plaintiff, which incidentally was not granted by Judge

10

1  Sabraw, and that was a class made up of consumers who had a
2  contract with Sprint, but were never charged an EFT.  That
3  is what I will call the subscriber class.
4        I am putting all of this on the record because this
5  is my general understanding of the case.  If anyone
6  disagrees, when you come up to argue, you can tell me what
7  is wrong about that, but I have taken a lot of time to read
8  every submission.  I attempted to read, and I think I did
9  read every case that was cited or at least certainly the
10  more relevant ones if it was a string cite, and I also
11  looked at all other relevant documents that were provided in
12  this case.  So as I understand, the subscriber class sought
13  all of the injunctive relief.
14        The payer class eventually went to trial on May
15  12th of 2008, and it went to a jury verdict.  For some
16  reason, which this Court doesn't quite comprehend, it
17  appears as though the damages aspect of the case went to
18  trial before the liability.  It was a damages trial, a jury
19  trial.
20        The jury found that as to that class, and now I am
21  really going to be painting with a very broad brush here,
22  but my understanding of the jury ruling on that was that the
23  damages sustained by defendant Sprint with regard to the
24  costs associated with the ETF exceeded return of the money
25  that was being sought by the plaintiffs in that class, and

11

1  therefore, there was no monetary award of damages.
2        Judge Sabraw subsequent to the verdict, however,
3  did make a finding or issued a ruling holding that the
4  Sprint ETFs were illegal under California law, but awarded
5  no damages to the class.
6        I am not exactly sure.  We couldn't figure it out
7  before I came out on the bench as to whether or not both the
8  jury determination and the judge's determination of the
9  legality of the ETF is on appeal, or if it's awaiting motion
10  practice, or what is happening with that.
11        Can somebody illuminate me as to that?
12        MR. SUPRENANT:  The answer, your Honor, is both.
13  We filed our notice of appeal.  Plaintiff's counsel had
14  filed a motion for a new trial.  That will be -- that is
15  being briefed.
16        THE COURT:  So that is as I thought.
17        So Sprint filed a notice of appeal --
18        MR. SUPRENANT:  Yes.
19        THE COURT:  -- on the determination of the legality
20  of the ETFs that is pending before the Appellate Division or
21  whatever it's called in California.
22        MR. SUPRENANT:  An appeal has been filed.
23        THE COURT:  And a motion for new trial has not been
24  heard?
25        MR. SUPRENANT:  It will be heard next week, I

12

1  believe, your Honor, on January 22nd.
2        THE COURT:  So that is what is happening with that.
3        Now, with regard to the subscriber class, which
4  Judge Sabraw had not certified originally, that was
5  appealed, as I understand it, by the plaintiffs who appealed
6  the denial of the certification, and they won on appeal in
7  the California Court of Appeals, which reversed that, Judge
8  Sabraw's decision in June of 2008.  That class then after
9  the reversal eventually becomes certified, but it doesn't
10  become certified until December 19th of 2008, and that now
11  is before a different judge.  I guess both of the Sabraw
12  judges are no longer on the bench, or maybe they moved to
13  another division.  I don't know what happened, but the new
14  name in California is Judge Winifred Smith, who I had the
15  pleasure of talking to a couple of times in this case.
16        That class seeks injunctive relief against Sprint
17  to bar Sprint from using flat ETF's in California, as I
18  understand it, and also a temporary restraining order
19  restraining Sprint from charging or collecting ETFs in
20  California.  That matter is pending before Judge Smith.
21        In addition to that, through conversations with
22  Judge Smith and from information that counsel has provided,
23  it is my understanding that there has been a motion filed
24  before Judge Smith to have her declare the ETFs as was the
25  case in the payer class declared illegal.  That has not been

13

1  decided by the judge, and although some tentative ruling has
2  been issued on some of the issues, I don't know what a
3  effect of a quote, unquote, tentative ruling is.  It is new
4  to this Court that there are such things, but apparently
5  there is in California, and I know some tentative ruling has
6  been issued, but no final ruling has been issued by judge
7  Smith as to those issues.
8        Then we have the Smith arbitration class.  The
9  Smith arbitration class, as I understand it, was originally
10  filed in a different manner.  It was filed back on April
11  30th, 2004.  It was filed in Florida, and in that original
12  filing, the plaintiffs had alleged, among other things, that
13  ETF charges charged to consumers after they complained of
14  service problems were illegal.  We call that the service
15  class.
16        There was some motion practice with regard to
17  whether or not there should be some arbitration practice in
18  that, and whether or not the matter should be compelled to
19  go to arbitration, and the Florida court apparently agreed
20  and entered an order compelling arbitration as a result of a
21  motion filed by defendant Sprint.
22        On December 1st, 2005, the plaintiff filed for
23  arbitration, which arbitration is being handled, as I
24  understand it, through the JAMS program and a judge retired.
25        Was he a magistrate judge or a District Court

14

1  judge?

2       MR. SUPRENANT:  He was a magistrate judge in the

3  federal system and also a state judge.

4       THE COURT:  I just want to call him by the right

5  title.  So retired Magistrate Judge and State Judge

6  Haberfield is now handling the arbitration of that matter.

7       Once Judge Haberfield took over the case, another

8  class of consumers was added, and then the plaintiffs

9  voluntarily dismissed on behalf of the original service

10  class.

11       The new class that was then certified were all

12  Sprint customers except those involved in the California

13  case, or anybody in California for that matter, who between

14  May 1st of 2000 and January 1st, 2007 were in fact charged

15  an early termination fee that was greater than the total

16  recurring charges left in the life of the contract.  That

17  is, as I understand it, how that class was in general terms.

18  I will call that the late terminator class.

19       There is some dispute as to the size of that class.

20  Some of the documentation that I reviewed in this case in

21  the original paperwork with regard to that class, there was

22  an estimated class size I think somewhere indicated of about

23  16,000 people.

24       This late terminator class was certified on June

25  10th of 2008 and was noticed through publication in two

15

1  places, "USA Today" on 9/2/08 and 9/8/08 and was also given

2  as part of the notice a link to a class website.  The

3  opt-out period in that class expired November 1st of 2008.

4       It is important to note, at least for this Court's

5  ultimate analysis in the case, that originally the

6  plaintiffs sought language in the notice is to the effect

7  that if they did not opt out of their class, they could not

8  be a member of another class.  Taking a look at the final

9  class notice, that language is not there.  It is important

10  for the Court to look at it.

11       Plaintiffs also moved in the Smith arbitration for

12  an order enjoining people in that class who did not opt out

13  from the late terminator class who did not opt out of the

14  late terminator class from settling the matter elsewhere.

15  The arbitrator denied that request.

16       Then there was summary judgment practice.  A

17  hearing was scheduled for this month on January 6th, but

18  subsequently to the motion practice that occurred here I

19  think, that date had been either adjourned or vacated by the

20  arbitrator without a date.

21       Is there a new date on the summary judgment now?

22       MR. SUPRENANT:  No, your Honor.

23       THE COURT:  All right.

24       The Smith arbitration attorney, Mr. Strange, who is

25  here in court today, seeks some things.  One of them is

16

1  to -- they seem to be allowed to obviously, they don't want

2  their class enjoined or their arbitration enjoined in any

3  way.  They want to go ahead with their case, or in the

4  alternative, they want to mass opt-out their people or in

5  the alternative, they want Sprint to give them the contact

6  information regarding the members of their class, and I

7  think that that was also considered by the arbitrator on

8  December 30th of last year.

9       The arbitrator granted the motion, but that order

10  was then stayed pursuant to an order that I issued, staying

11  the arbitration proceedings until this matter was resolved

12  here or at least this motion or show cause order was heard.

13       There has been obviously a cross-motion by the

14  Larson group here in the Federal District Court case for a

15  stay of the Smith arbitration until 45 days after this

16  Court's approval of the proposed settlement.

17       I think a request had also been made of the

18  arbitrator to stay the arbitration, and he declined to rule

19  on that as I understand it, because he felt that in order to

20  rule on that, he would have to make some type of findings

21  regarding the adequacy of the settlement in this Court and

22  he didn't want to go there.

23       The Larson group also has moved before this Court

24  ₁not only to stay the Smith arbitration and the proceedings

25  therein, but also to stay Mr. Bursor's case in California,

17

1  the subscriber case, for 45 five days until after approval

2  as well.

3       That is my understanding of the general facts.  I

4  went through all of that, so that all of you understand that

5  I understand the facts, and I understand what has happened,

6  so you don't waste a lot of time in your argument telling me

7  what happened when you already know that I know.

8       Having said that, you also should be aware of the

9  fact that I have read your briefs.  I understand the

10  arguments.  So understanding that when you argue, you don't

11  have to read me the briefs.  If that is what you are going

12  to do, then we are wasting our time because I already read

13  them.  But if you want to highlight some specific parts of

14  your argument that you consider are the most important parts

15  and should be considered by the Court.  Obviously, there is

16  the issue, do I have jurisdiction, is the class included in

17  the settlement.  Those are the important parts.  By the

18  Court letting that litigation go forward going to interfere

19  with my ability to manage and handle the potential

20  settlement of this case.

21       Has the attorney-client relationship in the Smith

22  case changed or become different as a result of the opt-out

23  period running out, such that it changes whether or not they

24  can mass opt-out, you know all of the other salient issues.

25  I am willing to hear you on that.

18

1    What is not relevant today and what a lot of
2 briefing pages were dedicated to is telling me, and now I am
3 addressing both the Smith and the subscriber class
4 attorneys, telling me that this is a bad settlement, that
5 the Larson settlement is not a good settlement.
6    I understand you feel that way.  Maybe you are
7 right, and maybe you are not, but that decision I have to
8 make at the fairness hearing.
9    I understand two things:  I understand why
10 practically you would do it in your briefs, and why you want
11 to bring it to my attention because you want me to consider
12 it and put everything into context and in the right light.
13 You have done that in your briefing.  I don't need to hear
14 argument today about how unfair this is, because it is not
15 relevant to the analysis that I have to make here.
16    If you think it is relevant, then I will hear it,
17 but you will have to show me why that would be relevant to
18 any of the issues that are of importance today.
19    All right.  I am finished talking for a while.
20    Mr. Boyle, it is your motion.  I will hear you
21 first, and then we will go ahead and hear everybody else.
22    MR. BOYLE:  Thank you, your Honor.
23    I think just to give an overlay of I think what is
24 the important and salient procedure posture that we are in
25 and why we are here today, I wanted to just talk a little

19

1 bit about the fact that, you know, there -- this is not an
2 uncommon situation where an entity such as Sprint with, you
3 know, customers all over the country --
4    THE COURT:  I am aware of that.  I had other class
5 action suits.  Other people come in, and obviously their
6 case is being affected.  They don't want their case stopped.
7 They want to scuttle your settlement.  Sometimes maybe they
8 are right, sometimes not, but it's not uncommon to happen in
9 class action litigation.
10    MR. BOYLE:  And it's particularly salient that the
11 settlement that was formerly approved by this Court was by
12 an Article III Court.  An Article III Court possesses power
13 under the All Writs Act to protect its jurisdiction and
14 effectuate the settlement, and so that's a summary.
15    As of December 8th, we did have a conditionally
16 certified class.  We have class counsel appointed in that
17 order.  We have a preliminarily approved settlement, and
18 then subsequently approval of the notice plan.  And the
19 Court should know that notice has indeed begun and indeed
20 claims have been made.  Claims are ongoing and claims are
21 being made today, so the Larson settlement is very Akin to,
22 for example, a bankruptcy estate.
23    It's a claim -- there is money here, and there are
24 claims that can be made.  And what happens in a bankruptcy
25 setting is the automatic stay kicks in.  It prevents races

20

1 to other courthouses, and it prevents other certain
2 creditors from going to make claims and affect their rights
3 to the detriment of other creditors.  It consolidates it all
4 in one proceeding, and it stays all collateral litigation,
5 and that is quite frankly what should happen here, your
6 Honor.
7    We have --
8    THE COURT:  Excuse me.
9    But in order to get there, don't I have to first --
10 one of the preliminary determinations that I have to make is
11 that -- which case do you want to take on first here?
12    MR. BOYLE:  Well, they are both included within the
13 settlement.  We could start with the subscriber case.
14    THE COURT:  Don't I have to make a determination
15 that each case, one, both or none is included within the
16 settlement for jurisdictional purposes, don't I have to
17 start there?
18    MR. BOYLE:  Yes, you do.
19    Your Honor, the class definition is very broad and
20 clearly encompasses both of those groups that you described.
21 There's no question about it.  There is only one exception,
22 one carve-out.  That is the Ayyad payer case, which your
23 Honor distinguished from the Ayyad subscriber case, and by
24 the way, I think Mr. Bursor's briefing may have conflated
25 those at times, you know, for whatever reason, but the

21

1 tentative that you indicated Judge Smith recently issued
2 actually directs a separate pleading be filed in the
3 subscriber case, so we have the situation now, where the
4 subscriber case is just carved out just as it was in our
5 settlement.
6    We have the Ayyad claims carved out, the subscriber
7 claims in two separate definitions in the settlement
8 agreement addressing both of those groups, one in, one out.
9 Subscriber in, payer out.
10    We have a class definition that clearly includes
11 them and also includes the so-called late terminators in the
12 Smith arbitration, so the class definition clearly
13 encompasses them.  The preliminary approval order
14 preliminarily certifies that class.  That is our settlement
15 class --
16    THE COURT:  I appreciate the fact that you stopped
17 talking right away.  I don't know how many times lawyers do
18 that.  They go ahead with their argument, and then they
19 don't listen to what may be important to me in my
20 decision-making.
21    What do you say about the argument that Mr. Bursor
22 raises in the brief, that the way that the notice was
23 approved would be confusing because of the carve-out
24 language, and that people who are in the subscriber class
25 may think, hey, I am part of the Ayyad -- Ayyad, is that how

**22**

1  you pronounce it --

2  MR. BOYLE: I'm not sure quite frankly.

3  THE COURT: -- Ayyad class, and therefore, you

4  know, are not included in the settlement?

5  MR. BOYLE: Well, your Honor, the notices that have

6  gone out all direct the class members to refer to the

7  settlement agreement. The settlement agreement is posted on

8  the website. In the settlement agreement -- it says

9  specifically in the notice, "Defined terms herein have the

10  same meaning as in the settlement agreement. Please see the

11  settlement agreement."

12  The settlement agreement clearly makes that

13  distinction, and anybody who looks to see the definition of

14  the Ayyad case would understand that those are the claims

15  that have actually been tried and litigated, and then there

16  is the California subscriber case, which is described, and

17  those have not yet been finally litigated to the point where

18  the Court has made a decision.

19  Quite frankly, your Honor, in this day and age, you

20  know, the common practice, since you have a funneling

21  process towards, you know, websites and opportunities to

22  obtain the information through separate media, one, they

23  could come to the courthouse. Obviously, that is not

24  particularly practical. But, two, they could go to the

25  settlement administrator website. A copy of the settlement

**23**

1  agreement is up there.

2  We indicated to your Honor in some affidavits where

3  the notices have gone out. There will be a publication.

4  There will be a web base. It is on the Sprint's website.

5  It is on counsel's website. It's on the settlement

6  administrator's website, and there is a bill message going

7  out to, you know, I think it's approximately 35 million

8  lines of service, saying, you know, go to the website, read

9  the documents therein.

10  So, you know, in order to I think accept their

11  argument, you would have to disregard the nature of the

12  notice and the way that it directs people to the settlement

13  agreement.

14  I don't think that that is a practical reason to

15  conclude that they are not within the settlement agreement.

16  I think it is a factual matter, and as a legal matter, they

17  are within the settlement agreement.

18  Mr. Bursor has an argument about --

19  THE COURT: Where is the language that you say

20  defines Mr. Bursor's subscriber class?

21  MR. BOYLE: It is in the settlement agreement.

22  THE COURT: I know. Which number, four?

23  MR. BOYLE: It is on page five.

24  THE COURT: Page four?

25  MR. BOYLE: Yes, your Honor.

**24**

1  THE COURT: All right.

2  Page five. Is it Roman Numeral IV, that you want

3  to talk about --

4  MR. BOYLE: No. The Roman Numeral is a --

5  THE COURT: -- maybe I was looking at the wrong

6  page. Let me get it.

7  MR. BOYLE: -- that is a benefit, your Honor.

8  THE COURT: You are right.

9  Let me just get to page five. Hold on.

10  Go ahead.

11  MR. BOYLE: So you have the Ayyad class claims

12  occupying the bulk of page five, and then right below that

13  the California subscriber class claims, and that again goes

14  over to page six.

15  So, you know, your Honor, it is in there, and I

16  don't think anybody has made a serious argument that it is

17  not in the settlement agreement. I think the argument that

18  has been made is that it's not in the notice, and I think --

19  THE COURT: No, I agree. I agree that was the

20  argument, but I wanted the argument to make sense to me when

21  I look at the transcript later or when I am writing

22  something up later.

23  MR. BOYLE: Two points I would make about Mr.

24  Bursor's argument on that point is that certainly he can

25  challenge notice. There is a procedure to do that. He

**25**

1  could come to the fairness hearing and say, you know, notice

2  wasn't good. And you may say, you know what, I agree,

3  notice wasn't good, and this settlement isn't going forward,

4  so that is a --

5  THE COURT: Well --

6  MR. BOYLE: -- so presumably if we have to go and

7  have the subscriber claims dismissed on res judicata grounds

8  or obtain an injunction, and try to enforce it out there, he

9  can argue then, notice was no good. You're attempting to

10  get my case dismissed just isn't going -- will not work.

11  But I don't believe that that argument (a) has merit, or (b)

12  interferes in any way with this Court's ability to enter an

13  All Writs Act injunction, which by the way, your Honor,

14  simply seeks a time-out, so that the final hearing process

15  can go forward in a rational process, it will give your

16  Honor some time for your Honor to make a decision.

17  We asked for 45 days after that hearing. That's

18  it. We are not trying to cut anybody off of their rights.

19  THE COURT: All right.

20  If all they are asking for is injunctive relief,

21  how is that going to interfere, because we agree that the

22  All Writs Act and the injunction action goes together,

23  right?

