1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
2                     Civil No. 07-5325(JLL)


3
       - - - - - - - - - - - - - - -X
4                                    :
     BARRY HALL, et al.,             :      TRANSCRIPT OF
5                                    :        PROCEEDINGS
            Plaintiffs,              :
6                                    :      June 29, 2010
            -vs-                     :
7                                    :
     AT&T MOBILITY, f/k/a,           :
8    CINGULAR WIRELESS, LLC, et al.,:
                                     :
9            Defendants.             :       Newark, New Jersey
                                     :
10     - - - - - - - - - - - - - - -X


11


12


13   B E F O R E:

14              THE HONORABLE JOSE L. LINARES,
            UNITED STATES DISTRICT COURT JUDGE
15


16


17


18
        Pursuant to Section 753 Title 28 United States Code, the
19   following transcript is certified to be an accurate record
     as taken stenographically in the above-entitled proceedings.
20
     s/Phyllis T. Lewis, CCR, CRCR
21    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                  PHYLLIS T. LEWIS, C.C.R., C.R.C.R.
22        Official Court Reporter - United States District Court
                 P.O. Box 25588, Newark, New Jersey  07101
23                       (732) 735-4522

24


25


                PHYLLIS T. LEWIS, CSR, CRR, OFFICIAL COURT REPORTER

```
 1      A P P E A R A N C E S :

 2              CARELLA, BYRNE, CECCHI,
                OLSTEIN, BRODY & AGNELLO, P.C.
 3              5 Becker Farm Road
                Roseland, New Jersey 07068
 4              973-994-1744
                BY:  JAMES E. CECCHI, ESQ.
 5                -and-
                STRANGE & CARPENTER, ESQS.
 6              12100 Wilshire Boulevard (Suite 1900)
                Los Angeles, California 90025
 7              310-207-4044
                BY:  BRIAN RUSSELL STRANGE, ESQ.
 8              Attorneys for Plaintiffs.

 9
                DRINKER, BIDDLE & REATH, LLP
10              One Logan Square
                18th and Cherry Streets
11              Philadelphia, Pa. 19103
                215-988-2753
12              BY:  WILLIAM M. CONNOLLY, ESQ.
                     JENNIFER K. GREEN, ESQ.
13              Attorneys for Defendant,
                AT&T Mobility.
14

15              JOSEPH ANTONELLI, ESQ.
                100 Lakes Drive (Suite 450)
16              West Covina, California 91790
                626-917-6228
17              Attorney for Dias.

18
                MARK LAVERY, ESQ.
19              733 Lee (Suite 150)
                Des Plaines, Illinois 60016
20              847-813-7771
                Attorney for Objector,
21              Christopher V. Langone.

22
                HAROLD PETER SCHROER, PRO SE
23

24

25
```

```
1                    THE CLERK:  All rise.

2                    THE COURT:  Good afternoon.

3                    Please be seated.

4                    All right.  This is in the matter of Barry Hall, et

5          al. Versus AT&T Mobility, also known as Cingular Wireless,

6          LLC, et al.

7                    Counsel, your appearances for the record, please.

8                    MR. CECCHI:  Good afternoon, your Honor.

9                    James Cecchi on behalf of the plaintiffs in the

10         class.

11                   With me today is my co-counsel in this matter,

12         Brian Strange, from Strange & Carpenter.

13                   MR. STRANGE:  Good afternoon, your Honor.

14                   THE COURT:  Good afternoon.

15                   Yes?

16                   MR. CONNOLLY:  Good morning, your Honor.

17                   William Connolly from Drinker, Biddle & Reath for

18         defendant, AT&T Mobility.

19                   With me today is my colleague, Jennifer Green.

20                   THE COURT:  Good afternoon.

21                   MR. LAVERY:  Your Honor, Mark Lavery appearing for

22         objector, Christopher V. Langone.

23                   I have filed a motion for admission pro hac vice

24         and tendered a copy to your clerk.

25                   MR. ANTONELLI:  Good afternoon, your Honor.
```

1              Joseph Antonelli.  I am appearing on behalf of the

2       Dias plaintiffs in a Los Angeles Superior Court action as

3       ETF counsel.

4              I also submitted a pro hac vice application as

5       well.

6              THE COURT:  I will deal with that momentarily.

7              MR. SCHROER:  H.P. Schroer --

8              THE COURT:  Wait one second, please.

9              You may be seated, Counsel, please.

10             Yes, sir?

11             MR. SCHROER:   -- H.P. Schroer.  I am here on

12      behalf of myself and to the objection.

13             THE COURT:  Thank you very much, sir.

14             Anybody else?

15             No.

16             All right.  Let me go through some preliminaries

17      for the record.

18             This is a class action matter.  It involves a claim

19      by the plaintiffs that the early termination fees, which I

20      am sure will be called "ETFs" during the course of this

21      hearing charged by AT&T Mobility or "ATTM" violate, among

22      other things, the Federal Communications Act and State

23      Consumer Protection laws.

24             ETFs constitute a fee that is charged to customers

25      of the mobile phone company for cancellation of their

1     wireless service at any time after a trial period, but

2     before the end of the service plan term regardless of the

3     reason for the cancellation.

4           The plaintiff in this case, Mr. Barry Hall, is a

5     citizen of California.  He had a subscriber agreement with

6     AT&T, which contained an ETF provision, and he was, as I

7     understand it, also ultimately charged an ETF.

8           This matter began back in November of 2007 when a

9     lawsuit was filed in this court.

10          Subsequent to that, there was some discovery and

11    motion practice, including a motion by the defendant here,

12    to compel arbitration, which I denied back in March of 2009.

13         Thereafter, the parties entered into settlement

14    negotiations through mediation, et cetera, which culminated

15    in the parties making an application for a preliminary

16    approval of the settlement, which I granted back in November

17    of 2009.  At that time I granted preliminary approval for

18    the settlement, as well as the formal notice to this class.

19         Subsequent to that, on April 2nd, 2010, I amended

20    the order to reschedule the date of the final approval

21    hearing and other related dates, and eventually this matter

22    was scheduled for today for the final approval hearing.

23         I have received and reviewed briefs from both

24    sides, from both the class action attorneys and as class

25    action counsel, as well as the defense attorneys in this

1    case.

2          I have also received opposition to the settlement

3    from a number of individual objectors that are not

4    represented by counsel, as well as objectors that are in

5    fact represented by counsel.

6          Mr. Schroer, who is here in court today, had

7    contacted my law clerk and indicated a desire to be heard.

8    I told him that he would be, and we will hear from him today

9    at sometime during the hearing.

10         In addition to that, we do have two applications

11   for two attorneys to be admitted pro hac vice in this

12   matter.  One is that of Mr. Joseph Giuseppi, Joseph

13   Antonelli, and I had received that, and I am inclined to

14   grant that for the purposes of this hearing.

15         Mr. Cecchi do you have any objection to that?

16         MR. CECCHI:  I do not, Judge.  I reviewed Mr.

17   Antonelli's application.  I note him to be a lawyer in good

18   standing, and we have no objection.

19         THE COURT:  Mr. Connolly, the same question.

20         MR. CONNOLLY:  No objection, your Honor.

21         THE COURT:  All right.  I will grant Mr.

22   Antonelli's application to be admitted pro hac vice for the

23   purposes of this hearing.

24         In addition to that, I received a notice of motion

25   for a pro hac vice admission filed today.  I am not crazy

1    about that, but in any event, it is by attorney Mark Lavery

2    of the Lavery Law Firm from the State of Illinois, who

3    represents previously a pro se objector, Christopher

4    Langone.

5         Any objections to Mr. Lavery being admitted pro hac

6    vice for the purposes of this hearing?

7         MR. CECCHI:  Judge, we received, Mr. Strange and I,

8    the pro hac vice admission about ten minutes ago in the

9    attorney conference room.

10        I reviewed it.  Based upon the assertions that are

11   contained in there, we would have no objection to Mr. Lavery

12   making a presentation to the Court today.  However, I will

13   reserve my rights because I am not familiar with him, and we

14   just did get this application.

15        THE COURT:  Mr. Connolly?

16        MR. CONNOLLY:  No objection, your Honor.

17        THE COURT:  Mr. Lavery --

18        MR. LAVERY:  Yes, your Honor.

19        THE COURT:  -- Mr. Lavery, why the late

20   application?

21        MR. LAVERY:  Your Honor, I tried to coordinate with

22   your office to get an ECF password.  I am an ECF filer in

23   the Northern District of Illinois, and I learned the

24   procedures here are different, and therefore, I would have

25   to paper file.

1              We had sent a notice of intent to appear last week,

2       but obviously logistically it was easiest for me to

3       physically file the motion today upon being here rather than

4       travel to New Jersey last week.

5              THE COURT:  The problem with that is that normally

6       when I receive applications pro hac vice like yours, we do

7       some preliminary things to determine whether or not to admit

8       you, like we did with the other attorney, one of which is,

9       of course, to insure that you are a member in good standing

10      of the bar of the State of Illinois and that your client has

11      standing in this case.

12             Now, he was already an objector here, so I am not

13      going to take issue with it, and I want to be nice to the

14      State of Illinois as well.  So to the extent that you have

15      represented to the Court that you are a member in good

16      standing and that you in fact have no problems, which would

17      prevent your admission pro hac vice in this court, based on

18      that representation, I will allow it.

19             MR. LAVERY:  Thank you very much, your Honor.

20             I am here with Mr. Langone in court.  He is here as

21      well.

22             THE COURT:  All right.

23             So I will sign both of those now, so they can get

24      filed.  Today is the 29th.

25             THE CLERK:  Yes.

```
 1                THE COURT:  Mr. Antonelli, did you submit a
 2      proposed form of order?
 3                MR. ANTONELLI:  Yes, I did, your Honor.  I do have
 4      a copy with me.
 5                THE COURT:  Could you hand it up to my law clerk
 6      because I don't see it in the file.
 7                Mike, get me a copy, please.
 8                (Document handed to the Court)
 9                All right.  Now, that that is out of the way, we
10      can continue with this matter.
11                The Court has jurisdiction in this matter pursuant
12      to 28 United States Code Section 1332(d) inasmuch as it is a
13      class action involving more than a hundred members, at least
14      one of the class members resides in a state different than
15      the defendant, and the aggregate amount of controversy
16      exceeds $5 million as a basis for jurisdiction.
17                The Court has received a number of objections in
18      this matter, in fact, 22 of them.  Some of those objectors
19      are represented by counsel, and some are proceeding pro se.
20                There is only one pro se objector here today, and
21      he will be given an opportunity to be heard today.  The
22      other ones have submitted letters in this matter, which the
23      Court will consider, notwithstanding the fact that they are
24      not here.
25                We also have objectors that are represented by
```

1   counsel.  Those objectors have originally been put into

2   three categories.  We have the Harter objectors represented

3   by Vincent Verdiramo.  Is Mr. Verdiramo in court?

4             He is not.

5             Has anybody heard from him?

6             MR. CECCHI:  We have not, your Honor.

7             THE COURT:  All right.

8             He has submitted papers in connection with this

9   matter, all of which I have read.  I would have given him an

10  opportunity to be heard, should he have appeared here today,

11  but he is not here.  He represents what I call the Harter

12  objectors, which are composed of Joni Harter, David Mehaffie

13  and Clark Brown.

14            There are also the Turner objectors, which are

15  represented by Jeff Weinstein.

16            Is he here, Mr. Weinstein?

17            MR. CECCHI:  Mr. Weinstein is not here, your Honor.

18            THE COURT:  Do you know if he is coming?

19            MR. CECCHI:  We have not had any communications

20  from Mr. Weinstein.

21            THE COURT:  All right.  He represents Sallie Turner

22  and Carla Walsh.

23            I also have the Olson objectors represented by

24  Vincent Verdiramo as well.

25            Is that right, Mike, he represents two groups of

1    objectors?

2            All right.

3            The Olson objectors are composed of Carl Olson and

4    Hugh Ramsey.

5            Now, of course, we have the other two objectors

6    that will be represented by counsel here today.

7            The procedure that I would like to follow is as

8    follows:  I am going to have class counsel first and then

9    defense counsel set forth their application on the record

10   and the reasons why you believe the settlement should

11   receive final approval.

12           Thereafter, without the necessity of addressing the

13   objectors at this point, thereafter I will hear from the

14   objectors.  First, the objectors represented by counsel that

15   are here, and then I will hear from Mr. Schroer, and then

16   anybody else that shows up while the hearing is still going

17   on.  Then I will give an opportunity to both class counsel

18   and the defense to address the objections.  The Court will

19   then in all likelihood reserve decision to deal with this.

20           I will hear arguments on the adequacy of the

21   settlement and the reasonability of the settlement, but I am

22   not going to hear argument on attorneys' fees today.  I have

23   received enough documentation for me to deal with that on

24   the papers.  I mean, you can mention it obviously as part of

25   the approval, but I don't need to hear oral argument on

1       that.  I will have to do my analysis of that including the

2       lodestar and everything else.

3               Is there a problem with that, Mr. Cecchi?

4               MR. CECCHI:  No, there isn't, your Honor.

5               THE COURT:  Any problem with that, Mr. Connolly?

6               MR. CONNOLLY:  No, your Honor.

7               I would just like to state for the record with

8       respect to counsel who are not here today, counsel for the

9       Harter objectors had represented in a filing, docket entry

10      531, that he would not be coming today.

11              THE COURT:  But even though they said that, I

12      wanted the record to be clear that if they had come, I would

13      have given them an opportunity, but I have received

14      information from them anyway that they may not be coming, so

15      that is the way I would like to proceed.

16              Mr. Cecchi, we will hear from you first on the

17      reasonableness of the settlement, and why it meets the Girsh

18      factors, and then I will hear from the defense and go from

19      there.

20              MR. CECCHI:  Thank you, your Honor.

21              With the Court's permission, I would just briefly

22      make an introductory remark about this particular AT&T case.

23      All of these ETF cases are similar, but there are

24      distinguishing factors I think which make our efforts, Mr.

25      Strange's and mine and Bill's somewhat unique in this case,

1       in that as in the other cases, T-Mobile and Sprint, there

2       were ETF cases pending around the country in various stages,

3       in various places, various stages of success, where many of

4       the lawyers who we had previously attempted to bring into

5       our class counsel umbrella decided to go a different route.

6              In this case what is unique is you got the vast

7       majority of all of the lawyers, who were prosecuting cases

8       against AT&T Mobility on the theory that these have as a

9       liquidated damage provision and are supporting the

10      settlement and are supporting the fee application, and those

11      include -- all of the lawyers included advanced the cell

12      phone termination cases in Alamada County, Mr. Bursor, Mr.

13      Plutzik and Ms. Mottek.  They all joined us in their

14      assessment and our assessment that this is an outstanding

15      deal with AT&T, and that this settlement respectfully should

16      enjoy final approval from your Honor, as should the fee

17      application, so I did want to put that on the record first.

18             It has taken some time and effort to do that, but

19      they are all behind the settlement, so hopefully that will

20      make this process somewhat more expedited than we had in the

21      past.

22             In terms of the overall fairness of the settlement,

23      your Honor is very well aware of the precedents that support

24      the fairness of this settlement.  I would ask with the

25      Court's permission, Mr. Strange would like to address your

1    Honor as to why under Girsh this particular settlement

2    should enjoy final approval as well.

3              THE COURT:  All right, Mr. Strange.

4              MR. STRANGE:  Thank you, your Honor.

5              This settlement concludes many years of litigation

6    against the defendant AT&T Cingular regarding the use of

7    ETFs and telephone service contracts.

8              The proposed resolution involves not only the Hall

9    case before your Honor, but the Waldmann versus Cingular

10   case and the Sasik versus AT&T case, which is currently

11   pending in consolidated cases before Chief Judge Collins in

12   the Central District of California.

13             It also includes resolving the in re telephone

14   cases before Judge Sabraw in Alemada County and the Kinkel

15   versus Cingular case in Illinois, all of which have

16   significant histories of litigation.

17             With respect to the Waldmann case, your Honor, it

18   was first filed over six years ago --

19             THE COURT:  Where was Waldmann filed?

20             MR. STRANGE:  It was initially filed in the Florida

21   State Court in May of 2004.  There were two separate removal

22   proceedings to the Federal Court.  It ultimately was

23   removed.  During the pendency of those removal proceedings,

24   there were various hearings in State Court, various

25   discovery disputes that happened.  There was depositions of

1          the representative plaintiffs in Kentucky and Los Angeles.

2                    Ultimately, it was transferred to the Central

3     District of California after it was removed from Florida and

4     consolidated with the Sasik case in Los Angeles.

5                    Initially, a primary jurisdiction stay was granted

6     in that court by Judge Collins.  It was ultimately lifted at

7     our request.  There was a substantial preemption motion,

8     which was denied without prejudice, and then Judge Collins

9     did something, which has not happened in any of these cases,

10    to my knowledge, in which she allowed expedited discovery on

11    the policy and procedures of AT&T to determine whether as a

12    factual matter, there should be a preemption ruling in that

13    case.

14               So during the expedited discovery process, over a

15    million pages of documents were produced to us by AT&T, all

16    of which we reviewed.

17               We then took two major depositions of officials of

18    AT&T regarding their policy and procedures on ETFs.

19               We then had what was in effect a summary judgment

20    type of hearing before Judge Collins, where ultimately she

21    issued a decision denying a request that the action be

22    deemed preempted.

23               Similarly, in the Sasik case, that was filed in

24    March of 2005 in the Central District, there were two

25    separate motions to compel arbitration that were denied.

1          There was an appeal to the Ninth Circuit by AT&T,

2     which was ultimately dismissed.  And in that case we also

3     had class discovery, including the representative plaintiffs

4     being deposed.

5          In the telephone cases, they were consolidated in a

6     State Court proceeding before Judge Sabraw.  I know your

7     Honor is familiar with that, but just to summarize vis-a-vis

8     AT&T, there were years of litigation in that case including

9     class discovery, and ultimately that case against AT&T was

10    certified as a California class after a hearing.

11         There were substantial FCC proceedings in

12    Washington, which was also concluded or involved in the fee

13    application here, and with respect to the Sprinkle case --

14    the Kinkel case, excuse me, in Illinois, there were years of

15    litigation in that case, including the arbitrator denying a

16    motion to compel arbitration, the defendant bringing that

17    issue to the State Court in Illinois, appealing it to -- all

18    the way to the Supreme Court in Illinois, because there is a

19    published decision holding that the action was not

20    enforceable in the Kinkel case.

21         So after all of these years of litigation, your

22    Honor, we ultimately retained Judge Wolfson here in New

23    Jersey and had two full days of mediation regarding coming

24    to a classwide resolution, a nationwide resolution here.

25    Those two days of negotiations didn't settle the case.

```
 1          There were numerous calls and negotiations afterwards, which

 2     ultimately resolved it in the settlement.

 3               THE COURT:  This is Judge Douglas Wolfson, right?

 4               MR. STRANGE:  Yes, your Honor.

 5               THE COURT:  Because there is more than one Judge

 6     Wolfson in New Jersey, so I just wanted to make sure the

 7     record indicates that it was Douglas Wolfson, Ex-Judge

 8     Wolfson, that was retained.

 9               MR. STRANGE:  Yes, your Honor.

10               So ultimately --

11               THE COURT:  So how long did you mediate with Judge

12     Wolfson?

13               MR. STRANGE:  There were two full days of mediation

14     on two separate occasions, one day per occasion, and then

15     numerous calls of negotiations, but I am not sure of the

16     total length, somewhere around two or three weeks.

17               When the resolution did happen, when we agreed in

18     principle on the settlement, ultimately all of the firms,

19     save one, who is Mr. Dias' counsel who is here, Mr.

20     Antonelli, but 17 firms were involved in the ETF litigation

21     process in support of the settlement, and those are the ones

22     listed in our fee application and settlement approval.

23     These are the lawyers that know these issues all well and

24     the pitfalls and the strengths of this litigation.

25               With respect to the settlement, it was a hard
```

1    fought negotiation.  There are certain things unique to

2    AT&T, which are different than some of the other defendants,

3    not only their policy and procedures with respect to ETFs,

4    but they had a different size of an ETF as to some of the

5    carriers.  Their ETF was a hundred-fifty or a

6    hundred-and-seventy-five depending on the jurisdiction.

7              T-Mobile's, for example, was 200.  Sprint's was 150

8    to 200, and Verizon was 175, so that the size of ETFs made a

9    difference.

10             Also, AT&T had many markets in which it actually

11   had a prorated ETF during the class period, so all of those

12   factors were considered in terms of the settlement.  The $18

13   million that they had agreed to pay we think compares

14   favorably to the T-Mobile settlement of which was 13 and a

15   half million, and Sprint's was 17 and a half, and the

16   largest carrier, Verizon, was 22 million.

17             With respect to the AT&T settlement, as your Honor

18   knows, it is 16 million in cash, which is no reversion.  It

19   either goes to the class, or if any is left over, it is

20   going to cy pres, not to the defendant.  It's $2 million in

21   calling cards.

22             Just to clarify that, with respect to the 2

23   million, that is the retail value.  Each card has 200

24   minutes.  The retail value is 14 dollars, so up to 2 million

25   can be claimed based on the retail value, and that is

1    significantly greater than somewhat -- some of the other

2    settlements --

3            THE COURT:  You said up to 200 million or 2

4    million?

5            MR. STRANGE:  2 million, excuse me.

6            They have agreed to a two-year injunction against

7    the flat rate ETFs, and they have agreed with respect to the

8    subscriber class that they have the ability to convert from

9    the flat rate ETF to a pro rata ETF, should they choose.

10           Those latter parts of this settlement, the two-year

11   injunction and the ability to convert are not -- although

12   they are worth we think substantial sums, they weren't

13   considered in the 18-million-dollar figure.

14           With respect to the notice program, your Honor, I

15   think Mr. Connolly can better speak to that, but suffice it

16   to say that we considered other settlements, and that we

17   think this notice program is as good, if not better, than

18   any of the other notice programs.  We sent out over 27

19   million individual notices, 25 million --

20   25-million-900-something-thousand in the invoice is included

21   in that --

22           THE COURT:  How many?

23           MR. STRANGE:  25,978,568.

24           And, your Honor, we also -- at some point AT&T

25   discovered they had not sent out Spanish notices, so we

```
1          actually continued this hearing, and we sent out 729,000
2          notices in Spanish.  So after that substantial notice
3          program, we only received 23 objections, which we think we
4          have addressed in our papers.
5                   With respect to the Girsh factors, your Honor, the
6          first one being the complexity and duration of the cases, I
7          think that was covered in my initial remarks.  Suffice it to
8          say that over six years of litigation and very complex
9          issues with respect to arbitration that occurred in the AT&T
10         case, so the stage of the proceedings has advanced.
11                  As I indicated, one of the cases, the State Court
12         cases, actually have been certified.  But probably one of
13         the more significant issues, which your Honor is well aware
14         of, is that in a liquidated damage case, to the extent that
15         we proved that this penalty is illegal, AT&T has a claim for
16         damages as against the class members.
17                  In fact, in my Waldmann case they had asserted
18         counterclaims.  We know based on history with respect to the
19         Ayyad versus Sprint case, that the jury in fact returned
20         damages that arguably were greater than the damages assessed
21         against the defendant.
22                  So there were substantial risks to the class of
23         getting nothing, should this case proceed.  There is still a
24         substantial risk with respect to arbitration, your Honor.
25         One thing not noted here, notwithstanding our victory, is
```

21

1       that the U.S. Supreme Court has recently accepted cert on a

2       case dealing with the issue of arbitration, and we -- I

3       believe it was AT&T -- so that issue is not entirely to bed,

4       although I would like to tell you that it is.  So that was

5       still a risk for the class, and then establishing damages is

6       also a tricky issue in this case.

7               So when you consider all of those facts together

8       and the fact that AT&T had various policies with respect to

9       implementing the --

10              THE COURT:  What?

11              MR. STRANGE:  -- had various policies with respect

12      to where they implemented the ETF, whether flat or pro rata,

13      we think this is an excellent settlement for the class.  And

14      I personally have been litigating these types of classes for

15      25 years, and in my opinion, Judge Wolfson did an incredible

16      job in putting this together with AT&T and Mr. Cecchi's

17      assistance.  We think this is a settlement that should be

18      approved, and it is an excellent result.

19              Thank you, your Honor.

20              THE COURT:  Mr. Connolly?

21              MR. CONNOLLY:  Thank you, your Honor.

22              William Connolly for defendant, AT&T Mobility.

23              Your Honor, we wrote quite a bit about the notice

24      program in our briefing, so I won't go through every element

25      unless your Honor has specific points you want me to hit,

1    but I would just like to pick up on what Mr. Strange said

2    and just highlight two instances in which we felt our notice

3    program was stronger than the other settlements that you

4    have previously given final approval to, the Sprint and

5    T-Mobile settlements, the Sprint settlement being in this

6    same action, and the T-Mobile settlement being in the

7    Milliron action also before your Honor.

8           With respect to the Sprint settlement, your Honor,

9    your Honor may recall there was some question as to what

10   work Sprint could do by way of identifying former customers

11   to receive direct notice.

12          I am a little bit by Plato's cave because I

13   couldn't see some of the under seal declarations that got

14   bandied around a bit, but I saw what your Honor said about

15   them.  I guess there was a question as to whether Sprint

16   could do that work.

17          T-Mobile did do that work, and we are akin to

18   T-Mobile in that we went into our billing system to identify

19   additional people to get direct notice, so that is one

20   respect in which I would say that our program was stronger

21   than Sprint's.  Again, not to criticize Sprint's, but just

22   to say we stand a little bit higher.

23          Second, with respect to T-Mobile, our publication

24   notice plan is a little stronger as evidenced by Tiffaney A.

25   Allen, Rust Consulting's declaration, in that we substituted

```
1      "USA Weekend" for "USA Today," which resulted in greater

2      circulation and greater reach of the settlement.

3              Also, with respect to the bill insert portion of

4      the notice program, I believe the T-Mobile settlement

5      restricted that to certain customers within their current

6      subscriber base, and we sent it to all of our customers who

7      received bills from us, both paper bill inserts, the people

8      who received their bills in paper, and by emails to

9      customers who received their bills electronically.  That is

10     with respect to notice.

11              Just a few minor items, your Honor.  Your Honor had

12     asked about the duration of the mediation.  Our two sessions

13     with Judge Douglas Wolfson were August 11th and August 27th.

14     Then there were also phone calls with him in between those

15     two dates, and then after those dates before filing, I think

16     it was September 15th, if I remember correctly, was the day

17     that we filed the settlement papers and a motion for

18     preliminary approval with your Honor.

19              Your Honor, also to pick up on something Mr.

20     Strange said just about what we viewed as different factors

21     in our case with respect to defending against these claims,

22     and again, we are settling and not trying the case, so I

23     will spare you my closing argument unless you would like it.

24     But the significance of the fact that our ETF was less than

25     other carriers in just absolute dollar terms, is that, as
```

1        Mr. Strange said, there is a right to recover actual damages

2        in the event an early termination fee would be invalidated,

3        and with a lower dollar ETF than other carriers, we would

4        have a lower hurdle before our actual damages were more than

5        the amount of the ETF charge, so that is the significance at

6        that point in our view.

7                Another point just with respect to the prorated

8        ETF, Mr. Strange mentioned that that was a significant

9        factor in our defense simply because it made our class

10       smaller.

11               We were unique among all of the national carriers,

12       and that for a great portion of the class period, we

13       actually had two different ETF policies in the United

14       States.

15               We had a number of markets, almost half of the

16       country, where we had a prorated ETF, and then we had the

17       rest of the country, our customers had flat ETFs.  And flat

18       ETFs are the ETFs that have been challenged in all of these

19       cases that your Honor has heard about in our settlement and

20       the cases that preceded us in this court.  None of those

21       cases have ever dealt with prorated ETFs.

22               So, again, just in terms of how big was the case

23       against us, we had a large number of our customers who just

24       simply were not part of it as opposed to other carriers.

25               With respect to the benefits, again, we laid it out

1     in the briefing, so I won't rehash it all, but there is

2     strong individual benefits.  They have value, both monetary

3     benefits and non monetary benefits.  I would say, again,

4     similar to T-Mobile.  I had the benefit of watching and

5     learning as these two cases preceded us in this court, and

6     similar to T-Mobile, we offered, which Sprint could not, the

7     opportunity to convert to a prorated ETF.

8         Your Honor, you didn't want to hear about

9     attorneys' fees today, and I won't have much to say about

10     them in any event on my side of the aisle here, but I will

11     just note under that the preliminary approval order and the

12     settlement agreement, this Court and your Honor is the

13     exclusive forum for resolving attorneys' fees issues for

14     class counsel and ETF counsel.

