Exhibit 3

IN THE MATTER PENDING BEFORE JAMS
ALAN J. GREIMAN, ARBITRATOR

THE LAKIN LAW FIRM, P.C.,

                              Claimant,        Arbitration No. 1340007668

        v.

FREED & WEISS LLC,

                              Respondent.

## RESPONDENT FREED & WEISS' MOTION TO DISMISS FOR LACK OF JUSTICIABLE CONTROVERSY AND NON-COMPLIANCE WITH THE ILLINOIS DECLARATORY JUDGMENT ACT

This lawsuit should be dismissed or stayed because it prematurely seeks recovery of a portion of a class action attorneys' fee award that claimant the Lakin Law Firm ("LLF") has appealed to the Third Circuit Court of Appeals. LLF has appealed by seeking to disqualify the defendant here – Freed & Weiss ("F&W") – for a variety of reasons it presented to the Honorable Jose Linares of the United State District Court for the District of New Jersey. In addition to the LLF appeal, several other appeals by other objectors are currently pending before the Third Circuit that go to the fairness of the settlement and the fairness of the attorneys' fee award and allocation of that award. If the Third Circuit were to agree with any part of the appeal of LLF or one of the other objectors, LLF's demand would be mooted because there would be no attorneys' fees award to claim in this arbitration.

1

In apparent recognition of this fact, the arbitrator on the April 26, 2010 conference call with the parties suggested, *sua sponte*, that this action may still be able to move forward at this time, despite the pendency of the Third Circuit appeals, in the manner of a declaratory judgment. However, this arbitration is governed by an Illinois choice of law clause, and Illinois law regarding declaratory judgments and any good sense regarding efficiency and preservation of resources demands that this arbitration demand not be considered unless and until the attorneys' fee award is final. Specifically, under Illinois law, a declaratory judgment cannot be issued because the demand does not present a justiciable controversy, resolution of the demand would not permit the parties to alter their future actions to minimize liability, and because the demand asks for no specific declarations and is only styled as a demand for a monetary judgment. The law and practicality demand the dismissal, or in the alternative the staying, of this proceeding because "absent a justiciable controversy, courts lack subject matter jurisdiction." *In re Gerald D.*, 308 Ill. App. 3d 628, 630 (1 Dist. 1999)(citing *In re Ardedia L.*, 249 Ill. App. 3d 35, 39-40).

## FACTUAL BACKGROUND

This lawsuit involves a misguided effort by LLF to claim a right to an attorneys' fee from a class action lawsuit against Sprint Nextel filed in and settled in the District of New Jersey. The lawsuit is predicated on a settlement agreement between the two subject law firms that purported to resolve all disputes between the two firms after the firms had a falling out and determined they could no longer work together. The settlement agreement purports to identify cases that the firms had been previously working on and to set up a mechanism to divide responsibility and fees for those cases. One case listed in the settlement agreement is *"Hall v. Sprint"*, a case challenging Sprint's right to charge early termination fees that was filed in and remains pending in the Circuit of Illinois for Madison County.

2

Prior to the execution of the settlement agreement, F&W, along with other co-counsel law firms (LLF was not on the complaint), filed the *Larson v. Sprint* case in federal court in New Jersey. The *Larson* case pursued a similar theory to *Hall* but did not include the members of the *Hall* class when it was filed.[1] As United States District Judge Jose Linares explained it, "The initial Complaint in this [the *Larson*] action excluded members of the *Hall* class. Eventually, the parties entered into mediation and settled the matter. The settlement included certification of a nationwide class and it subsumed many class action lawsuits filed against Sprint in other courts, including the *Hall* matter." *See* August 27, 2009 Order at 3, attached as Exhibit 1 hereto. The *Larson* case appears nowhere in the settlement agreement between F&W and LLF, and it is the fees from the *Larson* case that LLF seeks here. In addition to the *Larson* and *Hall* cases, several other cases pursuing similar theories against Sprint were pending in state court in California and Florida and in a class arbitration.

Several months after the settlement agreement between LLF and F&W was executed, F&W and its *Larson* co-counsel were involved in settlement negotiations with Sprint concerning the *Larson* case. Unbeknownst to F&W and its co-counsel, Sprint was also negotiating with LLF to settle the *Hall* case. At some point during the settlement discussions with Sprint, Sprint brought up the prospect of expanding the *Larson* class to include the class members that had paid the ETF to Sprint prior to the Sprint/Nextel merger. Despite efforts by F&W to reach out to LLF to discuss coordination of these discussions where the *Larson* case would subsume the members of the *Hall* class, LLF failed to return any of F&W's phone calls. As Judge Linares found after extensive briefing, "the evidence this Court has received indicates that the Bock Group [which

---

[1] The *Hall* case included persons who had paid an ETF to Sprint, while the *Larson* case contained different class members focusing on the time after Sprint acquired Nextel. Thus, the *Larson* class included all Nextel subscribers and Sprint/Nextel subscribers subsequent to the merger.

included LLF] was non-responsive to Weiss's attempts to communicate with them regarding the *Hall* matter. . . . all signs indicate that he [PaulWeiss of F&W] was effectively frozen out of any further interaction with Hall or with the Bock Group litigating the *Hall* case."

Following preliminary approval of the *Larson* class settlement, Judge Linares issued injunctions pursuant to the All Writs Act enjoining any other lawsuit covered by the class settlement from proceeding. Judge Ruth of the Circuit of Madison County denied a motion by LLF to enjoin Judge Linares from proceeding with the settlement in *Larson*.

F&W did not settle the *Hall* case. There was no preliminary approval of a settlement submitted in *Hall*. There was no final approval of a settlement sought or made in *Hall*. There was no notice to the class in the *Hall* case. The *Hall* case remains on the docket in Madison County to this day. Make no mistake, LLF's action here is to seek fees for the *Larson* case, not the *Hall* case.

Nonetheless, LLF had every opportunity to seek fees for its time in prosecuting the *Hall* case by asking Judge Linares to award it such fees. Indeed, counsel in the California and Florida state cases and in the arbitration all sought and received some fees for their efforts expended in their respective cases which had been mooted by the *Larson* settlement. All had done so pursuant to the June 2, 2009 order issued by Judge Linares requiring that "All counsel seeking fees shall file a motion for fees by this date [October 14, 2009]. ***Any fee application not filed by October 16, 2009 is deemed to be waived.***" *See* June 2, 2009 Order at 3, attached as Exhibit 2 hereto. LLF made no such application for a fee before Judge Linares, and by order of a federal court any subsequent request for fees is deemed waived. By his order of January 15, 2010, Judge Linares approved an aggregate attorneys' fee award of $5,775,000 to be split among counsel. (*See* Final Approval Order attached as Exhibit 3 hereto.)

LLF here seeks one third of the entire $5,775,000 attorneys' fee award from *Larson* in this arbitration. See LLF Arb. Demand at ¶25. This request, beyond the fact that it is unmoored from any provision of the settlement agreement between F&W and LLF, exceeds the amount of money F&W received in the Larson litigation by a factor of nearly two. The damages prayer here ignores the fact that nearly one dozen law firms from the cases enjoined by the *Larson* settlement received fees from the total settlement award to which LLF claims the right to one third.[2]

Finally, LLF actively worked to reduce the amount of fees F&W and its co-counsel ultimately received from Judge Linares. Most significantly, LLF objected to class counsel (including F&W) receiving its expenses from the common fund in addition to the attorneys' fees, successfully arguing that those costs should be satisfied from the attorneys' fees award instead.[3]

---

[2] There were ten law firms included in the fee petition submitted by class counsel in *Larson*. *See* Final Approval Order at 45 (attached as Exhibit 3). In addition fees were awarded to more than a half dozen other firms who had cases pending against Sprint that would be extinguished by the *Larson* settlement and who, unlike LLF, sought their fees from Judge Linares in compliance with his orders. *See* Final Approval Order at 69-70 ("Based on the reasons set forth above, the Court finds that the efforts by the Bursor Group, Lite DePalma and the Plutzik Group have each provided a direct benefit to the *Larson* Class and, as a result, they should be compensated accordingly. Having granted Class Counsel's request for a fee award in the amount of $5,775,000, the Court will allocate $254,100 to the Bursor Group and Lite DePalma, jointly, for their respective efforts in pursuing the successful notice-related objections to the settlement raised by the Galleguillos Objectors. The Court will also award those firms comprising the Plutzik Group with an award of $565,950 for their efforts in litigating the California Subscriber Class Claims. The balance of the fee award will be allocated to Class Counsel.").

[3] *See* Final Approval Order at 41 ("Objector Hall takes issue with, among other things, the fact that although the Settlement Agreement provides that Class Counsel may seek "an award of attorneys' fees and expenses in an amount not to exceed 33% of the Total Class Benefit," Class Counsel now asks for a fee award in the amount of 33% of the Total Class Benefit ($5,775,000) plus reimbursement of $256,115.91 in expenses. The Court has considered Hall's argument in this regard and agrees that the terms of the Settlement Agreement speak for themselves. Therefore, to the extent the Court approves Class Counsel's request for attorneys' fees in the

LLF's actions in actively working to reduce the fees paid to class counsel in *Larson* establishes that even LLF did not believe it had a right to those fees. If LLF truly felt it had a claim to one third of the fees and expenses, it would not have tried to get that number reduced. This is important background for the arbitrator in order to comprehend the lengths of sophistry to which LLF is willing to go.

<u>**ARGUMENT**</u>

**I. LLF HAS NOT ESTABLISHED THE PREDICATE REQUIREMENTS FOR OBTAINING A DECLARATORY JUDGMENT UNDER ILLINOIS LAW.**

    **A. UNTIL THE THIRD CIRCUIT RULES ON THE PENDING APPEAL OF THE CLASS SETTLEMENT IN THE *LARSON* CASE, THERE IS NO JUSTICIABLE CONTROVERSY UNDER ILLINOIS LAW UNDER WHICH TO HAVE DECLARATORY JUDGMENT .**

In its demand for arbitration, LLF claims that it is entitled to one-third of the net fees awarded to counsel in the *Larson* Sprint ETF case in the District of New Jersey. However, what LLF fails to note in its arbitration demand is that the class settlement of the *Larson* case is on appeal pending in the Third Circuit, and the decision granting fees is not sufficiently ripe to permit adjudication under Illinois law, which governs here because the settlement agreement at issue has an Illinois choice of law clause.

