**NOT FOR PUBLICATION**                                                          **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARRY HALL, et al., individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>AT&T MOBILITY LLC f/k/a CINGULAR WIRELESS LLC, et al.,<br><br>    Defendants. | Civil Action No.: 07-5325 (JLL)<br><br><br><br><br>**OPINION** |

**LINARES**, District Judge.

This Court granted preliminary approval to the proposed settlement of this class action lawsuit on November 4, 2009 ("Preliminary Approval Order"), and set forth a timeline pursuant to which Class Counsel and AT&T Mobility LLC f/k/a Cingular Wireless LLC ("ATTM") (collectively, the "Settling Parties") could move for final approval of the "Settlement Agreement." (Docket Entry No. 421).  Pursuant to that schedule, the Court conducted a fairness hearing on June 29, 2010.  Now, having considered the briefs and declarations filed by the  parties,  including the objectors, and the arguments raised at the aforesaid fairness hearing, the Court sets forth its findings below.

## I.      Background

This class action involves a claim by Plaintiffs[1] that the early-termination fees ("ETFs")

charged by ATTM violate, inter alia, the Federal Communications Act and state consumer protection

laws.[2] (Third Am. Compl. ¶ 4, Docket Entry No. 356).[3] ETFs constitute a fee of between $150 and

$200 charged to customers for cancellation of their wireless service "at any time after a trial period

---

[1] Plaintiff Barry Hall is a citizen of California whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 8). Plaintiff Roman Sasik is a citizen of California whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 12). Plaintiff David Dickey is a citizen of Minnesota whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 13). Plaintiff Steven Wright is a citizen of California whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged and paid an ETF. (Id., ¶ 14). Jane Waldmann is a citizen of Florida whose subscriber agreement with ATTM contained an ETC provision and who was ultimately charged an ETF. (Id., ¶ 15). Robert Wise is a citizen of Tennessee whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 16). Jackie Thurman is a citizen of Kentucky whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 17). Richard Chisolm is a citizen of Massachusetts whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 18). Mary Pitsikoulis is a citizen of New York whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶19). Debra Lively is a citizen of California whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 20). Jacqueline Sims is a citizen of California whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 21). Kisha Orr is a citizen of California whose subscriber agreement with ATTM contained an ETF provision and who was ultimately charged an ETF. (Id., ¶ 22).

[2] The Court retains jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). This is a class action involving more than 100 members where at least one class member resides in a state different from the defendants and where the aggregate amount in controversy exceeds $5,000,000.

[3] Similar class action complaints were filed against T-Mobile and Sprint. See Milliron, et al. v. T-Mobile USA, Inc., Civil Action No. 08-4149 and Larson, et al. v. Sprint Nextel Corp., Civil Action No. 07-5325. Both matters were also resolved by way of settlement. See Milliron, et al. v. T-Mobile USA, Inc., 2009 WL 3345762 (D.N.J. Sept. 10, 2009) (Linares, J.) and Larson, et al. v. Sprint Nextel Corp., 2010 WL 234934 (D.N.J. Jan. 15, 2010) (Linares, J.).

but before the end of the 'service plan' term, regardless of the reason(s) for cancellation." (Id., ¶ 3).

After engaging in two all-day mediation sessions with the Honorable Douglas Wolfson (ret.), the parties agreed to settle the matter for $18 million ($16 million in cash and $2 million in non-cash benefits in the form of AT&T Pre-Paid Long Distance Calling Cards ("prepaid calling cards")) pursuant to the terms of a Settlement Agreement, which contains the following general terms: (1) a cash common fund of $16 million to be paid to Class members who were charged and/or paid a flat-rate ETF ("ETF-Assessed Class"),[4] (2) $2 million in non-cash relief in the form of prepaid calling cards to be given to Class members who were subject to an ETF by ATTM but were not charged and did not pay an ETF ("Subscriber Class"),[5] and (3) the ability for eligible Class members to modify their contract by converting flat-rate ETFs into pro-rated ETFs. See generally Settlement Agreement. Additionally, ATTM has agreed to refrain from entering into new customer service agreements that contain a flat-rate ETF for a period of two years.

The instant action was filed on November 5, 2007. ATTM subsequently filed a motion to compel arbitration. By way of Opinion and Order dated March 30, 2009, the Court denied ATTM's motion to compel. An appeal of this Court's March 30, 2009 decision is currently pending before

---

[4] The ETF-Assessed Class includes all persons in the United States who were parties to a contract with ATTM which contained a flat-rate ETF and who were charged a flat-rate ETF. See Settlement Agreement at Art. II, ¶ 20, Docket Entry No. 355-3. Reference to "all persons in the United States" includes those persons residing in United States territories, including, but not limited to, Puerto Rico.

[5] The Subscriber Class includes all persons in the United States who were parties to a contract with ATTM which contained a flat-rate ETF but who were not charged and did not pay an ETF. See Settlement Agreement at Art. II, ¶ 47, Docket Entry No. 355-3. Reference to "all persons in the United States" includes those persons residing in United States territories, including, but not limited to, Puerto Rico.

the Untied States Court of Appeals for the Third Circuit.

On November 4, 2009, this Court preliminarily approved the settlement and preliminarily certified the settlement class ("Class").  The Class consists of two subclasses – (1) ETF-Assessed Class: All persons in the United States who were parties to a contract for a wireless telephone account with ATTM and/or its predecessor companies and were billed a Flat-Rate ETF by ATTM and/or its predecessor companies from January 1, 1998 until November 4, 2009.  The ETF-Assessed Class includes such persons whether or not they paid any portion of the ETF, whether to ATTM, any outside collection agency, or other third party to whom ATTM has assigned the rights to the ETF; and (2) Subscriber Class: All persons in the United States who were or are parties to a contract for a wireless telephone account with ATTM and/or its predecessor companies that included or includes a provision for a Flat-Rate ETF from January 1, 1998 until November 4, 2009, and who have not paid or been billed a Flat-Rate ETF.  The Subscriber Class excludes all current employees of ATTM. (Docket Entry No. 421 ("Preliminary Approval Order") at 3).  Thus, Class members include all current and former ATTM customers who entered into a wireless service contract with ATTM which contained a flat-rate ETF, regardless of whether or not they were charged or paid the ETF, and regardless of the type of wireless device that they ultimately used with said contract.

Now, having considered the arguments and briefs in support of and in opposition to the preliminarily-approved settlement, and having conducted the fairness hearing required by Fed. R. Civ. P. 23(e)(2), the Court issues this Opinion to address the issues of: (1) Class certification; (2) reasonableness of the settlement; and (3) reasonableness of the requested attorney fee award.

## II.      Class Certification

Prior to addressing the specifics of the settlement, the Court analyzes the class certification factors promulgated by Fed. R. Civ. P. 23.  Rule 23 has been held to permit classes certified only for settlement.  In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 778 (3d Cir. 1995).  In order to be certified, the class must meet all of the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a)(1-4).  It must also meet the additional requirements of Rule 23(b)(3): superiority and predominance.  Fed. R. Civ. P. 23(b)(3).

### A.      Rule 23(a) Factors

#### 1.      Numerosity

 Fed. R. Civ. P. 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  "The Third Circuit has generally held that the numerosity requirement is met if the proposed class exceeds 100 members."  Welch v. Bd. of Dirs. of Wildwood Golf Club, 146 F.R.D. 131, 135 (W.D. Pa. 1993).  The Class includes millions of class members, dispersed nationwide.  Thus, it is so numerous that joinder of all members is impracticable.

#### 2.      Commonality

All members of the Class seek to declare ATTM's flat-rate ETF an unenforceable penalty.  "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).  Here, the requirement is easily satisfied, as all Class members share a common question of law and seek relief on the same nucleus of operative facts.

#### 3.      Typicality

The typicality inquiry "assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interest will be fairly represented." Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 149-50 (3d Cir. 2008) (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996)). Its purpose is to ensure that the interests of the class representatives do not diverge from those of the class as a whole. Baby Neal, 43 F.3d at 57-58. Here, the claims of the named Plaintiffs are typical of the Class claims because, like the Class, Hall and the other named Plaintiffs, allege that they were subject to a flat-rate ETF, which operates as an unenforceable penalty. Thus, the named Plaintiffs' claim is based on the same legal theory and course of conduct as that of the absent members of the Class. This factor is accordingly satisfied.

### 4. Adequacy

In order to certify a class, a court must also find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "There are two factors: (1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." In re Prudential Ins. Co. of Am. Sales Practice Litig., 962 F. Supp. 450, 519 (D.N.J. 1997).

No objection has been lodged specifically as to the qualifications and capabilities of Class Counsel, and the Court is aware of Class Counsel's expertise in handling complex civil litigation. In fact, many of the firms handling this matter on behalf of the Class have appeared before this Court on other class action-related litigation, and the Court is satisfied that they are well-equipped to handle a case of this size and complexity.