24  MR. BOYLE: Yes.

25  THE COURT: How is pure injunctive relief going to

26

1  affect my ability to manage and make sure that the
2  settlement goes forward in an orderly and appropriate
3  fashion?
4        MR. BOYLE:  It will create essentially a different
5  group of beneficiaries.  They will be the beneficiaries from
6  that injunction who will receive a benefit that differs in
7  nature than the benefit in the settlement.
8        Let's say that injunction goes forward and a
9  subscriber terminates, right?
10       If a subscriber terminates, then that class, we
11  can't charge them an ETF, so they are in the situation where
12  they have obtained a benefit, which is different than the
13  benefit that the settlement class members are sure of
14  getting, which is in the settlement here.  Depending on the
15  category, there will be a cash award to those people who are
16  subject to an ETF, but on an ongoing basis.  It is still a
17  valid and viable remedy for Sprint, and we roll along with
18  it until November 2010 or something.
19       So if you then have a group that does not meet the
20  current settlement definition because they got the benefit,
21  and they are treated differently, then our settlement class
22  definition changes.  The final approval order will not be in
23  the form submitted that was to your Honor with the
24  preliminary approval order, and one of our rights to
25  terminate is if the order is not entered in substantially

27

1  the same form as agreed upon and proposed to the Court.  So
2  that would be the remedy that would be available to Sprint
3  to exercise and, you know, obviously it is premature to
4  indicate whether or not that would happen, but it represents
5  a serious threat to the viability of the settlement, and I
6  think triggers the jurisdiction protection element of the
7  All Writs Act.  So that is a concern we have with respect to
8  what is going on in the California subscriber class.
9        And there is a derivative issue, your Honor, as I
10  am sure you are aware, in reading all of the cases, there
11  are concerns that get raised in All Writs Act cases related
12  to full faith and credit and the Rooker-Feldman doctrine.
13  Those issues were implicated when State Court's orders are
14  issues and are finalized.
15       We have two tentative decisions sitting out there
16  from Judge Smith in the subscriber case.  If they are not
17  stayed, if those cases are not stayed, there is a potential
18  that those orders would go to final without any further
19  action by Mr. Bursor on behalf of his clients out there, and
20  your Honor may be in no position, if you determine that the
21  settlement is fair, should go forward and should include
22  that subscriber class, may be in no position to give us that
23  relief.
24       So once again, your jurisdiction could be
25  interfered with by the pending and ongoing situation in the

28

1  California subscriber case, so to me, that is a concern.
2        Your Honor, I think it is also interesting and
3  helpful for the Court to consider what happened in such a
4  short period of time.  This absolute flurry of litigation
5  has occurred over the Christmas holidays at an incredibly
6  fast pace.  No real exigent reason for it to happen, but
7  there is a practical reason for it to happen.  The lawyers
8  there want to scuttle this settlement, and that is the
9  practical issue we are confronted with.
10       And, again, akin to a bankruptcy court, who has an
11  automatic stay, you don't want races to the courthouse and
12  people getting out ahead of other similarly situated people.
13  There's a process for it.  It's the final approval process.
14  It is the fairness hearing before your Honor where you can
15  consider all of the arguments from all of the players at the
16  same time and understand whether or not it meets the test in
17  your Honor's discretion.
18       We are not looking for any special deals.  We are
19  not looking to get a leg up on anybody.  We want to keep the
20  playing field completely flat and fair and allow an orderly
21  administration of this settlement.
22       Again, your Honor, with respect to the merits of
23  the All Writs Act as it stands, we believe both with respect
24  to the subscriber case and with respect to the Smith
25  arbitration, the Third Circuit precedent is overwhelmingly

29

1  in favor of your Honor's power and ability to issue it, so
2  this is not -- I do not believe there is a legal leg to
3  stand on to say you cannot do it.  The only question for the
4  Court is:  Should I do it.
5        You clearly have the power to do it.  There has not
6  been any argument made in my mind that could overcome Diet
7  Drugs, which just seems to go through this thing so clearly.
8  And, indeed, in Diet Drugs, they were concerned about a
9  provision in the settlement agreement that said if more than
10  a certain percentage of the class there opted out, the
11  settlement would be scuttled because the defendant had the
12  right to terminate the settlement.  They noted in a mass
13  opt-out procedure, you could trigger that immediately, and
14  the settlement could be imperiled.  Similarly in our
15  settlement agreement, we have a very similar position, your
16  Honor.
17       With respect to Mr. Strange in his argument, he is
18  asking your Honor to create new law.  He has no case that
19  stands for the proposition that he asserts.  He contends
20  that the creation of the attorney-client privilege triggers
21  the ability to do mass opt-outs, but that applies to case
22  law that has taking cases that have been certified, and the
23  attorney-client privilege thereby created and still enjoys
24  mass opt-out, and therefore --
25       THE COURT:  Wait.  Let me play that out.  That is

30

1  not all he says.

2      He says, yes, although generally speaking in class

3  action cases, notice is where the attorney/client privilege

4  situation gets done.

5      This case is different than all of the cases you

6  have cited, and that you have now cited that says that in

7  the specific circumstances of a case like this, where the

8  matter was not only certified, went to notice, and the

9  opt-out period closed, he says that makes the

10  attorney-client relationship, which albeit existed already,

11  more cogent and more serious because now people have made a

12  conscious decision to stay in a particular class and agreed

13  that they are going to be represented by the attorney in

14  that class, and that therefore, now they have the right to

15  speak on behalf of the entire class, and you don't have any

16  case that says that is not so.

17      MR. BOYLE:  Well, I would say you are right about

18  that because it is a novel theory, so I guess if he can make

19  up a theory, and then say you don't have a case that says

20  I'm wrong, he says I would, I would take the exact opposite

21  position, even if I believe our arguments are in equi pose,

22  and I don't believe they are, I think the Court would really

23  have to go out on a limb and say, in light of no controlling

24  precedent, I am going to adopt a theory of law that I don't

25  think he supported juris prudentially.

31

1      He makes a logical argument, and he thinks it is a

2  good argument, but juris prudentially I don't believe he has

3  a basis for it, and say I'm going to take that argument and

4  I'm going to allow for a mass opt-out, which will

5  undoubtedly -- undoubtedly in fact scuttle this settlement,

6  which it likely would, which will make nationwide settlement

7  of class actions extremely difficult, and there is no policy

8  support --

9      THE COURT:  All right.  Let me ask you this other

10  question.

11      Excuse me.

12      (The Court and Clerk confer.)

13      The other question I was going to ask you is:  In

14  your opt-out language, it says that the individual can

15  certainly opt-out, right, or someone that has authority to

16  speak on behalf of the individual, right?  Why would that

17  not be him?

18      MR. BOYLE:  Well, because the authority is an

19  individual right, so he must establish that he has obtained

20  the right from each individual to opt-out.

21      Nobody is saying that if he didn't have

22  authorization from each member of the class to do it, you

23  know, they met with him and agreed and said do it, that he

24  couldn't act as their attorney for that purpose, but the

25  case law is very clear.  The decision to opt-out is

32

1  individual --

2      THE COURT:  Because by virtue of due process, I

3  understand it.

4      Now, he would say, the problem with Mr. Boyle's

5  argument, Judge, is that yes, I haven't had the right to go

6  to my clients and say, look, you know, you have the right to

7  opt-out, you have the right to stay in the class, I don't

8  think that settlement is so great, right?

9      Then the client says, okay, I will opt-out and give

10  you my permission.

11      However, I would do all of that, but I don't know

12  who my clients are.

13      MR. BOYLE:  Well, I guess that would kind of beg

14  the question as to why they would have the right to mass

15  opt-out without that information.

16      THE COURT:  A point well taken.  But still that

17  gets us to the other issue, where he wants the to say,

18  well, I want the ability to have the names, so at least I

19  can go after these people and have a shot at it --

20      MR. BOYLE:  Well, your Honor, again, where I would

21  come out on that is within the context and the confines of

22  typical class action procedure.  We all have issues with

23  respect to notice and how best to give it, and how you have

24  to do it.  It is the best practicable notice under the

25  circumstances, and he decided that publication notice worked

33

1  for his particular clients.  We have publication notice as

2  well at other enhanced ways to do notice.

3      There is nothing to support the notion that we can

4  be compelled to provide him with a list of information, so

5  that he can go and attempt to cajole each class member to

6  sign an opt-out form.

7      If they can legitimately obtain consent of persons

8  to opt-out, that is what the opt-out process is for.  But

9  his contention that I am bereft of a remedy because I don't

10  know who my class members are has no juries prudential

11  weight as far as I can tell in any case law, and again, we

12  would be in a situation where that type of request and that

13  of a process would be a significant impediment to nationwide

14  settlements that happen every day in this country.

15      What he wants to do would encumber the process and

16  burden it to a point where it would no longer be a relevant

17  process to settle cases.  That is his position, but he has

18  not one case, not one case that supports that position, and

19  he wants your Honor to go out on that limb.  I don't see any

20  reason why on a policy basis your Honor would accept that

21  offer.  It just quite frankly doesn't make any sense to me.

22      THE COURT:  All right.  Talk to me a little bit

23  about how his arbitration case going forward is going to

24  interfere.

25      MR. BOYLE:  Again, your Honor, as I think you are

34

1  aware from the affidavits, there was a rather peculiarized
2  process with respect to this onerous discovery they were
3  seeking from Sprint. Once the preliminary approval order
4  was entered, there had been an email exchange about a status
5  conference to talk about, to my understanding, to set up for
6  briefing with the arbitrator, and boom, right away the
7  arbitrator said, oh, no, I'm going to treat this as a
8  motion, and I'm going to have a hearing, I think on the 6th
9  of January, just to kind of move the process forward in a
10  way that would ultimately place a major burden on Sprint,
11  drive up our legal fees, and drive up our expenses to get to
12  a point where we would engage in a process, for which there
13  was no legal authority, and ultimately to cause a scuttling
14  of the settlement, so the reasons to stay it are
15  overwhelming.
16          What is the reason not to stay it?
17          We are asking your Honor for a time-out, 45 days
18  after the final approval hearing to gather objections --
19      THE COURT:  Why do you need 45 days, because it has
20  to be narrowly tailored, as you know, and 45 days seems like
21  an awfully long time.
22      MR. BOYLE:  Your Honor, certainly we were just
23  trying to build in a period of time to allow the Court to
24  undertake the consideration and whether or not to grant the
25  final approval.

35

1          So obviously, to the extent that your Honor
2  determines that the better way to do that is to be the next
3  day of issuing a final approval order, you know, to allow
4  the parties to consider their options, we would have no
5  objection --
6      THE COURT:  It is not 45 days from the approval.
7  It is 45 days from the date of the fairness hearing --
8      MR. BOYLE:  Is it 45 days from the decision --
9      THE COURT:  -- that is the part I don't understand.
10      MR. BOYLE:  -- your Honor, I certainly accept that
11  criticism of the proposed order, and obviously --
12      THE COURT:  No, no, no.
13          Just tell me what it is that you seek with regard
14  to those 45 days.
15          Is it 45 days from the date of the decision, and
16  why would it be necessary to do that?
17      MR. BOYLE:  Your Honor, it is not necessary.  I
18  apologize.  I thought it was 45 days from the date of the
19  hearing to allow obviously your Honor --
20      THE COURT:  That is not what the papers state, I
21  don't think, and I am going from memory.  But your argument
22  would make sense if you think it is going to take me 45 days
23  to make that decision, then, you know, I should have that
24  time before, you know, the injunction goes off and you get
25  it.

36

1          All right.
2          (The Court and Clerk confer.)
3          All right.  Any other arguments?
4      MR. BOYLE:  I have nothing else, your Honor.
5      THE COURT:  Okay.
6      MR. SUPRENANT:  Your Honor, would you like to hear
7  from me or Mr. Cecchi?
8      THE COURT:  Well, I don't know what you are going
9  to add.  What are you going to add?
10      MR. SUPRENANT:  Thank you, your Honor, for asking
11  that question.
12      I will try to be brief because your Honor asked --
13  inquired of Mr. Boyle on some matters that I was more
14  prepared on, and I want not to redo that argument, but get
15  through it and touch on it as quickly as I can.  I think I
16  can make my comments in five to ten minutes.
17      THE COURT:  Okay.  You are on the clock.
18      MR. SUPRENANT:  Okay.  Thank you, your Honor.
19      First, on the specific point on the Ayyad and the
20  fact that we believe the notice was clear and unambiguous,
21  but as Mr. Boyle explained, and I am not going to repeat, it
22  does reference the settlement agreement.
23      I just wanted to cite a case we cited in the reply,
24  Prudential Insurance, 177 FRD 216 from the District of New
25  Jersey.  It is cited in the reply, and that says, It is

37

1  typical and appropriate to --
2      THE COURT:  For people to notice and cite to a
3  website.
4      MR. SUPRENANT:  Okay.  I just wanted to make that
5  point, your Honor.
6      I wanted to talk about some of the -- again,
7  staying Ayyad, the argument -- and again, I am going to try
8  to avoid any repetition.
9      The argument that the Ayaad subscriber class is not
10  included, I think to a significant extent that is really an
11  argument that there is not enough benefits there, and I am
12  not going to go there --
13      THE COURT:  Say that again.
14      MR. SUPRENANT:  -- I think to a significant amount
15  plaintiffs' argument that the subscriber class is not
16  included in the settlement is really masquerading as an
17  argument that the benefits are not sufficient, okay.
18  Obviously, that hasn't been -- has no persuasive power at
19  all to make an objection.
20      But I also wanted to address plaintiffs' very
21  sustained and prolonged efforts to confuse the two cases in
22  their opposition, and I could be very brief, because I think
23  your Honor has --
24      THE COURT:  All right.  Go ahead.
25      MR. SUPRENANT:  Obviously, what happened when Judge

38

1  Ronald Sabraw denied class cert on June of '06, and your
2  Honor having lived through the events you narrated, I was
3  very much impressed by the master you and your staff have on
4  that long history.  That is exactly what happened.
5      Judge Sabraw denied class cert to the subscriber
6  class and nothing happened.  We did cull out the payer
7  class.  We believed, your Honor, in some negotiations and in
8  our own internal thinking that we could have settled the
9  payer class, although that was a closer question, and we
10 decided to cull that out.
11     But the subscriber class, as Judge Smith in his
12 tentative decision -- and I won't belabor it, because it is
13 tentative -- but on the point that is not a finding.  It's
14 not anything to change.  She makes it so clear that they are
15 separate claims, separate classes, separate time periods,
16 and that that case is so inchoate, that she actually has
17 ordered them to file a new complaint, so she could figure
18 out what the claim is.
19     So the notion that plaintiff -- that Sprint is
20 asking your Honor to stay a post trial proceedings is, your
21 Honor, with all due respect fabricated.
22     The subscriber class is squarely included in the
23 settlement.  If they have arguments, that it is insufficient
24 benefits, that is argument for a later date.
25     Your Honor plainly has jurisdiction.  They say you

39

1  don't, your Honor doesn't.  The Carlough case in the Third
2  Circuit says your Honor does.
3      What is needed?
4      Preliminary approval and a commencement of the
5  opt-out period.  That has happened.
6      They make an argument that the Sprint subscriber
7  case being filed first cannot be stayed.
8      No.  The third Circuit in Diet Drugs said --
9  rejected that sequencing argument.
10     Again, under the Diet Drugs case, they say, well,
11 your Honor can't stay that proceeding because this is not a
12 multi-district litigation.
13     Again, the Third Circuit disagrees in Diet Drugs.
14 Your Honor has the authority to stay it if the settlement,
15 to, quote, it files a substantial class person from multiple
16 stages.  So I think, as Mr. Boyle indicates, we think this
17 is a very easy and not close question, I do want to address
18 in a non duplicative way, and I am almost done with the
19 Ayyad.
20     The harm, why should your Honor act, and I'll try
21 to avoid -- one thing is, as Mr. Boyle indicated, the
22 tentative decision to grant limited, quote, unquote, limited
23 injunctive relief that was granted in the tentative decision
24 on January 2nd.  If that is made final, that is going to be
25 a very disruptive conflict matter that will make it

40

1  difficult to -- for your Honor to effectuate and protect the
2  settlement.
3      THE COURT:  Why?
4      MR. SUPRENANT:  Well, because as Mr. Boyle
5  indicated, there will be a carve-out.  There will be a
6  carve-out for California.  And what will happen, and these
7  are included in our moving papers, your Honor, the
8  declarations, is that it will say that the tentative
9  decision says, I'm going to let you continue to charge a
10 flat rate ETF, but I am not going to let you assign it, and
11 I am not going to let you --
12     THE COURT:  Report it.
13     MR. SUPRENANT:  -- report it to the credit
14 agencies.
15     And with respect to that, there are two kinds of
16 significant harms we will suffer that we meant to get away
17 from with the settlement, that will involve huge management
18 distraction and additional costs.
19     Number one:  We don't treat California separately
20 as a national service provider.  We have national procedures
21 including for the collection of past due amounts, and we
22 would have to change and carve that out logistically, and it
23 would be a nightmare, your Honor.  We are not sure we could
24 do it, and it would involve massive expenditures.
25     Number two:  The ability to charge a flat rate ETF,

41

1  but effectively do nothing to enforce it, but reduce it, we
2  believe, to be a paper sword.
3      We could charge a contract breacher.  The trial in
4  the Ayaad payer class, the jury found not paying your fees
5  means you breached the contract.  We can charge them the
6  contract breacher, but we can't report them.  We can't
7  assign the debt, and we would have huge difficulty actually
8  in getting payment from people who breached their contracts,
9  not only in California -- not only in California, but due to
10 the aggressive publicity that plaintiffs' counsel have
11 engaged in and likely will engage in in the future.  There
12 will be confusion throughout the United States, and the
13 magnitude of the financial harm would be such that it would
14 seriously undermine the financial deal that we thought we
15 had.
16     THE COURT:  All right.  I understand that argument.
17     I have a question.
18     Was there another California case with another
19 judge, not Judge Sabraw or Judge Smith, that dealt with the
20 issue of the legality or illegality of the ETF and said
21 there was a material issue of fact and refused to rule on
22 that?
23     (The Court and Clerk confer.)
24     MR. SUPRENANT:  Well, let me say two things.
25     There is a coordinated proceeding involving AT&T

42

1  Mobility, and it involves T Mobile, so there were
2  proceedings there, so your Honor may be referring to the
3  tentative decision --
   THE COURT: Excuse me.
   (Court and Clerk confer.)
6  THE COURT: You're right. The tentative decision
7  where she said there were material issues of fact --
8  MR. SUPRENANT: Under --
9  THE COURT: -- using either theory.
10  MR. SUPRENANT: -- either theory --
11  THE COURT: -- I know there are two competing
12  theories as to how you consider the illegality as to where
13  there is a penalty, or whether you did sufficient background
14  work to determine the likelihood of the reasonable amount.
15  Okay. Never mind. Thank you.
16  MR. SUPRENANT: I am almost done with it.
17  One more point --
18  THE COURT: Well, how much time are you going to
19  spend on Smith, because you are almost out of your time
20  already.
21  MR. SUPRENANT: I'll spend four minutes on that.
22  THE COURT: You are to spend three minutes.
23  MR. SUPRENANT: Three minutes.
24  THE COURT: And you are done with Ayyad.
25  What else will you tell me that I already don't

43

1  know?
2  MR. SUPRENANT: One thing. What happens if both
3  tentative decisions -- I am talking about the harm if what
4  happens if the TRO comes about, remains in place and becomes
5  final, or what happens in the tentative, you know, on the
6  judgment issue is reversed.
7  How about if we come out unscathed? Okay.
8  What is going to happen is the race to the
9  courthouse to scuttle this settlement is going continue. I
10  mean, my team worked around the clock on a dispositive
11  motion, and the client is paying for that. The harder and
12  more multiple times we have to fight to protect the
13  settlement, the more the settlement we thought we had --
14  THE COURT: All right.
15  MR. SUPRENANT: -- I am done with Ayyad.
16  Okay. I will simply say with respect to Smith's --
17  Mr. -- let me just proceed.
18  Mr. Strange said we have a novel theory. He has a
19  novel theory. There is a ton of cases, and I won't repeat
20  it, that says class cannot mass opt-out.
21  What necessarily -- for Mr. Strange's position to
22  be correct, what necessarily must have been true is they
23  should have gone on to say, of course, this rule is not
24  universal, of course, if the class has been certified and
25  notice has gone out and the opt-out period, none of that

44

1  happened --
2  THE COURT: What has happened in those cases, there
3  have been statements by some of the judges in those cases
4  set aside, where they said, and it is important to note that
5  here it hasn't, you know, the opt-out period hasn't ended or
6  something to that effect --
7  MR. SUPRENANT: Oh, I would say they have no
8  obviously decisional force, but two more points on Smith.
9  Number one: It doesn't work even within the narrow
10  context of the JAMS' arbitration.
11  The JAMS' arbitration says that if Mr. Strange
12  reaches a settlement in that arbitration, there has to be
13  notice to the class, and they get another chance to
14  opt-out --
15  THE COURT: I saw that in your brief.
16  MR. SUPRENANT: -- and so it would be, we submit, a
17  very bad novel rule of law that takes a protection to the
18  class and says, you are a member of the Smith class, when
19  you were given notice that was the only game in town, there
20  is now another game in town. I as the class member get to
21  choose.
22  Just two more points, your Honor.
23  One: The rules of the game, that becomes a new
24  law. The rules of the game have changed.
25  What class action counsel would do is rush, not to

45

1  State Court, rush not to Federal Court, but rush to any kind
2  of arbitrator they could get and move full steam ahead to
3  get the class certified for the notice period and the
4  opt-out period to end, and then the All Writs act is cut off
5  at the knees.
6  I think that is exactly the kind of incentive that
7  would be created, and that is exactly opposite of what
8  should happen under the All Writs Act being expressed by the
9  judge in Diet Drugs.
10  The last point, your Honor, is if we -- if we are
11  made to produce a class member, Smith class members' names
12  and addresses, there is a declaration from coincidentally
13  and almost a gentleman by the name of Scott Bursor, and he
14  put in our objections that said, wait a minute, he verified
15  objections. It would take five and a half months and cost
16  between $275,000 to $350,000 to compile this information. I
17  think those are very conservative estimates.
18  THE COURT: Do you think five months is a
19  conservative estimate?
20  MR. SUPRENANT: Yes, your Honor, and I could give
21  you the background for that.
22  We are not gilding a lily. We are not putting any
23  mustard on that hot dog.
24  Here is the problem. We have mothball systems. We
25  have two different systems that were mothballed that contain

46

1  a significant amount of that data.