15         In our briefing, your Honor, finally just two

16     points.  As your Honor has seen, these cases are not

17     necessarily over before or after your Honor makes a final

18     ruling on final approval.  There have been motions for

19     injunction in each of the two settlements that preceded this

20     case.  We have already filed one with respect to the

21     Colisimo action.  That case was then voluntarily withdrawn

22     by those counsel, the Faruqi & Faruqi firm, and Scott

23     Bursor, who are part of the settlement, have joined in it.

24     They filed a case which is covered by the settlement.

25         Although our motion for injunction was mooted by

```
1        the fact they voluntarily dismissed the case, I have heard
2        nothing to suggest they won't simply bring it once final
3        approval is granted, and we could come back at that time and
4        have that injunction fight, but those issues are before your
5        Honor.  The briefing is before your Honor.  I would ask your
6        Honor to take a look at it and clarify your final approval
7        order that this settlement does not distinguish on the basis
8        of what device the customer contracted for that had a flat
9        ETF associated with it.
10               We made an argument in our final approval papers.
11       In addition to our previous injunction papers, we served it
12       on counsel in the Colisimo case, who are also ETF counsel,
13       joined in the settlement, so they would know that I planned
14       to show up here today and say it, and now I have, your
15       Honor.
16               Lastly, your Honor, a second issue like that is we
17       have a young gentleman, Mr. Velez-Colon in Puerto Rico --
18               THE COURT:  In Puerto Rico, right.
19               MR. CONNOLLY:  -- and who has, to be charitable,
20       had a bad experience --
21               THE COURT:  Wait a minute.  Let's go back.
22               The settlement does not distinguish based on the
23       type of equipment that was being used, is that what you are
24       saying --
25               MR. CONNOLLY:  Yes, your Honor.
```

```
1                THE COURT:  -- the Blackberry type thing or a cell

2        phone, is that what you are --

3                MR. CONNOLLY:  Exactly, your Honor.

4                The premise of the Colisimo lawsuit was that -- if

5        you would excuse me, your Honor, I just wanted to grab

6        something out of my bag.

7                THE COURT:  Okay.

8                Does the settlement agreement, though, address that

9        issue --

10               MR. CONNOLLY:  The cell --

11               THE COURT:  -- or is it silent?

12               MR. CONNOLLY:  It is silent.  It does not speak in

13       terms of what devices are or are not covered.

14               It just says anybody who has had a wireless

15       telephone account with AT&T Mobility, who has had a flat

16       rate ETF, correspondingly the release, your Honor, talks in

17       terms of releasing all claims relating to ETFs in fixed term

18       subscriber agreements.  And the Colisimo case, your Honor,

19       suggested that it would be a class action only on behalf of

20       people who had this device I am holding in my hand, which is

21       a wireless laptop card.  You put this into the side of your

22       laptop computer, and it lets you use the internet over a

23       wireless network as opposed to an overall Wifi network or,

24       you know, plugging it into the wall in your office.

25               What we showed in our papers in the Colisimo case
```

1  through declarations and the exhibits and the contractual

2  documents of Mr. Colisimo himself is that AT&T has one kind

3  of account regardless of device.

4          Mr. Colisimo himself had contracted both for

5  phones -- this is an iPhone.  He had contracted for a

6  Blackberry.  He had contracted for a wireless data card.

7  All of those have the same kinds of contracts.  All of those

8  have wireless telephone numbers associated with them.  And

9  actually what we also showed in our papers, and I won't bore

10  you with the demonstration today, but there are little cards

11  in all of these that are interchangeable, so that I could

12  actually take the card out of this - and Jen and I actually

13  did it in the attorney conference room before we came in

14  here today - and I could take the card out of here and pop

15  it into this phone and make calls with the phone number that

16  is associated with this.

17          So that devices are actually interchangeable.  And

18  once you've signed up for an agreement, and again, we showed

19  this in our declarations, there is no -- AT&T does not track

20  what device you are using, nor does the fact that you may

21  change devices change your underlying term contract, so that

22  is the Colisimo issue, your Honor.

23          THE COURT:  Okay.

24          MR. CONNOLLY:  Then with respect to Mr.

25  Velez-Colon, he has filed a lawsuit in Puerto Rico

1    originally arising out of a bad customer experience with

2    T-Mobile, but then at some point has added allegations on

3    behalf of classes against every major wireless carrier, and

4    I think I am just the first to come see you, your Honor,

5    since he has done this.

6              In our experience, our limited experience with him

7    so far, is we have seen that he has been willing to dismiss

8    defendants who have been improperly joined, if somebody can

9    show him a basis to do that.

10             He has dismissed some other defendants, not the

11   ones that have been before your Honor, but some other

12   wireless telephone companies.  Our hope is that rather than

13   having to come back to you with an injunction application

14   down the road, if we could just simply show him that, yes,

15   this has been addressed and Puerto Rico customers are being

16   included in this class, that that might be enough to help us

17   avoid that application, and on that front --

18             THE COURT:  Wait, wait.

19             What would you expect the Court to do, to find

20   that, I guess in your world, you would want me to say that

21   this settlement includes all current and former AT&T

22   subscribers, right, that contain a flat ETF?

23             MR. CONNOLLY:  That's right, your Honor.

24             THE COURT:  Regardless (a) of what device that is,

25   the other case --

1          MR. CONNOLLY:  That's right.

2          THE COURT:  -- and then that that class of people

3     includes the Purto Rico customers as well?

4          MR. CONNOLLY:  That is right, your Honor.  They are

5     included.

6          And on that count, your Honor, we disseminated

7     notice in Puerto Rico.

8          THE COURT:  I note that you received claims, right?

9          MR. CONNOLLY:  We have received claims from Puerto

10    Rico.  I have reviewed exclusion requests from Puerto Rico.

11         I will be honest.  My Spanish is at Sesame Street

12    level, so I couldn't tell you everything they say.  That is

13    the claims administrator who translates them, but I can

14    recognize Puerto Rico addresses and exclusion requests, and

15    we have received those.  We are processing claims from them.

16    You know, we would intend to continue to do so.

17         THE COURT:  So it includes all Puerto Rico

18    customers.  You are requesting the Court to indicate in its

19    final approval opinion, if I do approve it, that it includes

20    all Puerto Rico customers that fall into the definition of

21    the class.

22         MR. CONNOLLY:  That's right, your Honor.

23         THE COURT:  You are not asking for an injunction at

24    this point, because you expect that what will happen then is

25    that he will withdraw --

```
1              MR. CONNOLLY:  My hope would be that I would go to
2     him and say -- he has given us an indication, if you can
3     show me that this is not a proper claim for me to be
4     asserting, I will withdraw it.
5              Independent of that, I have seen other defendants
6     he has withdrawn as to them, so I have some hope that he is
7     capable of having a dialog with us.
8              THE COURT:  Because he has other claims he wants to
9     pursue, it doesn't necessarily have to be an ETF.
10             MR. CONNOLLY:  Oh, understood.  Although, your
11    Honor, the only claims he is asserting against my client,
12    AT&T Mobility, are ETF claims.
13             He has a separate set of claims relating to his
14    experiences with T-Mobile, and those are in this complaint,
15    and I'm not -- that is not my issue.
16             THE COURT:  Is he pro se?
17             MR. CONNOLLY:  I'm sorry?
18             THE COURT:  Is he pro se?
19             MR. CONNOLLY:  He is pro se, your Honor.
20             THE COURT:  Okay.  Thank you.
21             Anything else?
22             MR. CONNOLLY:  No, your Honor.
23             Thank you.
24             (Court and Clerk confer)
25             THE COURT:  Okay.
```

```
 1                    State your name for the record and who you

 2       represent.

 3                    MR. ANTONELLI:  Good afternoon, your Honor.

 4                    Joseph Antonelli on behalf of the Dias plaintiffs,

 5       the Los Angeles Superior Court action.

 6                    Your Honor --

 7                    THE COURT:  Wait, wait, wait, wait, wait.

 8       Plaintiffs in Los Angeles?

 9                    MR. ANTONELLI:  Yes.

10                    THE COURT:  Just bear with me one second.

11                    Is Mr. Dias either a member of the class, or does

12       he have standing is what I am getting at.

13                    MR. ANTONELLI:  Yes.  It's Ms. Dias.  She has --

14                    THE COURT:  How does she qualify as a member of the

15       class?

16                    MR. ANTONELLI:  She was an AT&T customer, and she

17       was also assessed an ETF --

18                    THE COURT:  So she paid it?

19                    MR. ANTONELLI:  Actually I can't recall.  I have

20       two clients, both Ms. Dias and Ms. Day, and they were

21       both --

22                    THE COURT:  She was either assessed an ETF or paid

23       an ETF?

24                    MR. ANTONELLI:  That's correct, and they both

25       received a notice package and have not objected.  I am not
```

```
 1        here as an objector, your Honor.

 2               THE COURT:  Okay.

 3               MR. ANTONELLI:  Your Honor, my position is that

 4        we -- according to the settlement agreement, you know, our

 5        case was an ETF related case, so we submitted our fees and

 6        costs package to Mr. Strange and Mr. Cecchi, which we did.

 7        We submitted everything timely and, you know, we -- I have

 8        been kind of frustrated, and I explained that to both

 9        plaintiffs' counsel today because they basically ignored my

10        request to talk and to try to work something out.

11               I notice Mr. Strange said he worked out an

12        agreement with everybody, but he never has even spoken to

13        me, and that was my main contention, and the only reason I

14        flew out from California is because I felt like I was being

15        ignored.

16               We had spent seven years litigating the case.  We

17        have got a substantial amount of time into it, over 1500

18        hours, which would be a lodestar of 890,000 in costs of over

19        41,000, which the cost has gone up now because of the trip

20        out here.

21               When I had a conversation with Mr. Cecchi probably

22        about a week ago or maybe ten days ago, he was not able or

23        not willing to speak with me until Mr. Strange and I and him

24        could all get together on a conference call, and he promised

25        to call me back.
```

```
 1                When I spoke to Mr. Cecchi this morning, he said,
 2      "Well, I thought you were supposed to call me."
 3                The bottom line is we just never spoke.  I
 4      submitted a lot of email correspondence that I believe is
 5      Exhibit 14.  It would be pushing the issue -- let's just
 6      talk.
 7                So I guess the biggest gripe from Dias and the Day
 8      plaintiffs are the substantial amount of work.  I realize it
 9      is not worth $890,000.  That is not what I am asking for.  I
10      explained that to Mr. Cecchi, you know, this morning or this
11      afternoon, right before the hearing for the first time the
12      three of us got to talk about this.  I have faith that we
13      will work something out.  We will be able to discuss this.
14                THE COURT:  I think I know.
15                Why can't you talk?
16                MR. CECCHI:  We absolutely can talk, your Honor,
17      and we --
18                THE COURT:  Here is what I am going to do:
19                I will direct you three to have a conversation
20      within the next week or so and see if this matter can be
21      resolved.  Let the Court know if it has been resolved and
22      what your proposal is, so that in the event the settlement
23      is approved, I will deal with it.
24                If you can't, I will have to make a call when I
25      decide the attorneys' fees.  You made your submission.
```

```
 1        Certainly I am not going to ignore you.  You have a
 2   litigation that has been pending.  You have done work.  The
 3   question is the apportionment.  Talk it over with counsel.
 4               I am directing counsel to talk to him.  Let's not
 5   ignore him.
 6               I assume that is the relief you wanted from this
 7   Court today.
 8               MR. ANTONELLI:  That's correct, your Honor.  That's
 9   perfect.
10               Your Honor, if we could have until July 15th
11   because I do have vacation plans.  When I return --
12               THE COURT:  You are the one who is in a hurry to
13   talk, and now you want more time?
14               (Laughter)
15               MR. CECCHI:  I am not available on July 15th, so --
16               MR. ANTONELLI:  I will talk on my vacation then.
17               THE COURT:  Get back to the Court by July 15th.
18               MR. ANTONELLI:  Thank you, your Honor.
19               THE COURT:  Okay.
20               The other attorney, please?
21               MR. LAVERY:  Good morning, your Honor -- oh, good
22   afternoon.
23               THE COURT:  I was going to say --
24               (Laughter)
25               MR. LAVERY:  I am appearing here today on behalf of
```

```
 1        Christopher Langone, L-a-n-g-o-n-e, for the record.
 2               Mr. Langone is a class member in two ways.  Back in
 3        '03, he paid AT&T, his current wireless, with respect to
 4        Account No. 003143002 --
 5               THE COURT:  So he paid an ETF?
 6               MR. LAVERY:  Yes.  As part of the final settlement
 7        of his bill, he was charged, assessed and paid --
 8               THE COURT:  What is your name again?
 9               MR. LAVERY:  What is that?
10               THE COURT:  What is your name again?
11               MR. LAVERY:  It's Mark Lavery, L-a-v-e-r-y.
12               THE COURT:  Okay, Mr. Lavery.
13               MR. LAVERY:  And --
14               THE COURT:  I think I called you "Lavery" before.
15               MR. LAVERY:  Yes.
16               THE COURT:  I'm sorry about that.
17               MR. LAVERY:  That is fine.  That's how my
18        grandmother pronounces it.
19               THE COURT:  Okay, Mr. Lavery.
20               MR. LAVERY:  Your Honor, we are here today to
21        primarily object to the settlement agreement specifically,
22        not to the common fund, but to paragraph two of that
23        agreement, which is the distribution of the fund.
24               This agreement that was negotiated allows you to
25        separately enter orders with respect to the distribution
```

```
 1          directly going to that.  In Article 3 settlement class
 2          relief, paragraph one states that what the common fund will
 3          be.  Paragraph two distribution of the common fund says that
 4          the aggregate fees, costs and expenses shall be paid from
 5          the common fund consistent with the provisions of Article 6
 6          of the settlement agreement.  The remainder of the common
 7          fund shall be distributed pursuant to a plan of allocation
 8          to be adopted by the Court separately from the approval of
 9          the settlement.
10                We believe that is very important because you can
11          today approve the $18 million.  It doesn't seem like there's
12          much objection to the amount in light of the risks, which I
13          would like to say for the record, there is this new risk of
14          the U.S. Supreme Court accepting cert, and in light of
15          Rennen Center and in light of still Neilson, there are
16          serious issues, but there is also the risk, ATTM, of passage
17          of the Arbitration Fairness Act, which is pending before
18          Congress and could have retroactive applicability and
19          completely invalidate arbitration as a liability shield in
20          these types of cases.  So there are risks on both sides, but
21          that is not really the substance.  There is always
22          compromise in these kinds of cases.
23                But what we are talking about is since this is sort
24          of the last chance hotel, at least for ATTM subscribers with
25          respect to the ETF, we believe it is very important that
```

```
 1    your Honor maximize the distribution of the common fund to

 2    class members.  We believe there is some rather simple

 3    changes you can make to effectively do that.

 4              I would first like to point out that these

 5    objections that we are making today can be testified, if you

 6    would like to, under oath, as part of the evidentiary

 7    hearing, but they were started in its original -- Mr.

 8    Langone's original objection letter.

 9              I think the most important is the distribution of

10    the fund, especially with respect to cy pres and what amount

11    the plaintiffs' allocation gives.

12              What we would like you to do is get rid of the

13    damages cap - what we call the damages cap - which is in

14    this plan of allocation proposed by class counsel.

15              This would -- basically there are, as you can see

16    from their distribution, they have a chart that basically

17    where you can get from 25 to 140 based on how many months

18    there were in the time.

19              THE COURT:  Right.

20              MR. LAVERY:  First of all, we think that is very

21    onerous with respect to the class members --

22              THE COURT:  Why?

23              MR. LAVERY:  -- because this class goes back over

24    ten years, and they may not remember.  They may not have

25    those records.  They may have a recollection, yeah, I paid
```

1    it, but they don't recall or they didn't save the proof.

2         I mean, we are talking about a maximum loss of $175

3    here.  Most consumers, and we are talking about millions of

4    consumers, don't save that kind of paperwork.

5         So the thing is is that the way it is structured

6    currently, they have the burden of proof, which their lawyer

7    should be doing, not them, and then it is cross-checked by

8    the class administrator, who has got the information, so we

9    think that is a very onerous requirement and basically you

10   can simplify the claim form.  That's the guidelines, the

11   National Association of Consumer Advocates talk a lot about

12   claim forms, and that simplicity is better.

13        We think here, if you send an email with a

14   certification, hey, I paid it, and then the claims

15   administrator says, yeah, they paid it, we think the

16   simplest way to distribute the fund then is pro rata, which

17   is done in many, many, many class actions.

18        There is no need for this kind of scaled work,

19   which is -- I feel it is like we are dealing with an

20   insurance company here, and it is basically set up to reduce

21   the distribution of the class and increase the distribution

22   of the cy pres, which is inappropriate under class action

23   jurisprudence, and I will get to that later, but just let me

24   talk about the structure here.

25        We got a $16 million cash fund.  Based on the prior

1          claimant, we are expecting probably around 40 to 50,000

2          claims to come in based on T-Mobile and Sprint and the

3          similar cases that have already gone through that process.

4                  So the typical argument against our approach that

5          has been -- that class counsel interestingly has argued

6          against us from, and we think that presents a potential

7          conflict, but we can get into that with respect to fees,

8          which I know you want to bracket, but getting back to that,

9          the question is -- there is not going to be any kind of

10         windfall.  It is very important for the Court to consider

11         the broadness of the release here.

12                 You are not just giving up your ETF claim.  You are

13         giving up any claim against ATTM --

14                 THE COURT:  Wait.  You meant to the ETF --

15                 MR. LAVERY:  -- well, there is a dispute as to the

16         scope of the release, I believe --

17                 THE COURT:  Well, if you look at the language, it

18         says any claim or potential claim defense, et cetera, that

19         is related to or involving ETF, something to that effect.  I

20         am not reading it.  I am just going from memory.

21                 MR. LAVERY:  We believe the hazy area is in the

22         Alemada County litigation, they have added -- within the

23         banner of In Re Cell Phone Litigation, there is now an ATTM

24         blocking settlement going on under the banner that related

25         litigation, so to the extent of what the scope of the

1      release is here, we believe it is very unclear, but

2      nevertheless, even with respect to ETF, there is a very

3      broad release with respect to ancillary claims that could be

4      related to ETF.  For example, credit damages, collection

5      agencies are assigned these debts, and they put it on your

6      credit report.  One of the class members who was pro se

7      complained about that.

8          Now, if he is claiming in, he will certainly be

9      giving up any ability under --

10          THE COURT:  Those claims are not included --

11          MR. LAVERY:  -- to the extent they are related to

12      the ETF, they would be.  If the only credit damages because

13      of an ETF late charge was put on your credit report, then we

14      think that would definitely come within the scope.

15          But there are also claims that are not ancillary

16      related or directly related that are being released for

17      statutory damages and for punitive damages.  In the State of

18      New York, for example, you can get the greater of $500 as

19      long as you have some actionable damages.

20          The point here is that there is not going to be any

21      windfall, if you get rid of their plan of allocation and do

22      what we are proposing, which is just the pro rata.

23          THE COURT:  How would the pro rata work?

24          MR. LAVERY:  Essentially what we would see is that

25      basically people would claim in, either electronically or

42

1     through paper, and then the claims administrator would just

2     make sure that it had some validity, that their records

3     checked out.

4          And then once we get all of those claims in, at the

5     end of that period, 90 days, there is a pro rata

6     distribution allowed for a pro rata amount for all people

7     who claimed into that cash fund, and that is fairly easy for

8     the claims administrator to do.  It is done in many class

9     actions.

10         So at the end of the 90 days, they'd give the

11    report.  They'd say there was 50,000 people.  You got 16

12    million to distribute, which is our position, but we will

13    get into that later, and then you would just give the pro

14    rata share.

15         If 50,000 people claim in, there's not going to be

16    any windfall.  It's not going to be more than a couple of

17    hundred dollars.  It would be less than your statutory

18    damages under New York law certainly, and they are going to

19    show that there are real damages there.

20         So basically -- this will promote mutuality because

21    this is what's going to happen.  Let's say there's an

22    extremely high -- let's say somebody gets on Face Book and

23    promotes this, and we get a hundred-thousand or 200,000.

24    Then there is a pro rata reduction already structured into

25    the agreement, so there's -- and then if you get five

1      dollars, if it reduces down to five dollars, people get no

2      cash.  It all goes, I believe, to cy pres or cards.  I am

3      not sure how it works.

4              But the point is, let's say that the threshold gets

5      down to $21 for everybody, even the people who would have

6      qualified for 140, there is just a pro rata reduction at

7      that point, so it is already structured in.

8              We want mutuality.  If it's 50,000, it should all

9      go to them rather than cy pres.  If there's less or if

10     there's more than the agreement already contemplates, then

11     they're going to get a pro rata smaller reduction.

12             The policy justifications for a cy pres are

13     completely absent in this case.  Cy pres is inconsistent

14     almost always with a claim in the settlement because you

15     know exactly who is getting the money and exactly who was

16     damaged, and there is really no issue except for the issue

17     of like unclaimed checks.  Sometimes if you gave out checks,

18     and nobody cashed the checks, then maybe sometimes a cy pres

19     remedy at that point could be appropriate.  But that is

20     probably what's not going to happen here based on what we

21     have seen in Sprint and the other cases.

22             If I can get you some -- there is some really good

23     case law from the 7th Circuit on this issue for your

24     reference, Simer vs. Rios, S-i-m-e-r, v. Rios, 661 F.2d,

25     655.  That is from the 7th Circuit in 1981.

44

```
1                    THE COURT:  661 F.2d?

2                    MR. LAVERY:  Yeah.  It's 661 F.2d 655 at 675.

3                    There's also Cicelski, C-i-c-e-l-s-k-i, vs. Sears

4         Robuck & Company.

5                    THE COURT:  Wait.  C-i-c --

6                    MR. LAVERY:  C-i-c-e-l-s-k-i.

7                    THE COURT:  Versus who?

8                    MR. LAVERY:  Versus Sears Robuck & Company.

9                    THE COURT:  What is the cite on that?

10                   MR. LAVERY:  1984, 132 Mich. AP they're citing in

11        this case, in the Simer case, 132 Mich. AP 298 at 304 to

12        305 --

13                   THE COURT:  What are you going to tell me --

14                   MR. LAVERY:  -- and that's 338 Northwest 2nd --

15                   THE COURT:  -- that these cases --

16                   MR. LAVERY:  -- basically that the point here is

17        that the mechanism -- that a cy pres fluid recovery is a

18        procedural device to avoid manageability problems in the

19        calculation and distribution of damages in large class

20        actions.  Examples of such problems are where the person is

21        not injured or not likely to come forward and prove their

22        claims, and where such persons cannot be given notice of the

23        case.

24                   And those problems existed back in the seventies

25        and eighties, but with the technology that we have today,
```

```
 1        obviously these people can be found.  They can be found on

 2        the internet.  They can be emailed notice.  They can be

 3        given notice all of these ways.  There is already an

 4        internet website set up for people that electronically claim

 5        in, so the cy pres remedy is just something that is of the

 6        past and should not be contemplated in this case.  The

 7        entire fund should go to the claimants.

 8              There is also Gordon vs. Boden, an Illinois case.

 9        It could be found at 586 Northeast 2nd 461.  That is the

10        First District of Illinois Appellate Court (1991).

11              THE COURT:  586 Northeast 2nd what?

12              MR. LAVERY:  461.

13              THE COURT:  All right.

14              Look, so you would like to see the settlement

15        approved, but do away with the cy pres provision, put all of

16        that money, all of the money going to the class on a pro

17        rata basis?

18              MR. LAVERY:  Yes.

19              THE COURT:  Okay.  I got it.

20              MR. LAVERY:  Going on to my next point.  Now, with

21        respect to attorneys' fees --

22              THE COURT:  Don't those things go to just the

23        settlement being better, but doesn't necessarily make it

24        unreasonable the way it is?

25              MR. LAVERY:  What, the plaintiffs' allocation?
```

```
1                THE COURT:  Yes.
2                MR. LAVERY:  The plaintiffs' allocation as
3    currently structured is unreasonable because of the fact
4    that the attorneys want 6 million based on an undistributed
5    fund, okay?
6                They want one-third of the money that goes to
7    charity.  That is unreasonable.  They are not here to help
8    charity.  They are here to help real class members who were
9    paid and charged real penalty fees that have been litigated
10   for almost ten years.
11               Of course, Mr. Langone has familiarity with that,
12   because he has -- he currently as well for the last ten
13   years has litigated early termination late fee litigation
14   against Blockbuster Video that still continues and
15   personally knows Paul Weiss and Freed Weiss and Phil Boch,
16   not Boch and Cash, but formally of Freed Weiss, and that is
17   a whole different issue.
18               They are not here, interestingly enough, and we
19   understand you don't want to deal with attorneys' fees and
20   then we think that is appropriate.  We think there needs to
21   be an evidentiary hearing.  There is very significant issues
22   with the way that this was structured.
23               Basically it is our position with respect to that,
24   that there is some overreaching here, because if we look at
25   the way that Sprint and the other cases shook out, you will
```

1 have about 50,000 people claiming in, maybe for about a

2 25-dollar benefit, so that the recovery to the class is only

3 going to be about $1.5 million.

4   And then in this case, let's see, if we

5 extrapolated the numbers the same, there is about 1.5

6 million that will go to the real class members, 2 million in

7 the subscriber cards, so we are talking about 3.5 million

8 actual to the class, but they are asking for double that in

9 fees, 6 million, so we believe it is patently unreasonable.

10 They can't be given a big credit for a huge cy pres, and

11 that is why that plan of allocation is unreasonable.

12   Now, going back to the attorneys' fees issue, just

13 for the record, there has been a memorandum of law filed by

14 mail with the Court, and they have replied to that on ETF.

15   There was a June 17th letter objecting to fees, and

16 there was previously the original March 24th, 2010

17 objection, which also objected to fees, and those have all

18 been briefed here.  But we believe that under the In Re

19 Agent Orange case, which they cite to as authority for them,

20 that there has definitely got to be some very, very

21 important examination, even including that evidentiary

22 hearing with Paul Weiss here and Brad Lakin here, and Phil

23 Boch here, because under In Re Agent Orange, it talks about

24 the importance of cross-examination when it comes to class

25 action fees, and in this kind of case we believe it is very,

1       very important.

2               If I could give you the highlights since we have

3       traveled here, I don't want to go on to an area you don't

4       want to look at --

5               THE COURT:  Well, I don't want to look at

6       attorneys' fees right now because I have to make a

7       preliminary decision whether I am even going to have a

8       hearing or just argument in which case you will get to argue

9       it again.

10              I mean, I will tell you what I will do.  Since you

11      traveled here, I will give you a couple of minutes, and that

12      is it on this, if you want to tell me some highlight that

13      you want me to look at.

14              You already went into it when you were talking

15      about the percentage that is being asked for vis-a-vis the

16      funds that actually will be distributed to the class

17      members --

18              MR. LAVERY:  I guess the first thing I would say

19      that's most important to get out to this Court is that

20      there's -- we believe that the current settlement agreement

21      on fees, which, of course, does not harm the 18 million, you

22      could give one dollar in attorneys' fees, and the settlement

23      still goes through.  There is no bust-out clause, if there

24      is no threshold, you can give zero fees, if you want, and

25      that is clear in the settlement agreement.

1          As a preliminary issue, Rule 23A says that in a

2     class action, fees can either be given, if they are

3     authorized by law, or if they are authorized by an

4     agreement.  With respect to authorized by law, we believe

5     that they are not authorized by law under the Rules of

6     Professional Conduct.

7          The first structural problem is a violation of Rule

8     1.15, safeguarding of property.  When there is a dispute

9     about attorney fees, which there is, which counsel for Dias

10    indicated there is a clear dispute going on, they need to --

11    they cannot get paid early.  There is a very odd feature in

12    this settlement that I have unfortunately seen develop in

13    class settlements recently where the lawyers get paid first

14    even before the appeal deadline.

15         In 15 days ATTM is going to cut a check for $6

16    million to class counsel in this case before this thing has

17    been resolved, and the class members can't get their claims

18    paid until all of the appeals are settled.  So you got this

19    bizarre situation, where they get 6 million upfront, but

20    then the case continues for years for the actual people that

21    they represented.  I mean structurally, I think you should

22    take a stand and show that those kinds of settlement should

23    never be purported because it just doesn't make sense.