In Illinois, "the court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments[.]" 735 ILCS 5/2-701. In order to show "actual controversy" here, LLF, as the party seeking declaratory judgment, must establish that the underlying facts and issues are not premature "because the courts are not to render advisory opinions or merely provide legal advice about ***possible future events***." *P&S Grain, LLC v.*

---

amount of $5,775,000, such an award will be decreased by any expenses to which the Court ultimately determines Class Counsel (or other counsel) may be entitled.")

*County of Williamson*, 2010 WL 1374925, *5 (Ill. App. 2010); *see also American Service Ins. Co. v. Jones*, 2010 WL 1254856, *9 (Ill. App. 2010)("Whether [a declaratory judgment] action is considered "premature" or unripe for adjudication focuses on an evaluation of the fitness of the issue for judicial decision at that point in time."); *Certain Underwriters at Lloyd's London v. Boeing Company*, 895 N.E.2d 940, 959 (Ill. App. 2008)(affirming the trial court's granting of stay of declaratory judgment proceeding because the issue of liability has not been adjudicated). "If the plaintiff's interests would be adversely affected *only in the event some future possibility* occurs or does not occur, the action for a declaratory judgment should be dismissed." *Barrington Community Unit School Dist. No. 220 v. Special Education Dist. of Lake County*, 615 N.E.2d 1153, 1160 (Ill. App. 1993)( emphasis added).

It is clear that a declaratory judgment in Illinois is appropriately raised only in situations where the status between and among the parties is clear and unchanging.  That is far from the case before the arbitrator here.  The status of LLF's claim for funds depends entirely upon the Third Circuit's decision in the appeal of the *Larson* case.  There is no "actual controversy" here for the arbitrator to decide, as the request for a declaratory judgment is premature.  Whether fees were actually awarded to F&W for LLF to claim a portion of is not a definite fact at this point, and LLF *might* have a claim to those funds *only* in the event of the future possibility of the Third Circuit ruling against LLF in the appeal of the *Larson* case.  The Illinois Supreme Court has made it clear that "[a] sound exercise of judicial discretion would appear to us to necessitate dismissal of a complaint seeking a declaration of rights which were dependent upon the decision of then pending but undecided cases. Such a complaint does not 'present a concrete dispute admitting of an immediate and definitive determination of the parties' rights' as *Underground*

7

*Contractors Association* requires (66 Ill.2d 371, 375, 5 Ill.Dec. 827, 829, 362 N.E.2d 298, 300)."

*Howlett v. Scott*, 69 Ill.2d 135, 143 (1977).

Indeed, were the arbitrator here to entertain a declaratory judgment request, any order issued would be a classic "advisory opinion" that advises the parties of their rights depending on whether particular future facts come to pass. *Compare Czapski v. Maher*, 385 Ill. App. 3d 861, 867 (1 Dist. 2008) ("A decision by us on whether the excess policies would be triggered in the event of a future judgment is premature and would serve merely as an advisory opinion, which this court lacks the authority to issue.").

### B. THE DEMAND FOR ARBITRATION IS NOT STYLED AS A DECLARATORY JUDGMENT REQUEST AND IT IS INAPPROPRIATE TO PROCEED WITHOUT THE LAKIN LAW FIRM FIRST STATING THE DECLARATION(S) IT SEEKS AND FREED & WEISS HAVING AN OPPORTUNITY TO CHALLENGE THE RIPENESS OF THE REQUEST FOR DECLARATIONS.

The demand for arbitration does not seek a declaratory judgment, nor does it mention the concept of a declaratory judgment anywhere within. Instead, the demand for arbitration alleges a breach of contract, and requests the arbitrator to find in its favor and award a portion of the attorneys' fees from the *Larson* case. The Illinois Declaratory Judgment Act requires that a "complaint for declaratory judgment [] recite[] an actual controversy between the parties in sufficient factual detail and request[] a declaration of rights" to be found "sufficient to state a cause of action." *AEH Construction, Inc. v. State Dept. of Labor*, 318 Ill. App.3d 1158, 1161 (3 Dist. 2001). The demand here is plainly insufficient on both counts. First, the demand recites no facts establishing an actual controversy in light of the pendency of its own and other appeals. Second, the complaint requests no declaration of rights. Without both of these requirements, the

8

complaint must be dismissed because "[a] plaintiff seeking declaratory judgment must specify all facts necessary to justify the unusual relief sought." *Id.* at 1163.

### C. THE PURPOSE OF A DECLARATORY JUDGMENT WOULD NOT BE SERVED BECAUSE NEITHER LLF NOR F&W COULD ALTER ITS FUTURE CONDUCT TO AVOID LIABILITY.

The broad public policy purposes of the Illinois Declaratory Judgment Act are not served by allowing consideration of a declaratory judgment here. It has been stated time and again by Illinois courts that "[t]he purpose of a declaratory judgment action is to determine the rights of the parties so that the plaintiff can alter his future conduct to avoid liability." *Adkins Energy LLC v. Delta-T Corp.*, 347 Ill. App. 3d 373, 379 (2 Dist. 2004). But regardless of what this arbitrator may rule, neither party can alter its conduct to avoid future liability given the nature of the (as yet unstated) declarations LLF might seek.

A determination as to whether LLF is entitled to some portion of the *Larson* fees under the settlement agreement between F&W and LLF will not alter anyone's conduct, let alone to allow the parties to alter their conduct to avoid liability (to the contrary, as discussed below, mere consideration of a declaratory judgment at this time will impose liability because the parties will have to pay the costs of proceeding in arbitration which might not even be necessary depending on the Third Circuit's resolution of the appeals). This is known as the "doctrine of nonliability for past conduct", and has special application when the declaration is sought in a breach of contract case concerning a failure to pay pursuant to the contract:

> The doctrine of nonliability for past conduct bars an action for declaratory judgment when the conduct that makes a party liable, that is, amenable to suit, has already occurred. The fact that the amount allegedly owed under a contract is already fixed does not preclude a declaratory judgment action, because a party is not amenable to suit until a breach occurs. Therefore, declaratory judgment could guide future conduct in such a situation because a court could determine whether or not a valid contract exists and, thereby, inform the party that potentially owes

9

> the money whether or not it would be in breach of contract should it refuse to pay.
> In such a situation, *only when a party refuses to pay does a declaratory judgment*
> *action become improper because, at that point, the refusal to pay either is or is*
> *not a breach of contract and there is no future action to guide.*

*Id.* at 378. Here, F&W has refused to pay, a fact which indisputably makes a declaratory action improper.

Where a declaratory judgment would not provide the opportunity for the parties to alter their future behavior to avoid liability, Illinois courts have not hesitated to dismiss declaratory judgment complaints. *See, e.g., Howlet v. Scott,* 69 Ill.2d 135, 143 (1977) (plaintiff, who had already terminated relationship at issue, was not entitled to declaratory judgment because his rights were fixed); *Eyman v. McDonough District Hospital,* 245 Ill.App.3d 394, 396-97 (3 Dist. 1993) (declaratory judgment that the plaintiff properly terminated her employment agreement and could keep money advanced to her was not obtainable because "[s]he had already embarked on a course of conduct and wanted the court to find her not liable for that conduct. She was not seeking to learn the consequences of her actions before acting. The plaintiff tries to distinguish her case by stating that she also asked the court to declare that the defendant materially breached the contract. Nevertheless, a breach of contract claim is an action at law and is not a proper subject for a declaratory judgment."); *Pincham v. Cunningham,* 285 Ill. App. 3d 780, 783 (Ill. App. 1 Dist. 1996) ("declaratory relief is inappropriate in this case because a declaratory judgment is not available to adjudicate nonliability for past acts. As such, declaratory relief is not a proper mechanism for determining whether plaintiff's Operation PUSH speech violated Rule 67.").

## II. CONTRARY TO LLF'S REPRESENTATION, PROCEEDING WITH THIS COMPLAINT ON EVEN A DECLARATORY BASIS WILL INVOLVE SUBSTANTIAL DISCOVERY AND BRIEFING ON SEVERAL COMPLEX ISSUES.

"A declaratory judgment action is used 'to afford security and relief against uncertainty *with a view to avoiding litigation, rather than in aid of it.*'" *Stokes*, 298 Ill.App.3d 252, 281, 232 (5 Dist. 1998) (quoting *Dolezal*, 266 Ill.App.3d 1070, 1083 (1st Dist. 1994)) (emphasis in original). This case, far from giving the parties guidance so as to allow them the opportunity to avoid future liabilities, actually does the opposite by requiring the expenditure of resources on a potentially quixotic effort to fix the right to claim fees when the fees awarded are the subject of a hotly contested appeal.

Contrary to Mr.Chapman's oral representation during the parties' April 26, 2010 conference call that the Lakin Law Firm's case "can be proven with a few Requests for Admissions," this case will require far more proof. Numerous depositions will be necessary to establish many of the facts discussed herein including how the *Larson* case came to include the additional class members that had been part of the *Hall* class, how the *Hall* case came to be enjoined, how settlement was conducted and occurred in *Larson* and how the discussions were conducted in *Hall*, how other Sprint ETF cases are like *Hall* and how those lawyers submitted their requests for fees in accordance with Judge Linares' order, which LLF has flaunted by filing the instant arbitration. As Freed & Weiss sees it, at least the following depositions would be necessary to determine a "declaration" here:

- Dominic Suprenant, lead counsel for Sprint in both *Hall* and *Larson*. Mr. Suprenant is a partner in Quinn Emmanuel's Los Angeles office;

- Fred Klein, Sprint's local counsel in *Hall* and an active participant in the *Hall* mediation, whose emails put in question the veracity of Mr. Lakin's characterization of his final *Hall* settlement demands;

- Joe Boyle and Lori Mazzuchetti, both partners in the Newark office of Kelly, Drye & Warren and active participants in the *Larson* mediation;

- James Cecchi, F&W's co-counsel in *Larson* and a partner in Roseland, New Jersey based Carella Byrne;

- Stephen Weiss, F&W's co-counsel in *Larson* and a partner in the Manhattan office of Seeger Weiss;

- Jonathan Shub, F&W's co-counsel in the *Larson* case who currently is a solo practitioner in Philadelphia;

- Judge Rakowski, the mediator in *Hall*; and

- Judge Politan, the mediator in *Larson*, who lives in Palm Beach Florida.