With respect to the Class representatives, the Court finds that Plaintiffs' interests are not

antagonistic to those of other members of the Class.  The named Plaintiffs, like other Class members, were parties to a wireless service contract with ATTM that contained a flat-rate ETF and allege that they were harmed as a result thereof.  Objectors Sallie Turner and Carla Walsh ("Turner Objectors") oppose the settlement on the basis that the named Plaintiffs – who were all charged and/or paid an ETF – are all members of the ETF-Assessed Class and thus cannot fairly represent members of the Subscriber Class.  Members of the Subscriber Class do receive benefits under the terms of the Settlement Agreement – namely, non-cash benefits in the form of prepaid calling cards or the ability to convert their existing contracts containing a flat-rate ETF into one with a pro-rated ETF.  To the extent the Turner Objectors take issue with the fact that any unused calling cards will be distributed to charity instead of to Subscriber Class members, the Court notes that this approach is entirely consistent with the approach utilized with any unclaimed funds from the ETF-Assessed Class common fund.  Such an approach is particularly fair to members of the Subscriber Class who suffered no calculable out-of-pocket loss from the flat-rate ETF.

Moreover, no defenses unique to the class representatives have been raised, and the class representatives do not have divergent interests from the Class as a whole.  Thus, the Court finds that the named Plaintiffs are capable of fairly and adequately protecting the interests of the Class in connection with the proposed settlement.

**B.    Rule 23(b)(3) Factors**

Pursuant to Fed. R. Civ. P. 23(b)(3), a Court must find that the "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 266 (3d Cir. 2009)

("Whereas 'Rule 23(a)(2)'s commonality element requires that the proposed class members share at least one question of fact or law in common with each other,' the Rule 23(b)(3) predominance element 'requires that common issues predominate over issues affecting only individual class members.' "). Thus, in examining predominance, the purpose of the inquiry is to determine whether class-wide issues outweigh individual issues.

Here, the Court finds that common questions of law and fact predominate over questions affecting only individual members of the Settlement Class. Each Class member signed a contract with ATTM that contained a flat-rate ETF provision. Each Class member maintains that ATTM's flat-rate ETF is an unenforceable penalty in violation of, inter alia, § 201(b) of the Federal Communications Act, which requires that all charges and practices of common carriers be "just and reasonable." 47 U.S.C. § 201(b). See, e.g., In re Ins. Brokerage Antitrust Litig., 579 F.3d at 266 (noting that Rule 23 requires that a class possess at least one issue of law or fact that affects all class members' claims). Section 201(b) provides, in pertinent part, that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b). Pursuant to § 207 of the Act, "[a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the [FCC] [or] . . . bring suit for the recovery of the damages for which such common carrier may be liable . . . in any district court of the United States of competent jurisdiction." 47 U.S.C. § 207. Because the elements of a Federal Communications Act violation focus on the conduct of the defendant – namely, the lawfulness of the ETF imposed by ATTM – the Court finds that common questions of law and fact predominate. See id. at 268-69. Nothing in the

record indicates that individual issues would predominate at trial and no objections have been raised in connection with the predominance requirement.

Additionally, given that the value of an individual claim is no more than a few hundred dollars, maintaining individual actions in this case would be prohibitively expensive. A class action is, therefore, the superior method of fairly adjudicating the controversy. Thus, the Settlement Class satisfies the predominance and superiority requirements of Rule 23(b)(3). Having met the requirements of Rules 23(a) and 23(b)(3), the Settlement Class is granted final certification.

## III.   Notice

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 306 (3d Cir. 1998). Under Federal Rule of Civil Procedure 23(c), notice must be disseminated by "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c); see also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175-76 (1974) (finding that Rule 23(c) includes an "unambiguous requirement" that "individual notice must be provided to those class members who are identifiable through reasonable effort").

Additionally, in this case, where a settlement class has been provisionally certified and a proposed settlement preliminarily approved, proper notice must meet the requirements of Federal Rules of Civil Procedure 23(c)(2)(B) and 23(e). See Larson v. Sprint Nextel Corp., No. 07-5325,

2009 WL 1228443, at *2 (D.N.J. April 30, 2009) (Linares, J.).  Rule 23(c)(2)(B)-compliant notice must inform class members of: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the class member's right to retain an attorney; (5) the class member's right to exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on class members under Rule 23(c)(3).  Id.; Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).  Rule 23(e) notice must contain a summary of the litigation sufficient "to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." In re Prudential Ins. Co. of Am. Sales Practices Litig., 177 F.R.D. 216, 231 (D.N.J. 1997).

On November 4, 2009, this Court approved a notice program containing the following components: (1) mail notice, (2) long form notice, (3) short form notice, and (4) invoice notice. Of these four components, the invoice notice represented the individual notice to ATTM's current subscribers while the other three components comprised the notice publication plan intended to reach a large portion of Class members.  By way of Order dated April 2, 2010, the Court directed that additional notice containing text in Spanish be sent to certain Class members via direct mail. See Docket Entry No. 505.

Individual notice was provided to 25,978,586 ATTM customers throughout the United States, including Puerto Rico.  (Throckmorton Decl., ¶¶ 8, 9, 11).  Such notice was provided via bill insert to customers who receive paper bills from ATTM and by email to customers who receive their bills electronically. (Id., ¶ 3).  Individual postcard notice was also mailed to 1,177,231 customer accounts on the ETF Payer Class Member List. (Botzet Decl., ¶ 9).  Spanish-language postcards were mailed to 729,211 account holders who had previously elected to receive their bills in Spanish.

(Throckmorton Decl., ¶ 10).   Publication notice was also utilized to keep potential Class members apprised of the settlement.   For instance, the Short Form Notice was published once a week for two consecutive weeks in the Los Angeles Times, San Francisco Chronicle, New York Times, Washington Post, Chicago Tribune, Dallas Morning News, and the Philadelphia Inquirer, and for one week in the USA Weekend and Parade Magazine. (Botzet Decl., ¶ 10).   The Long Form Notice was posted on the settlement website, www.attmetfsettlement.com. (Id., ¶ 11).

Specific objections related to notice were filed by two pro se objectors: (a) Eddy Fonyodi, and (b) Chris Langone.[6]  In addition, an objection related to notice generally was filed by the Harter, Olson and Langone Objectors (identified more specifically below).[7]  Such objectors claim that the settlement is unfair inasmuch as Class Counsel failed to provide Class members with adequate notice of their fee petition.  In particular, the Harter Objectors claim that the deadline for filing an objection

---

[6] Although the Court allowed attorney Mark Lavery to make arguments on behalf of Objector Langone during the fairness hearing in this matter, Mr. Lavery's eligibility to practice before this Court later became an issue. By way of Order dated July 22, 2010, this Court's Order conditionally admitting Mr. Lavery pro hac vice was vacated, Mr. Lavery's motion for pro hac admission was denied and all arguments raised by Mr. Lavery at the fairness hearing were stricken from the record. See Docket Entry No. 570.  A motion for reconsideration of this Court's decision is currently pending before the Court.  In the interest of justice, the Court has, in any event, considered the arguments raised by Mr. Lavery on behalf of Objector Langone in assessing the fairness of the Class settlement.

[7] The Court also notes that Regenia Baker submitted a letter to the Court dated March 3, 2010, wherein she voices some concern over whether the notice plan was designed to reach members of the United States troops stationed overseas.  To the extent such letter should be construed as a notice-related objection, the Court notes: (1) Ms. Baker does not represent that she is a member of the military or that she has otherwise suffered any personal prejudice related to her objection, (2) beyond the four categories of notice detailed above, Class Counsel has represented that overseas troops have access to the publications advertising the Settlement via internet and mail, and (3) Class Counsel also represents that ATTM "has a longstanding policy of waiving ETF fees for deployed members of the military." See Docket Entry No. 533 n. 1. Such objection, to the extent it should be construed as such, is therefore rejected.

was March 24, 2010, but no formal motion for attorneys' fees had been filed by Class counsel by such time (thereby effectively preventing Class members from properly opposing any such fee application).  Such objection is overruled inasmuch as the settlement website makes clear that (a) once filed, Class Counsel's fee application would be available on the settlement website, and (b) although objections to the settlement were due on March 24, 2010, objections to Class Counsel's fee application were due on June 17, 2010.  See http://www.attmetfsettlement.com.  Class Counsel's fee application was filed on June 10, 2010, thereby giving Class members sufficient time in which to oppose such application.  Moreover, Class members were also afforded an opportunity to appear at the June 29th fairness hearing in this matter.

Turning back to the specific objections lodged as to the adequacy of notice, Eddy Fonyodi raises general concerns with the data utilized by ATTM in fashioning its ETF Payer Class Member List.[8]  Although the specific nature of Mr. Fonyodi's objection is not readily discernible, his general concerns are unfounded.  ATTM worked diligently with an independent consultant to analyze the billing data from ATTM's four billing systems in order to identify all account holders who paid a flat-rate ETF since September 1, 2005. (Wentland Decl., ¶¶ 5-7).  This list was then supplemented with two additional data sets: (1) 4,479 account holders that ATTM had previously identified as having paid flat-rate ETFs based upon its quarterly sampling of flat-rate ETF subscriber charges, and (2) 159,271 accounts/addresses that had been preliminarily identified as having been charged a flat-rate ETF by Robert S. Knusden, an expert utilized in the Kinkel v. Cingular Wireless LLC litigation.[9]

---

[8] Although Mr. Fonyodi's objection does not make specific reference to any particular list, the sentence referred to by Mr. Fonyodi appears in the section of the Settlement Agreement entitled "ETF Payer Class Member List."