2       In the payer class case in California, which was

3  litigated for six years, and only dealt with a California

4  only class, every single time when we went to do the data

5  work, it was laborious and longer than anticipated, and none

6  of that work has to do -- very little of that work has to do

7  with the national population of people going back to 1992 --

8  1999.

9       Most of that data is a mothball system, and we

10  could not possibly in a way that would make the effectuation

11  of this settlement practical comply with that order.

12       One last thing, your Honor.

13       We believe it is irrelevant here because mass

14  opt-out is an empty theory.  We believe it is irrelevant in

15  California because the class was notified in ways that Mr.

16  Strange agreed that the "USA Today" was the best practical

17  notice.

18       Thank you.

19       THE COURT:  Mr. Cecchi, do you want to add anything

20  to what hasn't been already discussed?

21       MR. CECCHI:  Only two quick points from the

22  perspective of class counsel in this proceedings, Judge.

23       There is also a harm in connection with the

24  subscriber class.  If they are taken out of this settlement

25  and undoubtedly included in the settlement, that those class

47

1  members who now get certain identifiable relief and a

2  release from Sprint of any damage claim are exposed to

3  damage claims, if they get the same relief that the

4  plaintiffs in California got, the payer class.

5       Remember, what happened was there was Sprint had a

6  counter claim against those members, which was sustained.

7  The subscriber class would be exposed to the same type of

8  claim.

9       In terms of the Smith case, the fact that Mister --

10  my friend Mr. Strange needs help talking to his clients

11  illustrates the sui generis or legally creative nature of

12  the relationship, but the point is, as Dom touched on it,

13  the Smith class members have been communicated with.  They

14  have been given massive robust notice from this Court.  The

15  fact that the Smith court included in this case, it was

16  settled as part of this case, and that individual due

17  process rights those members have they can exercise.  They

18  can say, I'd rather go for the uncertain, speculative relief

19  out in California, or I can come here and get my $90 and my

20  release.

21       We submit, as fiduciaries, those individual members

22  should exercise their due process rights for themselves.

23       Thank you, Judge.

24       THE COURT:  Thank you.

25       All right.  Who will speak first, the subscriber

48

1  class or the Smith class?

2       MR. BURSOR:  What is your Honor's preference?

3       THE COURT:  I don't care.

4       MR. BURSOR:  Then I will go first, your Honor.

5       THE COURT:  Sure.

6       MR. BURSOR:  Scott Bursor for the Ayyad plaintiffs,

7  your Honor, and thank you for the courtesy to allow me to

8  appear.

9       I had sketched out a presentation that followed the

10  structure of the briefs, but I think given your Honor's

11  familiarity with the facts here, that I want to jump right

12  to a point I think your Honor appropriately focused on

13  in several questions from the bench, which was --

14       THE COURT:  Well, don't be misled by questions.  I

15  will have questions for you, too.

16       MR. BURSOR:  I hope that you will, your Honor, but

17  what I want to do is I want to try to answer the question

18  that you asked of both Mr. Boyle and Mr. Suprenant, which is

19  if the California subscriber class case goes forward, if the

20  injunction that Judge Smith tentatively granted on January

21  2nd, if that becomes final, how would that interfere with

22  your Honor's consideration of the settlement in this case,

23  and I think that the answer to that -- the answers that were

24  given by counsel on the other side were wrong.

25       The correct answer is that Judge Smith's injunction

49

1  would not interfere in any way with your Honor's

2  consideration of the proposed settlement in this case.

3       Now, what Mr. Boyle -- Mr. Boyle's answer to that

4  question was:  If the injunction issues in favor of the

5  subscriber class, that would create a different benefit for

6  a portion of the class.  He said the settlement class

7  definition would change, and that the final approval order

8  that your Honor issues would therefore have to change, and

9  that Sprint would be permitted to back out.

10       That is certainly almost incorrect.

11       THE COURT:  Why?

12       MR. BURSOR:  The talk about a race to final

13  judgment is misleading because there is really not a race.

14  There is no question that if your Honor grants final

15  approval to this settlement, that will happen before we can

16  ever get any kind of a final judgment in California because

17  my understanding of the law is for res judicata purposes, a

18  final order by a federal trial judge -- a Federal District

19  Judge is final for res judicata purposes without waiting out

20  for the -- but in California state court, that is not the

21  case, and so there is no race that's going on here.

22       If there was a race, your Honor, that rule would

23  put us at a tremendous disadvantage.  There is no question

24  we can't win any race, and we are not racing anywhere, so

25  Mr. Boyle's statement that there would be a different

50

1  benefit and change to the class definition --

2  THE COURT:  Well, you have to agree it's going to

3  be within the class.  It's going to be a different benefit

4  of the same people, the people in California versus

5  everybody else in the entire country.

6  MR. BURSOR:  I don't agree with that, your Honor,

7  and I'll tell you why.

8  THE COURT:  Why?

9  MR. BURSOR:  Because if your Honor approves the

10  settlement --

11  THE COURT:  As it is now, right --

12  MR. BURSOR:  -- without changing a word, any

13  contrary order in California is going to be vacated, and it

14  would be -- your order would be res judicata, and that one

15  would not.  There is no way that California order survives

16  your Honor's approval of this settlement.

17  There is no race or no interference with what your

18  Honor is doing.  There is no way that Judge Smith's

19  injunction could require as a legal matter a change in the

20  class definition or a different settlement than here.

21  What could happen -- the way I see it playing out,

22  I actually don't want to argue the settlement, but I don't

23  believe your Honor is going to approve the settlement.

24  But assuming that the settlement in current form

25  got approval from your Honor, if Judge Smith's restraining

51

1  order had entered, I think your Honor's order would

2  automatically vacate it, or it would lay a predicate for

3  vacating that order, because the claims would then be

4  released and bar any res judicata, and they could be

5  resuscitated, so to speak, in the event the Third Circuit

6  took another action, so Mr. Boyle's answer was just wrong.

7  Your Honor, there is no way -- there's no way that

8  the California court can take any action on any matter that

9  is pending in our case.

10  THE COURT:  Okay.

11  But isn't what we are talking about here -- let's

12  put it in the real context.  We are talking about the

13  subscriber class, right?

14  MR. BURSOR:  Right.

15  THE COURT:  A class that did not exist until

16  December what, December 19th?

17  MR. BURSOR:  That is actually not correct.

18  THE COURT:  How is that not correct?

19  Was the class certified on December 19th or not?

20  MR. BURSOR:  Not.

21  THE COURT:  There has to be a date, and I want to

22  know what that date was because it is important to this

23  Court because of the things that flow from that.

24  When was the case certified?  You would know.  You

25  were the attorney.

52

1  MR. BURSOR:  I mean, I know as well as anybody

2  does.

3  THE COURT:  That's good.

4  What is it?

5  MR. BURSOR:  Your Honor, what happened was Judge

6  Ron Sabraw denied certification on January 9th, 2006.

7  THE COURT:  Correct.

8  MR. BURSOR:  He denied certification.

9  THE COURT:  They appealed to the Court of Appeals

10  in California.  They reversed it June 1st --

11  MR. BURSON:  It was actually June 9th of '08

12  they reversed, and they reversed direction to certify the

13  class.

14  Now, my view is on that date, the class was

15  certified.  Now, our view --

16  THE COURT:  Except had the class been noticed?

17  MR. BURSOR:  Yes.

18  THE COURT:  When was it noticed?

19  MR. BURSOR:  Your Honor, I brought some --

20  THE COURT:  When was it noticed?

21  It had to be noticed after December 18th --

22  MR. BURSOR:  No, your Honor.

23  The order directing the issuance of notice was

24  issued November 14th, and I believe that is an exhibit to my

25  declaration.

53

1  THE COURT:  So the certification must have been

2  before the 19th then.

3  MR. BURSOR:  Yes, certainly.

4  If I may, your Honor, do you have my declaration at

5  the bench?

6  THE COURT:  I don't have it.

7  Do I need to go get it?

8  Just tell me.  It is just a matter of dates that

9  don't change.

10  MR. BURSOR:  May I go through the chronology?

11  This is June 9th, 2008.  The Court of Appeals

12  reverses and directs the State Court or the District

13  Court -- the state trial court to certify the class.

14  We go to a case management conference, the first

15  one with the new judge, and Mr. Suprenant and I are there.

16  I say to the judge in August, your Honor, the class is

17  certified.  All that is left to do is issue an order

18  regarding notice.

19  Mr. Suprenant says, your Honor, we want more time

20  to study it because we don't necessarily agree that it is

21  certified or not certified, and they have to make a motion.

22  We come back for another case management conference

23  in September, and we say, your Honor, it's clear that no

24  motion is needed.  The Court of Appeals order is directing

25  this Court to certify the class, and we don't have to make a

54

1 second motion.

2 And Sprint at the September case management

3 conference says, yeah, we've now come around to that view,

4 there is no reason for the motion, but we want you to wait

5 until Judge Bonnie Sabraw issues her final ruling on the

6 trial result because we think that may affect the content of

7 the notice.

8 Judge Smith in September says, Okay, I'll wait.

9 In October -- pardon me -- in late October, Judge

10 Smith directs the parties to confer on the content of an

11 order and the content of the notice.

12 We confer in October. We don't reach agreement.

13 On November 7th, 2008, we submitted what is called

14 under California law a statement regarding class notice.

15 If I may provide a copy to the Court, because this

16 chronology may be important, and I would like the Court to

17 know exactly what happened.

18 THE COURT: Does counsel have it? I assume they

19 do.

20 MR. BOYLE: Yes.

21 MR. BURSOR: I have copies for everybody.

22 THE COURT: Liz, just bring me a copy.

23 You can just hand the rest to my deputy clerk.

24 Give me my copy.

25 MR. BURSOR: Actually could I have one back?

55

1 THE COURT: So you give them this.

2 MR. BURSOR: Your Honor, this is a document that we

3 filed in the State Court.

4 THE COURT: This is a document entitled Plaintiffs'

5 Statement Regarding Class Notice.

6 MR. BURSOR: Right.

7 What happened was the Court had directed us to meet

8 and confer on what the notice to the class would say.

9 We did not reach agreement, and so we submitted

10 this statement, and it attaches a proposed notice.

11 THE COURT: All right.

12 MR. BURSOR: We say in the statement that this is a

13 mandatory non opt-out class in our view.

14 THE COURT: Because she can enjoin --

15 MR. BURSOR: -- right.

16 THE COURT: -- injunctive relief, and you don't

17 need to opt out --

18 MR. BURSOR: -- and we are requesting that

19 notice -- the notice be published only on the website, and

20 that we not repeat the newspaper publications that had been

21 done previously, or in the alternative, that Sprint be

22 required to pay.

23 If I can point out, this is November. Obviously,

24 this is before your Honor --

25 THE COURT: That had been done previously where?

56

1 MR. BURSOR: Within the payer class.

2 THE COURT: The payer class, but not this class?

3 MR. BURSOR: Correct.

4 THE COURT: Okay.

5 MR. BURSOR: What we said was, in the payer class

6 we published in many newspapers for consecutive weeks in

7 California, but, your Honor, Judge Smith, we are requesting

8 that since this is a mandatory non opt-out class, that we

9 simply post this notice on the website without incurring any

10 more expenses in the case.

11 That's November 7th, and Sprint opposed it at that

12 time, and have filed a competing submission.

13 We come to court before Judge Smith on November

14 14th, and --

15 THE COURT: So that is not that unusual, where the

16 parties can't agree on the form of notice. That's certainly

17 not unusual in this court.

18 MR. BURSOR: Okay. It's not unusual in my

19 experience either. I am just trying to explain.

20 THE COURT: So there is a disagreement on the form

21 of the notice.

22 MR. BURSOR: Right.

23 So what happened is we come to court on November

24 14th, and during the hearing on this before Judge Smith, Mr.

25 Suprenant was there, and I was there, and Sprint changed

57

1 their mind and said we no longer object to the class notice,

2 and we no longer object to its publication on the website.

3 So on November 14th, Judge Smith issued an order,

4 which is Exhibit L to my declaration, and it is says on page

5 one, The Court finds the class notice is appropriate at this

6 time, November 14th.

7 The Court finds that the contents of plaintiffs'

8 proposed notice is adequate and orders plaintiffs to post a

9 proposed notice on the existing website concerning the

10 Sprint ETF case, and plaintiffs will pay the costs.

11 So on November 14th, she ordered us to direct

12 notice to the class, and in the exact form that we

13 submitted.

14 Your Honor, I have a copy of it as --

15 THE COURT: When does the opt-out period run out?

16 MR. BURSOR: Well, your Honor --

17 THE COURT: There is no opt-out?

18 MR. BURSOR: It is a non opt-out class.

19 THE COURT: Was there an order by a judge

20 certifying this class?

21 MR. BURSOR: This is the -- in my view --

22 THE COURT: Not in your view --

23 MR. BURSOR: There --

24 THE COURT: -- I understand.

25 Your argument is that the timing should be when the

58

1  Court of appeals said, I am remanding it for class
2  certification, right, or directing that the District Court
3  or the State Court certify the class.
4          MR. BURSOR:  Correct.
5          THE COURT:  Now, if that had happened here, the
6  Third Circuit would have said, I am sending it back and
7  directing Judge Linares to certify the class, and then there
8  would either have been a motion practice or not.  You would
9  have come in and said, well, Judge, I don't have to make a
10  motion.  They directed you to certify it.
11          I would say, you know what?  You are right, and
12  then I sign an order certifying the class.
13          Did that ever happen?
14          MR. BURSOR:  Hum, I don't -- there was not an order
15  that said, I hereby certify the class with this court.  We
16  have a November 14th order saying --
17          THE COURT:  So where did you get December 19th
18  from?
19          MR. BURSOR:  Pardon me.  The November 14th order
20  which says --
21          THE COURT:  All right.
22          MR. BURSOR:  -- the Court finds that class notice
23  is appropriate --
24          THE COURT:  Could you please stop one second?
25          MR. BURSOR:  Yes.

59

1          THE COURT:  You don't have to lead.  You can stay
2  there.
3          Mr. Suprenant, someone in your brief from your
4  side, I don't know if you was you or Mr. Boyle who said to
5  me that the class was certified on December 19th.
6          Where did that come from?
7          MR. SUPRENANT:  That is -- well, among other places
8  it's in our reply at page six.
9          The California subscriber class was not certified
10  until December 19th, 2008.  An order that the Ayyad counsel
11  decided not to advise the Court, Fazio Affidavit,
12  Exhibit A --
13          THE COURT:  I have it.
14          MR. SUPRENANT:  -- so it is --
15          THE COURT:  Could you get it for me, please?
16          MR. BURSOR:  May I provide the Court --
17          THE COURT:  Counsel, there is an order.
18          MR. BURSOR:  I don't recall.
19          If I can address it, the November 14th, your
20  Honor, directs notice to the class.
21          Now, the Court cannot direct notice to a class
22  unless the class has first been certified you would think,
23  right?
24          THE COURT:  You would think.
25          MR. BURSOR:  You would think.

60

1          So obviously, if that is correct, then the Court
2  was of the view that there was no further motion necessary,
3  and that the class was certified by virtue of the June
4  8th -- pardon me -- June 9th order from the Court of
5  Appeals.  Otherwise, how could the Court be issuing
6  notice --
7          THE COURT:  How long is the notice period?
8          I know there is no opt-out, but you sent a notice
9  and --
10          MR. BURSOR:  The order was post the notice on the
11  website.
12          THE COURT:  That is it?
13          MR. BURSOR:  Right.
14          It is the website that had existed for several
15  years for the payer class, and the thought was that was the
16  best place to go, so that is the order we get on the 14th.
17          Now, there was still some squabbling about meeting
18  and conferring on the precise language of the class
19  definition, which by the way, the payer class was certified
20  by the 2006 order, but there were about -- I think there
21  were about four or five orders subsequent to that that
22  modified and clarified the definition of the payer class
23  before it was actually tried, so there was more than one
24  order.  In fact, there was a handful of orders over a series
25  of two years that modified the definition to the payer

61

1  class.
2          My understanding of the December 19th order is that
3  it was simply clarifying the definition of a subscriber
4  class that had already been certified by virtue of the Court
5  of Appeals' ruling and that had already been notified --
6          THE COURT:  Except notwithstanding, you are telling
7  me, saying there was no motion by you to do that, it says
8  order granting plaintiffs' motion for certification of
9  subscriber class.
10          MR. BURSOR:  It is a mistake, because we did make a
11  motion.  It's a miswording.  I think it is undisputed that
12  no such motion was ever made.  Then after 2006, we filed a
13  motion in 2006 to do it.
14          THE COURT:  Well, it becomes the whole history.  On
15  June 9th, 2006, the Court denied the plaintiffs' motion for
16  certification of the subscriber class, and the plaintiffs
17  subsequently appealed the Court's decision or the Court's
18  order, I'm sorry, and on June 9th, 2008 the Court of Appeals
19  reversed the Court's order and held that this Court should
20  have certified the subscriber class.
21          Now, therefore, the Court orders as follows:
22  Plaintiffs' motion for certification of the subscriber class
23  in the Sprint early termination case is granted, so it is
24  not clarifying anything about the payer class.
25          MR. BURSOR:  No.  I didn't suggest it was

62

1 clarifying anything about the payer class.

2        I am suggesting it was clarifying the scope of the

3 subscriber class.

4        Does your Honor have Exhibit L?

5        THE COURT: Then it defines the subscriber class

6 under paragraph 2, and then on paragraph 3, the Court will

7 enter a separate order regarding whether notice to class

8 members is necessary, and whether class members may exclude

9 themselves from the action.

10        MR. BURSOR: It skips over an important order,

11 which is the November 14th, so --

12        THE COURT: I didn't skip over it. I am reading

13 the December 19th order. I know it is a separate order,

14 which is the November --

15        MR. BURSOR: I wasn't suggesting your Honor skipped

16 it.

17        I am saying that order, which, as I understand it,

18 was signed in the form that the parties submitted, although

19 I am going to --

20        THE COURT: Well, you certainly got it and never

21 brought it to the attention of this Court, and then for

22 whatever reason thought that it wasn't important to do

23 anything about this order.

24        MR. BURSOR: No. I thought the key date was the

25 date that the notice was ordered to the class, which was

63

1 November 14th, which is Exhibit L to my declaration.

2        THE COURT: You are telling me that I am to assume

3 that without activity on your side, Judge Winifred Smith

4 just took it upon herself to say, I am going to issue an

5 order, on your letterhead, with your proposed form of order,

6 and signed it?

7        MR. BURSOR: We submitted the proposed form.

8        Are you talking about the December 19th order or

9 the November 14th order?

10        THE COURT: All right.

11        Who is plaintiffs' counsel?

12        It says here Bramson, Plutzik.

13        Who is that?

14        MR. BURSOR: That's my colleague.

15        THE COURT: He's your colleague?

16        MR. BURSOR: Yes.

17        THE COURT: So somehow you guys gave Judge Smith a

18 proposed form of order, and she signed it.