24         The whole promise that they will pay it back to the

25    class, if it's later harmed on appeal, just doesn't seem to

```
 1    make pragmatic sense, because it is a taxable event, so the

 2    6 million immediately is going to get eaten up the Federal

 3    Government and so that's going to harm their ability to pay

 4    it back.  And then the next thing is if there's no insurance

 5    or bond that they give, and then there's the issue of

 6    insolvency.

 7            Right now Freed & Weiss and Brad Lakin in the Lakin

 8    Chapman firm, as it's currently called, and Phil Boch in the

 9    Boch & Hatch firm, as it's currently called, are at odds in

10    an arbitration over the breach of a settlement related to

11    the Kinkel litigation, and they're all -- and Phil Boch and

12    Eric Freed and Paul Weiss are still in the Circuit Court in

13    Cook County in litigation over their fees in this case.

14    That is completely undisclosed to the Court and it needs to

15    be examined, because under Rule 1.5, there is an illegal --

16    there is a prohibited fee split.  1.5 prohibits the type of

17    agreement because there is basically some requirements,

18            The division needs to be in proportion to the work

19    done.  We don't know what the division is.  It is concealed.

20    There has not been given -- fee records given.  We have

21    asked for them, and they have not been given, and we can't

22    assess the proportion without the actual time records,

23    rather than these summaries.

24            I have reviewed personally time records of Paul

25    Weiss in the Sprint case that are a public record, and he is
```

```
1      billing for class competition games.  He is billing for

2      things like strategized --

3              THE COURT:  Counsel, that is another case --

4              MR. LAVERY:  -- right, right -- what I mean is --

5              THE COURT:  -- Counsel, if I start talking, you

6      have to stop --

7              MR. LAVERY:  Yes, your Honor.

8              THE COURT:  -- the court reporter is not going to

9      be able to take both of us down.

10              Don't tell me about what is happening in another

11     case.  I want to know what is happening here.  All right?

12              Go ahead.

13              MR. LAVERY:  If I may, that is a case.  That was an

14     exhibit to the Freed & Weiss versus Boch & Hatch litigation,

15     which is about Cingular Wireless, now known as the ATTM

16     litigation.  That was an exhibit that they were showing

17     about improper billing, so that is why I bring it up.  It is

18     related to this case, not that case.

19              THE COURT:  All right.

20              MR. LAVERY:  Yeah.  And the current litigation

21     between Weiss and Lakin and Weiss and Boch centers on this

22     case and what happened in Kinkel.

23              Just to let you know what happened in Kinkel is,

24     yes, they achieved a big victory in the Supreme Court, which

25     we would argue was stuff that had to do generally with
```

```
 1     arbitration, not specifically to that arbitration, but
 2     nevertheless, after they won, Phil Boch wrote a letter to
 3     Donna Kinkel basically saying, well, we're not going to work
 4     with Paul Weiss any more, so you got to choose.  Are you
 5     going to stay with us and Lakin, or are you going to stay
 6     with Freed & Weiss?
 7          She checked she would stay with Lakin and with Phil
 8     Boch's firm, which was no surprise, since she is from
 9     Madison County where Brad Lakin practices, so --
10          THE COURT:  Counsel, you are getting far afield.
11          MR. LAVERY:  -- well, yes.  We just wanted to
12     apprise the Court that we believe it is significant.
13          Getting back to our legal --
14          THE COURT:  Well, I said I would give you a little
15     leeway to talk about attorneys' fees.  We are going to deal
16     with this on another day, so --
17          MR. LAVERY:  Okay.  Then I got some simple points.
18          The next point is there is no written agreement
19     between ETF and class counsel, assuming joint
20     responsibility.  The ETF counsel, other than counsel for
21     Dias, is not before you and has not appeared in this case.
22     Then, the only parties that have joint responsibility are
23     the co-counsel.
24          With respect to -- so it is that Rule 1.5 prohibits
25     this type of agreement.  The case of In Re Agent Orange and
```

1    that seminole case, which they cited actually, specifically

2    says that fee sharing agreements of this type, where all

3    discretion is given to counsel to compensate attorneys that

4    didn't do work on the case should be prohibited.

5             Then the final thing is Rule 23 as amended by CAFA,

6    it contemplates there is competition for lead counsel, and

7    that you will just pick the most adequate firm, and they're

8    the ones who share in the bounty of attorneys' fees rather

9    than strangers to the litigation, like ETF counsel, the way

10   it is structured here.

11            THE COURT:  Thank you.

12            MR. LAVERY:  Thank you very much.

13            THE COURT:  Okay.

14            Are there any other attorneys here on behalf of any

15   objectors?

16            All right.  It is now 3:15.  There are no other

17   layers here today.

18            I will hear from Mr. Schroer.  You have been

19   patiently waiting.

20            MR. SCHROER:  It's been very interesting.

21            THE COURT:  It is nice to have you in my court,

22   sir.

23            MR. SCHROER:  Thank you.

24            Just for the record, my name is H.P. Schroer.  I

25   live in --

1                    THE COURT:  Is it Schroer or Schroer?

2                    MR. SCHROER:  It's S-c-h-r-o-e-r.

3          I was a customer of AT&T Mobility in 2003 and was

4     charged an ETF.

5                    First of all, I would like to thank the Court for

6     giving me an opportunity to address it in my opposition to

7     the settlement.

8                    Secondly, since I am not an attorney, I know it is

9     not easy to deal with folks like me.  I appreciate your

10    Court's indulgence.

11                   THE COURT:  No problem.

12                   MR. SCHROER:  Because of my being charged what I

13    considered an illegal charge, I refused to pay it.  And

14    because of this, my ability to obtain credit has been

15    compromised for seven years.  The low credit score created

16    by the credit reporting agencies has subjected me to

17    unconscionable interest rates, and I have been the victim of

18    unrelenting efforts from collection agencies to obtain their

19    pound of flesh.  The most recent one was a matter of six

20    weeks ago.

21                   Granted, I could have avoided all of this by simply

22    paying the ETF, but I was determined as a matter of

23    principle to make an effort to fight it.

24                   From the inception of my individual complaint with

25    the FCC in the early 2000s, I have been joined by millions

1          of others in the various class action cases across the

2          country.  As the Court knows, I was named a class

3          representative in the Verizon class action case.

4                  The irony is although my questioning the legality

5          of the ETF has been vindicated over time, I and thousands of

6          others like me continue to be subject to the debilitating

7          effects of credit defamation caused by the ETF.

8                  While I recognize that no settlement will satisfy

9          all parties, it is my belief that any settlement should

10         address the major concerns of those affected, and it should

11         be fair and reasonable to all, something the present

12         settlement fails to do.

13                 Those who have made -- who paid an ETF are being

14         made whole by being reimbursed.  However, I think that the

15         Court is entitled to some explanation on how the credit

16         defamation issue, the major concern of those who did not pay

17         the ETF, is addressed and made whole by a cash settlement of

18         25 dollars.

19                 Mr. Cecchi -- Cecchi?

20                 MR. CECCHI:  Yes.

21                 MR. SCHROER:  Mr. Cecchi's explanation that we have

22         a right to opt out of the settlement and bring a suit

23         against AT&T is at best disingenuous.

24                 Judging from the legal bills that he submitted by

25         his firm, as well as all of the other firms, I think it is

```
 1    safe to say that there are very few individuals who are in a
 2    financial position to fight this issue through bringing a
 3    personal suit on their own to the Court.
 4             THE COURT:  You know, but there also could be
 5    problems associated with being able to have a class of those
 6    people as well because of the differences in personal damage
 7    issues arising out of when your credit is affected, right?
 8    How would we be able to determine in a class --
 9             MR. SCHROER:  I am not looking for an assessment of
10    damages.  I am only looking for an option on the part of the
11    individual to have that option, either accept the 25
12    dollars, or have AT&T notify the credit reporting agencies
13    that the ETF has been cancelled or settled.  It has nothing
14    to do with how much -- what effect the condemnation of
15    credit has against me or anybody else.  That's an
16    entirely --
17             THE COURT:  You say part of the settlement should
18    include those people who refused to pay it --
19             MR. SCHROER:  Correct.
20             THE COURT:  -- and whose credit has been affected,
21    right?
22             MR. SCHROER:  Correct.
23             THE COURT:  And then there should be an additional
24    item in the settlement that allows you not just the option
25    for the money, but also that AT&T as a defendant in this
```

```
 1          case should notify the credit reporting bureaus?
 2                    MR. SCHROER:  Not both.  Either/or.
 3                    In effect, it would save AT&T money because they
 4          wouldn't have to pay out 25 dollars.
 5                    It is my belief unless they were in unusual
 6          circumstances, few, if any of us, would accept a 25-dollar
 7          settlement against an option of having the credit reporting
 8          agencies notified that the ETF is settled.
 9                    I cite the herculean efforts of Gary L. Lamb -- I
10          am tongue twisted here -- an individual who also objected,
11          and incidentally, he would like to have the option of having
12          the ETF -- the credit reporting agencies be notified that
13          this settlement -- the ETF has been settled.
14                    When I asked the class attorney, Mr. Eckman, if any
15          of the class representatives were subject to credit
16          defamation, I was advised this information was not available
17          to me because it was not relevant to my objection.
18                    I believe it is, and I would like to have the
19          Court's opinion.  I have submitted that information.
20                    Unfortunately, our society in spite of tremendous
21          advances continues to exhibit prejudice towards those of
22          color and certain ethnic backgrounds.  I believe that there
23          is also a subliminal prejudice towards people who fail to
24          pay their bills, and therefore, they are not afforded the
25          same treatment as others in similar circumstances.
```

1              In my defense and for all of those who may have not

2       paid their bill because of a matter of principle, I should

3       like the Court to consider the following:

4              Mr. Fedor in his memorandum of law in response to

5       objection to the whole settlement, dated June 10th, states

6       that my argument is based on my own personal circumstances.

7              While that's certainly true, it is not unique to

8       me, but to thousands of others.  And to prove my point, I

9       asked the class attorney for the number of people who did

10      not pay the ETF, yet filed a claim.

11             I was informed by Mr. Eckman it was not relevant to

12      my objection, and he refused me the information.

13             I believe it is not only relevant to me, but to the

14      Court as well.  While I am not an attorney, neither is Mr.

15      Eckman a judge.  And as I noted in my letter of June 11th to

16      him and to the Court, I await the Court's decision on my

17      request.

18             When I filed my objection to the settlement, it was

19      not my intent to sabotage the settlement, nor should my

20      action have been construed by any to disparage the effort of

21      all of those involved in the negotiations.  I was naive in

22      thinking that the option I was proposing would be given some

23      consideration by the counsels in the case.  However, from

24      the moment I filed the objection, I have been considered an

25      adversary by the class counsels.

```
 1              Rather than their addressing their arguments

 2    against the merits of the credit option, they have chosen to

 3    question the legitimacy of my objection by demeaning my

 4    motivation and refusing me information, which would help

 5    reinforce my position, as well as be beneficial to the

 6    courts in making their decisions.

 7              I welcome the Court's opinion concerning my

 8    rebuttal of their accusations, and I look forward to its

 9    decision.

10              As I stated in my rebuttal, I have always from day

11    one been concerned with the defamation of the credit issue

12    when I first started my fight on the legality of the ETF

13    with Verizon.

14              This was done in spite of the fact that Verizon

15    cancelled the charge to me.  As I explained through the

16    Verizon -- though the Verizon settlement did not include any

17    credit option, it was negotiated during a period when all

18    class actions were being threatened to be usurped by the

19    FCC.  I and others spoke before the FCC in 2008, and due to

20    our combined efforts, we were successful in defeating the

21    cell phone providers' petition to have the FCC intercede.

22              Therefore, today, no negotiated settlement is under

23    the gun to settle for anything less than one which addresses

24    the concerns of most and is fair and reasonable to all.

25              Again, I ask the Court:  What does 25 dollars do
```

```
1          towards changing a low credit score?

2                  Sadly nothing.

3                  Because of low credit scores created by the

4      insidious ETF, people can be denied loans, which can impact

5      their lives.  The Court can do something which can help

6      change this vicious cycle, and in doing so, do something

7      other courts have failed to do.  By including the credit

8      option amendment, you are not only giving claimants an

9      opportunity to exercise a right they are entitled to, but at

10     the same -- excuse me, your Honor -- but at the same time

11     providing some relief to those thousands of thousands in our

12     society who are in distress.

13                 To sum it up:  You will not find a litany of cases

14     to uphold my position, for I am sure the Court is

15     well-versed on this subject and doesn't need any information

16     from me.

17                 I am appealing to the Court's sense of justice.

18     What I propose for the Court to consider on a scale of

19     justice is does my objection and proposed amendment, is it

20     reasonable, is it fair, does it have any deleterious effect

21     upon any class member or counsel?

22                 Does it delay the finalization of the settlement?

23                 Does it entail a great expense to put into effect?

24                 The answer to that, I don't know because the class

25     counsel wouldn't tell me how many people are going to be
```

1     involved.

2           Does my amendment to the settlement make it fairer,

3     more reasonable, without changing its integrity?

4           I want to thank the Court for its patience.  I hope

5     the Court will exercise its right by approving the inclusion

6     of the credit option settlement amendment in the settlement.

7           I look forward to your decision, and I hope my

8     efforts will not become, as many have said, an exercise in

9     futility.

10          I thank you.

11          THE COURT:  Thank you, Mr. Schroer.

12          I thank you for the respect that you have shown to

13     the Court throughout.  As a pro se litigant, not represented

14     by counsel, you are right, sometimes it becomes difficult

15     for the Court to deal with pro se litigants, but that has

16     not been the case with you, and for that I thank you as

17     well.

18          MR. SCHROER:  Thank you.

19          THE COURT:  All right.  Let me speak to defense

20     counsel first.

21          Why don't we start with his objection?  How

22     difficult would it be to do what he wants to do?

23          MR. CONNOLLY:  Your Honor, with any settlement, and

24     your Honor noted it when the same objections were raised in

25     the Sprint settlement, this was a hard fought settlement.

```
1        We did not lose this case despite Mr. Schroer's argument --
2               THE COURT:  He is not arguing that you lost the
3   case.  He in fact lauds your efforts -- well, not your
4   efforts -- but the efforts of Mr. Cecchi and company in
5   carrying the banner, so --
6               MR. CONNOLLY:  And, your Honor, we have granted the
7   25-dollar relief, which is a substantial relief to people
8   who didn't pay the ETF.
9               In addition, the settlement preserves their right.
10  If somebody comes after them in a collection action saying
11  they owed that ETF, they are allowed to continue to contend
12  it's illegal.  They do not waive the right to continue, as
13  Mr. Schroer wants to, to claim that it is illegal.  But he
14  is correct, the settlement we have reached does not agree,
15  does not agree for purposes of settlement, that all ETFs
16  ever charged have been illegal.  That is not the settlement.
17              THE COURT:  He is not asking you to recognize that
18  at this point.  All he wants to do is to be able to have
19  something for those people who refused to pay the ETF, that
20  recognizes that his particular ETF claim has been settled.
21              MR. CONNOLLY:  Your Honor, under the settlement as
22  with the T-Mobile and the Sprint and the Verizon settlements
23  before, this settlement does not eliminate the obligation to
24  pay ETFs for people who didn't pay them.  It offers refunds
25  to them, offers significant refunds to the people who have
```

1      actually put out money for the ETF, but that has been the

2      case with every ETF settlement, and we are no different in

3      that regard.  So our settlement is not to say that every ETF

4      we ever charged is therefore not owed.

5              THE COURT:  Go ahead.

6              MR. CONNOLLY:  Again, your Honor, not different

7      than T-Mobile and Sprint before us or Verizon in the Alemada

8      Superior Court before that.

9              Let me be clear about something because Mr. Schroer

10     has been very courteous and gentlemanly to me and to the

11     Court today.  I feel like he has taken from our brief that

12     we ascribed some impropriety to the fact that he agreed in

13     the Verizon case as a named class representative to

14     precisely the relief that is in our settlement.  I am not

15     suggesting it was improper for him to do that in that case.

16             To his credit, when we pointed out that he had

17     served as a class representative who agreed to a settlement

18     with exactly the same relief for this group of people as is

19     present in this settlement, he didn't hide behind his

20     lawyer.  He didn't say, I didn't know about it.

21             He wrote to your Honor and said I knew about it.  I

22     talked about it with my counsel, and we agreed it was fair.

23             Now, Mr. Schroer's position is there were events

24     going on in the FCC that made that a reasonable compromise,

25     and I 100 percent accepted that it was important to him.

```
1                   There are many factors.  We could spend a great
2       deal of time on today or other days on all of the risk
3       factors in this case that make this case like every other
4       case, a settlement and a compromise.
5                   It is easy to come in and say, but can't you do
6       this, or can't you do this.  That wasn't the compromise that
7       was struck.
8                   On the specific FCC point, that was never resolved
9       by the FCC, and this settlement agreement, like the ones
10      before it, contains an express provision where class counsel
11      made AT&T promise that if the FCC does rule that these kinds
12      of claims are preempted, it doesn't form a basis for us to
13      back out of the settlement.
14                  THE COURT:  If you were assessed an ETF, and you
15      didn't pay it, you would be covered for your 25 bucks,
16      right?
17                  MR. CONNOLLY:  Yes.
18                  THE COURT:  You could come in and make a claim,
19      right?
20                  MR. CONNOLLY:  Yes.
21                  THE COURT:  Even though you never paid it?
22                  MR. CONNOLLY:  Yes.
23                  THE COURT:  Okay.
24                  If you get the 25 bucks at that point, isn't your
25      ETF claim settled?
```

```
1                    MR. CONNOLLY:  No.  Under the terms of the
2       settlement agreement, the settlement agreement provides that
3       the settlement does not obligate AT&T, again, as with all of
4       the carriers before us, to cease efforts to collect the
5       ETFs.  We do not waive our right --
6                    THE COURT:  As against that person, though.
7                    MR. CONNOLLY:  No, no, your Honor.
8                    As against that person, our settlement, as with the
9       ones before it, does not waive our ability to try to
10      continue to collect that, as it does not waive their right
11      to continue to oppose it, if we to do do that.
12                   THE COURT:  They can make a claim for damages --
13                   MR. CONNOLLY:  Hum --
14                   THE COURT:  -- is that correct?  I just want to
15      know what the parameters are.
16                   So if a person is charged an ETF and refuses to pay
17      the ETF, right, then they get notice of this settlement, and
18      goes in and says, okay, I want my 25 dollars, right?  You
19      pay them the 25 dollars.  You then sue them for the
20      collection, right?
21                   MR. CONNOLLY:  Yes.
22                   THE COURT:  You said you could still do that,
23      right?
24                   MR. CONNOLLY:  That's right.  Well, yes.  AT&T does
25      not file suit against its own, but let's just say we go down
```

1      the road, and it gets sold to somebody, and they sue them, a

2      collection agency, yes.

3              THE COURT:  They could then claim that it was an

4      illegal charge, right?  It doesn't bar them from saying

5      that?

6              MR. CONNOLLY:  That is right.  In defense of a

7      collection action, it does not bar them from doing that.

8              THE COURT:  Can they as part of that defense

9      counterclaim say that you owe me money because my credit was

10     screwed up by it, because I say it is illegal, and if I am

11     correct in pursuing the fact that it is an illegal charge, I

12     now want damages for my credit being screwed up?

13             MR. CONNOLLY:  That is right.  That is released.

14     What they retain the right to do is they retain the right to

15     raise illegality as a defense to the claim that's being

16     brought against them for collection of the payment.

17             So if they were to prevail on that claim, they

18     would end up at the end of the day with 25 dollars, and not

19     having to pay the fee, if they prevailed.

20             THE COURT:  All right.

21             Go ahead.

22             MR. CONNOLLY:  Your Honor, do you have other

23     questions of Mr. Schroer, or I don't know if you want to

24     hear --

25             THE COURT:  No.  You have addressed I guess your

1       position with regard to that.

2                   MR. CONNOLLY:  Again, your Honor --

3                   THE COURT:  How would it affect this settlement to

4       do what Mr. Schroer wants to do?

5                   MR. CONNOLLY:  The administrative burden on us, for

6       example, I went back to my client, and I said, can you find

7       me something on Mr. Schroer.  I did not know before today it

8       was 2003 that he paid the early termination fee.

9                   Our ability to go back all of those years and

10      identify people and what their status is, and whether they

11      challenged it is not realistic.  It's not something that's

12      at the touch of the finger.  That's why we wouldn't agree to

13      do it in the settlement.

14                  I also want to state that Mr. Schroer has said that

15      his situation is the only charge that he has not paid is the

16      ETF charge.  He didn't leave owing us other money.

17                  For the vast majority of people, that is not the

18      case.  Most people who had an early termination fee also

19      don't pay other charges on their bill, and this settlement

20      says nothing about those charges.

21                  So if somebody didn't pay their last bill of a

22      hundred dollars and didn't pay their ETF, there is nothing

23      in the settlement releasing any claims they have related to

24      the hundred dollars or any ability to remedy any defamation

25      of the credit for those.  This is now leaking a little bit

1      into Mr. Lavery's point, but as your Honor noted, these

2      releases are consi -- have been to ETF related claims.

3              Again, your Honor, this is a specific issue that

4      arose in the Sprint settlement, and your Honor approved the

5      settlement there as well.

6              THE COURT:  I understand.  Throughout your papers

7      and Mr. Cecchi's papers, you make reference to the fact that

8      some of these things have been approved by the Court, and

9      that is true, and that is something that I will take into

10     consideration, but each settlement in these cases is unique

11     and different and should be looked at individually --

12             MR. CONNOLLY:  I understood, your Honor --

13             THE COURT:  -- and--

14             MR. CONNOLLY:  -- and when I said that, I don't

15     mean to suggest -- I'm sorry, your Honor, for interrupting.

16             THE COURT:  -- I said I could relook at a

17     particular issue and say, you know what, I think I missed it

18     on the other one, and I think this should be different,

19     right?  It could be done.

20             MR. CONNOLLY:  You could do that.  Yes, your Honor.

21     I suggest you ought not, but yes.

22             THE COURT:  Okay. I could do that.

23             (Laughter.)

24             MR. CONNOLLY:  I have not as much to say about Mr.

25     Lavery's presentation because it is largely leaking into

```
 1    attorneys' fees, and I guess I'll just say --
 2              THE COURT:  Anything to say about what the attorney
 3    said?  If you want to address it, address it now.
 4              If not, I will hear from the other side.
 5              MR. CONNOLLY:  With respect to Mr. Lavery's
 6    presentation, I think your Honor drew out the point, that he
 7    does not object to the settlement in whole.  He has an
 8    objection where he would like to change the cy pres
 9    provision, and he has some issues about attorneys' fees,
10    which we have not fully fleshed out and probably won't
11    today.
12              With respect to the cy pres, your Honor, I just
13    offer my experience.  It is not uncommon in these kinds of
14    settlements to have cy pres provisions.  I speak as a bit
15    unusual here.  This money is not coming back to my client
16    regardless of where it goes.  It's either going to claimants
17    or it's going to cy pres.  It is not the case that it is
18    disfavored or uncommon if your Honor -- and this has come up
19    in the other -- I'm sorry, I sound like a broken record --
20    this has come up in the other settlements, where objectors,
21    not Mr. Lavery, showed up in other settlements and said all
22    the money should go out to claimants.
23              If it did, it would have to be simple.  There was a
24    suggestion that the claims administrator has some ability
25    with the push of a button to decide who has paid or who
```

 1       hasn't paid and what their status is.  As we learned in

 2       these cases, that is very difficult for the defendants to

 3       do.  There is no magic list of the claims administrator.

 4              I think what he was really suggesting at the end of

 5       the day, your Honor, was a much simpler program, which would

 6       be instead of having a cy pres provision, to take the money

 7       and divide it up by the number of claims and call it a day.

 8              Honestly, your Honor, that is not my client's money

 9       anyway, if the settlement is approved, so I defer to the

10       Court, of course, as I do on everything, but I mean I do

11       think fashioning that remedy is something that is up to your

12       Honor.

13              Your Honor has kept the cy pres in the other

14       settlements.  I think there is a potential issue in this

15       cases, where if you are just simply dividing up a fund among

16       the number of claimants, you do run a risk that the numbers

17       are too large, you encourage fraudulent claims, or if word

18       gets out that that is what is going to happen, you can

19       encourage fraudulent claims.  The more it looks like a

20       lottery ticket and not like a claim for damages.

21              I think with the claim numbers we are expecting

22       here, I am not suggesting we are going to be handing out

23       $10,000 checks, if you were to do it that way, but it is a

24       concern.  I guess, again, your Honor --

25              THE COURT:  I know that you are not in the position

```
 1      to tell me with exactitude or anything dealing with

 2      exactitude, but the best case scenario, right?

 3           MR. CONNOLLY:  We are over 43,000 now, and I think

 4      in the experience with some of the other settlements, and

 5      just more broadly, is that you see a bump.  If your Honor

 6      issues final approval for the settlement, the claims period

 7      runs for a period of time beyond final approval for the

 8      reason that there will be stories, you know, there will be

 9      publicity around your final decision, and that will drive

10      more claims, so I think it is very easy to imagine 50,000

11      claims and again potentially higher than that.

12           But standing at 43 now, if you look at what

13      happened with T-Mobile, and we are higher than T-Mobile was

14      to this point in their settlement process --

15           THE COURT:  Would the suggestion, though, wouldn't

16      that not be more simplistic to administer, the suggestion

17      that has been made, rather --

18           MR. CONNOLLY:  I would say the suggestion that is

19      made, where there is not an investigation, but simply these

20      are people who filed claims, sort of let's magnify their

21      claim, if you will, to take up the money that is there, that

22      is something I believe for us to administer -- I mean, the

23      secret to that is it's mathematical.  I mean, you take a

24      number -- I should -- actually I am jumping ahead, because

25      they say 16 million, and class counsel, no doubt, think
```

```
 1        there will be less available because you will award them
 2        fees, but a number will be left over for distribution.  You
 3        could give us orders to sort of magnify people's claims, if
 4        not pro rata to administer, but pro rata increasing, that
 5        that could be done and --
 6                THE COURT:  Okay.
 7                MR. CONNOLLY:  -- again, that is why I say, and it
 8        is easy for me to say because it is no longer my client's
 9        money, if you approve the settlement.  We think this is one
10        that is in your real house and it's in your discretion as it
11        was in the other settlements, Judge.
12                THE COURT:  Thank you very much.
13                Mr. Cecchi, or, Mr. Strange, somebody?
14                MR. CECCHI:  Very briefly, Judge, and then Mr.
15        Strange is going to address In Re Agent Orange --
16                THE COURT:  Address what?
17                MR. CECCHI:  -- the In Re Agent Orange case.
18                THE COURT:  Mr. Cecchi, why do you care what
19        happens to that money?
20                MR. CECCHI:  The issue from our perspective as
21        class counsel is that we designed the plan of allocation to
22        provide class members as close as we could with damages,
23        what -- how there were damaged, and that is why you have the
24        stepped plan of allocation.
25                The danger, the concern, the policy concern I would
```

```
 1        have is that some people are going to get a windfall for

 2        more than their damages.

 3                I also share Mr. Connolly's concern that you have a

 4        potential for creating a lottery ticket, and there is news

 5        out --

 6                THE COURT:  But the windfall here would be minimal

 7        in terms of dollars, right?

 8                I mean, there are many ways to structure that.  You

 9        could say, you could put a cap on the cy pres, for example,

10        and distribute the rest pro rata, right?

11                MR. CECCHI:  I think all of that is true.

12        The policy --

13                THE COURT:  It doesn't really affect -- it could

14        only affect the class --

15                MR. CECCHI:  -- well --

16                THE COURT:  -- other than the policy

17        considerations, the Court has to have policy considerations,

18        and I agree with you, the potential for the fraudulent

19        claims issue and the associated and administrative cost, if

20        I were to investigate those things --

21                MR. CECCHI:  Right.

22                THE COURT:  -- the potential of a windfall to one

23        class member over others may put the class members in an

24        antagonistic position in that some people are going to get

25        more money --
```

1           MR. CECCHI:  It is certainly not insurmountable.

2       All of those issues are not insurmountable.  I agree with

3       Mr. Connolly.  It is something an experienced claim

4       administrator can handle.

5           The concept that we put into this settlement and

6       the other settlements was the idea of having to claim,

7       having to file a claim is important.  You have to be

8       invested in the process and to get back that class member a

9       measure of their damages as close as you can, that was the

10      concept and theory, and not to talk about the other cases,

11      it was used in many cases.  There is nothing conceptually

12      wrong with what your Honor is saying --

13          THE COURT:  Just as I sit here, I think there are

14      many different ways to do it.

15          You can say it is pro rata, not to exceed, you

16      know, more than one-quarter of your actual damages.

17          MR. CECCHI:  There's plenty of ways.  Absolutely.

18      I agree, and your Honor would have the discretion to fashion

19      that --

20          THE COURT:  All right.  Let's get to the other

21      issue.

22          MR. CECCHI:  Very briefly on Mr. Schroer, we

23      appreciate the passionate remarks that he made to your

24      Honor.  There's a couple of points I would make.

25          He was the class rep in Verizon.  The settlement

1     here is exactly the same as Verizon, so it did come as some

2     surprise to us that Mr. Schroer came forward to say that

3     this one is not fair and reasonable and adequate as to that

4     provision.

5             The real issue there, though, I have some

6     familiarity with this having negotiated these ETF

7     settlements over a number of years.  Many of these ETFs are

8     sold.  AT&T doesn't do this collection work.  They sell the

9     debt.  I can speak that that was the case in T-Mobile and

10    Sprint.  They don't own these debts any more.  Those

11    defendants who own this debt and paid these gentlemen for

12    those debts are not before the Court, so that's really the

13    issue on the credit relief.  That is the issue we faced

14    trying to negotiate that issue when we were trying to settle

15    the case.  Those defendants are not before the Court.