This list is nine depositions in seven states, and does not include the depositions of LLF and F&W lawyers.

In addition, F&W will put in expert testimony that LLF's claimed right to recover fees is contrary to legal ethics rules concerning disclosure of fee sharing and that its interpretation of the settlement agreement between F&W and LLF creates conflicts of interest that make that interpretation untenable. Specifically, LLF's theory of recovery for breach of contract, set forth in Paragraph 22 of its demand, sets forth a plethora of ethical issues that will involve expert testimony. LLF Arb Demand at ¶22 ("F&W has breached the agreement by, among others things, engaging in settlement negotiations with Sprint regarding the Sprint ETF class without permission from LLF and filing a similar case against Sprint when it amended its Nextel complaint on or about December 5, 2008 without permission from LLF."). LLF's interpretation of the parties' settlement agreement would have acted to prevent F&W from pursuing the best

interests of the class because LLF disagreed with F&W's judgment. A contract between lawyers cannot subjugate a lawyer's incentive or ability to vigorously represent the class to the interests of other lawyers in protecting claims to fees. The ethical ramifications of LLF's arbitration demand here are serious and not uncomplicated.

## CONCLUSION

In short, LLF cannot meet the requirements for a declaratory judgment under Illinois law, it cannot establish a justiciable controversy given the pendency of the Third Circuit appeal. Starting the substance of arbitration now will engender a senseless squandering of resources. LLF's arbitration demand should be dismissed, or in the alternative, stayed.


DATED: May 7, 2010                              Respectfully submitted:

                                                **FREED & WEISS,**
                                                **Defendant**

                                                By: _____

                                                Jeffrey A. Leon
                                                Julie D. Miller
                                                111 West Washington Street Suite 1331
                                                Chicago, Illinois 60602
                                                Telephone: (312) 220-0000
                                                Facsimile: (312) 220-7777
                                                jeff@freedweiss.com
                                                juliem@freedweiss.com

13

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
### District of New Jersey

CHAMBERS OF
JOSE L. LINARES
JUDGE

MARTIN LUTHER KING JR.
FEDERAL BUILDING & U.S. COURTHOUSE
50 WALNUT ST., ROOM 5054
P.O. Box 999
Newark, NJ 07101-0999
973-645-6042

August 26, 2009

## LETTER OPINION AND ORDER

Re:      <u>Larson, et al. v. Sprint Nextel, et al.</u>
        Civil Action No. 07-5325 (JLL)

Dear Counsel:

Pending before this Court is a motion to disqualify Freed Weiss LLC, Paul M. Weiss (collectively, "Weiss"), and Richard J. Burke ("Burke"), filed by attorneys Phillip A. Bock, Robert M. Hatch, Bradley M. Lakin, and Daniel J. Cohen (hereinafter, the "Bock Group"), on behalf of Objector Jessica Hall (Docket Entry #151). The Court has received several submissions related to this motion. They are as follows:

(1) Motion to disqualify by Jessica Hall (Docket Entry # 151);

(2) Motion to Withdraw "Hall's Motion to Disqualify", filed by Jeffrey Millar, Esq.[1];

(3) Motion to Strike "Millar's Motion to Withdraw Hall's Motion to Disqualify," filed by the Bock Group (Docket Entry # 174);

(4) Motion to Strike "Hall's motion to disqualify," filed by Class Counsel[2] (Docket Entry # 177);

(5) Brief in opposition to Hall's original Motion to Disqualify, filed by Class Counsel (Docket Entry # 176);

(6) Reply brief in further support of Hall's Motion to Disqualify (Docket Entry # 200);

(7) Motion *in limine* to preclude or strike the expert declarations of Richard Zitrin, Edward Sherman, and Roy D. Simon, Jr. (Docket Entry # 288);

(8) Motion for sanctions by the Bock Group against Jeffrey Millar, Esq. (Docket Entry # 314); and

(9) Motion to strike the Bock Group's motion for sanctions (Docket Entry # 327)

_____

[1] This motion was not filed on the electronic docket. However, Mr. Millar sent a copy to the Court and a copy to all relevant counsel. Thus, the Court will consider the motion.

[2] Class Counsel refers to the firms appointed to represent the interests of the <u>Larson</u> class in the present matter.

The Court appears to find itself in the midst of an attorney squabble resulting from the acrimonious dissolution of a prior law firm. That dissolution and the anger that it has spawned are of little relevance to the propriety of the settlement in this matter. Because the motion to disqualify and associated motions to strike do not directly challenge the reasonableness of the settlement achieved in this matter, the Court decides them now, in advance of the next fairness hearing. This Opinion first addresses the various motions to strike (and a motion for sanctions) and then turns to the merits of the motion to disqualify.

## I.   Motions to Strike and Motion for Sanctions

First, the Court addresses the Bock Group's motion to strike Mr. Millar's motion to withdraw.[3] The Bock Group states that Mr. Millar filed his motion without "prior notice to or consent from Hall." (Docket Entry # 174 at 2.) Next, they state that "Millar's motion is predicated on the incorrect premise that Millar represents Hall." (Id.) At the time of Mr. Millar's motion, however, he did represent Ms. Hall. Hall's declaration, signed on February 3, 2009, and attached to the Bock Group's motion to strike, undoubtedly supports that fact. (Docket Entry # 174, Exh. 1 ("Hall Decl.").) She clearly states that she selected Mr. Millar to be her attorney and that only after consulting with Mr. Bock on January 30, 2009 did she eventually switch attorneys. (Id. ¶¶ 2-6.) Finally, Hall states that she has decided to revoke her letter selecting Millar and remain with the Bock Group. (Id. ¶ 8.) This revocation, however, occurred after the filing of Millar's motion. Thus, the Bock Group's motion to strike is denied.

At the same time, however, Millar's motion to withdraw "Hall's motion to disqualify" is based on the premise that he represents Hall, not the Bock Group. As the Hall Declaration makes clear, that is no longer true. Thus, regardless of whether Millar represented Hall when he filed his motion to withdraw the Bock Group's motion to disqualify, his motion no longer retains the factual underpinning it had when he initially filed it. Accordingly, it is denied.

Next, Class Counsel has filed a motion to strike Hall's motion to disqualify. Class Counsel's motion relies in part on Millar's motion, which the Court has now denied. Class Counsel also claims that Hall's Declaration provides no evidence that she was actually represented by the Bock Group when they filed their initial motion to disqualify. Her Declaration, however, makes clear that "Phil Bock is and has always been my attorney in my case." (Hall Decl. ¶ 3.) Thus, regardless of her apparent confusion over the status of Millar and his relationship with her other attorneys, it is clear that she has always believed Bock to be her attorney. Accordingly, Class Counsel's motion to strike is denied.

Finally, the Bock Group files a motion for sanctions against attorney Jeffrey A.J. Millar for purportedly failing to obtain Hall's consent before filing a the motion to withdraw on her

---

[3] Millar's motion to withdraw seeks to "withdraw" Hall's motion to disqualify. He argues that the Bock Group improperly filed their motion to disqualify, and that as Hall's attorney, he would like the motion ostensibly filed on her behalf to be withdrawn.

behalf. (Docket Entry #314.) Millar has submitted opposition, lodging a laundry list of Rule 11 procedural mishaps that, if true, would doom the motion. Rather than addressing each procedural issue, however, the Court simply denies the motion on the merits. At the time that Millar filed a motion to withdraw on behalf of Hall, he properly represented her. (See Docket Entry #327-2 (Agreement between Hall and Millar).) He was under no duty to gain her affirmative consent for every action he took on her behalf. Though Hall eventually terminated her attorney-client relationship with Millar, that termination is not grounds to impose sanctions for what was, at the time, a defensible filing. Thus, the motion for sanctions is denied.[4]

## II.   Motion to Disqualify

Having disposed of the various preliminary motions, the Court has before it the Bock Group's original motion to disqualify. Class Counsel has submitted opposition as well as three expert declarations.[5] Finally, the Court heard both sides orally during the March 2009 Fairness Hearing.

The Bock Group moves to disqualify Freed & Weiss LLC, Paul M. Weiss, and Richard Burke from representing the Class in this matter due to an apparent conflict of interest.[6] On February 2, 2004, Weiss and Burke, along with the Bock Group, filed a class action on behalf of Jessica Hall in Illinois state court, captioned Hall v. Sprint Spectrum, L.P., et al., No. 04-L-113 (Third Judicial Circ., Madison County, Illinois) (hereinafter, "Hall"). That action alleged that Sprint customers had been illegally charged ETFs. Eventually, relations between Freed & Weiss and the Lakin Firm deteriorated, and the two firms agreed to split up the Hall case. Freed and Burke remained as counsel of record in that case but agreed to give up the role of co-lead counsel to let the Lakin Firm assume full operational control.

On November 5, 2007, Freed acted Burke acted with the other members of the present Class Counsel team to file the instant action against Sprint. The initial Complaint in this action excluded members of the Hall class. Eventually, the parties entered into mediation and settled the matter. The settlement included certification of a nationwide class and it subsumed many

---

[4] Millar also filed a motion to strike the motion for sanctions. (Docket Entry No. 327.) That motion is denied. Though the motion for sanctions lacks merit, Millar gives this Court no reason why it should be stricken, as opposed to denied.

[5] The Bock Group's motion in limine to preclude the expert declarations of Richard Zitrin, Edward Sherman, and Roy D. Simon, Jr. (Docket Entry # 288) was denied during the March 17, 2009 Fairness Hearing. (March 17, 2009 Fairness Hr'g TR. 26.)