[9] See Kinkel v. Cingular Wireless, LLC, 857 N.E. 2d 250 (Ill. 2006).

(Wentland Decl., ¶ 8).  Thus, the ETF Payer Class Member List was created by ATTM through a comprehensive review of ATTM's billing data and other sources.

Objector Chris Langone argues that the bill insert notice was deficient inasmuch as it failed to facilitate the objection process by omitting the addresses of the court and/or Class Counsel.  Mr. Langone does not dispute that the bill insert contained the address of the Claims Administrator. Class Counsel has represented to the Court that any and all objections which were transmitted to the Claims Administrator, Class Counsel <u>or</u> ATTM's counsel have been filed with this Court.  <u>See generally</u> Strange Decl., Docket Entry No. 520-1.  Accordingly, Mr. Langone fails to convince the Court that he – or any other Class members – have been prejudiced by such an omission.

Thus, the Court concludes that both the bill insert and the postcard contain all of the information required by Rule 23(c)(2)(B)(i)-(vii) and comply fully with Rule 23(e).  The Court finds that the parties have fully complied with the stringent requirements set forth by Rules 23(c)(2)(B) and 23(e).[10]   The notice plan was robust, thorough, and included all of the essential elements necessary to properly apprise absent Class members of their rights.  Additionally, on September 24, 2009, ATTM properly gave notice of the pending class settlement to the Attorney General of the United States and the attorneys general of all fifty states, the District of Columbia, Puerto Rico and the Virgin Islands, as required by 28 U.S.C. § 1715.  (Botzet Decl., Ex B., Docket Entry No. 513).


**IV.    Final Settlement Approval**

Under Rule 23, a court may only approve a class settlement after it has held a hearing and

---

[10] For a more detailed discussion of the notice requirements associated with Rule 23(c)(2)(B) and 23(e), <u>see</u> <u>Larson v. Sprint Nextel Corp.</u>, 2009 WL 1228443 (D.N.J. April 30, 2009) (Linares, J.).

determined that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The

Third Circuit has enumerated nine factors to be utilized in this determination:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975).  Additionally, a presumption of fairness exists

where a settlement has been negotiated at arm's length, discovery was sufficient, the settlement

proponents are experienced in similar matters, and there are few objectors.  See In re Warfarin

Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004).  Moreover, "the participation of an independent

mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's

length and without collusion between the parties."  Bert v. AK Steel Corp., No. 1:02-CV-467, 2008

WL 4693747 (S.D. Ohio Oct. 23, 2008).  A presumption of fairness attaches in this case because:

(a) the Settling Parties negotiated the settlement before the Honorable Douglas Wolfson (ret.), (b)

pre-settlement discovery conducted in this case and in related cases, including but not limited to

Waldmann v. Cingular Wireless, LLC[11] and Sasik v. AT&T Wireless,[12] as well as disclosures made

during mediation, supplied counsel with a comprehensive understanding of the factual and legal

issues involved, (c) the attorneys litigating this matter are experienced in similar litigation, and (d)

---

[11]Waldmann v. Cingular Wireless, LLC, Case No. 07-5087 (C.D. Cal.).

[12] Sasik v. AT&T Wireless Servs., Inc., Case No. 05-2346 (C.D. Cal.).

relatively few class members have objected.  See generally Varacallo v. Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 235 (D.N.J. Feb. 15, 2005) (Linares,  J.).

Finally, settlement of litigation is generally favored by courts, especially in the class action setting.  "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."  In re General Motors, 55 F.3d 768, 784 (3d Cir. 1995); see also In re Warfarin, 391 F.3d at 535 (noting the "overriding public interest in settling class action litigation").  At the same time, the district court functions "as a fiduciary who must serve as a guardian of the rights of absent class members" by ensuring that the proposed settlement is fair, reasonable, and adequate.  In re General Motors, 55 F.3d at 785.

Turning, therefore, to each of the Girsh factors, the Court finds as follows:

**A.     Complexity, Expense and Likely Duration of the Litigation**

The expense and likely duration of litigation are factors to be considered in evaluating the reasonableness of a proposed class action settlement.  In this case, the litigation has the potential to drag on for years, particularly since an appeal of the threshold arbitration issue is currently pending before the Third Circuit.  In addition, the issues involved are legally and factually complex. Continued litigation of this matter would require numerous depositions, extensive inquiry into ATTM's cost accounting methods and assumptions and expert witness testimony related thereto. Importantly, continued prosecution of this case would also require Plaintiff to overcome considerable legal hurdles, including ATTM's belief that this matter is subject to arbitration pursuant to the customers'  wireless service contracts.  Although this Court found that it was not, as previously stated, ATTM's appeal of same is still pending before the Third Circuit.  Finally, the fact that the parties were able to reach a settlement relatively early in the litigation weighs in favor of approval,

as it saves the time associated with discovery, motions, and eventually trial.  Importantly, of course, settlement also provides the Class with immediate, definite relief.  This factor therefore weighs in favor of approval.

**B.      Reaction of the Class to the Settlement**

This second Girsh factor gauges whether members of the class generally support or object to the settlement.  In order to properly evaluate it, "the number and vociferousness of the objectors" must be examined.  In re General Motors, 55 F.3d at 812.  Generally, "silence constitutes tacit consent to the agreement."  Id. (quotation omitted).

Here, out of millions[13] of Class members, only 279[14] have opted out of the Class and only twenty-three (23) have objected to the  fairness of the proposed Settlement.[15]  Thus, this settlement has strong class support.  The Court has considered each of the twenty-three (23) objections and, based on the reasons that follow, finds that none are meritorious.

**1.      Harter Objectors**

Joni Harter, David Mehaffie and Clark Richard Brown (the "Harter Objectors"), through their counsel, object to the Settlement on several grounds: (1) the proposed non-cash benefits are inadequate, (2) the prepaid calling cards are heavily restricted and thus are not worth the assigned value, (3) the injunctive relief provides no actual value to the Class, (4) the proration process is not

---

[13] Individual notice was provided to over 27 million Class members. See Docket Entry No. 524 at 4.

[14] See Botzet Decl., ¶ 3, Docket Entry No. 512.

[15] The Court notes that the objection filed by Gerald and Andrew Phillips, through counsel, has been withdrawn, and that the objection filed by Deborah Thatcher is actually a request to opt-out of the Class.

adequately explained and is overly complicated, and (5) the cy pres provision fails to make Class members whole.

As to the contentions that the non-cash benefits are inadequate, that the injunctive relief provides no actual value to the Class and that the prepaid calling cards are overly restricted (thereby diminishing their actual value), such distinct provisions were the result of an arm's length negotiation between Class Counsel and ATTM. Such negotiations resulted in a compromise. If this case is not settled, for instance, ATTM would be under no obligation to cease its practices of charging flat-rate ETFs. Thus, the fact that the Harter Objectors would prefer that all Class members receive greater cash benefits (and fewer prepaid calling cards), or to extend the two year injunction to five years has no bearing on whether the terms of the Settlement Agreement itself are fair and reasonable. After all, a settlement is, by its very nature, a compromise that naturally involves mutual concessions.

As to the contention that the prepaid calling cards are heavily restricted, or are somehow "illusory,"[16] the Harter Objectors fail to substantiate any such claim. Moreover, Class Counsel and counsel for ATTM represent to the Court that the prepaid calling cards which comprise the non-cash benefits portion of the Settlement are the same type of prepaid calling cards which are sold to the general public by AT&T on its website. Such cards provide real and quantifiable value to members of the Class. Any suggestion to the contrary is hereby rejected. See, e.g., Shaw v. Toshiba Am. Info. Sys., Inc., 91 F. Supp. 2d 942, 960 (E.D. Tex. 2000) ("The obligations imposed upon Toshiba under the terms of the proposed Settlement Agreement, even if one ignores the cash-payment obligations, constitute real and quantifiable value to the class members and should be included in determining

---

[16] Similar objections were filed by the Turner Objectors and Danielle M. Lenox.

the total economic value provided to the class by virtue of the proposed Settlement Agreement.").

The Harter Objectors also argue that the proration process is not adequately explained and is overly complicated. The Proration Benefit component of the settlement allows a customer to convert from a flat-rate ETF to a pro-rated ETF. "Proration Benefit" and "Prorated ETF" are thoroughly defined in the Settlement Agreement which was readily accessible to Class members through the Settlement website. See Docket Entry No. 355-4 at 14. By its own definition, a prorated ETF subjects subscribers to an ETF of $175 but "[f]or service activated on or after May 25, 2008, the Early Termination Fee will be reduced by $5.00 for each full month toward your minimum term that you complete." Id. Class members may elect this benefit by simply checking a box on the claim form. See http://www.attmetfsettlement.com/pdfs/ClaimForm.pdf. The Court finds that this benefit was adequately explained and reasonably made available to Class members.