19        MR. BURSOR: Yes.

20        But my point is just -- I am just trying to clear

21 up --

22        THE COURT: Your point is that as you look back to

23 the day of the November 14th order, where the class notice

24 is held to be sufficient, right?

25        MR. BURSOR: November 14th.

64

1        THE COURT: That is the operative date.

2        All right. Go ahead.

3        MR. BURSOR: I am not sure what significance it has

4 right now, but it is clear since at least June 9th, 2008,

5 that this class is getting certified.

6        THE COURT: The significance that it had was, until

7 you began talking about the November order, was that I was

8 led to believe by you originally that this class had been

9 certified for a long time, and it wasn't until the reply

10 brief that I learned that the certification date was

11 December 19th, right? Which would have meant that the class

12 certification -- your class didn't even exist until after

13 this case had been settled and preliminary notice was sent

14 out, and that would be of some moment to this Court.

15        MR. BURSOR: Your Honor, we disagree with that

16 characterization of the chronology because it omits that

17 November 14th --

18        THE COURT: You should have told me that --

19        MR. BURSOR: -- what it already said was that the

20 Court directed notice by order dated November 14th, and that

21 is what happened.

22        THE COURT: Go ahead.

23        MR. BURSOR: So, your Honor, I think I covered Mr.

24 Boyle's answer to the question of what is it that is

25 interfering, and it is clear that the injunction can't

65

1 interfere with your Honor's consideration of the proposed

2 settlement as a legal matter.

3        THE COURT: Just so that I get it, because the

4 ultimate determination of the Court on the fairness issue

5 would serve as res judicata, and therefore, at that time

6 will vacate the effect of any injunction that has been

7 entered into with the California court --

8        MR. BURSOR: If you approve the settlement, I

9 believe that's that correct.

10        THE COURT: Right.

11        MR. BURSOR: It would either vacate or serve as a

12 predicate for the -- so that is my response to Mr. Boyle's

13 answer to that question.

14        Now, Mr. Suprenant gave an answer to the same

15 question, and he said that the TRO may be interruptive to

16 the settlement, and your Honor said why.

17        He gave two answers. He said because we have

18 national procedures, and it would be really tough for us to

19 change our procedure in California, and he said it's going

20 to adversely impact our ability to charge a fee and make it

21 like a paper sword.

22        My response to that is that neither of those

23 components of his answer interfered in any way with what

24 your Honor is doing.

25        The injunction, if, in fact, it is true that it

66

1  makes it difficult for Sprint to continue to do what it is
2  doing --
3         THE COURT:  What about if it threatened the
4  settlement?
5         MR. BURSOR:  In what way?
6         THE COURT:  If it changes what was bargained and
7  agreed, you know, they gave up some things, and they got
8  some things.  That is the nature of the settlement, right?
9         MR. BURSOR:  Right.
10        THE COURT:  And they didn't bargain, and they're
11  not being able to charge the --
12        MR. BURSOR:  Right.
13        THE COURT:  -- in California.  That was not part of
14  the deal.  They expected that they would be able to
15  continue --
16        MR. BURSOR:  Well, they didn't --
17        THE COURT:   -- that is why you have appropriation
18  and all of the other things.  That was part and parcel of
19  the overall agreement.  And if that goes out, a substantial
20  or an important part of that agreement has now been
21  offended, and therefore, it threatens liability to manage
22  and effectuate the settlement.
23        MR. BURSOR:  It would only be affected -- Sprint's
24  conduct would only be affected between the time of the
25  injunction in California and the time, your Honor, if you

67

1  approve it, grants final approval of the settlement.
2         Once you grant final approval of the settlement,
3  there is no more --
4         THE COURT:  Are you willing to stipulate that if I
5  were to approve the settlement as of that date, any
6  injunctive relief you have ceases to exist?
7         MR. BURSOR:  Yes.
8         THE COURT:  Go ahead.
9         MR. BURSOR:  Now, one thing that I do agree with,
10  from both Mr. Suprenant and Mr. Boyle, is that Diet Drugs
11  won here and controls --
12        THE COURT:  Wait a minute.
13        I am not suggesting that you have stipulated.  I am
14  just wondering if you would be willing to in fairness to
15  you.  But under that stipulation, there would not be any
16  remand --
17        MR. BURSOR:  If your Honor --
18        THE COURT:  -- there would not be any subsequent
19  litigation by you in California, right?
20        MR. BURSOR:  -- if your Honor approves the
21  settlement as is, and your Honor finds that the subscriber
22  class is included within that settlement, that order would
23  be res judicata.  We would not be able to do anything in
24  California.
25        You know, we may have appellate remedies in the

68

1  Third Circuit, but as I understand it, that claim is over
2  for any claim that's encompassed in that settlement.
3         Now, we have some issues about the notice and how
4  the carve-out was done in that case, and obviously --
5         THE COURT:  We will argue about it eventually.
6         MR. BURSOR:  -- I'm not going to argue about it
7  now, your Honor.  I will argue about it on March 5th, but
8  that is my understanding of how the law works, and how the
9  analogy of this Court's order would affect what's going to
10  happen in California.
11        I don't think there is any question about it.
12  That's why Mr. Boyle characterized and Mr. Suprenant
13  characterized as a flurry of activities in California, like
14  we were trying to do something fast before your Honor did
15  something is simply wrong.
16        The proceedings that are ongoing in California,
17  every single one of them, would be proceeding the same way
18  from our perspective whether this proposed settlement was
19  preliminarily approved here or whether it didn't exist at
20  all.
21        There's no -- this settlement was not the stimulus
22  for any action that we took in California, and there is no
23  action that we take in California that relates in way to any
24  kind of attack on the settlement.
25        We are going to attack the settlement on the first

69

1  week of February when the objections are due, and you are
2  going to see us again on March 5th objecting, but that has
3  nothing to do with what we're doing in California, because
4  the impetus for the proceedings in California is that we had
5  a trial.  As a result of that trial, we won a claim
6  declaring the fee to be illegal, the ETFs to be illegal.
7  That came down on December 4th --
8         THE COURT:  You want to start enjoining that or
9  using that to start as of right now until I make the
10  decision sometime in March, right?
11        MR. BURSOR:  I think we have a right --
12        THE COURT:  Then at that point --
13        MR. BURSOR:  -- that's what we're trying to do.
14        THE COURT:  That you are trying to do that, so that
15  is the period of time you want to enjoin them.
16        MR. BURSO:  Well, no.  We are going to enjoin them
17  before because we don't expect --
18        THE COURT:  Because you don't expect that the
19  settlement will be approved.
20        I am saying in the posture we are in here today,
21  all you are seeking to do, as I understand it, based on your
22  view of the law as you have cited several times, is to be
23  able to hopefully get Judge Smith to go along with what you
24  want to do.  That is something and you still have to cross
25  that hurdle --

70

1       MR. BURSOR:  Right.

2       THE COURT:  -- and if that judge wants to extend

3   injunctive relief, as you wanted to do, then to be able to

4   do that, if I don't approve the settlement, well, then you

5   are back where you are today, and there is no problem.

6       But if I do approve the settlement, then the remedy

7   that you just got before Judge Smith goes away at that point

8   by virtue of res judicata, right?

9       MR. BURSOR:  And we recognize this Court, I mean as

10  a Federal Court, your order will be res judicata.

11      THE COURT:  You said that.  Okay.

12      MR. BURSOR:  Yes.

13      So we recognize that we are at risk here, but

14  that's not why we're doing what we are doing in Calfornia,

15  because we have -- one thing that Mr. Boyle said is that

16  this is an ordinary case, it's not unusual at all to have an

17  injunction like this.  And, your Honor, with all due

18  respect, I think it is an unusual because there are very few

19  cases like this that actually go to trial.

20      THE COURT:  This hasn't gone to trial.  What are

21  you talking about?

22      MR. BURSOR:  Well, your Honor, the payer class went

23  to trial.

24      THE COURT:  I understand that.  We're not talking

25  about the payer class.  We are talking about the subscriber

71

1   class.

2       MR. BURSOR:  It was our --

3       THE COURT:  I am not trying to stay the payer

4   class.  That would be unusual, and I think that is one of

5   the reasons why it was carved out.  They had to come to me

6   to agree on the proposed settlement, at least the

7   preliminary approval and notice, and maybe I would have

8   given preliminary approval, but they carved it out.

9   But, you know, that is not what we are talking about.  We

10  are not talking about the payer class.  We are talking about

11  the subscriber class.  The subscriber class has just gone to

12  notice, and that is all that happened.

13      MR. BURSOR:  Well, they were litigated in parallel

14  up to the point of class certification in 2006, and so,

15  right, it has gone to notice, but it has not progressed past

16  that except for the tentative ruling on the TRO we got

17  January 2nd.

18      But, your Honor, if I may, this is a JCCP

19  proceeding on a complex action that's been carefully managed

20  by the California court since 2003.

21      One of the things that we were told in an order

22  from Judge Ron Sabraw was that the result of the payer class

23  case would determine the remedies available as a practical

24  matter to the subscriber class.

25      I am referring now, your Honor, to Exhibit D to my

72

1   declaration, which is the June 9th, 2006 order by Judge Ron

2   Sabraw, and what he says at page 22 is that the claims of

3   the current subscriber class for injunctive relief, and he

4   resolved through the alternate procedure of claims for

5   monetary leave --

6       THE COURT:  Sure.

7       MR. BURSOR:  -- if the ETFs in their current form

8   are void, then defendants would be subjected to monetary

9   liability, a judgment, and a result of monetary liability

10  would likely cause the defense to change their business

11  practices.

12      He goes on at page 23 to say:  The decision

13  concerning the ETF payer class will provide that limited

14  relief, and that was his grounds for not certifying the

15  subscribers, so it has not --

16      THE COURT:  I grant your appeal was not on

17  appropriate grounds?

18      MR. BURSOR:  Right.

19      However, it has always been our understanding that

20  the declaratory relief, like the illegality of the fee --

21      THE COURT:  If I were you, that is what I would be

22  doing, right?  Saying, I won on the payer class on the issue

23  of legality, Judge.  I want you to apply that, the same

24  theory, to the issue of the injunctive relief, and then I

25  want to go ahead and get injunctive relief on the subscriber

73

1   class.  I would do that, too, if I were you, and it would be

2   a good argument.

3       The point is, though, is that subscriber class is

4   part of the settlement, and that injunctive relief issue was

5   part of what was contemplated as the give and take of

6   another settlement that could be threatened because of what

7   you are trying to do in California, should I now enjoin it,

8   right?

9       MR. BURSOR:  Right, right.

10      Perhaps this is a good point to discuss -- actually

11  before I get to Baldwin-United -- well, let me just go to

12  Baldwin-United because that was exactly the issue involved,

13  and that was the Second Circuit --

14      THE COURT:  Which issue was it?

15      MR. BURSOR:  In Baldwin-United --

16      THE COURT:  That is a New York case, right?

17      MR. BURSOR:  New York, Second Circuit.

18      What happened was there was a large MDL settlement

19  of a number of security cases.  Preliminary approval goes

20  out, and notice goes out.

21      After notice goes out, you get a bunch of state AGs

22  who start issuing subpoenas, like they will start a new

23  case.  They're rattling around like they are going to start

24  a new lawsuit as State AGs.

25      Defendants go in, and they say, very much like what

74

1  Sprint is saying here, you know, if we are subject to
2  liability on the State AG type claims, that is depriving us
3  of a settlement -- the bargain that we struck with the
4  settlement.
5       So what the Second Circuit did -- actually I
6  believe the District Court did, and the Second Circuit
7  affirmed, what the District Court of New York did was to say
8  State Ags are enjoined under the All Writs Act, a necessary
9  jurisdiction prong, because what they are doing, commencing
10 new actions that threaten this settlement post preliminary
11 approval is something that the Court has the power to enjoin
12 and did enjoin.
13      THE COURT:  Okay.
14      MR. BURSOR:  But what the trial court did not do
15 and was particularly careful about was to say that the All
16 Writs Act injunction that issued against the State AGs would
17 in no way hamper them from bringing any type of claim
18 seeking prospective and injunctive relief.
19      We discussed this in the brief, your Honor, and the
20 actual order granting the All Writs injunction is attached
21 to the Second Circuit's opinion as Appendix A to the
22 reported opinion.
23      So exactly what that District Court did not do,
24 that is exactly what your Honor is being asked to do with
25 respect to the subscriber class case except on even worse

75

1  facts, because we are not talking about a subscriber class
2  case that was filed -- I think everybody here will recognize
3  that we didn't get the notice from the preliminary approval
4  and say, we should file a new case, issue subpoenas, like
5  what the State AGs did in Baldwin-United.
6       Our subscriber class case was filed in 2003 at the
7  same time as, you know, the payer class was filed.  In
8  fact, it is the same docket number.  It is the same
9  complaint.  It's the same causes of action.  They are
10 identical word for word.  That is why, you know, some of the
11 arguments have said, well, Mr. Bursor has been conflating
12 the payer class case with the subscriber class case.
13      You know, my response to that would be, I am not
14 conflating them.  They are part of the same case at least
15 and unless until that tentative ruling came out yesterday.
16 If they are going to be severed in some way, I don't know.
17 But from 2003 through today --
18      THE COURT:  Counsel, do you think that one of the
19 distinguishing factors in that case was the fact that it
20 involved state officials acting in their representative
21 capacity, and the Court looked at the injunctive relief
22 sought by the State as someone representing the actual State
23 and considering this issue of federalism and comity and
24 looked at it a little differently than they would look at
25 this case?

76

1       MR. BURSOR:  I certainly don't think there is
2  anything in the ruling that suggests that, your Honor,
3  and --
4       THE COURT:  You don't think there is?
5       MR. BURSOR:  I don't think so, and in fact, I think
6  it is on all fours --
7       THE COURT:  I know that it refers to suits by the
8  State, and I am trying to find the language.
9       In talking about Governor Hughes, it talks about
10 sovereign immunity cases, the status of sovereign immunity
11 purposes or actions instituted by state officials in a
12 representative capacity present a similar exception to, you
13 know, the ability to file injunctions, et cetera.
14      So, in any event -- all right.  I was just asking
15 whether you thought that made a difference, and you don't
16 think it does.
17      MR. BURSOR:  Well, I think it is the exactly the
18 same because the state officials were bringing, you know,
19 were exempted and permitted to bring actions in a
20 representative capacity on behalf of those claiming to be
21 affected by the ongoing practices, which is exactly what we
22 were appointed by the Court to do in California, so I would
23 suggest that the analogy is actually perfect.
24      We are the State Court appointed representatives of
25 this class, and what we are seeking is to allow the State

77

1  Court to continue its decision-making process and to enforce
2  the orders that it has made, and to see through to
3  completion of a massive case that has been managed for six
4  years and to allow the ruling -- the injunction to make it
5  have some teeth, so it is not as Mr. Suprenant said, a paper
6  sword.  He was referring to the fees, and I am referring to
7  now the injunction.  If the State Court is enjoined, if we
8  are enjoined --
9       THE COURT:  If you are enjoined, what is your harm?
10 If you are enjoined for 45 days or whatever it takes to get
11 to March, what is the harm?
12      MR. BURSOR:  The harm to us, your Honor, is that we
13 know from the work we did from the litigation to litigate
14 claims, we know that Sprint is making $30 million in
15 charges -- pardon me -- $60 million nationwide monthly in
16 these charges, and about a fifth in California, so it is $12
17 million every month.  45 days, you're talking about $14
18 million.  We know -- I believe the figure I provided to you,
19 but the adverse credit reports are being made against the
20 people we represent for nonpayment of the fee, adverse
21 credit reports of about a rate of 2000 per day, something
22 like that.  We already know --
23      THE COURT:  Where did you get that information
24 from?
25      MR. BURSOR:  We get that --

78

1      THE COURT:  Are you representing that as fact to
2  the Court?
3      MR. BURSOR:  Based on the testimony of J. Franklin.
4      THE COURT:  Who is that, your expert?
5      MR. BURSOR:  No, the Sprint employee.
6      He is -- I'm trying to remember his exact title.
7  He is the fellow at Sprint in charge of collections for
8  generically speaking, collections.
9      He testified for about a half a day at our trial
10  about the volume of collections, the collection procedures.
11  The assignment of the fees to collection agencies, the
12  dunning letters that collection agents -- that Sprint sends
13  out itself, and then the dunning letters through the
14  collection agencies, and then the adverse credit reports
15  that Sprint makes, so we had extensive testimony on this in
16  our litigation.
17      And what is happening today, right now, and what
18  has been happening since December 4th when we got the ruling
19  on the legality is that this is continuing.  It is continued
20  at the rate, you know, the last available figure is $60
21  million per month.
22      Based on what we know about California as a
23  fraction of the nation, it is $12 million a month in
24  California.  I can't remember the exact number I gave to the
25  Court in California, but it was something on the order of a

79

1  thousand to 2000 to maybe slightly more adverse credit
2  reports every single day.
3      The TRO application that we made to the Court in
4  California that resulted in the January 2nd tentative
5  ruling, that was supported by declarations from these
6  individuals saying, I was charged this fee.  I refused to
7  pay it.  It was found illegal on December 4th, and on
8  December 9th, or December 12th or on December 16th I
9  received a dunning letter threatening to make an adverse
10  credit report on me, if I don't pay it.  I don't want to pay
11  it, but I don't want my credit trashed.
12      That was the showing that we made to lead to the
13  tentative ruling that Judge Smith issued.  But we also know,
14  your Honor, you know, there were hundreds of pretrial orders
15  in our cases.
16      One of the things that those orders made clear was
17  that we were not going to be able to recover what was called
18  consequential damages for injuries such as defamation of
19  credit or other types of consequential damages, for example,
20  for injuries to competition resulting in higher charges and
21  things of that nature.  So we were limited, and I expect we
22  would be going forward as well.
23      We were limited to the sort of injunctive relief
24  against the charges themselves and against these sort of
25  collection activities directly, and we would not be able to

80

1  come in after the fact on behalf of the tens of thousands of
2  people who since December 4th, when it was declared illegal
3  on through March 5th, for example, you know, if we assume
4  that your Honor is not going to approve the settlement.
5      But if we are stayed until March 5, we will have,
6  you know, more than a hundred-thousand people that we
7  represent are going to have their credit impacted with an
8  adverse credit report for nonpayment of a fee that we proved
9  illegal through around six years of litigation, so that is
10  the harm to us.
11      What we are trying to do in California is I think
12  what your Honor has recognized is the logical next step from
13  the decision that we got on December 4th.
14      Now, on December 4th, we got the declaratory relief
15  that appears illegal, and we got an injunction enjoining
16  Sprint from collecting $225 million in such fees against
17  class members --
18      THE COURT:  The payer class.
19      MR. BURSOR:  -- payer class members, and there were
20  many class members.  Some were charged and didn't pay.  Some
21  were charged and did pay, and those who were charged and did
22  not pay, that Sprint was enjoined from collecting that
23  money.
24      Now, you know, I know there were characterizations
25  going back and forth on the results of the trial.  Sprint

81

1  says we got no money --
2      THE COURT:  Don't you think all of that that you
3  are telling me about that is part and parcel of what
4  prompted Sprint to try to get a national settlement done, so
5  they don't have to worry about that problem any more?
6      MR. BURSOR:  Without a doubt, and I wasn't going
7  there because I think that is an issue for March 5.
8      THE COURT:  But that is part of their thing, right?
9      Okay.  Well, they got one favorable ruling over
10  there, and they could potentially get it at least in the
11  subscriber class, too, and other people may get it, so I
12  want to put this to bed, and I want to stop charging ETFs,
13  which I'm going to do on January 1st, but I want to get rid
14  of that exposure, and I am willing to pay whatever millions
15  of dollars they are willing to pay to get rid of that
16  exposure --
17      MR. BURSOR:  Absolutely right.  There's no question
18  about it, and I agree a hundred percent --
19      THE COURT:  Okay.
20      So part and parcel of potentially being enjoined
21  for however long, if it's not on March 5th, was part of the
22  bargain here --
23      MR. BURSOR:  I don't know that that -- I mean,
24  nobody negotiated with us, so I can't --
25      THE COURT:  You are telling me, there's no question