16            I did want to very briefly respond to Mr. Lavery's

17    comments.  It somewhat surprised me because most of his

18    filings or Mr. Langone's filings were directed at other

19    issues, namely, the attorneys' fee issue.  I note two things

20    for your Honor.  We fully briefed it.  Rule 1.5 is not the

21    touchstone here.  Rule 23 is.  None of the cases he cited

22    are Rule 23 class action cases.  None of the principles he

23    brought to bear in this case have anything to do with your

24    Honor's discretion (A).

25            (B), allocation of fees, according to the leading

```
 1        treatise on class actions and numerous cases is routinely
 2        and preferably given to class counsel to allocate in the
 3        first instance.  Your Honor is the ultimate fiduciary for
 4        the class, and you ultimately have discretion over that, but
 5        there is no illegal fee sharing arrangement here between
 6        anybody.  This is a Rule 23 application to your Honor.
 7        Every one of those lawyers performed work.  We did an
 8        assessment that they performed valuable work, and if we are
 9        fortunate to have our fee application granted, we will make
10        an application if your Honor gives us that discretion.
11             I do want to put something on the record, Judge.
12        The question that Mr. Lavery raised about the, quote,
13        unquote, illegal fee sharing, Rule RPC 1.5 and Rule 23 is
14        within your Honor's sole and exclusive jurisdiction.  I
15        don't want to have to burden myself or more importantly your
16        Honor with an All Writs Act application to enjoin Mr.
17        Langone from the lawsuit, which he filed against myself, my
18        firm, Mr. Strange, and a bunch of other lawyers who I don't
19        know what they have to do with this.  But he filed a lawsuit
20        this week, and Mr. Langone is in court here today,
21        addressing the very issue that his lawyer just argued to
22        your Honor.
23             I would ask Mr. Langone when I finish my remarks to
24        commit to your Honor that he will withdraw that lawsuit, so
25        I don't have to spend the time and energy of defending it,
```

 1      putting my malpractice carrier on notice and bringing an All

 2      Writs Act application to your Honor to have it dismissed and

 3      enjoined.

 4              So when I am done, I will ask that Mr. Langone or

 5      his counsel tell us what he intends to do about the lawsuit

 6      that he filed.

 7              One other point I wanted to make -- oh, what is

 8      motivating Mr. Langone is a complete mystery to me because

 9      whatever is happening in Madison County, Illinois that he

10      apparently is involved in, I am not involved in.  It has

11      nothing to do with this case.

12              Whatever is going on between Mr. Weiss, Paul Weiss,

13      who is not class counsel in this case, Mr. Boch, who is not

14      class counsel in this case, and Mr. Lakin, who is not class

15      counsel in this case, what's going on in Illinois has

16      nothing to do with the fairness and adequacy of this

17      settlement, nor the appropriateness or lack of

18      appropriateness of the fee application that we have asked

19      your Honor to rule upon.

20              Why he has brought that tangential dispute here,

21      why he has sued me in Illinois out of some animus to lawyers

22      who are not in this case is a complete and total mystery to

23      me, but we would ask him to have the decency and

24      professional courtesy to let the Court know whether or not

25      we are going to be dealing with an All Writs Act application

1   next week about the lawsuit, and that that is solely within

2   your Honor's jurisdiction.

3          Thank you, Judge.

4          MR. STRANGE:  Just a few brief points, your Honor.

5   Brian Strange for the class.

6          With respect to the distribution, one of the issues

7   that we were concerned with is because these are -- we

8   contend illegal penalties, at the beginning of the contract

9   arguably those people have not suffered any damages.  It is

10  really -- and I made this argument before your Honor on the

11  other side of the Sprint case -- it is those people at the

12  end of their contract that have a day left or 30 days left

13  that are really the ones, when they have to pay the 175 or

14  whatever the amount of money, are really the ones damaged --

15         THE COURT:  What?

16         MR. STRANGE:  -- those are really the people

17  damaged because they are paying that fee with a small amount

18  of time left in the contract, and the late term payors we

19  talked about before, so the structure of the distribution

20  was really, you know, the late term payors get the $140, and

21  that if you don't know whether you paid an ETF, you are down

22  to the lower end of the scale, where if you are in the early

23  part of your contract, so we tried to allocate them, you

24  know, according to what the claims were of the plaintiffs.

25         Obviously, we would, you know, like to have as much

```
 1    money go to the class as possible, but we provided a

 2    mechanism for people who make claims and just traditionally

 3    in these types of cases, if people don't make claims, one

 4    thing we want to make sure of is that it doesn't go back to

 5    the defendant and it goes to a charity somehow related to

 6    the class of plaintiffs which your Honor would have the

 7    right to approve, should it get to that point, if all of the

 8    claims are not exhausted, and we don't know at this point if

 9    they are all exhausted or not.  But if they are, it is not

10    an issue.  If not, then your Honor would have the right to

11    approve whatever charity it should be allotted to the class

12    that we represent.  So the allocation was designed to

13    address the claims that were presented in the case.

14          With respect to the issue of fees since it was

15    touched on, with respect to Mr. Langone, apparently there is

16    an issue going on with Mr. Weiss.  In one of his letters he

17    said that if I would have known that he was involved in this

18    case, I would have opted out.  That's in one of his letters

19    I think that was submitted to the Court.  So we actually

20    gave him -- we said, look, if you want to opt out, we will

21    see if we can get you a late opt-out, and we have not heard

22    from him on that issue.

23          With respect to this attorneys' fees issue, it

24    is -- under Rule 23, the controlling law, as your Honor

25    knows, is Rule 23.  If every time a court sitting in a class
```

```
1        action has 50 states and had to apply the law of the state
2        they were sitting in, that would be a problem, and that is
3        why the courts have said that the courts in control of the
4        fees under a federal class action under the class action
5        fairness act is under Rule 23 --
6             THE COURT:  What do you say that potentially here
7        in light of the historical data regarding how many claims
8        were filed in the other cases, cases that weren't looking at
9        attorneys' fees, which counsel is asking for, much exceed
10       the amount of the benefit that the class members are
11       actually getting?
12            MR. STRANGE:  That is a traditional argument made
13       by objectors.  That was routinely objected -- or routinely
14       overruled even in class actions where there is a reversion
15       because the courts have said, look, you can make available a
16       fund.  And I have had class actions where there is large
17       checks that people don't claim, $10,000.  You know, you can
18       make things available, but you can't necessarily make them
19       take it, and the courts have routinely rejected those types
20       of arguments.  There is only one case I know that has even
21       held it.
22            I just had a case down in Puerto Rico, in federal
23       court in Puerto Rico, where everybody made the same
24       argument, and it was overruled.  It's traditionally
25       overruled because it just presents a whole host of problems.
```

```
 1              This case is even stronger because there's no money
 2      going back to the defendants.  They paid or are going to pay
 3      the 18 million, and that is what the fee should be based on.
 4              Then -- I mean, it is particularly troubling that
 5      we, as class counsel, went to all of the trouble to try to
 6      negotiate with all of the counsel involved in this case,
 7      which was no small matter, as your Honor might imagine, and
 8      the In Re Agent Orange, which is a 1987 2nd Circuit case, I
 9      have it right here, what that Court said was exactly that
10      class counsel usually is in the best position to determine
11      those fees even after the courts award them, and it should
12      be based on people's roles, how these people contributed to
13      the case, which we are in the best position to know, i.e.,
14      the Kinkel case and the case in California.
15              What the Agent Orange case said is -- and in that
16      case there was a particular issue, which was there was a PSC
17      that made a provision where you could get three times your
18      investment -- whatever you invested for cost, you got three
19      times that back, the fee arrangement.  And the court said,
20      if there is a return on investment situation to the class
21      counsel, that is a potential problem.  But in the same
22      breath the court said, accordingly, the practice of allowing
23      class counsel to distribute a general fee in an equitable
24      fund case among themselves pursuant to a fee sharing
25      agreement is unexceptional -- unexceptional, so that court
```

```
1        does stand for the fact that class counsel can distribute it
2        among themselves, but in a particular situation where you
3        have three times your cost, you know, that wouldn't be
4        appropriate.  So we have gone to the, you know, the
5        extraordinary effort to try to fold in class counsel who
6        have worked for years on this case and have them share in
7        the fee.
8                Thank you, your Honor.
9                THE COURT:  Thank you.
10               MR. SCHROER:  May I have just an opportunity to
11       address something that Mr. Cecchi brought out?
12               THE COURT:  Very briefly, okay?
13               MR. SCHROER:  It will be very brief.
14               THE COURT:  Very briefly because are concluding
15       this hearing at four o'clock.
16               MR. SCHROER:  I appreciate that.  Thank you for the
17       privilege.
18               I think what he stated with regard to the selling
19       of the accounts to some other individuals --
20               THE COURT:  Right.
21               MR. SCHROER:  -- is smoke and mirrors.
22               THE COURT:  Why?
23               MR. SCHROER:  Because we don't even know how many
24       people are in the situation, in the ETF situation.
25               In other words, there may be one person -- I just
```

```
 1        found out there are 46,000 in total.  Am I correct?
 2                THE COURT:  That is what was said to the Court.
 3                MR. SCHROER:  In the information, and I am
 4        guestimating that of that 46,000, I would say that the
 5        majority of it, and this information I am sure he knows,
 6        would be those who have paid the EFT.  Those who have not
 7        paid the ETF, I would think would be minuscule.
 8                So by him saying that there -- or I got the
 9        impression, and I might be wrong, that he was implying that
10        it would entail a great deal of expense on the part of AT&T
11        to then go to people who they sold these accounts to, maybe
12        on ten cents on the dollar, as such, that they would have a
13        great deal of expense to do that, and I say it is -- I don't
14        think it is the case, and I would like to leave you with
15        that thought.
16                THE COURT:  Thank you.
17                Mr. Lavery?
18                MR. LAVERY:  Yes.
19                THE COURT:  What is this about this lawsuit that I
20        just heard about?
21                MR. LAVERY:  Would you like Mr. Langone to address
22        it?
23                THE COURT:  No.  You represent him.  I am not going
24        to hear from a litigant that you represent.
25                MR. LAVERY:  Okay.  Sure.
```

```
1              Your Honor, that action was filed as a declaratory

2     judgment action that named lead counsel as necessary parties

3     that relates to --

4              THE COURT:  What does it relate to?

5              MR. LAVERY:  -- it relates to the propriety of

6     class counsel giving money to the Kinkel counsel.

7              THE COURT:  In connection with this case?

8              MR. LAVERY:  Yes -- no, in connection with the --

9              THE COURT:  In connection with this case, right?

10             MR. LAVERY:  -- in connection with the attorney fee

11    award that may -- which is undisclosed with respect to

12    what --

13             THE COURT:  How is that not under the jurisdiction

14    of this Court?

15             MR. LAVERY:  Because ETF counsel, Boch, Lakin,

16    Weiss -- Weiss has filed, I believe an appearance in the

17    Sprint case, and so have Lakin and Boch, but they have never

18    came under this case.  Therefore, ETF counsel has not --

19    they are not under the jurisdiction of your Honor right now,

20    and that is essentially the point, and it has not been

21    served.  It is basically there -- to be there in case your

22    Honor would approve it today, and then the issue would be

23    about this -- because there is this 15-day rule, and they

24    get paid in advance, and then the issue would be whether or

25    not there could be a declaration that class counsel could
```

```
 1    not take -- could not diminish the size of the fund in order

 2    to pay off Lakin and Boch and Weiss.  That is my

 3    understanding.

 4            THE COURT:  How is that not in the jurisdiction of

 5    this Court?  I still don't understand that.

 6            MR. LAVERY:  Because of -- you would have to ask

 7    Mr. Langone --

 8            THE COURT:  Look, here is what I am going to do.

 9            MR. LAVERY:  Yes.

10            THE COURT:  It is up to you how you want to handle

11    that --

12            MR. LAVERY:  Yes.

13            THE COURT:  -- but at the end of the day, if it

14    turns out that that lawsuit is clearly within all four

15    corners within the jurisdiction of this Court, and there is

16    going to be additional litigation or motion practice in

17    connection with this in order for me to enjoin a case that

18    obviously belongs here, I am not going to be very pleased

19    about that, and I certainly would entertain any kind of

20    application with regard to something that turns out to be

21    frivolous, that was just filed in order to create some

22    additional problem in another court, which clearly should be

23    before this Court.

24            MR. LAVERY:  No, and --

25            THE COURT:  Do we understand each other?
```

```
 1              MR. LAVERY:  -- clearly, your Honor.  And we are

 2     waiting upon your ruling and taking no action because

 3     essentially your ruling, if you expand the size of the fund,

 4     for example, to take out the cy pres, then you do have to

 5     consider the percentage of the fund that they would get

 6     rather than the one million, and so it would moot it out,

 7     and then -- so I mean, essentially we believe that your

 8     action could moot out the need for a declaratory judgment

 9     action, but Mr. Langone didn't want to wait --

10              THE COURT:  What if I approve it the way it is,

11     then what?

12              MR. LAVERY:  Well, then presumably we would have to

13     appeal to the third Circuit.

14              THE COURT:  Correct.  But that lawsuit still has

15     nothing to do with the price of beans because I am going to

16     be making the decision here.

17              MR. LAVERY:  Well, unless you rule that ETF counsel

18     are outside of the scope of your jurisdiction, which is an

19     issue that we have put in our briefs.  We put it in the

20     briefs --

21              THE COURT:  Counsel, I knew nothing about this

22     lawsuit until ten minutes ago --

23              MR. LAVERY:  Well, right --

24              THE COURT:  -- All I am saying is, because I have

25     had experience like this in other cases, that I don't want
```

```
1       this being used as a vehicle to either create additional
2       issues for class counsel because of whatever animosity
3       exists, or to try to usurp the jurisdiction of this Court by
4       filing somewhere else, when everyone knows that it pertains
5       to a matter that is presently pending before this Court.
6       Because if the Court is then going to be required to
7       entertain an All Writs Act application or briefing on that
8       or argument on that, and ultimately the person who filed the
9       lawsuit knows very well that it was within the jurisdiction
10      of this Court will end up paying attorneys' fees and
11      sanctions.  I am not going to go through an exercise like
12      that.  I am not suggesting what is what happened here, but I
13      want everyone to understand where I stand with regard to
14      that.
15              MR. LAVERY:  And, your Honor, we contemplated that
16      if that were to occur, the case would probably be
17      transferred to your jurisdiction under the appropriate
18      transfer rules for the U.S. District Court system.  But the
19      question was we couldn't get jurisdiction over Lakin, Boch
20      and Weiss in the State of New Jersey.  That was only
21      possible in the State of Illinois.
22              THE COURT:  Thank you.
23              MR. CECCHI:  Judge, I would just like to hand a
24      copy of the lawsuit to your Honor, so you have it for your
25      records.  A prayer for relief is squarely within the four
```

```
 1      corners of your Honor's jurisdiction.  It is exactly the
 2      Rule 1.5E argument that is made, and it is a frivolous
 3      lawsuit --
 4              THE COURT:  Stop, Mr. Cecchi.  I am not going to
 5      decide this issue today.  That lawsuit is not before me, and
 6      you may be right, or you may be wrong.  I don't know about
 7      that.  All I am saying is that in these class action
 8      lawsuits, there is always the issue where everybody starts
 9      fighting about the fees, and I recognize it is part of the
10      type of case that it is.
11              I suggest you guys talks about this and figure out
12      whatever position you take, that it better have a solid
13      legal basis because I don't want to end up having litigation
14      and motion practice over things that are clearly frivolous
15      or clearly something that should have been resolved by way
16      of an agreement, to have the Court decide it or do whatever,
17      so either work it out or file whatever motions you think are
18      appropriate.
19              MR. LAVERY:  Thank you.
20              MR. CECCHI:  Thank you, Judge.
21              THE COURT:  Okay.
22              I am going to obviously take this matter under
23      consideration.  I am going to take another look at the
24      attorneys' fees situation and figure out how I am going to
25      do that, if I am going to approach that, or whether or not
```

1     we have to have another hearing just on that issue.

2              Certainly my interest here is to moving the -- if I

3     think the settlement is adequate and appropriate, to move it

4     along for the benefit of the class, not necessarily for the

5     benefit of counsel, although that is going to happen as well

6     if things are approved.  It is just a question of timing, so

7     I will probably address the settlement first, counsel fees

8     second.  I want to resolve all of the issues in one shot, if

9     I can do that.  I will try to do that, of course, in one

10    sitting, but it may require additional argument.  I don't

11    know.

12             MR. CONNOLLY:  Your Honor, could I ask one question

13    about the timing?

14             THE COURT:  Sure.

15             MR. CONNOLLY:  Is your Honor suggesting that there

16    might be an order on the final approval of the settlement

17    then perhaps before there was an order on the final

18    approval --

19             THE COURT:  I am suggesting that that is a

20    possibility.