[6] The Bock Group also references certain misconduct allegations against Paul M. Weiss and his alleged failure to update his pro hac status accordingly. The Court rejects this argument, noting that Mr. Weiss and Mr. Cecchi advised Magistrate Judge Salas of the situation and thereby proceeded in accordance with L. Civ. R. 101.1(c)(1).

class action lawsuits filed against Sprint in other courts, including the Hall matter. This Court preliminarily approved the settlement on December 4, 2008 and allowed Class Counsel to file an Amended Complaint that included the Hall class.

The merits of the settlement shall be addressed at the October fairness hearing. For purposes of this motion, it is enough to note that Hall objects to it. Additionally, Hall moves this Court to disqualify Weiss and Burke. Hall lodges two general arguments in support of disqualification, and the Court addresses each in turn. Neither holds merit.

### A.   Sibling Classes

First, the Bock Group leans heavily on a recent law review article to assert a structural conflict based upon the alleged filing of "sibling class actions." Richard G. Stuhan & Sean P. Costello, Robbing Peter to Pay Paul: The Conflict of Interest Problem in Sibling Class Actions, 21 Georgetown Journal of Legal Ethics 1995 (2008). In that article, the authors argue that lawyers who bring "sibling class actions" should be per se disqualified from serving as class counsel. They define "sibling class actions" as class actions that share the following characteristics: (1) at least two class actions, each brought on behalf of different putative classes, usually in different jurisdictions; (2) brought against the same defendant; (3) brought by the same attorney or firm; (4) generally share the same legal theories and factual allegations; (5) usually involve substantial damages. Id. at 1198. The Bock Group argues that Weiss and Burke have created an incurable structural conflict of interest by representing sibling classes – namely the Hall class as well as the present Larson class. (Docket Entry # 151 ¶¶ 37-53.) This argument is both factually and legally flawed.

Factually, the classes in this case do not implicate the "sibling class actions" discussed in the aforementioned law review article. There is no antagonism or structural conflict of interest between the Hall and Larson classes – rather, both can recover under the settlement in this matter as both assert identical claims. Thus, this is not a case where the same attorney represented one class in one courthouse while representing a separate class with an adverse set of interests in another courthouse. Instead, the two classes assert identical claims and have identical rights under the settlement.

Legally, the Bock Group's "sibling class" disqualification argument finds little support in the law. Certainly, Hall can object to the reasonableness of the settlement in this court. And she has properly done so. And perhaps, if the Hall class retained claims adverse to those settled by Larson, a claim of conflict might well prove meritorious. Indeed, as Class Counsel correctly notes, these sorts of actual adverse conflicts permeate the caselaw relied upon by the Bock Group. See, e.g., Kuper v. Quanum Chemical Corp., 145 F.R.D. 80 (S.D. Ohio 1992) (court identifies actual conflict of interest between a class of ERISA claimants in one court and a class of bondholders against the same defendant in another court); Moore v. Margiotta, 581 F. Supp. 649 (E.D.N.Y. 1984) (two different classes were "laying claim to the same monies on different theories of damages"); Fiandaca v. Cunningham, 827 F.2d 825 (1st Cir. 1987) (holding it

"inconceivable that [class counsel] . . .could properly have performed the role of 'advocate' for both . . . class[es]. . . ."); Kurczi v. Eli Lilly, 160 F.R.D. 667 (N.D. Ohio 1995) (court finds that "absent class members were at great risk of being sold out" to achieve a greater recover for the class representatives in their individual capacity).

Contrary to both the law review article and the many cases cited by the Bock Group, the situation here presents no actual conflict. Indeed, the Bock Group has not identified what that actual conflict might be. The Hall class members are covered in full by the settlement reached in this matter and can claim benefits arising out of the settlement should they so choose. To the extent they disagree with the outcome reached, they are free to object. Unlike the cases identified above, however, the classes here are not in actual, apparent, or even potential/implied conflict. Thus, aside from the fact that the per se rule of disqualification has never been applied by a single court in the context of sibling class actions, even if courts routinely disqualified attorneys in such situations, this case would not warrant such drastic action.

### B.   Actual Conflict of Interest

Next, the Bock Group lodges a more typical conflict-of interest argument, arguing that Weiss improperly represented Hall in Illinois while also litigating and settling the present matter in New Jersey. Thus, the Bock Group argues that Weiss should have submitted a motion to withdraw from representation in the Illinois case prior to undertaking the instant matter.

In Lazy Oil Co. v. Witco Corp., the Third Circuit analyzed conflict-of-interest rules in class actions. 166 F.3d 581 (3d Cir. 1999). In that case, a group of class representatives objected to a settlement negotiated on their behalf and specifically moved to disqualify Class Counsel from representing the remainder of the class. Id. at 583. They argued that Class Counsel, who originally represented the lead plaintiffs-turned-objectors, should have been disqualified from representing the remaining class members once the objectors chose to attack the settlement. Id. The Third Circuit upheld the district court's decision denying the motion to disqualify. The Court adopted the concurring opinion of Judge Adams, in In re Corn Derivatives Antitrust Litig., 748 F.2d 157 (3d Cir. 1984), in which he "endorsed a balancing approach to attorney-disqualification motions in the class action context." Id. at 589. Additionally, the Court noted that "the conflict rules do not appear to be drafted with class action procedures in mind and may be at odds with the policies underlying the class action rules." Id. (quoting Bruce A. Green, Conflicts of Interest in Litigation: The Judicial Role, 65 Fordham L. Rev. 71, 127 (1996)). Finally, the Court held that "class counsel may be continue to represent the remaining class representatives and the class as long as the interest of the class in continued representation is not outweighed by the actual prejudice to the objectors of being opposed by their former counsel." Id. at 590.

Under Lazy Oil, the Bock Group's motion to disqualify must be denied. At best, Ms. Hall is a class representative who is now an objector to the action. At worst, she is simply a class member who takes issue with the settlement reached. Either way, she has made no concrete

showing of actual prejudice arising from Weiss's continued representation of the <u>Larson</u> class in this matter. The attorneys comprising the Bock Group appear to be well-positioned to object on her behalf and to challenge the reasonableness of the settlement as they see fit. Moreover, Hall offers no evidence to prove that Weiss either failed to represent her interests or failed in his duties to the class due to his alleged dual representation. Noting that Class Counsel retains an obligation to the Class for whom the settlement was negotiated, the Court finds that Weiss and the remainder of Class Counsel properly negotiated this settlement on behalf of the Class.[7]

Finally, as to Weiss's alleged attorney-client relationship with Hall, the Court notes two facts. First, Weiss has no attorney-client agreement with Ms. Hall. That agreement only existed between Hall and Bock. Second, the evidence this Court has received indicates that the Bock Group was non-responsive to Weiss's attempts to communicate with them regarding the <u>Hall</u> matter. Though Weiss never filed a motion to withdraw from the Illinois litigation, all signs indicate that he was effectively frozen out of any further interaction with Hall or with the Bock Group litigating the <u>Hall</u> case. The Court, however, does not base its ruling upon the lack of attorney-client agreement or the Bock Group's non-responsiveness. Rather, the motion is denied because (1) sibling class rivalries are not recognized by the law as warranting <u>per se</u> disqualification and in any event are not in line with the facts of this case; (2) the Bock Group fails to articulate any actual or implied prejudice arising from Weiss's alleged dual representation; (3) Weiss and the remainder of Class Counsel adequately represented the interests of all Class members, including Hall; and (4) Hall, to the extent she is dissatisfied with the settlement, is free to object and has competent counsel by her side to aide her in that endeavor.

**III.   Conclusion**

For the reasons set forth above, **IT IS** on this **27th day of August, 2009,**

**ORDERED** that Millar's motion to withdraw is **DENIED**; and it is further

**ORDERED** that the Bock Group's motion to strike (Docket Entry # 174) is **DENIED**; and it is further

**ORDERED** that Class Counsel's motion to strike (Docket Entry # 177) is **DENIED**; and it is further

**ORDERED** that the Bock Group's motion *in limine* to preclude or strike certain expert declarations (Docket Entry # 288) is **DENIED**; and it is further

---

[7] This Opinion does not purport to shed light upon the actual reasonableness of the settlement. That issue will be argued and discussed at a future fairness hearing. Rather, this Opinion simply deals with the narrow issue of disqualification and whether or not Weiss and the rest of Class Counsel adequately represented the Class in spite of Weiss's alleged dual representation of Hall and Larson.

**ORDERED** that the Bock Group's motion for sanctions (Docket Entry # 314) is **DENIED;** and it is further

**ORDERED** that Millar's motion to strike (Docket Entry # 327) is **DENIED;** and it is further

**ORDERED** that the Bock Group's motion to disqualify (Docket Entry #151) is **DENIED.**

**SO ORDERED.**

/s/ Jose L. Linares
Jose L. Linares
United States District Judge

# EXHIBIT 2

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

JUDY LARSON, et al.,                    :
                                        :
               Plaintiffs,              :
                                        :
        v.                              :       CIVIL ACTION NO. 07-5325 (JLL)
                                        :
SPRINT NEXTEL CORPORATION, et al.,  :
                                        :       **ORDER**
               Defendants.              :
                                        :

**LINARES**, District Judge.

On April 30, 2009, this Court denied without prejudice final approval to the settlement in this action and ordering the settling parties to submit within 21 days a new Rule 23(c)(2)-complaint individual notice plan. (Docket Entry Nos. 321, 322.) On May 21, 2009, Class Counsel and Sprint proposed a new notice plan that meets the individual notice requirements of Rule 23 and that comports with the language and findings of this Court's previous opinion.

In short, Sprint and Class Counsel propose the following: (1) insert a new two-sided notice ("Bill Insert") into each current Sprint customer's bill for a full one-month billing cycle; (2) provide a brief bill message in the "Sprint News and Notices" box of the bill directing customers to look at the Bill Insert; (3) provide individual postcard notice by direct mail to – (i) the 194,461 members of the Robertson class for whom Sprint has contact information; (ii) the 34,760 subscribers identified through records of the Sprint Executive and Regulatory Services department; (iii) the 17,093 customers identified through Sprint's Quality Assurance Program;

1

(iv) the 848 subscribers identified through Sprint email addresses; (v) the 38,000 subscribers

identified through data sampling conducted in connection with the Smith et al v. Sprint

Spectrum, L.P. (JAMS Case No. 1220034325) arbitration; and (vi) 413 customers identified by

the Minnesota Attorney General in connection with a separate lawsuit brought in Minnesota.