Lastly, the Harter Objectors take issue with the cy pres provision of the Settlement Agreement. Objector Langone raises a similar objection. "Cy pres principles have most commonly been used where unclaimed funds remain following distribution of the class fund to individual class members. In such circumstances, the court, analogizing to cy pres principles, may distribute the unclaimed portion for the indirect benefit of the class." In re Matzo Food Prods. Litig., 156 F.R.D. 600, 605 (D.N.J. 1994) (emphasis added). The Harter Objectors take issue with the fact that "[t]here is no requirement that the cy pres be limited to organizations whose purpose will benefit the class in some way." (Docket Entry No. 499). The relevant portion of the Settlement Agreement provides that "[a]ny amounts remaining in the Common Fund after distribution has been made to Authorized Claimants and all expenses have been paid shall be conveyed to one or more charitable organizations jointly proposed by the Class Representatives and ATTM and approved by the Court." See

Settlement Agreement at 18, Docket Entry No. 355-4.  Such provisions are generally intended to "compensate, at least indirectly, the unlocatable class members." Six (6) Mexican Workers v. Arizona Citrus Growers, 641 F. Supp. 259, 269 (D. Ariz. 1986).  The Harter Objectors do not propose a particular charitable organization, nor has one been selected by the parties or approved by the Court at this time. That the Court may ultimately approve a charitable organization which does not directly benefit each and every Class member is, thus, immaterial to the reasonableness of the settlement given that the purpose underlying this provision is to indirectly benefit absent Class members. This objection is, therefore, overruled.

### 2.    Turner Objectors

Objectors Sallie Turner and Carla Walsh (the "Turner Objectors") contest the fairness of the settlement on the basis that: (1) any unclaimed money remaining in the Common Fund should be paid to Class members, not "third parties," and (2) the non-cash benefits lack "standards" inasmuch as the specific monetary value of each prepaid calling card of up to 200 minutes depends on the retail price assigned to same by ATTM.

That the Turner Objectors would prefer to receive greater monetary benefits under the terms of the settlement has no bearing on the reasonableness of the Settlement as a whole.  Cy pres provisions, such as the one included in this Settlement, are generally intended to compensate the "unlocatable class members," albeit indirectly. See, e.g.,  Six (6) Mexican Workers, 641 F. Supp. at 269.  The Turner Objectors have failed to convince the Court that distribution of unclaimed benefits to a charitable organization would, under the circumstances, be unfair to members of the Subscriber Class.

As to the contention regarding the ambiguity of the value of the prepaid calling cards, as

previously stated, the prepaid calling cards which comprise the non-cash benefits portion of the Settlement are the same prepaid calling cards which are sold to the general public by AT&T on its website. Although the Settlement Agreement does not specify their retail value, the Court notes that AT&T currently offers a 100 minute calling card on its website for $7.00 and a 300 minute calling for $18.00. See http://www.consumer.att.com/prepaidcard/fy/pao.html. To the extent the retail value of the calling cards which comprise the non-cash benefits portion of the Settlement becomes an issue,[17] such value should be calculated in a manner which is proportional to the values ascribed to similar cards by AT&T. For instance, based upon the respective retail values of 100 and 300 minute calling cards on AT&T's website,[18] the current retail value of a 200 minute card would range between $12 - $14.00.

### 3. Olson Objectors

Carl R. Olson and Hugh Ramsey (the "Olson Objectors") challenge the reasonableness of the settlement on the basis that "[i]n contrast to the Sprint settlement, this settlement does not even require AT&T to prorate their ETFs in the future." (Docket Entry No. 498). The Settlement Agreement does, however, provide two related benefits to Class members: (1) it affords members of the Subscriber Class with the option to convert their flat-rate ETF into a prorated ETF, and (2) it serves to enjoin ATTM from entering into new customer service agreements containing a flat-rate ETF for a period of two years. Similar prospective relief was provided for in the T-Mobile and Sprint settlements. This objection is, therefore overruled.

---

[17] See Settlement Agreement at 17 ("ATTM shall provide no more than Two Million Dollars ($2,000,000.00) (face, retail value) in non-cash compensation for the benefit of qualified members of the Subscriber Class."), Docket Entry No. 355-4.

[18] See http://www.consumer.att.com/prepaidcard/fy/pao.html.

### 4. Chris Langone

Chris Langone objects to the settlement on several grounds, some of which have already been addressed, and some of which will be addressed in the context of Class Counsel's fee application. The Court will now address the remaining aspects of Mr. Langone's objection: (1) the failure of the parties to provide a procedure for Class members to determine if they actually paid an ETF (thereby entitling them to monetary recovery under the terms of the Settlement Agreement), (2) the unfairness of the cy pres provision, (3) the unfairness of the damages cap, (4) the overly broad nature of the release provision, and (5) the inadequacy of the settlement amount.

As to Mr. Langone's complaint regarding the parties' failure to facilitate the process by which Class members could determine whether or not they qualify as ETF-Assessed Class members (thereby entitling them to money damages), Mr. Langone essentially argues that the Settlement is unfair because Class members must prove their own membership by submitting proofs of claims.[19] Objectors Maltin, Wilkinson and Dixon assert similar objections. Courts have frequently upheld claims forms such as the one utilized in this case, and the Court finds it perfectly appropriate to require Class members to submit certain information proving that they are entitled to collect the relief awarded in this case. See, e.g., DeHoyos v. Allstate Corp., 240 F.R.D. 269, 314 (W.D. Tex. 2007); In re Remeron End-Payor Antitrust Litig., 2005 WL 2230314, at * 18 (D.N.J. Sept. 13, 2005) (noting practical problems of automatically distributing money to all potential class members such as sending checks to addresses that may be outdated). This objection is accordingly overruled.

Mr. Langone also claims that: (1) the damages cap imposed is unfair, and (2) any money

---

[19] Mr. Lavery, on behalf of Mr. Langone, raised a similar argument at the Fairness Hearing. See Tr. (June 29, 2010) at 39:5-17.

remaining in the Common Fund should be distributed to Class Members in a <u>pro rata</u> fashion, not

to a charity, thereby eliminating the need for the cy pres provision. <u>See</u> Tr. (June 29, 2010) at 38:12-

45:7.  Class Counsel and Counsel for ATTM admit that Mr. Langone's request – of fashioning a

distribution whereby any amounts remaining in the Common Fund be distributed to Class Members

in a <u>pro rata</u> fashion – is not an insurmountable task. <u>See</u> Tr. (June 29, 2010) at 72: 1-5; 74:1-4.

Nevertheless, both raise certain risks that may result should the Plan of Allocation be redesigned

in the manner proposed by Mr. Langone.  Such considerations include: (1) the potential for

fraudulent claims issues (and associated administrative cost of investigating same), and (2) the

potential of a windfall to certain Class members.  The Court agrees that such risks are significant,

well-founded and weigh against granting the relief requested by Mr. Langone.

  In addition, the Court is cognizant of the fact that Class Counsel has spent a considerable

amount of time designing the Plan of Allocation so as to provide Class members with an amount as

close as possible to their actual damages. <u>See</u> Tr. (June 29, 2010) at 72:20-24.  For instance, those

Class members who paid the ETF at the end of their contract were damaged more than Class

members who did not pay the ETF at all or who paid the ETF at the beginning of the their contract

and are thus compensated accordingly under the Plan of Allocation. <u>See id.</u> at 78:9-24. The Court

agrees that giving excess funds to claimants who have already been compensated or who have

suffered no out-of-pocket expenses would inappropriately give them a windfall.  Moreover, as

pointed out by Class Counsel, the Court finds that making such a change to the method of allocation

at this juncture would be unfair to those individuals who chose to opt out of the Class or failed to

file a claim since such individuals might have decided to file a claim had they known that their

recovery would be increased by excess funds.  In short, the Plan of Allocation (as well as the cy pres

provision) are significant terms of a heavily negotiated and well thought out Settlement Agreement. Based on the reasons set forth above, the Court finds that such terms are better left undisturbed.

Mr. Langone also objects to the settlement on the basis that the release contained therein improperly "releases unknown claims and waives statutory protections that prevent waivers of unknown claims." (Docket Entry No. 500).  The Settlement Agreement releases: (1) ETF-Related Claims,[20] and (2) claims "that in any way relate to . . . any of the allegations, defenses, claims, motions and/or theories raised in or that could have been raised in any action . . . challenging the validity and/or legality of the Flat-Rate ETF or the propriety of its assessment or collection," including this action.  See Settlement Agreement, ¶ 10, Docket Entry No. 355-4.  Similar release provisions were contained in the Milliron v. T-Mobile and Larson v. Sprint settlements which were approved by the Court.  "A court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint."  In re Corrugated Container Antitrust Litig., 643 F.2d 195, 221 (5th Cir. 1981); see, e.g., In re Prudential Ins. Co. of Am. Sales Practice Litig., 261 F.3d 355, 366 (3d Cir. 2001) ("It is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action. This is true even though the precluded claim was not presented, and could not have been presented, in the class action itself.").  This objection is, thus, rejected.