82

1  that that was brought to the table.  There's no question
2  that that was part of what was of concern to them.
3      Don't you think that would have been sort of
4  the same motion practice that eventually would have occurred
5  with plaintiffs' people, which I know these firms in this
6  Court, too?
7      They would have moved, and maybe they would have
8  used your case as an example, your payer class.  Hey, these
9  things are illegal in New Jersey or should be illegal --
10     MR. BURSOR:  Yes.
11     THE COURT:  -- so obviously, they were trying to
12 buy peace with all of that.
13     MR. BURSOR:  Well, actually, your Honor, what they
14 were trying to do with this settlement, and I have been
15 holding off on this because it will be something I will talk
16 about March 5th --
17     THE COURT:  You have to go to the fairness of the
18 settlement.
19     MR. BURSOR:  But the essence of what is happening
20 here is this settlement was motivated by a desire to neuter,
21 so to speak, the decision that has been coming in
22 California, and that we have all known was coming for more
23 than six months, to try to cut off the prospective
24 injunctive portion of what we achieved in California because
25 that is so valuable --

83

1      THE COURT:  Not only cut it off with you, but cut
2  it off nationwide.
3      MR. BURSOR:  Absolutely.  Because the first thing I
4  would have been doing --
5      THE COURT:  If I take that away from them, I have
6  taken away a very serious -- I am threatening the settlement
7  then.
8      MR. BURSOR:  Well, no, your Honor.
9      THE COURT:  If it is such a big important part,
10 don't you think that would then threaten the settlement?
11     MR. BURSOR:  It would not threaten your Honor's --
12 I do think it would make it untenable for your Honor as a
13 practical matter for your Honor to approve a settlement
14 because it would be so facially inadequate.  If we achieve
15 that injunction in California, it would expose the
16 inadequacy of the settlement, but it would not as a legal or
17 jurisdictional matter prevent your Honor from doing that.
18     You see, what would happen, if we are successful,
19 if you don't enjoin us, and we are successful in getting
20 that prospective injunctive relief, then you would hear us
21 come back on March 5th and say, your Honor, the --
22     THE COURT:  Excuse me --
23     MR. BURSOR:  -- whole --
24     THE COURT:  -- excuse me.
25     What was the key of the other cases throughout the

84

1  country --
2      MR. BURSOR:  What?
3      THE COURT:  -- whichever, maybe Smith, maybe any
4  other cases out there.  I don't know.
5      Hey, you know what, I will move for injunctive
6  relief and I'm going to use Mr. Bursor's win in the payer
7  class, and I'm going to move for injunctive relief between
8  now and the date of the final settlement, too, and all of a
9  sudden, nationwide, that big piece that they thought they
10 had negotiated and agreed upon then through the settlement
11 is gone, right?
12     MR. BURSOR:  That is what they should do --
13     THE COURT:  That who should be doing?
14     MR. BURSOR:  -- that is what they should be doing.
15 Your Honor, I think --
16     THE COURT:  At the end of the day, though, at this
17 juncture, isn't that something that I should be concerned
18 with, whether or not the settlement that was worked out in
19 this Court or in the case before this Court is being
20 threatened by these different actions throughout the
21 country?
22     MR. BURSOR:  No.
23     THE COURT:  I shouldn't be concerned about that?
24     MR. BURSOR:  No.
25     Your Honor, respectfully your Honor should be

85

1  concerned with whether another court is going to take an
2  action that will, as Diet Drugs put it, interfere with your
3  Honor's own path to judgment here.
4      THE COURT:  The path to judgment being the path to
5  consideration of whether or not to finally approve this?
6      MR. BURSOR:  Correct.
7      THE COURT:  And if it affects the settlement all
8  together, isn't it going to affect the path to the fairness
9  hearing?
10     MR. BURSOR:  No.  The distinction that I am trying
11 to draw here, if you look at the Carlough case, or you look
12 at Diet Drugs --
13     THE COURT:  I have looked at both.
14     MR. BURSOR:  I am sure.
15     But what you see in Carlough, which I believe was
16 the West Virginia case, and Diet Drugs was the Texas case,
17 or maybe it's flipped around.
18     Carlough was asbestos, and preliminary approval
19 goes out, and there's a Texas case filed by plaintiffs
20 called Gore, and so what the Gore plaintiffs did is 16 days
21 before the opt-out, they filed a complaint, and the relief
22 they seek is a declaration that the Federal Judge's --
23     THE COURT:  Anyway, Diet Drugs was the Texas case,
24 but go ahead.
25     MR. BURSOR:  Yes.

86

1          Gore was -- no. I think Diet Drugs was West
2   Virginia, and Carlough was West Virginia -- Texas --
3          A VOICE: No. Diet Drugs was Texas.
4          THE COURT: Counsel, don't you think I read this
5   stuff?
6          The Eastern District of Pennsylvania in Diet Drugs
7   tried to enjoined the Texas court, all right?
8          MR. BURSOR: Okay.
9          THE COURT: The Texas state plaintiffs.
10         MR. BURSOR: And what happened was --
11         THE COURT: Do you want me to tell you the facts
12  because I know them, too.
13         MR. BURSOR: They sought relief that would
14  interfere with the Federal Court's ability in both Carlough
15  and Diet Drugs.
16         The state plaintiffs went in and asked the State
17  Court Judge to modify the opt-out procedures that the
18  Federal Judge established in a preliminary approval order,
19  and that is why in both of those cases those orders were
20  really impinging on the Federal Court's path to judgment,
21  and they were impinging on the Federal Court's control over
22  how it would entertain the opt-outs and it would consider
23  final approval.
24         But what didn't happen in Carlough and Diet Drugs
25  is there was not a case that was threatening just to reach

87

1   judgment first, or threatening just to obtain some relief
2   that was parallel to the relief that was being sought in the
3   federal action.
4          For example, in Diet Drugs, there wasn't an issue
5   that the state case just reached judgment first, or just
6   achieved injunction that would stop the defendant from doing
7   what the defendant was doing. Those were not issues in Diet
8   Drugs and Carlough.
9          What the Diet Drugs Court said, and I think there
10  is a passage in the opinion that is key on this, and I know
11  your Honor read the case --
12         THE COURT: I have it in front of me right now.
13         MR. BURSOR: -- it is at page 234.
14         THE COURT: I don't know if you have the same
15  page --
16         MR. BURSOR: 282 F.3d --
17         THE COURT: -- Counsel, I have the case. The
18  question is whether the pages are the same. I may be
19  looking at a book, and you are looking at a Lexis printout,
20  but go ahead.
21         What is the quote that you want me to look at?
22         MR. BURSOR: The quote is: It may not be
23  sufficient that state actions reach some measure of
24  inconvenience or duplicative litigation.
25         THE COURT: I have that quote.

88

1          MR. BURSOR: An injunction may issue, however,
2   where the state court action threatens to frustrate
3   proceedings and disrupt the resolution of federal
4   litigation. In other words, the state action must not
5   threaten to reach judgment first, it must interfere with the
6   federal court's own path --
7          THE COURT: It is interference, no question. It
8   has to be interference or threatened interference.
9          MR. BURSOR: Right.
10         I would submit, your Honor, that merely getting a
11  TRO on relief that would be greater than the relief sought
12  in the settlement on our own path to judgment, on our own
13  parallel path in the State Court litigation, that does not
14  qualify as something that would interfere with this Court's
15  path to judgment, because it is not the same type of attack
16  on the Federal Court proceedings that happened in the West
17  Virginia and Texas cases in Carlough and Diet Drugs.
18         Your Honor, we have not -- in California, we have
19  not made any attempt to make any sort of mass opt-out.
20         I know the Smith case may be pursuing some kind of
21  a different tact on that, but we have not done that, and we
22  will not do that. We will not take any action in California
23  that would in any way impinge on this Court's control over
24  the process for considering objections to the settlement or
25  for considering opt-outs to the settlement.

89

1          We are not going in that direction, and I will
2   commit to that right now. That is not what we are doing.
3          So the action that we are taking is very much akin
4   to what was carved out in United, where the Federal Court in
5   New York recognized that it wouldn't be proper to enjoin the
6   State AGs from seeking prospective injunctive relief, which
7   is exactly what we are doing.
8          But we are not doing anything like Mr. Strange is
9   doing with the Smith case or like the Texas or West Virginia
10  folks did in Carlough or Diet Drugs.
11         We are simply proceeding along on our parallel path
12  to judgment. And if your Honor approves the settlement
13  here, you will get there first. We recognize that because
14  of the rule about finality, we can't win a race, but we are
15  proceeding on our own path to judgment.
16         I think that is important for two reasons:
17         One, there is a very real harm that is occurring to
18  the people that we represent in large measure, and that is
19  why we have an obligation to represent them and seek the
20  relief, so that they are not subject to illegal charges, and
21  they are not subject to adverse credit reports on those
22  charges. We have to try to stop that.
23         I also think it's -- not only is our doing that not
24  an interference with your Honor's consideration, I think it
25  is helpful to your Honor, because I think, you know, the

90

1    docket in this court -- in this action is pretty thin.
2    There has not been a trial here. There really hasn't been
3    any rulings by your Honor on any really real merits related
4    issues. So this Court's familiarity with the facts and
5    evidence is, I think, less than it would be if there had
6    been a trial, and we are going to object to the settlement.
7    I don't think there is any secret about that.
8          When we do that, we want to provide your Honor with
9    as much information as we can.
10         We don't want to be in the position to come in and
11   say to your Honor, this is what we are about to do, or we
12   are going to win and speculate on this or that or the other
13   thing.
14         We want to come in and say, your Honor, we
15   litigated the payer class to judgment. These are the
16   remedies we got. We are litigating the subscriber class
17   case to judgment. So far we have gotten a TRO that's worth
18   about ten times as much as the relief that's in this
19   proposed settlement. We want to be able to lay before your
20   Honor that information, and your Honor should want that
21   information. We are so close to the finish line in that
22   case, that it doesn't make a whole lot --
23         THE COURT: I don't know how close you are. The
24   tentative order says that there are potential issues of
25   material fact in that, so where are you going with that?

91

1          MR. BURSOR: Not all tentative orders are created
2    equally, your Honor, with all due respect to the tentative
3    order. You know, that is our battle to wage in California.
4    I will argue that tomorrow unless something else goes wrong
5    here, but --
6          THE COURT: Unless something different happens, not
7    necessarily wrong.
8          (Laughter)
9          MR. BURSOR: Fair enough, your Honor.
10         THE COURT: That doesn't necessarily mean you're
11   not going to win.
12         Look, wrap it up. I still have to hear from the
13   Smith people.
14         MR. BURSOR: The point is this, your Honor:
15   What we are doing is not the same kind of attack on
16   the Court's jurisdiction --
17         THE COURT: You said that.
18         MR. BURSOR: -- and what we are doing is going to
19   be helpful to the Court, and we are going to be
20   participating in the process going forward, and we want to
21   be helpful, but we don't want to be restrained in a way that
22   will stop us from providing that information.
23         I think that the circumstances in this case are
24   very, very different than in Carlough or Diet Drugs, and
25   those cases are very distinguishable particularly with

92

1    respect to the relative maturation of the state case versus
2    the federal case, where here we have almost the flip side of
3    Diet Drugs.
4          In Diet Drugs, the Federal Court had, you know, I
5    think it was 18,000 individual suits, and a hundred class
6    actions. A complex MDL proceeding went on for a long time,
7    and the State Court people came in very late to the game,
8    and here we have the situation flipped.
9          THE COURT: That is flipped, if I conflate the two
10   cases, the payer case and the other case. The only amount
11   of overlap that exists there is the fact that legally or by
12   virtue of winning in the payer case on the legality issue,
13   you are in a stronger position, you believe, to now make the
14   argument that is applicable to the other class. But it
15   hasn't been, and I don't want this record to seem as though
16   there has been this massive amount of litigation involving
17   the subscriber class, because that just hasn't happened.
18   That is just not true.
19         There was litigation regarding the payer class on
20   the damages issue that had nothing to do with the subscriber
21   class. The jury trial had nothing to do with that. What
22   had to do with it was one motion regarding the legality
23   before and the judicial decision on that one issue, so it is
24   not this massive amount of litigation out of Diet Drugs,
25   okay, compared to what happened here.

93

1          I mean, one could make the argument that the length
2    of this case, the motion practice and the discovery that
3    occurred here vis-a-vis the subscriber class is much larger.
4    Your point is well taken. I want you to wrap it up, please.
5          Anything new that you have not told me already?
6          MR. BURSOR: Well, your Honor, unless you have
7    further questions --
8          THE COURT: I don't have any further questions.
9          MR. BURSOR: Okay.
10         Well, thank you for the opportunity to appear.
11         THE COURT:   Thank you.
12         MR. DE PALMA: I promise to be under two minutes.
13   May I say one thing?
14         THE COURT: Under two minutes I'd like.
15         MR. DE PALMA: Under two minutes.
16         THE COURT: I knew you weren't going to be able to
17   help yourself, Joe.
18         (Laughter)
19         MR. DE PALMA: There is a lot of detail here, but I
20   just wanted to focus or refocus the Court's attention on
21   some very primary basic points in the anti-injunction act.
22         I think the general rule presupposes that you could
23   have parallel state and federal proceedings independently
24   moving towards judgment. That presupposes, your Honor, that
25   one judgment may end up better or worse than other. So the

94

1  test isn't really to look at, well, can we do better or
2  worse in California versus doing better or worse here.
3       The test is really whether the anti-injunction
4  act's very narrow exception necessary in aid of jurisdiction
5  applies. In order for that exception to apply, there must
6  be conduct in the state proceeding that is different than
7  merely moving towards its own judgment. There must be
8  conduct in that proceeding that interferes with your Honor's
9  hearing on March 5th.
10      Mr. Bursor indicated conceding, properly conceding,
11 that whatever happens in California will be trumped if your
12 Honor approves this settlement. So that the necessary
13 element, which you must -- which the Sprint defendant must
14 show in order to have this Court issue a writ, that there is
15 some characterization in the state proceeding that
16 interferes with your Honor's jurisdiction is missing.
17      It is true that Mr. Bursor is proceeding in a case
18 where the judgment, if it goes all the way to the end, may
19 ultimately be different than the judgment that the Court
20 could render here, but that is not the right focus.
21      The right focus is what is Mr. Bursor doing in
22 California, what are his colleagues doing in California that
23 will interfere with this Court's ability to render a final
24 judgment, and the answer is nothing.
25      To make it very clear that the answer is nothing,

95

1  Mr. Bursor conceded that whatever happens in this court, if
2  your Honor approves the settlement, is res judicata, so that
3  eliminates the exception.
4       THE COURT: What if what happens in California has
5  the ability to determine whether there is a settlement?
6       MR. DE PALMA: That is exactly the point I'm trying
7  to make.
8       THE COURT: Wouldn't you think that is a serious
9  interference?
10      MR. DE PALMA: If the ability is by a mass opt-out
11 to destroy a settlement, if the ability is to have a State
12 Court issue an order that tells your Honor what to do, that
13 interferes with the Court's jurisdiction.
14      But if the possibility exists that the California
15 case may result in a different judgment, then that is not
16 enough under Diet Drugs and says it is not enough. Diet
17 Drugs says, the traditional notion is that in rem actions in
18 federal and state court may proceed concurrently without
19 interference from either court, and there is no evidence
20 that the exception to the anti-injunction act was intended
21 to alter this balance.
22      So the focus, your Honor, is on your jurisdiction,
23 and as long as the end result --
24      THE COURT: The focus is on my path to judgment,
25 and whether my path to judgment is being substantially

96

1  interfered with --
2       MR. DE PALMA: Absolutely.
3       THE COURT: -- and that is the determination I have
4  to make. I agree with you a hundred percent.
5       MR. DE PALMA: Your Honor could make that
6  determination regardless of what happens in the natural
7  course of the proceedings in California, so I maybe went a
8  little under two minutes, but I hope it was helpful.
9       THE COURT: Yes. I think that the point you have
10 made is well taken, that that is where the focus is.
11      Now, whether or not an injunction that exists
12 between now and March 5th or whenever, if I ultimately
13 approve or disapprove the settlement, it interferes with
14 that path or not is a decision that I have to make. You say
15 it doesn't, and they say it does, and that is where we are
16 at.
17      MR. DE PALMA: Thank you.
18      THE COURT: Thank you.
19      What I would like to do is if you want to reply
20 with regard to the subscriber class only, then I will hear
21 you now, so I could get done with the subscriber class and
22 move on to Smith, and that way we can finalize the argument,
23 so we are not here all day.
24      MR. BOYLE: Thank you, your Honor.
25      Some brief points. You know, I think that it is

97

1  nice to cavalierly say that, you know, I will stipulate to
2  vacate the injunction or not. There are a series of
3  Rooker-Feldman doctrine issues.
4       The Third Circuit looked at that in Diet Drugs, and
5  the fact of the matter is that under the Rooker-Feldman
6  doctrine, there is a concern that a judgment, and it says,
7  the Third circuit said --
8       THE COURT: Where are you reading from, Diet Drugs?
9       MR. BOYLE: Diet Drugs. It's the last page of the
10 case, regardless of the page numbers. It's headnote 30 --
11      THE COURT: Wait. I have it right here.
12      MR. BOYLE: -- We have said that Rooker-Feldman
13 precludes federal action if the relief requested in a
14 federal action would effectively reverse the state court
15 decision or void its ruling.
16      Okay. So there is a concern, we would have to see
17 what that ruling was to figure it out, but again, your
18 Honor, it is hard to imagine why we would go down that path
19 when we have a March 5th hearing on fairness.
20      I would point out that what happened in the
21 subscriber case after it was remanded and after it was
22 certified is that immediately they ran into court seeking
23 very broad relief that would have prevented us from
24 collecting or asserting a flat rate ETF.
25      As I said to your Honor, it is very clear to us

98

1   that if we are enjoined from a case that is within this
2   settlement, the subscriber class, from collecting those
3   ETFs, no matter what happens, for that period of time you
4   are going to create a different level of --
5           THE COURT:  What about enjoining me from reporting
6   to these people?  It doesn't really seem fair, does it?
7           MR. BOYLE:  Well --
8           THE COURT:  That this was a determination of their
9   legality in California, and you could continue to report
10  those people, and that has really nothing to do with our
11  settlement, does it?
12          MR. BOYLE:  Well, your Honor, there is an
13  interesting point, which I don't quite frankly get.
14          THE COURT:  If I remember, part of Judge Smith's,
15  and there is a lot of material, and I'm going a lot from
16  memory, but wasn't that something that she was concerned
17  with?  Maybe I'll just enjoin on that piece.  What is wrong
18  with letting that piece go forward --
19          MR. BOYLE:  Well, your Honor, quite frankly, it
20  hampers our ability to assert it and collect ETFs.
21          Couple of important points here.  One:  I'm not
22  sure what that has to do with the subscriber class because
23  presumably people that were reported for not paying it are
24  not part of the subscriber class.
25          THE COURT:  Are not?