21             MR. CONNOLLY:  Again, your Honor, if that were to

22    happen, I would just call your attention to Article 3,

23    Section 1 of the settlement agreement, which --

24             THE COURT:  When you say "Article 3," you know --

25             (Laughter.)

```
 1                   MR. CECCHI:  It's not as important as the other
 2          Article 3, Judge.
 3                   THE COURT:  Section 1?
 4                   MR. CONNOLLY:   Section 1.  It just has to do with
 5          the timing of AT&T Mobility's payment obligations under the
 6          settlement.  We have paid into escrow all but 6.25 million,
 7          which would end up in the payment of the final amount into
 8          the escrow being maintained by Rust, would be -- is
 9          triggered by the date of the entry of the final approval
10          order and judgment.  And as you can imagine, when I go tell
11          them they have to write a check, assuming that's where we
12          end up, if your Honor approves the settlement, they will
13          want to look at this and be clear that what you have is --
14                   THE COURT:  How would that -- run this by me again.
15                   MR. CONNOLLY:   Sure.
16                   Our final payment obligation --
17                   THE COURT:  Final payment as in final amount on the
18          entire fund.
19                   MR. CONNOLLY:   Exactly, your Honor.
20                   We have funded a large portion of the 16 million
21          already and put it into escrow.
22                   THE COURT:  All but 6.2?
23                   MR. CONNOLLY:   All but 6.2, that's right, your
24          Honor.  The last 6.2 is due to be paid into escrow within
25          ten business days of the date of entry of the final approval
```

```
 1      order and judgment.
 2              THE COURT:  So why does whatever I do affect your
 3      ability to do that?
 4              MR. CONNOLLY:  As long as you were sort of -- all I
 5      am asking, your Honor, is if you do approve the settlement,
 6      and if you do do it before resolving the attorneys' fees --
 7              THE COURT:  The money will still be in escrow,
 8      right?  The attorneys' fees money would then be in escrow
 9      so --
10              MR. CONNOLLY:  I apologize.  I am not being clear.
11              I'm just saying I need to -- when I go to my client
12      and say, time to write a $6.2 million check, but the case
13      isn't totally over yet because the judge is still sitting on
14      some issues --
15              THE COURT:  But the issues will have to do with the
16      way the money is distributed --
17              MR. CONNOLLY:  Absolutely.
18              THE COURT:  -- I don't see how it is an issue --
19              MR. CONNOLLY:  I apologize, your Honor.
20              THE COURT:  -- maybe it is too late in the day.
21              Explain it to me again.
22              MR. CONNOLLY:  Sure.
23              THE COURT:  I say to you, let's just for the sake
24      of argument -- obviously if I say I don't approve the
25      settlement, then --
```

```
 1                MR. CONNOLLY:  Then I would have a different
 2      conversation.
 3                THE COURT:  -- you would have a different
 4      conversation with your client.
 5                If I approve the settlement, the settlement
 6      document kicks into play, and it requires you to pay the
 7      money to escrow within a given time.  You pay it.
 8                MR. CONNOLLY:  That's right.
 9                THE COURT:  The distribution of the money issue is
10      not your payment of it into escrow.
11                MR. CONNOLLY:  All I am asking for, your Honor, in
12      that circumstance would be a sentence that simply says:
13      This constitutes the final approval of the settlement and
14      judgment and payment.  Just something that I can show to my
15      client that says, see, all of the issues aren't resolved,
16      but this is the magic piece of paper that means that you
17      have to write the check.
18                THE COURT:  All of the issues as to your client.
19                MR. CONNOLLY:  That's right, your Honor.
20                THE COURT:  Does everybody agree to that?
21                MR. CECCHI:  We do, Judge.
22                The attorney fee order would have nothing to with
23      their funding obligation.
24                THE COURT:  That is the way I see it.
25                MR. CONNOLLY:  That is the way I see it, too, your
```

```
1       Honor.  Just all of the other settlements, not to beat a

2       dead horse, everything happened at once.  It was sort of

3       nice and easy and simple.  So all I am asking is if there is

4       that statement, and it could be noted, so it will make it

5       easier for me to tell the people, "Yes, it is time to write

6       the check."

7                    THE COURT:  Okay.

8                    Thank you, Counsel.

9                    MR. CECCHI:  Thank you, Judge.

10                   MR. CONNOLLY:  Thank you, your Honor.

11                   (Court adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$10,000** [2] - 70:23, 80:17
**$140** [1] - 78:20
**$16** [1] - 39:25
**$175** [1] - 39:2
**$18** [2] - 18:12, 37:11
**$21** [1] - 43:5
**$500** [1] - 41:18
**$890,000** [1] - 34:9

## '

**'03** [1] - 36:3

## 0

**003143002** [1] - 36:4

## 1

**1** [3] - 89:23, 90:3, 90:4
**1.15** [1] - 49:8
**1.5** [7] - 47:3, 47:5, 50:15, 50:16, 52:24, 75:20, 76:13
**1.5E** [1] - 88:2
**100** [1] - 63:25
**10th** [1] - 58:5
**11th** [2] - 23:13, 58:15
**13** [1] - 18:14
**132** [2] - 44:10, 44:11
**1332(d** [1] - 9:12
**14** [2] - 18:24, 34:5
**140** [2] - 38:17, 43:6
**15** [1] - 49:15
**15-day** [1] - 84:23
**150** [1] - 18:7
**1500** [1] - 33:17
**15th** [4] - 23:16, 35:10, 35:15, 35:17
**16** [4] - 18:18, 42:11, 71:25, 90:20
**17** [2] - 17:20, 18:15
**175** [2] - 18:8, 78:13
**17th** [1] - 47:15
**18** [2] - 48:21, 81:3
**18-million-dollar** [1] - 19:13
**1981** [1] - 43:25
**1984** [1] - 44:10
**1987** [1] - 81:8
**1991** [1] - 45:10

## 2

**2** [6] - 18:20, 18:22, 18:24, 19:3, 19:5,
47:6
**200** [4] - 18:7, 18:8, 18:23, 19:3
**200,000** [1] - 42:23
**2000s** [1] - 54:25
**2003** [2] - 54:3, 67:8
**2004** [1] - 14:21
**2005** [1] - 15:24
**2007** [1] - 5:8
**2008** [1] - 59:19
**2009** [2] - 5:12, 5:17
**2010** [2] - 5:19, 47:16
**22** [2] - 9:18, 18:16
**23** [9] - 20:3, 53:5, 75:21, 75:22, 76:6, 76:13, 79:24, 79:25, 80:5
**23A** [1] - 49:1
**24th** [1] - 47:16
**25** [12] - 19:19, 21:15, 38:17, 55:18, 56:11, 57:4, 59:25, 64:15, 64:24, 65:18, 65:19, 66:18
**25,978,568** [1] - 19:23
**25-dollar** [3] - 47:2, 57:6, 62:7
**25-million-900-something-thousand** [1] - 19:20
**27** [1] - 19:18
**27th** [1] - 23:13
**28** [1] - 9:12
**298** [1] - 44:11
**29th** [1] - 8:24
**2nd** [5] - 5:19, 44:14, 45:9, 45:11, 81:8

## 3

**3** [4] - 37:1, 89:22, 89:24, 90:2
**3.5** [1] - 47:7
**30** [1] - 78:12
**304** [1] - 44:11
**305** [1] - 44:12
**338** [1] - 44:14
**3:15** [1] - 53:16

## 4

**40** [1] - 40:1
**41,000** [1] - 33:19
**43** [1] - 71:12
**43,000** [1] - 71:3
**46,000** [2] - 83:1, 83:4
**461** [2] - 45:9, 45:12

## 5

**5** [1] - 9:16
**50** [1] - 80:1

**50,000** [6] - 40:1, 42:11, 42:15, 43:8, 47:1, 71:10
**531** [1] - 12:10
**586** [2] - 45:9, 45:11

## 6

**6** [6] - 37:5, 46:4, 47:9, 49:15, 49:19, 50:2
**6.2** [4] - 90:22, 90:23, 90:24, 91:12
**6.25** [1] - 90:6
**655** [2] - 43:25, 44:2
**661** [3] - 43:24, 44:1, 44:2
**675** [1] - 44:2

## 7

**729,000** [1] - 20:1
**7th** [2] - 43:23, 43:25

## 8

**890,000** [1] - 33:18

## 9

**90** [2] - 42:5, 42:10

## A

**A)** [1] - 75:24
**ability** [10] - 19:8, 19:11, 41:9, 50:3, 54:14, 65:9, 67:9, 67:24, 69:24, 91:3
**able** [6] - 33:22, 34:13, 51:9, 56:5, 56:8, 62:18
**absent** [1] - 43:13
**absolute** [1] - 23:25
**Absolutely** [2] - 74:17, 91:17
**absolutely** [1] - 34:16
**accept** [2] - 56:11, 57:6
**accepted** [2] - 21:1, 63:25
**accepting** [1] - 37:14
**according** [3] - 33:4, 75:25, 78:24
**accordingly** [1] - 81:22
**Account** [1] - 36:4
**account** [2] - 27:15, 28:3
**accounts** [2] - 82:19, 83:11
**accusations** [1] - 59:8

**achieved** [1] - 51:24
**Act** [6] - 4:22, 37:17, 76:16, 77:2, 77:25, 87:7
**act** [1] - 80:5
**action** [30] - 4:2, 4:18, 5:24, 5:25, 9:13, 15:21, 16:19, 22:6, 22:7, 25:21, 27:19, 32:5, 39:22, 47:25, 49:2, 55:1, 55:3, 58:20, 62:10, 66:7, 75:22, 80:1, 80:4, 84:1, 84:2, 86:2, 86:8, 86:9, 88:7
**actionable** [1] - 41:19
**actions** [7] - 39:17, 42:9, 44:20, 59:18, 76:1, 80:14, 80:16
**actual** [6] - 24:1, 24:4, 47:8, 49:20, 50:22, 74:16
**added** [2] - 29:2, 40:22
**addition** [4] - 6:10, 6:24, 26:11, 62:9
**additional** [6] - 22:19, 56:23, 85:16, 85:22, 87:1, 89:10
**address** [2] - 11:18, 13:25, 27:8, 54:6, 55:10, 69:3, 72:15, 79:13, 82:11, 83:21, 89:7
**Address** [1] - 72:16
**addressed** [4] - 20:4, 29:15, 55:17, 66:25
**addresses** [2] - 30:14, 59:23
**addressing** [3] - 11:12, 59:1, 76:21
**adequacy** [2] - 11:20, 77:16
**adequate** [3] - 53:7, 75:3, 89:3
**administer** [3] - 71:16, 71:22, 72:4
**administrative** [1] - 67:5, 73:19
**administrator** [8] - 30:13, 39:8, 39:15, 42:1, 42:8, 69:24, 70:3, 74:4
**admission** [3] - 6:25, 7:8, 8:17
**admit** [1] - 8:7
**admitted** [3] - 6:11, 6:22, 7:5
**adopted** [1] - 37:8
**advance** [1] - 84:24
**advanced** [2] - 13:11, 20:10
**advances** [1] - 57:21
**adversary** [1] - 58:25

**advised** [1] - 57:16
**Advocates** [1] - 39:11
**affect** [4] - 67:3, 73:13, 73:14, 91:2
**affected** [3] - 55:10, 56:7, 56:20
**afforded** [1] - 57:24
**afield** [1] - 52:10
**afternoon** [3] - 32:3, 34:11, 35:22
**afterwards** [1] - 17:1
**agencies** [6] - 41:5, 54:16, 54:18, 56:12, 57:8, 57:12
**agency** [1] - 66:2
**Agent** [7] - 47:19, 47:23, 52:25, 72:15, 72:17, 81:8, 81:15
**aggregate** [2] - 9:15, 37:4
**ago** [6] - 7:8, 14:18, 33:22, 54:20, 86:22
**agree** [2] - 62:14, 62:15, 67:12, 73:18, 74:2, 74:18, 92:20
**agreed** [7] - 17:17, 18:13, 19:6, 19:7, 63:12, 63:17, 63:22
**agreement** [24] - 5:5, 25:12, 27:8, 28:18, 33:4, 33:12, 36:21, 36:23, 36:24, 37:6, 42:25, 43:10, 48:20, 48:25, 49:4, 50:17, 52:18, 52:25, 64:9, 65:2, 81:25, 88:16, 89:23
**agreements** [2] - 27:18, 53:2
**ahead** [4] - 51:12, 63:5, 66:21, 71:24
**aisle** [1] - 25:10
**akin** [1] - 22:17
**Alamada** [1] - 13:12
**Alemada** [3] - 14:14, 40:22, 63:7
**allegations** [1] - 29:2
**Allen** [1] - 22:25
**allocate** [2] - 76:2, 78:23
**allocation** [11] - 37:7, 38:11, 38:14, 41:21, 45:25, 46:2, 47:11, 72:21, 72:24, 75:25, 79:12
**allotted** [1] - 79:11
**allow** [1] - 8:18
**allowed** [3] - 15:10, 42:6, 62:11
**allowing** [1] - 81:22
**allows** [2] - 36:24, 56:24
**almost** [3] - 24:15, 43:14, 46:10

amended [2] - 5:19, 53:5

amendment [4] - 60:8, 60:19, 61:2, 61:6

amount [12] - 9:15, 24:5, 33:17, 34:8, 37:12, 38:10, 42:6, 78:14, 78:17, 80:10, 90:7, 90:17

analysis [1] - 12:1

ancillary [2] - 41:3, 41:15

Angeles [5] - 4:2, 15:1, 15:4, 32:5, 32:8

animosity [1] - 87:2

animus [1] - 77:21

answer [1] - 60:24

antagonistic [1] - 73:24

ANTONELLI [11] - 9:3, 32:3, 32:9, 32:13, 32:16, 32:19, 32:24, 33:3, 35:8, 35:16, 35:18

Antonelli [5] - 4:1, 6:13, 9:1, 17:20, 32:4

Antonelli's [2] - 6:17, 6:22

anyway [2] - 12:14, 70:9

AP [2] - 44:10, 44:11

apologize [2] - 91:10, 91:19

appeal [3] - 16:1, 49:14, 49:25, 86:13

appealing [2] - 16:17, 60:17

appeals [1] - 49:18

appear [1] - 8:1

appearance [1] - 84:16

appeared [2] - 10:10, 52:21

appearing [2] - 4:1, 35:25

Appellate [1] - 45:10

applicability [1] - 37:18

application [2] - 4:4, 5:15, 6:17, 6:22, 7:14, 7:20, 11:9, 13:10, 13:17, 16:13, 17:22, 29:13, 29:17, 76:6, 76:9, 76:10, 76:16, 77:2, 77:18, 77:25, 85:20, 87:7

applications [2] - 6:10, 8:6

apply [1] - 80:1

apportionment [1] - 35:3

appreciate [3] - 54:9, 74:23, 82:16

apprise [1] - 52:12

approach [2] - 40:4, 88:25

appropriate [6] - 43:19, 46:20, 82:4, 87:17, 88:18, 89:3

appropriateness [2] - 77:17, 77:18

approval [25] - 5:16, 5:17, 5:20, 5:22, 11:11, 11:25, 13:16, 14:2, 17:22, 22:4, 23:18, 25:11, 25:18, 26:3, 26:6, 26:10, 30:19, 37:8, 71:6, 71:7, 89:16, 89:18, 90:9, 90:25, 92:13

approve [10] - 30:19, 37:11, 72:9, 79:7, 79:11, 84:22, 86:10, 91:5, 91:24, 92:5

approved [7] - 21:18, 34:23, 45:15, 68:4, 68:8, 70:9, 89:6

approves [1] - 90:12

approving [1] - 61:5

April [1] - 5:19

Arbitration [1] - 37:17

arbitration [10] - 5:12, 15:25, 16:16, 20:9, 20:24, 21:2, 37:19, 50:10, 52:1

arbitrator [1] - 16:15

area [2] - 40:21, 48:3

arguably [2] - 20:20, 78:9

argue [2] - 48:8, 51:25

argued [2] - 40:5, 76:21

arguing [1] - 62:2

argument [15] - 11:22, 11:25, 23:23, 26:10, 40:4, 48:8, 58:6, 62:1, 78:10, 80:12, 80:24, 87:8, 88:2, 89:10, 91:24

arguments [3] - 11:20, 59:1, 80:20

arising [2] - 29:1, 56:7

arose [1] - 68:4

arrangement [2] - 76:5, 81:19

Article [5] - 37:1, 37:5, 89:22, 89:24, 90:2

ascribed [1] - 63:12

asserted [1] - 20:17

asserting [2] - 31:4, 31:11

assertions [1] - 7:10

assess [1] - 50:22

assessed [5] - 20:20,

32:17, 32:22, 36:7, 64:14

assessment [4] - 13:14, 56:9, 76:8

assigned [1] - 41:5

assistance [1] - 21:17

associated [5] - 26:9, 28:8, 28:16, 56:5, 73:19

Association [1] - 39:11

assume [1] - 35:6

assuming [2] - 52:19, 90:11

AT&T [41] - 4:21, 5:6, 12:22, 13:8, 13:15, 14:6, 14:10, 15:11, 15:15, 15:18, 16:1, 16:8, 16:9, 18:2, 18:10, 18:17, 19:24, 20:9, 20:15, 21:3, 21:8, 21:16, 21:22, 27:15, 28:2, 28:19, 29:21, 31:12, 32:16, 36:3, 54:3, 55:23, 56:12, 56:25, 57:3, 64:11, 65:3, 65:24, 75:8, 83:10, 90:5

attempted [1] - 13:4

attention [1] - 89:22

ATTM [7] - 4:21, 37:16, 37:24, 40:13, 40:23, 49:15, 51:15

attorney [13] - 7:1, 7:9, 8:8, 28:13, 35:20, 49:9, 54:8, 57:14, 58:9, 58:14, 69:2, 84:10, 92:22

attorneys [6] - 5:24, 5:25, 6:11, 46:4, 53:3, 53:14

attorneys' [20] - 11:22, 25:9, 25:13, 34:25, 45:21, 46:19, 47:12, 48:6, 48:22, 52:15, 53:8, 69:1, 69:9, 75:19, 79:23, 80:9, 87:10, 88:24, 91:6, 91:8

August [2] - 23:13

authority [1] - 47:19

authorized [4] - 49:3, 49:4, 49:5

available [5] - 35:15, 57:16, 72:1, 80:15, 80:18

avoid [2] - 29:17, 44:18

avoided [1] - 54:21

await [1] - 58:16

award [3] - 72:1, 81:11, 84:11

aware [2] - 13:23, 20:13

Ayyad [1] - 20:19

## B

backgrounds [1] - 57:22

bad [2] - 26:20, 29:1

bag [1] - 27:6

bandied [1] - 22:14

banner [3] - 40:23, 40:24, 62:5

bar [3] - 8:10, 66:4, 66:7

Barry [1] - 5:4

base [1] - 23:6

Based [2] - 7:10, 39:25

based [11] - 8:17, 18:25, 20:18, 26:22, 38:17, 40:2, 43:20, 46:4, 58:6, 81:3, 81:12

basis [6] - 9:16, 26:7, 29:9, 45:17, 64:12, 88:13

beans [1] - 86:15

bear [2] - 32:10, 75:23

become [1] - 61:8

becomes [1] - 61:14

bed [1] - 21:3

began [1] - 5:8

beginning [1] - 78:8

behalf [7] - 4:1, 4:12, 27:19, 29:3, 32:4, 35:25, 53:14

behind [2] - 13:19, 63:19

belief [2] - 55:9, 57:5

belongs [1] - 85:18

beneficial [1] - 59:5

benefit [5] - 25:4, 47:2, 80:10, 89:4, 89:5

benefits [4] - 24:25, 25:2, 25:3

best [4] - 55:23, 71:2, 81:10, 81:13

better [5] - 19:15, 19:17, 39:12, 45:23, 88:12

between [5] - 23:14, 51:21, 52:19, 76:5, 77:12

beyond [1] - 71:7

big [3] - 24:22, 47:10, 51:24

biggest [1] - 34:7

bill [5] - 23:3, 23:7, 36:7, 58:2, 67:19, 67:21

Bill's [1] - 12:25

billing [4] - 22:18, 51:1, 51:17

bills [5] - 23:7, 23:8, 23:9, 55:24, 57:24

bit [6] - 21:23, 22:12, 22:14, 22:22, 67:25, 69:14

bizarre [1] - 49:19

Blackberry [2] - 27:1, 28:6

Blockbuster [1] - 46:14

blocking [1] - 40:24

Boch [14] - 46:15, 46:16, 47:23, 50:8, 50:9, 50:11, 51:14, 51:21, 52:2, 77:13, 84:15, 84:17, 85:2, 87:19

Boch's [1] - 52:8

Boden [1] - 45:8

bond [1] - 50:5

Book [1] - 42:22

bore [1] - 28:9

bottom [1] - 34:3

bounty [1] - 53:8

bracket [1] - 40:8

Brad [3] - 47:22, 50:7, 52:9

breach [1] - 50:10

breath [1] - 81:22

Brian [1] - 78:5

brief [3] - 63:11, 78:4, 82:13

briefed [2] - 47:18, 75:20

briefing [5] - 21:24, 25:1, 25:15, 26:5, 87:7

briefly [6] - 12:21, 72:14, 74:22, 75:16, 82:12, 82:14

briefs [3] - 5:23, 86:19, 86:20

bring [4] - 13:4, 26:2, 51:17, 55:22

bringing [3] - 16:16, 56:2, 77:1

broad [1] - 41:3

broadly [1] - 71:5

broadness [1] - 40:11

broken [1] - 69:19

brought [4] - 66:16, 75:23, 77:20, 82:11

Brown [1] - 10:13

bucks [2] - 64:15, 64:24

bump [1] - 71:5

bunch [1] - 76:18

burden [3] - 39:6, 67:5, 76:15

bureaus [1] - 57:1

Bursor [2] - 13:12, 25:23

business [1] - 90:25

bust [1] - 48:23

bust-out [1] - 48:23
button [1] - 69:25

## C

C-i-c-e-l-s-k-i [1] - 44:6
CAFA [1] - 53:5
calculation [1] - 44:19
California [6] - 5:5, 14:12, 15:3, 16:10, 33:14, 81:14
cancellation [2] - 4:25, 5:3
cancelled [2] - 56:13, 59:15
cannot [2] - 44:22, 49:11
cap [3] - 38:13, 73:9
capable [1] - 31:7
card [5] - 18:23, 27:21, 28:6, 28:12, 28:14
cards [4] - 18:21, 28:10, 43:2, 47:7
care [1] - 72:18
Carl [1] - 11:3
Carla [1] - 10:22
carrier [3] - 18:16, 29:3, 77:1
carriers [6] - 18:5, 23:25, 24:3, 24:11, 24:24, 65:4
carrying [1] - 62:5
case [117] - 5:4, 6:1, 8:11, 12:22, 12:25, 13:6, 14:9, 14:10, 14:15, 14:17, 15:4, 15:13, 15:23, 16:2, 16:8, 16:9, 16:13, 16:14, 16:15, 16:20, 16:25, 20:10, 20:14, 20:17, 20:19, 20:23, 21:2, 21:6, 23:21, 23:22, 24:22, 25:20, 25:21, 25:24, 26:1, 26:12, 27:18, 27:25, 29:25, 33:5, 33:16, 43:13, 43:23, 44:11, 44:23, 45:6, 45:8, 47:4, 47:19, 47:25, 48:8, 49:16, 49:20, 50:13, 50:25, 51:3, 51:11, 51:13, 51:18, 51:22, 52:21, 52:25, 53:1, 53:4, 55:3, 57:1, 58:23, 61:16, 62:1, 62:3, 63:2, 63:13, 63:15, 64:3, 64:4, 67:18, 69:17, 71:2, 72:17, 75:9, 75:15, 75:23, 77:11, 77:13, 77:14, 77:15,

77:22, 78:11, 79:13, 79:18, 80:20, 80:22, 81:1, 81:6, 81:8, 81:13, 81:14, 81:15, 81:16, 81:24, 82:6, 83:14, 84:7, 84:9, 84:17, 84:18, 84:21, 85:17, 87:16, 88:10, 91:12
cases [37] - 12:23, 13:1, 13:2, 13:7, 13:12, 14:11, 14:14, 15:9, 16:5, 20:6, 20:11, 20:12, 24:19, 24:20, 24:21, 25:5, 25:16, 37:20, 37:22, 40:3, 43:21, 44:15, 46:25, 55:1, 60:13, 68:10, 70:2, 70:15, 74:10, 74:11, 75:21, 75:22, 76:1, 79:3, 80:8, 86:25
cash [5] - 18:18, 39:25, 42:7, 43:2, 55:17
Cash [1] - 46:16
cashed [1] - 43:18
categories [1] - 10:2
caused [1] - 55:7
cave [1] - 22:12
cease [1] - 65:4
Cecchi [14] - 6:15, 12:3, 12:16, 33:6, 33:21, 34:1, 34:10, 55:19, 62:4, 72:13, 72:18, 82:11, 88:4
CECCHI [23] - 6:16, 7:7, 10:6, 10:17, 10:19, 12:4, 12:20, 34:16, 35:15, 55:20, 72:14, 72:17, 72:20, 73:11, 73:15, 73:21, 74:1, 74:17, 74:22, 87:23, 88:20, 90:1, 92:21
Cecchi's [3] - 21:16, 55:21, 68:7
Cell [4] - 40:23
cell [4] - 13:11, 27:1, 27:10, 59:21
Center [1] - 37:15
centers [1] - 51:21
Central [3] - 14:12, 15:2, 15:24
cents [1] - 83:12
cert [2] - 21:1, 37:14
certain [3] - 18:1, 23:5, 57:22
certainly [5] - 41:8, 42:18, 58:7, 74:1, 85:19
Certainly [1] - 35:1, 89:2
certification [1] -

39:14
certified [2] - 16:10, 20:12
cetera [2] - 5:14, 40:18
challenged [2] - 24:18, 67:11
chance [1] - 37:24
change [4] - 28:21, 60:6, 69:8
changes [1] - 38:3
changing [2] - 60:1, 61:3
Chapman [1] - 50:8
charge [8] - 24:5, 41:13, 54:13, 59:15, 66:4, 66:11, 67:15, 67:16
charged [10] - 4:21, 4:24, 5:7, 36:7, 46:9, 54:4, 54:12, 62:16, 63:4, 65:16
charges [2] - 67:19, 67:20
charitable [1] - 26:19
charity [4] - 46:7, 46:8, 79:5, 79:11
chart [1] - 38:16
check [4] - 49:15, 90:11, 91:12, 92:17
checked [3] - 39:7, 42:3, 52:7
checks [3] - 43:17, 43:18, 70:23, 80:17
Chief [1] - 14:11
choose [2] - 19:9, 52:4
chosen [1] - 59:2
Christopher [2] - 7:3, 36:1
CIC [1] - 44:5
Cicelski [1] - 44:3
CICELSKI [1] - 44:3
Cingular [4] - 14:6, 14:9, 14:15, 15:15
Circuit [6] - 16:1, 43:23, 43:25, 50:12, 81:8, 86:13
circulation [1] - 23:2
circumstance [1] - 92:12
circumstances [3] - 57:6, 57:25, 58:6
cite [3] - 44:9, 47:19, 57:9
cited [2] - 53:1, 75:21
citing [1] - 44:10
citizen [1] - 5:5
claim [29] - 4:18, 20:15, 31:3, 39:10, 39:12, 40:12, 40:13, 40:18, 41:25, 42:15, 43:14, 45:4, 58:10, 62:13, 62:20, 64:18,

64:25, 65:12, 66:3, 66:15, 66:17, 70:20, 70:21, 71:21, 74:3, 74:6, 74:7, 80:17
claimant [2] - 40:1
claimants [5] - 45:7, 60:8, 69:16, 69:22, 70:16
claimed [2] - 18:25, 42:7
claiming [2] - 41:8, 47:1
claims [40] - 23:21, 27:17, 30:8, 30:9, 30:13, 30:15, 31:8, 31:11, 31:12, 31:13, 39:14, 40:2, 41:3, 41:10, 41:15, 42:1, 42:4, 42:8, 44:22, 49:17, 64:12, 67:23, 68:2, 69:24, 70:3, 70:7, 70:17, 70:19, 71:6, 71:10, 71:11, 71:20, 72:3, 73:19, 78:24, 79:2, 79:3, 79:8, 79:13, 80:7
clarify [2] - 18:22, 26:6
Clark [1] - 10:13
class [107] - 4:18, 5:18, 5:24, 9:13, 9:14, 11:8, 11:17, 13:5, 16:3, 16:9, 16:10, 18:11, 18:19, 19:8, 20:16, 20:22, 21:5, 21:13, 24:9, 24:12, 25:14, 27:19, 29:16, 30:2, 30:21, 32:11, 32:15, 36:2, 37:1, 38:2, 38:14, 38:21, 38:23, 39:8, 39:17, 39:21, 39:22, 40:5, 41:6, 42:8, 44:19, 45:16, 46:8, 47:2, 47:6, 47:8, 47:24, 48:16, 49:2, 49:13, 49:16, 49:17, 49:25, 51:1, 52:19, 55:1, 55:2, 55:3, 56:5, 56:8, 57:14, 57:15, 58:9, 58:25, 59:18, 60:21, 60:24, 63:13, 63:17, 64:10, 71:25, 72:21, 72:22, 73:14, 73:23, 74:8, 74:25, 75:22, 76:1, 76:2, 76:4, 77:13, 77:14, 78:5, 79:1, 79:6, 79:11, 79:25, 80:4, 80:10, 80:14, 80:16, 81:5, 81:10, 81:20, 81:23, 82:1, 82:5, 84:6, 84:25, 87:2, 88:7, 89:4

classes [2] - 21:14, 29:3
classwide [1] - 16:24
clause [1] - 48:23
clear [6] - 12:12, 48:25, 49:10, 63:9, 90:13, 91:10