Both the Bill Insert and the postcard contain all of the information required by Rule

23(c)(2)(B)(i)-(vii) and comply fully with Rule 23(e).

Additionally, the Court is satisfied – upon examining the Declaration of Scott Rice,

Sprint's Vice-President of Customer Billing Services – that it would be unreasonable to require

Sprint to engage in further efforts to individually identify additional class members. The time,

cost, and effort associated with poring through and analyzing the various Sprint databases are not

reasonable, and the Court finds that individual notice, as outlined above, is sufficient to satisfy

Rule 23. Thus, the new individual notice plan is approved in full.

Finally, the following schedule shall govern the dates leading up to, and including, the

fairness hearing:

- October 7, 2009: Deadline for any member of the settlement class to submit a valid Request for Exclusion.

- October 7, 2009: Deadline for any member of the settlement class who does not submit a request for exclusion to file specific objections to the settlement. If the objector is simply repeating an objection he/she lodged at the first fairness hearing in this matter, the Court requires nothing more than a short statement re-alleging the objection. Additionally, all objectors who plan on speaking at the fairness hearing shall say so in writing. However, the Court will not allow objectors to repeat arguments made at the first fairness hearing.

- October 7, 2009: the Settlement Administrator shall deliver to Class Counsel, who shall then file with the Court, a report stating the total number of timely and valid requests for exclusion from the settlement class

- October 14, 2009: Class Counsel and Sprint shall file with the Court any memoranda or other materials in support of Final Approval of the Settlement Agreement.

- October 14, 2009: All counsel seeking fees shall file a motion for fees by this date. Any fee application not filed by October 16, 2009 is deemed to be waived.

- October 19, 2009: Deadline for objections or opposition solely to the fee applications.

- October 21, 2009, at 10 AM: Final approval hearing.

**ACCORDINGLY, IT IS** on this 2nd day of June, 2009;

**ORDERED** that the amended notice plan, as submitted on May 21, 2009 and outline above, is adopted as Rule 23-compliant; and it is further

**ORDERED** that the settling parties and objectors shall adhere to all deadlines as set forth above.

Jose L. Linares
United States District Judge

3

# EXHIBIT 3

NOT FOR PUBLICATION                                    **CLOSED**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUDY LARSON, et al., individually and on behalf of all others similarly situated, | Civil Action No.: 07-5325 (JLL) |
| Plaintiffs, | |
| v. | |
| SPRINT NEXTEL CORPORATION, et al., | OPINION |
| Defendants. | |

**LINARES**, District Judge.

This Court granted preliminary approval to the proposed settlement of this class action lawsuit on December 8, 2008 ("Preliminary Approval Order"), and set forth a timeline pursuant to which Class Counsel and Sprint Nextel Corporation ("Sprint") (collectively, the "Settling Parties") could move for final approval of the "Settlement Agreement." (Docket Entry No. 92). Pursuant to that schedule, the Court conducted an initial fairness hearing from March 12, 2009 through March 17, 2009. Following the initial fairness hearing, the Court ruled that the individual notice component of the initial Notice Plan did not comply with Federal Rule of Civil Procedure 23(c)(2). Thereafter, an Amended Notice Plan was approved by the Court and a second fairness hearing was conducted on Wednesday, October 21, 2009. Now, having considered the briefs and declarations filed by the parties, including the objectors, and the arguments raised at the aforesaid fairness hearing, the Court sets forth its findings below.

## I.      Background

This class action involves a claim by Plaintiffs that the early-termination fees ("ETFs")
charged by Sprint violate, inter alia, the Federal Communications Act and state consumer protection
laws.[1]  (Second Am. Compl. ¶ 4, Docket Entry No. 90).  ETFs constitute a fee of between $150 and
$200 charged to customers for cancellation of their wireless service "at any time after a trial period
but before the end of the 'service plan' term, regardless of the reason(s) for cancellation." (Id., ¶ 3).
Plaintiff Judy Larson is a citizen of Washington whose subscriber agreement with Sprint contained
an ETF provision and who was ultimately charged an ETF.  (Id., ¶ 7).  Plaintiff Barry Hall is a citizen
of California whose subscriber agreement with Sprint contained an ETF provision and who was
ultimately charged an ETF. (Id., ¶ 8).   Plaintiff Joe Milliron is a citizen of California whose
subscriber agreement with Sprint contained an ETF provision and who was ultimately charged an
ETF. (Id., ¶ 9).  Plaintiff Tessie Robb is a citizen of Florida whose subscriber agreement with Sprint
contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 10).  Plaintiff Willie
Davis is a citizen of Alabama whose subscriber agreement with Sprint contained an ETF provision
and who was ultimately charged an ETF, but did not pay the ETF. (Id., ¶ 11).

After undergoing five months of mediation with the Honorable Nicholas H. Politan (ret.), the
parties agreed to settle the matter for $17.5 million ($14 million in cash and $3.5 million in
activation fee waivers, bonus minutes and credit forgiveness) pursuant to the terms of a settlement
agreement ("Settlement Agreement").  In the event that the claims to be paid out of the cash portion

---

[1] The Court retains jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d).  This is a
class action involving more than 100 members where at least one class member resides in a state
different from the defendants and where the aggregate amount in controversy exceeds $5,000,000.

of the Settlement Fund exceed the available amount in the fund, all cash benefits would be reduced in pro rata proportion. At the close of the claim period, any cash left in the Settlement Fund would be converted into a cy pres award and would be distributed by Sprint in the form of pre-paid calling cards to the United States military for use by members of the armed forces and their families.[2] In addition to such monetary relief, the Settlement Agreement would also serve to enjoin Sprint from entering into new fixed-term subscriber agreements containing flat-rate ETFs for a period of two-years.

On December 8, 2008, this Court preliminary certified a Rule 23(b)(3) class defined as follows:

> All persons in the United States who are or were parties to a personal fixed-term subscriber agreement for a Sprint Nextel Wireless Service Account for personal or mixed business/personal use, whether on the Sprint CDMA network or Nextel iDen network, or both, **excluding accounts** for which the responsible party for the Wireless Service Account is a business, corporation or a governmental entity, entered into between July 1, 1999 and December 31, 2008 and whose claims relate in any way to an Early Termination Fee or use of an Early Termination Fee in a fixed-term subscriber agreement, and/or use or propriety of a fixed-term subscriber agreement whether the term was for the initial fixed-term subscriber agreement or subsequent extensions or renewals to the fixed-term subscriber agreement for whatever reason and/or who were charged by or paid an Early

---

[2] See Joint Stipulation Regarding the Cy Pres Terms of Settlement Agreement, Docket Entry No. 367 ("The parties agree, subject to the Court's discretion and approval, that if any money remains in the Common Fund after the expiration of the Claim Period, that money would be used to: (a) to purchase prepaid long distance calling cards to be donated to a charitable organization or for a charitable purpose (since the Settlement Agreement was first signed, the parties have agreed that these prepaid calling cards would be donated to the U.S. Military for use by members of the armed forces and their families); or (b) in any other appropriate manner the Court directs. It is not the intent of the parties that this cy pres provision would work as a reverter or result in any portion of the Common Fund being returned to Sprint."); see also Tr. (Oct. 21, 2009) at 22:13-15 ("The idea was cy pres under Your Honor's discretion, and our stipulation, which Your Honor has noted, says it unequivocally, it's not a reverter.").

> Termination Fee to Sprint Nextel, excluding only the Ayyad Class Claims[3] and Persons whose right to sue Sprint Nextel as a Settlement Class Member is otherwise barred by a prior settlement agreement and/or prior final adjudication on the merits. The Settlement Class includes Persons who were subject to an ETF, whether or not they paid any portion of the ETF either to Sprint Nextel or to any outside collection agency or at all, and includes persons who are prosecuting excluded claims to the extent such persons have claims other than those expressly excluded.

(Docket Entry No. 92 ("Preliminary Approval Order") at 3-4) (emphasis in original).

Following the initial fairness hearing which was held from March 12, 2009 through March 17, 2009, the Court ruled that the publication component of the initial Notice Plan complied with Rule 23(c)(2) but that the individual notice component of the initial Notice Plan did not. (Docket Entry Nos. 321, 339). A proposed Amended Notice Plan was submitted on May 21, 2009 and approved by the Court on June 2, 2009. (Docket Entry No. 344).

Now, having considered the arguments and briefs in support of and in opposition to the preliminarily-approved settlement,[4] and having conducted the fairness hearing required by Fed. R.

---

[3] The matter of Ayyad et al. v. Sprint Spectrum, et al., Case No. RG03-121510, proceeding in the Superior Court of the State of California, Alameda County, was originally part of the coordinated proceedings pending in the Cellphone Termination Fee Cases (California Judicial Council Coordinated Proceedings No. 4332). The Ayyad Class Claims, as defined in the Settlement Agreement, were severed from all other claims alleged in the Cellphone Termination Fee Cases. Such claims have been carved out of the Larson Settlement Agreement. (Settlement Agreement at 5, Docket Entry No. 84-1).

[4] The Court declines to consider any submissions, including supplemental declarations, filed by objectors after October 7, 2009. This Court's June 2, 2009 Order made clear that all objections to the settlement were due to the Court by October 7, 2009. Class Counsel and Sprint were permitted to file their material in support of final approval of the settlement by October 14, 2009. The Court's June 2, 2009 Order did not provide for the filing of reply briefs or other submissions in response to arguments made by Class Counsel and/or Sprint. Thus, the Court declines to consider: (1) the Declaration of Robert W. Schmeider III submitted by Objector Jessica Hall (Docket Entry No. 398), (2) the Declaration of Brad Lakin submitted by Objector Jessica Hall (Docket Entry No. 401), (3) the Declaration of Colin Weir submitted by the Galleguillos Objectors (Docket Entry No.