Finally, Mr. Langone also objects to the settlement on the basis that the exclusion of the Shorts and "West Virginia" claims from the Hall Settlement suggests that claim(s) asserted in those

_____

[20] ETF-Related Claims are defined, generally, as claims "that in any way challenge or relate to the validity, legality, or propriety of Flat-Rate ETFs." See Settlement Agreement, ¶ 23, Docket Entry No. 355-4.

actions are "going well and [have] merit" and, therefore, that continued prosecution of the claims in this case "can result in a significantly better recovery" for members of the Class. (Docket Entry No. 500). Essentially, Mr. Langone is challenging the adequacy of the proposed settlement amount. Such an objection is based on pure speculation. As the Court explained in the context of the Larson v. Sprint settlement, Plaintiffs in ETF cases face significant risk at trial. See generally Clark v. Lomas & Nettleton Fin. Corp., 79 F.R.D. 641, 651 (D.C. Tex. 1978) ("No contested lawsuit is ever a 'sure thing.' "). The only ETF case which has gone to trial (Ayyad, et al. v. Sprint Spectrum, et al.,Case No. RG03-121510, proceeding in the Superior Court of the State of California, Alameda County) resulted in a jury determination that defendants were entitled to greater damages than the Plaintiff class. See Larson, 2010 WL 234934, at *12 ("Although the jury in Ayyad found Sprint liable to the class of California consumers in the amount of $73,775,975.00, the jury also found that the class of California consumers had breached their contracts with Sprint and that Sprint's actual damages from such breach was over $225 million. Thus, Sprint's award of damages actually exceeded the class's recovery in that case."). By contrast, the Settlement here provides immediate and substantial relief to Class members, and is proportional to similar nationwide ETF settlements. See, e.g., White v. Cellco Partnership d/b/a Verizon Wireless, RG04-137699 (Calif. Superior Ct., Alameda Cty, CA) (October 21, 2008) (approving settlement in the amount of $21 million for an estimated 92 million member class). Mr. Langone's objection as to the adequacy of the settlement amount is thus overruled.

### 5.       Pro Se Objections

Objectors Curry Taylor, Peter Moon and Neil Anthony Boyd take issue with the entire premise of the lawsuit. In particular, these objectors argue that ATTM should not be liable to the

-24-

Class because Class members voluntarily entered into contracts with ATTM containing a flat-rate ETF.[21]  By contrast, objector Deborah Colburn voices her personal displeasure with ATTM.  The foregoing objectors have not raised any substantive objection as to the fairness or reasonableness of the settlement itself.  Such objections are, therefore, overruled.

Objectors M. Walters, Laura Maltin and Deborah Colburn object to the settlement on the basis that it does not change ATTM's policy regarding flat-rate ETFs.  As previously stated, the Settlement Agreement specifically provides members of the Subscriber Class with the option to convert their flat-rate ETF into a prorated ETF, and serves to enjoin ATTM from entering into new customer service agreements containing a flat-rate ETF for a period of two years. That these objectors would prefer to further modify ATTM's policy regarding flat-rate ETFs does not, without more, suggest that the terms reached are unreasonable or unfair.

Objectors Maltin and Paul Dixon object to receipt by the named Plaintiffs of a $2,000 incentive award since they claim it is unclear what, if anything, they have done to benefit the Class. "Incentive awards are 'not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class.' . . . In fact, '[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.' " In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 400 (D.D.C. 2002).  The named Plaintiffs to this action agreed to pursue the claims at issue for the benefit of the entire Class.    The distribution of the incentive award reflects the named Plaintiffs' involvement in the prosecution of the case and in discovery, including, in some

---

[21] The Court notes that regardless of whether or not Class members voluntarily agreed to enter into contracts containing a flat-rate ETF with ATTM, the legality of such flat-rate ETFs remains in question.

instances, depositions.  The Court finds an incentive award in the amount of $2,000 per Plaintiff to be both fair and reasonable under the circumstances.  This objection is, therefore, overruled.

Certain pro se objectors have also raised objections related to the issue of damages.  For instance, Lenox, Schroer, Lambert and Hicks[22] claim that certain issues related to damages were overlooked – namely, whether ATTM is liable for damages to credit arising from those who failed to pay the ETF and whether ATTM is liable for "lost opportunity" damages suffered by those who remained in a two (2) year contract, or added an additional family plan line, in order to avoid being charged an ETF.

In particular, Schroer argues that "because of my being charged what I considered an illegal charge, I refused to pay it. And because of this, my ability to obtain credit has been compromised for seven years." See Tr. (June 29, 2010) at 54:12-23.  Schroer admits that he could have avoided such damage to his credit by paying the ETF, but that he was "determined as a matter of principle to make an effort to fight it." Id.  Schroer would essentially have the Court re-write the terms of the Settlement to include an option, in lieu of accepting money from the Common Fund, to have ATTM notify the credit reporting agencies that the ETF has been cancelled and/or is settled. See Tr. (June 29, 2010) at 56:9-16.   Mr. Schroer cites to no legal authority allowing the Court to unilaterally re-write the terms of the Settlement Agreement, nor is the Court aware of any such authority.  Moreover, as stressed by ATTM during the June 29, 2010 Fairness Hearing: (1) Mr. Schroer, Ms. Lenox, and all potential Class members alike, had the option to opt out of the Class and pursue their own claims against ATTM, including but not limited to credit score and "lost opportunity" claims,

---

[22] Class Counsel represents that Objector Anthony R. Hicks has also filed a request for exclusion from the Class; therefore, he may not object to its settlement. In the interest of justice, the Court has, in any event, considered the merits of his objection.

and (2) Class members who have agreed to settle their ETF-related claims against ATTM by way of the instant Settlement retain the right to raise illegality as a defense to any claims brought against them for collection of an unpaid ETF.  See Tr. (June 29, 2010) at 66:13-16.  In light of the foregoing, the Court concludes that the objections raised do not cast doubt upon the reasonableness of the settlement reached in this matter.

### C.    Stage of the Proceedings and Discovery Completed

This action is being settled after six years of aggressive pretrial work and formal discovery. This Settlement resolves years of intense litigation in related cases throughout the country, after substantial discovery, complex motion practice, including but not limited to ATTM's motion to compel arbitration, as well as participation in proceedings before the FCC.  It is clear that the parties had sufficient information to assess the settlement value of the case and examine the strengths and weaknesses of their relative positions.   Additionally, Class Counsel has extensive experience litigating ETF cases, having filed similar actions against T-Mobile, Verizon, and Sprint.  The Court finds that the parties have sufficiently apprised themselves of the relevant facts and law to make a knowledgeable decision as to settlement.  This factor weighs in favor of approval.

### D.    Risks of Establishing Liability

The risks of proceeding to trial in any case are always considerable.  See In re Prudential, 962 F. Supp. at 539.   This case is no different.  Class Counsel has outlined several risks to establishing liability and damages, including: (1) even if Plaintiffs succeed in establishing that ATTM's flat-rate ETF is an enforceable policy, any recovery to which the Class may be entitled might be offset by ATTM's counterclaim for actual damages, and (2) ATTM's actual damages could very well exceed the amounts recoverable by the Class.  In that scenario, the Class recovery would be zero.  Given

such risks, and noting the inherent difficulty associated with litigating and proving this case at trial, the Court agrees that this <u>Girsh</u> factor weighs in favor of approval.

### E.    Risks of Establishing Damages

This factor is intertwined with the previous one, and weighs in favor of approval.

### F.    Risks of Maintaining the Class Action Through Trial

Plaintiffs run the risk that the Court would not find this action suitable for certification.  Even if class certification were granted, Plaintiffs face the added challenge of maintaining class certification through trial.  <u>See, e.g.</u>, <u>Eggleston v. Chi Journeyman Plumbers Local Union No. 130 U.A.</u>, 657 F.2d 890, 896 (7th Cir. 1981) ("After all, a favorable class determination by the court is not cast in stone.").  This factor weighs in favor of approval.

### G.    Ability of Defendant to Withstand A Greater Judgment

ATTM is a multi-billion dollar company that has given no indication of an inability to pay a greater judgment.  Thus, this factor weighs against settlement.

### H.    The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of all the Attendant Risks of Litigation

Combining the final two <u>Girsh</u> factors, the analysis here compares the reasonableness of the settlement against the risks of litigation and the best possible Class recovery.  As indicated earlier, a jury could very well find a net recovery in favor of the Class, but it also could find that ATTM's damages exceed those of the Class, thereby leaving the Class with no recovery at all.  In addition, although the amount of ETFs paid by Class members is a liquidated amount, ATTM's potential breach of contract damages are not.  According to Class Counsel, there are multiple ways of calculating ATTM's potential damages.  In the same vein, determining which expenses are or are

not properly included as damages is a matter of expert debate.  Ultimately, it is difficult to predict the best possible recovery for this Class.  That being said, it is clear that $18 million is a reasonable recovery in light of the risks already highlighted.

Having evaluated the proposed settlement against the nine <u>Girsh</u> factors and against the dictates of Rules 23(b)(3), 23(c), and 23(e), the Court finds that it warrants approval.  The minuscule number of objectors combined with the size of the class recovery, the robust notice program, and the real risks associated with taking this matter to trial all indicate that the Settlement ought to be approved.  The Court therefore grants the motion for final approval of the settlement reached in this matter.