99

1           MR. BOYLE:  Are not because they obviously pay ETF,
2   so I'm not sure where Mr. Bursor has the standing to assert
3   that as a grave harm in connection with the subscriber
4   class.  Maybe he has an argument there, but it doesn't seem
5   right to me.
6           Quite frankly, those people who pay the ETF or were
7   charged the ETF and didn't pay it are part of this
8   settlement.  They are entitled to claim a benefit.  They
9   have a remedy.  It has been preliminarily approved.
10          If you alter that landscape, you will affect the
11  ability to settle, and we will have a right to terminate,
12  and you are squarely within the All Writs Act.  No questions
13  asked.
14          They can talk about jurisdiction all they want.
15  This is about once there is preliminary approval, the final
16  approval is the judgment, and it is your path to preliminary
17  approval to final approval that you need to protect, and it
18  is abundantly clear that what they are doing in California
19  not only will, but is designed to affect that.
20          They went in for that TRO the day after Christmas,
21  had it heard the day after New Years.
22          What was the rush?
23          If the people paid it, they were out of their
24  class, and they did it for leverage.
25          Now, let's talk about the Ayyad injunction.

100

1           That injunction was based on a finding that in 2002
2   and in 2005 Sprint allegedly did not conduct the appropriate
3   damage study in order to assert its ETF.  That has nothing
4   to do with what is going on and what happened after the
5   class period, and at that trial Sprint presented significant
6   evidence regarding both the amount of damage it suffered and
7   what the ETF was there for, so we have a good argument that
8   the factual underpinning that resulted in their judgment in
9   the payer case has no merit in the subscriber case, and I
10  believe that is what Judge Smith was referring to when she
11  talked about the record not being developed in her much
12  recent tentative, which I agree is a tentative.
13          So the idea that this is a slam dunk, and there is
14  all of these harms to all people out there is not supported
15  by the record, but what is more important is your
16  jurisdiction is being impacted, and they are doing this for
17  a reason.
18          Why did Mr. Bursor seek on ten days' notice a
19  finding that the subscriber case had an illegal penalty as
20  well?
21          He is doing it to drive the issue, to put us in the
22  position where we have to think about getting out of that
23  settlement.  We have come to this Court to say the path from
24  preliminary approval to final approval has an obstruction in
25  it, and that is what is going on in California.

101

1           There is no reason to take the flip side of Mr.
2   Bursor's argument, that we can't wait until the final
3   approval order process is complete, because, again, if
4   people have paid or charged ETF --
5           THE COURT:  Well, they are part of payer class.
6           MR. BOYLE:  They are not in the California
7   subscriber counts, and that is what it is.  I think they are
8   part of our settlement otherwise, and they have remedies and
9   rights, and class counsel has determined that that is an
10  appropriate remedy and right for them, and you need to make
11  that determination, but we don't need to have that process
12  interfered with.
13          Mr. DePalma's comments in all due respect are off
14  the point because he seizes on jurisdiction and talking
15  about procedural rights and things like that and other
16  things, but what the All Writs Act is designed for, is there
17  going to be an interference in going from preliminary
18  approval to final approval.  It is very clear that this
19  activity will do that.  It will create a separate people --
20  group of people, who will get a benefit that is different
21  than what the class gets, and Mr. Suprenant talked about the
22  significant harm and expense it places on Sprint, which
23  undermines the benefit of the bargain that they sought and
24  gives us the right again to seek appropriate relief in that
25  regard.

102

1    I think on its face it is very clear.  And, again,
2  I don't know what the California court will do with respect
3  to some type of relief they might seek that may have the
4  Rooker-Feldman effect.  But my point is:  Why would we risk
5  that?  Why would we get to that place where the remedy may
6  not be effective, when there is Third Circuit precedent that
7  squarely supports the notion that your Honor may stay these
8  actions for the limited purpose of determining whether or
9  not to finally approve the settlement and put it to bed for
10  all involved?
11    Thank you.
12    MR. DE PALMA:  To correct a factual statement,
13  there is a fact that we dispute.
14    MR. BOYLE:  Well, your Honor, I also thought it
15  would be helpful if Mr. Bursor could tell us when this
16  notice went up on the website.
17    MR. BURSOR:  Your Honor, the subscriber case
18  absolutely does include the people who were charged the fee
19  on or after the end day of the payer class.  That is not
20  even in dispute in the California case.
21    Every one of the folks that I was describing who
22  put in declarations in support of the TRO were members of
23  the subscriber class and charged a fee after it was
24  determined to be determined to be illegal -- Mr. Boyle's
25  theory that --

103

1    THE COURT:  I thought the subscriber class were
2  people who had a contract, had not been charged, but had not
3  cancelled because of the specter of the ETF, right?
4    MR. DE PALMA:  As defined at a given point in time,
5  but time marched on, so there was a definition of a
6  subscriber class from -- with bookend dates.  Months and
7  years go by, and people in the subscriber class end up
8  terminating their contracts, and they're charged a flat fee
9  on early termination --
10    MR. BURSOR:  The class definition does not say they
11  were not charged.  They were anybody who was a party to a
12  contract with that fee.  Some were charged, and some were
13  not.
14    If it were otherwise, then we would only be seeking
15  relief on people who could not be affected.  And once you
16  are affected by ETF, you drop out of the class, and that
17  would make no sense at all.  So just with that correction, I
18  guess I will sit down.
19    MR. SUPRENANT:  If I could be heard.
20    THE COURT:  Just bear with me.
21    Well, in the order that you gave me, Mr. Suprenant,
22  it says that the subscriber class is defined as all persons
23  who are parties to a Sprint customer agreement with a flat
24  early termination fee or a personal cell phone account with
25  a California area code and a California billing address.

104

1    MR. SUPRENANT:  Your Honor, I think --
2    THE COURT:  It doesn't go the rest of the way and
3  say that -- but you have not been charged an ETF --
4    MR. SUPRENANT:  -- I understand, your Honor, and I
5  was going to -- let me just address that point first.
6    I have always understood from June 2006, that the
7  subscriber class was as it has always been defined in
8  various permutations, and that as people who were tethered,
9  as plaintiffs used, they weren't charged it, but they were
10  subject to it, and it had some coercive --
11    THE COURT:  Well, they are now saying that it
12  included people who paid ETF.
13    MR. SUPRENANT:  I don't think that --
14    THE COURT:  It has to be written somewhere.
15    MR. SUPRENANT:  -- I think that will be subject to
16  further litigation and argument in California.  I don't
17  think that -- other than implication --
18    THE COURT:  Assuming that is of importance to me in
19  determining whether I should not enjoin an injunction in
20  California regarding reporting people, that concerns me.
21    Should I know whether or not it includes people who
22  had to pay ETF, whether it is the subscriber class?
23    MR. SUPRENANT:  I think -- two answers, your Honor.
24    One:  I do believe that is uncertain and unsettled
25  in California.  There is arguments one can make from the one

105

1  your Honor just read.
2    The second answer I would say is even if that is
3  true, okay, even if what plaintiffs' counsel just told you
4  is true, there are still reasons why, your Honor, compelling
5  reasons, why that quote, unquote, harm from the bad credit
6  report should not dissuade your Honor from staying it.  That
7  was one of the points I was going to mention, which is -- as
8  is clear from the result of the people who were getting bad
9  credit reports breached their contract.
10    The decision in novel unprecedented decisions, that
11  a liquidated damage provision that under state damages is
12  illegal because you didn't hire lawyers and accountants to
13  do a damage study, first of all, it is not preclusive, and
14  we believe that there are appellate remedies.  But more
15  significantly, your Honor, is those people will end up owing
16  us more money.  The harm to them -- the harm to them won't
17  be the negative credit report.
18    The harm to them is instead of being on the hook
19  for a hundred-fifty or $200, they will be on the hook for
20  several multiples of that.  On average, they will be on the
21  hook for $520.
22    So if the relief that is being sought in California
23  ultimately issued, the class members are going to be worse
24  off.  Their liability will be greater than the ETF.
25    With respect to the numbers, I don't want to burden

106

1  your Honor. We disagree with the numbers. The numbers are
2  diminishing. The numbers Plaintiffs' counsel gave are
3  clearly overstated, but I can go into that only if your
4  Honor wishes to.
5        The last thing I would mention is class cert was
6  granted on December 19th, 2008. Your Honor has the order.
7        THE COURT: Then why would they issue the June
8  4th -- I think it was the December 19th or the 14th order
9  directing notice --
10        MR. SUPRENANT: The November 14th?
11        THE COURT: -- November rather.
12        MR. SUPRENANT: I was going to say just two things
13  about the notice, your Honor.
14        Number One: There is no language. The Court of
15  Appeals' decision -- first, I'm going to the Court of
16  Appeals' decision.
17        Mr. Bursor told you repeatedly that they said
18  certify class, and the language is not there --
19        THE COURT: Well, it is certainly in the order to
20  certify the class.
21        MR. SUPRENANT: Yes, I understand. I'm talking
22  about the Court of Appeals.
23        THE COURT: The language in the order certifying
24  the class says that the Court of Appeals says that:
25        On June 9th, 2008, the Court of Appeals reversed

107

1  the Court's order and held that the Court should have
2  certified the class.
3        MR. SUPRENANT: I think that's different than
4  directing. That's just certifying, and I would point out
5  that that was prepared -- I am surprised to have plaintiffs'
6  counsel attack the proposed order that they wrote.
7        But there is no language in the opinion -- as a
8  matter of fact, there is no language in the opinion saying
9  respond to the Court -- rather, you know, Superior Court on
10  remand, certify the class. I know that because we argued
11  about it.
12        The question was: Were there remaining arguments
13  you could make, and we thought there were, but we thought at
14  the end of the day they probably would lose, so we didn't
15  make them.
16        But -- but -- Mr. Bursor himself said after
17  November 14th when he said there was an order certifying the
18  class, he told your Honor, which is true, that there
19  continued to be disagreements about exactly how it would be
20  worded. Those continued on throughout November. The time
21  the class was certified was December 19th. It is the
22  exhibit your Honor looked at.
23        THE COURT: How could you issue notice to a class
24  that wasn't even certified?
25        MR. SUPRENANT: The question there was: Was the

108

1  class -- was it entitled -- I say this, your Honor -- I
2  don't think there is any disagreement, and I agree with
3  plaintiffs' counsel, that the class was going to be
4  certified. That was evident from sometime in the fall. It
5  was in the future going to be certified.
6        As your Honor obviously appreciates, the specific
7  language that was going to be used had to be agreed upon, so
8  we would know what was being certified.
9        As plaintiffs' counsel said, as the litigation
10  proceeded from 2003 onward, there were multiple orders
11  affecting the precise bounds of the definition.
12        One of the things that changed, for example, was
13  the Sprint Nextel merger -- I won't go into the details --
14  but there is common ground between Mr. Bursor and myself
15  that the class definition was changed, and obviously the
16  class couldn't be certified until the language certifying
17  the class was agreed upon, and that did not happen, your
18  Honor, until December 19th. I think your Honor said it
19  exactly right.
20        It is a very simple question. Was the order signed
21  certifying the class, and when did it happen, and that is
22  December 19th.
23        THE COURT: Thank you.
24        I will hear you on the Smith case. I am going to
25  take a break first. I will give everyone a break. It will

109

1  be a short break, not a lunch break, so everybody can use
2  the facilities or whatever you want to do, and then we will
3  come back. I will give my staff a little break just for
4  about 15 minutes or so, and then we will come back and hear
5  from Mr. Strange, and we will hear any rebuttal to that, and
6  then I will either rule from the bench, or I am going to
7  take it under advisement and make a quick ruling.
8        I know that Judge Smith has matters pending before
9  her for tomorrow. I will try to coordinate, so nothing
10  happens between us until, you know, when we're together,
11  we'll see what we can do about that --
12        MR. BURSOR: Your Honor --
13        THE COURT: -- because I know you have to go back
14  to California. I am trying to accommodate counsel by that
15  comment.
16        What?
17        MR. BURSOR: I just wanted to ask for some mercy
18  from the Court. I'm feeling a little under the weather, and
19  depending on your Honor's ruling, I may or may not have to
20  get on a flight, so I don't know if your Honor could take
21  that into account in terms of timing or not.
22        MR. SUPRENANT: Your Honor, I find myself in the
23  rare position of agreeing with Mr. Bursor, so if your Honor
24  could --
25        THE COURT: You are both feeling under the weather?

110

1      (Laughter.)

2      MR. BOYLE:  No.  They are both going to California.

3      THE COURT:  I know that.  Okay.  I will take that

4  under consideration.

5      Counsel, we are doing all of this argument here

6  today, and obviously you want me to give this due

7  consideration.  I obviously read everything, and I've heard

8  it.  I don't want to necessarily make a quick or a hasty

9  decision.  I am starting to formulate some thoughts in my

10  own head as to where I should go, and probably I could maybe

11  later do it from the bench.  Let's see how it goes.

12      Right now we will take a 15-minute break, and we

13  will come back and hear the other arguments.

14      (Recess taken.)

15      THE CLERK:  All rise.

16      THE COURT:  You may be seated.

17      We were about to hear from Mr. Strange.

18      MR. SUPRENANT:  Mr. Strange very graciously allowed

19  me ten seconds to make a point.

20      On page eight of our reply, which was filed I guess

21  yesterday, Mr. Fazio was stating that on page eight, the

22  first full paragraph--

23      THE COURT:  Page eight of what?

24      MR. SUPRENANT:  The reply we filed yesterday.

25      THE COURT:  Yes.

111

1      MR. SUPRENANT:  With respect to the Ayyad motion,

2  the California Court required --

3      THE COURT:  Can you just give me one second,

4  please?

5      THE REPORTER:  I can hardly hear you over here,

6  too.

7      MR. SUPRENANT:  I'm sorry.

8      It goes to --

9      THE COURT:  Counsel, hold on.

10      Page eight?

11      MR. SUPRENANT:  The first full paragraph,

12  your Honor.

13      THE COURT:  Apart from the settlement, that

14  paragraph?

15      MR. SUPRENANT:  That paragraph, your Honor.

16      And in the last paragraph, we state:  To date, as

17  of yesterday, the notice, that notice regarding a California

18  subscriber class, has not been published, citing to Mr.

19  Fazio's declaration at paragraph 11 on Exhibit 8.  It is our

20  understanding that that notice for the California subscriber

21  class was first posted on the internet sometime yesterday or

22  today.

23      That is all I have.

24      So, in other words, the sequence was whatever the

25  order on November 14th, saying, yes, there will be

112

1  publication --

2      THE COURT:  19th.  Oh, the December 19th --

3      MR. SUPRENANT:  -- the December 19th certification

4  order, and then yesterday the notice actually went up.

5      Thank you, your Honor.

6      Thank you, Mr. Strange.

7      THE COURT:  Mr. Strange --

8      MR. STRANGE:  Thank you, your Honor.

9      THE COURT:  -- before you begin, I do have a bone

10  to pick with you.  It is a small bone, but I issued an order

11  in this case, wherein I stayed the arbitration proceedings

12  pending whatever is going to happen today.  Remember that?

13      MR. STRANGE:  Yes.

14      THE COURT:  I know you didn't agree with that

15  order, and I know maybe you believe, or I think I know you

16  believe that I have authority to do that.  But even so, an

17  attorney who is under an order from a Federal District Court

18  Judge shouldn't go then to an arbitrator and urge him to

19  disregard that order and to tell him that you don't believe

20  I have the authority.  If you didn't think I had the

21  authority, your remedy was to go to the Third Circuit and

22  get that taken care of, not to go to the arbitrator and say,

23  with all due respect, we don't think he has authority and

24  disregard it.

25      What made you think you could do that?

113

1      MR. STRANGE:  Your Honor, I apologize.  I shouldn't

2  have done that.  I just acted out of surprise, and you know,

3  in retrospect, it was not the right thing to do.

4      THE COURT:  Okay.

5      Go ahead.  I will hear your argument.

6      MR. STRANGE:  Thank you, your Honor.

7      Thank you for allowing me to speak, and I am sorry

8  to lead off on that note.

9      THE COURT:  Well, I wanted it said because

10  obviously there are other counsel that appear in front of me

11  here, and I take my orders seriously.  I realize I am not

12  perfect, and sometimes I may issue legal decisions that are

13  wrong.

14      If they are wrong, then the Court of Appeals will

15  tell me that they are wrong, and we will fix them when they

16  come back, but that is the way it works.  That is our system

17  of law.  It's not for me to issue an order, and then a

18  lawyer who doesn't like the order go --

19      MR. STRANGE:  I'm sorry, your Honor.

20      THE COURT:  -- like in State Court, where somebody

21  issues an order, well, you have to stop the eviction.  And

22  then he goes to the constable saying, here's the order

23  saying you have to stop the eviction, but I don't think you

24  have the authority, go ahead and throw him out, you know --

25      MR. STRANGE:  It wasn't appropriate, your Honor.  I

114

1 apologize.
2        THE COURT:  All right.  I am not going to hold it
3 against you in your argument, believe me.  I like lawyers
4 too much, but don't do that again.
5        MR. STRANGE:  I won't.
6        I do appreciate the fairness with which you looked
7 at this matter, which is in this short amount of time is
8 very impressive.
9        I want to make the point about how we got here,
10 because your Honor's comments with respect to various orders
11 issued by various courts is something that was wrestled with
12 by all of the courts in the country, including state and
13 federal courts when you have a settlement of a national
14 class action.
15        The order by Judge Haberfield, where we as counsel
16 requested him to enjoin Sprint from trying to settle around,
17 this involved what we understood was an attempt to settle
18 this case in the Hall court in Illinois --
19        THE COURT:  I'm sorry.  Say it again.  Restate it.
20        MR. STRANGE:  -- there is another case, which is
21 also affected by this Court, called Hall.  That is in the
22 Illinois State Court, and that is a certified national
23 class, where no notice has gone out.
24        So when we went into Judge Haberfield, it was with
25 respect to our concern that there was some settling

115

1 happening in that case without us involved.  And Judge
2 Haberfield, while denying the injunction, noted that he
3 would retain jurisdiction over the parties in the matter
4 before him.
5        Subsequent to that, notice was issued in their
6 case, as your Honor noted, and the opt-out period appeared
7 to have expired.  But prior to that, your Honor, I was aware
8 of how these cases were, and I said to Sprint's counsel, why
9 don't be go to Judge Linares' courtroom and try to resolve
10 this case?
11        THE COURT:  Resolve your --
12        MR. STRANGE:  My case and this case in a global
13 settlement, and Mr. Suprenant didn't -- declined my
14 invitation.
15        The next thing I knew is he actually took me up on
16 my suggestion.  He just forgot to include me.
17        So now I am here objecting, but in a very unique
18 manner, and one which I think your Honor probably noted has
19 never been cited in any case, which is that in my case,
20 notice has gone out, and the opt-out period has expired.
21 And as your Honor noted previously, we think that that
22 entitles us to a special role as class counsel that we have
23 been chosen by the class members to be their attorney.
24        There are various cases that discuss the
25 attorney-client privilege, but some of them, for example,

116

1 the Impervious Pain Case, which is cited in the papers,
2 talks about that during the notice and prior to the close of
3 opt-out, the status is sort of uncertain about the
4 relationship between the attorney and the class members
5 because the notice goes out to the class members and tells
6 them they have the right to exclude themselves from the
7 class, and in those cases where the Court says, well, you
8 can't improperly influence those people about whether they
9 will stay in the class or not, and there are a lot of court
10 orders on that issue about proper communications.
11        But once the opt-out period expires, according to
12 all of the cases, that relationship is cemented, and class
13 counsel is deemed to represent the absent class members.
14        We searched high and low to try to find a case that
15 dealt with exactly that issue, and there is not one.
16        THE COURT:  But the question is:  Does the fact
17 that the relationship had then been cemented, as you well
18 put it, does that put it in a different light with regard to
19 the issue of mass opt-outs, right?
20        MR. STRANGE:  Yes, your Honor.
21        I think it has two effects on the issues before
22 your Honor.
23        One is:  Is that something that you should have
24 been told at the time of the preliminary approval hearing
25 was held before your Honor.