clearly [5] - 85:14, 85:22, 86:1, 88:14, 88:15
Clerk [1] - 31:24
clerk [2] - 6:7, 9:5
CLERK [1] - 8:25
client [8] - 8:10, 31:11, 67:6, 69:15, 91:11, 92:4, 92:15, 92:18
client's [2] - 70:8, 72:8
clients [1] - 32:20
close [2] - 72:22, 74:9
closing [1] - 23:23
co [1] - 52:23
co-counsel [1] - 52:23
Code [1] - 9:12
Colisimo [8] - 25:21, 26:12, 27:4, 27:18, 27:25, 28:2, 28:4, 28:22
collect [2] - 65:4, 65:10
collection [8] - 41:4, 54:18, 62:10, 65:20, 66:2, 66:7, 66:16, 75:8
Collins [4] - 14:11, 15:6, 15:8, 15:20
Colon [2] - 26:17, 28:25
color [1] - 57:22
combined [1] - 59:20
coming [5] - 10:18, 12:10, 12:14, 16:23, 69:15
comments [1] - 75:17
commit [1] - 76:24
common [2] - 36:22, 37:2, 37:3, 37:5, 37:6, 38:1
communications [1] - 10:19
Communications [1] - 4:22
companies [1] - 29:12
Company [2] - 44:4, 44:8
company [3] - 4:25, 39:20, 62:4
compares [1] - 18:13
compel [5] - 5:12, 15:25, 16:16
compensate [1] - 53:3
competition [2] - 51:1, 53:6

**complained** [1] - 41:7
**complaint** [2] - 31:14, 54:24
**complete** [2] - 77:8, 77:22
**completely** [3] - 37:19, 43:13, 50:14
**complex** [1] - 20:8
**complexity** [1] - 20:6
**composed** [2] - 10:12, 11:3
**compromise** [4] - 37:22, 63:24, 64:4, 64:6
**compromised** [1] - 54:15
**computer** [1] - 27:22
**concealed** [1] - 50:19
**concept** [2] - 74:5, 74:10
**conceptually** [1] - 74:11
**concern** [5] - 55:16, 70:24, 72:25, 73:3
**concerned** [2] - 59:11, 78:7
**concerning** [1] - 59:7
**concerns** [2] - 55:10, 59:24
**concluded** [1] - 16:12
**concludes** [1] - 14:5
**concluding** [1] - 82:14
**condemnation** [1] - 56:14
**Conduct** [1] - 49:6
**confer** [1] - 31:24
**conference** [3] - 7:9, 28:13, 33:24
**conflict** [1] - 40:7
**Congress** [1] - 37:18
**connection** [6] - 10:8, 84:7, 84:8, 84:9, 84:10, 85:17
**Connolly** [7] - 6:19, 7:15, 12:5, 19:15, 21:20, 21:22, 74:3
**CONNOLLY** [62] - 6:20, 7:16, 12:6, 21:21, 26:19, 26:25, 27:3, 27:10, 27:12, 28:24, 29:23, 30:1, 30:4, 30:9, 30:22, 31:1, 31:10, 31:17, 31:19, 31:22, 61:23, 62:6, 62:21, 63:6, 64:17, 64:20, 64:22, 65:1, 65:7, 65:13, 65:21, 65:24, 66:6, 66:13, 66:22, 67:2, 67:5, 68:12, 68:14, 68:20, 68:24, 69:5, 71:3, 71:18, 72:7, 89:12, 89:15, 89:21,

90:4, 90:15, 90:19, 90:23, 91:4, 91:10, 91:17, 91:19, 91:22, 92:1, 92:8, 92:11, 92:19, 92:25
**Connolly's** [1] - 73:3
**consi** [1] - 68:2
**consider** [6] - 9:23, 21:7, 40:10, 58:3, 60:18, 86:5
**consideration** [3] - 58:23, 68:10, 88:23
**considerations** [2] - 73:17
**considered** [5] - 18:12, 19:13, 19:16, 54:13, 58:24
**consistent** [1] - 37:5
**consolidated** [3] - 14:11, 15:4, 16:5
**constitute** [1] - 4:24
**constitutes** [1] - 92:13
**construed** [1] - 58:20
**Consulting's** [1] - 22:25
**Consumer** [2] - 4:23, 39:11
**consumers** [2] - 39:3, 39:4
**contacted** [1] - 6:7
**contain** [1] - 29:22
**contained** [2] - 5:6, 7:11
**contains** [1] - 64:10
**contemplated** [2] - 45:6, 87:15
**contemplates** [2] - 43:10, 53:6
**contend** [2] - 62:11, 78:8
**contention** [1] - 33:13
**continue** [7] - 9:10, 30:16, 55:6, 62:11, 62:12, 65:10, 65:11
**continued** [1] - 20:1
**continues** [3] - 46:14, 49:20, 57:21
**contract** [5] - 28:21, 78:8, 78:12, 78:18, 78:23
**contracted** [4] - 26:8, 28:4, 28:5, 28:6
**contracts** [2] - 14:7, 28:7
**contractual** [1] - 28:1
**contributed** [1] - 81:12
**control** [1] - 80:3
**controlling** [1] - 79:24
**controversy** [1] - 9:15
**conversation** [4] - 33:21, 34:19, 92:2, 92:4

**convert** [3] - 19:8, 19:11, 25:7
**Cook** [1] - 50:13
**coordinate** [1] - 7:21
**copy** [3] - 9:4, 9:7, 87:24
**corners** [2] - 85:15, 88:1
**correct** [6] - 32:24, 35:8, 62:14, 65:14, 66:11, 83:1
**Correct** [3] - 56:19, 56:22, 86:14
**correctly** [1] - 23:16
**correspondence** [1] - 34:4
**correspondingly** [1] - 27:16
**cost** [4] - 33:19, 73:19, 81:18, 82:3
**costs** [3] - 33:6, 33:18, 37:4
**counsel** [65] - 4:3, 5:25, 6:4, 6:5, 9:19, 10:1, 11:6, 11:8, 11:9, 11:14, 11:17, 12:8, 13:5, 17:19, 25:14, 25:22, 26:12, 33:9, 35:3, 35:4, 38:14, 40:5, 49:9, 49:16, 52:19, 52:20, 52:23, 53:3, 53:6, 53:9, 60:21, 60:25, 61:14, 61:20, 63:22, 64:10, 71:25, 72:21, 76:2, 77:5, 77:13, 77:14, 77:15, 80:9, 81:5, 81:6, 81:10, 81:21, 81:23, 82:1, 82:5, 84:2, 84:6, 84:15, 84:18, 84:25, 86:17, 87:2, 89:5, 89:7
**Counsel** [5] - 4:9, 51:3, 51:5, 52:10, 86:21
**counsels** [2] - 58:23, 58:25
**count** [1] - 30:6
**counterclaim** [1] - 66:9
**counterclaims** [1] - 20:18
**country** [4] - 13:2, 24:16, 24:17, 55:2
**County** [6] - 13:12, 14:14, 40:22, 50:13, 52:9, 77:9
**couple** [3] - 42:16, 48:11, 74:24
**course** [7] - 4:20, 8:9, 11:5, 46:11, 48:21, 70:10, 89:9
**court** [17] - 5:9, 6:6,

8:17, 8:20, 10:3, 15:6, 24:20, 25:5, 51:8, 53:21, 76:20, 79:25, 80:23, 81:19, 81:22, 81:25, 85:22
**Court** [70] - 4:2, 7:12, 8:15, 9:8, 9:11, 9:17, 9:23, 11:18, 14:21, 14:22, 14:24, 16:6, 16:17, 16:18, 20:11, 21:1, 25:12, 29:19, 30:18, 31:24, 32:5, 34:21, 35:7, 35:17, 37:8, 37:14, 40:10, 45:10, 47:14, 48:19, 50:12, 50:14, 51:24, 52:12, 54:5, 55:2, 55:15, 56:3, 58:3, 58:14, 58:16, 59:25, 60:5, 60:14, 60:18, 61:4, 61:5, 61:13, 61:15, 63:8, 63:11, 68:8, 70:10, 73:17, 75:12, 75:15, 77:24, 79:19, 81:9, 83:2, 84:14, 85:5, 85:15, 85:23, 87:3, 87:5, 87:6, 87:10, 87:18, 88:16
**Court's** [7] - 12:21, 13:25, 54:10, 57:19, 58:16, 59:7, 60:17
**courteous** [1] - 63:10
**courtesy** [1] - 77:24
**courts** [7] - 59:6, 60:7, 80:3, 80:15, 80:19, 81:11
**covered** [4] - 20:7, 25:24, 27:13, 64:15
**crazy** [1] - 6:25
**create** [2] - 85:21, 87:1
**created** [2] - 54:15, 60:3
**creating** [1] - 73:4
**credit** [30] - 41:4, 41:6, 41:12, 41:13, 47:10, 54:14, 54:15, 54:16, 55:7, 55:15, 56:7, 56:12, 56:15, 56:20, 57:1, 57:7, 57:12, 57:15, 59:2, 59:11, 59:17, 60:1, 60:3, 60:7, 61:6, 63:16, 66:9, 66:12, 67:25, 75:13
**criticize** [1] - 22:21
**cross** [2] - 39:7, 47:24
**cross-checked** [1] - 39:7
**cross-examination** [1] - 47:24
**culminated** [1] - 5:14
**current** [5] - 23:5, 29:21, 36:3, 48:20, 51:20
**customer** [4] - 26:8, 29:1, 32:16, 54:3
**customers** [11] - 4:24, 22:10, 23:5, 23:6, 23:9, 24:17, 24:23,

29:15, 30:3, 30:18, 30:20
**cut** [1] - 49:15
**Cy** [1] - 43:13
**cy** [19] - 18:20, 38:10, 39:22, 43:2, 43:9, 43:12, 43:18, 44:17, 45:5, 45:15, 47:10, 69:8, 69:12, 69:14, 69:17, 70:6, 70:13, 73:9, 86:4
**cycle** [1] - 60:6

# D

**damage** [3] - 13:9, 20:14, 56:6
**damaged** [4] - 43:16, 72:23, 78:14, 78:17
**damages** [25] - 20:16, 20:20, 21:5, 24:1, 24:4, 38:13, 41:4, 41:12, 41:17, 41:19, 42:18, 42:19, 44:19, 56:10, 65:12, 66:12, 70:20, 72:22, 73:2, 74:9, 74:16, 78:9
**danger** [1] - 72:25
**data** [2] - 28:6, 80:7
**date** [3] - 5:20, 90:9, 90:25
**dated** [1] - 58:5
**dates** [3] - 5:21, 23:15
**David** [1] - 10:12
**days** [10] - 16:23, 16:25, 17:13, 33:22, 42:5, 42:10, 49:15, 64:2, 78:12, 90:25
**deadline** [1] - 49:14
**deal** [12] - 4:6, 11:19, 11:23, 13:15, 34:23, 46:19, 52:15, 54:9, 61:15, 64:2, 83:10, 83:13
**dealing** [4] - 21:2, 39:19, 71:1, 77:25
**dealt** [1] - 24:21
**debilitating** [1] - 55:6
**debt** [2] - 75:9, 75:11
**debts** [3] - 41:5, 75:10, 75:12
**decency** [1] - 77:23
**decide** [4] - 34:25, 69:25, 88:5, 88:16
**decided** [1] - 13:5
**decision** [9] - 11:19, 15:21, 16:19, 48:7, 58:16, 59:9, 61:7, 71:9, 86:16
**decisions** [1] - 59:6
**declaration** [2] - 22:25, 84:25
**declarations** [3] -

22:13, 28:1, 28:19
**declaratory** [2] - 84:1, 86:8
**deemed** [1] - 15:22
**defamation** [5] - 55:7, 55:16, 57:16, 59:11, 67:24
**defeating** [1] - 59:20
**defendant** [9] - 5:11, 9:15, 14:6, 16:16, 18:20, 20:21, 21:22, 56:25, 79:5
**defendants** [8] - 18:2, 29:8, 29:10, 31:5, 70:2, 75:11, 75:15, 81:2
**defending** [2] - 23:21, 76:25
**defense** [11] - 5:25, 11:9, 11:18, 12:18, 24:9, 40:18, 58:1, 61:19, 66:6, 66:8, 66:15
**defer** [1] - 70:9
**definitely** [2] - 41:14, 47:20
**definition** [1] - 30:20
**delay** [1] - 60:22
**deleterious** [1] - 60:20
**demeaning** [1] - 59:3
**demonstration** [1] - 28:10
**denied** [4] - 5:12, 15:8, 15:25, 60:4
**denying** [2] - 15:21, 16:15
**deposed** [1] - 16:4
**depositions** [2] - 14:25, 15:17
**designed** [2] - 72:21, 79:12
**desire** [1] - 6:7
**despite** [1] - 62:1
**determine** [4] - 8:7, 15:11, 56:8, 81:10
**determined** [1] - 54:22
**develop** [1] - 49:12
**device** [6] - 26:8, 27:20, 28:3, 28:20, 29:24, 44:18
**devices** [3] - 27:13, 28:17, 28:21
**dialog** [1] - 31:7
**Dias** [8] - 4:2, 32:4, 32:11, 32:13, 32:20, 34:7, 49:9, 52:21
**Dias'** [1] - 17:19
**difference** [1] - 18:9
**differences** [1] - 56:6
**different** [15] - 7:24, 9:14, 13:5, 18:2, 18:4, 23:20, 24:13,

46:17, 63:2, 63:6, 68:11, 68:18, 74:14, 92:1, 92:3
**difficult** [3] - 61:14, 61:22, 70:2
**diminish** [1] - 85:1
**direct** [3] - 22:11, 22:19, 34:19
**directed** [1] - 75:18
**directing** [1] - 35:4
**directly** [2] - 37:1, 41:16
**discovered** [1] - 19:25
**discovery** [6] - 5:10, 14:25, 15:10, 15:14, 16:3, 16:9
**discretion** [6] - 53:3, 72:10, 74:18, 75:24, 76:4, 76:10
**discuss** [1] - 34:13
**disfavored** [1] - 69:18
**disingenuous** [1] - 55:23
**dismiss** [1] - 29:7
**dismissed** [4] - 16:2, 26:1, 29:10, 77:2
**disparage** [1] - 58:20
**dispute** [4] - 40:15, 49:8, 49:10, 77:20
**disputes** [1] - 14:25
**disseminated** [1] - 30:6
**distinguish** [2] - 26:7, 26:22
**distinguishing** [1] - 12:24
**distress** [1] - 60:12
**distribute** [5] - 39:16, 42:12, 73:10, 81:23, 82:1
**distributed** [3] - 37:7, 48:16, 91:16
**distribution** [14] - 36:23, 36:25, 37:3, 38:1, 38:9, 38:16, 39:21, 42:6, 44:19, 72:2, 78:6, 78:19, 92:9
**District** [6] - 7:23, 14:12, 15:3, 15:24, 45:10, 87:18
**divide** [1] - 70:7
**dividing** [1] - 70:15
**division** [2] - 50:18, 50:19
**docket** [1] - 12:9
**document** [1] - 92:6
**Document** [1] - 9:8
**documentation** [1] - 11:23
**documents** [2] - 15:15, 28:2
**dollar** [3] - 23:25, 24:3, 48:22, 83:12

**dollars** [14] - 18:24, 42:17, 43:1, 55:18, 56:12, 57:4, 59:25, 65:18, 65:19, 66:18, 67:22, 67:24, 73:7, 77:4
**done** [9] - 29:5, 35:2, 39:17, 42:8, 50:19, 59:14, 68:19, 72:5, 77:4
**Donna** [1] - 52:3
**double** [1] - 47:8
**doubt** [1] - 71:25
**Douglas** [3] - 17:3, 17:7, 23:13
**down** [9] - 29:14, 43:1, 43:5, 51:9, 65:25, 78:21, 80:22
**drew** [1] - 69:6
**drive** [1] - 71:9
**due** [2] - 59:19, 90:24
**duration** [2] - 20:6, 23:12
**during** [5] - 4:20, 6:9, 15:14, 18:11, 59:17
**During** [1] - 14:23

# E

**early** [8] - 4:19, 24:2, 46:13, 49:11, 54:25, 67:8, 67:18, 78:22
**easiest** [1] - 8:2
**easy** [5] - 42:7, 54:9, 64:5, 71:10, 72:8
**eaten** [1] - 50:2
**ECF** [2] - 7:22
**Eckman** [3] - 57:14, 58:11, 58:15
**effect** [6] - 15:19, 40:19, 56:14, 57:3, 60:20, 60:23
**effectively** [1] - 38:3
**effects** [1] - 55:7
**effort** [4] - 13:18, 54:23, 58:20, 82:5
**efforts** [9] - 12:24, 54:18, 57:9, 59:20, 61:8, 62:3, 62:4, 65:4
**EFT** [1] - 83:6
**eighties** [1] - 44:25
**either** [9] - 18:19, 32:11, 32:22, 41:25, 49:2, 56:11, 69:16, 87:1, 88:17
**Either/or** [1] - 57:2
**electronically** [3] - 23:9, 41:25, 45:4
**element** [1] - 21:24
**eliminate** [1] - 62:23
**email** [2] - 34:4, 39:13
**emailed** [1] - 45:2
**emails** [1] - 23:8

**encourage** [2] - 70:17, 70:19
**end** [13] - 5:2, 42:5, 42:10, 66:18, 70:4, 78:12, 78:22, 85:13, 87:10, 88:13, 90:7, 90:12
**energy** [1] - 76:25
**enforceable** [1] - 16:20
**enjoin** [2] - 76:16, 85:17
**enjoined** [1] - 77:3
**enjoy** [2] - 13:16, 14:2
**entail** [2] - 60:23, 83:10
**enter** [1] - 36:25
**entered** [1] - 5:13
**entertain** [2] - 85:19, 87:7
**entire** [2] - 45:7, 90:18
**entirely** [2] - 21:3, 56:16
**entitled** [2] - 55:15, 60:9
**entry** [3] - 12:9, 90:9, 90:25
**equipment** [1] - 26:23
**equitable** [1] - 81:23
**Eric** [1] - 50:12
**escrow** [8] - 90:6, 90:8, 90:21, 90:24, 91:7, 91:8, 92:7, 92:10
**especially** [1] - 38:10
**essentially** [3] - 84:20, 86:3, 86:7
**Essentially** [1] - 41:24
**establishing** [1] - 21:5
**et** [2] - 5:14, 40:18
**ETF** [77] - 4:3, 5:6, 5:7, 12:23, 13:2, 17:20, 18:4, 18:5, 18:11, 19:9, 21:12, 23:24, 24:3, 24:5, 24:8, 24:13, 24:16, 25:7, 25:14, 26:9, 26:12, 27:16, 29:22, 31:9, 31:12, 32:17, 32:22, 32:23, 33:5, 36:5, 37:25, 40:12, 40:14, 40:19, 41:2, 41:4, 41:12, 41:13, 47:14, 52:19, 52:20, 53:9, 54:4, 54:22, 55:5, 55:7, 55:13, 55:17, 56:13, 57:8, 57:12, 57:13, 58:10, 59:12, 60:4, 62:8, 62:11, 62:19, 62:20, 63:1, 63:2, 63:3, 64:14, 64:25, 65:16, 65:17, 67:16, 67:22, 68:2, 75:6, 78:21,

82:24, 83:7, 84:15, 84:18, 86:17
**ETFs** [16] - 4:20, 4:24, 14:7, 15:18, 18:3, 18:8, 19:7, 24:17, 24:18, 24:21, 27:17, 62:15, 62:24, 65:5, 75:7
**ethnic** [1] - 57:22
**event** [5] - 7:1, 24:2, 25:10, 34:22, 50:1
**events** [1] - 63:23
**eventually** [1] - 5:21
**evidenced** [1] - 22:24
**evidentiary** [3] - 38:6, 46:21, 47:21
**Ex** [1] - 17:7
**Ex-Judge** [1] - 17:7
**exactitude** [2] - 71:1, 71:2
**exactly** [6] - 43:15, 63:18, 75:1, 81:9, 88:1
**Exactly** [2] - 27:3, 90:19
**examination** [2] - 47:21, 47:24
**examined** [1] - 50:15
**example** [6] - 18:7, 41:4, 41:18, 67:6, 73:9, 86:4
**Examples** [1] - 44:20
**exceed** [2] - 74:15, 80:9
**exceeds** [1] - 9:16
**excellent** [2] - 21:13, 21:18
**except** [1] - 43:16
**exclusion** [2] - 30:10, 30:14
**exclusive** [2] - 25:13, 76:14
**excuse** [4] - 16:14, 19:5, 27:5, 60:10
**exercise** [4] - 60:9, 61:5, 61:8, 87:11
**exhausted** [2] - 79:8, 79:9
**Exhibit** [1] - 34:5
**exhibit** [3] - 51:14, 51:16, 57:21
**exhibits** [1] - 28:1
**existed** [1] - 44:24
**exists** [1] - 87:3
**expand** [1] - 86:3
**expect** [2] - 29:19, 30:24
**expecting** [2] - 40:1, 70:21
**expedited** [3] - 13:20, 15:10, 15:14
**expense** [3] - 60:23, 83:10, 83:13
**expenses** [1] - 37:4

**experience** [7] - 26:20, 29:1, 29:6, 69:13, 71:4, 86:25
**experienced** [1] - 74:3
**experiences** [1] - 31:14
**Explain** [1] - 91:21
**explained** [3] - 33:8, 34:10, 59:15
**explanation** [2] - 55:15, 55:21
**express** [1] - 64:10
**extent** [4] - 8:14, 20:14, 40:25, 41:11
**extraordinary** [1] - 82:5
**extrapolated** [1] - 47:5
**extremely** [1] - 42:22

## F

**F.2d** [3] - 43:24, 44:1, 44:2
**Face** [1] - 42:22
**faced** [1] - 75:13
**fact** [17] - 6:5, 8:16, 9:18, 9:23, 20:17, 20:19, 21:8, 23:24, 26:1, 28:20, 46:3, 59:14, 62:3, 63:12, 66:11, 68:7, 82:1
**factor** [1] - 24:9
**factors** [7] - 12:18, 12:24, 18:12, 20:5, 23:20, 64:1, 64:3
**facts** [1] - 21:7
**factual** [1] - 15:12
**fail** [1] - 57:23
**failed** [1] - 60:7
**fails** [1] - 55:12
**fair** [5] - 55:11, 59:24, 60:20, 63:22, 75:3
**fairer** [1] - 61:2
**fairly** [1] - 42:7
**Fairness** [1] - 37:17
**fairness** [4] - 13:22, 13:24, 77:16, 80:5
**faith** [1] - 34:12
**fall** [1] - 30:20
**familiar** [2] - 7:13, 16:7
**familiarity** [2] - 46:11, 75:6
**far** [2] - 29:7, 52:10
**Faruqi** [2] - 25:22
**fashion** [1] - 74:18
**fashioning** [1] - 70:11
**favorably** [1] - 18:14
**FCC** [9] - 16:11, 54:25, 59:19, 59:21, 63:24, 64:8, 64:9, 64:11

**feature** [1] - 49:11
**federal** [2] - 80:4, 80:22
**Federal** [3] - 4:22, 14:22, 50:2
**Fedor** [1] - 58:4
**fee** [26] - 4:24, 13:10, 13:16, 16:12, 17:22, 24:2, 46:13, 50:16, 50:20, 53:2, 66:19, 67:8, 67:18, 75:19, 76:5, 76:9, 76:13, 77:18, 78:17, 81:3, 81:19, 81:23, 81:24, 82:7, 84:10, 92:22
**fees** [40] - 4:19, 11:22, 25:9, 25:13, 33:5, 34:25, 37:4, 40:7, 45:21, 46:9, 46:19, 47:9, 47:12, 47:15, 47:17, 47:25, 48:6, 48:21, 48:22, 48:24, 49:2, 49:9, 50:13, 52:15, 53:8, 69:1, 69:9, 72:2, 75:25, 79:14, 79:23, 80:4, 80:9, 81:11, 87:10, 88:9, 88:24, 89:7, 91:6, 91:8
**felt** [2] - 22:2, 33:14
**few** [4] - 23:11, 56:1, 57:6, 78:4
**fiduciary** [1] - 76:3
**fifty** [1] - 18:5
**fight** [4] - 26:4, 54:23, 56:2, 59:12
**fighting** [1] - 88:9
**figure** [3] - 19:13, 88:11, 88:24
**file** [6] - 7:25, 8:3, 9:6, 65:25, 74:7, 88:17
**filed** [24] - 5:9, 6:25, 8:24, 14:18, 14:19, 14:20, 15:23, 23:17, 25:20, 25:24, 28:25, 47:13, 58:10, 58:18, 58:24, 71:20, 76:17, 76:19, 77:6, 80:8, 84:1, 84:16, 85:21, 87:8
**filer** [1] - 7:22
**filing** [3] - 12:9, 23:15, 87:4
**filings** [2] - 75:18
**Final** [1] - 90:17
**final** [25] - 5:20, 5:22, 11:11, 13:16, 14:2, 22:4, 25:17, 25:18, 26:2, 26:6, 26:10, 30:19, 36:6, 53:5, 71:6, 71:7, 71:9, 89:16, 89:17, 90:7, 90:9, 90:16, 90:17, 90:25, 92:13

**finalization** [1] - 60:22
**finally** [1] - 25:15
**financial** [1] - 56:2
**fine** [1] - 36:17
**finger** [1] - 67:12
**finish** [1] - 76:23
**firm** [7] - 25:22, 50:8, 50:9, 52:8, 53:7, 55:25, 76:18
**Firm** [1] - 7:2
**firms** [3] - 17:18, 17:20, 55:25
**first** [15] - 11:8, 12:16, 13:17, 14:18, 20:6, 29:4, 34:11, 38:4, 48:18, 49:7, 49:13, 59:12, 61:20, 76:3, 89:7
**First** [4] - 11:14, 38:20, 45:10, 54:5
**five** [3] - 18:6, 42:25, 43:1
**fixed** [1] - 27:17
**flat** [8] - 19:7, 19:9, 21:12, 24:17, 26:8, 27:15, 29:22
**flesh** [1] - 54:19
**fleshed** [1] - 69:10
**flew** [1] - 33:14
**Florida** [1] - 14:20, 15:3
**fluid** [1] - 44:17
**fold** [1] - 82:5
**folks** [1] - 54:9
**follow** [1] - 11:7
**following** [1] - 58:3
**follows** [1] - 11:8
**form** [3] - 9:2, 39:10, 64:12
**formal** [1] - 5:18
**formally** [1] - 46:16
**former** [2] - 22:10, 29:21
**forms** [1] - 39:12
**forth** [1] - 11:9
**fortunate** [1] - 76:9
**forum** [1] - 25:13
**forward** [4] - 44:21, 59:8, 61:7, 75:2
**fought** [2] - 18:1, 61:25
**four** [3] - 82:15, 85:14, 87:25
**fraudulent** [3] - 70:17, 70:19, 73:18
**Freed** [6] - 46:15, 46:16, 50:7, 50:12, 51:14, 52:6
**frivolous** [3] - 85:21, 88:2, 88:14
**front** [1] - 29:17
**frustrated** [1] - 33:8
**full** [2] - 16:23, 17:13
**fully** [2] - 69:10, 75:20

**finalization** group...
**fund** [20] - 36:22, 36:23, 37:2, 37:3, 37:5, 37:7, 38:1, 38:10, 39:16, 39:25, 42:7, 45:7, 46:5, 70:15, 80:16, 81:24, 85:1, 86:3, 86:5, 90:18
**funded** [1] - 90:20
**funding** [1] - 92:23
**funds** [1] - 48:16
**futility** [1] - 61:9

## G

**games** [1] - 51:1
**Gary** [1] - 57:9
**general** [1] - 81:23
**generally** [1] - 51:25
**gentleman** [1] - 26:17
**gentlemanly** [1] - 63:10
**gentlemen** [1] - 75:11
**Girsh** [3] - 12:17, 14:1, 20:5
**Giuseppi** [1] - 6:12
**given** [16] - 9:21, 10:9, 12:13, 22:4, 31:2, 44:22, 45:3, 47:10, 49:2, 50:20, 50:21, 53:3, 58:22, 76:2, 92:7
**Gordon** [1] - 45:8
**Government** [1] - 50:3
**grab** [1] - 27:5
**grandmother** [1] - 36:18
**grant** [2] - 6:14, 6:21
**granted** [6] - 5:16, 5:17, 15:5, 26:3, 62:6, 76:9
**Granted** [1] - 54:21
**great** [5] - 24:12, 60:23, 64:1, 83:10, 83:13
**greater** [5] - 19:1, 20:20, 23:1, 23:2, 41:18
**gripe** [1] - 34:7
**group** [1] - 63:18
**groups** [1] - 10:25
**guess** [7] - 22:15, 29:20, 34:7, 48:18, 66:25, 69:1, 70:24
**guestimating** [1] - 83:4
**guidelines** [1] - 39:10
**gun** [1] - 59:23
**guys** [1] - 88:11

## H

**H.P** [3] - 4:7, 4:11, 53:24
**hac** [8] - 4:4, 6:11, 6:22, 6:25, 7:5, 7:8, 8:6, 8:17
**half** [3] - 18:15, 24:15
**Hall** [2] - 5:4, 14:8
**hand** [3] - 9:5, 27:20, 87:23
**handed** [1] - 9:8
**handing** [1] - 70:22
**handle** [2] - 74:4, 85:10
**hard** [2] - 17:25, 61:25
**harm** [1] - 48:21, 50:3
**harmed** [1] - 49:25
**Harter** [4] - 10:2, 10:11, 10:12, 12:9
**Hatch** [2] - 50:9, 51:14
**hazy** [1] - 40:21
**hear** [13] - 6:8, 11:13, 11:15, 11:20, 11:22, 11:25, 12:16, 12:18, 25:8, 53:18, 66:24, 69:4, 83:24
**heard** [8] - 6:7, 9:21, 10:5, 10:10, 24:19, 26:1, 79:21, 83:20
**hearing** [18] - 4:21, 5:21, 5:22, 6:9, 6:14, 6:23, 7:6, 11:16, 15:20, 16:10, 20:1, 34:11, 38:7, 46:21, 47:22, 48:8, 82:15, 89:1
**hearings** [1] - 14:24
**held** [1] - 80:21
**help** [5] - 29:16, 46:7, 46:8, 59:4, 60:5
**herculean** [1] - 57:9
**hide** [1] - 63:19
**high** [1] - 42:22
**higher** [3] - 22:22, 71:11, 71:13
**highlight** [2] - 22:2, 48:12
**highlights** [1] - 48:2
**himself** [2] - 28:2, 28:4
**historical** [1] - 80:7
**histories** [1] - 14:16
**history** [1] - 20:18
**hit** [1] - 21:25
**holding** [2] - 16:19, 27:20
**honest** [1] - 30:11
**Honestly** [1] - 70:8
**Honor** [137] - 6:20, 7:16, 7:18, 7:21, 8:19, 9:3, 10:6, 10:17, 12:4, 12:6,

12:20, 13:16, 13:23, 14:1, 14:4, 14:9, 14:17, 16:7, 16:22, 17:4, 17:9, 18:17, 19:14, 19:24, 20:5, 20:13, 20:24, 21:19, 21:21, 21:23, 21:25, 22:7, 22:8, 22:9, 22:14, 23:11, 23:18, 23:19, 24:19, 25:8, 25:12, 25:15, 25:16, 25:17, 26:5, 26:6, 26:15, 26:16, 26:25, 27:3, 27:5, 27:16, 27:18, 28:22, 29:4, 29:11, 29:23, 30:4, 30:6, 30:22, 31:11, 31:19, 31:22, 32:3, 32:6, 33:1, 33:3, 34:16, 35:8, 35:10, 35:18, 35:21, 36:20, 38:1, 51:7, 60:10, 61:23, 61:24, 62:6, 62:21, 63:6, 63:21, 65:7, 66:22, 67:2, 68:1, 68:3, 68:4, 68:12, 68:15, 68:20, 69:6, 69:12, 69:18, 70:5, 70:8, 70:12, 70:13, 70:24, 71:5, 74:12, 74:18, 74:24, 75:20, 76:3, 76:6, 76:10, 76:16, 76:22, 76:24, 77:2, 77:19, 78:4, 78:10, 79:6, 79:10, 79:24, 81:7, 82:8, 84:1, 84:19, 84:22, 86:1, 87:15, 87:24, 89:12, 89:15, 89:21, 90:12, 90:19, 90:24, 91:5, 91:19, 92:11, 92:19