Civ. P. 23(e)(2), the Court issues this Opinion to address the issues of: (1) Class certification; (2)

reasonableness of the settlement; (3) reasonableness of the requested attorney fee award; and (4)

allocation of the attorney fee award.

## II.    Class Certification

Prior to addressing the specifics of the settlement, the Court analyzes the class certification

factors promulgated by Fed. R. Civ. P. 23. Rule 23 has been held to permit classes certified only for

settlement. In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768,

777-78 (3d Cir. 1995). In order to be certified, the class must meet all of the requirements of Rule

23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a)(1-4). It must also

meet the additional requirements of Rule 23(b)(3): superiority and predominance. Fed. R. Civ. P.

23(b)(3).

### A.    Rule 23(a) Factors

#### 1.    Numerosity

Fed. R. Civ. P. 23(a)(1) requires that a class be "so numerous that joinder of all members

is impracticable." "The Third Circuit has generally held that the numerosity requirement is met if

the proposed class exceeds 100 members." Welch v. Bd. of Dirs. of Wildwood Golf Club, 146

---

402), and (4) the Supplemental Declaration of Scott Bursor submitted by the Galleguillos Objectors
(Docket Entry No. 400). The Court recognizes its initial willingness, at the October 21, 2009
hearing, to consider or reject the Weir Declaration (Docket Entry No. 402), in whole or in part.
Having considered the circumstances surrounding the filing of the Weir Declaration, along with the
motion to strike said declaration (Docket Entry No. 411) subsequently filed by counsel for Sprint,
the Court agrees with Sprint that said declaration is untimely and procedurally inappropriate. The
Court will, however, consider those materials submitted after October 7, 2009 which relate to
applications for attorneys' fees.

F.R.D. 131, 135 (W.D. Pa. 1993). The Class includes millions of class members, dispersed nationwide. Thus, it is so numerous that joinder of all members is impracticable.

### 2.   Commonality

All members of the Class seek to declare Sprint's flat-rate ETF an unenforceable penalty. "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). Here, the requirement is easily satisfied, as all Class members share a common question of law and seek relief on the same nucleus of operative facts.

### 3.   Typicality

The typicality inquiry "assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interest will be fairly represented." Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 149-50 (3d Cir. 2008) (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996)). Its purpose is to ensure that the interests of the class representatives do not diverge from those of the class as a whole. Baby Neal, 43 F.3d at 57. Here, the claims of the named Plaintiffs are typical of the Class claims because, like the Class, Larson and the other named Plaintiffs, allege that Sprint charged them a flat-rate ETF, which operates as an unenforceable penalty. Stated differently, the named Plaintiffs' claim is based on the same legal theory and course of conduct as that of the absent members of the Class. Thus, the named Plaintiffs' incentives line up with those of absent class members. This factor is accordingly satisfied.

### 4.   Adequacy

In order to certify a class, a court must also find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "There are two factors: (1)

the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." In re Prudential Ins. Co. Sales Practice Litig., 962 F. Supp. 450, 519 (D.N.J. 1997).

No objection has been lodged specifically as to the qualifications and capabilities of Class Counsel, and the Court is aware of Class Counsel's expertise in handling complex civil litigation.[5] In fact, many of the firms handling this matter on behalf of the Class have appeared before this Court on other class action-related litigation, and the Court is satisfied that they are well-equipped to handle a case of this size and complexity.

With respect to the Class representatives, the Court finds that Plaintiffs' interests are not antagonistic to those of other members of the Class. Lina Galleguillos, Michael Moore and Antranick Harrentsian (collectively, "Galleguillos Objectors") argue that Plaintiffs are inadequate representatives inasmuch as there are no named Plaintiffs who are current subscribers to Sprint's illegal ETFs; as a result, Plaintiffs did not negotiate or otherwise attempt to enjoin Sprint from enforcing its flat-rate ETFs in the future.[6] As a preliminary matter, Class members who had

---

[5] The Court notes that the Galleguillos Objectors argue, generally, that Class counsel are inadequate for the same reasons that the Class representatives are inadequate, as well as for failing to make sufficient efforts to provide adequate notice (both initially, and again upon re-notice). Such objection is not only unsubstantiated, but is also meritless. The fact that the Court took issue with certain aspects of the initial notice plan has no bearing on the qualifications or capabilities of Class Counsel. In any event, the Court subsequently approved the Amended Notice Plan submitted by Class Counsel and Sprint, and now finds that Class Counsel and Sprint fully complied with the stringent requirements set forth by Rules 23(c)(2)(B) and 23(e).

[6] To the extent the Galleguillos Objectors challenge the adequacy of the settlement on this basis, the Court rejects such challenge. The fact that Sprint is permitted to continue to collect flat-rate ETFs is a provision which was part and parcel of heavy negotiation and compromise, and was ultimately agreed upon by Class Counsel and Sprint in the context of this particular case. The fact that T-Mobile agreed, in the context of a separate litigation, to pro-rate its ETFs going forward has no bearing on the particular circumstances of this case or the reasonableness of its settlement. The

California Subscriber Class Claims, that is, claims asserted in California state court by Sprint customers who did not allege that they had been charged and/or paid an ETF, but instead alleged simply that they were subject to an ETF in their subscriber agreement,[7] do receive a benefit under the terms of the Settlement if they are charged or are otherwise harmed by the flat-rate ETF.  For instance, if they are charged an ETF, they would fall into Category I or Category II Class members (depending on whether or not they paid the ETF), and would be entitled to the relief provided for under such categories. (Settlement Agreement, Art. II, Docket Entry No. 84-1). If they are otherwise harmed because of the existence of the flat-rate ETF, such Class members would fall into Category IV Class members and would be entitled to the relief afforded therein. (Id.).  By contrast, the type of injunctive relief referred to by the Galleguillos Objectors – which would allow them to terminate without paying an ETF – could potentially expose such Class members to a counterclaim for damages from Sprint.  See, e.g., Garrett v. Coast & Southern Fed. Sav. & Loan Assn., 9 Cal.3d 731, 741 (1973) ("We do not hold herein that merely because the late charge provision is void and thus cannot be used in determining the lender's damages, the borrower escapes unscathed. He remains liable for the actual damages resulting from his default.").

Moreover, no defenses unique to the class representatives have been raised, and the class representatives do not have divergent interests from the Class as a whole.  Thus, the Court finds that the named Plaintiffs are capable of fairly and adequately protecting the interests of the Class in

Galleguillos Objectors mere disagreement with this particular provision is equally irrelevant to reasonableness of the overall settlement.

[7] California Subscriber Class Claims, part of the Cellphone Termination Fee Cases, JCCP 4332 (Calif. Superior Ct., Alameda Cty, CA), are identified as "Related Claims" in Article I of the Settlement Agreement.  Thus, the Settlement Agreement will settle and release the California Subscriber Class Claims.

connection with the proposed settlement.

### B.    Rule 23(b)(3) Factors

Pursuant to Fed. R. Civ. P. 23(b)(3), a Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In examining predominance, the purpose of the inquiry is to determine whether class-wide issues outweigh individual issues. Here, the Court finds that common questions of law and fact predominate over questions affecting only individual members of the Settlement Class. Each Class member signed a contract with Sprint that contained a flat-rate ETF provision. Each Class member maintains that Sprint's flat-rate ETF is an unenforceable penalty. Nothing in the record exists to indicate that individual issues would predominate at trial.

Additionally, given that the value of an individual claim is no more than a few hundred dollars, maintaining individual actions in this case would be prohibitively expensive. A class action is, therefore, the superior method of fairly adjudicating the controversy. Thus, the Settlement Class satisfies the predominance and superiority requirements of Rule 23(b)(3). Having met the requirements Rules 23(a) and 23(b)(3), the Settlement Class is granted final certification.

### III.   Notice

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 306 (3d Cir. 1998).

Under Federal Rule of Civil Procedure 23(c), notice must be disseminated by "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c); see also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175-76 (1974) (finding that Rule 23(c) includes an "unambiguous requirement" that "individual notice must be provided to those class members who are identified through reasonable effort").

Additionally, in this case, where a settlement class has been provisionally certified and a proposed settlement preliminarily approved, proper notice must meet the requirements of Federal Rules of Civil Procedure 23(c)(2)(B) and 23(e). See Larson v. Sprint Nextel Corp., No. 07-5325, 2009 WL 1228443, at *2 (D.N.J. April 30, 2009) (Linares, J.). Rule 23(c)(2)(B)-compliant notice must inform class members of: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the class member's right to retain an attorney; (5) the class member's right to exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on class members under Rule 23(c)(3). Id.; Fed. R. Civ. P. 23(c)(2)(B)(I)-(vii). Rule 23(e) notice must contain a summary of the litigation sufficient "to apprise parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." In re Prudential Ins. Co. of Am. Sales Practices Litig., 177 F.R.D. 216, 231 (D.N.J. 1997).

On December 18, 2008, this Court approved a notice program containing the following components: (1) publication notice in major national and regional publications, (2) a bill insert, (3) a "PR Newswire Release," (4) Google AdWords campaign, and (5) a website. Of these five components, the bill insert represented the individual notice to Sprint's current subscribers while the

other four pieces comprised the notice publication plan intended to reach a large portion of class members.

Objections related to notice were filed by two groups of objectors: (a) the Galleguillos Objectors, and (b) Jessica Hall.   Objector Jessica Hall argues that class notice continues to be deficient inasmuch as the cost of such notice should not take away from the class relief.  However, such objection actually relates to the reasonableness of the settlement itself, not to any alleged deficiency with respect to the notice plan. Thus, this aspect of the Hall Objection will be addressed by the Court in connection with its assessment of the reasonableness of the settlement.