## V.     Attorneys' Fees, Incentive Award and Expenses

Next, Class Counsel also moves for an award of attorneys' fees in the amount of thirty-three and one-third (33 1/3) percent of the Class benefit plus reimbursement of expenses in the amount of $506,943.75.  Thirty-three and one-third percent of the $18 million is equal to $6 million.  Substantive objections to Class Counsel's application for fees have been filed by: (1) Christopher Langone, and (2) the Harter Objectors.[23]

### A.     Application of <u>Gunter</u> Factors

The awarding of fees is within the district court's discretion.  <u>See</u> <u>In re Cendant Corp.</u> <u>PRIDES Litig.</u>, 243 F.3d 722, 727 (3d Cir. 2001).  However, the court must clearly articulate the

---

[23] The Court notes that several objectors oppose the Settlement on the basis of the attorney's fees sought under the Settlement Agreement.  The Court has considered such objections and notes that they do not challenge the fee application itself; rather, they appear to be based on an overall hostility towards attorney's fees in general.  Such generalized objections have no bearing on the reasonableness of the fees sought in the specific context of this matter and are therefore rejected.

reasons supporting its conclusion.  See In re Diet Drugs, 582 F.3d 524, 538 (3d Cir. 2009); In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 301 (3d Cir. 2005).  "In a class action settlement, the court must thoroughly analyze an application for attorneys' fees, even where the parties have consented to the fee award."   Varacallo, 226 F.R.D. at 248.   Generally, a court will use either the percentage-of-recovery method or the lodestar method to determine the fee award.  In re GM, 55 F.3d at 821.  The lodestar method is considered most appropriate in statutory fee-shifting cases, and has the advantage of resembling a traditional fee calculation, whereas the percentage-of-recovery method is viewed as best approximating a contingent fee award in a common fund recovery.  See Cendant PRIDES, 243 F.3d at 732; see generally In re Diet Drugs, 582 F.3d at 540.  The Third Circuit has approved the use of the percentage-of-recovery method for determining attorneys' fees in common fund cases, such as this one.  See, e.g., In re Rite Aid, 396 F.3d at 300.

The standard for evaluating fee awards is reasonableness.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  In common fund cases of the type presented here,  where attorneys' fees and the Class recovery come from the same source and the fees are based on a percentage of the Class settlement, the Third Circuit has set forth a multi-factor analysis to help analyze whether or not the percentage award is reasonable.  See Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n. 1 (3d Cir. 2000).  These factors include:

> (1) the size of the fund created and the number of persons benefited;
> (2) the presence or absence of substantial objections by members of
> the class to the settlement terms and/or fees requested by counsel; (3)
> the skill and efficiency of the attorneys involved; (4) the complexity
> and duration of the litigation; (5) the risk of nonpayment; (6) the
> amount of time devoted to the case by plaintiffs' counsel; and (7) the
> awards in similar cases.

Id.; see also In re AT&T Corp., 455 F.3d 160, 165 (3d Cir. 2006).  These factors are not intended to be exhaustive.  Among other factors that a Court may consider are:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any "innovative" terms of settlement.

AT&T, 455 F.3d at 165-166 (citing In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions, 148 F.3d 283, 338-340 (3d Cir. 1998)).  The above-referenced factors should not be applied in a formulaic way; rather, the district court should "engage in robust assessments of the fee award reasonableness factors recognizing an especially acute need for close judicial scrutiny of fee arrangements in class action settlements."  AT&T, 455 F.3d at 166 (citations and quotations omitted); see also Gunter, 223 F.3d at 195 n.1 (finding that "factors listed above need not be applied in a formulaic way" and "in certain cases, one factor may outweigh the rest").  Finally, the Third Circuit requires that a district court cross-check the percentage-of-recovery calculation against the lodestar method to ensure that the percentage-of-recovery method has yielded a reasonable number. See AT&T, 455 F.3d at 164.

Thus, the Court first evaluates the propriety of the requested fee award through application of the Gunter factors.  Importantly, the Girsh factors discussed earlier are similar to and overlap with several of the Gunter factors.  Therefore, the Court incorporates by reference the reasons already articulated for approval of the settlement, and now makes specific findings with respect to each of the Gunter factors.

### 1.    Size of Fund Created and Number of Persons Benefitted

The first <u>Gunter</u> factor analyzes the size of the fund created and the number of persons benefitted.  <u>Gunter</u>, 223 F.3d at 195. n.1.  The size of the fund here is large and the size of the Class measures in the millions.  As of June 29, 2010, over 43,000 claims had been filed.  <u>See</u> Tr. (June 29, 2010) at 71:3-11.  Thus, the settlement has afforded benefits to a large amount of people. Additionally, alongside these monetary benefits, ATTM is enjoined from entering into new fixed-term subscriber agreements containing flat-rate ETFs for a period of two-years.  Considering the large number of persons benefitted and the significant size of the common fund created, this factor weighs in favor of the $6 million request for fees.

### 2.     Class Member Objections

Next, a Court must examine "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." <u>Gunter</u>, 223 F.3d at 195 n.1. Two objections to Class Counsel's fee application have been lodged by Objector Langone and the Harter Objectors.

Objector Langone raises the following objections: (1) class members were not given enough time to object to Class Counsel's fee application (and/or to meaningfully review the time records submitted), (2) Class Counsel should not be paid prior to disposition of appeals, (3) Class Counsel's fee split violates ethical rules, (4) the amount of attorneys' fees is unreasonable without detailed time records by all law firms seeking fees, and (5) Class Counsel's fees should be based upon a percentage of claims actually paid out, not on funds made available to the Class.

As to the contention that Class members were not given sufficient time to object to Class Counsel's fee application, this Court's May 24, 2010 Order (which was and is publicly available on the Settlement website) sets forth the schedule to be followed by Class Counsel.  Class Counsel filed

their fee application by the deadline set by the Court (June 10, 2010).  This Court's May 24, 2010 Order afforded Class members with five (5) days within which to file objections thereto.  The Court finds five (5) days to be a reasonable amount of time for class members to consider the fee application and render any objections to same.  This amount of time is consistent with the amount of time afforded to class members in the other ETF class action settlements approved by this Court. See, e.g., Larson v. Sprint Nextel Corp., Civil Action No. 07-5325, Docket Entry No. 344; Milliron v. T-Mobile, Civil Action No. 08-4149, Docket Entry No. 37.  Objector Langone has failed to show that he was prejudiced by such deadline, particularly given the substantive and well thought out objection he filed.  In addition, the Court allowed Langone's attorney, Mr. Lavery, to elaborate on any such objections to Class Counsel's fee application during the fairness hearing.  See Tr. (June 29, 2010) at 48:5-53:11. Langone's request for additional time to file additional objections to Class Counsel's fee application is therefore denied.

The Court also finds Langone's objection to Class Counsel's proposed "fee-splitting" in the context of this matter to be meritless.  Langone argues, in particular, that the fee arrangement among Class Counsel and other ETF Counsel violates Rule of Professional Conduct 1.5(e) which governs fee splitting among attorneys who do not work at the same firm.  Rule of Professional Conduct 1.5(e) provides, in pertinent part, as follows:

> Except as otherwise provided by the Court Rules, a division of a fee between lawyers who are not in the same firm may be made only if:
>
> (1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation;
>
> (2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and

(3) the total fee is reasonable.

RPC 1.5(e) (emphasis added). Federal Rule of Civil Procedure 23(h), which governs the award of attorneys' fees' in class actions, provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h) (emphasis added). In assessing the reasonableness of the instant settlement and the requested fee award, the Court serves the "role of protector of the rights of the class." In re Agent Orange Prod. Liab. Litig., 818 F.2d 216, 222 (2d Cir. 1987). In doing so, there is no question that "courts should look to the various codes of ethics as guidelines for judging the conduct of counsel." Id. Having said that, Langone has provided the Court with no legal basis on which to read RPC 1.5(e) as restricting fee sharing in the context of class action settlements, particularly where the overall reasonableness of such fees is specifically assessed by the Court. See, e.g., In re Cendant, 404 F.3d at 187-95. Langone's contention – that the fee arrangement proposed by Class Counsel violates the ethical rules inasmuch as it seeks to distribute a portion of the fees requested to attorneys who worked on ETF litigation which ultimately benefitted the Hall Class – is based on an overly technical interpretation of the ethical rules. Although Langone's argument is well taken, it does not persuade the Court that the fee award requested by Class Counsel is, in and of itself, unreasonable and/or improper. See, e.g., In re Diet Drugs, 582 F.3d at 542 ("[N]o authority suggests that courts should abrogate valid fee division contracts. To the contrary, we have recognized the benefits of agreements regarding the distribution of attorney fees.").

Langone also takes issue with the fact that Class Counsel's fee application is based upon a percentage of the funds made available to the Class ($18 million) and not on a percentage of the claims actually paid out. As discussed above, there is no reversion in this case. Therefore, through

-34-

the efforts of Class Counsel, ATTM will pay the entire $18 million regardless of how many claims are ultimately filed.  The entire $18 million will then be used to benefit the Class – both directly through the claims process and indirectly through the cy pres provision.  Therefore, the Court agrees that basing Class Counsel's fee award on a percentage of the $18 million is appropriate and reasonable under the circumstances.  Langone cites to no legal authority in support of his contention that attorneys' fees should, instead, be based on a percentage of claims actually paid out, nor is the Court aware of any such authority.  See, e .g., Waters v. Intern. Precious Metals Corp., 190 F.3d 1291, 1295-1296 (11th Cir. 1999) ("No case has held that a district court must consider only the actual payout in determining attorneys' fees.").