117

1        THE COURT:  You mean should they have told me that
2 your opt-out period had ran?
3        MR. STRANGE:  Yes, and notice was given.
4        THE COURT:  Wasn't the more important thing for
5 them to tell me, that notice be given?
6        MR. STRANGE:  Yes, notice and opt-out.  I threw
7 opt-out in there because of the significance of it, but
8 absolutely, the notice has been given.  That is a fact I
9 think your Honor would have wanted to know, and it is --
10 that is an issue that is grappled with within the
11 Skywalker --
12        THE COURT:  I knew that your case existed, but I
13 didn't know what the status was --
14        MR. STRANGE:  I'm sorry?
15        THE COURT:  I knew your case existed.  I was
16 aware of it, and I was aware of the Ayyad case.  There are
17 other cases that are being affected by this.
18        I attempted to settle this case myself.  At one
19 time way before it went to mediation, I brought everybody
20 here, including AT&T, and I failed miserably, but I tried,
21 and I spent some time with counsel.  It wasn't to be, and we
22 moved on, so I did have some background information as to
23 what was going on with the rest of the country.  I wasn't
24 doing this in a vacuum.
25        Frankly, I don't recall if I was specifically told,

118

1  by the way, in the Smith arbitration case, you know, they
2  had gone to notice or they didn't.  I don't recall that.
3       MR. STRANGE:  Well, the significance I think, your
4  Honor, is that when class counsel's relationship has been
5  cemented, the defendant shouldn't go around and try to
6  settle that case without that counsel being involved, and it
7  is the same --
8       THE COURT:  But isn't it really, I mean at the end
9  of the day, you have to agree and listen --
10      MR. STRANGE:  Well, I --
11      THE COURT:  -- I think it is a novel argument and
12  you make it well.  But at the end day, isn't the decision to
13  opt-out or not opt-out an individual decision by virtue of
14  due process?
15      MR. STRANGE:  Well, the way I would address that
16  is, yes, it is an individual decision, but there is no --
17      THE COURT:  Should that individual decision you
18  think be made by a lawyer.
19      MR. STRANGE:  I think it can be made by a lawyer.
20      THE COURT:  Without consultation with that person?
21      MR. STRANGE:  Generally that person does consult
22  with their lawyer.  That is true.
23      But I wanted to make the point that with respect to
24  notice, and there is a case called Romstadt versus Apple,
25  which is cited in our papers, and that is a case where the

119

1  court -- a District Court in Ohio had certified a case that
2  actually entered summary judgment against Apple, and Apple
3  went and tried to settle the case in the Texas State Court.
4  And that Court came to the same conclusions as the Skywalker
5  Court and said, wait a minute, you can't communicate with
6  lawyers or with clients and class counsel without violating
7  the rules of professional conduct, and why didn't you tell
8  the State Court that they were counsel?
9       One of the big problems, in addition to that, that
10  we find here, your Honor, is that our clients are members of
11  what we call the Net Payer Class, and I know your Honor
12  probably understands that from reading the papers, but those
13  are the clients that according to Sprint's numbers are the
14  ones who actually were damaged by the ETF because they
15  terminated in the late part of their contract.
16      THE COURT:  They are the late terminator class.
17      MR. STRANGE:  Sprint has made the point, and we put
18  it in our papers, that there is a conflict between those
19  people and the people that owe money.
20      And so knowing that we are class counsel, and
21  knowing that we represent these people, who they say have a
22  conflict, and knowing that notice has gone out, and the
23  opt-out period has ended, that to me is something that your
24  Honor would have wanted to know.
25      And the courts that deal with this issue, the

120

1  Skywalker case and the Romstadt case have said exactly that,
2  and that is one of the reasons --
3       THE COURT:  In the Skywalk case, they still allowed
4  the settlement to go through.  If I recall correctly, that
5  order was eventually vacated by the judge.
6       MR. STRANGE:  The reason it was vacated is
7  explained in the Amchem case.  I note in the footnote --
8       THE COURT:  Right.  The lawyers got together later
9  on and agreed it should be vacated, right?
10      MR. STRANGE:  They got a settlement.
11      THE COURT:  They got the settlement, but the facts
12  are that it was vacated, and the facts are that then they
13  let the settlement go through.
14      MR. STRANGE:  Correct.
15      But the scenario, and it is a little hard to piece
16  through, but the scenario was, there was a contempt order,
17  and the Court actually said in that order, in addition to
18  finding them in contempt, it said that I am going to hold in
19  abeyance whether I will give full faith and credit to the
20  State Court settlement.  Then after that hearing, the
21  lawyers got together and settled the case.
22      So the fact that it was vacated as part of the
23  settlement doesn't mean a whole lot.  It didn't usurp the
24  Court's ruling.  The principal is if you have class counsel,
25  particularly after notice, you don't go around and try to

121

1  settle the case without being involved.
2       The reason is pretty clear, and it's articulated in
3  Skywalker and dozens of other cases.  There is a real danger
4  to that because it allows a defendant to pick and choose
5  their counsel, and that is not right, and it evades the
6  Court's supervisory powers as being a fiduciary to the class
7  after certification.
8       In all due respect, with all of the lawyers here
9  who are fine lawyers, that is what happened to Judge
10  Haberfield and what's happened to us, which is after notice,
11  after our case goes out with a different definition and a
12  potential conflict between other class members, we are
13  intentionally excluded from settlement negotiations.
14      THE COURT:  Okay.  They are excluded, but in the
15  arbitration process, it was recognized, as was pointed out
16  by counsel, by both the JAMS rules and by virtue of the
17  motion practice that took place before the arbitrator that
18  they could go ahead and settle the case elsewhere, right?
19  That is recognized.
20      MR. STRANGE:  I don't think so, your Honor.
21      The citation that is in the reply brief is to the
22  JAMS rules regarding the fact that you could opt-out of the
23  settlement.
24      THE COURT:  But didn't you also make a motion
25  before the arbitrator to enjoin your own clients from

122

1  settling it anywhere else?
2       MR. STRANGE:  Enjoin Sprint's counsel, yes, and the
3  Court denied that.
4       THE COURT:  And they denied it?
5       MR. STRANGE:  Yes.
6       When he denied it, he expressly said that he was
7  going to retain jurisdiction over the parties regarding the
8  events here, but that was part of the certification in
9  opt-out.  That was prior to the opt-out period expiring.
10      THE COURT:  In your class only one guy opted out,
11  right, Mr. Yanocopolis?
12      MR. STRANGE:  Yes, your Honor.
13      So none of the cases regarding -- I guess I have
14  two points with respect to the fact that we have a certified
15  class with notice in the opt-out.
16      First is with respect to the All Writs Act,
17  I read those cases, and I've come to the conclusion, and it
18  is cited in the Diet cases, that what the courts have done
19  is analogized those cases to in rem jurisdiction.
20      THE COURT:  Some courts have done it.  The Third
21  Circuit really didn't do that.  What they did is just say,
22  look, the more simpler way to look at it is in aid of
23  jurisdiction --
24      MR. STRANGE:  Right.
25      THE COURT:  -- and that encompasses other things

123

1  than in rem.
2       MR. STRANGE:  Right.
3       THE COURT:  I mean, they acknowledge it, and they
4  give it some language and say we acknowledge some courts do
5  it that way and take issue with that, but the more simple
6  way to look at it, which is just to look at it in the aid of
7  jurisdiction of this type of complex, national type of class
8  action litigation --
9       MR. STRANGE:  Right.
10      At some point there has to be a limit on it.  At
11  some point the Court has got to say, is this fair the way
12  this settlement is going on, and am I going to exercise my
13  jurisdiction --
14      THE COURT:  Is it fair to whom?
15      MR. STRANGE:  The class.
16      THE COURT:  The class, or is it fair to you?
17      MR. STRANGE:  The class.
18      THE COURT:  Isn't that what the fairness hearing is
19  about?
20      MR. STRANGE:  No, your Honor.  Because as pointed
21  out by various cases is that, first of all, those are issues
22  that the Court should know on preliminary approval because
23  it could change notice.
24      For example, the notice in this case that was
25  published didn't say anything about the Smith arbitration.

124

1       So if you are a class member, and you receive
2  notice that you are a member of the Smith class, and then
3  you get some notice about the settlement, you are going to
4  be confused.  That is something that was taken care of in
5  the Verizon notice by the way.  There was mention of the
6  Verizon arbitration, but there is no mention in our case.
7       Now, the defendants may say, well, it is mentioned
8  in the settlement agreement.  Somebody can see the
9  settlement agreement, but --
10      THE COURT:  Because the notice goes directly to the
11  settlement agreement --
12      MR. STRANGE:  I agree.
13      THE COURT:  -- and that in fairness to them has
14  been approved as a proper notice method in other cases.
15      MR. STRANGE:  Right.  But we are talking about lay
16  people.  We're talking about lay people that get a notice
17  and say you are a member of the Smith arbitration, if you
18  qualify under these circumstances.  And then you get a
19  notice about a settlement here, and if they take the
20  initiative to go on and look at the settlement agreement,
21  and it says that -- I mean, really what should have
22  happened, and in one of the primary basis upon which there
23  is reversals of these types of cases is notice, and --
24  and --
25      THE COURT:  Let me ask you a question.

125

1       Did you know that the Larson people were down in
2  wherever they were mediating this case?
3       Counsel, did you know that they were out -- because
4  I was under the impression that you were aware that the
5  mediation process was taking place during the summer.
6       MR. STRANGE:  Absolutely I had no idea.
7       What I thought was happening was that they were
8  trying to settle the Hall case in Illinois.
9       I had no idea that they were trying to settle this
10  case.  And, in fact, I think Sprint insisted on a protective
11  order, where Mr. Cecchi couldn't mention that to me, but I
12  had no idea that it was being mediated or settled.  I almost
13  fell off my chair when I saw it, but stranger things have
14  happened.
15      So one issue I think your Honor has to deal with is
16  if there is a certified class after notice, and an opt-out
17  period has expired, can class counsel be excluded from
18  settlement negotiations, and will your Honor stay their
19  actions when our actions were going on four years and has
20  been certified in many subsequent motions --
21      THE COURT:  Isn't that what happens in the bulk of
22  the cases, where these injunctions have been issued?
23      MR. STRANGE:  No, your Honor.
24      THE COURT:  If you take out the close-out period
25  out of that hypothetical, that the close-out period has

126

1   expired -- I mean that the opt-out period has closed, if you
2   take that one statement out of your statement that you made,
3   that is what happens in most of the cases, right?  The class
4   is certified and notice given, right --
5       MR. STRANGE:  Hum --
6       THE COURT:   -- and then the injunctions are
7   issued.
8       MR. STRANGE:  -- no, your Honor.  Every case that I
9   read that is cited in these papers, none of those cases
10  involve a certified case where notice had gone out, not one
11  of them, and in fact --
12      THE COURT:  Well, let's see.
13      Is there any case that says that the All Writs Act
14  doesn't apply to those cases?
15      MR. STRANGE:  No --
16      THE COURT:  Go ahead.
17      MR. STRANGE:  -- not that I am aware of.
18      The only case that I know of that where notice had
19  gone out in the other case was the Skywalker case, where the
20  Court held attorneys in contempt for communicating with
21  clients of the class counsel.
22      But in all of the other cases, and in fact, as your
23  Honor noted in the Hanlon case and in the Barry case and In
24  Re Anti-Trust cases, all of the courts specifically noted
25  with respect to the injunction and the mass opt-out, that

127

1   there had been no notice in the case where the counsel
2   wanted to opt them out as the class.
3       There has been a number of cases where the Court
4   says you can't do a mass opt-out.  But in all of those
5   cases -- not all, but in the three major cases, the ones I
6   listed, the Court specifically noted that notice had not
7   gone out in those cases, and those people did not have the
8   opportunity to choose their lawyer.
9       So I thought it was interesting that in the
10  Romstadt case, where the Court was faced with a situation
11  where somebody tried to settle around the Federal Court, the
12  Court said Apple contends that no Federal Court has ever
13  done what I am doing.  It appears to be correct.  Plaintiff
14  has not cited, and I have not found an exact precedent for
15  my action.  On the other hand, I have found no case that
16  stands for the proposition I cannot do what I am doing.
17      So what we are grappling here with is a unique
18  situation, and -- but it is grounded on the fundamental
19  principles of class action law.
20      If you got a notice in a case, and it goes out to
21  the class members, and they choose to remain in the case,
22  can the defendant go to another jurisdiction and settle that
23  case out from under the class counsel?
24      THE COURT:  Let me ask you a question.  Let's have
25  a lawyer out in anywhere, Pennsylvania, all right, John

128

1   Smith.
2       John Smith represents Mary Jones on her ETF single
3   case in a small claims court or wherever it is.  Do we have
4   an attorney-client relationship there?
5       MR. STRANGE:  Yes.
6       THE COURT:  Okay.
7       And notice goes out.  She will get that notice,
8   right?
9       MR. STRANGE:  Yes.
10      THE COURT:  They don't have to contact that lawyer,
11  do they?
12      MR. STRANGE:  No, but there's a big difference.
13      THE COURT:  What makes you any different?
14      MR. STRANGE:  Because Sprint knows that my clients
15  are represented by counsel.
16      THE COURT:  But you don't know who your clients
17  are.
18      MR. STRANGE:  I don't have their names and
19  addresses.
20      THE COURT:  And isn't the other relationship in my
21  hypothetical a stronger relationship?  It's a one-on-one
22  contractual relationship, and they can still notice and
23  settle that case right under that solo practitioner's feet,
24  right?
25      MR. STRANGE:  Yes, but no.  Well, the difference is

129

1   this, your Honor:
2       If a lawyer knows that a client is represented by
3   the lawyer, they can't go directly to the client and try to
4   settle the case.  They have to go through their lawyer.
5       So in your Honor's example, when the notice went
6   out, if Sprint knew that that person was represented by
7   counsel, I think they should go to the lawyer and not the
8   client.
9       THE COURT:  Okay.  Maybe you are right.
10      Then you say the penalty of that should be that I
11  don't interfere with your case then?
12      MR. STRANGE:  I think your Honor has a number of
13  different remedies.  One remedy is not to sale -- stay our
14  case, because we represent those people, and we should go
15  forward with our Net Payer action.
16      Another would be to say that you are going to allow
17  us to opt-out on behalf of our clients in light of the fact
18  that we represent this class and certified with notice, and
19  nobody ever told you that when you approved the settlement.
20      Then the third option is that, as your Honor is
21  aware, Judge Haberfield has ordered Sprint to give us the
22  names and add addresses of the class members.  Now --
23      (Cell phone rings)
24      THE COURT:  Counsel, you know better than that.
25      MR. SUPRENANT:  I'm sorry.  I do, and I thought it

130

1   was off.
2        MR. STRANGE:  -- we cited the cases in our -- I
3   think in our December 23rd letter, but the cases are pretty
4   clear, and I don't think I would get anybody to dispute
5   this, which is when you are certified class counsel, after
6   there has been a certification, you are entitled to the
7   names and addresses of your clients to contact you, and that
8   is why Judge Haberfield --
9        THE COURT:  Say that again.
10       MR. STRANGE:  When a case is certified --
11       THE COURT:  Right.
12       Could you cite me a case for that?
13       MR. STRANGE:  They are in my papers, which I
14  believe is my December 23rd letter to your Honor, but they
15  were cited in the authorities on which Judge Haberfield
16  ordered Sprint to produce the names and addresses.
17       THE COURT:  Those cases hold what?
18       MR. STRANGE:  That once certified, class counsel
19  has the right for the names and addresses of its clients.
20       So that is the basis on which Judge Haberfield
21  ordered it, so the third remedy your Honor could take would
22  be to not enjoin that portion of the case by Judge
23  Haberfield, where he ordered Sprint to produce the names and
24  addresses with respect to our clients.
25       So this is a little bit of a unique situation, but

131

1   I think it is a very, very important situation, and it is
2   not covered in any of the cases done by any counsel here on
3   class actions.
4        I have been litigating class actions for longer
5   than I want to remember, for some 20 plus years.  I've never
6   had a situation, where there is a certified class and
7   notice, where somebody tries to settle out without class
8   counsel.
9        I don't fault anybody here.  Everybody is trying to
10  do the best they can, but as the Courts have noted, it is a
11  very dangerous precedent, because it would allow Sprint to
12  put counsel, who doesn't have nearly the amount of time
13  invested, to do a settlement.
14       It is particularly egregious here when we represent
15  a sub class of the settlement class, and Sprint has been
16  very adamant as a conflict between our clients, and if we
17  would have been involved in the settlement, it would have
18  looked different, because we would have insisted on more of
19  the settlement pot for our clients.
20       So I believe, your Honor, that your Honor also has
21  another solution, which is to tentatively indicate your
22  concern with what happened here and tell Sprint to go back
23  to the drawing board and try to come up with something that
24  we can all live with, and that is really what should happen
25  in these cases because it is not fair to the lawyers, the

132

1   ones that worked for four years or negotiated for somebody
2   that hasn't worked as hard, and it's not fair to the class,
3   particularly my class, who are more damaged than other
4   members of the settlement class, so I think the solution is
5   to tentatively deny the injunction and tell Sprint to go
6   back to the drawing board.
7        THE COURT:  Thank you.
8        MR. SUPRENANT:  Your Honor, Mr. Boyle did most of
9   the argument, and I have three brief points I would like to
10  make.
11       One:  I think it is utterly unpersuasive without
12  any case law support to say we should rewind the settlement
13  procedure based on not doing something that no Court has
14  ever held we had to do, number one.
15       THE COURT:  By that you mean contact counsel?
16       MR. SUPRENANT:  By that I mean, that we have to
17  somehow include them in the settlement discussion because --
18       THE COURT:  Notice had gone out.
19       MR. SUPRENANT:  -- because they had -- Judge
20  Haberfield and the arbitrator had certified the class and
21  the opt-out period.
22       THE COURT:  Had there ever been a case, though?  He
23  said there was no case, where this All Writs Act power was
24  invoked after notice had been sent --  ,
25       MR. SUPRENANT:  Your Honor --

133

1        THE COURT:  -- do you agree with that or disagree?
2        MR. SUPRENANT:  -- well, there is certainly cases,
3   including Diet Drugs, where the class had been certified, so
4   the question is, and I would --
5        THE COURT:  But he is saying since the
6   attorney-client relationship is formed upon notice going
7   out, once that happened, and you were aware of it, you knew
8   that particular class of settling people, right, that those
9   people that were within your settlement were being
10  represented by counsel, and therefore, based on the
11  attorney-client relationship - he said "privilege," but I
12  think he meant relationship - you had a duty to talk to him
13  and let him know that you were trying to settle his clients'
14  cases.
15       MR. SUPRENANT:  Yes, and I will get to my
16  communications and what Mr. Strange knew and didn't know.
17       But we cited in the reply at page five or six a
18  case that says, look, the attorney-client relationship
19  between class counsel and absent class members is a court
20  created relationship.  The courts have created that
21  relationship.
22       THE COURT:  Right.
23       MR. SUPRENANT:  I think the point is this is not a
24  client relationship between Mr. Strange and Mr. John P.
25  Smith, where there is a real relationship there.  I think

134

1  obviously if this was in a non class situation, I think the
2  argument would have considerably greater strength, so I
3  think there is no --
4      THE COURT:  But you knew who was counsel.  You knew
   who Mr. Strange was, and you knew the class of people that
6  he represented --
7      MR. SUPRENANT:  Yes.
8      THE COURT:  -- and you knew that that class of
9  people was going to be encompassed within your settlement --
10     MR. SUPRENANT:  Yes.
11     THE COURT:  -- and you chose not to let him know.
12     MR. SUPRENANT:  Well, I will take issue with that
13 in a moment, your Honor.
14     THE COURT:  Why don't you take issue with it right
15 now?
16     Tell me, did you let him know or not?
17     You are dancing around the elephant.  I want to
18 know.  I asked him point blank.  He said no --
19     MR. SUPRENANT:  Mr. Strange is correct that he
20 broached the idea of settling all of the various litigations
21 in New Jersey.
22     I knew that Mr. Strange had a previous professional
23 relationship with Mr. Cecchi.  Mr. Strange knew we were
24 seeking to settle the case.  That is why he brought the
25 motion, the motion that the Court --