**Honor's** [4] - 75:24, 76:14, 78:2, 88:1
**hope** [5] - 29:12, 31:1, 31:6, 61:4, 61:7
**hopefully** [1] - 13:19
**host** [1] - 80:25
**hotel** [1] - 37:24
**hours** [1] - 33:18
**house** [1] - 72:10
**huge** [1] - 47:10
**Hugh** [1] - 11:4
**Hum** [1] - 65:13
**hundred** [7] - 9:13, 18:5, 18:6, 42:17, 42:23, 67:22, 67:24
**hundred-and-seventy-five** [1] - 18:6
**hundred-fifty** [1] - 18:5
**hundred-thousand** [1] - 42:23

**hurdle** [1] - 24:4
**hurry** [1] - 35:12

## I

**i.e** [1] - 81:13
**idea** [1] - 74:6
**identify** [2] - 22:18, 67:10
**identifying** [1] - 22:10
**ignore** [2] - 35:1, 35:5
**ignored** [2] - 33:9, 33:15
**illegal** [12] - 20:15, 50:15, 54:13, 62:12, 62:13, 62:16, 66:4, 66:10, 66:11, 76:5, 76:13, 78:8
**illegality** [1] - 66:15
**Illinois** [13] - 7:2, 7:23, 8:10, 8:14, 14:15, 16:14, 16:17, 16:18, 45:8, 45:10, 77:9, 77:21, 87:21
**Illonois** [1] - 77:15
**imagine** [3] - 71:10, 81:7, 90:10
**immediately** [1] - 50:2
**impact** [1] - 60:4
**implemented** [1] - 21:12
**implementing** [1] - 21:9
**implying** [1] - 83:9
**importance** [1] - 47:24
**important** [10] - 37:10, 37:25, 38:9, 40:10, 47:21, 48:1, 48:19, 63:25, 74:7, 90:1
**importantly** [1] - 76:15
**impression** [1] - 83:9
**improper** [2] - 51:17, 63:15
**improperly** [1] - 29:8
**impropriety** [1] - 63:12
**inappropriate** [1] - 39:22
**inasmuch** [1] - 9:12
**inception** [1] - 54:24
**incidentally** [1] - 57:11
**inclined** [1] - 6:13
**include** [3] - 13:11, 56:18, 59:16
**included** [5] - 13:11, 19:20, 29:16, 30:5, 41:10
**includes** [5] - 14:13, 29:21, 30:3, 30:17, 30:19

**including** [7] - 5:11, 12:1, 16:3, 16:8, 16:15, 47:21, 60:7
**inclusion** [1] - 61:5
**inconsistent** [1] - 43:13
**increase** [1] - 39:21
**increasing** [1] - 72:4
**incredible** [1] - 21:15
**Independent** [1] - 31:5
**indicate** [1] - 30:18
**indicated** [3] - 6:7, 20:11, 49:10
**indicates** [1] - 17:7
**indication** [1] - 31:2
**individual** [6] - 6:3, 19:19, 25:2, 54:24, 56:11, 57:10
**individually** [1] - 68:11
**individuals** [2] - 56:1, 82:19
**indulgence** [1] - 54:10
**information** [9] - 12:14, 39:8, 57:16, 57:19, 58:12, 59:4, 60:15, 83:3, 83:5
**informed** [1] - 58:11
**initial** [1] - 20:7
**injunction** [8] - 19:6, 19:11, 25:19, 25:25, 26:4, 26:11, 29:13, 30:23
**injured** [1] - 44:21
**insert** [1] - 23:3
**inserts** [1] - 23:7
**insidious** [1] - 60:4
**insolvency** [1] - 50:6
**instance** [1] - 76:3
**instances** [1] - 22:2
**instead** [1] - 70:6
**insurance** [2] - 39:20, 50:4
**insure** [1] - 8:9
**insurmountable** [2] - 74:1, 74:2
**integrity** [1] - 61:3
**intend** [1] - 30:16
**intends** [1] - 77:5
**intent** [2] - 8:1, 58:19
**intercede** [1] - 59:21
**interchangeable** [2] - 28:11, 28:17
**interest** [2] - 54:17, 89:2
**interesting** [1] - 53:20
**interestingly** [2] - 40:5, 46:18
**internet** [3] - 27:22, 45:2, 45:4
**interrupting** [1] - 68:15
**introductory** [1] -

12:22
**invalidate** [1] - 37:19
**invalidated** [1] - 24:2
**invested** [2] - 74:8, 81:18
**investigate** [1] - 73:20
**investigation** [1] - 71:19
**investment** [2] - 81:18, 81:20
**invoice** [1] - 19:20
**involved** [8] - 16:12, 17:20, 58:21, 61:1, 77:10, 79:17, 81:6
**involves** [2] - 4:18, 14:8
**involving** [2] - 9:13, 40:19
**iPhone** [1] - 28:5
**irony** [1] - 55:4
**issue** [46] - 8:13, 16:17, 21:2, 21:3, 21:6, 26:16, 27:9, 28:22, 31:15, 34:5, 43:16, 43:23, 46:17, 47:12, 49:1, 50:5, 55:16, 56:2, 59:11, 68:3, 68:17, 70:14, 72:20, 73:19, 74:21, 75:5, 75:13, 75:14, 75:19, 76:21, 79:10, 79:14, 79:16, 79:22, 79:23, 81:16, 84:22, 84:24, 86:19, 88:5, 88:8, 89:1, 91:18, 92:9
**issued** [1] - 15:21
**issues** [19] - 17:23, 20:9, 20:13, 25:13, 26:4, 37:16, 46:21, 56:7, 69:9, 71:6, 74:2, 75:19, 78:6, 87:2, 89:8, 91:14, 91:15, 92:15, 92:18
**item** [1] - 56:24
**items** [1] - 23:11

## J

**Jeff** [1] - 10:15
**Jen** [1] - 28:12
**Jersey** [4] - 8:4, 16:23, 17:6, 87:20
**job** [1] - 21:16
**joined** [5] - 13:13, 25:23, 26:13, 29:8, 54:25
**joint** [2] - 52:19, 52:22
**Joni** [1] - 10:12
**Joseph** [4] - 4:1, 6:12, 32:4
**judge** [2] - 58:15, 91:13

**Judge** [23] - 6:16, 7:7, 14:11, 14:14, 15:6, 15:8, 15:20, 16:6, 16:22, 17:3, 17:5, 17:7, 17:11, 21:15, 23:13, 72:11, 72:14, 76:11, 78:3, 87:23, 88:20, 90:2, 92:21
**Judging** [1] - 55:24
**judgment** [6] - 15:19, 84:2, 86:8, 90:10, 91:1, 92:14
**July** [3] - 35:10, 35:15, 35:17
**jumping** [1] - 71:24
**June** [3] - 47:15, 58:5, 58:15
**jurisdiction** [16] - 9:11, 9:16, 15:5, 18:6, 76:14, 78:2, 84:13, 84:19, 85:4, 85:15, 86:18, 87:3, 87:9, 87:17, 87:19, 88:1
**jurisprudence** [1] - 39:23
**jury** [1] - 20:19
**justice** [2] - 60:17, 60:19
**justifications** [1] - 43:12

## K

**Kentucky** [1] - 15:1
**kept** [1] - 70:13
**kicks** [1] - 92:6
**kind** [7] - 28:2, 33:8, 39:4, 39:18, 40:9, 47:25, 85:19
**kinds** [5] - 28:7, 37:22, 49:22, 64:11, 69:13
**Kinkel** [9] - 14:14, 16:14, 16:20, 50:11, 51:22, 51:23, 52:3, 81:14, 84:6
**knowledge** [1] - 15:10
**known** [2] - 51:15, 79:17
**knows** [7] - 18:18, 46:15, 55:2, 79:25, 83:5, 87:4, 87:9

## L

**L-a-v-e-r-y** [1] - 36:11
**lack** [1] - 77:17
**laid** [1] - 24:25
**Lakin** [12] - 47:22, 50:7, 51:21, 52:5, 52:7, 52:9, 77:14, 84:15, 84:17, 85:2,
87:19
**Lamb** [1] - 57:9
**Langone** [14] - 7:4, 8:20, 36:1, 36:2, 46:11, 76:17, 76:20, 76:23, 77:4, 77:8, 79:15, 83:21, 85:7, 88:5
**LANGONE** [1] - 36:1
**Langone's** [2] - 38:8, 75:18
**language** [1] - 40:17
**laptop** [2] - 27:21, 27:22
**large** [5] - 24:23, 44:19, 70:17, 80:16, 90:20
**largely** [1] - 68:25
**largest** [1] - 18:16
**last** [6] - 8:1, 8:4, 37:24, 46:12, 67:21, 90:24
**Lastly** [1] - 26:16
**late** [7] - 7:19, 41:13, 46:13, 78:18, 78:20, 79:21, 91:20
**latter** [1] - 19:10
**lauds** [1] - 62:3
**Laughter** [4] - 35:14, 35:24, 68:23, 89:25
**Lavery** [13] - 7:1, 7:2, 7:5, 7:11, 7:17, 7:19, 36:11, 36:12, 36:14, 36:19, 69:21, 76:12, 83:17
**LAVERY** [54] - 7:18, 7:21, 8:19, 35:21, 35:25, 36:6, 36:9, 36:11, 36:13, 36:15, 36:17, 36:20, 38:20, 38:23, 40:15, 40:21, 41:11, 41:24, 44:2, 44:6, 44:8, 44:10, 44:14, 44:16, 45:12, 45:18, 45:20, 45:25, 46:2, 48:18, 51:4, 51:7, 51:13, 51:20, 52:11, 52:17, 53:12, 83:18, 83:21, 83:25, 84:5, 84:8, 84:10, 84:15, 85:6, 85:9, 85:12, 85:24, 86:1, 86:12, 86:17, 86:23, 87:15, 88:19
**Lavery's** [4] - 68:1, 68:25, 69:5, 75:16
**law** [11] - 6:7, 9:5, 42:18, 43:23, 47:13, 49:3, 49:4, 49:5, 58:4, 79:24, 80:1
**Law** [1] - 7:2
**laws** [1] - 4:23
**lawsuit** [16] - 5:9, 27:4, 28:25, 76:17,
76:19, 76:24, 77:5, 78:1, 83:19, 85:14, 86:14, 86:22, 87:9, 87:24, 88:3, 88:5
**lawsuits** [1] - 88:8
**lawyer** [4] - 6:17, 39:6, 63:20, 76:21
**lawyers** [8] - 13:4, 13:7, 13:11, 17:23, 49:13, 76:7, 76:18, 77:21
**layers** [1] - 53:17
**lead** [2] - 53:6, 84:2
**leading** [1] - 75:25
**leaking** [2] - 67:25, 68:25
**learned** [2] - 7:23, 70:1
**learning** [1] - 25:5
**least** [2] - 9:13, 37:24
**leave** [2] - 67:16, 83:14
**leeway** [1] - 52:15
**left** [5] - 18:19, 72:2, 78:12, 78:18
**legal** [2] - 52:13, 55:24, 88:13
**legality** [2] - 55:4, 59:12
**legitimacy** [1] - 59:3
**length** [1] - 17:16
**less** [5] - 23:24, 42:17, 43:9, 59:23, 72:1
**letter** [4] - 38:8, 47:15, 52:2, 58:15
**letters** [3] - 9:22, 79:16, 79:18
**level** [1] - 30:12
**liability** [1] - 37:19
**lifted** [1] - 15:6
**light** [4] - 37:12, 37:14, 37:15, 80:7
**likelihood** [1] - 11:19
**likely** [1] - 44:21
**limited** [1] - 29:6
**line** [1] - 34:3
**liquidated** [2] - 13:9, 20:14
**list** [1] - 70:3
**listed** [1] - 17:22
**litany** [1] - 60:13
**litigant** [2] - 61:13, 83:24
**litigants** [1] - 61:15
**litigated** [2] - 46:9, 46:13
**litigating** [2] - 21:14, 33:16
**litigation** [20] - 14:5, 14:16, 16:8, 16:15, 16:21, 17:20, 17:24, 20:8, 35:2, 40:22, 40:25, 46:13, 50:11, 50:13, 51:14, 51:16,
51:20, 53:9, 85:16, 88:13
**Litigation** [1] - 40:23
**live** [1] - 53:25
**lives** [1] - 60:5
**loans** [1] - 60:4
**lodestar** [2] - 12:2, 33:18
**logistically** [1] - 8:2
**Look** [2] - 45:14, 85:8
**look** [13] - 26:6, 40:17, 46:24, 48:4, 48:5, 48:13, 59:8, 61:7, 71:12, 79:20, 80:15, 88:23, 90:13
**looked** [1] - 68:11
**looking** [3] - 56:9, 56:10, 80:8
**looks** [1] - 70:19
**Los** [5] - 4:2, 15:1, 15:4, 32:5, 32:8
**lose** [1] - 62:1
**loss** [1] - 39:2
**lost** [1] - 62:2
**lottery** [2] - 70:20, 73:4
**low** [3] - 54:15, 60:1, 60:3
**lower** [3] - 24:3, 24:4, 78:22

## M

**Madison** [2] - 52:9, 77:9
**magic** [2] - 70:3, 92:16
**magnify** [2] - 71:20, 72:3
**mail** [1] - 47:14
**main** [1] - 33:13
**maintained** [1] - 90:8
**major** [4] - 15:17, 29:3, 55:10, 55:16
**majority** [3] - 13:7, 67:17, 83:5
**malpractice** [1] - 77:1
**manageability** [1] - 44:18
**March** [5] - 5:12, 15:24, 47:16
**Mark** [2] - 7:1, 36:11
**markets** [2] - 18:10, 24:15
**mathematical** [1] - 71:23
**matter** [17] - 4:18, 5:8, 5:21, 6:12, 9:10, 9:11, 9:18, 9:22, 10:9, 15:12, 34:20, 54:19, 54:22, 58:2, 81:7, 87:5, 88:22
**maximize** [1] - 38:1
**maximum** [1] - 39:2
**mean** [12] - 11:24, 39:2, 48:10, 49:21, 51:4, 68:15, 70:10, 71:22, 71:23, 73:8, 81:4, 86:7
**means** [1] - 92:16
**meant** [1] - 40:14
**measure** [1] - 74:9
**mechanism** [2] - 44:17, 79:2
**mediate** [1] - 17:11
**mediation** [4] - 5:14, 16:23, 17:13, 23:12
**meets** [1] - 12:17
**Mehaffie** [1] - 10:12
**member** [8] - 8:9, 8:15, 32:11, 32:14, 36:2, 60:21, 73:23, 74:8
**members** [13] - 9:13, 9:14, 20:16, 38:2, 38:21, 41:6, 46:8, 47:6, 48:17, 49:17, 72:22, 73:23, 80:10
**memorandum** [2] - 47:13, 58:4
**memory** [1] - 40:20
**mention** [1] - 11:24
**mentioned** [1] - 24:8
**merits** [1] - 59:2
**Mich** [2] - 44:10, 44:11
**might** [4] - 29:16, 81:7, 83:9, 89:16
**Mike** [2] - 9:7, 10:25
**million** [33] - 9:16, 15:15, 18:13, 18:15, 18:16, 18:18, 18:20, 18:23, 18:24, 19:3, 19:4, 19:5, 19:19, 37:11, 39:25, 42:12, 46:4, 47:3, 47:6, 47:7, 47:9, 48:21, 49:16, 49:19, 50:2, 71:25, 81:3, 86:6, 90:6, 90:20, 91:12
**millions** [2] - 39:3, 54:25
**Milliron** [1] - 22:7
**mine** [1] - 12:25
**minimal** [1] - 73:6
**minor** [1] - 23:11
**minuscule** [1] - 83:7
**minute** [1] - 26:21
**minutes** [4] - 7:8, 18:24, 48:11, 86:22
**mirrors** [1] - 82:21
**missed** [1] - 68:17
**mobile** [1] - 4:25
**Mobile** [18] - 13:1, 18:14, 22:5, 22:6, 22:17, 22:18, 22:23, 23:4, 25:4, 25:6,

29:2, 31:14, 40:2, 62:22, 63:7, 71:13, 75:9
**Mobile's** [1] - 18:7
**Mobility** [6] - 4:21, 13:8, 21:22, 27:15, 31:12, 54:3
**Mobility's** [1] - 90:5
**moment** [1] - 58:24
**momentarily** [1] - 4:6
**monetary** [2] - 25:2, 25:3
**money** [26] - 43:15, 45:16, 46:6, 56:25, 57:3, 63:1, 66:9, 67:16, 69:15, 69:22, 70:6, 70:8, 71:21, 72:9, 72:19, 73:25, 78:14, 79:1, 81:1, 84:6, 91:7, 91:8, 91:16, 92:7, 92:9
**months** [1] - 38:17
**moot** [2] - 86:6, 86:8
**mooted** [1] - 25:25
**morning** [3] - 34:1, 34:10, 35:21
**Most** [2] - 39:3, 67:18
**most** [6] - 38:9, 48:19, 53:7, 54:19, 59:24, 75:17
**motion** [10] - 5:11, 6:24, 8:3, 15:7, 16:16, 23:17, 25:25, 85:16, 88:14
**motions** [3] - 15:25, 25:18, 88:17
**motivating** [1] - 77:8
**motivation** [1] - 59:4
**Mottek** [1] - 13:13
**move** [1] - 89:3
**moving** [1] - 89:2
**MR** [179] - 4:7, 4:11, 6:16, 6:20, 7:7, 7:16, 7:18, 7:21, 8:19, 9:3, 10:6, 10:17, 10:19, 12:4, 12:6, 12:20, 14:4, 14:20, 17:4, 17:9, 17:13, 19:5, 19:23, 21:11, 21:21, 26:19, 26:25, 27:3, 27:10, 27:12, 28:24, 29:23, 30:1, 30:4, 30:9, 30:22, 31:1, 31:10, 31:17, 31:19, 31:22, 32:3, 32:9, 32:13, 32:16, 32:19, 32:24, 33:3, 34:16, 35:8, 35:15, 35:16, 35:18, 35:21, 35:25, 36:6, 36:9, 36:11, 36:13, 36:15, 36:17, 36:20, 38:20, 38:23, 40:15, 40:21, 41:11, 41:24, 44:2, 44:6,

44:8, 44:10, 44:14, 44:16, 45:12, 45:18, 45:20, 45:25, 46:2, 48:18, 51:4, 51:7, 51:13, 51:20, 52:11, 52:17, 53:12, 53:20, 53:23, 54:2, 54:12, 55:20, 55:21, 56:9, 56:19, 56:22, 57:2, 61:18, 61:23, 62:6, 62:21, 63:6, 64:17, 64:20, 64:22, 65:1, 65:7, 65:13, 65:21, 65:24, 66:6, 66:13, 66:22, 67:2, 67:5, 68:12, 68:14, 68:20, 68:24, 69:5, 71:3, 71:18, 72:7, 72:14, 72:17, 72:20, 73:11, 73:15, 73:21, 74:1, 74:17, 74:22, 78:4, 78:16, 80:12, 82:10, 82:13, 82:16, 82:21, 82:23, 83:3, 83:18, 83:21, 83:25, 84:5, 84:8, 84:10, 84:15, 85:6, 85:9, 85:12, 85:24, 86:1, 86:12, 86:17, 86:23, 87:15, 87:23, 88:19, 88:20, 89:12, 89:15, 89:21, 90:1, 90:4, 90:15, 90:19, 90:23, 91:4, 91:10, 91:17, 91:19, 91:22, 92:1, 92:8, 92:11, 92:19, 92:21, 92:25
**mutuality** [2] - 42:20, 43:8
**mystery** [2] - 77:8, 77:22

## N

**naive** [1] - 58:21
**name** [4] - 32:1, 36:8, 36:10, 53:24
**named** [3] - 55:2, 63:13, 84:2
**namely** [1] - 75:19
**national** [1] - 24:11
**National** [1] - 39:11
**nationwide** [1] - 16:24
**necessarily** [5] - 25:17, 31:9, 45:23, 80:18, 89:4
**necessary** [1] - 84:2
**necessity** [1] - 11:12
**need** [6] - 11:25, 39:18, 49:10, 60:15, 86:8, 91:11
**needs** [3] - 46:20, 50:14, 50:18
**negotiate** [2] - 75:14,

81:6
**negotiated** [4] - 36:24, 59:17, 59:22, 75:6
**negotiation** [1] - 18:1
**negotiations** [5] - 5:14, 16:25, 17:1, 17:15, 58:21
**Neilson** [1] - 37:15
**network** [2] - 27:23
**never** [6] - 33:12, 34:3, 49:23, 64:8, 64:21, 84:17
**nevertheless** [2] - 41:2, 52:2
**New** [6] - 8:4, 16:22, 17:6, 41:18, 42:18, 87:20
**new** [1] - 37:13
**news** [1] - 73:4
**next** [5] - 34:20, 45:20, 50:4, 52:18, 78:1
**nice** [2] - 8:13, 53:21
**Ninth** [1] - 16:1
**nobody** [1] - 43:18
**non** [1] - 25:3
**None** [3] - 24:20, 75:21, 75:22
**normally** [1] - 8:5
**Northeast** [2] - 45:9, 45:11
**Northern** [1] - 7:23
**Northwest** [1] - 44:14
**note** [4] - 6:17, 25:11, 30:8, 75:19
**noted** [4] - 20:25, 58:15, 61:24, 68:1
**nothing** [12] - 20:23, 26:2, 56:13, 60:2, 67:20, 67:22, 74:11, 77:11, 77:16, 86:15, 86:21, 92:22
**notice** [22] - 5:18, 6:24, 8:1, 19:14, 19:17, 19:18, 20:2, 21:23, 22:2, 22:11, 22:19, 22:24, 23:4, 23:10, 30:7, 32:25, 33:11, 44:22, 45:2, 45:3, 65:17, 77:1
**notices** [3] - 19:19, 19:25, 20:2
**notified** [2] - 57:8, 57:12
**notify** [2] - 56:12, 57:1
**notwithstanding** [2] - 9:23, 20:25
**November** [2] - 5:8, 5:16
**number** [11] - 6:3, 9:17, 24:15, 24:23, 28:15, 58:9, 70:7, 70:16, 71:24, 72:2,

75:7
**numbers** [4] - 28:8, 47:5, 70:16, 70:21
**numerous** [3] - 17:1, 17:15, 76:1

## O

**o'clock** [1] - 82:15
**oath** [1] - 38:6
**object** [2] - 36:21, 69:7
**objected** [4] - 32:25, 47:17, 57:10, 80:13
**objecting** [1] - 47:15
**objection** [18] - 4:12, 6:15, 6:18, 6:20, 7:11, 7:16, 37:12, 38:8, 47:17, 57:17, 58:5, 58:12, 58:18, 58:24, 59:3, 60:19, 61:21, 69:8
**objections** [6] - 7:5, 9:17, 11:18, 20:3, 38:5, 61:24
**objector** [4] - 7:3, 8:12, 9:20, 33:1
**objectors** [19] - 6:3, 6:4, 9:18, 9:25, 10:1, 10:2, 10:12, 10:14, 10:23, 11:1, 11:3, 11:5, 11:13, 11:14, 12:9, 53:15, 69:20, 80:13
**obligate** [1] - 65:3
**obligation** [2] - 62:23, 90:16, 92:23
**obligations** [1] - 90:5
**obtain** [2] - 54:14, 54:18
**Obviously** [1] - 78:25
**obviously** [6] - 8:2, 11:24, 45:1, 85:18, 88:22, 91:24
**occasion** [1] - 17:14
**occasions** [1] - 17:14
**occur** [1] - 87:16
**occurred** [1] - 20:9
**odd** [1] - 49:11
**odds** [1] - 50:9
**offer** [1] - 69:13
**offered** [1] - 25:6
**offers** [2] - 62:24, 62:25
**office** [2] - 7:22, 27:24
**officials** [1] - 15:17
**Olson** [3] - 10:23, 11:3
**once** [3] - 26:2, 28:18, 42:4
**One** [4] - 6:12, 20:25, 41:6, 77:7
**one** [37] - 4:8, 8:8,

9:14, 9:20, 17:5, 17:14, 17:19, 20:6, 20:11, 20:12, 22:19, 25:20, 28:2, 32:10, 35:12, 37:2, 46:6, 48:22, 54:19, 59:11, 59:23, 68:18, 72:9, 73:22, 74:16, 75:3, 76:7, 78:6, 79:3, 79:16, 79:18, 80:20, 82:25, 86:6, 89:8, 89:9, 89:12
**one-quarter** [1] - 74:16
**one-third** [1] - 46:6
**onerous** [2] - 38:21, 39:9
**ones** [8] - 9:22, 17:21, 29:11, 53:8, 64:9, 65:9, 78:13, 78:14
**opinion** [4] - 21:15, 30:19, 57:19, 59:9
**opportunity** [8] - 9:21, 10:10, 11:17, 12:13, 25:7, 54:6, 60:9, 82:10
**oppose** [1] - 65:11
**opposed** [2] - 24:24, 27:23
**opposition** [2] - 6:2, 54:6
**opt** [3] - 55:22, 79:20, 79:21
**opt-out** [1] - 79:21
**opted** [1] - 79:18
**option** [10] - 56:10, 56:11, 56:24, 57:7, 57:11, 58:22, 59:2, 59:17, 60:8, 61:6
**oral** [1] - 11:25
**Orange** [7] - 47:19, 47:23, 52:25, 72:15, 72:17, 81:8, 81:15
**order** [12] - 5:20, 9:2, 25:11, 26:7, 85:1, 85:17, 85:21, 89:16, 89:17, 90:10, 91:1, 92:22
**orders** [2] - 36:25, 72:3
**original** [3] - 38:7, 38:8, 47:16
**originally** [2] - 10:1, 29:1
**ought** [1] - 68:21
**outside** [1] - 86:18
**outstanding** [1] - 13:14
**overall** [2] - 13:22, 27:23
**overreaching** [1] - 46:24
**overruled** [3] - 80:14, 80:24, 80:25

owe [1] - 66:9
owed [2] - 62:11, 63:4
owing [1] - 67:16
own [5] - 56:3, 58:6, 65:25, 75:10, 75:11

**P**

package [2] - 32:25, 33:6
pages [1] - 15:15
paid [28] - 32:18, 32:22, 36:3, 36:5, 36:7, 37:4, 38:25, 39:14, 39:15, 46:9, 49:11, 49:13, 49:18, 55:13, 58:2, 64:21, 67:8, 67:15, 69:25, 70:1, 75:11, 78:21, 81:2, 83:6, 83:7, 84:24, 90:6, 90:24
paper [5] - 7:25, 23:7, 23:8, 42:1, 92:16
papers [10] - 10:8, 11:24, 20:4, 23:17, 26:10, 26:11, 27:25, 28:9, 68:6, 68:7
paperwork [1] - 39:4
Paragraph [1] - 37:3
paragraph [2] - 36:22, 37:2
parameters [1] - 65:15
part [11] - 11:24, 24:24, 25:23, 36:6, 38:6, 56:10, 56:17, 66:8, 78:23, 83:10, 88:9
particular [6] - 12:22, 14:1, 62:20, 68:17, 81:16, 82:2
particularly [1] - 81:4
parties [5] - 5:13, 5:15, 52:22, 55:9, 84:2
parts [1] - 19:10
passage [1] - 37:16
passionate [1] - 74:23
password [1] - 7:22
past [2] - 13:21, 45:6
patently [1] - 47:9
patience [1] - 61:4
patiently [1] - 53:19
Paul [6] - 46:15, 47:22, 50:12, 50:24, 52:4, 77:12
pay [25] - 18:13, 49:24, 50:3, 54:13, 55:16, 56:18, 57:4, 57:24, 58:10, 62:8, 62:19, 62:24, 64:15, 65:16, 65:19, 66:19, 67:19, 67:21, 67:22,

78:13, 81:2, 85:2, 92:6, 92:7
paying [3] - 54:22, 78:17, 87:10
payment [7] - 66:16, 90:5, 90:7, 90:16, 90:17, 92:10, 92:14
payors [2] - 78:18, 78:20
penalties [1] - 78:8
penalty [2] - 20:15, 46:9
pendency [1] - 14:23
pending [5] - 13:2, 14:11, 35:2, 37:17, 87:5
people [40] - 22:19, 23:7, 27:20, 30:2, 41:25, 42:6, 42:11, 42:15, 43:1, 43:5, 45:1, 45:4, 47:1, 49:20, 56:6, 56:18, 57:23, 58:9, 60:4, 60:25, 62:7, 62:19, 62:24, 62:25, 63:18, 67:10, 67:17, 67:18, 71:20, 73:1, 73:24, 78:9, 78:11, 78:16, 79:2, 79:3, 80:17, 81:12, 82:24, 83:11
people's [2] - 72:3, 81:12
per [1] - 17:14
percent [1] - 63:25
percentage [2] - 48:15, 86:5
perfect [1] - 35:9
performed [2] - 76:7, 76:8
perhaps [1] - 89:17
period [7] - 5:1, 18:11, 24:12, 42:5, 59:17, 71:6, 71:7
permission [2] - 12:21, 13:25
person [6] - 44:20, 65:6, 65:8, 65:16, 82:25, 87:8
personal [3] - 56:3, 56:6, 58:6
personally [3] - 21:14, 46:15, 50:24
persons [1] - 44:22
perspective [1] - 72:20
pertains [1] - 87:4
petition [1] - 59:21
Phil [6] - 46:15, 47:22, 50:8, 50:11, 52:2, 52:7
Phone [1] - 40:23
phone [7] - 4:25, 13:12, 23:14, 27:2, 28:15, 59:21

phones [1] - 28:5
physically [1] - 8:3
pick [3] - 22:1, 23:19, 53:7
piece [1] - 92:16
pitfalls [1] - 17:24
places [1] - 13:3
plaintiff [1] - 5:4
Plaintiffs [1] - 32:8
plaintiffs [8] - 4:2, 4:19, 15:1, 16:3, 32:4, 34:8, 78:24, 79:6
plaintiffs' [4] - 33:9, 38:11, 45:25, 46:2
plan [8] - 5:2, 22:24, 37:7, 38:14, 41:21, 47:11, 72:21, 72:24
planned [1] - 26:13
plans [1] - 35:11
Plato's [1] - 22:12
play [1] - 92:6
pleased [1] - 85:18
plenty [1] - 74:17
plugging [1] - 27:24
Plutzik [1] - 13:13
point [25] - 11:13, 19:24, 24:6, 24:7, 29:2, 30:24, 38:4, 41:20, 43:4, 43:7, 43:19, 44:16, 45:20, 52:18, 58:8, 62:18, 64:8, 64:24, 68:1, 69:6, 71:14, 77:7, 79:7, 79:8, 84:20
pointed [1] - 63:16
points [5] - 21:25, 25:16, 52:17, 74:24, 78:4
policies [3] - 21:8, 21:11, 24:13
policy [8] - 15:11, 15:18, 18:3, 43:12, 72:25, 73:12, 73:16, 73:17
pop [1] - 28:14
portion [3] - 23:3, 24:12, 90:20
position [13] - 33:3, 42:12, 46:23, 56:2, 59:5, 60:14, 63:23, 67:1, 70:25, 73:24, 81:10, 81:13, 88:12
possibility [1] - 89:20
possible [2] - 79:1, 87:21
potential [7] - 40:6, 40:18, 70:14, 73:4, 73:18, 73:22, 81:21
potentially [2] - 71:11, 80:6
pound [1] - 54:19
practice [4] - 5:11, 81:22, 85:16, 88:14

practices [1] - 52:9
pragmatic [1] - 50:1
prayer [1] - 87:25
preceded [3] - 24:20, 25:5, 25:19
precedents [1] - 13:23
precisely [1] - 63:14
preempted [2] - 15:22, 64:12
preemption [2] - 15:7, 15:12
preferably [1] - 76:2
prejudice [3] - 15:8, 57:21, 57:23
preliminaries [1] - 4:16
preliminary [7] - 5:15, 5:17, 8:7, 23:18, 25:11, 48:7, 49:1
premise [1] - 27:4
pres [20] - 18:20, 38:10, 39:22, 43:2, 43:9, 43:12, 43:13, 43:18, 44:17, 45:5, 45:15, 47:10, 69:8, 69:12, 69:14, 69:17, 70:6, 70:13, 73:9, 86:4
present [2] - 55:11, 63:19
presentation [3] - 7:12, 68:25, 69:6
presented [1] - 79:13
presently [1] - 87:5
presents [2] - 40:6, 80:25
preserves [1] - 62:9
presumably [1] - 86:12
prevail [1] - 66:17
prevailed [1] - 66:19
prevent [1] - 8:17
previous [1] - 26:11
previously [4] - 7:3, 13:4, 22:4, 47:16
price [1] - 86:15
primarily [1] - 36:21
primary [1] - 15:5
principle [3] - 17:18, 54:23, 58:2
principles [1] - 75:22
privilege [1] - 82:17
pro [33] - 4:4, 6:11, 6:22, 6:25, 7:3, 7:5, 7:8, 8:6, 8:17, 9:19, 9:20, 19:9, 21:12, 31:16, 31:18, 31:19, 39:16, 41:6, 41:22, 41:23, 42:5, 42:6, 42:13, 42:24, 43:6, 43:11, 45:16, 61:13, 61:15, 72:4, 73:10, 74:15

problem [8] - 8:5, 12:3, 12:5, 49:7, 54:11, 80:2, 81:21, 85:22
problems [6] - 8:16, 44:18, 44:20, 44:24, 56:5, 80:25
procedural [1] - 44:18
procedure [1] - 11:7
procedures [4] - 7:24, 15:11, 15:18, 18:3
proceed [2] - 12:15, 20:23
proceeding [2] - 9:19, 16:6
proceedings [4] - 14:22, 14:23, 16:11, 20:10
process [6] - 13:20, 15:14, 17:21, 40:3, 71:14, 74:8
processing [1] - 30:15
produced [1] - 15:15
Professional [1] - 49:6
professional [1] - 77:24
program [8] - 19:14, 19:17, 20:3, 21:24, 22:3, 22:20, 23:4, 70:5
programs [1] - 19:18
prohibited [2] - 50:16, 53:4
prohibits [2] - 50:16, 52:24
promise [2] - 49:24, 64:11
promised [1] - 33:24
promote [1] - 42:20
promotes [1] - 42:23
pronounces [1] - 36:18
proof [2] - 39:1, 39:6
proper [1] - 31:3
property [1] - 49:8
proportion [2] - 50:18, 50:22
proposal [1] - 34:22