### A.    Publication Notice

Following the initial fairness hearing, the Court assessed and approved the notice publication plan in its April 30, 2009 Opinion, as amended by Order dated May 21, 2009.[8]  The implementation and design of the publication notice plan fell upon Gilardi & Co., LLC ("Gilardi"), a nationally-recognized specialist in the construction and dissemination of media-based notice programs in class action cases.  According to Plaintiffs' expert, Alan Vasquez, Gilardi began by defining the target audience as "all U.S. Adult Mobile Phones Subscribers." (Vasquez Decl. ¶ 6).  That left a total audience size of 168,557,000 individuals.  (Id.)  In order to reach as many of those individuals as possible, Gilardi designed a three-prong publication notice plan that included: (1) publication notice in various magazines and newspapers, (2) a PR Newswire Release, and (3) a Google AdWords

---

[8]  Accordingly, the Court hereby incorporates the reasons set forth in its April 30, 2009 Opinion, as amended by Order dated May 21, 2009.  Having already found the publication notice Rule 23-complaint, the Court will not repeat each and every aspect of its decision regarding same herein.

-11-

campaign.[9]

In ultimately finding the publication notice Rule 23-compliant, the Court addressed several

substantive objections, including objections by the Galleguillos Objectors.[10]   The real dispute over

publication notice concerned two elements: (1) the effective overall reach of the campaign, and (2)

the content of the notice.

### 1.    Reach

As to reach, after carefully considering the issue of whether the initial plan met or exceeded

acceptable reach statistics, the Court noted, in its April 30, 2009 Opinion, its satisfaction that the

publication notice plan was calculated to reach a significant amount of the Class.   Although the

parties differed over the concept of "reach" and whether the present plan met or exceeded acceptable

reach statistics, the Court ultimately found that the important statistic for analysis purposes is net

reach and both Todd Hilsee, the expert witness put forth by the Galleguillos Objectors and Alan

Vasquez, Plaintiffs' expert, agreed that the publication plan had a net reach of anywhere from 49-53

percent.   See Tr. (March 12, 2009) at 16-20; 153-154.   The Court acknowledged that the parties

differ about where along that spectrum this plan falls, but for purposes of analyzing the effectiveness

_____

[9] As previously explained, Gilardi also set up a website containing all relevant information
for prospective class members.   The website, while important, cannot be considered part of the
notice publication plan given that it does not actively place itself in view of class members.   Rather,
class members had to know the website address or be provided the website link to access it.   Because
of its static nature, it is not considered a piece of the publication notice campaign.

[10] To the extent the Galleguillos Objectors have requested additional discovery in connection
their Notice-related objections, such requests are denied as untimely.   Such requests were admittedly
made on October 7, 2009, yet, the October 21, 2009 fairness hearing was scheduled by the Court on
June 2, 2009.   Moreover, the Galleguillos Objectors failed to bring this matter to the Court's
attention until October 16, 2009 – less than a week before the scheduled fairness hearing.   See Docket
Entry No. 395.   The Galleguillos Objectors' efforts in this regard were not only untimely, but also
unrealistic under the circumstances.

of a notice plan, the Court found that it was sufficient to peg the program at 49 to 53 percent.

Ultimately, after having thoroughly evaluated the publication plan and the objections of the Galleguillos Objectors, the Court noted its satisfaction that such plan was calculated to reach a significant amount of the class. In particular, the Court noted that the regional newspapers were chosen to represent areas with large concentrations of Sprint subscribers. (Vasquez Decl., ¶ 8). The Court likewise noted that the plan incorporated multiple notices in issues of large national publications, including USA Today, Parade Magazine, Vista Magazine, and the New York Times. Finally, the Court explained that no case stands for the proposition that a publication notice reach of 49-53 percent is disallowed, especially when coupled with a strong individual notice program. Given the large size of this class and the discretion afforded this Court, the Court found the publication notice plan to have been sufficient.

### 2. Content

As to the content of the publication notices, the Court found that the sample provided to the Court (as "Exhibit A" to the Vasquez Declaration), contained all of the information required by Rule 23(c)(2). In particular, the Court found that such notice provided a description of the case and settlement class, along with the steps necessary to submit a claim, opt-out and/or object. Finally, the Court found that it informed the potential class member that future claims are barred unless the individual excludes him or herself from the settlement.

### 3. Conclusions Regarding Publication Notice

Many, if not all, of the arguments now raised by the Galleguillos Objectors regarding the publication notice were previously presented to, considered and rejected by the Court. These arguments include: (1) the weak and/or ineffective nature of the publication, (2) defects in the design

-13-

and content of the notice, (3) the notice provided false information concerning the status of the

Robertson v. Nextel Commc'ns, Inc. matter,[11] (4) the notice provided false information concerning

findings of illegality by a California state court,[12] (5) the notice provided false information

concerning the alleged reversion of cash to Sprint,[13] (6) notice was not written in plain language, and

---

[11] Robertson v. Nextel Commc'ns, Inc. was originally part of the Cellphone Termination Fee Cases, JCCP 4332, proceeding in Alameda County, California. Unlike the claims asserted in Ayyad, claims asserted in the matter of in Robertson were specifically included in the Larson Settlement. (Settlement Agreement at 5, Docket Entry No. 84-1).

The Galleguillos Objectors argue that the publication notice, which refers to the Settlement Agreement, incorrectly represents that summary judgment had been granted in the matter of Roberston in Nextel's favor when in fact the order granting summary judgment had been reversed on reconsideration. The Court noted such objection in its April 30, 2009 Opinion and directed that, "to the extent the parenthetical following the Robertson citation in the Settlement Agreement is incorrect, the parties should correct it." The Galleguillos Objectors now argue that the publication notice remains deficient because such parenthetical, contained in the Settlement Agreement, was never corrected. It is Defendant's position that no such correction was necessary because the information concerning the Robertson case was accurate on the date on which the Settlement Agreement was entered into and that they were under no obligation to amend the Settlement Agreement to reflect a status change that occurred thereafter. The Court is equally unaware of such an obligation, and the Galleguillos Objectors cite to no legal authority in support of same.

[12] The Galleguillos Objectors continue to take issue with the portion of the Long Form Notice which states "[t]his notice does not imply that there have been or would be any findings of violation of the law by Sprint Nextel or that recovery could be had in any amount if the Action were not settled." See Docket Entry No. 84-6. They maintain that such statement is inaccurate inasmuch as there has been a finding of illegality by a California court. When read in the proper context, however, it is clear that this statement was intended to reflect the legal posture of this action. Therefore, there is nothing inaccurate about this statement.

[13] The Galleguillos Objectors maintain that the Long Form notice was inadequate inasmuch as it failed to provide notice to the Class that monies left in the Common Fund would revert to Sprint. In support of this argument, the Galleguillos Objectors cite to page 23 of the Settlement Agreement which states that "[i]n the event there remains cash left in the fund after all claim periods have expired, the remaining cash will be returned to Sprint Nextel and Sprint Nextel shall issue prepaid calling Personal Identification Numbers valued in the amount of the remaining cash to a charitable organization . . ." The fact that such monies would initially be "returned to Sprint Nextel," does not signify that such monies would revert to Sprint; rather, the Settlement Agreement makes clear that such cash "shall" then be used by Sprint Nextel to issue prepaid calling cards to a

(7) the extremely low response rate confirms inadequacy of notice.[14]  Such arguments were raised in prior briefing before the Court and/or at the initial fairness hearing.  In finding the publication notice to be Rule 23-compliant, despite such alleged problems, the Court noted – and reiterates once again – that notices can never be perfectly drafted.  There is a fine line between writing them in "plain" language and incorporating all of the relevant information.  Class Counsel and Sprint have, in this case, succeeded in striking the right balance.  Accordingly, for these reasons as well as those set forth by the Court in its April 30, 2009 Opinion, as amended by Order dated May 21, 2009, the Court is satisfied that the publication component of the initial Notice Plan proposed and executed by Sprint and Class Counsel complies with Rule 23.

**B.    Individual Notice**

In its April 30, 2009 Opinion, this Court found the individual notice component of the Notice Plan to have been deficient.  As a result, the Court ordered Sprint and Class Counsel to re-notice the Class in accordance with the following directions:

Within 21 days, they shall present that notice plan to the Court.  It

---

charitable organization. Thus, the Settlement Agreement does not – and never has – provided for a reversion of money to Sprint. This point has been confirmed both during the October 21, 2009 hearing, as well as in the parties' joint stipulation regarding the cy pres provision.  See Joint Stipulation Regarding the Cy Pres Terms of Settlement Agreement, Docket Entry No. 367 ("It is not the intent of the parties that this cy pres provision would work as a reverter or result in any portion of the Common Fund being returned to Sprint."); see also Tr. (Oct. 21, 2009) at 22:13-15 ("The idea was cy pres under Your Honor's discretion, and our stipulation, which Your Honor has noted, says it unequivocally, it's not a reverter.").

[14] In previously finding the publication notice component of the Notice Plan compliant with Rule 23, the Court explained and now reiterates that "response rate is not by itself a factor to determining the strength or weakness of a notice campaign."  In any event, since the Amended Notice Plan was implemented, there have been an additional 44,808 claims representing 66,913 lines of service submitted, thereby demonstrating the overall effectiveness of the Amended Notice Plan. (Carmin Decl., ¶ 9).

should include at least the following: (1) a new form of individual notice that contains the 23(c)(2) elements; (2) a plan to supply that individual notice to members of the <u>Robertson</u> class; (3) a plan to supply that notice to all current Sprint subscribers; (4) an indication from Sprint as to what subclasses of subscribers are reasonably identifiable and a corresponding plan to provide individual notice to those subscribers . . . .

In response to this Court's directives, Sprint and Class Counsel devised an Amended Notice Plan. Such plan was submitted to the Court for approval on May 21, 2009. <u>See</u> Docket Entry No. 340. **No opposition to the Amended Notice Plan was submitted to the Court for consideration.** On June 2, 2009, this Court approved the Amended Notice Plan and directed Sprint and Class Counsel to re-issue the individual notice component accordingly. The Galleguillos Objectors now maintain that the individual notice component of the Amended Notice Plan remains deficient both as to its reach and content.