The remaining issues raised by Langone do not warrant a lengthy discussion by the Court. To the extent Langone challenges a statement made by Class Counsel regarding Langone's alleged involvement as an objector to the Larson v. Sprint Settlement, Class Counsel now admits that such statement was made in error.  In any event, the Court finds such statement to be entirely irrelevant to the Court's instant analysis (which turns on the fairness of the Hall v. ATTM Settlement).   To the extent Langone challenges the quality of the certifications and/or time records submitted by Class Counsel in support of their fee application, the Court has closely reviewed such submissions and, with the exception of one, is satisfied that the fees sought have been adequately supported and documented for purposes of this type of fee application.[24]  To the extent Langone takes issue with Class Counsel's failure to return his telephone calls in a timely manner, again, as previously noted,

---

[24]   As discussed in greater detail below, the Court relies upon a percentage-of-recovery method in fashioning an award of attorney's fees.  To delve deeply into the thousands of hours claimed by the many attorneys involved in this matter, as Langone would have the Court do, would undermine the Court's reliance on the percentage-of-recovery method.

Langone submitted a detailed objection to Class Counsel's fee application and his attorney was permitted to argue the merits of same during the fairness hearing. Accordingly, there is no indication before the Court that Langone has been prejudiced, in any way, by the manner in which Class Counsel has responded to his telephone calls. Lastly, Langone challenges the fact that, under the terms of the Settlement Agreement, Class Counsel will receive its attorneys' fees, to the extent awarded by the Court, before any appeals concerning the settlement have been decided. Langone concedes that Class Counsel would have to repay any such fee award to the extent approval of the settlement is reversed on appeal. The Settlement Agreement itself makes clear that in the event this Court's Final Approval Order is reversed or rendered void as a result of an appeal, "Class Counsel shall return to ATTM all fees, costs and other payments received by Class Counsel under this Settlement Agreement plus interest accruing at a rate equal to 3.25% per annum." (Settlement Agreement at 26, Docket Entry No. 355-4) (emphasis added). Nevertheless, Langone, through his attorney, asks the Court to "take a stand and show that those kinds of settlement [sic] should never be purported [sic] because it just doesn't make sense." Tr. (June 29, 2010) at 49:21-23. Langone has provided the Court with no legal basis or authority suggesting that such an arrangement is improper. Having carefully considered each of the objections raised by Langone, now in the context of Class Counsel's application for attorney's fees, such objections are rejected.

The remaining objection to Class Counsel's application for attorney's fees was filed by the Harter Objectors. Their objections relate largely to a fee application filed by ETF counsel Jacqueline Mottek, which has now been withdrawn. See Docket Entry No. 535. Thus, any objections related thereto are now moot. The balance of their objection relates to the lodestar amounts submitted by Class Counsel. In particular, the Harter Objectors take issue with the hourly rates submitted by Class

Counsel and other ETF counsel, and the amount of hours included in the total lodestar calculation. Such concerns, even if valid, are only minimally relevant since the Court utilizes the lodestar only as a "cross-check" to confirm the reasonableness of the percentage fee requested and, in any event, the lodestar submitted actually exceeds the fees requested. See, e.g., AT&T, 455 F.3d at 164. Lastly, to the extent the Harter Objectors voice concerns that Class Counsel may be "double-billing" for work done on related ETF litigation, such allegations are entirely unsubstantiated and are therefore rejected without further discussion.

Thus, the Court finds that this factor weighs in favor of approving the requested fee award.

### 3.   Skill and Efficiency of the Attorneys Involved

The Court considers the skill and efficiency of Plaintiff's counsel, "as measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." Nichols v. SmithKline Beecham Corp., No. 00-6222, 2005 WL 950616, at *22 (E.D. Pa. April 22, 2005) (quotation omitted). The Court has already found, in its analysis of the Girsh factors, that Class Counsel are experienced and skilled in prosecuting ETF cases specifically and class actions generally. The recovery achieved here came about quickly and swiftly, and although Class Counsel faced few legal difficulties in this particular case (due to the early settlement), the fact remains that a settlement of this magnitude only occurred because both sides clearly appreciated the significant risks and difficulties of going to trial. Finally, ATTM was represented by highly-skilled attorneys from a prominent law firm. See, e.g., In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsel's work.") Accordingly, this

factor weighs in favor of approving the requested fee award.

### 4.    Complexity, Difficulty, and Duration of the Litigation

With respect to duration, the Court has already noted that although this particular matter settled early, Class Counsel and their co-counsel have been litigating the related <u>Sasik</u> and <u>Waldmann</u> cases against ATTM for over six years.  Their combined efforts have resulted in, among other things, a successful motion to remand to state court, defeating motions to compel individual arbitration, taking and defending numerous depositions, conducting substantial written discovery on arbitration and preemption-related issues, and successfully opposing a motion to stay the cases pending an FCC proceeding concerning ETFs.  As indicated with respect to the third <u>Gunter</u> factor, this matter reached settlement because both sides clearly appreciated the difficulties with taking the case to trial.

Next, regarding difficulty and complexity, the legal issues presented in this case were by no means easy to navigate.  The Court has already discussed at length the potential hurdles that would have cropped up had Class Counsel elected to pursue this matter to trial.  Even though this particular litigation was not lengthy, the Court finds that the duration of the related matters against ATTM along with the complexity of the legal issues involved weighs in favor of awarding the requested amount of fees.

### 5.    Risk of Nonpayment

Class Counsel submits that it undertook this litigation on a contingent fee basis, with the risk that it might yield little or no recovery and leave them uncompensated for their efforts.  Certainly, the risk associated with taking a case on contingency is a real and important factor to consider.

Counsel's contingent fee risk is an important factor in determining

-38-

> the fee award. Success is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable. Counsel advanced all of the costs of litigation, a not insubstantial amount, and bore the additional risk of unsuccessful prosecution.

In re Prudential-Bache Energy Income P'ships Sec. Litig., No. 888, 1994 WL 202394, at *6 (E.D. La. May 18, 1994). Indeed, "[t]he contingent fee agreement further substantiates the propriety of the attorneys' fee award." In re Genta Sec. Litig., No. 04-2123, 2008 WL 2229843, at *10 (D.N.J. May 28, 2008); see also In re Pet Food Prods. Liab. Litig., No. 07-2867, 2008 WL 4937632, at *22 (D.N.J. Nov. 18, 2008) ("Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees."). The risk of nonpayment here, as with most contingency work, was high (as was Class Counsel's substantial out-of-pocket litigation expenses, which totaled over $500,000). Given the legal defenses available to ATTM – including its position on whether the claims asserted herein are subject to arbitration, as well as its potential counterclaim for actual damages – along with the oft-noted hurdles associated with certifying a class and proving liability, this factor is solidly in favor of approval.

**6.     Amount of Time Devoted to Case by Plaintiffs' Counsel**

The sixth Gunter factor is the "amount of time devoted to the case by plaintiffs' counsel." Gunter, 223 F.3d at 195 n.1. Class Counsel submits a summary of fees and expenses totaling 18,617.815 hours,[25] equaling $7,657,654.35 in lodestar and $506,943.75 in expenses. (Docket Entry No. 522-1 (Decl. of Strange Decl., ¶ 9)). The attorneys comprising this massive hourly bill break

---

[25] After adding up the hours submitted, this Court reaches a total which is less than that submitted by Class Counsel – 17,617.975. Because the Court utilizes a percentage-of-recovery method in calculating the attorney fee award (and relies on the lodestar method merely as a cross-check to assess its reasonableness) this discrepancy is immaterial.

down as follows:

| ATTORNEY | HOURS | LODESTAR ($) | EXPENSES ($) |
|---|---|---|---|
| Strange & Carpenter | 3,248.98 | $1,727,953.00 | $47,507.55 |
| Carella, Byrne | 750.7 | $484,810.00 | $6,493.37 |
| Phillip Bock | 1,415.40 | $492,852.50 | $75,479.96 |
| Scott Bursor | 504.5 | $290,983.50 | $966.94 |
| Joshua P. Davis | 26.275 | $15,765 | |
| Robert J. Evola | 6,300.88 | $1,098,709.45 | $136,276.43 |
| Nadeem Faruqi | 235.50 | $134,856.25 | $528.85 |
| Anthony Ferrigno | 406.7 | $230,832.00 | $9,541.72 |
| J. David Franklin | 771.25 | $920,966.80 | $70,041.11 |
| Pamela Gilbert | 150.99 | $72,670.60 | $4,161.29 |
| Carl Hilliard | 193.5 | $125,775.00 | $1,807.00 |
| Barry L. Kramer | 1,267.3 | $899,725.00 | $17,414.10 |
| Bramson, Plutzik | 1,580.70 | $777,336.50 | $112,885.73 |
| Marc G. Reich | 177 | $79,361.25 | $1,254.16 |
| Paul M. Weiss | 460.7 | $217,729.00 | $21,059.93 |
| Stephen A. Weiss | 127.60 | $87,329.00 | $1,495.61 |

(Docket Entry No. 522-2, Strange Decl., Ex. 2).