135

1      THE COURT:  No.  He said he thought you were trying
2  to settle the case, the whole case.
3      MR. SUPRENANT:  Well, that is not what his motion
4  said.  The motion didn't say --
5      THE COURT:  Did you tell him you were trying to
6  settle the whole case?
7      What made him think that?
8      MR. SUPRENANT:  Hum?
9      THE COURT:  Did you lead him to believe that you
10 were settling another case, a different case?
11     MR. SUPRENANT:  I let him know that we were trying
12 to settle the case.  We did have settlement discussions,
13 your Honor, with counsel in Hall.
14     But, in addition, your Honor, late in - well, at
15 the time he brought that motion up to the present, I have
16 never indicated to him in any fashion that we are only
17 seeking to settle in one forum.  He knew Mr. Cecchi, and he
18 knew we were seeking to settle the case here.
19     Your Honor, I don't want to speculate what Mr.
20 Strange suspected or knew, but he was on notice here, we are
21 attempting to seek it.  We told the Court.  We told the
   arbitrator, we think a global resolution of these cases
23 makes sense, and we ought to be free to do it how and when
24 we choose.
25     It is very surprising to me, your Honor, that given

136

1  Mr. Strange's own appreciation of the fact that the best
2  place to settle multiple litigations is in Federal Court
3  because the very reason we are here to today is the prior
4  relationship with Mr. Cecchi, that he never saw to make a
5  very simple phone call.  And later after these events, but
6  before we had a deal, I let Mr. Strange know again.  I let
7  him know again.  Brian, we are real close.  You probably
8  want to get involved.
9      And his partner, Mr. Kramer, who is not here today,
10 then took it upon himself to call Illinois counsel and say
11 what is this?  I hear you're about ready to settle, and they
12 said, we don't know what you're talking about.
13     Now, at that point I think there is only one
14 conclusion, so I think, your Honor -- one other point I want
15 to make, but with respect to this point, there is no case.
16     There is an avalanche of cases saying you cannot
17 mass opt-out.  We were under no obligation under the
18 existing case law, as we understood it, to do more than we
19 did, although I think we gave pretty clear signals what we
20 were doing, and that is how I would address your Honor's
21 concern.
22     One last point I wanted to make.  Mr. Strange said
23 that we worked so hard for four years.
24     As your Honor's replication of the facts indicated,
25 the vast bulk of that work went right down the drain because

137

1  that class was not certified.  The so-called bad service or,
2  you know, poor service thing, that is what the case was we
3  brought, and that is the arbitration.  We do not believe the
4  arbitrator had the authority or the jurisdiction to let this
5  completely second class come ahead when it was clear, first,
6  it was clear in light of a certi -- a denial on the
7  certification on the servi quality class in California.
8      I mean, I indicated to Mr. Strange after that class
9  certification was denied, saying there is no way that
10 service quality class could be granted because of individual
11 issues of what the service quality is will overwhelm -- will
12 overwhelm the common issues.
13     I called Mr. Strange, and I said, Brian, your case
14 is going nowhere, and let's try to resolve it.
15     Four days later he asked the arbitrator to tack on
16 his second arbitration, which had nothing to do with the
17 first one.  So all of that hard work he described for four
18 years, the vast bulk of it has to do with a class that was
19 not certified and was voluntarily dismissed.
20     I will now turn it over to Mr. Boyle unless your
21 Honor has questions.
22     THE COURT:  Thank you.
23     MR. BOYLE:  Your Honor, I want to make a couple of
24 points because I think what is being lost here with all of
25 the trees here is the forest.

138

1      I mean you have preliminary approval, and then you
2  have notice to the world, and you have a fairness hearing,
3  and there is no case law, and this still wouldn't work if
4  you had to find every putative or certified class plaintiff
5  lawyer, and say, hey, we are about to settle, do you want to
6  chime in?
7      You would never get a settlement, and you can see
8  it here. Everybody is down here to fight about the
9  settlement. That is fine, because that is the process we
10 have.
11     We entered a preliminary approval order. Your
12 Honor conditionally certified the class, their clients,
13 okay?
14     Some of those clients may share an attorney-client
15 relationship with other class counsel, but they are their
16 clients, and they are entitled to say this is the best deal
17 for my client, and I need a vehicle that works procedurally
18 to make it happen. I need a willing participant on the
19 other side, who won't be mired down the morass or fighting
20 over what got said to whom, when and where, and let's put it
21 all before one Court, have the objections done, and hear it
22 out, and let the Judge make the decision.
23     I go back to my analogy to a bankruptcy stay. If
24 you don't have an automatic stay in the bankruptcy case, the
25 state gets packed to death by ducks. That's the way it

139

1  goes, one after another, after another. The first person
2  that gets there gets the lion's share.
3      What we need and what the law provides for is that
4  there is a level playing field, and there is an opportunity
5  to make the arguments that are being made, but not in the
6  context of you should throw the preliminarily approved
7  settlement out, because I have an attorney-client
8  relationship with my certified class, and they didn't tell
9  me about it before they entered into it.
10     Interestingly, if we had gone to Mr. Strange and
11 talked to him about it, cut a deal with them or whatever or
12 gone to somebody else, they would have said we were in a
13 reverse auction, and that we were trying to drive the
14 settlement price down.
15     It is not the way it is done. You reach an
16 agreement. You have a fiduciary duty. You have counsel
17 with a fiduciary duty to the class. They say this is a good
18 deal, and we are willing to go forward in court and make it
19 happen.
20     We have objectors. They come to you, and they
21 raise a panoply of objections, and you sort it out. But
22 what you don't want to happen is have that be sorted out in
23 every other jurisdiction in a manner that blows up the
24 settlement and makes this whole process unworkable.
25     I would note that the Third Circuit said, and this

140

1  was in Diet Drugs: In the nature of complex litigation --
2  I'm sorry -- It is in the nature of complex litigation that
3  parties often seek complicated comprehensive settlements to
4  resolve as many claims as possible in one proceeding. These
5  cases are especially vulnerable to parallel state actions
6  that may frustrate the District Court's effort to craft a
7  settlement in the multi-district litigation before it.
8      Your Honor, this is the evidence of the frustration
9  that would be wrought if these things can go forward.
10     And by the way, the Anti-Injunction Act doesn't
11 apply to Mr. Strange's arbitration. It talks about
12 enjoining state claims. He's in arbitration. The All Writs
13 Act is clearly wrote there.
14     In any event, your Honor, I don't think that Mr.
15 Strange has come forward and given you a case that would
16 allow you to feel comfortable that upsetting the apple cart
17 here and providing for a precedent, that would cause similar
18 upsetting of apple carts in other settlements down the road
19 is a worthwhile thing to do.
20     On the other hand, we are here trying to do what is
21 always encouraged, resolution and settlement. That is what
22 we are after, and that is what we ask the Court to allow to
23 happen in an orderly fashion, and have the hearing before
24 your Honor in a fair, competent manner on March 4th.
25     THE COURT: Thank you.

141

1      MR. CECCHI: May I respond briefly, Judge?
2      I agree wholeheartedly with Mr. Boyle's comments.
3      I just wanted to note briefly that the origin of my
4  relationship with Mr. Strange is that I was on the same side
5  of a case where another lawyer who didn't have the claims
6  that I was prosecuting, and I had been appointed by a
7  Federal Court as interim class counsel settled those claims
8  out from under us, although his case didn't have the claims
9  in them, and that other lawyer who settled those cases,
10 quote, out from Mr. Strange, your Honor, over the summer
11 with Mr. Bursor in a Verizon case. I had a case in New
12 Jersey, and he settled a California State Court that
13 subsumed he turned into a national settlement, and we got
14 settled out.
15     Mr. Strange and I were on the same side, so our
16 relationship goes back to the summer when we were talking
17 about the Verizon case, where I was class counsel, and Scott
18 Bursor settled my case out from under me.
19     But in terms of the timing, because we talked about
20 it a little bit, it is relevant to note that the
21 negotiations between Sprint and counsel in this case began
22 long before Mr. Strange's notice went out. I think his
23 notice went out sometime in August, August 15th --
24     MR. STRANGE: September.
25     MR. CECCHI: -- September.

142

1    So what is going on is we had engaged -- and Mr.
2  Suprenant is correct -- we had a confidentiality agreement.
3  We had engaged in settlement discussions and mediations and
4  made significant progress and had gone a long way down the
5  road towards resolving this case long before notice went
6  out, so it wasn't as if notice went out, and we all got
7  together and said, let's keep him out of the process.
8    I hear what Mr. Strange says.  The system isn't
9  perfect.  Sometimes it is not fair.
10    I felt the same way over the summer when we had
11  gone to a federal court and been appointed to the only case
12  that had national claims.  We were on the other side of it.
13  I hear that argument, but there is a process here.
14    I concur with Mr. Boyle, and the process is there
15  is going to be a fairness hearing, and ultimately it is an
16  individual right.  It is a judiciously created relationship.
17  His class members got a much more robust notice that we sent
18  out, and they can decide, and remember, his little
19  carved-out class in that arbitration gets the most relief
20  here.
21    They can decide whether they want $90 in a very
22  uncertain situation, in a very uncertain playing field, that
23  we only have to look in the eye, where they sought damages
24  in the tens of millions of dollars and end up exposing the
25  class to a claim to know that this is an uncertain

143

1  environment that we are in, but those class members should
2  make the decision.
3    While I feel -- I hear the arguments that Mr.
4  Strange makes, it is the class members' rights that are at
5  issue here.  They got notice from your Honor from this case,
6  They should make the decision whether that $90 that
7  certainly could not be exposed to a counter claim and claims
8  from Sprint is a good deal or not.
9    Thank you, your Honor.
10    THE COURT:  You settled the case for
11  twenty-one-five?
12    MR. BURSOR:  I think only twenty-one.
13    THE COURT:  And the application was seven point
14  something?
15    MR. BURSOR:  Correct.  And Mr. Cecchi participated
16  in that application.  And as far as I recall, he supported
17  that settlement, and that olive branch hasn't been extended
18  back this way.
19    MR. CECCHI:  That is wrong.  We went to Florida and
20  extended that olive branch.
21    MR. BOYLE:  It just got jammed in our eye.  That's
22  all.
23    MR. STRANGE:  Your Honor, just briefly.
24    First of all, there is no case that involved notice
25  and the opt-out period.  And if it was, your Honor would

144

1  have heard from the defendants.
2    THE COURT:  But in the absence of a case doesn't
3  mean that your theory is correct.
4    MR. STRANGE:  That's correct.
5    What I am here to say is that there are many cases
6  that say this, but, for instance, Newburg says that after a
7  Court has certified a class as a class action, and the time
8  for exclusions has expired, the attorney for the named
9  plaintiffs represents all class members who were otherwise
10  unrepresented by counsel, and then it says defense counsel
11  must communicate with the class through the lawyer.
12    Your honor, I wanted to address a few points
13  simply, which is in Mr. Dominic's affidavit filed in this
14  case, he attached, fortunately for me, my motion before
15  Judge Haberfield.  And in that motion, I said, when I
16  requested the injunctive relief from Judge Haberfield, I
17  said, this is particularly true because claimants believe
18  Sprint may be attempting to settle these claims in a
19  different jurisdiction, such as Hall versus Sprint or the In
20  Re telephone cases.
21    We had no idea of this settlement before your
22  Honor.  I don't think Mr. Suprenant --
23    THE COURT:  But Mr. Boyle's point is well taken,
24  though.
25    Do you think that this class action litigation

145

1  settlement would ever come to fruition if every time they
2  began to talk about settling with one group, they had to go
3  out to every putative class or every certified class or
4  every place where a class had gone out to notice and start
5  having to bring those lawyers into the fold and try to put
6  them in the settlement room?
7    Do you think cases would settle under those
8  circumstances?
9    MR. STRANGE:  No.  I don't think that the defendant
10  is required to include every putative plaintiff's lawyer.
11  I don't think defendant is even required to include every
12  case that's been certified without notice.
13    However, when there has been notice, and the class
14  members chose to remain in the case and chose class counsel
15  as a lawyer, I think that they absolutely have to, or notice
16  means nothing, and the bigger problem --
17    THE COURT:  Well, notice in that case would mean,
18  hey, you can join this class, and then they get notice of
19  the settlement, and they can join that class, or they
20  opt-out, one or both.
21    MR. STRANGE:  First of all, there is no notice here
22  that says you have a choice to remain in Smith or a choice
23  to remain in settlement, and there would have been, if we
24  would have been involved at a minimum, so that's is one
25  problem.

146

1    THE COURT: They got your notice. What that notice
2    meant was they could be in your class or they could be out
3    of your class. They had to make an individual choice at
4    that point, right?
5         MR. STRANGE: Yes.
6         THE COURT: Obviously, you couldn't make it for
7    them, right?
8         MR. STRANGE: No.
9         THE COURT: It was up to was the individual.
10        MR. STRANGE: Yes.
11        THE COURT: Now, they have another choice again,
12   right?
13        They could be in the settlement or not be in the
14   settlement. If they are not in the settlement, they remain
15   in your class, right?
16        MR. STRANGE: The problem is two-fold.
17        The first problem is that we represent those
18   people, and they chose us as their lawyers. That also
19   creates notice --
20        THE COURT: They chose you as a lawyer, or they
21   chose your action?
22        MR. STRANGE: They chose my action, but by choosing
23   my action, and not selecting their own lawyer, it says you
24   will be represented by class counsel. Here is your lawyer.
25        It is true class action is a fiction, but at some

147

1    point in time it's got to be how does the class action
2    work --
3         THE COURT: The attorney-client relationship is of
4    a different nature in class actions, right? It is a legally
5    created relationship.
6         MR. STRANGE: Yes, your Honor.
7         But as your Honor noted in the Spinola case, which
8    I read last night, you don't have to have an express
9    contract. It could be as a result of the circumstances, and
10   the circumstances here were on pretty fundamental class
11   action principles, which is the client received the notice,
12   and they chose to remain in there, and they chose to have
13   class counsel represent them.
14        They couldn't hire their own lawyer and go to
15   arbitration. It says that right in the notice, so we have
16   to adhere to the requirements of class actions, that when a
17   class has been notified, and when the opt-out period
18   expired, they cannot go around the backs of class counsel
19   and settle the case.
20        What is going to happen is that will create havoc.
21   I am not suggesting that they -- that all of these
22   settlements that have been cited in the Hanlon case and the
23   In Re: Anti-Trust case, and in the Diet Drug case -- by the
24   way, there was no notice in that case obviously. So all of
25   those cases are fine, not affected by your Honor's ruling.

148

1    But in a situation, where you're saying it is okay
2    for a defendant to settle a case when the class counsel's
3    been informed after notice and opt-out, that is a huge
4    problem because it is going to create a scenario just like
5    in the court in Skywalker said, defendant would from this
6    day forward be free to select counsel as their choice in
7    attempting to defeat a class action. If one counsel did not
8    agree with them, they would be free to get another counsel
9    to file a class action and settle it.
10        So in a situation here, which is unique, unique in
11   my experience in being a class action lawyer, not covered in
12   any of those cases, but exactly in line with all of the
13   principles of those cases is that when there is a formatted
14   attorney/client relationship after notice and opt-out,
15   defendant has to include that. Defendant cannot go around
16   and settle without telling them -- shouldn't go to a court
17   and not tell that court there has been notice in this case.
18   And here is a particularly egregious example, which is that
19   we represent a portion of the class of Net Payers that
20   Sprint has been adamant with the conflate between my clients
21   and any members of the settlement case, yet they purposely
22   exclude the lawyers representing that part of the class.
23        So, your Honor, I think every case --
24        THE COURT: They have two lawyers.
25        MR. STRANGE: Pardon me?

149

1         THE COURT: They have two lawyers now.
2         MR. STRANGE: The class?
3         THE COURT: The class of people, right? Mr.
4    Cecchi's group represents them, too --
5         MR. STRANGE: Well --
6         THE COURT: -- the certified class and sent
7    notice --
8         MR. STRANGE: -- right, but in settlement
9    negotiations, Sprint excluded the lawyers who had been
10   appointed and have, you know, years of knowledge of that
11   issue particularly, and the settlement doesn't address that,
12   your Honor. The settlement deals with if you are in the
13   first quarter of your contract, you can get certain
14   benefits --
15        THE COURT: And then if you are in the seventh
16   month, then you get --
17        MR. STRAIGHT: Right. That doesn't address the
18   conflict. The Net Payers is a different issue, because the
19   Net Payers are, for instance, in a year contract, according
20   to Sprint's numbers, would be the last three months of a
21   year contract, so that hasn't been addressed.
22        We could have addressed it, and we should have
23   addressed it, and your Honor should tell Sprint to go
24   address it with us and come back with a settlement because
25   this is contrary to the principles of class action law.

150

1     THE COURT: Okay. All right.

2        Counsel, we have been sitting here since a little

3   bit after eleven, and it is now after three o'clock,

4   listening to oral arguments except for the 20-minute break

5   we took.

6        I understand, am I correct, that everyone would

7   rather that I rule today?

8     MR. BOYLE: Yes, your Honor.

9     MR. BURSOR: Yes, your Honor.

10     THE COURT: I want the record to reflect that

11   because my original thought was to take some time and

12   perhaps write something up that would be more thorough, that

13   I might perhaps have the time to do in order to accommodate

14   counsel. I am aware of the fact that Judge Smith has a

15   matter pending before her tomorrow.

16        Did anyone talk to Judge Smith about perhaps

17   adjoining that for a couple of days to give the Court an

18   opportunity to do something here?

19        I guess I am looking at you, Mr. Bursor.

20     MR. BURSOR: We have not, but I would be perfectly

21   willing to do that. If your Honor wants to step off the

22   bench and ask her if she could do that, I would be all for

23   that.

24        The problem I have doing it as just a lawyer, not a

25   fellow judge, is that Judge Smith's calendar is very

151

1   difficult. We are only given like one date a month to get

2   in to get heard, but if your Honor wanted to ask her --

3     THE COURT: If I ask her, I am sure she would do it

4   as a courtesy to me, but I don't know if I wanted to put her

5   on the spot.

6     MR. SUPRENANT: I just wanted to answer your

7   Honor's question.

8        We obviously oppose plaintiffs' TRO on the basis,

9   among others, we argued your Honor should stay these

10   proceedings and give Judge Linares time to --

11     THE COURT: I understand your argument.

12     MR. SUPRENANT: -- and Mr. Bursor didn't agree. He

13   fiercely disagreed.

14     MR. STRANGE: Your Honor, from my part, I would be

15   happy for your Honor to render a decision.

16     THE COURT: I understand.

17        I think the more exigent piece is in Mr. Bursor's

18   situation because he has to get back to argue the case

19   tomorrow, and so does counsel for Sprint.

20        Your situation is a little bit different. Maybe I

21   will rule on everything, but what we are going to do now is

22   adjourn for now, nobody leaves, and I want to finish the

23   dialogue that I started with you, Mr. Strange, because it

24   was truncated by virtue of my own schedule, and I wanted to

25   get going with the argument. So with everyone's permission,

152

1   I would like to see Mr. Strange and Mr. Cecchi for a minute.

2        Is there anyone who objects to that?

3     MR. BOYLE: No, your Honor.

4     THE COURT: I am trying to see if there is

5   something they could work out. Otherwise, I could make a

6   global decision here or make a partial decision, make a

7   decision on the subscriber class issue, and you know, have a

8   little more time on the other one or just decide both.

9        Just give me a minute, and I will try to figure it

10   out.

11        Mr. Cecchi, and, Mr. Strange, I will see you in a

12   minute. Let me just talk to my clerk about a couple of

13   things first.

14     MR. CECCHI: Thank you, your Honor.

15     THE COURT: Thank you.

16     (Recess taken)

17     (Discussion held off the record.)

18     (Court adjourned.)