propose [1] - 60:18
proposed [4] - 9:2, 14:8, 38:14, 60:19
proposing [2] - 41:22, 58:22
propriety [1] - 84:5
prorated [5] - 18:11, 24:7, 24:16, 24:21, 25:7
prosecuting [1] - 13:7
Protection [1] - 4:23
prove [2] - 44:21, 58:8
proved [1] - 20:15
provide [1] - 72:22

**provided** [1] - 79:1
**providers'** [1] - 59:21
**provides** [1] - 65:2
**providing** [1] - 60:11
**provision** [8] - 5:6, 13:9, 45:15, 64:10, 69:9, 70:6, 75:4, 81:17
**provisions** [2] - 37:5, 69:14
**PSC** [1] - 81:16
**public** [1] - 50:25
**publication** [1] - 22:23
**publicity** [1] - 71:9
**published** [1] - 16:19
**Puerto** [12] - 26:17, 26:18, 28:25, 29:15, 30:7, 30:9, 30:10, 30:14, 30:17, 30:20, 80:22, 80:23
**punitive** [1] - 41:17
**purported** [1] - 49:23
**purposes** [4] - 6:14, 6:23, 7:6, 62:15
**pursuant** [3] - 9:11, 37:7, 81:24
**pursue** [1] - 31:9
**pursuing** [1] - 66:11
**Purto** [1] - 30:3
**push** [1] - 69:25
**pushing** [1] - 34:5
**put** [15] - 10:1, 13:17, 27:21, 41:5, 41:13, 45:15, 60:23, 63:1, 73:9, 73:23, 74:5, 76:11, 86:19, 90:21
**putting** [2] - 21:16, 77:1

## Q

**qualified** [1] - 43:6
**qualify** [1] - 32:14
**quarter** [1] - 74:16
**questioning** [1] - 55:4
**questions** [1] - 66:23
**quite** [1] - 21:23
**quote** [1] - 76:12

## R

**raise** [1] - 66:15
**raised** [2] - 61:24, 76:12
**Ramsey** [1] - 11:4
**rata** [16] - 19:9, 21:12, 39:16, 41:22, 41:23, 42:5, 42:6, 42:14, 42:24, 43:6, 43:11, 45:17, 72:4, 73:10, 74:15

**rate** [3] - 19:7, 19:9, 27:16
**rates** [1] - 54:17
**rather** [8] - 8:3, 29:12, 38:2, 43:9, 50:23, 53:8, 71:17, 86:6
**Rather** [1] - 59:1
**Re** [7] - 40:23, 47:18, 47:23, 52:25, 72:15, 72:17, 81:8
**re** [1] - 14:13
**reach** [1] - 23:2
**reached** [1] - 62:14
**read** [1] - 10:9
**reading** [1] - 40:20
**real** [6] - 42:19, 46:8, 46:9, 47:6, 72:10, 75:5
**realistic** [1] - 67:11
**realize** [1] - 34:8
**really** [11] - 37:21, 43:16, 43:22, 70:4, 73:13, 75:12, 78:10, 78:13, 78:14, 78:16, 78:20
**reason** [3] - 5:3, 33:13, 71:8
**reasonability** [1] - 11:21
**reasonable** [6] - 55:11, 59:24, 60:20, 61:3, 63:24, 75:3
**reasonableness** [1] - 12:17
**reasons** [1] - 11:10
**rebuttal** [2] - 59:8, 59:10
**receive** [3] - 8:6, 11:11, 22:11
**received** [16] - 5:23, 6:2, 6:13, 6:24, 7:7, 9:17, 11:23, 12:13, 20:3, 23:7, 23:8, 23:9, 30:8, 30:9, 30:15, 32:25
**recent** [1] - 54:19
**recently** [2] - 21:1, 49:13
**recognize** [4] - 30:14, 55:8, 62:17, 88:9
**recognizes** [1] - 62:20
**recollection** [1] - 38:25
**record** [14] - 4:17, 11:9, 12:7, 12:12, 13:17, 17:7, 32:1, 36:1, 37:13, 47:13, 50:25, 53:24, 69:19, 76:11
**records** [6] - 38:25, 42:2, 50:20, 50:22, 50:24, 87:25
**recover** [1] - 24:1
**recovery** [2] - 44:17,

47:2
**reduce** [1] - 39:20
**reduces** [1] - 43:1
**reduction** [3] - 42:24, 43:6, 43:11
**reference** [2] - 43:24, 68:7
**refunds** [2] - 62:24, 62:25
**refused** [4] - 54:13, 56:18, 58:12, 62:19
**refuses** [1] - 65:16
**refusing** [1] - 59:4
**regard** [5] - 63:3, 67:1, 82:18, 85:20, 87:13
**regarding** [4] - 14:6, 15:18, 16:23, 80:7
**Regardless** [1] - 29:24
**regardless** [3] - 5:2, 28:3, 69:16
**rehash** [1] - 51:1
**reimbursed** [1] - 55:14
**reinforce** [1] - 59:5
**rejected** [1] - 80:19
**relate** [1] - 84:4
**related** [13] - 5:21, 33:5, 40:19, 40:24, 41:4, 41:11, 41:16, 50:10, 51:18, 67:23, 68:2, 79:5
**relates** [2] - 84:3, 84:5
**relating** [2] - 27:17, 31:13
**release** [5] - 27:16, 40:11, 40:16, 41:1, 41:3
**released** [2] - 41:16, 66:13
**releases** [1] - 68:2
**releasing** [2] - 27:17, 67:23
**relevant** [3] - 57:17, 58:11, 58:13
**relief** [9] - 35:6, 37:2, 60:11, 62:7, 63:14, 63:18, 75:13, 87:25
**relook** [1] - 68:16
**remainder** [1] - 37:6
**remark** [1] - 12:22
**remarks** [3] - 20:7, 74:23, 76:23
**remedy** [4] - 43:19, 45:5, 67:24, 70:11
**remember** [2] - 23:16, 38:24
**removal** [2] - 14:21, 14:23
**removed** [2] - 14:23, 15:3
**Rennen** [1] - 37:15
**rep** [1] - 74:25

**replied** [1] - 47:14
**report** [3] - 41:6, 41:13, 42:11
**reporter** [1] - 51:8
**reporting** [5] - 54:16, 56:12, 57:1, 57:7, 57:12
**represent** [4] - 32:2, 79:12, 83:23, 83:24
**representation** [1] - 8:18
**representative** [5] - 15:1, 16:3, 55:3, 63:13, 63:17
**representatives** [1] - 57:15
**represented** [13] - 6:4, 6:5, 8:15, 9:19, 9:25, 10:2, 10:15, 10:23, 11:6, 11:14, 12:9, 49:21, 61:13
**represents** [4] - 7:3, 10:11, 10:21, 10:25
**request** [4] - 15:7, 15:21, 33:10, 58:17
**requesting** [1] - 30:18
**requests** [2] - 30:10, 30:14
**require** [1] - 89:10
**required** [1] - 87:6
**requirement** [1] - 39:9
**requirements** [1] - 50:17
**requires** [1] - 92:6
**reschedule** [1] - 5:20
**reserve** [2] - 7:13, 11:19
**resides** [1] - 9:14
**resolution** [4] - 14:8, 16:24, 17:17
**resolve** [1] - 89:8
**resolved** [7] - 17:2, 34:21, 49:17, 64:8, 88:15, 92:15
**resolving** [3] - 14:13, 25:13, 91:6
**respect** [45] - 12:8, 14:17, 16:13, 17:25, 18:3, 18:17, 18:22, 19:7, 19:14, 20:5, 20:9, 20:18, 20:24, 21:8, 21:11, 22:8, 22:20, 22:23, 23:3, 23:10, 23:21, 24:7, 24:25, 25:20, 28:24, 36:3, 36:25, 37:25, 38:10, 38:21, 40:7, 41:2, 41:3, 45:21, 46:23, 49:4, 52:24, 61:12, 69:5, 69:12, 78:6, 79:14, 79:15, 79:23, 84:11
**respectfully** [1] - 13:15

**respond** [1] - 75:16
**response** [1] - 58:4
**responsibility** [2] - 52:20, 52:22
**rest** [2] - 24:17, 73:10
**restricted** [1] - 23:5
**result** [1] - 21:18
**resulted** [1] - 23:1
**retail** [3] - 18:23, 18:24, 18:25
**retain** [1] - 66:14
**retained** [2] - 16:22, 17:8
**retroactive** [1] - 37:18
**return** [2] - 35:11, 81:20
**returned** [1] - 20:19
**reversion** [2] - 18:18, 80:14
**reviewed** [6] - 5:23, 6:16, 7:10, 15:16, 30:10, 50:24
**Rico** [13] - 26:17, 26:18, 28:25, 29:15, 30:3, 30:7, 30:10, 30:14, 30:17, 30:20, 80:22, 80:23
**rid** [2] - 38:12, 41:21
**rights** [1] - 7:13
**Rios** [2] - 43:24
**risk** [6] - 20:24, 21:5, 37:13, 37:16, 64:2, 70:16
**risks** [3] - 20:22, 37:12, 37:20
**road** [2] - 29:14, 66:1
**Robuck** [2] - 44:4, 44:8
**roles** [1] - 81:12
**room** [2] - 7:9, 28:13
**route** [1] - 13:5
**routinely** [4] - 76:1, 80:13, 80:19
**RPC** [1] - 76:13
**rule** [4] - 64:11, 77:19, 84:23, 86:17
**Rule** [15] - 49:1, 49:7, 50:15, 52:24, 53:5, 75:20, 75:21, 75:22, 76:6, 76:13, 79:24, 79:25, 80:5, 88:2
**rules** [1] - 87:18
**Rules** [1] - 49:5
**ruling** [4] - 15:12, 25:18, 86:2, 86:3
**run** [2] - 70:16, 90:14
**runs** [1] - 71:7
**Rust** [2] - 22:25, 90:8

## S

**S-c-h-r-o-e-r** [1] - 54:2
**sabotage** [1] - 58:19

Sabraw [2] - 14:14, 16:6
Sadly [1] - 60:2
safe [1] - 56:1
safeguarding [1] - 49:8
sake [1] - 91:23
Sallie [1] - 10:21
sanctions [1] - 87:11
Sasik [3] - 14:10, 15:4, 15:23
satisfy [1] - 55:8
save [4] - 17:19, 39:1, 39:4, 57:3
saw [1] - 22:14
scale [2] - 60:18, 78:22
scaled [1] - 39:18
scenario [1] - 71:2
scheduled [1] - 5:22
SCHROER [18] - 4:7, 4:11, 53:20, 53:23, 54:2, 54:12, 55:21, 56:9, 56:19, 56:22, 57:2, 61:18, 82:10, 82:13, 82:16, 82:21, 82:23, 83:3
Schroer [17] - 4:7, 4:11, 6:6, 11:15, 53:18, 53:24, 54:1, 61:11, 62:13, 63:9, 66:23, 67:4, 67:7, 67:14, 74:22, 75:2
Schroer's [2] - 62:1, 63:23
scope [4] - 40:16, 40:25, 41:14, 86:18
score [2] - 54:15, 60:1
scores [1] - 60:3
Scott [1] - 25:22
screwed [2] - 66:10, 66:12
se [9] - 7:3, 9:19, 9:20, 31:16, 31:18, 31:19, 41:6, 61:13, 61:15
seal [1] - 22:13
Sears [2] - 44:3, 44:8
seated [1] - 4:9
Second [1] - 22:23
second [4] - 4:8, 26:16, 32:10, 89:8
Secondly [1] - 54:8
secret [1] - 71:23
Section [4] - 9:12, 89:23, 90:3, 90:4
see [14] - 9:6, 22:13, 29:4, 34:20, 38:15, 41:24, 45:14, 47:4, 71:5, 79:21, 91:18, 92:15, 92:24, 92:25
seem [2] - 37:11, 49:25
sell [1] - 75:8
selling [1] - 82:18

seminole [1] - 53:1
send [1] - 39:13
sense [3] - 49:23, 50:1, 60:17
sent [5] - 8:1, 19:18, 19:25, 20:1, 23:6
sentence [1] - 92:12
separate [4] - 14:21, 15:25, 17:14, 31:13
separately [2] - 36:25, 37:8
September [1] - 23:16
serious [1] - 37:16
served [3] - 26:11, 63:17, 84:21
service [3] - 5:1, 5:2, 14:7
Sesame [1] - 30:11
sessions [1] - 23:12
set [4] - 11:9, 31:13, 39:20, 45:4
settle [3] - 16:25, 59:23, 75:14
settled [6] - 49:18, 56:13, 57:8, 57:13, 62:20, 64:25
settlement [125] - 5:13, 5:16, 5:18, 6:2, 11:10, 11:21, 12:17, 13:10, 13:15, 13:19, 13:22, 13:24, 14:1, 14:5, 17:2, 17:18, 17:21, 17:22, 17:25, 18:12, 18:14, 18:17, 19:10, 21:13, 21:17, 22:5, 22:6, 22:8, 23:2, 23:4, 23:17, 24:19, 25:12, 25:23, 25:24, 26:7, 26:13, 26:22, 27:8, 29:21, 33:4, 34:22, 36:6, 36:21, 37:1, 37:6, 37:9, 40:24, 43:14, 45:14, 45:23, 48:20, 48:22, 48:25, 49:12, 49:22, 50:10, 54:7, 55:8, 55:9, 55:12, 55:17, 55:22, 56:17, 56:24, 57:7, 57:13, 58:5, 58:18, 58:19, 59:16, 59:22, 60:22, 61:2, 61:6, 61:23, 61:25, 62:9, 62:14, 62:15, 62:16, 62:21, 62:23, 63:2, 63:3, 63:14, 63:17, 63:19, 64:4, 64:9, 64:13, 65:2, 65:3, 65:8, 65:17, 67:3, 67:13, 67:19, 67:23, 68:4, 68:5, 68:10, 69:7, 70:9, 71:6, 71:14, 72:9, 74:5, 74:25, 77:17, 89:3, 89:7,

89:16, 89:23, 90:6, 90:12, 91:5, 91:25, 92:5, 92:13
settlements [15] - 19:2, 19:16, 22:3, 22:5, 25:19, 49:13, 62:22, 69:14, 69:20, 69:21, 70:14, 71:4, 72:11, 74:6, 75:7
settling [1] - 23:22
seven [2] - 33:16, 54:15
seventies [1] - 44:24
seventy [1] - 18:6
shall [2] - 37:4, 37:7
share [4] - 42:14, 53:8, 73:3, 82:6
sharing [4] - 53:2, 76:5, 76:13, 81:24
shield [1] - 37:19
shook [1] - 46:25
shot [1] - 89:8
show [7] - 26:14, 29:9, 29:14, 31:3, 42:19, 49:22, 92:14
showed [4] - 27:25, 28:9, 28:18, 69:21
showing [1] - 51:16
shown [1] - 61:12
shows [1] - 11:16
side [4] - 25:10, 27:21, 69:4, 78:11
sides [2] - 5:24, 37:20
sign [1] - 8:23
signed [1] - 28:18
significance [2] - 23:24, 24:5
significant [6] - 14:16, 20:13, 24:8, 46:21, 52:12, 62:25
significantly [1] - 19:1
silent [2] - 27:11, 27:12
Simer [2] - 43:24, 44:11
SIMER [1] - 43:24
similar [5] - 12:23, 25:4, 25:6, 40:3, 57:25
Similarly [1] - 15:23
simple [3] - 38:2, 52:17, 69:23
simpler [1] - 70:5
simplest [1] - 39:16
simplicity [1] - 39:12
simplify [1] - 39:10
simplistic [1] - 71:16
simply [8] - 24:9, 24:24, 26:2, 29:14, 54:21, 70:15, 71:19, 92:12
sit [1] - 74:13
sitting [4] - 79:25, 80:2, 89:10, 91:13

situation [7] - 49:19, 67:15, 81:20, 82:2, 82:24, 88:24
six [3] - 14:18, 20:8, 54:19
size [4] - 18:4, 18:8, 85:1, 86:3
small [2] - 78:17, 81:7
smaller [2] - 24:10, 43:11
smoke [1] - 82:21
society [2] - 57:20, 60:12
sold [2] - 66:1, 75:8, 83:11
sole [1] - 76:14
solely [1] - 78:1
solid [1] - 88:12
sometime [1] - 6:9
Sometimes [1] - 43:17
sometimes [2] - 43:18, 61:14
somewhat [4] - 12:25, 13:20, 19:1, 75:17
somewhere [2] - 17:16, 87:4
sorry [4] - 31:17, 36:16, 68:15, 69:19
sort [4] - 37:23, 71:20, 72:3, 91:4
sound [1] - 69:19
Spanish [3] - 19:25, 20:2, 30:11
spare [1] - 23:23
specific [3] - 21:25, 64:8, 68:3
specifically [3] - 36:21, 52:1, 53:1
spend [2] - 64:1, 76:25
spent [1] - 33:16
spite [2] - 57:20, 59:14
split [1] - 50:16
spoken [1] - 33:12
Sprinkle [1] - 16:13
Sprint [19] - 13:1, 20:19, 22:4, 22:5, 22:8, 22:10, 22:15, 25:6, 40:2, 43:21, 46:25, 50:25, 61:25, 62:22, 63:7, 68:4, 75:10, 78:11, 84:17
Sprint's [4] - 18:7, 18:15, 22:21
squarely [1] - 87:25
stage [1] - 20:10
stages [2] - 13:2, 13:3
stand [4] - 22:22, 49:22, 82:1, 87:13
standing [6] - 6:18, 8:9, 8:11, 8:16, 32:12, 71:12

start [2] - 51:5, 61:21
started [2] - 38:7, 59:12
starts [1] - 88:8
State [15] - 4:22, 7:2, 8:10, 8:14, 14:21, 14:24, 16:6, 16:17, 20:11, 32:1, 41:17, 87:20, 87:21
state [4] - 9:14, 12:7, 67:14, 80:1
states [3] - 37:2, 58:5, 80:1
States [2] - 9:12, 24:14
status [2] - 67:10, 70:1
statutory [2] - 41:17, 42:17
stay [4] - 15:5, 52:5, 52:7
stepped [1] - 72:24
still [12] - 11:16, 20:23, 21:5, 37:15, 46:14, 48:23, 50:12, 65:22, 85:5, 86:14, 91:7, 91:13
stop [1] - 51:6
Stop [1] - 88:4
stories [1] - 71:8
STRANGE [11] - 14:4, 14:20, 17:4, 17:9, 17:13, 19:5, 19:23, 21:11, 78:4, 78:16, 80:12
Strange [14] - 7:7, 13:25, 14:3, 22:1, 23:20, 24:1, 24:8, 33:6, 33:11, 33:23, 72:13, 72:15, 76:18, 78:5
Strange's [1] - 12:25
strangers [1] - 53:9
strategized [1] - 51:2
Street [1] - 30:11
strengths [1] - 17:24
strong [1] - 25:2
stronger [4] - 22:3, 22:20, 22:24, 81:1
struck [1] - 64:7
structural [1] - 49:7
structurally [1] - 49:21
structure [3] - 39:24, 73:8, 78:19
structured [6] - 39:5, 42:24, 43:7, 46:3, 46:22, 53:10
stuff [1] - 51:25
subject [3] - 55:6, 57:15, 60:15
subjected [1] - 54:16
subliminal [1] - 57:23
submission [1] -

34:25
**submit** [1] - 9:1
**submitted** [9] - 4:4,
9:22, 10:8, 33:5,
33:7, 34:4, 55:24,
57:19, 79:19
**subscriber** [5] - 5:5,
19:8, 23:6, 27:18,
47:7
**subscribers** [2] -
29:22, 37:24
**Subsequent** [2] -
5:10, 5:19
**substance** [1] - 37:21
**substantial** [9] - 15:7,
16:11, 19:12, 20:2,
20:22, 20:24, 33:17,
34:8, 62:7
**substituted** [1] -
22:25
**success** [1] - 13:3
**successful** [1] - 59:20
**sue** [2] - 65:19, 66:1
**sued** [1] - 77:21
**suffered** [1] - 78:9
**suffice** [1] - 19:15
**Suffice** [1] - 20:7
**suggest** [4] - 26:2,
68:15, 68:21, 88:11
**suggested** [1] - 27:19
**suggesting** [6] -
63:15, 70:4, 70:22,
87:12, 89:15, 89:19
**suggestion** [4] -
69:24, 71:15, 71:16,
71:18
**suit** [3] - 55:22, 56:3,
65:25
**sum** [1] - 60:13
**summaries** [1] - 50:23
**summarize** [1] - 16:7
**summary** [1] - 15:19
**sums** [1] - 19:12
**Superior** [3] - 4:2,
32:5, 63:8
**support** [2] - 13:23,
17:21
**supporting** [2] - 13:9,
13:10
**supposed** [1] - 34:2
**Supreme** [4] - 16:18,
21:1, 37:14, 51:24
**surprise** [2] - 52:8,
75:2
**surprised** [1] - 75:17
**system** [2] - 22:18,
87:18

### T

**T-Mobile** [18] - 13:1,
18:14, 22:5, 22:6,
22:17, 22:18, 22:23,
23:4, 25:4, 25:6,
29:2, 31:14, 40:2,
62:22, 63:7, 71:13,
75:9
**T-Mobile's** [1] - 18:7
**talks** [3] - 27:16,
47:23, 88:11
**tangential** [1] - 77:20
**taxable** [1] - 50:1
**technology** [1] -
44:25
**telephone** [6] - 14:7,
14:13, 16:5, 27:15,
28:8, 29:12
**ten** [8] - 7:8, 33:22,
38:24, 46:10, 46:12,
83:12, 86:22, 90:25
**term** [5] - 5:2, 27:17,
28:21, 78:18, 78:20
**termination** [6] - 4:19,
13:12, 24:2, 46:13,
67:8, 67:18
**terms** [8] - 13:22,
18:12, 23:25, 24:22,
27:13, 27:17, 65:1,
73:7
**testified** [1] - 38:5
**THE** [176] - 4:6, 4:8,
4:13, 6:19, 6:21,
7:15, 7:17, 7:19, 8:5,
8:22, 8:25, 9:1, 9:5,
10:7, 10:18, 10:21,
12:5, 12:11, 14:3,
14:19, 17:3, 17:5,
17:11, 19:3, 19:22,
21:10, 21:20, 26:18,
26:21, 27:1, 27:7,
27:11, 28:23, 29:18,
29:24, 30:2, 30:8,
30:17, 30:23, 31:8,
31:16, 31:18, 31:20,
31:25, 32:7, 32:10,
32:14, 32:18, 32:22,
33:2, 34:14, 34:18,
35:12, 35:17, 35:19,
35:23, 36:5, 36:8,
36:10, 36:12, 36:14,
36:16, 36:19, 38:19,
38:22, 40:14, 40:17,
41:10, 41:23, 44:1,
44:5, 44:7, 44:9,
44:13, 44:15, 45:11,
45:13, 45:19, 45:22,
46:1, 48:5, 51:3,
51:5, 51:8, 51:19,
52:10, 52:14, 53:11,
53:13, 53:21, 54:1,
54:11, 56:4, 56:17,
56:20, 56:23, 61:11,
61:19, 62:2, 62:17,
63:5, 64:14, 64:18,
64:21, 64:23, 65:6,
65:12, 65:14, 65:22,
66:3, 66:8, 66:20,
66:25, 67:3, 68:6,
68:13, 68:16, 68:22,
69:2, 70:25, 71:15,
72:6, 72:12, 72:16,
72:18, 73:6, 73:13,
73:16, 73:22, 74:13,
74:20, 78:15, 80:6,
82:9, 82:12, 82:14,
82:20, 82:22, 83:2,
83:16, 83:19, 83:23,
84:4, 84:7, 84:9,
84:13, 85:4, 85:8,
85:10, 85:13, 85:25,
86:10, 86:14, 86:21,
86:24, 87:22, 88:4,
88:21, 89:14, 89:19,
89:24, 90:3, 90:14,
90:17, 90:22, 91:2,
91:7, 91:15, 91:18,
91:20, 91:23, 92:3,
92:9, 92:18, 92:20,
92:24
**themselves** [2] -
81:24, 82:2
**theory** [2] - 13:8,
74:10
**thereafter** [1] - 11:13
**Thereafter** [2] - 5:13,
11:12
**therefore** [3] - 7:24,
57:24, 63:4
**Therefore** [2] - 59:22,
84:18
**thinking** [1] - 58:22
**third** [2] - 46:6, 86:13
**thousand** [1] - 42:23
**thousands** [4] - 55:5,
58:8, 60:11
**threatened** [1] - 59:18
**three** [7] - 10:2, 17:16,
34:12, 34:19, 81:17,
81:18, 82:3
**threshold** [2] - 43:4,
48:24
**throughout** [1] -
61:13
**Throughout** [1] - 68:6
**ticket** [2] - 70:20, 73:4
**Tiffany** [1] - 22:24
**timely** [1] - 33:7
**timing** [3] - 89:6,
89:13, 90:5
**today** [33] - 5:22, 6:6,
6:8, 6:25, 7:12, 8:3,
9:20, 9:21, 10:10,
11:6, 11:22, 12:8,
12:10, 25:9, 26:14,
28:10, 28:14, 33:9,
35:7, 35:25, 36:20,
37:11, 38:5, 44:25,
53:17, 59:22, 63:11,
64:2, 67:7, 69:11,
76:20, 84:22, 88:5
**Today** [2] - 8:24, 23:1
**together** [3] - 21:7,
21:16, 33:24
**tongue** [1] - 57:10
**took** [1] - 15:17
**total** [3] - 17:16,
77:22, 83:1
**totally** [1] - 91:13
**touch** [1] - 67:12
**touched** [1] - 79:15
**touchstone** [1] -
75:21
**towards** [3] - 57:21,
57:23, 60:1
**track** [1] - 28:19
**traditional** [1] - 80:12
**traditionally** [2] -
79:2, 80:24
**transfer** [1] - 87:18
**transferred** [2] - 15:2,
87:17
**translates** [1] - 30:13
**travel** [1] - 8:4
**traveled** [2] - 48:3,
48:11
**treatise** [1] - 76:1
**treatment** [1] - 57:25
**tremendous** [1] -
57:20
**trial** [1] - 5:1
**tricky** [1] - 21:6
**tried** [2] - 7:21, 78:23
**triggered** [1] - 90:9
**trip** [1] - 33:19
**trouble** [1] - 81:5
**troubling** [1] - 81:4
**true** [3] - 58:7, 68:9,
73:11
**try** [6] - 33:10, 65:9,
81:5, 82:5, 87:3,
89:9
**trying** [3] - 23:22,
75:14
**Turner** [2] - 10:14,
10:21
**turns** [2] - 85:14,
85:20
**twisted** [1] - 57:10
**two** [26] - 6:10, 6:11,
10:25, 11:5, 14:21,
15:17, 15:24, 16:23,
16:25, 17:13, 17:14,
17:16, 19:6, 19:10,
22:2, 23:12, 23:15,
24:13, 25:5, 25:15,
25:19, 32:20, 36:2,
36:22, 37:3, 75:19
**two-year** [2] - 19:6,
19:10
**type** [7] - 15:20,
26:23, 27:1, 50:16,
52:25, 53:2, 88:10
**types** [4] - 21:14,
37:20, 79:3, 80:19
**typical** [1] - 40:4

### U

**U.S** [3] - 21:1, 37:14,
87:18
**ultimate** [1] - 76:3
**ultimately** [12] - 5:7,
14:22, 15:6, 15:20,
16:2, 16:9, 16:22,
17:2, 17:10, 17:18,
76:4, 87:8
**Ultimately** [1] - 15:2
**umbrella** [1] - 13:5
**unclaimed** [1] - 43:17
**unclear** [1] - 41:1
**uncommon** [2] -
69:13, 69:18
**unconscionable** [1] -
54:17
**Under** [1] - 65:1
**under** [24] - 14:1,
22:13, 25:11, 38:6,
39:22, 40:24, 41:9,
42:18, 47:18, 47:23,
49:5, 50:15, 59:22,
62:21, 79:24, 80:4,
80:5, 84:13, 84:18,
84:19, 87:17, 88:22,
90:5
**underlying** [1] - 28:21
**understood** [2] -
31:10, 68:12
**undisclosed** [2] -
50:14, 84:11
**undistributed** [1] -
46:4
**unexceptional** [2] -
81:25
**Unfortunately** [1] -
57:20
**unfortunately** [1] -
49:12
**unique** [6] - 12:25,
13:6, 18:1, 24:11,
58:7, 68:10
**United** [2] - 9:12,
24:13
**unless** [4] - 21:25,
23:23, 57:5, 86:17
**unquote** [1] - 76:13
**unreasonable** [5] -
45:24, 46:3, 46:7,
47:9, 47:11
**unrelenting** [1] -
54:18
**unusual** [2] - 57:5,
69:15
**up** [32] - 9:5, 11:16,
18:24, 19:3, 22:1,
23:19, 26:14, 28:18,
33:19, 39:20, 40:12,
40:13, 41:9, 45:4,
50:2, 51:17, 60:13,
66:10, 66:12, 66:18,

69:18, 69:20, 69:21,
70:7, 70:11, 70:15,
71:21, 85:10, 87:10,
88:13, 90:7, 90:12
**upfront** [1] - 49:19
**uphold** [1] - 60:14
**USA** [2] - 23:1
**usurp** [1] - 87:3
**usurped** [1] - 59:18

## V

**vacation** [2] - 35:11,
35:16
**validity** [1] - 42:2
**valuable** [1] - 76:8
**value** [4] - 18:23,
18:24, 18:25, 25:2
**various** [8] - 13:2,
13:3, 14:24, 21:8,
21:11, 55:1
**vast** [2] - 13:6, 67:17
**vehicle** [1] - 87:1
**Velez** [2] - 26:17,
28:25
**Velez-Colon** [2] -
26:17, 28:25
**Verdiramo** [3] - 10:3,
10:24
**Verizon** [12] - 18:8,
18:16, 55:3, 59:13,
59:14, 59:16, 62:22,
63:7, 63:13, 74:25,
75:1
**versed** [1] - 60:15
**Versus** [2] - 44:7, 44:8
**versus** [5] - 14:9,
14:10, 14:15, 20:19,
51:14
**vice** [8] - 4:4, 6:11,
6:22, 6:25, 7:6, 7:8,
8:6, 8:17
**vicious** [1] - 60:6
**victim** [1] - 54:17
**victory** [2] - 20:25,
51:24
**Video** [1] - 46:14
**view** [1] - 24:6
**viewed** [1] - 23:20
**Vincent** [2] - 10:3,
10:24
**vindicated** [1] - 55:5
**violate** [1] - 4:21
**violation** [1] - 49:7
**vis** [4] - 16:7, 48:15
**vis-a-vis** [2] - 16:7,
48:15
**voluntarily** [2] -
25:21, 26:1
**vs** [3] - 43:24, 44:3,
45:8

## W

**wait** [6] - 29:18, 32:7,
86:9
**Wait** [6] - 4:8, 26:21,
29:18, 32:7, 40:14,
44:5
**waiting** [2] - 53:19,
86:2
**waive** [4] - 62:12,
65:5, 65:9, 65:10
**Waldmann** [4] - 14:9,
14:17, 14:19, 20:17
**wall** [1] - 27:24
**Walsh** [1] - 10:22
**wants** [5] - 31:8,
61:22, 62:13, 62:18,
67:4
**Washington** [1] -
16:12
**watching** [1] - 25:4
**ways** [5] - 36:2, 45:3,
73:8, 74:14, 74:17
**website** [1] - 45:4
**week** [6] - 8:1, 8:4,
33:22, 34:20, 76:20,
78:1
**Weekend** [1] - 23:1
**weeks** [2] - 17:16,
54:20
**Weinstein** [4] - 10:15,
10:16, 10:17, 10:20
**Weiss** [19] - 46:15,
46:16, 47:22, 50:7,
50:12, 50:25, 51:14,
51:21, 52:4, 52:6,
77:12, 79:16, 84:16,
85:2, 87:20
**welcome** [1] - 59:7
**well-versed** [1] -
60:15
**whole** [7] - 46:17,
49:24, 55:14, 55:17,
58:5, 69:7, 80:25
**Wifi** [1] - 27:23
**William** [1] - 21:22
**willing** [2] - 29:7,
33:23
**windfall** [6] - 40:10,
41:21, 42:16, 73:1,
73:6, 73:22
**Wireless** [1] - 51:15
**wireless** [9] - 5:1,
27:14, 27:21, 27:23,
28:6, 28:8, 29:3,
29:12, 36:3
**withdraw** [3] - 30:25,
31:4, 76:24
**withdrawn** [2] - 25:21,
31:6
**Wolfson** [8] - 16:22,
17:3, 17:6, 17:7,
17:8, 17:12, 21:15,

23:13
**won** [1] - 52:2
**word** [1] - 70:17
**words** [1] - 82:25
**works** [1] - 43:3
**world** [1] - 29:20
**worth** [2] - 19:12, 34:9
**write** [3] - 90:11,
91:12, 92:17
**Writs** [4] - 76:16, 77:2,
77:25, 87:7
**written** [1] - 52:18
**wrote** [3] - 21:23,
52:2, 63:21

## Y

**year** [2] - 19:6, 19:10
**years** [16] - 14:5,
14:18, 16:8, 16:14,
16:21, 20:8, 21:15,
33:16, 38:24, 46:10,
46:13, 49:20, 54:15,
67:9, 75:7, 82:6
**York** [2] - 41:18, 42:18
**young** [1] - 26:17

## Z

**zero** [1] - 48:24