### 1.   Reach

After considering the original objections as to individual notice filed by the Galleguillos Objectors, the Court found the individual notice component of the original Notice Plan to have been deficient and directed Sprint and Class Counsel to provide Rule 23-compliant individual notice to: (a) identified members of the <u>Robertson</u> class, and (b) those subclasses capable of reasonable identification.

In response to this Court's April 30, 2009 Opinion, Sprint and Class Counsel submitted a proposed Amended Notice Plan providing for the mailing of individual postcard notices by direct mail to (a) the 194,461 members of the <u>Roberston</u> class for whom Sprint has contact information, (b) the 34,760 subscribers identified through the records of Sprint's Executive and Regulatory Services Department, (c) the 17,093 customers identified through Sprint's Quality Assurance

Program, (d) the 848 subscribers identified through Sprint email addresses, (e) the 38,000 subscribers identified through data sampling conducted with the Smith v. Sprint Spectrum, L.P. (JAMS Case No. 1220034325) arbitration, and (f) the 413 customers identified by the Minnesota Attorney General in connection with a separate lawsuit brought in Minnesota. In addition, Sprint also filed the Declaration of its Vice President of Customer Billing Services, Scott Rice, to address what subclasses of the settlement class members are reasonably identifiable and the efforts that would be necessary to search Sprint's billing systems for additional subclasses of settlement class members.

The Galleguillos Objectors now argue that the individual notice component of the Amended Notice Plan remains deficient as to its reach because: (1) Sprint failed to provide individual notice to 9.2 million identifiable class members, and (2) Mr. Rice's declaration setting forth the estimates of the time and expense required to identify different subsets of class members from Sprint's databases is inadmissible.

### (i).     Failure to Provide Notice to 9.2 Million Identifiable Class Members

The Galleguillos Objectors argue that Sprint has failed to comply with Fed. R. Civ. P. 23(c)(2)(B) inasmuch as Sprint has failed to query its own billing records to identify class members who were charged and/or paid early termination fees. According to the Galleguillos Objectors, 9.2 million of such class members can be identified from Sprint's own billing records with "modest efforts;" thus, in failing to provide individual notice to the 9.2 million identifiable class members, Sprint has failed to meet the "reasonable effort" standard. Sprint maintains that this figure is flawed inasmuch as it contains national data for ETFs charged not only to relevant individual accounts but

-17-

also to millions of non-settlement class members. For instance, Sprint points out that the 9.2 million figure includes data for the Ayyad class members who are specifically excluded from the Settlement Class.

The Galleguillos Objectors now concede that the 9.2 million figure is, at the very least, based on outdated data and therefore unreliable. See Docket Entry No. 395 at 2.[15] In any event, the crux of the Galleguillos Objection to the reach aspect of the individual component of the notice plan is that Sprint could have identified millions of additional class members through Sprint's own billing records. Even if such speculation were correct, the Court has already examined the Rice Declaration and found that the time, cost and effort necessary to do so – as certified by Sprint's Vice-President of Customer Billing Services – would be unreasonable in light of all the circumstances.[16] Nothing presented to the Court has given the Court reason to revisit this finding.[17]

_____

[15] As previously explained by the Court, the Galleguillos Objectors made no effort to obtain additional data and/or discovery from Sprint or Class Counsel until two weeks before the October 21, 2009 fairness hearing, which was scheduled by the Court back on June 2, 2009. Moreover, such outstanding matters were first brought to the Court's attention on October 16, 2009 – less than a week before the scheduled fairness hearing. As a result, their belated efforts to obtain such data were denied by the Court as untimely.

[16] In doing so, the Court noted that Rule 23 contains a pragmatic "reasonableness" element in terms of identifying individual class members. See April 30, 2009 Op. at 9.

[17] The Court has considered the January 4, 2010 letter submitted to the Court by Scott Bursor, as well as the responses submitted by Class Counsel and counsel for Sprint. Mr. Bursor urges the Court to consider the recent decision in West v. Carfax, Inc., 2009 WL 5064143 (Ohio Ct. App. Dec. 24, 2009), where the Ohio Court of Appeals reversed a trial court's approval of a settlement where individual notice had not been provided to class members whose names and addresses were obtainable from information on the defendant's database. As a preliminary matter, the Court notes that the Ohio court's decision in Carfax is not binding on this Court. In any event, the Court has considered the Carfax decision and finds that it supports this Court's April 30, 2009 and June 2, 2009 decisions regarding individual notice. In particular, both courts utilized the same reasonable efforts standard in assessing what efforts should be required of the defendants in order to satisfy Rule 23. The fact that the court in Carfax determined, based upon a unique set of facts, that Carfax could

-18-

### (ii).   Rice Declaration

In connection with the proposed Amended Notice Plan, Sprint submitted a declaration by Mr. Rice describing Sprint's billing databases and providing estimates of time and expense required to query and identify various subsets of class members.  In approving the Amended Notice Plan, the Court relied upon the Rice Declaration in determining the reasonableness of requiring Sprint to engage in further efforts to individually identify additional class members.

The Galleguillos Objectors now argue that Sprint withheld important data regarding the anticipated benefits of such efforts when it submitted the proposed Amended Notice Plan, and that such data was necessary in order to properly evaluate the reasonableness of said efforts.  In addition, the Galleguillos Objectors urge the Court to strike Mr. Rice's Declaration on the following grounds: (a) the Rice Declaration is based on double and triple hearsay, and (b) the Rice Declaration is inadmissible under Federal Rules of Evidence 601, 602, 701, 702 and 802.  In response, Sprint argues that the declaration of Mr. Rice did, in fact, address anticipated results.  In any event, Sprint maintains that the Court was provided with all of the information that it required to determine whether it would be reasonable to require Sprint to engage in the efforts set forth in the Rice Declaration, and that the Court properly exercised its discretion when it concluded that the efforts necessary to do so were not reasonable.

The Rice Declaration was submitted to the Court on May 21, 2009.  See Docket Entry No. 341.  The Galleguillos Objectors took no action with respect to this declaration until October 7,

---

have converted an already existing list of vehicle identification numbers into a list of class members through the efforts of a co-defendant, which was "in the business of providing names and addresses of vehicle owners in class action suits," and in failing to do so, failed to meet the reasonable effort standing, has no bearing on what constitutes reasonable effort by Sprint in the Larson matter.

2009.  See Docket Entry No. 370.  To the extent the Galleguillos Objectors took issue with any aspect of the Rice Declaration, such issues should have been brought to the Court's attention at or around the time that such declaration was submitted for the Court's consideration.[18]  This holds particularly true in a nationwide class action of this magnitude, and given (a) the particular circumstances giving rise to the re-notice, including the Galleguillos Objectors appearance at the first fairness hearing and their objections to the original notice plan, (b) that such declaration was filed on the public docket and in conjunction with a proposed Amended Notice Plan as directed by the Court, and (c) that counsel for the Galleguillos Objectors had notice of the declaration and read it when filed.[19]  Thus, all of the grounds for the objection to the Rice Declaration were known to the Galleguillos Objectors when the Declaration was filed.  Having failed to raise such issues regarding the admissibility of the Rice Declaration at a time when the Court could have taken said issues into consideration prior to the Court's approval (and execution) of the Amended Notice Plan, the Galleguillos Objectors have waived their right to challenge the Rice Declaration on such a basis.  See, e.g., Gov't of Virgin Islands v. Archibald, 987 F.2d 180, 184 (3d Cir. 1993) ("The appropriate

---

[18] During the second fairness hearing, Mr. Bursor, arguing on behalf of the Galleguillos Objectors, took the position that the Galleguillos Objectors did not respond to the Rice Declaration at the time in which it was filed because no formal motion seeking approval of the Amended Notice Plan was pending before the Court. See Tr. (Oct. 21, 2009) at 44:17-20. According to Mr. Bursor, "I knew they submitted it, and we were looking at it. . . . I didn't know if your Honor was going to issue a briefing schedule to say if anybody has a response to this, file it. I didn't see a notice of motion that said, please take notice that this is the day your brief is due. . . ." Id. at 44:22-45:9. The Court finds such a rationale to be entirely unconvincing. As the Court explained during the hearing, "Mr. Bursor, in the history of this case, that has never stopped you. [Even] as of last night, I got a declaration from Weir . . . [and] that wasn't contemplated in my October 7th Order either, so that has never you stopped you from submitting papers to this Court. In fact, there has been a plethora of objections and briefing done without me even requesting it, so I don't know that that would have stopped you from doing it." Id. at 45:11-20.

[19] See Tr. (Oct. 21, 2009) at 44:19-45:3.

time to raise an objection is as soon as the party knows or reasonably should know of the grounds for objection."); Presidential Life Ins. Co. v. Milken, 946 F. Supp. 267, 278-279 (S.D.N.Y. 1996) ("A party to a settlement may be estopped from objecting thereto once another party to the settlement has relied, to its detriment, on the first party's failure to object to the settlement terms.").

   2.   **Content**

   Of the five components of the original notice plan, the bill insert represented the sole component of individual notice to Sprint's current subscribers.  This Court ruled, in its April 30, 2009 Opinion, that the content of the initial bill insert failed to comply with the dictates of Rule 23(c)(2).  The Amended Notice Plan submitted by Sprint and Class Counsel proposed the following changes to the content of the individual component of the notice plan: (1) insertion of a new two-sided bill insert into current Sprint customer's bills for a one-month billing cycle, (2) insertion of a brief bill message in the "Sprint News and Notices" box of the bill directing customers to look at the bill insert, and (3) the mailing of individual postcards by direct mail to the various subclasses of Class members identified by Sprint in the proposed Amended Notice Plan.  Sprint and Class Counsel also attached, as Exhibits A and B to the proposed Amended Notice Plan, the proposed form and content of the bill insert and postcard notice.

   The Court has previously analyzed both the bill insert and the postcard, and found that both contain all of the information required by Rule 23(c)(2)(B)(I)-(vii) and comply fully with Rule 23(e).  See June 2 Order at 2, Docket Entry No. 344.[20]  None of the objections raised by the Galleguillos Objectors (or any other objectors) give the Court reason to revisit this issue.

---

   [20] The Court hereby incorporates the reasons set forth in its June 2, 2009 Order.