This Court has evaluated the time summaries provided by the various attorneys identified above. Although the Court is generally satisfied with the declarations submitted in support of Class Counsel's fee application, the Court does, however, note its concern with the claimed hours and lodestar submitted by Stephen Weiss on behalf of the Law Firm of Seeger Weiss, LLP. Seeger Weiss, which serves as interim co-lead counsel in this matter, appears to have logged 127.60 hours,

-40-

equating to a lodestar of $87,329.00.  The Declaration of Stephen Weiss submitted in support of this figure provides the Court with no basis on which to assess this lodestar.   Although Mr. Weiss attaches a document which  states the attorney's name, their rate of compensation and the number of hours they billed in connection with the instant matter, Mr. Weiss's declaration fails to specify: (a) even general categories of work to which such hours are attributable, and (b) any specific contributions made by Seeger Weiss, LLP to the instant matter.  Given its lack of any factual detail, whatsoever, the Weiss Declaration is of little value to the Court in evaluating this Gunter factor.

Notwithstanding the Court's concern with the Weiss Declaration, the Court is satisfied that this factor supports a fee award in the amount requested. [26]  Thus, the Court finds this factor to weigh in support of awarding fees.

### 7.   Awards in Similar Cases

With respect to this final factor, the court must (1) compare the award requested with other awards in comparable settlements; and (2) ensure that the award is consistent with what the attorney would have received had the fee been negotiated on the open market.  See, e.g., McGee v. Continental Tire North Am., Inc., No. 06-6234, 2009 WL 539893, at *15 (D.N.J. March 4, 2009). As to the first inquiry, "most fees appear to fall in the range of nineteen to forty-five percent."  In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000).  The Court is aware that 33 1/3% is a standard figure for recovery in a consumer class action of the contingent-fee variety. See, e.g., Martin v. Foster Wheeler Energy Corp., No. 06-878, 2008 WL 906472, at *5 (M.D. Pa. March 31, 2008) (noting that for a settlement of $1.64 million "district courts have typically awarded

---

[26] In doing so, the Court notes the relatively small impact of the lodestar submitted by Seeger Weiss, LLP on Class Counsel's total lodestar.

attorneys' fees of 30% to 35% of the recovery, plus expenses…"); In re Corel Corp. Sec. Litig., 293 F. Supp. 2d 484, 495-98 (E.D. Pa. 2003) (awarding one-third of $7 million settlement fund).

The requested fee of 33 1/3 % is also consistent with a privately negotiated contingent fee in the marketplace.  "Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation." In re Remeron Direct Purchaser Antitrust Litig., No. 03-085, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005); see also In re Orthopedic Bone Screws Prods. Liab. Litig., 2000 WL 1622741, at *7 (E.D. Pa. Oct. 23, 2000) (noting that "plaintiffs' counsel in private contingency fee cases regularly negotiate agreements providing for thirty to forty percent of any recovery.").  Thus, the requested fee award is strongly supported by both subparts to this final Gunter factor.

### 8.   Conclusion

Application of the Gunter factors confirms the reasonableness of Class Counsel's requested 33 1/3 % fee award.  All seven of the Gunter factors, to varying degrees, militate in favor of approving the fee award requested.  The lack of any notable objections along with the complexity of the case, the substantial settlement, the contingency risk associated with nonpayment, and the fact that several courts in similar matters have awarded fees in this amount all indicate that approval of a 33 1/3% fee is warranted.

### B.   Lodestar Cross-Check

In common-fund cases, district courts are also advised to cross-check the percentage fee award against the lodestar method of awarding fees so as to ensure that the percentage is not unreasonable.  Gunter, 223 F.3d at 199.  "The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." AT&T, 455 F.3d

at 164.  The lodestar multiplier is calculated by dividing the attorneys' fees that Class Counsel seeks by Class Counsel's associated lodestar.  <u>See, e.g.</u>, <u>Cullen v. Whitman Med. Corp.</u>, 197 F.R.D. 136 n.6 (E.D. Pa. 2000).

As indicated above, the total time claimed by Class Counsel is 18,617.815 hours for a lodestar of $7,657,654.35 and a lodestar multiplier of .78.  Thus, the attorney fee award requested does not even cover the entire lodestar.  Even deducting the lodestar submitted by Seeger Weiss ($87,329.00) yields a lodestar for Class Counsel of $7,570,325.35 and a multiplier of .79.   The Third Circuit has noted that "[m]ultiples ranging from one to four are frequently awarded in common fund cases where the lodestar method is applied."  <u>In re Prudential</u>, 148 F.3d at 341.  In fact, in <u>Cendant PRIDES</u>, the Third Circuit approved a lodestar multiplier of 2.99 in a case it described as "relatively simple in terms of proof" in which "discovery was virtually nonexistent."  <u>Cendant PRIDES</u>, 243 F.3d at 735-36; <u>see also</u>  <u>AT&T</u>, 455 F.3d at 173 (discussing the reasonableness of the <u>Cendant PRIDES</u> multiplier).  A multiplier of less than one, as is the case here, is therefore quite reasonable for a lodestar.

Finally, the Court reiterates that "this is only a cross-check and a not a full lodestar analysis." <u>In re Linerboard Antitrust Litig.</u>, No. MDL 1261, 2004 WL 1221350, at *15 (E.D. Pa. June 2, 2004). To delve deeply into the thousands of hours claimed by the many attorneys involved in this matter would undermine the Court's reliance on the percentage-of-recovery method.  Thus, while this Court has raised questions as to some of the hours claimed within Class Counsel's fee petition, the fact of the matter is that the hours claimed more than satisfy the lodestar cross-check for percentage-of-recovery purposes.   As a result, regardless of the reliability of some of the hours submitted, the cross-check fully supports a fee award in the amount of $6,000,000.

### C.      Allocation of the $6,000,000 Fee Award

Generally, appointed Class Counsel is tasked with the responsibility of allocating the aggregate fee award to the various non-lead counsel who played a role in producing the settlement. The "submission of a combined fee application with actual allocation to be made by lead counsel has generally been adopted by the courts." In re Linerboard, 2004 WL 1221350, at *17.  "From the standpoint of judicial economy, leaving allocation to such counsel makes sense because it relieves the Court of the 'difficult task of assessing counsel's relative contributions.' " Id. (quoting In re Prudential, 148 F.3d at 329 n.96.)  Indeed, this general method of allocating fees is embedded in the Settlement Agreement, which provides that "Class Counsel shall be solely responsible for further distributing, to ETF Counsel and otherwise, any payments made" in connection with the Court's award of attorney's fees and costs. See Settlement Agreement at 25-26.  Accordingly, the Court allocates the fee award of $6,000,000 to Class Counsel, in its entirety.  Class Counsel is hereby vested with the discretion to distribute the fee award to those attorneys who assisted in creation of the present Settlement fund.

### D.      Expenses

Class Counsel requests $506,943.75 in out-of-pocket litigation expenses.  Expenses are recovered if they are adequately documented and reasonable in nature. In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001) ("Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action.") (citing Abrams v. Lightolier, Inc., 50 F.3d 1204, 1225 (3d Cir. 1995)).  Courts have generally approved expenses arising from photocopying, use of the telephone and fax, postage, witness fees, and hiring of consultants.  Abrams, 50 F.3d at 1225;

Cullen, 197 F.R.D. at 151.  The Court has closely reviewed the certifications submitted by the numerous attorneys in support of Class Counsel's request for reimbursement of expenses and finds that each adequately sets forth the specific types and/or categories of out-of-pocket costs comprising the total expenses requested.  Accordingly, Class Counsel's request for reimbursement of out-of-pocket litigation expenses in the amount of $506,943.75 is approved.

### E.    Incentive Awards

Class Counsel also requests that the Court approve the payment of incentive awards for the named Plaintiffs[27] in the amount of $2,000 each, totaling $24,000.  Given the duration of the litigation and the extent of their personal participation, the Court finds that the named Plaintiffs are entitled to compensation above and beyond their recoveries under the Settlement Agreement. As previously discussed, the named Plaintiffs to this action agreed to pursue the claims at issue for the benefit of the entire Class.  The distribution of the incentive award reflects the named Plaintiffs' involvement in the prosecution of the case and in discovery, including, in some instances, depositions.  Therefore, in accordance with Paragraph VI.4 of the Settlement Agreement,[28] the Court approves incentive awards in the amount of $2,000 for each of the named Plaintiffs to be paid out of the Common Fund.

## VI.    Conclusion

For the reasons set forth above, the Court finds that the Settlement in this matter is fair,

---

[27] The named Plaintiffs include: Barry Hall, Roman Sasik, David Dickey, Steven Wright, Jane Waldmann, Robert Wise, Edith Thurman (daughter of the late Plaintiff Jackie Thurman), Richard Chisolm, Mary Pitsikoulis, Debra Lively, Jacqueline Sims, and Kiisha Orr.

[28] See Settlement Agreement at 27, Docket Entry No. 355-4.

reasonable, and adequate and provides a significant recovery to the Class. Additionally, the request

for attorneys' fees in the amount of $6,000,000 is approved, as is Class Counsel's request for

reimbursement of out-of-pocket litigation expenses in the amount of $506,943.75, and Class

Counsel's request for incentive awards for each of the named Plaintiffs in the total amount of

$24,000.

      An appropriate Order accompanies this Opinion.


Date: October 13, 2010               /s/ Jose L. Linares         
                                           Jose L. Linares
                                           UNITED STATES DISTRICT JUDGE